David R. Eastlake
Texas Bar No. 24074165
*david.eastlake@bakerbotts.com*
Meghan Dawson McElvy
Texas Bar No. 24065127
*meghan.mcelvy@bakerbotts.com*
Travis James Sales
Texas Bar No. 17532080
*travis.sales@bakerbotts.com*
Christopher J. Tutunjian
Texas Bar No. 24110460
*christopher.tutunjian@bakerbotts.com*
BAKER BOTTS L.L.P.
910 Louisiana St., Suite 3200
Houston, Texas 77002
Telephone:      (713) 229-1234
Facsimile:      (713) 229-1522

*Counsel for Petitioning Creditor Steven A. Webster*

David Brian Miller
Texas Bar No. 00788057
*david@schneidlaw.com*
SCHNEIDER MILLER REYNOLDS, PC
300 N. Coit Rd., Suite 1125
Richardson, Texas 75080
Telephone:      (972) 479-1112
Facsimile:      (972) 479-1113

*Counsel for Petitioning Creditors Debra and Russell Van Cleve and Angela Garbiso*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **DENNIS JAMES ROGERS II,** | § | **Case No. 22-30500-7** |
| | § | |
| **Alleged Debtor.** | § | **(Involuntary Proceeding)** |

## PETITIONING CREDITORS' EMERGENCY MOTION
## FOR ENTRY OF AN ORDER (I) APPOINTING AN INTERIM TRUSTEE
## UNDER 11 U.S.C. § 303(G) AND (II) GRANTING EMERGENCY RELIEF

Steven A. Webster ("Webster"), Debra and Russell Van Cleve (together, the "Van Cleves"), and Angela Garbiso ("Garbiso," and together with Webster and the Van Cleves, the "Petitioning Creditors") hereby file this emergency motion (the "Emergency Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105(a) and 303(g) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rule 2001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) appointing an interim Chapter 7 trustee and (b) granting related relief, and respectfully move as follows:

## I.    PRELIMINARY STATEMENT

1.      In this involuntary bankruptcy case, there is no question that the alleged debtor —

Dennis James Rogers II ("Rogers"), a Dallas resident — has not and is not paying his debts as they

become due.  Indeed, in his sworn post-judgment interrogatory answers, Rogers admitted to owing

over $21 million to twenty-eight creditors, all of which he described as "past due."  Of those, at

least thirteen have sued Rogers and various Texas-based companies that he *alone* owns and

operates and, of those, nine have obtained final judgments or default judgments against him, or

against him and his companies jointly and severally, totaling over $13.9 million (excluding interest

and attorneys' fees awarded by the trial courts).[1]  By contrast, in those same sworn interrogatory

answers, Rogers disclosed that he has only approximately $24,000 in annual income compared to

approximately $120,000 to $150,000 in annual expenses (*i.e.*, −$96,000 to −$126,000 in annual

net income).

2.      The extraordinary remedy of appointment of an interim chapter 7 trustee is justified

and necessary in this case because Rogers' accumulation of unpaid debts is due largely to a series

of intentional and dishonest schemes that he has perpetrated individually and through his

wholly-owned companies as instrumentalities of fraud.  Specifically, through his schemes — all

variations on a similar theme — Rogers induced numerous people to invest (and frequently

reinvest) in fictitious business opportunities that typically (i) involved loans or advances for the

purchase and sale of wholesale fuel or commercial water rights, (ii) promised a high rate of return

over a short time period, and (iii) were backed by personal guarantees from Rogers.

3.      Thus, for example, Petitioning Creditor Webster and his associate Dennis Woods

("Woods") advanced one of Rogers' wholly-owned companies, OMTC, Inc. ("OMTC"),

---

[1]      These judgments are against Rogers or against him and certain entities of which he is the sole member and owner, jointly and severally.

$6,552,000 to be used to purchase allocations of fuel in an auction that never in fact occurred, only to have Rogers immediately transfer the funds from OMTC to his personal checking account. From there, Rogers used the funds on various personal expenses or endeavors, including: buying two tracts of valuable real property in Dallas, paying an architect, paying the legal fees of his defense attorneys in pending lawsuits, paying personal credit card debt, withdrawing $560,000 in cash, and transferring funds to his personal Robinhood investment account and various other personal accounts. All the while, Rogers repeatedly lied to Webster and Woods regarding the return of their funds and even sent fake wire transfer confirmations to give the false appearance that the funds would be returned to them imminently. In the Agreed Final Judgment, Rogers stipulates to having committed fraud against Webster.

4. Petitioning Creditors the Van Cleves and Garbiso, residents of California, collectively invested approximately $300,000 with Bootstrap Ventures, LLC ("Bootstrap Ventures")[2] for an alleged water rights deal that promised a high rate of return in a short time, backed by personal guarantees from Rogers. Consistent with his *modus operandi*, once the loans matured, the pleadings reflect that Rogers repeatedly promised that the funds would be returned within a matter of days (but they never were) and provided a litany of fake excuses for why the return of their funds was delayed. Under the Final Judgement, Rogers and Bootstrap Ventures jointly and severally owe the Van Cleves and Garbiso over $370,000 in the aggregate.

5. As detailed below, the lawsuits from Rogers' other unpaid creditors follow a similar pattern of deception and dishonesty that often include claims of fraud, theft, and conversion — not merely run-of-the-mill breach of contract claims. Collectively, this pattern of conduct establishes

---

[2]      Rogers is listed as the sole managing member of Bootstrap Ventures. *See* Ex. C, Bootstrap Ventures Texas Secretary of State Filing.

an urgent need for the appointment of an interim Chapter 7 trustee to preserve the property of Rogers' estate and prevent Rogers from further deceiving and concealing from his creditors the truth of what he has done with all the money he took and refused to pay back.

6. Rogers' sworn post-judgment interrogatory answers in the Webster matter give the impression that he has few non-exempt assets (two non-luxury vehicles, furniture, clothes, his wedding band, and sundry electronics). In a similar vein, Webster's attempts to enforce his judgment through various post-judgment garnishment proceedings against Rogers' personal bank accounts have thus far yielded $170,956 in judgments, of which only $8,047.91 has been turned over. This does not reconcile with the magnitude of funds Rogers misappropriated and raises serious concerns that he may have siphoned away substantial personal and/or business assets to intentionally put them out of the reach of his creditors. Also troubling is the fact that Rogers and his wife Allison established a trust called the Montaña Amorosa Revocable Trust (the "Montaña Trust") in August 2019 — as litigation against Rogers and his companies was mounting — to hold title to two, valuable adjoining real property lots in the Hillcrest area of Dallas (and potentially more).

7. Rogers also has a history of exhibiting dishonesty and obfuscation in judicial proceedings. In his deposition in the Webster lawsuit, Rogers invoked the Fifth Amendment in response to nearly all substantive questions. He did the same in response to Webster's post-judgment discovery requests until the court overruled all of his (and OMTC's) Fifth Amendment objections and compelled Rogers to answer them. Even then, Rogers refused to comply with the court's order, forcing Webster to file not one, but two motions for contempt and sanctions — the latter resulting in the trial court confining him to jail for two weeks. Rogers also

twice violated the trial court's temporary injunctions by using or allowing funds to be transferred from frozen accounts.

8.     The totality of these circumstances demonstrates that Rogers is not trustworthy enough to be left in control of his accounts or his businesses during the "gap period."  Additionally, there is significant confusion about where all the money Rogers took from his creditors has gone. The Petitioning Creditors respectfully urge the appointment of an interim Chapter 7 trustee.

## II.     JURISDICTION AND VENUE

9.     The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this Emergency Motion pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

10.     The bases for the relief requested herein are sections 105(a) and 303(g) of the Bankruptcy Code and Rule 2001 of the Bankruptcy Rules.

## III.     PROCEDURAL BACKGROUND

11.     On March 22, 2022, (the "Petition Date"), the Petitioning Creditors filed an involuntary petition for relief against alleged debtor Dennis James Rogers, II (the "Alleged Debtor" or "Rogers") under chapter 7 of the Bankruptcy Code in this Court.

12.     The Petitioning Creditors hold unsecured claims in excess of $6.7 million (exclusive of attorneys' fees and interest) in the aggregate that are neither contingent as to liability nor the subject of a bona fide dispute.  The Petitioning Creditors filed this involuntary chapter 7 case because (a) the Alleged Debtor has generally *not* been paying his debts as they become due (including, without limitation, debts owed to the Petitioning Creditors) and (b) such action was necessary to preserve the Alleged Debtor's estate and prevent any further loss that would harm

creditors, including dissipation of estate assets (fraudulently or otherwise) that could fund recoveries.

## IV. FACTUAL BACKGROUND

13. Since 2017, Rogers, individually and through various companies he solely owns and operates, has perpetrated a series of schemes to induce numerous individuals and entities to invest over $10 million in fake business opportunities. Most of these schemes have involved the supposed purchase or sale of wholesale fuel or water rights and promises of guaranteed returns over a short time backed by personal guarantees from Rogers. Rather than using the funds in a legitimate manner for the stated purposes, Rogers spent or absconded with them. Numerous individuals and entities, including the Petitioning Creditors, have never been repaid.

14. In turn, this led to a string of lawsuits by his unpaid creditors, which have resulted in six judgments in favor of ten creditors totaling approximately $13.9 million (excluding interest and attorneys' fees) that are now final and undisputed.

## A. Rogers Scams Webster and his Associate, Woods

15. Webster, along with his associate Woods, invest in the energy sector. In June 2020, Rogers approached Webster and Woods — through Webster's son, Aaron Webster (a fuels and commodities trader and shipper) — and told them that a large energy and commodities company called Vitol, Inc. ("Vitol") had decided to exit a large fuel position that it held in the Port of Brownsville, Texas. Rogers claimed that Vitol was hosting an auction through which potential buyers would bid for allocations of its fuel positions, and that Vitol had invited him to participate in the auction on behalf of prospective buyers.

16.     Rogers, through his solely owned business entity OMTC[3] offered to act as an intermediary and agent, and Webster and Woods agreed to post funds to reserve an allocation of various refined fuels offered through the auction.  Rogers told them that, in order to participate in the auction, an upfront cash deposit was required.  Should they decide to terminate their purchase of the fuel during the option period, Rogers agreed to immediately request the return of funds from Vitol and remit the funds to Webster and Woods within one banking day.

17.     Webster and Woods deposited $4,410,000 and $2,142,000, respectively, for a total of $6,552,000, into OMTC's Chase bank account ending in xxx7879 to participate in the purported Vitol auction.  Rogers claimed to have transferred these funds to Vitol and to have participated in the purported Vitol auction.  But before any deal with Vitol was consummated, Rogers recommended the purchases be terminated (supposedly owing to less favorable commercial terms than originally anticipated).  Webster and Woods agreed, expecting their funds to be returned within one banking day per the terms of their agreements with OMTC.  Rogers claimed to have notified Vitol of such decision, purportedly initiating the process of Vitol's return of the Funds to OMTC.

18.     In reality, Rogers' and OMTC's representations about the Vitol auction were simply untrue.  Rogers fabricated the event as part of a scheme to defraud Webster and Woods. *See* Ex. D (11/25/20 Vitol Cease & Desist Letter).

19.     Rogers failed to remit the funds within one banking day.  Webster and Woods, individually and through counsel, repeatedly contacted Rogers to inquire about why their funds have not been timely returned.  In response, while repeatedly and fully admitting that he owed

---

[3]     Rogers admitted in his deposition that he is the sole director, shareholder, and employee of OMTC and is the only person with access to and control over OMTC's bank account.  *See* Ex. E at 16, 25-29, 32 (Excerpts of 12/8/20 Rogers Deposition); *see also* Ex. F, OMTC Amended Certificate of Formation.

Webster and Woods the full $6,552,000 due, Rogers communicated to them, verbally and in writing, a wide array of excuses and misrepresentations.

20.     Rogers made multiple promises to pay, and on multiple occasions, he purported to provide wire confirmations indicating that transfers of the funds were on their way to Webster and Woods.  However, when the transfers never reached Webster's and Woods's bank accounts, Rogers concocted various lies for why he was unable to remit the funds, such as claiming that he had mistakenly provided the wrong account information or that there was a delay on Chase bank's end.  To keep up the ruse, Rogers went so far as sending fake Fedwire reference numbers and altering Goldman Sachs wire transfer confirmation emails to give the false impression to Webster and Woods that he had (or was attempting to) return the Funds.  *See* Ex. G (Goldman Sachs Wire Transfer Confirmations); Ex. H (Goldman Sachs Emails); Ex. I at 47-72, 87-94 (Excerpts of Deposition of Ryan McDonnell, Rogers' Goldman Sachs Representative) (testifying, among other things, as to his belief that Rogers had altered Goldman Sachs wire transfer confirmations and related emails).

21.     As a result, Webster and Woods filed suit against Rogers and OMTC in the 191st District Court of Dallas County, Texas (the "State Court") for, among other claims, breach of contract and fraud.  *See* Ex. J (Webster 2d Am. Petition).  Woods's funds ($2.142 million) were returned on the eve of the parties' temporary restraining order hearing, at which the State Court agreed to freeze several of Rogers' and OMTC's bank accounts involved in the scheme.  Rogers, however, has never repaid Webster his $4.41 million or the $6.25 million plus attorneys' fees and interest owed under the Agreed Final Judgment.

22.     In discovery, Webster obtained Rogers' and OMTC's bank records, which showed what actually happened to their funds.  On June 19, 2020 — the *same* date that OMTC received

Webster's and Woods's $6,552,000 — Rogers transferred $6,550,000 (all but $2,000 of the funds) to his personal Chase checking account ending in xxx1503, which at that time had a beginning balance of $7,057.93. *See* Ex. K at 12, 31 (Chase Bank Records).

23.     Rogers then used account xxx1503 as a launch pad to spend or transfer substantially all of Webster's and Woods's funds toward, among other things:  buying valuable, residential property in Dallas for approximately $1.7 million; paying an architect; paying the legal fees of his defense attorneys in pending lawsuits; paying personal credit card debt; withdrawing $560,000 in cash; and transferring funds to his personal Robinhood investment account and various other personal accounts. *See* Ex. K at 12-13 (Chase Bank Records).

24.     In addition, between June and July 2020, Rogers transferred a total of $2,497,000 to Mandarin Capital LLC ("Mandarin Capital").  As discussed below at paragraphs 35 and 36, Mandarin Capital is another alleged creditor of Rogers that purportedly loaned him over $6 million that has not been repaid.  Mandarin Capital was closely involved in Rogers' purchase of the two residential property lots in Dallas, at least one of which was purchased directly with funds Rogers unlawfully took from Webster.  Notably, Mandarin Capital is based in Utah and uses as its registered agent a law firm called McCullough Sparks, which markets itself as having expertise in the formation of asset protection trusts. *See* Ex. L (Mandarin Capital Registered Agent Filing); Ex. M (McCullough Law website excerpt promoting asset protection trusts that protect debtors from "future legal action against you and your heirs"); Ex. N (McCullough Sparks brochure for "541Trust – Superior Asset Protection" designed to "protect[] assets from a person's potential future liabilities by removing assets from the person's legal ownership")  Of related concern is the fact that, in August 2019, as litigation against him and his companies began to increase, Rogers

and his wife established the Montaña Trust. *See* Ex. O (Montaña Amorosa Revocable Trust Agreement).

25. Throughout discovery in Webster's lawsuit, Rogers refused to answer most substantive questions and instead invoked the Fifth Amendment. *See* Ex. E at 7, 145-72, 181-205 (Excerpts of 12/8/20 Rogers Deposition). When Rogers violated the terms of the State Court's temporary injunction restraining him from transferring funds out of certain bank accounts, Webster was forced to file a motion for contempt and sanctions, which the parties resolved through an agreed amended temporary injunction, the substance of which remained in effect until after entry of the Agreed Final Judgment discussed below in paragraph 27.

26. Eventually, on January 14, 2021, Webster and Rogers reached a settlement agreement under which Rogers agreed to pay Webster $5.25 million by March 1, 2021 in exchange for a full and final release of Webster's claims. *See* Ex. P at 1-2 (Webster Settlement Agreement). If he failed to do so, Rogers agreed that Webster could file with the State Court an Agreed Final Judgment entitling Webster to $6.25 million in compensatory damages and other relief. *Id.* at 2.

27. When Rogers failed to pay the settlement amount, and the State Court entered the Agreed Final Judgment. *See* Ex. Q (Webster Agreed Final Judgment). Critically, in this Agreed Final Judgment, Rogers admitted (and the State Court found) that he committed fraud:

> With regard to Steven Webster's fraud claims against Rogers, the Court has determined that **Rogers made representations to Steven Webster, which representations Rogers knew to be false, with the intent to deceive Steven Webster**. The Court has further determined that Steven Webster actually and justifiably relied on Rogers' false representations and sustained a loss as a proximate result thereof.
>
> . . .
>
> Additionally, as discussed above, the Court has determined and the Parties have agreed that one or more of the Steven Webster's claims

are of such character and nature that they cannot be discharged in bankruptcy under title 11 of the United States Code (the "Bankruptcy Code"), including but not limited to, under sections 523, 727, and 1328 of the Bankruptcy Code. Defendants voluntarily, knowingly, and intentionally waive all claims and defenses to the nondischargeability of such claims in a bankruptcy.

This judgment is binding on Defendants' heirs, successors, assigns, and any trustee or similar person appointed in any case under [*sic*] commenced under the Bankruptcy Code.

The Parties intend for the factual stipulations made in this judgment to have a preclusive effect in subsequent proceedings, including, but not limited to, in any bankruptcy case of the Defendants.

*Id.* at 3-4.

28.     After entry of the Agreed Final Judgment, Webster learned that, during the course of the litigation, Rogers had again violated the State Court's temporary injunction by transferring over $7,000 out of one of his frozen bank accounts.  Webster again filed a motion for contempt and sanctions against Rogers.  In its Judgment of Contempt, the State Court found that Rogers had violated its temporary injunction.  *See* Ex. R (9/8/21 Contempt Order).  Specifically, the State Court found that "Rogers violated the terms of the [temporary injunction] by transferring or causing to be transferred $7,644.00 out of OMTC's Chase Bank account with account number ending in xxx7879."  *Id.* at 3.  During the contempt hearing, Rogers stated that he did not recall moving the funds out of the account, but did not deny that he was the sole person with access to and control over it, and provided no other credible basis for the transfer of the funds besides his own intentional acts.  The State Court therefore found Rogers to be in criminal and civil contempt. *Id.*

29.     After entry of the Agreed Final Judgment on March 4, 2021, Rogers continued his evasiveness and refused to pay Webster or substantively and comprehensively respond to his post-judgment discovery requests (served on March 5, 2021).  Webster was forced to file a motion

to compel Rogers' responses when he again invoked the Fifth Amendment and objected to nearly all requests.  The State Court granted Webster's motion and overruled all of Rogers' improper Fifth Amendment objections, but Rogers still refused to respond.

30.    As a result, Webster moved for the third time to hold Rogers in contempt for violating the State Court's order compelling Rogers' responses.  The State Court granted the motion, finding that Rogers had violated its order to compel, as well as its previous judgment of contempt.  *See* Ex. S (11/18/21 Contempt Order).  The State Court found that Rogers "has repeatedly and knowingly disregarded and disobeyed [its] orders," doing so even after he "has already been held in contempt of court for knowingly violating orders of this Court and even after that finding, has failed to obey the valid orders of this Court."  *Id.* at 1.  The State Court found that "Rogers' behavior affronts the dignity and authority of this Court and obstructs this Court's administration of justice."  *Id.* at 2.  The State Court then ordered Rogers confined in Dallas County jail until he had provided his post-judgment discovery responses.  *Id.*

31.    After being released from jail two weeks later, Rogers finally provided responses to Webster's post-judgment discovery requests — over **nine months** after they were served.  In his sworn interrogatory answers, served on December 10, 2021, Rogers disclosed that he had over $21 million in "past due" debts to twenty-eight creditors.  *See* Ex. T (Rogers Verified Interrogatory Answers & Exhibits, at Exhibit B, List of Rogers Known Creditors).  At the same time, Rogers stated that he had little non-exempt personal property and negative annual net income of approximately -$96,000 to $126,000.  *See* Ex. T (Rogers Verified Interrogatory Answers & Exhibits, at Answer No. 4 & Exhibits, at Exhibit C, Summary of Dennis Rogers' Cash and Accounts).  Having never been paid and learning of Rogers' meager alleged assets and income in comparison to his creditor obligations, and having serious concerns that Rogers may have

absconded with his assets to intentionally put them out of the reach of his creditors, the Petitioning Creditors were left with no alternative but to commence this involuntary bankruptcy proceeding.

**B.     Rogers Scams the Van Cleves and Garbiso**

32.     In the summer of 2020, the Van Cleves and Garbiso met Rogers, who claimed that his company, Bootstrap Ventures, had experience with investment opportunities buying and selling water rights.  Rogers represented that he needed capital for a deal that would close quickly and that a buyer was already lined up.  On or about September 4, 2020, Garbiso loaned $200,000 to Bootstrap Ventures, secured by a promissory note personally guaranteed by Rogers.  When it became due, she was convinced to "roll over" the original loan and executed a second loan in the amount of $228,000, also personally guaranteed by Rogers.  On or about September 25, 2020, the Van Cleves loaned $50,000 to Bootstrap Ventures on similar terms.  All three loans went into default and Rogers repeatedly represented that full payments would occur in a matter of days, but they never did.  The victims brought claims for breach of contract, breach of guarantee, and common law fraud.  In the Final Judgment, Rogers and Bootstrap Ventures jointly and severally owe (1) Garbiso a total of $294,813.36, and (2) the Van Cleves a total of $64,652.05 (exclusive of attorneys' fees and pre- and post-judgment interest).  Rogers did not appeal this judgment, and it is now final.

**C.     Rogers Has Scammed Numerous Other Parties in Similar Ways**

33.     As discussed above, Rogers has perpetrated his scheme against numerous other parties in Texas and other states, which resulted in many lawsuits against Rogers and his businesses.  Petitioning Creditors do not have personal knowledge of all the facts underlying all the lawsuits against Rogers and, thus, summarize them below according to the publicly available pleadings.  While pleadings are of course not evidence, the consistent pattern of the allegations and claims against Rogers is telling in and of itself.

34. _Cause No. DC-21-00960; Faulkner v. Rogers et al.; in the 116th District Court in Dallas County, Texas (filed January 22, 2021)._ In September 2020, Rogers approached Scott Faulkner ("Faulkner") about an investment opportunity that Bootstrap Ventures had identified. Rogers claimed he had secured the opportunity to purchase water rights in New Mexico and a buyer to whom they could immediately re-sell the water rights; but he needed $5,500,000 in liquid capital to close the transaction. Faulkner invested in the project and wired Rogers $200,000. When Rogers told him that additional funds were needed to close the transaction, Faulkner wired an additional $190,000. After he repeatedly asked about the status of the transaction, it became apparent that it was not going to close, and Faulkner requested the return of his money. Rogers responded by making numerous false representations, including not showing up to meetings at the bank, sending edited or fake screenshots of purported transfers or wires of funds that were allegedly going to be used to repay Faulkner, and lying about having COVID-19 to avoid meeting with Faulkner. On December 15, 2020, the parties executed a settlement agreement that provided for Rogers to pay Faulkner a total of $450,000 in seven installments. After paying the first installment, Rogers began to lie again and attempt to delay further payments. Faulkner then brought suit for fraud, statutory fraud, conversion, and breach of contract. _See_ Ex. U at 16-23 (Faulkner Petition). The parties reached an Agreed Final Judgment entitling Faulkner to recover $430,000, wherein the Court found, among other things, that: "Plaintiff [Faulkner] is entitled to recover from Defendants [Rogers and Bootstrap Ventures], jointly and severally, for his cause of action for statutory fraud . . . [and] for his cause of action for theft/conversion . . . ." _See_ Ex. V at 1-2 (Faulkner Agreed Final Judgment). Rogers did not appeal this judgment and it is now final.

35. _Civil No. 200907123; Mandarin Capital, LLC v. Montana Amorosa Revocable Trust et al.; in the Third Judicial District Court for Salt Lake County, Utah (filed November 16,_

2020). Jason Meyer ("Meyer"), the principal of Mandarin Capital, met Rogers through a mutual friend in 2019. In July 2020, Rogers indicated that a large client, Midfrisian Dairy ("Midfrisian"), was building a factory in New Mexico that required over 1,000 acre-feet of water, for which it would pay over $10 million. Rogers represented that Midfrisian had ample funds to cover the purchase and guaranteed that Mandarin Capital's funds would sit in escrow until Rogers had identified the water rights and be returned, regardless of the success of Midfrisian.

36. Based on these and other representations, Mandarin Capital loaned Rogers $5,000,000 on July 24, 2020, with a requirement that Rogers repay the loan plus $600,000 in fees by November 15, 2020. In August 2020, Rogers stated he secured the water rights, but the project expanded, and he requested an additional $1.4 million, to which Mandarin Capital agreed in exchange for additional loan fees of $168,000. On September 21, 2020, Rogers claimed that he wired Mandarin Capital $8.35 million, but no such transfers were received. The funds have never been repaid, and Meyer believes the New Mexico transaction was fake. Mandarin Capital sued Rogers and the Montaña Trust for breach of contract, breach of personal guarantees, common law fraud, and negligent misrepresentation. *See* Ex. W at 86-153 (Mandarin Capital Complaint). Based on a Stipulated Judgment by Confession, judgment was entered in Mandarin Capital's favor for $6,446,086 (excluding attorneys' fees and costs). *See* Ex. X at 1 (Mandarin Capital Judgment). Rogers did not appeal this judgment and it is now final.[4]

---

[4]      On December 10, 2021, Mandarin Capital also sued Steven Webster, Aaron Webster, and Dennis Woods, individually, and Rogers, individually and as trustee of the Montaña Trust. In the lawsuit, Mandarin Capital seeks a declaration that Steve Webster's abstract of judgment is invalid as it relates to the two tracts of property in Dallas that Rogers purchased, and also seeks judicial foreclosure on those same tracts. Webster opposes Mandarin Capital's claims in part because Rogers appears to have purchased at least one of the tracts with Webster's money without his knowledge or consent as part of a fraudulent scheme, and also because the extent of the business relationship between Mandarin Capital and Rogers is unclear and it has not yet been determined whether and to what extent, if any, Mandarin Capital or its principal, Jason Meyer, played a role in or knew or reasonably should have known through appropriate due diligence of Rogers' fraudulent scheme against Webster.

37.    Case No. 19LBCV00725; *ACMC Finance and Trade LLC v. Energy Trading Co. LLC et al.*; In the Superior Court of California, County of Los Angeles (filed December 20, 2019). In September 2017, ACMC Finance ("ACMC") loaned $2,450,000 to a company for which Rogers served as intermediary, Energy Trading Company LLC ("Energy Trading"), in connection with oil ventures. Energy Trading refused to pay back the loan, and Rogers deliberately made false representations to extend the loan, providing assurances that it would be repaid. ACMC sued Rogers for, *inter alia*, money had and received, promissory fraud – fraud in the inducement, fraud – intentional misrepresentation, negligent misrepresentation, and conversion. *See* Ex. Y at 65-70, 88-142 (ACMC 1st Am. Complaint). The court granted ACMC's motion for summary adjudication as to its cause of action for intentional fraud against Rogers, *see* Ex. Z (ACMC Motion for Summary Adjudication) and Ex. AA (ACMC Order on Fraud Claim Against Rogers), and a trial on the remaining claims is scheduled for later this year.

38.    Cause No. DC-21-10421; *Ballanco et al. v. Bootstrap Ventures, LLC et al.*; in the 44th District Court in Dallas County, Texas (filed August 6, 2021). In 2020, Rogers presented Gerard Ballanco Jr. ("Ballanco"), David Meche ("Meche"), and Perry Judice ("Judice") with an opportunity to make short term loans with Bootstrap Ventures to facilitate transactions to "flip" water rights in New Mexico. Rogers represented that the property and buyers had already been identified and all that was needed was the capital to make the transactions happen. Bootstrap Ventures would execute promissory notes and Rogers would personally guarantee the loans. Under these conditions, Judice lent Rogers $100,000 on August 25, 2020 and an additional $100,000 on October 1, 2020; Meche lent Rogers $70,000 on August 20, 2020 and an additional $30,000 on October 7, 2020; and Ballanco lent Rogers $50,000 on August 24, 2020. After each note matured, Rogers and Bootstrap Ventures refused to pay the amounts due and, plaintiffs feared,

may not have even been engaged in the supposed transactions. The victims brought claims for breach of contract, fraudulent misrepresentation of intent to perform, and fraudulent inducement. *See* Ex. BB at 15-35 (Ballanco *et al.* Petition). After reaching a settlement agreement, Rogers breached it and failed to make any required payments. Subsequently, the court signed a Default Judgment against Rogers and Bootstrap Ventures finding that, by default, they admitted to the allegations and were liable for breaches of the promissory notes and related guarantees, fraudulent representations, and fraudulent inducements. *See* Ex. CC at 1 (Ballanco *et al.* Default Judgment). The court also ordered payments of $200,000 to Judice, $100,000 to Meche, and $50,000 to Ballanco (exclusive of attorneys' fees and interest). *See id.* at 2-3. Rogers did not appeal this Default Judgment and it is now final.

39. <u>Case No. A-21-842897-C; *May v. Rogers et al*; in the District Court for Clark County, Nevada (filed October 20, 2021).</u> Rogers approached Tony May ("<u>May</u>") about an investment opportunity with Bootstrap Ventures. On November 24, 2020, May entered into a promissory note with Rogers and Bootstrap Ventures for $50,000 to be paid back in the amount of $54,500 by December 20, 2020. Rogers provided several excuses for not paying back the loan amount, including needing time to finish the deal, illness, and frozen assets. May then brought claims for breach of contract, breach of the covenant of good faith and fair dealing, and fraud/intentional misrepresentation. *See* Ex. DD at 17-42, 49-64 (May 1st Am. Complaint). Default Judgments were entered against Rogers and Bootstrap Ventures. *See* Exs. EE (Rogers Default Judgment) and FF (Bootstrap Ventures Default Judgment). Rogers did not appeal these judgments and they are now final.

40. <u>Civil Action No. 3:21-cv-00013; *Foreman et al. v. Rogers et al.*; in the U.S. District Court for the Northern District of Texas, Dallas Division (filed January 5, 2021).</u> In October 2020,

Rogers approached John S. Foreman, III ("Foreman") with an allegedly lucrative business deal in which Rogers and Bootstrap Ventures needed a short-term loan to fund the capital necessary to fund the acquisition of a water rights deal in New Mexico. Rogers sent Foreman and Andre C. Leblanc ("Leblanc") news articles detailing other potentially lucrative water rights deals Rogers had purportedly closed recently. Foreman and Leblanc agreed to loan Rogers and Bootstrap Ventures $200,000. A week later, Rogers represented that additional capital was needed to finalize the acquisition of the deal and that Foreman and Leblanc would make double their loan as soon as the deal closed, which Rogers claimed was imminent. Foreman and Leblanc loaned an additional $450,000 to Rogers and Bootstrap Ventures, but when the loans became due and payable, neither Rogers nor Bootstrap Ventures made any payments. In response to demands for payment, Rogers falsely told Foreman and Leblanc that he had initiated wire transfers to repay the loans on multiple occasions. Foreman and Leblanc filed suit against Rogers and Bootstrap Ventures alleging breach of contract and common law fraud. *See* Ex. GG at 22-36 (Foreman *et al.* 1st Am. Complaint). A default judgment has been entered against Bootstrap Ventures, and a date for trial against Rogers has not yet been set.

41.     Cause No. 2017DCV0481; *The Steel Corp. of Tex. v. Push Start Industries, LLC et al.*; In the 327th District Court in El Paso County, Texas (filed February 10, 2017). In 2014, Rogers contacted an executive for The Steel Corporation of Texas ("Steel Corp.") regarding an investment opportunity with his company, Push Start Industries LLC ("Push Start"),[5] dealing with the sale of mineral rights. On three occasions over the span of several months, Rogers induced Steel Corp. to invest in purchasing and flipping mineral rights, for a total of $300,000. For over a

---

[5]     Rogers is the only officer, director, or manager of Push Start. *See* Ex. HH, Push Start Texas Franchise Tax Public Information Report.

year, Steel Corp. asked Rogers for updates on the investment, and Rogers offered a list of excuses, such as claiming that he was waiting for his bank to release the funds, promising that he would get the funds from his father, asking for extensions to pay, stating that he was selling his house and liquidating his assets, or ignoring inquiries.  Steel Corp. eventually sued Rogers for intentional misrepresentation, negligent misrepresentation, fraud, conversion, and violation of the Texas Securities Act.  *See* Ex. II at 69-92 (Steel Corp. Petition).  Ultimately, these claims were settled, and the lawsuit was dismissed on May 10, 2017.

42.    Cause No. DC-20-01897; *Funderz.net LLC v. OMTC, Inc. et al.*; in the 191st Judicial District for Dallas County, Texas (filed February 3, 2020).    Funderz.net LLC ("Funderz.net") entered into a series of promissory notes worth $10 million with OMTC to finance the purchase of ultra-low sulfur diesel fuel.  Rogers expressly promised to use the funds to purchase fuel but instead used the funds for personal use and never repaid the loans.  Funderz.net sued Rogers and OMTC for, *inter alia*, breach of contract, breach of guaranty, fraud, fraudulent inducement, conversion, and money had and received.  *See* Ex. JJ at 34-37, 42-44 (Funderz.net 3d Am. Petition).  The parties reached a settlement for $15 million to be paid in installments, but Rogers failed to pay as scheduled.  Although Rogers has now repaid $11.5 million of that debt, a jury trial is scheduled for later this year on the remaining amount owed to Funderz.net.

43.    Cause No. DC-19-12251; *Capano et al. v. Push Start Industries, LLC et al.*; In the 192nd Judicial District Court in Dallas County, Texas (filed August 19, 2019).    Anthony and Joanne Capano made four loans secured by promissory notes totaling $607,397.26 to Push Start, supposedly to fund water rights deals.  Push Start refused to pay the remaining balances on the third and fourth loans and Rogers, who personally guaranteed the notes, also refused to pay the past due balances.  Rogers conceded the debt and made a $200,000 payment, but no further

payments were made, leaving a total of $423,128.66 outstanding. The Capanos brought claims for breach of the notes and guaranties. *See* Ex. KK at 35-42 (Capano Petition). Ultimately, these claims were settled, and the lawsuit was dismissed on July 27, 2022. *See* Ex. LL (Capano Dismissal).

44. <u>Cause No. DC-19-01434; *Luxemborg Trading, LLC v. Organ Mountain Energy LLC et al.*; In the 162nd Judicial District Court in Dallas County, Texas (filed October 14, 2019).</u> In July 2018, Luxemborg Trading LLC ("<u>Luxemborg</u>") placed an order with Rogers' wholly-owned company, Organ Mountain Energy, LLC ("<u>Organ Mountain</u>"),[6] for ultra-low sulfur diesel. In August 2018, Luxemborg made four separate wire transfers to Organ Mountain totaling $1,000,000 as a deposit. Rogers acknowledged receiving the payment and stated that shipment would begin soon. The following month, Luxemborg sent notice cancelling the order and requesting the deposit be returned. On October 24, 2018, the parties entered into a formal settlement agreement, but Rogers and Organ Mountain refused to make the required $1,000,000 settlement payment to Luxemborg. Luxemborg brought claims for breach of the settlement agreement, breach of the agreement to purchase diesel, and unjust enrichment/money had and received. *See* Ex. NN at 19-26 (Luxemborg Petition). After suit was filed, the parties entered a new settlement agreement, and the action was dismissed on October 22, 2019. *See* Ex. OO (Luxemborg Dismissal).

45. <u>Cause No. DC-20-17073; *Hodges v. Bootstrap Ventures, LLC et al.*; in the 160th Judicial District Court in Dallas County, Texas (filed November 16, 2020).</u> In September 2020, Clark Hodges ("<u>Hodges</u>") made two short-term loans totaling $150,000 to Bootstrap Ventures to

---

[6]     Rogers is listed as the sole managing member of Organ Mountain. *See* Ex. MM, Organ Mountain Texas Franchise Tax Public Information Report.

facilitate a water rights transaction. Rogers represented that the funds were only needed for a few days until the transaction closed, and the loans would be repaid immediately. Rogers personally guaranteed repayment of the principal and interest. However, neither loan was repaid, and Hodges believes the transaction never occurred. Hodges sued for breach of contract, fraudulent representation of intent to perform, and fraudulent inducement. *See* Ex. PP at 20-21, 24-25, 28-29, 32-43 (Hodges Petition). Ultimately, the parties agreed to dismiss these claims. *See* Ex. QQ (Hodges Dismissal).

**D.** **The Petitioning Creditors Have Undertaken a Reasonable Investigation, and There Is Ample Evidence that Rogers is Not Paying His Debts as They Become Due**

46. On December 10, 2021, in connection with post-judgment discovery in Webster's lawsuit, Rogers provided a list of known creditors at the time, which he swore under penalty of perjury to be true and correct. *See* Ex. T (Rogers Verified Interrogatory Answers & Exhibits, at Exhibit B, List of Rogers Known Creditors). Rogers identified twenty-eight creditors with debts totaling approximately $21,195,000, all of which he identified as being "past due." *Id.* Several of these obligations arise from final judgments that are now unappealed and final. At a minimum, Rogers has undisputed debts of approximately $13.9 million in the aggregate.

47. Moreover, Rogers further disclosed in attachments to his December 10, 2021 sworn post-judgment discovery responses that he had a cumulative cash account balance of $156,184. *See* Ex. T (Rogers Verified Interrogatory Answers & Exhibits, at Exhibit C, Summary of Dennis Rogers's Cash and Accounts with Financial Institutions). In his interrogatory answers, he reported

minimal other assets. *See* Ex. T (Rogers Verified Interrogatory Answers, at Answers Nos. 4, 12, & Exhibits).[7]

48.     Accordingly, the Petitioning Creditors have reasonably investigated Rogers' affairs, and they can prove that Rogers is generally not paying his debts as they become due.

## V.     RELIEF REQUESTED

49.     By this Emergency Motion, the Petitioning Creditors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) appointing an interim chapter 7 trustee in this case; and (b) granting such other and further relief as the Court deems just and equitable.

## VI.     ARGUMENTS AND AUTHORITIES

### A.     Applicable Law

50.     In an involuntary case, as opposed to a voluntary case, the order for relief is entered only if the debtor does not successfully (or timely) contest the petition. "The time between the filing of the petition for involuntary bankruptcy and the order of relief commonly is referred to as the 'gap period.'" *In re Pucci Shoes, Inc.*, 120 F.3d 38, 41 (4th Cir. 1997) (citation omitted). Typically, throughout the gap period, "any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced" unless and until the court orders otherwise. 11 U.S.C. § 303(f). Section 303(g) of the Bankruptcy Code and Rule 2001 of the Federal Rules of

---

[7]     There are numerous inconsistencies with respect to Rogers' financial position that raise serious concerns that he has intentionally siphoned (and will continue to siphon) assets to put them out of the reach of creditors. For example, in sworn interrogatory answers, Rogers reports a low annual income of approximately $24,000 but has expenditures totaling five to six times that amount every year. The creation of the Montaña Trust, and the lack of information regarding same, further compound these grave concerns.

Bankruptcy Procedure, however, authorize the appointment of an interim trustee during this gap period.[8]  Section 303(g) provides, in pertinent part, as follows:

> At any time after the commencement of an involuntary case under chapter 7 of this title but before an order for relief in the case, the court, on request of a party in interest, after notice to the debtor and a hearing, and if necessary to preserve the property of the estate or to prevent loss to the estate, may order the United States trustee to appoint an interim trustee under section 701 of this title to take possession of the property of the estate and to operate any business of the debtor.

11 U.S.C. § 303(g).  Under section 303(g), bankruptcy courts have appointed interim trustees where "that relief is 'necessary to preserve the property of the estate or to prevent loss to the estate.'"  *See In re DiLorenzo,* 161 B.R. 752, 754 n.8 (Bankr. S.D.N.Y. 1993) (quoting 11 U.S.C. § 303(g)) (collecting cases providing circumstances where courts have installed interim trustees); *see also In re The Centre for Mgmt. & Tech., Inc.*, No. 07-19486-NVA, 2007 WL3197221, *2 (Bankr. D. Md. Oct. 26, 2007) (collecting cases); *see also In re James Plaza Joint Venture*, 62 B.R. 959, 960-61 (Bankr. S.D. Tex. 1986) (appointing interim trustee in involuntary chapter 7 bankruptcy pursuant to § 303(g) standard).

51.    Specifically, interim trustees are appointed "where the court has found that it would protect and preserve property of the estate; prevent concealment, waste or loss of assets by the alleged debtor; or prevent irreparable harm which would likely result between the time of the filing of the petition and the scheduled hearing."  *DiLorenzo*, 161 B.R. at 754 n.8 (citations omitted); *see also In re The Centre for Mgmt. & Tech., Inc.*, 2007 WL3197221, at *6 (appointment of interim

---

[8]    "[I]n order to avoid the appointment of an interim trustee in an involuntary case that may be dismissed, the court must determine, as a preliminary matter, that there is a reasonable likelihood that an order for relief will be entered."  *In re Diamondhead Casino Corp.*, 540 B.R. 499, 505 (Bankr. D. Del. 2015).  Rogers admits in sworn interrogatory answers during post-judgment discovery that he cannot pay his debts, and as shown in Section IV.D herein, there is ample evidence that Rogers is generally not pay his undisputed, liquidated debts as they become due. Accordingly, there is more than a reasonable likelihood that an order for relief will be entered.

trustee needed where "[s]trong uncertainty exist[ed] as to the reliability of [the debtor's] financial records and the nature of the organization itself" and thus "interim trustee [was] needed to try to make sense of these murky records and testimony").  The moving party can make this showing if the debtor has engaged in fraudulent and dishonest activities.  *See* Order [Docket No. 10, entered April 20, 2009], *In re Bernard L. Madoff*, Case No. 09-11893 (Bankr. S.D.N.Y.) (appointing interim chapter 7 trustee in involuntary case against infamous Ponzi scheme perpetrator, Bernard "Bernie" Madoff); *see also* Collier Bankruptcy Practice Guide ¶ 25.04 (2021) ("For instance, when a party in interest has reason to believe that current management is engaged in **fraudulent or dishonest activities**, or is incompetent or is grossly mismanaging the business of the debtor, it might be appropriate to consider applying for an interim trustee.") (emphasis added).

52.     Similarly, Bankruptcy Rule 2001 states that "[a]t any time following the commencement of an involuntary liquidation case and before an order for relief, the court on written motion of a party in interest may order the appointment of an interim trustee under § 303(g) of the Code."  Fed. R. Bankr. P. 2001(a).  Bankruptcy Rule 2001 further provides that "[t]he motion shall set forth the necessity for the appointment and may be granted only after hearing on notice to the debtor, the petitioning creditors, the United States trustee, and other parties in interest as the court may designate."  *Id.*[9]

53.     Also instructive is section 1104 of the Bankruptcy Code, which provides for the appointment of a trustee in chapter 11 cases "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause" or "if such appointment is in the interests of

---

[9]     Additionally, pursuant to section 105(a) of the Bankruptcy Code, this Court is authorized to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  The purpose of section 105(a) is "to assure the bankruptcy court's power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction."  2 Collier on Bankruptcy ¶ 105.01 (16th ed. 2021).

creditors, any equity security holders, and other interests of the estate." 11 U.S.C. §§ 1104(a)(1)-(2). Courts often define "fraud" by reference to state common law fraud, and "[a]s a practical matter, most courts consider the totality of the circumstances to ascertain whether there is sufficient evidence to find that the debtor intended to defraud creditors, and whether the debtor's actions as a whole rise to the level of fraud, dishonesty, or gross mismanagement justifying a trustee's appointment." *In re López–Muñoz*, 553 B.R. 179, 191 (B.A.P. 1st Cir. 2016), *aff'd sub nom. In re López–Muñoz*, 866 F.3d 487 (1st Cir. 2017). Operation of a fraudulent scheme that entails "deceit, misrepresentations, omissions and outright lies" before the commencement of the case is a ground for appointment of a trustee under section 1104(a)(1). *In re Vaughan*, 429 B.R. 14, 16, 26-28 (Bankr. D.N.M. 2010) (holding that because debtor was principal in a Ponzi scheme, cause existed to appoint a trustee in chapter 11 case). The same reasoning should extend to the appointment of an interim trustee in a chapter 7 proceeding. *See Matter of Beaucrest Realty Assoc.*, 4 B.R. 164, 165 (Bankr. E.D.N.Y. 1980) (finding that "[t]he legislative history suggests circumstances where . . . orders [under section 303] may be appropriate [in an involuntary case]," and "[t]hese circumstances are similar in nature to those specified in § 1104(a)(1) which authorizes the appointment of a trustee or examiner [in a chapter 11 case]").

## B.     Urgent Need for Appointment of Interim Trustee

54.     Here, there is an urgent need for an interim trustee as such relief is "necessary to preserve the property of the estate or to prevent loss to the estate." 11 U.S.C. § 303(g). Without an interim trustee, Rogers is likely to continue his extensive pattern of dishonesty and obfuscation and disregard for court orders, thereby increasing the likelihood of loss to the estate to the detriment of all creditors. *See In re DiLorenzo*, 161 B.R. at 754 n.8.

55.     Examples abound of Rogers' fraudulent conduct. As the above litigation history shows, his standard *modus operandi* is to approach a victim about a fictitious business opportunity

(typically a transaction involving water rights or fuel), request an upfront payment with a promise of repayment, request additional payments supposedly necessary to "close the deal," only to abscond with the victim's money, refuse to pay back the amounts, and evade efforts by the victim to secure repayment. This pattern is made clear by the numerous cases that all share similar facts, even down to Rogers' practice of fabricating fake Fedwire transfers and his use of similar excuses each time. Indeed, Rogers confessed to defrauding Webster and Faulkner in his Agreed Final Judgment with them. Ex. Q at 3 (Webster Agreed Final Judgment); Ex. V at 1 (Faulkner Agreed Final Judgment).

56. In light of this pattern of misleading and deceptive conduct, there is no reason to believe that Rogers will adequately safeguard and manage his property during the gap period, and Rogers' creditors face a serious risk that he will conceal or divert assets to put them out of the reach of creditors given the pending involuntary proceeding. Rogers has defrauded and harmed his creditors (and has even admitted to doing so in certain cases), and without the protections afforded by an interim trustee, Rogers' creditors will simply have to hope that he will suddenly break his bad habits and maintain the estate for their benefit. These legitimate concerns justify and necessitate the appointment of an interim trustee. *See In re DiLorenzo,* 161 B.R. at 754 n.8.

57. While Rogers' past pattern of fraud raises serious concerns over how he would manage his estate during the gap period, Rogers' pre-petition conduct also indicates that he may have already siphoned away assets and unnecessarily depleted his estate. The disparity between Rogers' current assets and his creditor obligations is striking. Rogers appears to have absconded with millions of dollars of his victims' funds, yet he simultaneously asserted in his sworn post-judgment discovery responses to Webster that he has virtually no non-exempt assets to show for it. *See* Ex. T (Rogers Verified Interrogatory Answers, at Answers Nos. 4, 12, & Exhibits, at Exhibit

C, Summary of Dennis Rogers's Cash and Accounts with Financial Institutions). According to his December 10, 2021 sworn post-judgment discovery responses, he had a net cash position at that time of −$21,038,816.[10]

58. Given that Rogers may have already engaged in asset diversion, his creditors face the risk that Rogers will continue to deplete his estate during the gap period, which warrants the appointment of an interim trustee. *See In re R.S. Grist Co.*, 16 B.R. 872, 873 (S.D. Fla. 1982) (preventing diversion of assets warrants appointment of interim trustee). Without the appointment of an interim trustee, Rogers' creditors face the risk that his funds and property will be disposed of before a trial on the merits of the involuntary petition. *See In re James Plaza Joint Venture*, 62 B.R. at 960-61 (holding that allegation that debtor's funds would be disposed of prior to trial on merits of involuntary petition warrants appointment of interim trustee).

59. Moreover, Rogers has proven himself to be wholly untrustworthy and totally reliant on fraud to conduct business. Thus, there is no reason to trust the veracity of his financial records or the legitimacy of his management of his properties and businesses at this stage. In his litigation with Webster, Rogers has consistently sought to evade responding to discovery and answering questions about the management of his estate—both by simply ignoring his obligation to respond and by invoking the Fifth Amendment. As evidenced by how he has dealt with his other victims, Rogers cannot be trusted to legitimately manage his estate and honestly deal with others. There is every reason to believe that he will evade his obligation during the gap period to maintain the estate, and it is imperative that an interim trustee be appointed as soon as possible. As in *In re The*

---

[10] Rogers identified $21,195,000 in past due amounts owed to your creditors (List of Rogers Known Creditors) compared with only $156,184 cumulative positive cash on balance as of December 2021 in your accounts (Summary of Dennis Rogers's Cash and Accounts with Financial Institutions). Even his stated cumulative cash account balance of $156,184, however, does not take into account the garnishment judgment in favor of Steven Webster against his Goldman Sachs account ending in xxx708-8 of $162,908, which remains unpaid at this time. Once that judgment is taken into account, Rogers' net cash position as at December 2021 was approximately −$21,038,816.

*Centre for Management & Technology, Inc.*, an interim trustee is needed to examine Rogers' unreliable financial and business records and make sense of "these murky records and testimony." 2007 WL3197221, at *6.

60.     Finally, Rogers has previously shown flagrant disregard for the judicial process and court orders.  Webster was forced to file not one, not two, but **three contempt motions** against Rogers, and Rogers was held in contempt of court twice (with the other instance of contempt being resolved by agreement).  He violated numerous court orders, including the order restraining use of his bank accounts multiple times, the first order of contempt, and the order compelling his post-judgment discovery responses.  The State Court has already found that he is willing to violate a court order that he "refrain from taking, or causing to be taken, whether directly or indirectly, any action to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of total amount not to exceed $1000, contained in" his bank accounts.  *See* Ex. R at 2-3 (9/8/21 Contempt Order).  In its second contempt order, the State Court emphasized that Rogers "has repeatedly and knowingly disregarded and disobeyed the orders of this Court," doing so even after he "has already been held in contempt of court for knowingly violating orders of this Court and even after that finding, has failed to obey the valid orders of this Court."  *See* Ex. S at 1 (11/18/21 Contempt Order).  It declared this sort of blatant disregard for the court an affront to "the dignity and authority of this Court and obstructs this Court's administration of justice."  *Id.* at 2.  Rogers' habits of deception and ruses extend beyond his business dealings and into the courts and judicial system.  He demonstrates a cold and repeated disregard for the serious financial harm that he has inflicted upon others and likewise totally disregards the authority of the judicial process.  Given Rogers' past behavior, there is a substantial risk of significant loss to the estate during the gap period unless an interim trustee is appointed.

61.     Given Rogers' contempt of the judicial process and his self-admitted fraud, the only meaningful remedy is the appointment of an interim trustee.  Any alternative, such as entering an order prohibiting or conditioning Rogers' use of the estate, would be wholly ineffective.  Indeed, Rogers has shown a flagrant disregard for and outright defiance of court orders in the past.  The Petitioning Creditors have no reason to believe that Rogers would suddenly abide by this Court's orders during the gap period.

62.     Looking to chapter 11 as an instructive guide, *see Matter of Beaucrest Realty Associates*, 4 B.R. at 165, Rogers' pattern of fraud provides ample cause for the appointment of a trustee.  Section 1104 of the Bankruptcy Code explicitly provides, among other things, that pre-petition fraud constitutes cause to appoint a trustee in a chapter 11 case.  11 U.S.C. § 1104(a)(1).  Rogers has admitted to committing fraud in a state court action, *see* Ex. Q at 3 (Webster Agreed Final Judgment), and there is more than "sufficient evidence to find that the debtor intended to defraud creditors" and that his actions "as a whole rise to the level of fraud, dishonesty, or gross mismanagement justifying a trustee's appointment." *In re López–Muñoz*, 553 B.R. at 191.  And looking at the numerous judgments and actions against Rogers, it is obvious that he has operated a fraudulent scheme that entails "deceit, misrepresentations, omissions and outright lies," and this provides cause for the appointment of a trustee. *In re Vaughan*, 429 B.R. at 16, 26-28.

63.     In sum, Rogers' pattern of misleading and deceptive conduct renders him totally unfit to manage the estate during the gap period.  His business partners cannot trust him, nor can the judicial system.  Rogers' past fraud and his demonstrated disregard for the judicial process creates a dangerous combination for Rogers' creditors, who can only hope that Rogers protects and preserves the estate during the gap period.  In light of these concerns arising out of Rogers'

dishonest and untrustworthy character, it is imperative that an interim trustee begin work immediately to marshal all of Rogers' assets for the benefit of all creditors, as well as begin investigating whether suspected fraudulent transfers made in furtherance of Rogers' schemes may be recovered and properly distributed to creditors. Rogers should be immediately replaced to prevent further losses to the estate and its creditors.

64.     Because an interim trustee is needed to prevent further loss to the Petitioning Creditors, as well as other creditors, the relief sought in this Emergency Motion is warranted and necessary.

65.     Given the overwhelming evidence that Rogers is not paying his undisputed debts as they become due, including Rogers' own sworn interrogatory answers in underlying litigation affirming same, the Petitioning Creditors additionally request the Court set the bond at $100 or a similar nominal amount.

**WHEREFORE**, the Petitioning Creditors respectfully request that the Court enter an order, in substantially the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested in this Emergency Motion and such other and further relief as the Court deems just and equitable.

*[Remainder of Page Intentionally Left Blank]*

Dated: March 22, 2022

Respectfully submitted,

By: _____/s/ David R. Eastlake_____
David R. Eastlake
Texas Bar No. 24074165
Meghan Dawson McElvy
Texas Bar No. 24065127
Travis James Sales
Texas Bar No. 17532080
Christopher J. Tutunjian
Texas Bar No. 24110460
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
Tel: 713.229.1397
Fax: 713.229.7897
david.eastlake@bakerbotts.com
meghan.mcelvy@bakerbotts.com
travis.sales@bakerbotts.com
christopher.tutunjian@bakerbotts.com

**Counsel for Petitioning Creditor Steven A. Webster**

– and –

_____/s/ David Brian Miller_____
David Brian Miller
Texas Bar No. 00788057
*david@schneidlaw.com*
SCHNEIDER MILLER REYNOLDS, PC
300 N. Coit Rd., Suite 1125
Richardson, Texas 75080
Telephone: (972) 479-1112
Facsimile: (972) 479-1113

**Counsel for Petitioning Creditors Debra and Russell Van Cleve and Angela Garbiso**

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that on March 22, 2022, I contacted Rogers to discuss the relief requested in the foregoing Emergency Motion. Rogers indicated that he is opposed to the relief requested herein.

*/s/ Meghan Dawson McElvy*
Meghan Dawson McElvy

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **DENNIS JAMES ROGERS II,** | § | **Case No. 22-30500-7** |
| | § | |
| **Alleged Debtor.** | § | **(Involuntary Proceeding)** |

**ORDER GRANTING PETITIONING CREDITORS' EMERGENCY MOTION
FOR ENTRY OF AN ORDER (I) APPOINTING AN INTERIM TRUSTEE
UNDER 11 U.S.C. § 303(G) AND (II) GRANTING EMERGENCY RELIEF
[RELATES TO DOCKET NO. _____]**

This matter coming before the Court upon the emergency motion (the "Emergency

Motion")[1] filed by Steven A. Webster, Debra and Russell Van Cleve, and Angela Garbiso

(collectively, the "Petitioning Creditors") for entry of an order, pursuant to sections 105(a) and

---

[1] Capitalized terms used but not otherwise defined herein shall have the same meanings as ascribed to them in the Emergency Motion.

303(g) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code")

and Rule 2001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a)

appointing an interim Chapter 7 trustee and (b) granting related relief; and it appearing that this

Court has jurisdiction to consider the Emergency Motion pursuant to 28 U.S.C. § 1334; and it

appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing

that venue of this involuntary chapter 7 case and the Emergency Motion in this District is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and, after due deliberation, the Court having determined

that the relief requested in the Emergency Motion is in the best interests of the Alleged Debtor, the

estate, its creditors, and all other parties in interest; and it appearing that proper and adequate notice

of the Emergency Motion has been given and that no other or further notice is necessary; and the

Court having reviewed the Emergency Motion and having heard the statements in support of the

relief requested therein at the hearing before the Court; and good and sufficient cause appearing

therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Emergency Motion is **GRANTED** as set forth herein.

2.      Pursuant to section 303(g) of the Bankruptcy Code, the United States Trustee shall

immediately appoint an interim chapter 7 trustee (the "Interim Trustee") to perform the duties set

forth in sections 701 and 704 of the Bankruptcy Code.

3.      Rogers shall cooperate in all respects with the Interim Trustee in implementing this

Order, including without limitation, by providing complete and accurate information as requested

by the Interim Trustee, and otherwise assist in the Interim Trustee's management of the estate.

4.      Rogers shall not interfere with the transition of control of the estate, including all

assets and properties comprising the estate, to the Interim Trustee pursuant to this Order.

5. Effective immediately upon entry of this Order, Rogers is and shall be prohibited from continuing to use, acquire, or dispose of property of the estate unless and until the Court orders otherwise, and Rogers shall take all appropriate and necessary actions to protect and preserve property of the estate pending the appointment of an interim chapter 7 trustee by the United States Trustee.

6. The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

7. This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implantation, interpretation and enforcement of this Order.

**# # # END OF ORDER # # #**

## **SERVICE LIST**

Reserved