David B. Miller
Texas Bar No. 00788057
david@schneidlaw.com
SCHNEIDER MILLER REYNOLDS, P.C.
300 N. Coit Road, Suite 1125
Richardson, Texas 75080
Telephone: (972) 479-1112
Facsimile: (972) 479-1113

T. Micah Dortch
Texas Bar No. 24044981
micah@dll-law.com
Dortch Lindstrom Livingston Law Group
2613 Dallas Parkway, Suite 220
Plano, Texas 75093
Telephone: 214-252-8258
Facsimile: 888-653-3299

*Special Counsel for the Trustee Areya Holder Aurzada*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: § | | CASE NO. 22-30500-swe7 |
| DENNIS JAMES ROGERS II, § | | |
|     Debtor. § | | CHAPTER 7 |

| | | |
|---|---|---|
| AREYA HOLDER AURZADA, § | | |
| CHAPTER 7 TRUSTEE FOR THE § | | |
| BANKRUPTCY ESTATE OF § | | |
| DENNIS JAMES ROGERS II § | | |
|         Plaintiff, § | | |
| § | | |
| v. § | | Adversary No. 24-03029 |
| § | | |
| JPMORGAN CHASE BANK, N.A. and § | | |
| FROST BANK, § | | |
|         Defendants. § | | |

**FIRST AMENDED COMPLAINT**

      **COMES NOW**, Areya Holder Aurzada ("Trustee" or "Plaintiff") in her capacity as

Chapter 7 Trustee for Dennis James Rogers II ("Debtor" or "Rogers") and files this her *First Amended Complaint* (the "Amended Complaint") and, in support, would respectfully show the Court as follows:

## NATURE OF THE ACTION

1. This adversary proceeding is brought by the Trustee against JPMorgan Chase Bank, N.A. ("Chase") and Frost Bank ("Frost") (collectively, the "Banks" or "Defendants") on behalf of the Debtor to avoid transfers and/or recover funds from the Banks for aiding and abetting fraudulent transfers, conspiracy to commit fraudulent transfers, aiding and abetting common law fraud, and, alternatively, under the equitable theory of money had and received.

## PARTIES

2. Plaintiff is the duly appointed trustee of the Debtor in the above-captioned bankruptcy case.

3. Chase has been served, has filed a Motion to Dismiss [Dkt.16] and may be served through its counsel of record.

4. Frost has been served, has filed a Motion to Dismiss [Dkt.17] and may be served through its counsel of record.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") because the claims and causes of action asserted in the Complaint arise in and under title 11 of the U.S. Code (the "**Bankruptcy Code**") and relate to a case filed under title 11 and pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas

Division under Case No. 22-30500.

6. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The claims and causes of action set forth herein concern the avoidance and recovery of claims under 11 U.S.C. §§ 544, 548 and 550, *inter alia*, of the Bankruptcy Code. Accordingly, this adversary proceeding is a "core" proceeding to be heard and determined by the Bankruptcy Court pursuant to 28 U.S.C. § 157(b).

## BANKRUPTCY PROCEEDING

8. On March 22, 2022, an involuntary petition was filed against the Debtor under Chapter 7 of the Bankruptcy Code. On March 28, 2022, this Court entered an order for the United States Trustee to appoint an interim Chapter 7 Trustee (Dkt. No. 16). Thereafter, the Trustee was appointed as the interim Chapter 7 Trustee. On April 26, 2022, this Court entered an order for relief against the Debtor under Chapter 7 (Dkt. No. 33). The Trustee continues to serve as the permanent Chapter 7 Trustee.

## BACKGROUND

**The Ponzi Scheme**[1]

9. In 2017 and 2018, Rogers set up at least five (5) different shell corporations – Organ Mountain Energy, LLC; OMTC, Inc.; Nomad Development, LLC; Bootstrap Ventures, LLC and Push Start Industries, LLC (collectively, the "Shell Entities").

10. Rogers was the sole owner of the Shell Entities. Investigation to date indicates no employees in any of the Shell Entities. Other than the original operating agreements, there are only a

---

[1] The existence of a Ponzi scheme, although true in this case, is not a requirement to recover under any cause of action asserted herein although it may be used to establish an element of a cause of action.

handful of corporate records of any type.

11. The banking records indicate that there was literally no distinction between or among the deposits and distributions made from Rogers' personal accounts and the accounts of the Shell Entities. Rogers and the Shell Entities used six different banks or brokerage firms. Rogers and the Shell Entities had 28 traditional banking accounts and another 20 brokerage accounts. On a weekly if not daily basis, Rogers transferred money between Shell Entity accounts and his personal account. The Shell Entities paid each other's debts and expenses and paid Rogers' debts and expenses. Even suggestions of any material underlying business in the bank records has proven to be false. By way of example, OMTC had significant transfers to and from an entity named Site Development Group. The CEO of Site Development Group recently reached a plea agreement in California for securities fraud and, of course, running a Ponzi scheme.

12. Without acknowledging that it is necessary under the facts and causes of action contained herein, the Trustee pleads that each Shell Entity functioned as an alter ego of Dennis Rogers. Specifically, each Shell Entity was organized and operated as a mere tool or business conduit for Rogers, there was such unity between the Shell Entities and Rogers that the separateness of the corporations ceased, and holding only the corporations liable would result in an injustice. *See, e.g.*, *Durham v Accardi*, 587 S.W.3d 179, 185 (Tex. App.-Houston [14th Dist.] 2019, no pet.)

13. For reasons understood only by those who have run Ponzi schemes, Rogers thought using the Shell Entities to conduct a Ponzi scheme and launder money was a good idea. Rogers pitched two fraudulent products – (1) buying and selling water rights and (2) flipping fuel that he claimed he could purchase wholesale or at auction. (The water rights product was likely a function of the fact that Dennis Rogers, **Sr.** had experience and success in selling water rights. Rogers was

happy to have investors think he was his father.)

14. The investment was typically documented by a promissory note, loan agreement, or purchase order with one of the Shell Entities and a guaranty by Rogers. The investments shared the common denominator of a promise for potential quick and significant return. The investments were considered securities and Rogers has acknowledged as much. Rogers has plead guilty to securities fraud and admitted that he used funds from investors to pay other investors, purchase real estate, and pay his personal expenses. See Ex. 1 Factual Résumé of Dennis Rogers in Case No. 3-24CR0170-K. Ex. 1 is incorporated herein and included as a public record to show background facts consistent with the Amended Complaint and not intended to convert any Motion to Dismiss into a motion for summary judgment. *See, e.g., Little Gem Life Sciences, LLC v. Orphan Med. Inc.*, 537 F.3d. 913, 916 (8th Cir. 2008).

15. In fact, however, there appears to have been no legitimate business income. There were no water rights and no fuel contracts. Instead, early investors were paid back by later investors and those payments to early investors spawned additional investors or a reinvestment. By way of example, Anthony and Joanne Capano, Ellis Guilbeau, Kenneth Guilbeau, John and Rhonda Harris, John Hughes, and Troya Montgomery received payments on their investments. Some investors received payments, made additional investments and, thus, remain creditors of Rogers. At no time did Rogers or the Shell Entities have the ability to pay investors absent obtaining money from new investors.

**The Banks Facilitate the Ponzi Scheme, Facilitate the Fraudulent Transfers and Benefit from Fees and Interest**

16. Ponzi schemes need banks. Specifically, to operate for any length of time, Ponzi schemes need banks willing to ignore the vast regulatory apparatus in place to identify and prevent

Ponzi schemes, money laundering, and other schemes of that nature. Rogers found Chase and Frost.

17. Beginning in 2018, and in some cases continuing through the Petition date, Rogers and the Shell Entities operated at least thirteen (13) accounts at Chase and eleven (11) accounts at Frost. Indeed, some of the Shell Entities had more than one checking account at the same institution.

18. Rogers' and the Shell Entities' bank records at Chase and Frost are simply shocking:

- voluminous cash transactions in excess of $10,000 on a single day or a two-day period;

- voluminous cash teller withdrawals;

- wires over $50,000;

- a significant portion of the transactions in even dollar amounts;

- money deposited and immediately transferred in the same or similar amounts; and

- high volume, significant deposits depleted on a monthly basis.

By way of example, note the following high dollar, even money withdrawals:

| JPMorgan Chase | | |
|---|---|---|
| Date | Account | Amount |
| 10/12/2018 | 1503 | $10,000.00 |
| 10/31/2018 | 8909 | $35,000.00 |
| 4/23/2019 | 8909 | $24,000.00 |
| 5/9/2019 | 1503 | $23,400.00 |
| 5/23/2019 | 7879 | $24,000.00 |
| 5/24/2019 | 1503 | $34,000.00 |
| 5/28/2019 | 7879 | $10,000.00 |
| 6/7/2019 | 1503 | $10,000.00 |
| 6/13/2019 | 1503 | $159,000.00 |
| 6/19/2019 | 1503 | $30,000.00 |
| 6/19/2019 | 1503 | $97,000.00 |
| 6/24/2019 | 1503 | $10,000.00 |
| 6/25/2019 | 1503 | $175,000.00 |
| 7/8/2019 | 1503 | $100,000.00 |

| JPMorgan Chase - continued | | |
|---|---|---|
| **Date** | **Account** | **Amount** |
| 7/9/2019 | 1503 | $25,000.00 |
| 7/16/2019 | 1503 | $10,000.00 |
| 7/16/2019 | 1503 | $10,000.00 |
| 9/19/2019 | 1503 | $10,000.00 |
| 9/19/2019 | 1503 | $150,000.00 |
| 9/26/2019 | 1503 | $156,455.00 |
| 9/27/2019 | 1503 | $67,840.00 |
| 10/7/2019 | 1503 | $30,000.00 |
| 10/9/2019 | 1503 | $100,000.00 |
| 11/6/2019 | 1503 | $200,000.00 |
| 11/7/2019 | 1503 | $25,000.00 |
| 11/20/2019 | 1503 | $25,000.00 |
| 2/11/2020 | 8315 | $15,000.00 |
| 2/25/2020 | 1503 | $10,000.00 |
| 6/19/2020 | 1503 | $560,000.00 |
| 6/24/2020 | 8315 | $615,000.00 |
| 7/20/2020 | 1503 | $35,000.00 |
| 7/27/2020 | 8315 | $15,000.00 |
| 7/28/2020 | 8315 | $15,000.00 |
| 7/29/2020 | 1503 | $15,000.00 |
| 8/6/2020 | 7879 | $10,000.00 |
| 8/7/2020 | 1503 | $135,000.00 |
| 9/8/2020 | 8315 | $10,000.00 |
| 9/11/2020 | 1503 | $150,000.00 |
| 9/14/2020 | 1503 | $25,000.00 |
| 9/15/2020 | 1503 | $60,000.00 |
| 9/30/2020 | 1503 | $45,000.00 |
| 1/21/2021 | 8909 | $20,000.00 |
| 1/22/2021 | 8909 | $27,000.00 |

| Frost | | |
|---|---|---|
| Date | Account | Amount |
| 6/22/2018 | 8430 | $32,393.00 |
| 3/25/2019 | 9321 | $10,000.00 |
| 4/1/2019 | 8457 | $23,000.00 |
| 10/22/2019 | 8457 | $70,000.00 |
| 1/24/2020 | 9321 | $25,000.00 |
| 3/3/2020 | 2223 | $20,000.00 |
| 3/3/2020 | 2223 | $10,000.00 |
| 4/21/2020 | 8457 | $15,000.00 |
| 4/23/2020 | 8457 | $20,000.00 |
| 5/20/2020 | 9321 | $12,000.00 |
| 12/4/2020 | 8457 | $10,000.00 |
| 12/8/2020 | 6271 | $10,000.00 |
| 1/20/2021 | 2223 | $15,000.00 |
| 2/12/2021 | 8457 | $25,000.00 |
| 1/21/2021 | 2223 | $10,000.00 |
| 2/12/2021 | 8457 | $25,000.00 |

Apparently, the Banks believed that Rogers and his businesses were allowed to round up or down to even amounts. Further, the Rogers-controlled accounts were often overdrawn. Statements from Frost indicate approximately 120 "NSF" fees. None of this seemed to deter the Banks. The Banks, of course, continue to collect various fees and enjoy the benefits of holding the funds.

19.     Most, if not all of these activities, would automatically trigger alerts, reports, and other safeguards under the Bank Secrecy Act, Know Your Customer rules, or other regulations. Chase and Frost were painfully aware of the signs of Ponzi schemes and fraudulent activity. To be clear, this is not a case of what the Banks *should* have known, this is a case of knowledge based on automatic triggers under the Bank Secrecy Act, the Banks' own internal rules and other regulations. By way of example, overdrafts require some communication with the customer. Cash withdrawals in excess of $10,000.00 require reporting. The Banks concealed the fraudulent activity and

substantially assisted the fraudulent scheme and fraudulent transfers by, among other things, providing accounts for Rogers to use as a conduit for investor deposits, allowing the diversion of substantial amount of funds from company to personal accounts, completing dozens of cash withdrawals and wire transfers of investor funds and ignoring hundreds of transactions among and between Rogers and the Shell Entities with no business purpose.

## CAUSES OF ACTION

A. **COUNT 1 - Aiding and Abetting Fraudulent Transfers or Civil Conspiracy to Commit Fraudulent Transfers**

20. The Trustee repeats and realleges each and every allegation made in the previous paragraphs as if set forth in full.

21. Transfers to perpetuate Ponzi schemes are fraudulent transfers. "Transfer" used herein, includes, but may not be limited to, any transfer of investor funds to pay earlier investors and any transfer of investor funds to any personal account of Dennis Rogers. By way of example, investor Troya Montgomery received payment on her early investment from funds that came from later investments.

22. To prevail on a cause of action for civil conspiracy to commit fraudulent transfers, the Trustee must show the existence of an underlying fraudulent transfer and (1) two or more parties involved, (2) an end to be accomplished, (3) a meeting of the minds on the end or course of action, (4) one or more overt, unlawful acts and (5) a proximate cause of injury.

> The agreement may be tacit and can be alleged and proven by circumstantial evidence. *Janvey v. Adams & Reese, LLP,* No. 3:12-CV-0495-N, 2013 WL 12320921, at *7 (N.D. Tex. Sept. 11, 2013) (citing *Bradt v. Sebek*, 14 S.W.3d 756, 766 (Tex. App.-Houston [1st Dist.] 2000, pet. denied)). Moreover, a conspiracy claim is "simply an alternative theory by which [a] plaintiff" may seek to recover on a fraudulent transfer claim. *Id.* at 630-31. "The

> theory is different, but the purpose and effect is the same." *Id*. "The purpose is to return to estate property that was allegedly wrongfully removed from the estate and the effect is to make the estate whole." *Id*. at 631.

*In re Northstar Offshore Group, LLC*, 616 B.R. 695, 743-44 (Bankr. S.D. Tex., 2020).[2] The Trustee assets that the Banks are joint tortfeasors with Rogers as to the fraudulent transfers.

**(1)   Avoidance of Actual Fraudulent Transfers – 11 U.S.C. § 548(a)(1)(A)**

23. Some of the Transfers occurred within 2 years of the Petition Date with actual intent to hinder, delay, or defraud the Debtor's other creditors.

24. By reason of the foregoing, the Trustee is entitled to an order and judgment that any of the Transfers paid within 2 years of the Petition date is avoided under section 548 of the Bankruptcy Code.

25. Pleading in the alternative, in the event that actual fraud is not conclusively presumed, the Trustee pleads that (1) Rogers and the Shell Entities were insolvent on the date the transfers were made or became insolvent as a result of the transfer or obligation. Specifically, Rogers and the Shell Entities had no underlying business, only a pile of obligations; (2) Rogers knew that he was creating debt that he would be unable to pay back (3) Rogers and the Shell Entities had been sued multiple times and knew other suits were on the way and (4) the general chronology of events and transactions as set forth herein show that Rogers made payments solely to keep the Ponzi scheme alive.[3]

---

[2] Cases cited as contrary to *Northstar* are distinguishable on their facts. *See, e.g., Mack v. Newton*, 737 F.2d 1343 (5th Cir. 1984). Here, the banks held and had an interest in the property which was fraudulently conveyed.

[3] The Fifth Circuit has not determined whether the heightened pleading standard of Rule 9(b) applies to fraudulent transfer claims, but numerous district courts have held that it does not. *See, e.g., Janvey v. Alguire,* 846 F. Supp. 2d 662, 675-76 (N. D. 2011). In any event, the (1) "who"- Dennis Rogers (2) what- misrepresentations of water rights and

**(2) Avoidance of Constructive Fraudulent Transfers — 11 U.S.C. § 548(a)(1)(B)**

26. Again, some of the Transfers were paid by the Debtor within 2 years of the Petition Date, and the Debtor received less than a reasonably equivalent value in exchange for such transfer or obligation. Interest is not payment of an antecedent debt, reasonably equivalent value or any value at all. *See, e.g. Janvey v. Brown,* 767 F.3d 430, 439-44 (5th Cir. 2014). Because the Transfers were premised on maintenance and perpetuation of a fraudulent scheme, they did not contribute any value in exchange for the monies and other assets they received.

27. Moreover, Rogers and the Shell Entities had been both sued and threatened with suit, and Rogers and the Shell Entities as a whole, were insolvent on the date that the Transfers were made and intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

28. By reason of the foregoing, the Trustee is entitled to an order and judgment that any of the Transfers paid within 2 years of the Petition date is avoided under section 548 of the Bankruptcy Code.

**(3) Avoidance of Actual Fraudulent Transfers — Tex. Bus. & Comm. Code § 24.005(a)(1) through 11 U.S.C. §§ 544(b)(1)**

29. Under 11 U.S.C. § 544(b)(1), the Trustee may avoid any transfer of an interest of the Debtor that is avoidable under applicable state law by a creditor holding an unsecured claim allowable under 11 U.S.C. § 502.

---

oil and gas ventures (3) "when" between 2017 and 2022 (3) "where" in promissory notes, and other documents and (4) "how" – fraudulent because Rogers never actually had the underlying water rights or other products, are established.

30. At the time the Transfers were made, other creditors of the Debtor held unsecured claims allowable under 11 U.S.C. § 502.

31. As such, the Trustee moves to avoid the Transfers because the Transfers could have been avoided by the Debtor's other creditors under Texas fraudulent transfer law. *See* TEX. BUS. & COM. CODE § 24.005(a)(1), including, but not necessarily limited to, Debra Van Cleve, Angela Garbiso, and Steven Webster.

32. Because Rogers and the Shell Entities operated as a Ponzi scheme, Texas law provides that the Transfers were made with an actual intent to hinder, delay, or defraud creditors.

33. By reason of the foregoing, the Debtor's other creditors have the right to avoid the Transfers under Section 24.005(a)(1) of the Texas Business and Commerce Code, and the Trustee can seek to enforce that right under section 544(b)(1) of the Bankruptcy Code.

**(4) Avoidance of Constructive Fraudulent Conveyances — Tex. Bus. & Comm. Code § 24.005(a)(2) through 11 U.S.C. §§ 544(b)(1)**

34. Under 11 U.S.C. § 544(b)(1), the Trustee may avoid any transfer of an interest of the Debtor that is avoidable under applicable state law by a creditor holding an unsecured claim allowable under 11 U.S.C. § 502.

35. At the time the Transfers were made, other creditors of the Debtor held unsecured claims allowable under 11 U.S.C. § 502, including, but not necessarily limited to, Debra Van Cleve, Angela Garbiso, and Steven Webster.

36. As such, the Trustee moves to avoid the Transfers because the Transfers could have been avoided by the Debtor's other creditors under Texas fraudulent transfer law. *See* TEX. BUS. & COM. CODE § 24.005(a)(2).

37. The Debtor did not receive reasonably equivalent value in exchange for the Transfers. Because the Transfers were premised on maintenance and perpetuation of a fraudulent scheme, they did not contribute any value in exchange for the monies and other assets they received. Interest is not payment of an antecedent debt, reasonably equivalent value or any value at all. *See, e.g. Janvey v. Brown,* 767 F.3d 430, 439-44 (5th Cir. 2014).

38. Before the Transfers, Rogers and the Shell Entities had been sued and threatened with suit.

39. Rogers and the Shell Entities were insolvent or became insolvent shortly after the Transfers.

40. At the time the Transfers were made, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

41. At the time the Transfers were made, the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

42. By reason of the foregoing, the Debtor's other creditors have the right to avoid the Transfer under Section 24.005(a)(1) of the Texas Business and Commerce Code, and the Trustee can seek to enforce that right under section 544(b)(1) of the Bankruptcy Code.

43. Circumstantial evidence is often all that is available to prove conspiracy as conspirators are unlikely to be forthcoming and transparent. Indeed, conspiracy may be proven from circumstances that give rise to a "natural inference" that overt acts were committed in furtherance of common design or scheme. Here, the volume and magnitude of what the Banks

concealed and failed to act upon gives rise to an inference that the Banks conspired with Rogers to run a Ponzi scheme.

### B. COUNT 2 – Aiding and Abetting Common Law Fraud

44. The Trustee repeats and realleges each and every allegation made in the previous paragraphs as if set forth in full.

45. To prevail on a cause of action of aiding and abetting common law fraud, the Trustee must show (1) the underlying fraud by the primary tortfeasor, (2) that the Banks knew of the underlying fraud, and (3) that the Banks substantially assisted or encouraged the primary tortfeasor in the underlying fraud.

46. Here, Rogers' fraud is nicely set out in <u>Exhibit 1</u>, identifying what Rogers said, some of the people he said things to, when he made the statements, and how the statements were fraudulent. Nevertheless, to set forth again, beginning in 2017 or 2018, and continuing through to the filing of the Involuntary Bankruptcy in this case. Rogers told victims, such as Angela Garbiso, Debra Van Cleve, and Scott Faulkner, that he controlled and could sell certain water rights or could purchase and sell fuel for quick profits. These representations were fraudulent, as Rogers has admitted, in that he owned no water rights and purchased no fuel.

47. The Banks concealed the fraudulent activity and substantially assisted the fraudulent scheme and fraudulent transfers by, among other things, providing accounts for Rogers to use as a conduit for investor deposits, allowing the diversion of substantial amount of funds from company to personal accounts, completing dozens of cash withdrawals and wire transfers of investor funds and ignoring hundreds of transactions among and between Rogers and the Shell Entities with no business purpose.

### C. COUNT 3 – Money Had and Received

48. The Trustee repeats and realleges each and every allegation made in the previous paragraphs as if set forth in full.

49. In the alternative under the theory of money had and received, the Trustee is entitled to recover any interest earned from holding the Debtor's accounts, any fees paid to the Banks related to the Debtor's accounts as well as the Trustee's reasonable and necessary attorney's fees.

50. To prove a claim for monies had and received, the Trustee need only show that (1) the Banks held or received money and (2) the money, in equity and good conscience, belongs to the Trustee for ultimate distribution to the defrauded investors.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Court enter judgment on Plaintiff's claims against the Banks and award Plaintiff:

1. Actual damages, including direct and consequential damages;
2. Pre- and post-judgment interest; and
3. All such other and further relief at law or in equity that the Court may deem just and proper.

Dated: August 14, 2024              Respectfully submitted,

By: /s/ David B. Miller
David B. Miller
Texas Bar No. 00788057
david@schneidlaw.com
SCHNEIDER MILLER REYNOLDS, P.C.
300 N. Coit Road, Suite 1125
Richardson, Texas 75080
Telephone: (972) 479-1112
Facsimile: (972) 479-1113

and

T. Micah Dortch
Texas Bar No. 24044981
micah@dll-law.com
Dortch Lindstrom Livingston Law Group
2613 Dallas Parkway, Suite 220
Plano, TX 75093
Telephone: 214-252-8258
Facsimile: 888-653-3299

*Special Counsel for the Trustee*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 14, 2024, I caused a copy of the foregoing to be served on all parties eligible to receive service through the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas by electronic mail.

By: */s/ David B. Miller*
David B. Miller