David R. Eastlake
Texas Bar No. 24074165
*david.eastlake@bakerbotts.com*
Meghan Dawson McElvy
Texas Bar No. 24065127
*meghan.mcelvy@bakerbotts.com*
Travis James Sales
Texas Bar No. 17532080
*travis.sales@bakerbotts.com*
Christopher J. Tutunjian
Texas Bar No. 24110460
*christopher.tutunjian@bakerbotts.com*
BAKER BOTTS L.L.P.
910 Louisiana St., Suite 3200
Houston, Texas 77002
Telephone:      (713) 229-1234
Facsimile:       (713) 229-1522

*Counsel for Petitioning Creditor Steven A. Webster*

David Brian Miller
Texas Bar No. 00788057
*david@schneidlaw.com*
SCHNEIDER MILLER REYNOLDS, PC
300 N. Coit Rd., Suite 1125
Richardson, Texas 75080
Telephone:      (972) 479-1112
Facsimile:       (972) 479-1113

***Counsel for Petitioning Creditors Debra and Russell Van Cleve and Angela Garbiso***

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **DENNIS JAMES ROGERS II,** | § | **Case No. 22-30500-7** |
| | § | |
| **Alleged Debtor.** | § | **(Involuntary Proceeding)** |

### PETITIONING CREDITORS' EMERGENCY MOTION
### FOR ENTRY OF AN ORDER (I) APPOINTING AN INTERIM TRUSTEE
### UNDER 11 U.S.C. § 303(G) AND (II) GRANTING EMERGENCY RELIEF

Steven A. Webster ("Webster"), Debra and Russell Van Cleve (together, the "Van Cleves"), and Angela Garbiso ("Garbiso," and together with Webster and the Van Cleves, the "Petitioning Creditors") hereby file this emergency motion (the "Emergency Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105(a) and 303(g) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rule 2001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) appointing an interim Chapter 7 trustee and (b) granting related relief, and respectfully move as follows:



# I.    PRELIMINARY STATEMENT

1.    In this involuntary bankruptcy case, there is no question that the alleged debtor — Dennis James Rogers II ("Rogers"), a Dallas resident — has not and is not paying his debts as they become due.  Indeed, in his sworn post-judgment interrogatory answers, Rogers admitted to owing over $21 million to twenty-eight creditors, all of which he described as "past due."  Of those, at least thirteen have sued Rogers and various Texas-based companies that he *alone* owns and operates and, of those, nine have obtained final judgments or default judgments against him, or against him and his companies jointly and severally, totaling over $13.9 million (excluding interest and attorneys' fees awarded by the trial courts).[1]  By contrast, in those same sworn interrogatory answers, Rogers disclosed that he has only approximately $24,000 in annual income compared to approximately $120,000 to $150,000 in annual expenses (*i.e.*, −$96,000 to −$126,000 in annual net income).

2.    The extraordinary remedy of appointment of an interim chapter 7 trustee is justified and necessary in this case because Rogers' accumulation of unpaid debts is due largely to a series of intentional and dishonest schemes that he has perpetrated individually and through his wholly-owned companies as instrumentalities of fraud.  Specifically, through his schemes — all variations on a similar theme — Rogers induced numerous people to invest (and frequently reinvest) in fictitious business opportunities that typically (i) involved loans or advances for the purchase and sale of wholesale fuel or commercial water rights, (ii) promised a high rate of return over a short time period, and (iii) were backed by personal guarantees from Rogers.

3.    Thus, for example, Petitioning Creditor Webster and his associate Dennis Woods ("Woods") advanced one of Rogers' wholly-owned companies, OMTC, Inc. ("OMTC"),

---

[1]    These judgments are against Rogers or against him and certain entities of which he is the sole member and owner, jointly and severally.

**Ex. Pg. 035**

$6,552,000 to be used to purchase allocations of fuel in an auction that never in fact occurred, only to have Rogers immediately transfer the funds from OMTC to his personal checking account. From there, Rogers used the funds on various personal expenses or endeavors, including: buying two tracts of valuable real property in Dallas, paying an architect, paying the legal fees of his defense attorneys in pending lawsuits, paying personal credit card debt, withdrawing $560,000 in cash, and transferring funds to his personal Robinhood investment account and various other personal accounts. All the while, Rogers repeatedly lied to Webster and Woods regarding the return of their funds and even sent fake wire transfer confirmations to give the false appearance that the funds would be returned to them imminently. In the Agreed Final Judgment, Rogers stipulates to having committed fraud against Webster.

4.      Petitioning Creditors the Van Cleves and Garbiso, residents of California, collectively invested approximately $300,000 with Bootstrap Ventures, LLC ("Bootstrap Ventures")[2] for an alleged water rights deal that promised a high rate of return in a short time, backed by personal guarantees from Rogers. Consistent with his *modus operandi*, once the loans matured, the pleadings reflect that Rogers repeatedly promised that the funds would be returned within a matter of days (but they never were) and provided a litany of fake excuses for why the return of their funds was delayed. Under the Final Judgement, Rogers and Bootstrap Ventures jointly and severally owe the Van Cleves and Garbiso over $370,000 in the aggregate.

5.      As detailed below, the lawsuits from Rogers' other unpaid creditors follow a similar pattern of deception and dishonesty that often include claims of fraud, theft, and conversion — not merely run-of-the-mill breach of contract claims. Collectively, this pattern of conduct establishes

---

[2]      Rogers is listed as the sole managing member of Bootstrap Ventures. *See* Ex. C, Bootstrap Ventures Texas Secretary of State Filing.

an urgent need for the appointment of an interim Chapter 7 trustee to preserve the property of Rogers' estate and prevent Rogers from further deceiving and concealing from his creditors the truth of what he has done with all the money he took and refused to pay back.

6.     Rogers' sworn post-judgment interrogatory answers in the Webster matter give the impression that he has few non-exempt assets (two non-luxury vehicles, furniture, clothes, his wedding band, and sundry electronics).  In a similar vein, Webster's attempts to enforce his judgment through various post-judgment garnishment proceedings against Rogers' personal bank accounts have thus far yielded $170,956 in judgments, of which only $8,047.91 has been turned over.  This does not reconcile with the magnitude of funds Rogers misappropriated and raises serious concerns that he may have siphoned away substantial personal and/or business assets to intentionally put them out of the reach of his creditors.  Also troubling is the fact that Rogers and his wife Allison established a trust called the Montaña Amorosa Revocable Trust (the "Montaña Trust") in August 2019 — as litigation against Rogers and his companies was mounting — to hold title to two, valuable adjoining real property lots in the Hillcrest area of Dallas (and potentially more).

7.     Rogers also has a history of exhibiting dishonesty and obfuscation in judicial proceedings.  In his deposition in the Webster lawsuit, Rogers invoked the Fifth Amendment in response to nearly all substantive questions.  He did the same in response to Webster's post-judgment discovery requests until the court overruled all of his (and OMTC's) Fifth Amendment objections and compelled Rogers to answer them.  Even then, Rogers refused to comply with the court's order, forcing Webster to file not one, but two motions for contempt and sanctions — the latter resulting in the trial court confining him to jail for two weeks.  Rogers also

Ex. Pg. 037

twice violated the trial court's temporary injunctions by using or allowing funds to be transferred from frozen accounts.

8.      The totality of these circumstances demonstrates that Rogers is not trustworthy enough to be left in control of his accounts or his businesses during the "gap period."  Additionally, there is significant confusion about where all the money Rogers took from his creditors has gone. The Petitioning Creditors respectfully urge the appointment of an interim Chapter 7 trustee.

## II.      JURISDICTION AND VENUE

9.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this Emergency Motion pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

10.      The bases for the relief requested herein are sections 105(a) and 303(g) of the Bankruptcy Code and Rule 2001 of the Bankruptcy Rules.

## III.      PROCEDURAL BACKGROUND

11.      On March 22, 2022, (the "Petition Date"), the Petitioning Creditors filed an involuntary petition for relief against alleged debtor Dennis James Rogers, II (the "Alleged Debtor" or "Rogers") under chapter 7 of the Bankruptcy Code in this Court.

12.      The Petitioning Creditors hold unsecured claims in excess of $6.7 million (exclusive of attorneys' fees and interest) in the aggregate that are neither contingent as to liability nor the subject of a bona fide dispute.  The Petitioning Creditors filed this involuntary chapter 7 case because (a) the Alleged Debtor has generally *not* been paying his debts as they become due (including, without limitation, debts owed to the Petitioning Creditors) and (b) such action was necessary to preserve the Alleged Debtor's estate and prevent any further loss that would harm

Ex. Pg. 038

creditors, including dissipation of estate assets (fraudulently or otherwise) that could fund recoveries.

## IV.    FACTUAL BACKGROUND

13.     Since 2017, Rogers, individually and through various companies he solely owns and operates, has perpetrated a series of schemes to induce numerous individuals and entities to invest over $10 million in fake business opportunities.  Most of these schemes have involved the supposed purchase or sale of wholesale fuel or water rights and promises of guaranteed returns over a short time backed by personal guarantees from Rogers.  Rather than using the funds in a legitimate manner for the stated purposes, Rogers spent or absconded with them.  Numerous individuals and entities, including the Petitioning Creditors, have never been repaid.

14.     In turn, this led to a string of lawsuits by his unpaid creditors, which have resulted in six judgments in favor of ten creditors totaling approximately $13.9 million (excluding interest and attorneys' fees) that are now final and undisputed.

### A.    Rogers Scams Webster and his Associate, Woods

15.     Webster, along with his associate Woods, invest in the energy sector.  In June 2020, Rogers approached Webster and Woods — through Webster's son, Aaron Webster (a fuels and commodities trader and shipper) — and told them that a large energy and commodities company called Vitol, Inc. ("Vitol") had decided to exit a large fuel position that it held in the Port of Brownsville, Texas.  Rogers claimed that Vitol was hosting an auction through which potential buyers would bid for allocations of its fuel positions, and that Vitol had invited him to participate in the auction on behalf of prospective buyers.

**Ex. Pg. 039**

16.    Rogers, through his solely owned business entity OMTC[3] offered to act as an intermediary and agent, and Webster and Woods agreed to post funds to reserve an allocation of various refined fuels offered through the auction.  Rogers told them that, in order to participate in the auction, an upfront cash deposit was required.  Should they decide to terminate their purchase of the fuel during the option period, Rogers agreed to immediately request the return of funds from Vitol and remit the funds to Webster and Woods within one banking day.

17.    Webster and Woods deposited $4,410,000 and $2,142,000, respectively, for a total of $6,552,000, into OMTC's Chase bank account ending in xxx7879 to participate in the purported Vitol auction.  Rogers claimed to have transferred these funds to Vitol and to have participated in the purported Vitol auction.  But before any deal with Vitol was consummated, Rogers recommended the purchases be terminated (supposedly owing to less favorable commercial terms than originally anticipated).  Webster and Woods agreed, expecting their funds to be returned within one banking day per the terms of their agreements with OMTC.  Rogers claimed to have notified Vitol of such decision, purportedly initiating the process of Vitol's return of the Funds to OMTC.

18.    In reality, Rogers' and OMTC's representations about the Vitol auction were simply untrue.  Rogers fabricated the event as part of a scheme to defraud Webster and Woods.  *See* Ex. D (11/25/20 Vitol Cease & Desist Letter).

19.    Rogers failed to remit the funds within one banking day.  Webster and Woods, individually and through counsel, repeatedly contacted Rogers to inquire about why their funds have not been timely returned.  In response, while repeatedly and fully admitting that he owed

---

[3]    Rogers admitted in his deposition that he is the sole director, shareholder, and employee of OMTC and is the only person with access to and control over OMTC's bank account.  *See* Ex. E at 16, 25-29, 32 (Excerpts of 12/8/20 Rogers Deposition); *see also* Ex. F, OMTC Amended Certificate of Formation.

**Ex. Pg. 040**

Webster and Woods the full $6,552,000 due, Rogers communicated to them, verbally and in writing, a wide array of excuses and misrepresentations.

20.    Rogers made multiple promises to pay, and on multiple occasions, he purported to provide wire confirmations indicating that transfers of the funds were on their way to Webster and Woods.  However, when the transfers never reached Webster's and Woods's bank accounts, Rogers concocted various lies for why he was unable to remit the funds, such as claiming that he had mistakenly provided the wrong account information or that there was a delay on Chase bank's end.  To keep up the ruse, Rogers went so far as sending fake Fedwire reference numbers and altering Goldman Sachs wire transfer confirmation emails to give the false impression to Webster and Woods that he had (or was attempting to) return the Funds.  *See* Ex. G (Goldman Sachs Wire Transfer Confirmations); Ex. H (Goldman Sachs Emails); Ex. I at 47-72, 87-94 (Excerpts of Deposition of Ryan McDonnell, Rogers' Goldman Sachs Representative) (testifying, among other things, as to his belief that Rogers had altered Goldman Sachs wire transfer confirmations and related emails).

21.    As a result, Webster and Woods filed suit against Rogers and OMTC in the 191st District Court of Dallas County, Texas (the "State Court") for, among other claims, breach of contract and fraud.  *See* Ex. J (Webster 2d Am. Petition).  Woods's funds ($2.142 million) were returned on the eve of the parties' temporary restraining order hearing, at which the State Court agreed to freeze several of Rogers' and OMTC's bank accounts involved in the scheme.  Rogers, however, has never repaid Webster his $4.41 million or the $6.25 million plus attorneys' fees and interest owed under the Agreed Final Judgment.

22.    In discovery, Webster obtained Rogers' and OMTC's bank records, which showed what actually happened to their funds.  On June 19, 2020 — the *same* date that OMTC received

Webster's and Woods's $6,552,000 — Rogers transferred $6,550,000 (all but $2,000 of the funds) to his personal Chase checking account ending in xxx1503, which at that time had a beginning balance of $7,057.93.  *See* Ex. K at 12, 31 (Chase Bank Records).

23.    Rogers then used account xxx1503 as a launch pad to spend or transfer substantially all of Webster's and Woods's funds toward, among other things:  buying valuable, residential property in Dallas for approximately $1.7 million; paying an architect; paying the legal fees of his defense attorneys in pending lawsuits; paying personal credit card debt; withdrawing $560,000 in cash; and transferring funds to his personal Robinhood investment account and various other personal accounts.  *See* Ex. K at 12-13 (Chase Bank Records).

24.    In addition, between June and July 2020, Rogers transferred a total of $2,497,000 to Mandarin Capital LLC ("Mandarin Capital").  As discussed below at paragraphs 35 and 36, Mandarin Capital is another alleged creditor of Rogers that purportedly loaned him over $6 million that has not been repaid.  Mandarin Capital was closely involved in Rogers' purchase of the two residential property lots in Dallas, at least one of which was purchased directly with funds Rogers unlawfully took from Webster.  Notably, Mandarin Capital is based in Utah and uses as its registered agent a law firm called McCullough Sparks, which markets itself as having expertise in the formation of asset protection trusts.  *See* Ex. L (Mandarin Capital Registered Agent Filing); Ex. M (McCullough Law website excerpt promoting asset protection trusts that protect debtors from "future legal action against you and your heirs"); Ex. N (McCullough Sparks brochure for "541Trust – Superior Asset Protection" designed to "protect[] assets from a person's potential future liabilities by removing assets from the person's legal ownership")  Of related concern is the fact that, in August 2019, as litigation against him and his companies began to increase, Rogers

and his wife established the Montaña Trust.  *See* Ex. O (Montaña Amorosa Revocable Trust Agreement).

25.    Throughout discovery in Webster's lawsuit, Rogers refused to answer most substantive questions and instead invoked the Fifth Amendment.  *See* Ex. E at 7, 145-72, 181-205 (Excerpts of 12/8/20 Rogers Deposition).  When Rogers violated the terms of the State Court's temporary injunction restraining him from transferring funds out of certain bank accounts, Webster was forced to file a motion for contempt and sanctions, which the parties resolved through an agreed amended temporary injunction, the substance of which remained in effect until after entry of the Agreed Final Judgment discussed below in paragraph 27.

26.    Eventually, on January 14, 2021, Webster and Rogers reached a settlement agreement under which Rogers agreed to pay Webster $5.25 million by March 1, 2021 in exchange for a full and final release of Webster's claims.  *See* Ex. P at 1-2 (Webster Settlement Agreement).  If he failed to do so, Rogers agreed that Webster could file with the State Court an Agreed Final Judgment entitling Webster to $6.25 million in compensatory damages and other relief.  *Id.* at 2.

27.    When Rogers failed to pay the settlement amount, and the State Court entered the Agreed Final Judgment.  *See* Ex. Q (Webster Agreed Final Judgment).  Critically, in this Agreed Final Judgment, Rogers admitted (and the State Court found) that he committed fraud:

> With regard to Steven Webster's fraud claims against Rogers, the Court has determined that **Rogers made representations to Steven Webster, which representations Rogers knew to be false, with the intent to deceive Steven Webster**. The Court has further determined that Steven Webster actually and justifiably relied on Rogers' false representations and sustained a loss as a proximate result thereof.
>
> . . .
>
> Additionally, as discussed above, the Court has determined and the Parties have agreed that one or more of the Steven Webster's claims

are of such character and nature that they cannot be discharged in bankruptcy under title 11 of the United States Code (the "Bankruptcy Code"), including but not limited to, under sections 523, 727, and 1328 of the Bankruptcy Code. Defendants voluntarily, knowingly, and intentionally waive all claims and defenses to the nondischargeability of such claims in a bankruptcy.

This judgment is binding on Defendants' heirs, successors, assigns, and any trustee or similar person appointed in any case under [*sic*] commenced under the Bankruptcy Code.

The Parties intend for the factual stipulations made in this judgment to have a preclusive effect in subsequent proceedings, including, but not limited to, in any bankruptcy case of the Defendants.

*Id.* at 3-4.

28. After entry of the Agreed Final Judgment, Webster learned that, during the course of the litigation, Rogers had again violated the State Court's temporary injunction by transferring over $7,000 out of one of his frozen bank accounts. Webster again filed a motion for contempt and sanctions against Rogers. In its Judgment of Contempt, the State Court found that Rogers had violated its temporary injunction. *See* Ex. R (9/8/21 Contempt Order). Specifically, the State Court found that "Rogers violated the terms of the [temporary injunction] by transferring or causing to be transferred $7,644.00 out of OMTC's Chase Bank account with account number ending in xxx7879." *Id.* at 3. During the contempt hearing, Rogers stated that he did not recall moving the funds out of the account, but did not deny that he was the sole person with access to and control over it, and provided no other credible basis for the transfer of the funds besides his own intentional acts. The State Court therefore found Rogers to be in criminal and civil contempt. *Id.*

29. After entry of the Agreed Final Judgment on March 4, 2021, Rogers continued his evasiveness and refused to pay Webster or substantively and comprehensively respond to his post-judgment discovery requests (served on March 5, 2021). Webster was forced to file a motion

11

to compel Rogers' responses when he again invoked the Fifth Amendment and objected to nearly all requests.  The State Court granted Webster's motion and overruled all of Rogers' improper Fifth Amendment objections, but Rogers still refused to respond.

30.    As a result, Webster moved for the third time to hold Rogers in contempt for violating the State Court's order compelling Rogers' responses.  The State Court granted the motion, finding that Rogers had violated its order to compel, as well as its previous judgment of contempt.  *See* Ex. S (11/18/21 Contempt Order).  The State Court found that Rogers "has repeatedly and knowingly disregarded and disobeyed [its] orders," doing so even after he "has already been held in contempt of court for knowingly violating orders of this Court and even after that finding, has failed to obey the valid orders of this Court."  *Id.* at 1.  The State Court found that "Rogers' behavior affronts the dignity and authority of this Court and obstructs this Court's administration of justice."  *Id.* at 2.  The State Court then ordered Rogers confined in Dallas County jail until he had provided his post-judgment discovery responses.  *Id.*

31.    After being released from jail two weeks later, Rogers finally provided responses to Webster's post-judgment discovery requests — over **nine months** after they were served.  In his sworn interrogatory answers, served on December 10, 2021, Rogers disclosed that he had over $21 million in "past due" debts to twenty-eight creditors.  *See* Ex. T (Rogers Verified Interrogatory Answers & Exhibits, at Exhibit B, List of Rogers Known Creditors).  At the same time, Rogers stated that he had little non-exempt personal property and negative annual net income of approximately -$96,000 to $126,000.  *See* Ex. T (Rogers Verified Interrogatory Answers & Exhibits, at Answer No. 4 & Exhibits, at Exhibit C, Summary of Dennis Rogers' Cash and Accounts).  Having never been paid and learning of Rogers' meager alleged assets and income in comparison to his creditor obligations, and having serious concerns that Rogers may have

absconded with his assets to intentionally put them out of the reach of his creditors, the Petitioning Creditors were left with no alternative but to commence this involuntary bankruptcy proceeding.

**B.      Rogers Scams the Van Cleves and Garbiso**

32.      In the summer of 2020, the Van Cleves and Garbiso met Rogers, who claimed that his company, Bootstrap Ventures, had experience with investment opportunities buying and selling water rights.  Rogers represented that he needed capital for a deal that would close quickly and that a buyer was already lined up.  On or about September 4, 2020, Garbiso loaned $200,000 to Bootstrap Ventures, secured by a promissory note personally guaranteed by Rogers.  When it became due, she was convinced to "roll over" the original loan and executed a second loan in the amount of $228,000, also personally guaranteed by Rogers.  On or about September 25, 2020, the Van Cleves loaned $50,000 to Bootstrap Ventures on similar terms.  All three loans went into default and Rogers repeatedly represented that full payments would occur in a matter of days, but they never did.  The victims brought claims for breach of contract, breach of guarantee, and common law fraud.  In the Final Judgment, Rogers and Bootstrap Ventures jointly and severally owe (1) Garbiso a total of $294,813.36, and (2) the Van Cleves a total of $64,652.05 (exclusive of attorneys' fees and pre- and post-judgment interest).  Rogers did not appeal this judgment, and it is now final.

**C.      Rogers Has Scammed Numerous Other Parties in Similar Ways**

33.      As discussed above, Rogers has perpetrated his scheme against numerous other parties in Texas and other states, which resulted in many lawsuits against Rogers and his businesses.  Petitioning Creditors do not have personal knowledge of all the facts underlying all the lawsuits against Rogers and, thus, summarize them below according to the publicly available pleadings.  While pleadings are of course not evidence, the consistent pattern of the allegations and claims against Rogers is telling in and of itself.

34.     <u>Cause No. DC-21-00960; *Faulkner v. Rogers et al.*; in the 116th District Court in</u> <u>Dallas County, Texas (filed January 22, 2021).</u>   In September 2020, Rogers approached Scott Faulkner ("<u>Faulkner</u>") about an investment opportunity that Bootstrap Ventures had identified. Rogers claimed he had secured the opportunity to purchase water rights in New Mexico and a buyer to whom they could immediately re-sell the water rights; but he needed $5,500,000 in liquid capital to close the transaction. Faulkner invested in the project and wired Rogers $200,000. When Rogers told him that additional funds were needed to close the transaction, Faulkner wired an additional $190,000.  After he repeatedly asked about the status of the transaction, it became apparent that it was not going to close, and Faulkner requested the return of his money.  Rogers responded by making numerous false representations, including not showing up to meetings at the bank, sending edited or fake screenshots of purported transfers or wires of funds that were allegedly going to be used to repay Faulkner, and lying about having COVID-19 to avoid meeting with Faulkner.  On December 15, 2020, the parties executed a settlement agreement that provided for Rogers to pay Faulkner a total of $450,000 in seven installments.  After paying the first installment, Rogers began to lie again and attempt to delay further payments.  Faulkner then brought suit for fraud, statutory fraud, conversion, and breach of contract.  *See* Ex. U at 16-23 (Faulkner Petition).  The parties reached an Agreed Final Judgment entitling Faulkner to recover $430,000, wherein the Court found, among other things, that: "Plaintiff [Faulkner] is entitled to recover from Defendants [Rogers and Bootstrap Ventures], jointly and severally, for his cause of action for statutory fraud . . . [and] for his cause of action for theft/conversion . . . ." *See* Ex. V at 1-2 (Faulkner Agreed Final Judgment).  Rogers did not appeal this judgment and it is now final.

35.     <u>Civil No. 200907123; *Mandarin Capital, LLC v. Montana Amorosa Revocable*</u> <u>*Trust et al.*; in the Third Judicial District Court for Salt Lake County, Utah (filed November 16,</u>

2020).  Jason Meyer ("Meyer"), the principal of Mandarin Capital, met Rogers through a mutual friend in 2019.  In July 2020, Rogers indicated that a large client, Midfrisian Dairy ("Midfrisian"), was building a factory in New Mexico that required over 1,000 acre-feet of water, for which it would pay over $10 million.  Rogers represented that Midfrisian had ample funds to cover the purchase and guaranteed that Mandarin Capital's funds would sit in escrow until Rogers had identified the water rights and be returned, regardless of the success of Midfrisian.

36.     Based on these and other representations, Mandarin Capital loaned Rogers $5,000,000 on July 24, 2020, with a requirement that Rogers repay the loan plus $600,000 in fees by November 15, 2020.  In August 2020, Rogers stated he secured the water rights, but the project expanded, and he requested an additional $1.4 million, to which Mandarin Capital agreed in exchange for additional loan fees of $168,000.  On September 21, 2020, Rogers claimed that he wired Mandarin Capital $8.35 million, but no such transfers were received.  The funds have never been repaid, and Meyer believes the New Mexico transaction was fake.  Mandarin Capital sued Rogers and the Montaña Trust for breach of contract, breach of personal guarantees, common law fraud, and negligent misrepresentation.  *See* Ex. W at 86-153 (Mandarin Capital Complaint). Based on a Stipulated Judgment by Confession, judgment was entered in Mandarin Capital's favor for $6,446,086 (excluding attorneys' fees and costs).  *See* Ex. X at 1 (Mandarin Capital Judgment). Rogers did not appeal this judgment and it is now final.[4]

---

[4]     On December 10, 2021, Mandarin Capital also sued Steven Webster, Aaron Webster, and Dennis Woods, individually, and Rogers, individually and as trustee of the Montaña Trust.  In the lawsuit, Mandarin Capital seeks a declaration that Steve Webster's abstract of judgment is invalid as it relates to the two tracts of property in Dallas that Rogers purchased, and also seeks judicial foreclosure on those same tracts.  Webster opposes Mandarin Capital's claims in part because Rogers appears to have purchased at least one of the tracts with Webster's money without his knowledge or consent as part of a fraudulent scheme, and also because the extent of the business relationship between Mandarin Capital and Rogers is unclear and it has not yet been determined whether and to what extent, if any, Mandarin Capital or its principal, Jason Meyer, played a role in or knew or reasonably should have known through appropriate due diligence of Rogers' fraudulent scheme against Webster.

37.    Case No. 19LBCV00725; *ACMC Finance and Trade LLC v. Energy Trading Co. LLC et al.*; In the Superior Court of California, County of Los Angeles (filed December 20, 2019). In September 2017, ACMC Finance ("ACMC") loaned $2,450,000 to a company for which Rogers served as intermediary, Energy Trading Company LLC ("Energy Trading"), in connection with oil ventures. Energy Trading refused to pay back the loan, and Rogers deliberately made false representations to extend the loan, providing assurances that it would be repaid. ACMC sued Rogers for, *inter alia*, money had and received, promissory fraud – fraud in the inducement, fraud – intentional misrepresentation, negligent misrepresentation, and conversion. *See* Ex. Y at 65-70, 88-142 (ACMC 1st Am. Complaint). The court granted ACMC's motion for summary adjudication as to its cause of action for intentional fraud against Rogers, *see* Ex. Z (ACMC Motion for Summary Adjudication) and Ex. AA (ACMC Order on Fraud Claim Against Rogers), and a trial on the remaining claims is scheduled for later this year.

38.    Cause No. DC-21-10421; *Ballanco et al. v. Bootstrap Ventures, LLC et al.*; in the 44th District Court in Dallas County, Texas (filed August 6, 2021). In 2020, Rogers presented Gerard Ballanco Jr. ("Ballanco"), David Meche ("Meche"), and Perry Judice ("Judice") with an opportunity to make short term loans with Bootstrap Ventures to facilitate transactions to "flip" water rights in New Mexico. Rogers represented that the property and buyers had already been identified and all that was needed was the capital to make the transactions happen. Bootstrap Ventures would execute promissory notes and Rogers would personally guarantee the loans. Under these conditions, Judice lent Rogers $100,000 on August 25, 2020 and an additional $100,000 on October 1, 2020; Meche lent Rogers $70,000 on August 20, 2020 and an additional $30,000 on October 7, 2020; and Ballanco lent Rogers $50,000 on August 24, 2020. After each note matured, Rogers and Bootstrap Ventures refused to pay the amounts due and, plaintiffs feared,

16

may not have even been engaged in the supposed transactions.  The victims brought claims for breach of contract, fraudulent misrepresentation of intent to perform, and fraudulent inducement.  *See* Ex. BB at 15-35 (Ballanco *et al.* Petition).  After reaching a settlement agreement, Rogers breached it and failed to make any required payments.  Subsequently, the court signed a Default Judgment against Rogers and Bootstrap Ventures finding that, by default, they admitted to the allegations and were liable for breaches of the promissory notes and related guarantees, fraudulent representations, and fraudulent inducements.  *See* Ex. CC at 1 (Ballanco *et al.* Default Judgment).  The court also ordered payments of $200,000 to Judice, $100,000 to Meche, and $50,000 to Ballanco (exclusive of attorneys' fees and interest).  *See id.* at 2-3.  Rogers did not appeal this Default Judgment and it is now final.

39.    Case No. A-21-842897-C; *May v. Rogers et al*; in the District Court for Clark County, Nevada (filed October 20, 2021).  Rogers approached Tony May ("May") about an investment opportunity with Bootstrap Ventures.  On November 24, 2020, May entered into a promissory note with Rogers and Bootstrap Ventures for $50,000 to be paid back in the amount of $54,500 by December 20, 2020.  Rogers provided several excuses for not paying back the loan amount, including needing time to finish the deal, illness, and frozen assets.  May then brought claims for breach of contract, breach of the covenant of good faith and fair dealing, and fraud/intentional misrepresentation.  *See* Ex. DD at 17-42, 49-64 (May 1st Am. Complaint).  Default Judgments were entered against Rogers and Bootstrap Ventures.  *See* Exs. EE (Rogers Default Judgment) and FF (Bootstrap Ventures Default Judgment).  Rogers did not appeal these judgments and they are now final.

40.    Civil Action No. 3:21-cv-00013; *Foreman et al. v. Rogers et al.*; in the U.S. District Court for the Northern District of Texas, Dallas Division (filed January 5, 2021).  In October 2020,

Ex. Pg. 050

Rogers approached John S. Foreman, III ("Foreman") with an allegedly lucrative business deal in which Rogers and Bootstrap Ventures needed a short-term loan to fund the capital necessary to fund the acquisition of a water rights deal in New Mexico.  Rogers sent Foreman and Andre C. Leblanc ("Leblanc") news articles detailing other potentially lucrative water rights deals Rogers had purportedly closed recently.  Foreman and Leblanc agreed to loan Rogers and Bootstrap Ventures $200,000.  A week later, Rogers represented that additional capital was needed to finalize the acquisition of the deal and that Foreman and Leblanc would make double their loan as soon as the deal closed, which Rogers claimed was imminent.  Foreman and Leblanc loaned an additional $450,000 to Rogers and Bootstrap Ventures, but when the loans became due and payable, neither Rogers nor Bootstrap Ventures made any payments.  In response to demands for payment, Rogers falsely told Foreman and Leblanc that he had initiated wire transfers to repay the loans on multiple occasions.  Foreman and Leblanc filed suit against Rogers and Bootstrap Ventures alleging breach of contract and common law fraud.  *See* Ex. GG at 22-36 (Foreman *et al.* 1st Am. Complaint).  A default judgment has been entered against Bootstrap Ventures, and a date for trial against Rogers has not yet been set.

41.    Cause No. 2017DCV0481; *The Steel Corp. of Tex. v. Push Start Industries, LLC et al.*; In the 327th District Court in El Paso County, Texas (filed February 10, 2017).  In 2014, Rogers contacted an executive for The Steel Corporation of Texas ("Steel Corp.") regarding an investment opportunity with his company, Push Start Industries LLC ("Push Start"),[5] dealing with the sale of mineral rights.  On three occasions over the span of several months, Rogers induced Steel Corp. to invest in purchasing and flipping mineral rights, for a total of $300,000.  For over a

---

[5]    Rogers is the only officer, director, or manager of Push Start.  *See* Ex. HH, Push Start Texas Franchise Tax Public Information Report.

year, Steel Corp. asked Rogers for updates on the investment, and Rogers offered a list of excuses, such as claiming that he was waiting for his bank to release the funds, promising that he would get the funds from his father, asking for extensions to pay, stating that he was selling his house and liquidating his assets, or ignoring inquiries.  Steel Corp. eventually sued Rogers for intentional misrepresentation, negligent misrepresentation, fraud, conversion, and violation of the Texas Securities Act.  *See* Ex. II at 69-92 (Steel Corp. Petition).  Ultimately, these claims were settled, and the lawsuit was dismissed on May 10, 2017.

42.  <u>Cause No. DC-20-01897; *Funderz.net LLC v. OMTC, Inc. et al.*; in the 191st Judicial District for Dallas County, Texas (filed February 3, 2020).</u>  Funderz.net LLC ("<u>Funderz.net</u>") entered into a series of promissory notes worth $10 million with OMTC to finance the purchase of ultra-low sulfur diesel fuel.  Rogers expressly promised to use the funds to purchase fuel but instead used the funds for personal use and never repaid the loans.  Funderz.net sued Rogers and OMTC for, *inter alia*, breach of contract, breach of guaranty, fraud, fraudulent inducement, conversion, and money had and received.  *See* Ex. JJ at 34-37, 42-44 (Funderz.net 3d Am. Petition).  The parties reached a settlement for $15 million to be paid in installments, but Rogers failed to pay as scheduled.  Although Rogers has now repaid $11.5 million of that debt, a jury trial is scheduled for later this year on the remaining amount owed to Funderz.net.

43.  <u>Cause No. DC-19-12251; *Capano et al. v. Push Start Industries, LLC et al.*; In the 192nd Judicial District Court in Dallas County, Texas (filed August 19, 2019).</u>  Anthony and Joanne Capano made four loans secured by promissory notes totaling $607,397.26 to Push Start, supposedly to fund water rights deals.  Push Start refused to pay the remaining balances on the third and fourth loans and Rogers, who personally guaranteed the notes, also refused to pay the past due balances.  Rogers conceded the debt and made a $200,000 payment, but no further

payments were made, leaving a total of $423,128.66 outstanding.  The Capanos brought claims for breach of the notes and guaranties.  *See* Ex. KK at 35-42 (Capano Petition).  Ultimately, these claims were settled, and the lawsuit was dismissed on July 27, 2022.  *See* Ex. LL (Capano Dismissal).

44.    Cause No. DC-19-01434; *Luxemborg Trading, LLC v. Organ Mountain Energy LLC et al.*; In the 162nd Judicial District Court in Dallas County, Texas (filed October 14, 2019). In July 2018, Luxemborg Trading LLC ("Luxemborg") placed an order with Rogers' wholly-owned company, Organ Mountain Energy, LLC ("Organ Mountain"),[6] for ultra-low sulfur diesel.  In August 2018, Luxemborg made four separate wire transfers to Organ Mountain totaling $1,000,000 as a deposit.  Rogers acknowledged receiving the payment and stated that shipment would begin soon.  The following month, Luxemborg sent notice cancelling the order and requesting the deposit be returned.  On October 24, 2018, the parties entered into a formal settlement agreement, but Rogers and Organ Mountain refused to make the required $1,000,000 settlement payment to Luxemborg.  Luxemborg brought claims for breach of the settlement agreement, breach of the agreement to purchase diesel, and unjust enrichment/money had and received.  *See* Ex. NN at 19-26 (Luxemborg Petition).  After suit was filed, the parties entered a new settlement agreement, and the action was dismissed on October 22, 2019.  *See* Ex. OO (Luxemborg Dismissal).

45.    Cause No. DC-20-17073; *Hodges v. Bootstrap Ventures, LLC et al.*; in the 160th Judicial District Court in Dallas County, Texas (filed November 16, 2020).  In September 2020, Clark Hodges ("Hodges") made two short-term loans totaling $150,000 to Bootstrap Ventures to

---

[6]     Rogers is listed as the sole managing member of Organ Mountain.  *See* Ex. MM, Organ Mountain Texas Franchise Tax Public Information Report.

facilitate a water rights transaction.  Rogers represented that the funds were only needed for a few days until the transaction closed, and the loans would be repaid immediately.  Rogers personally guaranteed repayment of the principal and interest.  However, neither loan was repaid, and Hodges believes the transaction never occurred.  Hodges sued for breach of contract, fraudulent representation of intent to perform, and fraudulent inducement.  *See* Ex. PP at 20-21, 24-25, 28-29, 32-43 (Hodges Petition).  Ultimately, the parties agreed to dismiss these claims.  *See* Ex. QQ (Hodges Dismissal).

**D.** **The Petitioning Creditors Have Undertaken a Reasonable Investigation, and There Is Ample Evidence that Rogers is Not Paying His Debts as They Become Due**

46.     On December 10, 2021, in connection with post-judgment discovery in Webster's lawsuit, Rogers provided a list of known creditors at the time, which he swore under penalty of perjury to be true and correct.  *See* Ex. T (Rogers Verified Interrogatory Answers & Exhibits, at Exhibit B, List of Rogers Known Creditors).  Rogers identified twenty-eight creditors with debts totaling approximately $21,195,000, all of which he identified as being "past due."  *Id.*  Several of these obligations arise from final judgments that are now unappealed and final.  At a minimum, Rogers has undisputed debts of approximately $13.9 million in the aggregate.

47.     Moreover, Rogers further disclosed in attachments to his December 10, 2021 sworn post-judgment discovery responses that he had a cumulative cash account balance of $156,184.  *See* Ex. T (Rogers Verified Interrogatory Answers & Exhibits, at Exhibit C, Summary of Dennis Rogers's Cash and Accounts with Financial Institutions).  In his interrogatory answers, he reported

minimal other assets.  *See* Ex. T (Rogers Verified Interrogatory Answers, at Answers Nos. 4, 12, & Exhibits).[7]

48.    Accordingly, the Petitioning Creditors have reasonably investigated Rogers' affairs, and they can prove that Rogers is generally not paying his debts as they become due.

## V.    RELIEF REQUESTED

49.    By this Emergency Motion, the Petitioning Creditors respectfully request entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>**, (a) appointing an interim chapter 7 trustee in this case; and (b) granting such other and further relief as the Court deems just and equitable.

## VI.    ARGUMENTS AND AUTHORITIES

### A.    Applicable Law

50.    In an involuntary case, as opposed to a voluntary case, the order for relief is entered only if the debtor does not successfully (or timely) contest the petition.  "The time between the filing of the petition for involuntary bankruptcy and the order of relief commonly is referred to as the 'gap period.'"  *In re Pucci Shoes, Inc.*, 120 F.3d 38, 41 (4th Cir. 1997) (citation omitted).  Typically, throughout the gap period, "any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced" unless and until the court orders otherwise.  11 U.S.C. § 303(f).  Section 303(g) of the Bankruptcy Code and Rule 2001 of the Federal Rules of

---

[7]    There are numerous inconsistencies with respect to Rogers' financial position that raise serious concerns that he has intentionally siphoned (and will continue to siphon) assets to put them out of the reach of creditors.  For example, in sworn interrogatory answers, Rogers reports a low annual income of approximately $24,000 but has expenditures totaling five to six times that amount every year.  The creation of the Montaña Trust, and the lack of information regarding same, further compound these grave concerns.

Ex. Pg. 055

Bankruptcy Procedure, however, authorize the appointment of an interim trustee during this gap

period.[8]  Section 303(g) provides, in pertinent part, as follows:

> At any time after the commencement of an involuntary case under
> chapter 7 of this title but before an order for relief in the case, the
> court, on request of a party in interest, after notice to the debtor and
> a hearing, and if necessary to preserve the property of the estate or
> to prevent loss to the estate, may order the United States trustee to
> appoint an interim trustee under section 701 of this title to take
> possession of the property of the estate and to operate any business
> of the debtor.

11 U.S.C. § 303(g).   Under section 303(g), bankruptcy courts have appointed interim trustees

where "that relief is 'necessary to preserve the property of the estate or to prevent loss to the

estate.'"  *See In re DiLorenzo,* 161 B.R. 752, 754 n.8 (Bankr. S.D.N.Y. 1993) (quoting 11 U.S.C.

§ 303(g)) (collecting cases providing circumstances where courts have installed interim trustees);

*see also In re The Centre for Mgmt. & Tech., Inc.*, No. 07-19486-NVA, 2007 WL3197221, *2

(Bankr. D. Md. Oct. 26, 2007) (collecting cases); *see also In re James Plaza Joint Venture*, 62

B.R. 959, 960-61 (Bankr. S.D. Tex. 1986) (appointing interim trustee in involuntary chapter 7

bankruptcy pursuant to § 303(g) standard).

      51.    Specifically, interim trustees are appointed "where the court has found that it would

protect and preserve property of the estate; prevent concealment, waste or loss of assets by the

alleged debtor; or prevent irreparable harm which would likely result between the time of the filing

of the petition and the scheduled hearing."  *DiLorenzo*, 161 B.R. at 754 n.8 (citations omitted); *see*

*also In re The Centre for Mgmt. & Tech., Inc.*, 2007 WL3197221, at *6 (appointment of interim

---

[8]     "[I]n order to avoid the appointment of an interim trustee in an involuntary case that may be dismissed, the
court must determine, as a preliminary matter, that there is a reasonable likelihood that an order for relief will be
entered." *In re Diamondhead Casino Corp.*, 540 B.R. 499, 505 (Bankr. D. Del. 2015).  Rogers admits in sworn
interrogatory answers during post-judgment discovery that he cannot pay his debts, and as shown in Section IV.D
herein, there is ample evidence that Rogers is generally not pay his undisputed, liquidated debts as they become due.
Accordingly, there is more than a reasonable likelihood that an order for relief will be entered.

trustee needed where "[s]trong uncertainty exist[ed] as to the reliability of [the debtor's] financial records and the nature of the organization itself" and thus "interim trustee [was] needed to try to make sense of these murky records and testimony").  The moving party can make this showing if the debtor has engaged in fraudulent and dishonest activities.  *See* Order [Docket No. 10, entered April 20, 2009], *In re Bernard L. Madoff*, Case No. 09-11893 (Bankr. S.D.N.Y.) (appointing interim chapter 7 trustee in involuntary case against infamous Ponzi scheme perpetrator, Bernard "Bernie" Madoff); *see also* Collier Bankruptcy Practice Guide ¶ 25.04 (2021) ("For instance, when a party in interest has reason to believe that current management is engaged in **fraudulent or dishonest activities**, or is incompetent or is grossly mismanaging the business of the debtor, it might be appropriate to consider applying for an interim trustee.") (emphasis added).

52.     Similarly, Bankruptcy Rule 2001 states that "[a]t any time following the commencement of an involuntary liquidation case and before an order for relief, the court on written motion of a party in interest may order the appointment of an interim trustee under § 303(g) of the Code."  Fed. R. Bankr. P. 2001(a).  Bankruptcy Rule 2001 further provides that "[t]he motion shall set forth the necessity for the appointment and may be granted only after hearing on notice to the debtor, the petitioning creditors, the United States trustee, and other parties in interest as the court may designate."  *Id.*[9]

53.     Also instructive is section 1104 of the Bankruptcy Code, which provides for the appointment of a trustee in chapter 11 cases "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause" or "if such appointment is in the interests of

---

[9]     Additionally, pursuant to section 105(a) of the Bankruptcy Code, this Court is authorized to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  The purpose of section 105(a) is "to assure the bankruptcy court's power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction."  2 Collier on Bankruptcy ¶ 105.01 (16th ed. 2021).

creditors, any equity security holders, and other interests of the estate."   11 U.S.C. §§ 1104(a)(1)-(2).  Courts often define "fraud" by reference to state common law fraud, and "[a]s a practical matter, most courts consider the totality of the circumstances to ascertain whether there is sufficient evidence to find that the debtor intended to defraud creditors, and whether the debtor's actions as a whole rise to the level of fraud, dishonesty, or gross mismanagement justifying a trustee's appointment."  *In re López–Muñoz*, 553 B.R. 179, 191 (B.A.P. 1st Cir. 2016), *aff'd sub nom. In re López–Muñoz*, 866 F.3d 487 (1st Cir. 2017).  Operation of a fraudulent scheme that entails "deceit, misrepresentations, omissions and outright lies" before the commencement of the case is a ground for appointment of a trustee under section 1104(a)(1).  *In re Vaughan*, 429 B.R. 14, 16, 26-28 (Bankr. D.N.M. 2010) (holding that because debtor was principal in a Ponzi scheme, cause existed to appoint a trustee in chapter 11 case).  The same reasoning should extend to the appointment of an interim trustee in a chapter 7 proceeding.  *See Matter of Beaucrest Realty Assoc.*, 4 B.R. 164, 165 (Bankr. E.D.N.Y. 1980) (finding that "[t]he legislative history suggests circumstances where . . . orders [under section 303] may be appropriate [in an involuntary case]," and "[t]hese circumstances are similar in nature to those specified in § 1104(a)(1) which authorizes the appointment of a trustee or examiner [in a chapter 11 case]").

## B.    Urgent Need for Appointment of Interim Trustee

54.    Here, there is an urgent need for an interim trustee as such relief is "necessary to preserve the property of the estate or to prevent loss to the estate."  11 U.S.C. § 303(g).  Without an interim trustee, Rogers is likely to continue his extensive pattern of dishonesty and obfuscation and disregard for court orders, thereby increasing the likelihood of loss to the estate to the detriment of all creditors.  *See In re DiLorenzo*, 161 B.R. at 754 n.8.

55.    Examples abound of Rogers' fraudulent conduct.  As the above litigation history shows, his standard *modus operandi* is to approach a victim about a fictitious business opportunity

**Ex. Pg. 058**

(typically a transaction involving water rights or fuel), request an upfront payment with a promise of repayment, request additional payments supposedly necessary to "close the deal," only to abscond with the victim's money, refuse to pay back the amounts, and evade efforts by the victim to secure repayment.  This pattern is made clear by the numerous cases that all share similar facts, even down to Rogers' practice of fabricating fake Fedwire transfers and his use of similar excuses each time.  Indeed, Rogers confessed to defrauding Webster and Faulkner in his Agreed Final Judgment with them.  Ex. Q at 3 (Webster Agreed Final Judgment); Ex. V at 1 (Faulkner Agreed Final Judgment).

56.     In light of this pattern of misleading and deceptive conduct, there is no reason to believe that Rogers will adequately safeguard and manage his property during the gap period, and Rogers' creditors face a serious risk that he will conceal or divert assets to put them out of the reach of creditors given the pending involuntary proceeding.  Rogers has defrauded and harmed his creditors (and has even admitted to doing so in certain cases), and without the protections afforded by an interim trustee, Rogers' creditors will simply have to hope that he will suddenly break his bad habits and maintain the estate for their benefit.  These legitimate concerns justify and necessitate the appointment of an interim trustee.  *See In re DiLorenzo,* 161 B.R. at 754 n.8.

57.     While Rogers' past pattern of fraud raises serious concerns over how he would manage his estate during the gap period, Rogers' pre-petition conduct also indicates that he may have already siphoned away assets and unnecessarily depleted his estate.  The disparity between Rogers' current assets and his creditor obligations is striking.  Rogers appears to have absconded with millions of dollars of his victims' funds, yet he simultaneously asserted in his sworn post-judgment discovery responses to Webster that he has virtually no non-exempt assets to show for it.  *See* Ex. T (Rogers Verified Interrogatory Answers, at Answers Nos. 4, 12, & Exhibits, at Exhibit

**Ex. Pg. 059**

C, Summary of Dennis Rogers's Cash and Accounts with Financial Institutions).  According to his December 10, 2021 sworn post-judgment discovery responses, he had a net cash position at that time of −$21,038,816.[10]

58.     Given that Rogers may have already engaged in asset diversion, his creditors face the risk that Rogers will continue to deplete his estate during the gap period, which warrants the appointment of an interim trustee.  *See In re R.S. Grist Co.*, 16 B.R. 872, 873 (S.D. Fla. 1982) (preventing diversion of assets warrants appointment of interim trustee).  Without the appointment of an interim trustee, Rogers' creditors face the risk that his funds and property will be disposed of before a trial on the merits of the involuntary petition.  *See In re James Plaza Joint Venture*, 62 B.R. at 960-61 (holding that allegation that debtor's funds would be disposed of prior to trial on merits of involuntary petition warrants appointment of interim trustee).

59.     Moreover, Rogers has proven himself to be wholly untrustworthy and totally reliant on fraud to conduct business.  Thus, there is no reason to trust the veracity of his financial records or the legitimacy of his management of his properties and businesses at this stage.  In his litigation with Webster, Rogers has consistently sought to evade responding to discovery and answering questions about the management of his estate—both by simply ignoring his obligation to respond and by invoking the Fifth Amendment.  As evidenced by how he has dealt with his other victims, Rogers cannot be trusted to legitimately manage his estate and honestly deal with others.  There is every reason to believe that he will evade his obligation during the gap period to maintain the estate, and it is imperative that an interim trustee be appointed as soon as possible.  As in *In re The*

---

[10]     Rogers identified $21,195,000 in past due amounts owed to your creditors (List of Rogers Known Creditors) compared with only $156,184 cumulative positive cash on balance as of December 2021 in your accounts (Summary of Dennis Rogers's Cash and Accounts with Financial Institutions).  Even his stated cumulative cash account balance of $156,184, however, does not take into account the garnishment judgment in favor of Steven Webster against his Goldman Sachs account ending in xxx708-8 of $162,908, which remains unpaid at this time.  Once that judgment is taken into account, Rogers' net cash position as at December 2021 was approximately −$21,038,816.

*Centre for Management & Technology, Inc.*, an interim trustee is needed to examine Rogers' unreliable financial and business records and make sense of "these murky records and testimony." 2007 WL3197221, at *6.

60.      Finally, Rogers has previously shown flagrant disregard for the judicial process and court orders.  Webster was forced to file not one, not two, but **three contempt motions** against Rogers, and Rogers was held in contempt of court twice (with the other instance of contempt being resolved by agreement).  He violated numerous court orders, including the order restraining use of his bank accounts multiple times, the first order of contempt, and the order compelling his post-judgment discovery responses.  The State Court has already found that he is willing to violate a court order that he "refrain from taking, or causing to be taken, whether directly or indirectly, any action to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of total amount not to exceed $1000, contained in" his bank accounts.  *See* Ex. R at 2-3 (9/8/21 Contempt Order).  In its second contempt order, the State Court emphasized that Rogers "has repeatedly and knowingly disregarded and disobeyed the orders of this Court," doing so even after he "has already been held in contempt of court for knowingly violating orders of this Court and even after that finding, has failed to obey the valid orders of this Court."  *See* Ex. S at 1 (11/18/21 Contempt Order).  It declared this sort of blatant disregard for the court an affront to "the dignity and authority of this Court and obstructs this Court's administration of justice."  *Id.* at 2.  Rogers' habits of deception and ruses extend beyond his business dealings and into the courts and judicial system.  He demonstrates a cold and repeated disregard for the serious financial harm that he has inflicted upon others and likewise totally disregards the authority of the judicial process.  Given Rogers' past behavior, there is a substantial risk of significant loss to the estate during the gap period unless an interim trustee is appointed.

61.    Given Rogers' contempt of the judicial process and his self-admitted fraud, the only meaningful remedy is the appointment of an interim trustee.  Any alternative, such as entering an order prohibiting or conditioning Rogers' use of the estate, would be wholly ineffective.  Indeed, Rogers has shown a flagrant disregard for and outright defiance of court orders in the past.  The Petitioning Creditors have no reason to believe that Rogers would suddenly abide by this Court's orders during the gap period.

62.    Looking to chapter 11 as an instructive guide, *see Matter of Beaucrest Realty Associates*, 4 B.R. at 165, Rogers' pattern of fraud provides ample cause for the appointment of a trustee.  Section 1104 of the Bankruptcy Code explicitly provides, among other things, that pre-petition fraud constitutes cause to appoint a trustee in a chapter 11 case.  11 U.S.C. § 1104(a)(1).  Rogers has admitted to committing fraud in a state court action, *see* Ex. Q at 3 (Webster Agreed Final Judgment), and there is more than "sufficient evidence to find that the debtor intended to defraud creditors" and that his actions "as a whole rise to the level of fraud, dishonesty, or gross mismanagement justifying a trustee's appointment." *In re López–Muñoz*, 553 B.R. at 191.  And looking at the numerous judgments and actions against Rogers, it is obvious that he has operated a fraudulent scheme that entails "deceit, misrepresentations, omissions and outright lies," and this provides cause for the appointment of a trustee. *In re Vaughan*, 429 B.R. at 16, 26-28.

63.    In sum, Rogers' pattern of misleading and deceptive conduct renders him totally unfit to manage the estate during the gap period.  His business partners cannot trust him, nor can the judicial system.  Rogers' past fraud and his demonstrated disregard for the judicial process creates a dangerous combination for Rogers' creditors, who can only hope that Rogers protects and preserves the estate during the gap period.  In light of these concerns arising out of Rogers'

dishonest and untrustworthy character, it is imperative that an interim trustee begin work immediately to marshal all of Rogers' assets for the benefit of all creditors, as well as begin investigating whether suspected fraudulent transfers made in furtherance of Rogers' schemes may be recovered and properly distributed to creditors.  Rogers should be immediately replaced to prevent further losses to the estate and its creditors.

64.    Because an interim trustee is needed to prevent further loss to the Petitioning Creditors, as well as other creditors, the relief sought in this Emergency Motion is warranted and necessary.

65.    Given the overwhelming evidence that Rogers is not paying his undisputed debts as they become due, including Rogers' own sworn interrogatory answers in underlying litigation affirming same, the Petitioning Creditors additionally request the Court set the bond at $100 or a similar nominal amount.

**WHEREFORE**, the Petitioning Creditors respectfully request that the Court enter an order, in substantially the form attached hereto as **Exhibit A**, granting the relief requested in this Emergency Motion and such other and further relief as the Court deems just and equitable.

*[Remainder of Page Intentionally Left Blank]*

Dated:  March 22, 2022

Respectfully submitted,

By:        */s/ David R. Eastlake*
David R. Eastlake
Texas Bar No. 24074165
Meghan Dawson McElvy
Texas Bar No. 24065127
Travis James Sales
Texas Bar No. 17532080
Christopher J. Tutunjian
Texas Bar No. 24110460
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
Tel:  713.229.1397
Fax:  713.229.7897
david.eastlake@bakerbotts.com
meghan.mcelvy@bakerbotts.com
travis.sales@bakerbotts.com
christopher.tutunjian@bakerbotts.com

**Counsel for Petitioning Creditor Steven A. Webster**

– and –

        */s/ David Brian Miller*
David Brian Miller
Texas Bar No. 00788057
*david@schneidlaw.com*
SCHNEIDER MILLER REYNOLDS, PC
300 N. Coit Rd., Suite 1125
Richardson, Texas 75080
Telephone:     (972) 479-1112
Facsimile:     (972) 479-1113

**Counsel for Petitioning Creditors Debra and Russell Van Cleve and Angela Garbiso**

## <u>CERTIFICATE OF CONFERENCE</u>

     The undersigned hereby certifies that on March 22, 2022, I contacted Rogers to discuss the relief requested in the foregoing Emergency Motion.  Rogers indicated that he is opposed to the relief requested herein.

                                 */s/ Meghan Dawson McElvy*
                                 Meghan Dawson McElvy

*Ex. Pg. 065*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **DENNIS JAMES ROGERS II,** | § | **Case No. 22-30500-7** |
| | § | |
| **Alleged Debtor.** | § | **(Involuntary Proceeding)** |

**ORDER GRANTING PETITIONING CREDITORS' EMERGENCY MOTION
FOR ENTRY OF AN ORDER (I) APPOINTING AN INTERIM TRUSTEE
UNDER 11 U.S.C. § 303(G) AND (II) GRANTING EMERGENCY RELIEF**
[Relates to Docket No. _____]

This matter coming before the Court upon the emergency motion (the "Emergency

Motion")[1] filed by Steven A. Webster, Debra and Russell Van Cleve, and Angela Garbiso

(collectively, the "Petitioning Creditors") for entry of an order, pursuant to sections 105(a) and

---

[1]      Capitalized terms used but not otherwise defined herein shall have the same meanings as ascribed to them in the Emergency Motion.

303(g) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>")

and Rule 2001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), (a)

appointing an interim Chapter 7 trustee and (b) granting related relief; and it appearing that this

Court has jurisdiction to consider the Emergency Motion pursuant to 28 U.S.C. § 1334; and it

appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing

that venue of this involuntary chapter 7 case and the Emergency Motion in this District is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and, after due deliberation, the Court having determined

that the relief requested in the Emergency Motion is in the best interests of the Alleged Debtor, the

estate, its creditors, and all other parties in interest; and it appearing that proper and adequate notice

of the Emergency Motion has been given and that no other or further notice is necessary; and the

Court having reviewed the Emergency Motion and having heard the statements in support of the

relief requested therein at the hearing before the Court; and good and sufficient cause appearing

therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Emergency Motion is **GRANTED** as set forth herein.

2.      Pursuant to section 303(g) of the Bankruptcy Code, the United States Trustee shall

immediately appoint an interim chapter 7 trustee (the "<u>Interim Trustee</u>") to perform the duties set

forth in sections 701 and 704 of the Bankruptcy Code.

3.      Rogers shall cooperate in all respects with the Interim Trustee in implementing this

Order, including without limitation, by providing complete and accurate information as requested

by the Interim Trustee, and otherwise assist in the Interim Trustee's management of the estate.

4.      Rogers shall not interfere with the transition of control of the estate, including all

assets and properties comprising the estate, to the Interim Trustee pursuant to this Order.

5.      Effective immediately upon entry of this Order, Rogers is and shall be prohibited from continuing to use, acquire, or dispose of property of the estate unless and until the Court orders otherwise, and Rogers shall take all appropriate and necessary actions to protect and preserve property of the estate pending the appointment of an interim chapter 7 trustee by the United States Trustee.

6.      The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

7.      This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implantation, interpretation and enforcement of this Order.

### # # # END OF ORDER # # #

# SERVICE LIST

Reserved

David R. Eastlake
Texas Bar No. 24074165
*david.eastlake@bakerbotts.com*
Meghan Dawson McElvy
Texas Bar No. 24065127
*meghan.mcelvy@bakerbotts.com*
Travis James Sales
Texas Bar No. 17532080
*travis.sales@bakerbotts.com*
Christopher J. Tutunjian
Texas Bar No. 24110460
*christopher.tutunjian@bakerbotts.com*
BAKER BOTTS L.L.P.
910 Louisiana St., Suite 3200
Houston, Texas 77002
Telephone:      (713) 229-1234
Facsimile:      (713) 229-1522

*Counsel for Petitioning Creditor Steven A. Webster*

David Brian Miller
Texas Bar No. 00788057
*david@schneidlaw.com*
SCHNEIDER MILLER REYNOLDS, PC
300 N. Coit Rd., Suite 1125
Richardson, Texas 75080
Telephone:      (972) 479-1112
Facsimile:      (972) 479-1113

*Counsel for Petitioning Creditors Debra and Russell Van Cleve and Angela Garbiso*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **DENNIS JAMES ROGERS II,** | § | **Case No. 22-30500-7** |
| | § | |
| **Alleged Debtor.** | § | **(Involuntary Proceeding)** |

### INDEX OF EXHIBITS TO
### PETITIONING CREDITORS' EMERGENCY MOTION
### FOR ENTRY OF AN ORDER (I) APPOINTING AN INTERIM TRUSTEE
### UNDER 11 U.S.C. § 303(G) AND (II) GRANTING EMERGENCY RELIEF

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Proposed Order |
| B | Service List *(Reserved)* |
| C | Bootstrap Ventures Texas Secretary of State Filing |
| D | 11/25/20 Vitol Cease & Desist Letter |
| E | Excerpts of 12/8/20 Rogers Deposition |

| F | OMTC Amended Certificate of Formation |
| G | Goldman Sachs Wire Transfer Confirmations |
| H | Goldman Sachs Emails |
| I | Excerpts of Deposition of Ryan McDonnell, Rogers' Goldman Sachs Representative |
| J | Webster Second Amended Petition |
| K | Chase Bank Records |
| L | Mandarin Capital Registered Agent Filing |
| M | McCullough Law website excerpt promoting asset protection trusts that protect debtors from "future legal action against you and your heirs" |
| N | McCullough Sparks brochure for "541Trust – Superior Asset Protection" designed to "protect[] assets from a person's potential future liabilities by removing assets from the person's legal ownership" |
| O | Montaña Amorosa Revocable Trust Agreement |
| P | Webster Settlement Agreement |
| Q | Webster Agreed Final Judgment |
| R | 9/8/21 Contempt Order |
| S | 11/18/21 Contempt Order |
| T | Excerpts of Rogers Verified Interrogatory Answers & Exhibits |
| U | Faulkner Petition |
| V | Faulkner Agreed Final Judgment |
| W | Mandarin Capital Complaint |
| X | Mandarin Capital Judgment |
| Y | ACMC First Amended Complaint |
| Z | ACMC Motion for Summary Adjudication |
| AA | ACMC Order on Fraud Claim Against Rogers |

| BB | Ballanco *et al.* Petition |
| CC | Ballanco *et al.* Default Judgment |
| DD | May First Amended Complaint |
| EE | Rogers Default Judgment |
| FF | Bootstrap Ventures Default Judgment |
| GG | Foreman *et al.* First Amended Complaint |
| HH | Push Start Texas Franchise Tax Public Information Report |
| II | Steel Corp. Petition |
| JJ | Funderz.net Third Amended Petition |
| KK | Capano Petition |
| LL | Capano Dismissal |
| MM | Organ Mountain Texas Franchise Tax Public Information Report |
| NN | Luxemborg Petition |
| OO | Luxemborg Dismissal |
| PP | Hodges Petition |
| QQ | Hodges Dismissal |

*Ex. Pg. 072*

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **DENNIS JAMES ROGERS II,** | § | **Case No. 22-30500-7** |
| | § | |
| **Alleged Debtor.** | § | **(Involuntary Proceeding)** |

**ORDER GRANTING PETITIONING CREDITORS' EMERGENCY MOTION**
**FOR ENTRY OF AN ORDER (I) APPOINTING AN INTERIM TRUSTEE**
**UNDER 11 U.S.C. § 303(G) AND (II) GRANTING EMERGENCY RELIEF**
**[RELATES TO DOCKET NO. _____]**

This matter coming before the Court upon the emergency motion (the "Emergency

Motion")[1] filed by Steven A. Webster, Debra and Russell Van Cleve, and Angela Garbiso

(collectively, the "Petitioning Creditors") for entry of an order, pursuant to sections 105(a) and

---

[1]        Capitalized terms used but not otherwise defined herein shall have the same meanings as ascribed to them in the Emergency Motion.

303(g) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code")

and Rule 2001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a)

appointing an interim Chapter 7 trustee and (b) granting related relief; and it appearing that this

Court has jurisdiction to consider the Emergency Motion pursuant to 28 U.S.C. § 1334; and it

appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing

that venue of this involuntary chapter 7 case and the Emergency Motion in this District is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and, after due deliberation, the Court having determined

that the relief requested in the Emergency Motion is in the best interests of the Alleged Debtor, the

estate, its creditors, and all other parties in interest; and it appearing that proper and adequate notice

of the Emergency Motion has been given and that no other or further notice is necessary; and the

Court having reviewed the Emergency Motion and having heard the statements in support of the

relief requested therein at the hearing before the Court; and good and sufficient cause appearing

therefor;

    **IT IS HEREBY ORDERED THAT:**

    1.      The Emergency Motion is **GRANTED** as set forth herein.

    2.      Pursuant to section 303(g) of the Bankruptcy Code, the United States Trustee shall

immediately appoint an interim chapter 7 trustee (the "Interim Trustee") to perform the duties set

forth in sections 701 and 704 of the Bankruptcy Code.

    3.      Rogers shall cooperate in all respects with the Interim Trustee in implementing this

Order, including without limitation, by providing complete and accurate information as requested

by the Interim Trustee, and otherwise assist in the Interim Trustee's management of the estate.

    4.      Rogers shall not interfere with the transition of control of the estate, including all

assets and properties comprising the estate, to the Interim Trustee pursuant to this Order.

5.      Effective immediately upon entry of this Order, Rogers is and shall be prohibited from continuing to use, acquire, or dispose of property of the estate unless and until the Court orders otherwise, and Rogers shall take all appropriate and necessary actions to protect and preserve property of the estate pending the appointment of an interim chapter 7 trustee by the United States Trustee.

6.      The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

7.      This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implantation, interpretation and enforcement of this Order.

### # # # END OF ORDER # # #

# EXHIBIT B

<u>Service List</u>

Reserved

1

# EXHIBIT C

# Texas Franchise Tax Public Information Report

05-102
FORM
(Rev.9-11/30)

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

Comptroller
of Public
Accounts

■ **Tcode** 13196 Franchise

| ■ Taxpayer number | ■ Report year | |
|---|---|---|
| 3 2 0 6 3 7 6 6 8 1 3 | 2 0 2 1 | *You have certain rights under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381or (512) 463-4600.* |

| Taxpayer name | | | | |
|---|---|---|---|---|
| **BOOTSTRAP VENTURES, LLC** | | | | |
| Mailing address | | | | Secretary of State (SOS) file number or Comptroller file number |
| **1920 MCKINNEY AVE FL 7** | | | | |
| City | State | ZIP Code | Plus 4 | |
| **DALLAS** | **TX** | **75201** | | **0802723717** |

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office |
|---|
| Principal place of business |

*Please sign below!* Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

3206376681321

**SECTION A** Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | Term expiration | m m d d y y |
|---|---|---|---|---|
| **DENNIS J ROGERS** | **DIRECTOR** | ● YES | | |
| Mailing address | City | State | | ZIP Code |
| **7775 FIREFALL WAY #1614** | **DALLAS** | **TX** | | **75230** |
| Name | Title | Director | Term expiration | m m d d y y |
| **DENNIS J ROGERS** | **PRESIDENT** | ○ YES | | |
| Mailing address | City | State | | ZIP Code |
| **7775 FIREFALL WAY #1614** | **DALLAS** | **TX** | | **75230** |
| Name | Title | Director | Term expiration | |
| | | ○ YES | | |
| Mailing address | City | State | | ZIP Code |

**SECTION B** Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C** Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

| Registered agent and registered office currently on file. *(see instructions if you need to make changes)* | ○ Blacken circle if you need forms to change the registered agent or registered office information. | | |
|---|---|---|---|
| Agent: **UNITED STATES CORPORATION AGENTS, INC.** | | | |
| Office: **9900 SPECTRUM DRIVE** | City **AUSTIN** | State **TX** | ZIP Code **78717** |

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here▶ | **Dennis J Rogers** | Title **Electronic** | Date **10-07-2021** | Area code and phone number ( **575** ) **649 - 5004** |
|---|---|---|---|---|

## Texas Comptroller Official Use Only

| VE/DE | ○ | PIR IND | ○ |
|---|---|---|---|

# EXHIBIT D



**DLS** | DOBROWSKI
LARKIN &
STAFFORD LLP

JARED A. McHAZLETT
jmchazlett@doblaw.com

November 25, 2020

*Via Certified Mail, Return Receipt Requested*
*And First Class Mail*

Dennis J. Rogers, II
6520 Del Norte Lane
Dallas, Texas 75225

RE: Cease and Desist Letter - Use of Vitol's Name and Corporate Identity

Dear Mr. Rogers:

Please be advised that this law firm represents Vitol Inc. We recently discovered that you and certain other individuals are potentially using or have previously used the name and corporate identity of Vitol Inc. and/or other affiliated entities within the Vitol family of companies (collectively "Vitol"). Specifically, we discovered you may have used the Vitol name in furtherance of a scheme to defraud third parties. The scheme, as we understand it, involved a fictitious "auction" you represented would be held by Vitol sometime earlier this year involving hydrocarbon products stored in the Port of Brownsville, Brownsville, Texas.

Vitol was recently served with a third-party subpoena in connection with a lawsuit.[1] The Amended Petition attached to the subpoena claims that you have improperly withheld funds belonging to third parties who allegedly intended to participate in this auction. We have no records of the auction you allegedly represented would be held by Vitol. We do not have records of any transaction with you or OMTC, Inc. As such, you can imagine how surprised we were when we received a subpoena seeking communications between you and Vitol and documents related to the fictitious auction.

Although your attorneys claim you yourself are a victim of a scheme involving two other persons, Blaine McManus and Gary Samson, posing as Vitol personnel, we find this unlikely given the alleged flow of funds in the lawsuit. Thus, it appears that you are either intentionally or negligently using the Vitol name to defraud third parties. The non-permitted use Vitol's name and likeness appears intended to confuse people concerning investment in your own business enterprises.

---

[1] Steven Webster, et al. v. Dennis J. Rogers, II and OMTC, Inc., Cause No. DC-20-10214, 191st Judicial District, Dallas County, Texas.

Dennis J. Rogers, II
November 24, 2020
Page 2 of 2

If Vitol's name or likeness was used for such purposes without permission, these activities constitute theft, conversion, misappropriation, misrepresentation, fraud and wire fraud, and are actionable under both state and federal civil and criminal laws. These laws provide numerous remedies to prevent unlawful conduct, including, but not limited to, preliminary and permanent injunctive relief, monetary damages, disgorgement of profits, attorneys' fees and costs, and punitive damages.

We demand that you immediately and permanently (i) stop any use of Vitol's name in furtherance of your own business and/or criminal enterprises, (ii) provide us with all available information concerning the involvement of Blaine McManus and Gary Samson in the supposed auction and the impersonation of Vitol personnel, and (iii) send written notice to any third parties (with a copy to Vitol) who may have reason to believe you, Blaine McManus, or Gary Samson represent Vitol. Such notice should inform those third parties that you, Blaine McManus, and Gary Samson have no affiliation with Vitol or authority to act on behalf of Vitol. Please provide the requested information and proof of notice by December 9, 2020.

Sincerely,

**DOBROWSKI, LARKIN & STAFFORD LLP**

Jared A. McHazlett

JAM/eke

cc:    Shawn Beloin
       Meghan Dawson McElvy
       Paul J. Dobrowski [Firm]

**UNITED STATES
POSTAL SERVICE**

December 3, 2020

Dear Evelyn Edwards:

The following is in response to your request for proof of delivery on your item with the tracking number:
**9489 0090 0027 6147 6839 80**.

| Item Details | |
|---|---|
| **Status:** | Delivered |
| **Status Date / Time:** | December 2, 2020, 3:17 pm |
| **Location:** | DALLAS, TX 75225 |
| **Postal Product:** | First-Class Mail® |
| **Extra Services:** | Certified Mail™ |
| | Return Receipt Electronic |

| Shipment Details | |
|---|---|
| **Weight:** | 0.7oz |

**Recipient Signature**

Signature of Recipient: *Dennis Rogers*
6520 DEL NORTE LN
DALLAS, TX 75225-2919

Address of Recipient:

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

# EXHIBIT E

### In the Matter Of:

*Webster vs*

*Rogers*

---

## *DENNIS ROGERS, II*

## *December 08, 2020*

---



**1**

```
 1            CAUSE NO. DC-20-10214
 2  STEVE WEBER, AARON WEBSTER, )   IN THE DISTRICT COURT
    and DENNIS WOODS,        )
 3                           )
       Plaintiffs,           )
 4                           )
    vs.                      )  191st JUDICIAL DISTRICT
 5                           )
    DENNIS J. ROGERS, II and )
 6  OMTC, INC.,              )
 7      Defendants,          )   DALLAS COUNTY, TEXAS
 8
 9
10
11  _____
12      VIDEOTAPED DEPOSITION OF DENNIS J. ROGERS, II,
    INDIVIDUALLY AND AS CORPORATE REPRESENTATIVE OF OMTC, INC.
13
        DECEMBER 8, 2020
14
        (Reported Remotely)
15  _____
16
17
18
19
        The Videotaped Deposition of DENNIS J. ROGERS,
20  II, INDIVIDUALLY, AND AS CORPORATE REPRESENTATIVE OF
    OMTC, INC., produced as a witness at the instance of the
21  Plaintiffs and duly sworn, was taken in the above-styled
    and -numbered cause on December 8, 2020, from 10:04 a.m.
22  to 4:15 p.m., before Amber Rodriguez, FPR, RPR,
    Certified Shorthand Reporter, reported by machine
23  shorthand method with the witness located in Dallas,
    Texas, pursuant to the Texas Rules of Civil Procedure,
24  the Twenty-Sixth Emergency Order Regarding the COVID-19
    State of Disaster, and the provisions stated on the
25  record or attached hereto.
```

**2**

```
 1              APPEARANCES:
 2   MEGHAN DAWSON McELVY, ESQUIRE
     MARGARET L. WITTENMYER, ESQUIRE
 3    Baker Botts, LLP
      910 Louisiana
 4    Houston, Texas 77002
      Telephone: (713) 229-1234
 5    Email: meghan.mcelvy@bakerbotts.com
 6    For the Plaintiffs via Zoom
 7
      BRADLEY M. KIRKLIN, ESQUIRE
 8    Henneman Rau, LLP
      815 Walker Street
 9    Suite 1440
      Houston, Texas 77002
10    Telephone: (713) 955-6030
      Email: bkirklin@hennemanrau.com
11
      For the Defendants via Zoom
12
13
14
15   Also Present:  Mike Bratkowski, Videographer
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1          INDEX OF PROCEEDINGS
 2  DENNIS J. ROGERS, II              PAGE
 3    Direct Examination by Ms. McElvy:    8
      CHANGES AND SIGNATURE           207
 4
      REPORTER'S CERTIFICATE          209
 5
 6          INDEX OF EXHIBITS
 7  Exhibit No.                    PAGE
 8    Exhibit 1  Amended Notice of Intention to Take the  16
        Oral and Videotaped Deposition Of
 9      Defendant Dennis J. Rogers, II
10    Exhibit 2  Amended Notice of Intention to Take the  16
        Oral and Videotaped Deposition of
11      Defendant OMTC, Inc.
12    Exhibit 3  Secretary of State Certificate of Formation
        For-Profit Corporation for OMTC, Inc.
13
      Exhibit 4  Certificate of Amendment          32
14
      Exhibit 5  OMTC, Inc. Professional Liability Insurance  3
15      Policy
16    Exhibit 6  Article Entitled New Dallas PE Firm   42
        Bootstrap Ventures Makes $1M Investment in
17      Behavior-Driven Ad Platform
18    Exhibit 7  Article Entitled PE firm Bootstrap Ventures  6
        launches in Dallas with focus on water
19      rights
20    Exhibit 8  Plaintiff Luxemborg Trading, LLC's First  47
        Amended Original Petition, Application for
21      Temporary Restraining Order, and
        Application for Temporary Injunction
22
      Exhibit 9  Plaintiffs' First Amended Petition Case.  50
23      No. DC-19-12251
24    Exhibit 10 Annual Report for Jornada Water Company  54
25
```

**4**

```
 1      INDEX OF EXHIBITS - CONTINUED
 2  Exhibit 11 Funderz.net LLC's First Amended Petition and
       Request for Exparte Temporary Restraining
 3     Order, Temporary Injunction, And Permanent
       Injunction
 4
    Exhibit 12 Complaint in Case No. 1 9LBCV00725   67
 5
    Exhibit 13 Defendants OMTC, Inc. and Dennis J. Rogers,  3
 6     II's Responses to Plaintiffs' Request for
       Disclosures
 7
    Exhibit 14 Fuel Purchase Order            75
 8
    Exhibit 15 Fuel Purchase Order            77
 9
    Exhibit 16 Texts between Dennis Rogers and Aaron   80
10     Webster
11  Exhibit 17 Steve Webster Wire Transfer      86
12  Exhibit 18 Dennis Woods Wire Transfer       86
13  Exhibit 19 JPMorgan Chase Records          87
14  Exhibit 20 E-mail Correspondence           91
15  Exhibit 21 Business Records Affidavit       103
16  Exhibit 22 Vitol Inc.'s Verified Response to   104
       Plaintiffs' Request for Production of
17     Subpoena Duces Tecum
18  Exhibit 23 Letter from Dobrowki, Larkin & Stafford   106
       LLP to Dennis J. Rogers, II, 11/25/2020
19
20  Exhibit 24 Unsworn Declaration of Dennis J. Rogers II 110
21  Exhibit 25 Defendants' Notice of Withdrawal of   116
       Summary Judgment Evidence
22  Exhibit 26 Goldman Sachs Wire Transfer Confirmation  131
       to Webster
23
24  Exhibit 27 Goldman Sachs Wire Transfer Confirmation  133
       to Woods
25  Exhibit 28 E-mail Correspondence, Subject: RE: Wires 137
```

5

1          INDEX OF EXHIBITS - CONTINUED
2   Exhibit 29 E-mail Correspondence, Subject: Return of  141
        Capital
3   Exhibit 30 Letter from Baker Botts to Dennis Rogers,  141
        07/13/2020
4
    Exhibit 31 E-mail Correspondence, Subject: Re: Call  142
5        w/ Chase Bank re: Fuel Purchase Orders
         Funds
6
7   Exhibit 32 E-mail Correspondence, Subject: Re: Fuel  143
         Purchase Orders -- wire transfers status
8   Exhibit 33 E-mail Correspondence, Subject: Re:  145
         Webster/Woods/OMTC Fuel Purchase Orders
9
    Exhibit 34 Goldman Sachs June Statement for Account  162
10       Ending in 708-8
11  Exhibit 35 Mandarin Capital, LLC Document  167
12  Exhibit 36 McCullough Sparkes Website  168
13  Exhibit 37 E-mail Correspondence, Subject: RE: GS  175
         Online Transfer Confirmation
14
    Exhibit 38 E-mail Correspondence, Subject: FWD: GS  178
15       Online Transfer Confirmation
16  Exhibit 39 Defendants OMTC, Inc. and Dennis J.  194
         Rogers, II's Objections and Responses to
17       Plaintiffs' First Set of Requests for
         Admissions
18
19
20
21
22
23
24
25

6

1          P R O C E E D I N G S
2       THE VIDEOGRAPHER:  Today's deposition is
3   taking place via video web conference due to the
4   COVID 19 pandemic.  My name is Michael Bratkowski,
5   a videographer representing Lexitas Legal.
6       Counsel on the call, please identify
7   yourselves and state whom you represent.
8       MS. McELVY:  This is Meghan McElvy, counsel
9   for Plaintiff Steven Webster, Aaron Webster and
10  Dennis Woods.  I also have in the room with me,
11  although not on video, associate at Baker Botts
12  Margaret Wittenmyer and Plaintiff Aaron Webster.
13      THE VIDEOGRAPHER:  Any other counsel?
14      MR. KIRKLIN:  Yes.  Brad Kirklin for the
15  Defendants OMTC, Inc. and Dennis J. Rogers, II.
16  And with me in my office in Houston is -- is a
17  lawyer in our law firm Laura Sammons.  And she
18  is -- she is right next to me.
19      THE VIDEOGRAPHER:  Thank you.  And we already
20  got Ms. Wittenmyer's appearance, correct?
21      COURT REPORTER:  Yes, sir.
22      Can I get you to raise your right hand,
23  please, sir.
24      Do you swear or affirm to tell the truth, the
25  whole truth and nothing but the truth, so help you

7

1   God?
2       THE WITNESS:  Yes, I do.
3       MR. KIRKLIN:  And Meghan, briefly, I'd like
4   to make a brief statement on the record.
5   Mr. Rogers, my client, wholly owns and operates and
6   is the sole shareholder of OMTC, Inc.  And he is
7   here today in his individual capacity and in his
8   capacity as OMTC's corporate representative per the
9   deposition notices.
10      Additionally, Plaintiffs in this case have
11  pleaded the alterego theory that OMTC and Rogers
12  are one and the same.  In that quote the corporate
13  form should be disregarded as between OMTC and
14  Rogers.  OMTC cannot designate any person other
15  than Rogers to testify as to the matters set forth,
16  set forth in the OMTC deposition notice, and
17  therefore Mr. Rogers intends to assert his Fifth
18  Amendment right as to questions relating to this
19  lawsuit because he has a reasonable belief such
20  answers could be used in a criminal prosecution or
21  could lead to other evidence that might be so used.
22      MS. McELVY:  Brad, as counsel for Defendants,
23  you agree this deposition will be conducted
24  pursuant to the Texas Rules of Civil Procedure,
25  correct?

8

1       MR. KIRKLIN:  Yes.
2       MS. McELVY:  And you agree that the remote
3   swearing in of Mr. Rogers as -- in his individual
4   capacity as a witness and as the corporate
5   representative of OMTC, Inc. is valid for trial and
6   impeachment purposes?
7       MR. KIRKLIN:  Yes.
8          DENNIS JAMES ROGERS, II
9   was called as a witness, and after having been first
10  duly sworn was deposed and testified as follows:
11          DIRECT EXAMINATION
12  BY MS. McELVY:
13      Q   Mr. Rogers, would you please state your full
14  name for the record.
15      A   Dennis James Rogers, II.
16      Q   Okay.  And I take it the II -- your father is
17  Dennis James Rogers?
18      A   Yes.
19      Q   Okay.  We just introduced ourselves on the
20  record a few moments ago.  My name is Meghan McElvy.
21  You and I have spoken before this lawsuit got filed.
22  You understand that I represent Steven Webster, Aaron
23  Webster and Dennis Woods in a suit they filed against
24  you and OMTC --
25      A   Yes.

9

```
1     Q     -- correct?
2     A     Yes.
3     Q     And you understand we're here for your
4  deposition and the deposition of OMTC who you are
5  serving as the corporate representative of, correct?
6     A     Yes.
7     Q     Okay.  And we'll be discussing the events
8  described in, you know, Plaintiff's petition, including
9  the alleged fuel auction hosted by Vitol in connection
10 with Vitol exiting its Brownsville, Texas fuel position;
11 the transfer of funds in the amount of $6.552 million by
12 Steven Webster and Dennis Woods to you in connection
13 with that auction and events relating to those.
14        Do you generally -- I'm not saying you agree
15 with all that.  But do you generally understand the --
16 the events that I'm referring to --
17        MR. KIRKLIN:  Objection.
18 BY MS. McELVY:
19    Q     -- in the petition?
20    A     Yes.
21    Q     Okay.  You have been deposed before today,
22 correct?
23    A     Yes.
24    Q     Okay.  Have you ever testified not in a
25 deposition but in a court of law or in an arbitration
```

10

```
1  hearing or some other type of proceeding like that?
2     A     No.
3     Q     How many times have you been deposed before
4  today?
5     A     Once.
6     Q     And was that in connection with the Luxemborg
7  trading lawsuit against you earlier this year?
8     A     On the advice of counsel, I respectfully
9  assert my Fifth Amendment right not to answer that
10 question.
11    Q     Was that in connection with a lawsuit that
12 you were deposed?
13    A     On the advice of counsel, I respectfully
14 assert my Fifth Amendment right not to answer that
15 question.
16    Q     Well, I'm going to go over some of the rules
17 of the road of a deposition.  Although you've done it
18 once, you know we're here so that I can ask you
19 questions about my clients' claims against you and OMTC
20 in the lawsuit, correct?
21    A     Yes.
22    Q     And the court reporter who is on the line
23 will be taking down a transcript of what we say and that
24 that may be used at trial or for any purposes in this
25 lawsuit, you understand that?
```

11

```
1     A     Yes.
2     Q     And the first and most thing that you need to
3  remember throughout the day is that you are under oath.
4  Do you understand that?
5     A     Yes.
6     Q     That means that you are subject to the same
7  penalties of perjury as if you were testifying in a
8  courtroom before a judge and jury.  You understand?
9     A     Yes.
10    Q     Okay.  And so that means that it's unlawful
11 to lie in this deposition and in the course of your
12 testimony today.  And you agree to tell the truth here
13 today, correct?
14    A     Yes.
15        MR. KIRKLIN:  Form.
16 BY MS. McELVY:
17    Q     All right.  We're conducting this deposition
18 virtually due to public health concerns from the -- the
19 ongoing COVID-19 pandemic.  Describe where you are
20 testifying from.
21    A     I am testifying in my office in Dallas,
22 Texas.
23    Q     What office?
24    A     The office of OMTC, Inc.
25    Q     What is the address?
```

12

```
1     A     1920 McKinney Avenue, Floor No. 7, Dallas,
2  Texas 75225.
3     Q     Who else is in the room with you?
4     A     No one.
5     Q     Okay.  Are you able to pan your camera around
6  so that we can see the full room?
7     A     Sure.  (Panning camera.)
8        Was that sufficient?
9     Q     So what -- well, that gave me a side to side.
10 What's on the other side of you; what are you facing?
11    A     Let me -- let me switch cameras real quick,
12 and I'll be able to do a 360 for you.
13    Q     Thank you.
14    A     Still hear me and see me okay?
15    Q     Yes.
16    A     (Panning camera.)
17    Q     Okay.  Thank you.
18    A     I'm going to switch cameras one more time.
19    Q     Okay.
20        All right.  Thank you.  I appreciate that.
21        Now, you understand that it would be improper
22 for anyone else to enter the room and to be talking to
23 you in the course of your testimony today or -- or
24 providing you answers or signaling to you on how to
25 answer my questions, correct?
```

13

1    A    Correct.  My door is locked.
2    Q    Okay.  And you agree not to do that today,
3  right?
4    A    Correct.
5    Q    Do you have a cell phone or an Apple watch
6  with you today?
7    A    I have a cell phone.
8    Q    Okay.  I would ask that you please turn it
9  off at this point.
10   A    (Witness complies.)
11   Q    You are not wearing an Apple watch or another
12 type of watch that can communicate?
13   A    No.
14   Q    Okay.  And do you have instant message or any
15 other similar messaging programs on the computer that
16 you are using right now?
17   A    No.
18   Q    Okay.  And you can confirm that if there is
19 anything like that it will remain on your computer; it
20 will remain disabled and not activated throughout the
21 deposition today, correct?
22   A    Correct.
23   Q    Okay.  You understand that you may not text,
24 e-mail or message in any way with your counsel while
25 you're testifying today, correct?

14

1    A    Correct.
2    Q    Okay.  You can visit during breaks, but while
3  you're testifying you may not do that.  And you agree to
4  abide by these rules?
5    A    Yes, ma'am.
6    Q    If you don't understand a question that I've
7  asked, I'll just ask you to have me repeat it or
8  rephrase it so that I know when you're answering a
9  question you've understood it, okay?
10   A    Okay.
11   Q    If you do not ask to clarify and you answer
12 the question, we will assume and the jury will assume
13 that you understood it, do you -- do you understand
14 that?
15   A    Yes.
16   Q    Okay.  We're doing fine so far, but continue
17 to answer out loud, not a nodding or shaking of the head
18 while we're on video.  We still need to give the court
19 reporter audio record of what is said today, okay?
20   A    Understood.
21   Q    Are you on any medication today?
22   A    No.
23   Q    Are you under the influence of alcohol,
24 drugs, or any other narcotics?
25   A    No.

15

1    Q    Is there any reason that you can't give full
2  and truthful testimony today?
3    A    No.
4    Q    Have you ever previously invoked the Fifth
5  Amendment in any other litigation?
6    A    No.
7    Q    This is the first time in a case that you've
8  been involved in in which you have invoked the Fifth
9  Amendment, do I understand you correctly?
10   A    Yes.
11       MS. McELVY:  You pull up Exhibit No. 2,
12   OMTC's deposition notice.  And just go to the top.
13       And I guess also pull up and mark Exhibit 1,
14   which is the Notice of the Deposition of Dennis J.
15   Rogers, II.
16       THE VIDEOGRAPHER:  Yeah.  I can't -- I can't
17   really share two documents at the same time.
18   It's --
19       MS. McELVY:  I understand.
20       THE VIDEOGRAPHER:  Okay.
21       MS. McELVY:  Okay.  Can you pull up
22   Exhibit 1?
23       THE VIDEOGRAPHER:  Will do.
24   BY MS. McELVY:
25   Q    All right.  Before you is the notice of your

16

1  deposition here today in your individual capacity.  And
2  you understand that you're being deposed in that
3  capacity in part today, correct?
4    A    Yes.
5       MS. McELVY:  Okay.  And if we go back to
6  Exhibit 2.  Just -- just so I'm clear, if I use an
7  exhibit today, do I need to actually on the record
8  say mark that as an exhibit or that will -- I do?
9  Okay.
10      Please mark as Exhibit 1, Dennis J Rogers, II
11  Notice of Deposition today.  Mark as Exhibit 2, the
12  Notice of Deposition of OMTC Inc.
13      (Exhibit 1 was marked for identification)
14      (Exhibit 2 was marked for identification)
15  BY MS. McELVY:
16   Q    You also understand that you are here in your
17 capacity as the corporate representative of OMTC,
18 correct?
19   A    Yes.
20   Q    And you can do that because you're the
21 president of OMTC, right?
22   A    Yes.
23   Q    You are the sole director on the Board of
24 Directors of OMTC?
25   A    Yes.

25

```
1    videographer Mike can share those through the chat
2    feature.  Okay?
3        MR. KIRKLIN:  Can you e-mail those to me?
4        MS. McELVY:  We can e-mail the marked
5    depositions after the exhibit -- after the
6    deposition, yes.
7        MR. KIRKLIN:  That would be best.  Because my
8    -- I have an issue with my chat function.
9        MS. McELVY:  All right.
10   BY MS. McELVY:
11   Q    Before you is what has been marked as
12   Exhibit 3 to your deposition.  This shows that OMTC,
13   Inc. was formed on June 21, 2018, correct?
14   A    Correct.
15   Q    For what purpose did you form OMTC, Inc.?
16   A    To sell and market diesel fuel in the state
17   of Texas.
18   Q    What type of diesel fuel?
19   A    A variety.  Over the road, as well as red dye
20   diesel.
21   Q    Okay.  Also known as ultra low sulfur diesel
22   for over the road and high sulfur diesel for red dye?
23   A    Yes, ma'am.
24   Q    Does OMTC, Inc. carry on any other business
25   besides buying and selling diesel fuel?
```

26

```
1    A    Yes.
2    Q    What is the business of OMC, Inc.?
3    A    Again, to market and sell both gasoline and
4    diesel fuel.
5    Q    Besides buying and selling bulk gasolines and
6    diesel fuel, does OMTC, Inc. carry on any other type of
7    business?
8    A    On the advice of counsel, I'm respectfully
9    asserting my Fifth Amendment right to not answer that
10   question.
11   Q    Does it buy and sell in jet fuel?
12   A    On the advice of counsel, I'm respectfully
13   asserting my Fifth Amendment right to not answer that
14   question.
15   Q    Are there any other owners or investors in
16   OMTC, Inc.?
17   A    No.
18   Q    If we scroll down the page of Exhibit 3,
19   originally --
20       MS. McELVY:  Sorry.  You went too far.  Still
21   on Page 1.
22   BY MS. McELVY:
23   Q    The directors listed were, No. 1, Thomas Ross
24   and No. 2, Director 2, Dennis James Rogers.  That does
25   not say Dennis James Rogers, II.  But is that a
```

27

```
1    reference to you on this filing?
2    A    Yes.
3    Q    So your father was never a director of OMTC,
4    Inc., correct?
5    A    No.
6    Q    Who is Thomas Ross?
7    A    He was an original partner but shortly after
8    formation of the company he was removed.
9    Q    Why was he removed?
10   A    He no longer wanted to participate with OMTC.
11   Q    Does he currently own any stake or have any
12   participation or involvement with the company at all?
13   A    No.
14   Q    And OMTC's office is where you are located
15   today, 1920 McKinney Avenue, Floor Seven, Dallas, Texas?
16   A    Yes, ma'am.
17   Q    Do you rent or own that property?
18   A    We rent it.
19   Q    Does OMTC, Inc. own any physical assets aside
20   from the office supplies there in your office and office
21   equipment?
22   A    On the advice of counsel, I am respectfully
23   asserting my Fifth Amendment right to not answer that
24   question.
25   Q    How many employees did OMTC, Inc. have in
```

28

```
1    2018 when you formed it?
2    A    Zero.
3    Q    Including Mr. Ross and yourself, originally
4    you were each directors but the company had zero
5    employees, correct?
6    A    Correct.
7    Q    Originally did Mr. Ross have on ownership
8    interest in OMTC, Inc.?
9    A    Yes.
10   Q    What was his interest?
11   A    49 percent.
12   Q    Okay.  And currently you own 100 percent of
13   OMTC, Inc.?
14   A    Yes.
15   Q    Did you buy Mr. Ross out when he left the
16   company?
17   A    He -- he didn't contribute his amount to the
18   company, and so he never really even gained his share.
19   He was supposed to contribute, and he did not.
20   Q    So I understand you to say that the entire
21   time it's been in existence you have owned 100 percent
22   of the shares of OMTC, Inc.?
23   A    Yes.
24   Q    How many employees does the company have
25   today?
```

Case 2:22-cv-30500-ohw7DoDoc 251e3 07/02d/29 E/ntere E08/82d/29 20/520451:2Page 8 of e 26
Ex Ro ger, II 58 of 489
Dennis Rogers, III December 08, 2020

29

1   A   Zero.
2   Q   Has OMTC, Inc. ever had any employees?
3   A   No.
4   Q   Has OMTC, Inc. ever had any other officer or
5   director besides yourself and Mr. Thomas Ross?
6   A   No.
7   Q   You are the only individual with access to or
8   control over OMTC's bank account, correct?
9   A   Yes.
10  Q   Do you keep financial statements for OMTC,
11  Inc.?
12  A   Yes.
13  Q   And you've done that in each year in 2018,
14  '19 and '20?
15  A   Yes.
16  Q   Do you have them audited?
17  A   No.
18  Q   If they were requested, are those available
19  to you that you could access to produce if ordered by
20  the Court?
21  A   Yes.
22  Q   How much cash on hand does OMTC have right
23  now?
24  A   On the advice of counsel, I'm respectfully
25  asserting my Fifth Amendment right to not answer that

30

1   question.
2   Q   Does OMTC have any debt?
3   A   On the advice of counsel, I'm respectfully
4   asserting my Fifth Amendment right not to answer that
5   question.
6   Q   How much debt does OMTC Inc. have?
7   A   On the advice of counsel, I'm respectfully
8   asserting my Fifth Amendment right not to answer that
9   question.
10  Q   You would agree that OMTC, Inc. is
11  undercapitalized relative to its potential liabilities,
12  correct?
13      MR. KIRKLIN:  Objection.
14  A   On the advice of counsel, I'm respectfully
15  asserting my Fifth Amendment right not to answer that
16  question.
17  BY MS. McELVY:
18  Q   Have you ever conducted a Board of Directors
19  meeting of OMTC, Inc.?
20  A   On the advice of counsel, I respectfully
21  assert my Fifth Amendment right not to answer that
22  question.
23  Q   Do you have any corporate meeting records of
24  OMTC, Inc.?
25  A   On the advice of counsel, I am respectfully

31

1   asserting my Fifth Amendment right not to answer that
2   question.
3   Q   Has OMTC, Inc. ever adopted a corporate
4   resolution?
5   A   On the advice of counsel, I'm respectfully
6   asserting my Fifth Amendment right not to answer that
7   question.
8   Q   Are the corporate records of OMTC, Inc.
9   available to you that you could produce if ordered to do
10  so by the Court?
11  A   On the advice of counsel, I'm respectfully
12  asserting my Fifth Amendment right not to answer that
13  question.
14  Q   As OMTC's sole owner and shareholder, and
15  given that it has no other employees, you are the sole
16  custodian of OMTC's record, correct?
17      MR. KIRKLIN:  Form.
18  A   Yes.
19  BY MS. McELVY:
20  Q   Does OMTC have any corporate policies like
21  sexual harassment policy or a -- you know, anything
22  along those lines?
23  A   On the advice of counsel, I respectfully
24  assert my Fifth Amendment right not to answer that
25  question.

32

1       MS. McELVY:  If we could pull up OM- --
2   Exhibit 4 which is -- and mark as Exhibit 4, OMTC's
3   Certificate of Amendment filed with the Texas
4   Secretary of State on November 28th, 2018.
5       (Exhibit 4 was marked for identification)
6   BY MS. McELVY:
7   Q   Mr. Rogers this is the Certificate of
8   Amendment for OMTC, Inc.  And as I understand it, this
9   was filed because you removed Mr. Thomas Ross as a
10  director, leaving yourself as the sole director of the
11  company, correct?
12  A   Yes.
13  Q   Was there any other reason that you filed the
14  Certificate of Amendment?
15  A   No.
16  Q   Okay.  That's the only change I saw.  And I
17  just wanted to confirm that was why you made this filing
18  with the Texas Secretary of State; is that correct?
19  A   Correct.
20  Q   Okay.  OMTC's business purpose and the
21  business that it conducts did not change at this point
22  in time, correct?
23  A   No.
24      MS. McELVY:  Would you please pull up
25  Exhibit 5 which is OMTC professional liability

Dennis Rogers, II - December 08, 2020

41

1  question.
2     Q    Do you believe your acts as alleged in this
3  lawsuit involve criminal, dishonest and knowingly
4  wrongful conduct?
5        MR. KIRKLIN:  Objection, form.
6     A    On the advice of counsel, I'm respectfully
7  asserting my Fifth Amendment right not to answer that
8  question.
9  BY MS. McELVY:
10    Q    I want to ask you about some other businesses
11 that you currently or may have in the past owned or
12 been -- or all or a part of.  The first is a company
13 named Bootstrap Ventures, LLC.  Do you -- do you know
14 which one I'm referring to?
15    A    Yes.
16    Q    You launched that company in 2020; is that
17 correct?
18    A    Yes.
19    Q    In what month?
20    A    In 2020?  Excuse me.  Could you repeat that
21 question again.
22    Q    In what month in 2020 did you start Bootstrap
23 Ventures?
24    A    I don't know if we started in 2000- -- 2020.
25 I would have to get back to you on that.  I -- I don't

42

1  remember when we started it.
2        MS. McELVY:  Could you pull up document
3  No. 6.
4        MS. McELVY:
5     Q    And we'll mark this as Exhibit 6 to your
6  deposition.
7        (Exhibit 6 was marked for identification)
8  BY MS. McELVY:
9     Q    It's an article titled New Dallas PE Firm
10 Bootstrap Ventures Makes $1M Investment in
11 Behavior-Driven Ad Platform.  Do you see that?
12    A    Yes.
13    Q    And that's your picture featured there in
14 this article at Exhibit 6, correct?
15    A    Yes.
16    Q    Okay.  And this article was published in May
17 of 2020.  And so that's why I was asking you if this
18 coincided with you forming the company or launching the
19 company?
20    A    Can you rephrase the question?
21    Q    Sure.  This article came out in or about
22 May 2020.  And my question is:  Does that refresh your
23 collection -- recollection that you began that company
24 in about May of this year?
25        MR. KIRKLIN:  Objection, form.  Meghan, it

43

1  looks like it's June 16th, 2020, just for
2  clarification.
3        MS. McELVY:  It says it was updated then, but
4  let me just short circuit this.
5  BY MS. McELVY:
6     Q    Mr. Rogers, what month and year was Bootstrap
7  Ventures formed, to the best of your knowledge?
8     A    I have to get back to you on that.  I don't
9  remember.
10    Q    Do you recall if it was this year or last
11 year?
12    A    I do not believe it was in 2020.
13    Q    You believe it was in 2019?
14    A    Correct.
15    Q    You are the president of Bootstrap Ventures?
16    A    Yes.
17    Q    How many other owners or investors or
18 shareholders does the company have?
19    A    On the advice of counsel, I'm respectfully
20 asserting my Fifth Amendment right not to answer that
21 question.
22    Q    Is the other person in this photograph in
23 Exhibit 6 Hunter Fedden Ross still an owner or
24 shareholder or member of Bootstrap Ventures?
25    A    On the advice of counsel, I'm respectfully

44

1  asserting my Fifth Amendment right not to answer that
2  question.
3     Q    Does Bootstrap Ventures have any employees?
4     A    On the advice of counsel, I'm respectfully
5  asserting my Fifth Amendment right not to answer that
6  question.
7     Q    Where does Bootstrap Ventures have an office?
8     A    On the advice of counsel, I'm respectfully
9  asserting my Fifth Amendment right not to answer that
10 question.
11    Q    I believe in this article it says that the --
12 the company had an office in Dallas, Texas and also an
13 office in California where Hunter was located.  Is that
14 still the case?
15        MR. KIRKLIN:  Objection, form.
16    A    On the advice of counsel, I'm respectfully
17 asserting my Fifth Amendment right not to answer that
18 question.
19 BY MS. McELVY:
20    Q    Bootstrap Ventures was founded to focus on
21 water rights transactions; is that correct?
22    A    On the advice of counsel, I'm respectfully
23 asserting my Fifth Amendment right not to answer that
24 question.
25    Q    What is the nature of Bootstrap Ventures'

45

1  business?
2      A    On the advice of counsel, I'm respectfully
3  asserting my Fifth Amendment right not to answer that
4  question.
5      Q    You have sole access to and control over the
6  company's bank accounts?
7      A    On the advice of counsel, I'm respectfully
8  asserting my Fifth Amendment right not to answer that
9  question.
10     Q    Is the $1 million investment discussed in
11 this article still in a viable project or venture?
12     A    On the advice of counsel, I'm respectfully
13 asserting my Fifth Amendment right not to answer that
14 question.
15     Q    Does Bootstrap Ventures have any bank
16 accounts?
17     A    On the advice of counsel, I'm respectfully
18 asserting my Fifth Amendment right not to answer that
19 question.
20     Q    Has Bootstrap Ventures ever been sued or
21 threatened with a lawsuit?
22     A    On the advice of my counsel, I am
23 respectfully asserting my Fifth Amendment right not to
24 answer that question.
25     Q    You also own or are part owner of a company

46

1  called Organ Mountain Energy, LLC, correct?
2      A    Yes.
3      Q    Sorry.  Let me go back to Bootstrap Ventures.
4      MS. McELVY:  If we could pull up Document
5  No. 7, which is another article about the company.
6      (Exhibit 7 was marked for identification)
7  BY MS. McELVY:
8      Q    And we'll mark this as Exhibit 7 to your
9  deposition.  This is an article that was published on
10 May 1st, 2020.  And it's entitled PE Firm Bootstrap
11 Ventures Launches in Dallas with Focus on Water Rights.
12 Do you see that?
13     A    Yes.
14     Q    Let me ask you this.  You said that you were
15 the president of Bootstrap Ventures.  Is it still a
16 company; does it still exist?
17     A    Yes.
18     Q    You have not wound it up or -- or closed it,
19 correct?
20     A    No.
21     MR. KIRKLIN:  Objection, form.
22 BY MS. McELVY:
23     Q    If we turn to Page 3 of this article, the
24 first paragraph at the top, you see there that it says:
25 The new firm will be -- Bootstrap Ventures will be led

47

1  by Rogers.  And in that paragraph it says:  In addition
2  to selling his previous company Jonada Water Company to
3  the City of Las Cruces in a $6.8 million deal which
4  marked one of the largest private water utility
5  purchases in the country.  You see where it says that?
6      A    Yes.
7      Q    And is that information that you provided to
8  author of this article?
9      A    Can you rephrase the question?
10     Q    Yeah.  Did you provide the publisher of this
11 article with information about your previous sale or
12 deal relating to the Jornada Water Company in order for
13 them to include it in this article?
14     A    I don't recall.
15     Q    That was a deal that you had been previously
16 involved with; is that correct?
17     A    On the advice of counsel, I'm respectfully
18 asserting my Fifth Amendment right to not answer that
19 question.
20     MS. McELVY:  Let's pull up document No. 8.
21     (Exhibit 8 was marked for identification)
22 BY MS. McELVY:
23     Q    And we'll mark it as Exhibit 8 to your
24 deposition.
25     Okay.  What we've marked as Exhibit 8 to your

48

1  deposition is a petition, First Amended Petition, filed
2  by Luxemborg Trading, LLC against you individually and a
3  company you owned call Organ Mountain Energy, LLC,
4  correct?
5      A    Yes.
6      Q    You are the president of Organ Mountain
7  Energy, LLC; is that right?
8      A    Yes.
9      Q    And you are the sole owner and member of that
10 company?
11     A    Yes.
12     Q    There are no other employees, directors or
13 investors in the company, correct?
14     A    On the advice of counsel, I respectfully
15 assert my Fifth Amendment right not to answer that
16 question.
17     Q    Does Organ Mountain Energy have an office?
18     A    On the advice of counsel, I'm respectfully
19 asserting my Fifth Amendment right to not answer that
20 question.
21     Q    Where is the office of Organ Mountain Energy?
22     A    On the advice of counsel, I'm respectfully
23 asserting my Fifth Amendment right not to answer that
24 question.
25     Q    Does Organ Mountain Energy, LLC have any bank

49

1  accounts?
2      A    On the advice of counsel, I'm respectfully
3  asserting my Fifth Amendment right not to answer that
4  question.
5      Q    You have sole access to Organ Mountain
6  Energy's bank accounts, correct?
7      A    On the advice of counsel, I'm respectfully
8  asserting my Fifth Amendment right not to answer that
9  question.
10     Q    You understand that in this lawsuit Luxemborg
11 alleged that it paid a total of a million dollars as a
12 deposit to being -- receiving a shipment of ultra low
13 sulfur diesel, correct?
14     A    On the advice of counsel, I'm respectfully
15 asserting my Fifth Amendment right not to answer that
16 question.
17     Q    And you entered into a settlement agreement
18 requiring you and Organ Mountain to pay a million
19 dollars, correct?
20     A    On the advice of counsel, I'm respectfully
21 asserting my Fifth Amendment right not to answer that
22 question.
23     Q    But you breached that settlement agreement
24 and that one million dollars was not paid, which in part
25 forms the basis of this First Amended Original Petition

50

1  against you and Organ Mountain Energy, correct?
2      MR. KIRKLIN:  Objection, form.
3      A    On the advice of counsel, I'm respectfully
4  asserting my Fifth Amendment right not to answer that
5  question.
6  BY MS. McELVY:
7      Q    You did eventually resolve this lawsuit by
8  paying the one million dollars to Luxemborg's counsel,
9  correct?
10     A    On the advice of counsel, I'm respectfully
11 asserting my Fifth Amendment right not to answer that
12 question.
13     Q    Have any other lawsuits been filed or
14 threatened against Organ Mountain Energy?
15     A    On the advice of counsel, I'm respectfully
16 asserting my Fifth Amendment right not to answer that
17 question.
18     Q    Just to confirm, Organ Mountain Energy still
19 exists today; it has not been wound up or closed,
20 correct?
21     A    Yes.
22     MS. McELVY:  Pull up exhibit -- Document
23 No. 9.
24     (Exhibit 9 was marked for identification)
25

51

1  BY MS. McELVY:
2      Q    And mark it as Exhibit No. 9 to your
3  deposition.  This is a lawsuit filed by Anthony J.
4  Capano and Joanne Capano against a company you mentioned
5  previously, the first company you formed after you left
6  schooling at UT Dallas, Push Start Industries, LLC.  And
7  it says Dennis Rogers, individually.  Do you see that?
8      A    Yes.
9      Q    Okay.  And that reference there, although it
10 doesn't have your full name, Dennis James Rogers, II,
11 that is you, correct, not your father?
12     A    That is me, correct.
13     Q    Okay.  And you currently still own Push Start
14 Industries, LLC?
15     A    Yes.
16     Q    You are the president of Push Start
17 Industries?
18     A    Yes.
19     Q    That company also focuses on water rights
20 deals; is that right?
21     A    On the advice of counsel, I'm respectfully
22 asserting my Fifth Amendment right not to answer that
23 question.
24     Q    And you are the sole owner and shareholder or
25 member of Push Start Industries, LLC, and there are no

52

1  other employees or directors or officers; is that
2  correct?
3      A    Correct.
4      Q    You have sole access to Push Start
5  Industries' bank accounts then?
6      A    On the advice of counsel, I'm respectfully
7  asserting my Fifth Amendment right not to answer that
8  question.
9      Q    As I understand it from reading this petition
10 and the Capanos' lawsuit against you and Push Start
11 Industries, they had executed four promissory notes and
12 sued -- sued you and Push Start because Push Start had
13 failed and refused to pay the remaining balance on the
14 third and forth notes; is that correct?
15     MR. KIRKLIN:  Objection, form.
16     A    On the advice of counsel, I'm respectfully
17 asserting my Fifth Amendment right not to answer that
18 question.
19 BY MS. McELVY:
20     Q    And those were promissory notes that you
21 personally had guaranteed, right?
22     MR. KIRKLIN:  Form.
23     A    On the advice of counsel, I'm respectfully
24 asserting my Fifth Amendment right not to answer that
25 question.

145

1 we on?
2      COURT REPORTER:  Do you not want to use
3 Exhibit -- Document 32?
4      MS. McELVY:  No.  Not right now.
5      COURT REPORTER:  Then this will be --
6 Document 33 will be Exhibit 33.
7      MS. McELVY:  Okay.
8      (Exhibit 33 was marked for identification)
9 BY MS. McELVY:
10     **Q    So this Exhibit 33 shows that on July 21 this**
11 **is actually communication between myself and your**
12 **original counsel on this case, a guy named Brett Chisum**
13 **with McCathern Law Firm; is that correct?**
14     A    On the advice of counsel, I'm respectfully
15 asserting my Fifth Amendment right to not answer that
16 question.
17 BY MS. McELVY:
18     **Q    And if we scroll down to the bottom of this**
19 **first page --**
20     MS. McELVY:  Actually, let's scroll to the --
21 keep scrolling down.  There we go.
22 BY MS. McELVY:
23     **Q    You see his e-mail to me on July 21st that**
24 **says he represents OMTC and you're recently notified of**
25 **the demand letter that Baker Botts sent.  And so he's**

146

1 **reaching out to discuss the issues.  Do you see that?**
2     A    On the advice of counsel, I'm respectfully
3 asserting my Fifth Amendment right to not answer that
4 question.
5     **Q    And then if we scroll back up to my response**
6 **to him, you see that we had proposed -- or actually I**
7 **confirm that I had reached out to you directly and**
8 **accepted your offer to schedule a three-way call with**
9 **Chase to better -- Chase Bank to better understand the**
10 **reasons for the delay and the return of Plaintiffs'**
11 **funds which said could be scheduled for 2:30 p.m. today.**
12 **Do you see that?**
13     A    On the advice of counsel, I am respectfully
14 asserting my Fifth Amendment right to not answer that
15 question.
16     THE VIDEOGRAPHER:  Counsel, can you give me
17 ten seconds to clear some of these old exhibits
18 because I'm running out of memory.  Thank you.
19     MS. McELVY:  Can you get back to the exhibit.
20 There we go.  Thanks.  Can you scroll to the top
21 e-mail.
22 BY MS. McELVY:
23     **Q    So regarding this three-way call that was**
24 **agreed to have with Chase to better understand these**
25 **issues, Brett e-mailed on July 21 and said that**

147

1 **you've been -- he's been unable to speak with you**
2 **because at that point you're in the hospital with your**
3 **wife for a medical issue.  Do you see that?**
4     A    On the advice of counsel, I'm respectfully
5 asserting my Fifth Amendment right to not answer that
6 question.
7     **Q    And your wife being in the hospital that day**
8 **was the reason that you gave to your counsel that your**
9 **counsel then gave to me as to why we couldn't conduct**
10 **that call with Chase Bank that day, correct?**
11     MR. KIRKLIN:  Objection, form.  I think -- I
12 think we're getting into attorney/client questions.
13     MS. McELVY:  What?
14     MR. KIRKLIN:  Do not answer that question
15 based on the attorney/client privilege.
16 BY MS. McELVY:
17     **Q    Was your wife actually in the hospital at**
18 **this point in time?**
19     A    On the advice of counsel, I'm respectfully
20 asserting my Fifth Amendment right to not answer that
21 question.
22     **Q    What medical issue was your wife having at**
23 **this time?**
24     A    On the advice of counsel, I am respectfully
25 asserting my Fifth Amendment right to not answer that

148

1 question.
2     MS. McELVY:  Go back to the Chase Bank
3 records on -- at Exhibit 18 [sic] which is Document
4 No. 18.
5 BY MS. McELVY:
6     **Q    I want to start by looking at the May the**
7 **activity for OMTC.**
8     MR. KIRKLIN:  Which exhibit is this?  Is it
9 18?
10     MS. McELVY:  I believe so.  18.  It's the
11 Chase Bank records.  And if we turn to Bates Page
12 27 and 28.  Just -- we can look at 27.
13 BY MS. McELVY:
14     **Q    This is the May activity on OMTC's account**
15 **ending in 7879 with Chase.  Do you see that?**
16     A    On the advice of counsel, I'm respectfully
17 asserting my Fifth Amendment right to not answer that
18 question.
19     **Q    And it shows a total of approximately 777,000**
20 **in deposits and additions that month and nearly the same**
21 **amount of withdraws, correct?**
22     A    On the advice of counsel, I am respectfully
23 asserting my Fifth Amendment right to not answer that
24 question.
25     **Q    And the primary deposit comes from an entity**

149

1 called Five Oaks Commodities, LLP. Again, who is Five
2 Oaks Commodities?
3    A    On the advice of counsel, I am respectfully
4 asserting my Fifth Amendment right to not answer that
5 question.
6    Q    Do you own any portion of Five Oaks
7 Commodities, LLP?
8    A    On the advice of counsel, I am respectfully
9 asserting my Fifth Amendment right to not answer that
10 question.
11    Q    Your ending balance as of May 29 in OMTC's
12 account was just $239.82, correct?
13    A    On the advice of counsel, I am respectfully
14 asserting my Fifth Amendment right to not answer that
15 question.
16    Q    So if we flip to Bates Page 31, this is your
17 June activity statement for OMTC's 7879 account. And we
18 see that the beginning balance is at that 200 -- that
19 same $239.82, correct?
20    A    On the advice of counsel, I am respectfully
21 asserting my Fifth Amendment right to not answer that
22 question.
23    Q    On June 19, this reflects the wire transfers
24 we talked about earlier from Steven Webster and Dennis
25 Woods into OMTC's 7879 account, correct?

150

1    A    On the advice of counsel, I'm respectfully
2 asserting my Fifth Amendment right to not answer that
3 question.
4    Q    And what you immediately do is transfer all
5 but 2,000 of that $6.552 million to your personal Chase
6 checking account ending in 1503, right?
7    A    On the advice of counsel, I'm respectfully
8 asserting my Fifth Amendment right to not answer that
9 question.
10    Q    You never informed Plaintiff that as soon as
11 you got their money you were going to take it out of
12 OMTC's account and put it into your personal Chase
13 checking account, correct?
14    A    On the advice of counsel, I'm respectfully
15 asserting my Fifth Amendment right to not answer that
16 question.
17    Q    They never gave you any sort of consent or
18 authorization to do that, right?
19    A    On the advice of counsel, I'm respectfully
20 asserting my Fifth Amendment right to not answer that
21 question.
22    Q    And that is not dealing fairly, truthfully or
23 honestly with them in connection with the proposed Vitol
24 auction as you had agreed, correct?
25    MR. KIRKLIN:  Form.

151

1    A    On the advice of counsel, I'm respectfully
2 asserting my Fifth Amendment right to not answer that
3 question.
4 BY MS. McELVY:
5    Q    And you knew that their understanding is that
6 those funds would remain on account with OMTC until
7 replaced by funds from the ultimate buyer at which point
8 they would be promptly returned, correct?
9    A    Can you rephrase the question?
10    Q    You understood from your communications and
11 conversations with -- with the Plaintiffs that it was
12 their understanding those funds -- their funds would
13 remain on account -- in OMTC's account the entire time,
14 not moved by you out of that account, correct?
15    MR. KIRKLIN:  Objection, form.
16    A    On the advice of counsel, I am respectfully
17 asserting my Fifth Amendment right to not answer that
18 question.
19 BY MS. McELVY:
20    Q    Let's look at your personal Chase checking
21 account ending in 1503. It's starting at Bates Page 12
22 of this exhibit. All right. You see there at the top
23 this is a Chase Bank account. And the person whose name
24 on the account is Dennis J. Rogers with an address of
25 6520 Del Norte Lane. That's you, correct?

152

1    A    On the advice of counsel, I'm respectfully
2 asserting my Fifth Amendment right to not answer that
3 question.
4    Q    And the account number ends in 1503 for your
5 personal Chase checking account, correct?
6    A    On the advice of counsel, I'm respectfully
7 asserting my Fifth Amendment right to not answer that
8 question.
9    Q    And the beginning balance in your personal
10 Chase checking account 1503 is just over $7,000. That
11 -- in June it's $7,057.93, correct?
12    A    On the advice of counsel, I'm respectfully
13 asserting my Fifth Amendment right to not answer that
14 question.
15    Q    And we see those transfers coming in from --
16 to this personal Chase checking account of yours ending
17 in 1503 from OMTC's account ending in 7879 on June 19 in
18 the amount of 4.4 million and 2.15 million, correct?
19    A    On the advice of counsel, I'm respectfully
20 asserting my Fifth Amendment right to not answer that
21 question.
22    Q    So you transferred a total of 6.55 million of
23 Plaintiffs' funds that were deposited originally into
24 OMTC's Chase account into this personal account the same
25 day that Plaintiff had wired the funds to you, right?

153

1    MR. KIRKLIN:  Objection, form.
2    A    On the advice of counsel, I am respectfully
3  asserting my Fifth Amendment right to not answer that
4  question.
5  BY MS. McELVY:
6    Q    And on that same day, June 19, 2020, which is
7  a Friday, right after you transferred the 6.55 million
8  into that account, you go on a spending spree, correct?
9    MR. KIRKLIN:  Objection, form.
10    A    On the advice of counsel, I'm respectfully
11  asserting my Fifth Amendment right to not answer that
12  question.
13  BY MS. McELVY:
14    Q    And the first payment you make out of your
15  personal Chase checking account after receiving into it
16  6.55 million of my client's funds is a $60,000 payment
17  to the law firm that is now representing you in this
18  case, correct?
19    A    On the advice of counsel, I am respectfully
20  asserting my Fifth Amendment right to not answer that
21  question.
22    Q    Did any of that $60,000 go to pay the
23  Funderz.net plaintiff?
24    A    On the advice of counsel, I'm respectfully
25  asserting my Fifth Amendment right to not answer that

154

1  question.
2    Q    Was that $60,000 to cover your legal fees in
3  the Funderz.net litigation?
4    A    On the advice of counsel, I'm respectfully
5  asserting my Fifth Amendment right to not answer that
6  question.
7    Q    The next payment you make on June 19th is
8  to another law firm the McCathern Law Firm who Brett
9  Chisum worked for, correct?
10    A    On the advice of counsel, I'm respectfully
11  asserting my Fifth Amendment right to not answer that
12  question.
13    Q    And you paid Brett Chisum's law firm $35,000
14  on that day, June 19th, right?
15    A    On the advice of counsel, I'm respectfully
16  asserting my Fifth Amendment right to not answer that
17  question.
18    Q    And Brett Chisum and the McCathern Law Firm
19  were representing you at that time in two lawsuits, both
20  the Capano lawsuit that we looked at earlier and also
21  the ACMC finance lawsuit; isn't that true?
22    A    On the advice of counsel, I'm respectfully
23  asserting my Fifth Amendment right to not answer that
24  question.
25    Q    And those lawsuits have nothing to do with my

155

1  plaintiffs and there would be no reason that Steve
2  Webster, Aaron Webster or Dennis Woods would want to
3  make payments for any reason to your lawyers that are
4  defending you in other lawsuits that they have nothing
5  to do with, right?
6    A    On the advice of counsel, I'm respectfully
7  asserting my Fifth Amendment right to not answer that
8  question.
9    Q    And the next thing you did with Plaintiffs'
10  money was pay $50,000 to an architect firm called SHM
11  Architects in Dallas on June 19th, correct?
12    MR. KIRKLIN:  Objection, form.
13    A    On the advice of counsel, I am respectfully
14  asserting my Fifth Amendment right to not answer that
15  question.
16  BY MS. McELVY:
17    Q    The SHM architectural firm was engaged by you
18  to design a home; is that right?
19    A    On the advice of counsel, I am respectfully
20  asserting my Fifth Amendment right to not answer that
21  question.
22    Q    The next thing you did on June 19 after you
23  paid your lawyer and an architect firm was you withdrew
24  $560,000 in cash, correct?
25    MR. KIRKLIN:  Form.

156

1    A    On the advice of counsel, I am respectfully
2  asserting my Fifth Amendment right to not answer that
3  question.
4  BY MS. McELVY:
5    Q    What was that cash withdrawn for?
6    A    On the advice of counsel, I am respectfully
7  asserting my Fifth Amendment right to not answer that
8  question.
9    Q    What did you do with that cash?
10    A    On the advice of counsel, I'm respectfully
11  asserting my Fifth Amendment right to not answer that
12  question.
13    Q    Who did you pay?
14    A    On the advice of counsel, I'm respectfully
15  asserting my Fifth Amendment right to not answer that
16  question.
17    Q    You next transferred $4 million to your
18  Goldman Sachs account ending in 708-8 on June 19th,
19  correct?
20    MR. KIRKLIN:  Form.
21    A    On the advice of counsel, I'm respectfully
22  asserting my Fifth Amendment right to not answer that
23  question.
24  BY MS. McELVY:
25    Q    And then you transferred $1,679,750.33 to

Case 22-03056 Document 63-3 Filed 03/22/23 Entered 03/22/23 20:47:11 Page 15 of 26
Case 4:22-cv-00600-ALM-KPJ Doc. #26-3 Filed 12/19/2022 Page 65 of 489
Ex. Pg. 65 of 489

Dennis Rogers, II · December 08, 2020

**157**

1    Chicago Title of Texas, correct?
2         MR. KIRKLIN:  Form.
3         A    On the advice of counsel, I'm respectfully
4    asserting my Fifth Amendment right to not answer that
5    question.
6    BY MS. McELVY:
7         Q    And that payment on June 19th to Chicago
8    Title of Texas or transfer was for the purpose of
9    closing or purchasing on two lots of land in Dallas on
10   which you intend to build a home, correct?
11        A    On the advice of counsel, I'm respectfully
12   asserting my Fifth Amendment right to not answer that
13   question.
14        Q    And that is the home that you engaged SHM
15   Architects to make architectural designs for, correct?
16        A    On the advice of counsel, I'm respectfully
17   asserting my Fifth Amendment right to not answer that
18   question.
19        Q    Continuing on to the next page, 13, of the
20   Chase records, you see that the next payment you make on
21   June 19th is to a Chase card ending in 3121 in the
22   amount of $4142.42.  Do you see that?
23        MR. KIRKLIN:  Objection, form.
24        A    On the advice of counsel, I am respectfully
25   asserting my Fifth Amendment right to not answer that

**158**

1    question.
2    BY MS. McELVY:
3         Q    Is this a personal credit card of yours?
4         A    On the advice of counsel, I'm respectfully
5    asserting my Fifth Amendment right to not answer that
6    question.
7         Q    Whose Chase card ending in 3121 is that?
8         A    On the advice of counsel, I'm respectfully
9    asserting my Fifth Amendment right to not answer that
10   question.
11        Q    Further on June 19th you transferred
12   another $20,000 to your personal account at Frost Bank,
13   correct?
14        A    On the advice of counsel, I'm respectfully
15   asserting my Fifth Amendment right to not answer that
16   question.
17        Q    What is that account at Frost Bank used for?
18        A    On the advice of counsel, I'm respectfully
19   asserting my Fifth Amendment right to not answer that
20   question.
21        Q    And who else is on that account or who else
22   has access to it?
23        A    On the advice of counsel, I am respectfully
24   asserting my Fifth Amendment right to not answer that
25   question.

**159**

1         Q    The last payment you made on June 19th,
2    that Friday, with Plaintiffs' fund was to American
3    Express in the amount of $27,035.54, correct?
4         A    On the advice of counsel, I'm respectfully
5    asserting my Fifth Amendment right to not answer that
6    question.
7         Q    Is that a personal credit card of yours and
8    your wife's?
9         A    On the advice of counsel, I'm respectfully
10   asserting my Fifth Amendment right to not answer that
11   question.
12        Q    So in total on June 19 after you transferred
13   6.55 million of Plaintiffs' funds into your personal
14   Chase checking account, you paid or transferred out of
15   that account on the same day the funds were received a
16   total of $6,435,954, correct, if we add up all those
17   transactions on June 19th that we just went over?
18        MR. KIRKLIN:  Objection, form.
19        A    On the advice of counsel, I'm respectfully
20   asserting my Fifth Amendment right to not answer that
21   question.
22   BY MS. McELVY:
23        Q    In other words, you had used up all but about
24   $114,050 of Plaintiffs' funds by the end of the same day
25   that you'd received them, correct?

**160**

1         MR. KIRKLIN:  Form.
2         A    On the advice of counsel, I'm respectfully
3    asserting my Fifth Amendment right to not answer that
4    question.
5    BY MS. McELVY:
6         Q    And you did that by paying -- using
7    Plaintiffs' funds paying a bunch of creditors, personal
8    credit cards, bought property for yourself with their
9    money, paid down personal debt, and you paid your
10   lawyers that are defending you in lawsuits the
11   Plaintiffs have nothing to do with, correct?
12        MR. KIRKLIN:  Form.
13        A    On the advice of counsel, I'm respectfully
14   asserting my Fifth Amendment right to not answer that
15   question.
16   BY MS. McELVY:
17        Q    The following Monday on June 22nd you
18   continue spending Plaintiffs' fund, and you make an
19   online transfer to a checking account ending in 8315 in
20   the amount of $59,000, correct?
21        A    On the advice of counsel, I'm respectfully
22   asserting my Fifth Amendment right to not answer that
23   question.
24        Q    What is that account ending in 8315 used for?
25        A    On the advice of counsel, I'm respectfully

Case 2:23-05050-nhw7 Doc 62 Filed 03/22/19 Entered 03/22/19 07:57:1 Page 16 of 26
Case 2:23-05050-nhw7 Doc 261-3 Filed 12/29/20 Entered 12/29/20 11:25:41 Page 16 of 26
Ex Page 66 of 489
Dennis Rogers, II, December 08, 2020

161

1  asserting my Fifth Amendment right to not answer that
2  question.
3      Q    Who else has access to that account?
4      A    On the advice of counsel, I'm respectfully
5  asserting my Fifth Amendment right to not answer that
6  question.
7      Q    On June 22nd, you then make another
8  transfer to your personal Frost account ending in 9321
9  in the amount of $5,000, correct?
10     A    On the advice of counsel, I'm respectfully
11 asserting my Fifth Amendment right to not answer that
12 question.
13     Q    And then finally on June 22nd, you transfer
14 $25,000 to a Robin Hood account which is a personal
15 investing platform like E Trade or Charles Schwab,
16 correct?
17     MR. KIRKLIN:  Form.
18     A    On the advice of counsel, I'm respectfully
19 asserting my Fifth Amendment right to not answer that
20 question.
21 BY MS. McELVY:
22     Q    So in total on June 22nd you transferred or
23 paid out of the Chase -- your personal Chase checking
24 account ending in 50 -- 1503 a total of $89,000 of
25 Plaintiffs' funds, correct?

162

1      MR. KIRKLIN:  Form.
2      A    On the advice of counsel, I'm respectfully
3  asserting my Fifth Amendment right to not answer that
4  question.
5  BY MS. McELVY:
6      Q    And then on June 24 you transfer 1.6 million
7  plus 250,000 for a total of 1.85 million back into your
8  personal Chase checking account 1503 from the Goldman
9  Sachs cash accounting ending in 708-8, correct?
10     A    On the advice of counsel, I'm respectfully
11 asserting my Fifth Amendment right to not answer that
12 question.
13     MS. McELVY:  Pull up Document No. 34 and mark
14 it as Exhibit 34 to this deposition.
15     (Exhibit 34 was marked for identification)
16 BY MS. McELVY:
17     Q    This is a statement from Goldman Sachs Dennis
18 Rogers' cash account for the period June 1 to
19 June 30th.  Is that correct?
20     A    On the advice of counsel, I'm respectfully
21 asserting my Fifth Amendment right to not answer that
22 question.
23     Q    If we look at Bates Page 183, if you look at
24 the Goldman Sachs Bates number, you see on this page
25 that it shows on June the 22nd, $4 million coming into

163

1  the Goldman Sachs -- I'm sorry.  Not 4 million.  We were
2  talking about the -- you see on June 24 it shows a
3  $1.85 million transfer out of the account, correct?
4      A    On the advice of counsel, I'm respectfully
5  asserting my Fifth Amendment right to not answer that
6  question.
7      Q    And why is it that you were moving funds into
8  your Chase checking account ending in 1503 to Gold --
9  over to Goldman Sachs the cash account ending in 708-8
10 and then right back into your Chase account ending in
11 1503?  Why are you moving funds around like that?
12     A    On the advice of counsel, I'm respectfully
13 asserting my Fifth Amendment right to not answer that
14 question.
15     Q    Are you doing that because you think it will
16 make it more difficult for creditors like Plaintiffs
17 to trace their funds?
18     A    On the advice of counsel, I'm respectfully
19 asserting my Fifth Amendment right to not answer that
20 question.
21     Q    We go back to the Chase records in
22 Exhibit 18, and we look at the transactions on June 24.
23 Because you merely transferred Plaintiffs' funds that
24 you had moved into your Goldman Sachs cash account
25 ending in 708-8 and then moved them back, you're still

164

1  working with only Plaintiffs' funds in these payments on
2  June 24 through June 29, correct?
3      A    On the advice of counsel, I'm respectfully
4  asserting my Fifth Amendment right to not answer that
5  question.
6      Q    And so on June 24 after you wire from your
7  Goldman Sachs account the 1.85 million back into your
8  personal Chase checking account ending in 1503, you make
9  several other transfers.  The first is to your account
10 ending in 8315 in the amount of 615,000, correct?
11     A    On the advice of counsel, I'm respectfully
12 asserting my Fifth Amendment right to not answer that
13 question.
14     Q    Then you transfer $1,016,000 back to OMTC's
15 account ending in 7879, right?
16     A    On the advice of counsel, I'm respectfully
17 asserting my Fifth Amendment right to not answer that
18 question.
19     Q    Then you transfer to your account ending in
20 8315 another 6500 and then right after that 61,000,
21 correct?
22     MR. KIRKLIN:  Form.
23     A    On the advice of counsel, I'm respectfully
24 asserting my Fifth Amendment right to not answer that
25 question.

165

1  BY MS. McELVY:
2      Q    On June 25th you pay $100,000 to the
3  Padfield Stout, LLC law firm trust account in Fort
4  Worth, and it refers to OMTC, Inc. matters, correct?
5      A    On the advice of counsel, I am respectfully
6  asserting my Fifth Amendment right to not answer that
7  question.
8      Q    And the Padfield -- Padfield Stout firm
9  represents Funderz.net in the lawsuit against you and
10  OMTC, Inc., correct?
11     A    On the advice of counsel, I'm respectfully
12  asserting my Fifth Amendment right to not answer that
13  question.
14     Q    And so you're using your personal Chase
15  checking account here to pay OMTC, Inc.'s debt in the
16  Funderz.net lawsuit with Plaintiffs' funds, correct?
17     A    On the advice of counsel, I am respectfully
18  asserting my Fifth Amendment right to not answer that
19  question.
20     Q    On June 29 you make two more credit card
21  payments.  One to your Chase carding ending in 3121 in
22  the amount of $1,792.42, correct?
23         MR. KIRKLIN:  Form.
24     A    On the advice of counsel, I'm respectfully
25  asserting my Fifth Amendment right to not answer that

166

1  question.
2  BY MS. McELVY:
3      Q    And then you make another credit card payment
4  to Discover in the amount of $1,117.17 correct?
5      A    On the advice of counsel, I am respectfully
6  asserting my Fifth Amendment right to not answer that
7  question.
8      Q    You got a very small credit from a check on
9  June 30th in the amount of $607, correct?
10     A    On the advice of counsel, I'm respectfully
11  asserting my Fifth Amendment right to not answer that
12  question.
13     Q    And then you transfer to OMTC's account
14  ending in 7879 on June 30th, $2,000, true?
15     A    On the advice of counsel, I'm respectfully
16  asserting my Fifth Amendment right to not answer that
17  question.
18     Q    And then on June 30th -- I'm sorry.  On
19  July -- yeah, sorry.  June 30th there is a wire
20  transfer out of your personal Chase checking account to
21  Mandarin Capital, LLC based in or located in Holladay,
22  Utah in the amount of $24,000.  Do you see that?
23     A    On the advice of counsel, I am respectfully
24  asserting my Fifth Amendment right to not answer that
25  question.

167

1          MS. McELVY:  We can pull up Document 35 and
2  mark it as Exhibit 35.
3          (Exhibit 35 was marked for identification)
4          MR. KIRKLIN:  Meghan, we've been going for
5  over an hour now.  Is -- can we take a break?
6          MS. McELVY:  Yeah.  This is as good a point
7  as any.  We can pick it back up.  How long of a
8  break do you need?
9          MR. KIRKLIN:  Just ten minutes for me.
10         MS. McELVY:  Okay.
11         THE VIDEOGRAPHER:  And we're off the record
12  at 2:43 p.m. Central time.
13         (Recess from 2:43 p.m. to 2:57 p.m.)
14         COURT REPORTER:  And we are back on the
15  record at 2:57 p.m. Central.
16  BY MS. McELVY:
17     Q    Okay.  Mr. Rogers, we're back from a short
18  break.  Are you ready to proceed?
19     A    Yes.
20     Q    You understand you're still under oath?
21     A    Yes.
22     Q    Okay.  Right before the break we were looking
23  at your Chase personal checking account records, the
24  account ending in 1503 and noted the fact that you had
25  transferred on July 2nd, 2020, $24,000 out of that

168

1  account over to Mandarin Capital, LLC located in
2  Holladay, Utah, correct?
3      A    On the advice of counsel, I'm respectfully
4  asserting my Fifth Amendment right to not answer that
5  question.
6      Q    And so if we go to Exhibit 35, this is the
7  Secretary of State filing made by Mandarin Capital, LLC
8  located in Utah.  This says Provo.  But you see here
9  that the registered agent for this Mandarin Capital, LLC
10  is a company called McCullough Sparks.  Do you see that?
11         MR. KIRKLIN:  Form.
12     A    On the advice of counsel, I'm respectfully
13  asserting my Fifth Amendment right to not answer that
14  question.
15         MS. McELVY:  Okay.  And if we can then pull
16  up Document 36 and mark it as Exhibit 36 to this
17  deposition.
18         (Exhibit 36 was marked for identification)
19  BY MS. McELVY:
20     Q    This is a printout from McCullough Sparks'
21  website.  And if we look at their website, we see that
22  McCullough Sparks, the registered agent of Mandarin
23  Capital that you spent Plaintiffs' funds to, specializes
24  in asset protection, correct?
25     A    On the advice of counsel, I am respectfully

Case 2:23-cv-00500-DLR  Document 76-3  Filed 03/12/24  Page 18 of 26
Case 2:22-cv-02671-DJH  Document 129-3  Filed 09/25/24  Page 18 of 26
Ex. Pg. 69 of 489
Dennis Rogers, II  December 08, 2020

169

1  asserting my Fifth Amendment right to not answer that
2  question.
3      Q    So you transferred Plaintiffs' funds to a
4  company whose specialty is to shield assets from
5  creditors, correct?
6          MR. KIRKLIN:  Objection, form.
7      A    On the advice of counsel, I am respectfully
8  asserting my Fifth Amendment right to not answer that
9  question.
10  BY MS. McELVY:
11     Q    Going back to your Chase Bank records in
12  Exhibit 18 [sic], on July 6 you transfer 1.5 million and
13  1. --
14         MS. McELVY:  Let the screen get back to -- I
15         think we were on the right page.  Scroll down to
16         the next page on July -- yeah.
17  BY MS. McELVY:
18     Q    You see there on July 6th you transfer
19  1.5 million and then another $1 million from your
20  Goldman Sachs' cash account ending in 708 -- I'm sorry.
21  From your Goldman Sachs' account to this Chase account
22  for a total of 2.5 million, correct?
23     A    On the advice of counsel, I am respectfully
24  asserting my Fifth Amendment right to not answer that
25  question.

170

1      Q    And then you transfer another $50,000 back
2  into this personal Chase checking account ending in 1503
3  from the account ending in 8315 in the amount of $50,000
4  on July 6th, correct?
5      A    On the advice of counsel, I'm respectfully
6  asserting my Fifth Amendment right to not answer that
7  question.
8      Q    Then on July 7th, you transfer another
9  $2,473,000 to Mandarin Capital, the same company we were
10  talking about whose register agent specializes in --
11  McCullough Sparks who specializes in shielding assets
12  from creditors, right?
13     A    On the advice of counsel, I'm respectfully
14  asserting my Fifth Amendment right to not answer that
15  question.
16     Q    And all of that money that you sent to
17  Mandarin Capital actually originated from Steve Webster
18  and Dennis Woods, correct?
19     A    On the advice of counsel, I'm respectfully
20  asserting my Fifth Amendment right to not answer that
21  question.
22     Q    Do you hold an account with Mandarin Capital
23  at present?
24     A    On the advice of counsel, I respectfully
25  assert my Fifth Amendment right to not answer that

171

1  question.
2      Q    Have you retained McCullough Sparks to
3  provide asset protection services to you or to OMTC,
4  Inc.?
5      A    On the advice of counsel, I am respectfully
6  asserting my Fifth Amendment right to not answer that
7  question.
8      Q    Who is your point of contact at Mandarin
9  Capital?
10     A    On the advice of counsel, I am respectfully
11  asserting my Fifth Amendment right to not answer that
12  question.
13     Q    Who is your point of contact at McCullough
14  Sparks?
15     A    On the advice of counsel I'm respectfully
16  asserting my Fifth Amendment right to not answer that
17  question.
18     Q    Why are you transferring funds to them from
19  your Chase account ending in 1503?
20     A    On the advice of counsel, I'm respectfully
21  asserting my Fifth Amendment right to not answer that
22  question.
23     Q    Are you transferring funds to them to keep
24  them protected from creditors or are you purchasing
25  goods or services or property with those funds?

172

1          MR. KIRKLIN:  Form.
2      A    On the advice of counsel, I am respectfully
3  asserting my Fifth Amendment right to not answer that
4  question.
5  BY MS. McELVY:
6      Q    Going back to your Goldman Sachs' records,
7  let's just go back to the June Goldman Sachs' statement
8  which was Exhibit 34.  Who was your main point of
9  contact at Goldman Sachs?
10     A    On the advice of counsel, I'm respectfully
11  asserting my Fifth Amendment right to not answer that
12  question.
13     Q    You have e-mailed before with a Goldman
14  Sachs' account representative named Ryan McDonnell
15  regarding transfers of certain funds, correct?
16     A    On the advice of counsel, I'm respectfully
17  asserting my Fifth Amendment right to not answer that
18  question.
19     Q    And when you have things that you need to
20  request the bank do or take care of, Ryan McDonnell at
21  Goldman Sachs is somebody that you can contact to do
22  that, correct?
23     A    Can you rephrase the question?
24     Q    Yeah.  You have accounts at Goldman Sachs and
25  Ryan McDonald -- McDonnell is an account rep of sorts

181

1 question.
2 BY MS. McELVY:
3 **Q Your current residence address of 6520**
4 **Del Norte, is that your -- your homestead address for**
5 **tax purposes?**
6 A On the advice of my counsel, I'm respectfully
7 asserting my Fifth Amendment right to not answer that
8 question.
9 MS. McELVY: All right. Can we go off the
10 record for a few minutes and take a quick break.
11 THE VIDEOGRAPHER: And we're off record at
12 3:20 p.m. Central.
13 (Recess from 3:20 p.m. to 3:35 p.m.)
14 THE VIDEOGRAPHER: And we are back on the
15 record, 3:35 p.m.
16 BY MS. McELVY:
17 **Q Mr. Rogers, we're back from a brief break.**
18 **You ready to continue?**
19 A Yes.
20 **Q And you're still under oath?**
21 A Yes.
22 **Q You made representations to the Plaintiffs**
23 **that there was going to be a Vitol auction of fuel or**
24 **sale of Vitol fuel and that you could serve as an**
25 **intermediary with respect to Vitol in order to secure**

182

1 **portions of that fuel, correct?**
2 A On the advice of counsel, I'm respectfully
3 asserting my Fifth Amendment right to not answer that
4 question.
5 **Q And at that time you made those**
6 **representations to Plaintiffs, you knew that they were**
7 **false, correct?**
8 A On the advice of counsel, I'm respectfully
9 asserting my Fifth Amendment right to not answer that
10 question.
11 **Q And you made those representations with the**
12 **intent that they would rely on them and that that would**
13 **induce them to transfer their 6.55 -- 552 million in**
14 **funds to OMTC's account, correct?**
15 A I'm sorry. You cut out halfway through that.
16 I'm not sure --
17 **Q Yeah. You made those false representations**
18 **to Plaintiffs about Vitol with the intent that they**
19 **would rely on them and that those representations would**
20 **induce Plaintiffs to transfer the 6.552 million to your**
21 **OMTC account since you could then transfer it to your**
22 **personal Chase checking account and use it to pay other**
23 **creditors in manners that Plaintiffs never authorized,**
24 **correct?**
25 MR. KIRKLIN: Objection, form.

183

1 A On the advice of counsel, I'm respectfully
2 asserting my Fifth Amendment right to not answer that
3 question.
4 BY MS. McELVY:
5 **Q You told Plaintiffs that you would provide a**
6 **service for them specifically representing them of their**
7 **interests for purposes of the Vitol auction, correct?**
8 A On the advice of counsel, I'm respectfully
9 asserting my Fifth Amendment right to not answer that
10 question.
11 **Q And those services were not actually even**
12 **capable of being provided because either no Vitol**
13 **auction or sale took place. Or if it did, you were**
14 **never a participant or had any involvement in it,**
15 **correct?**
16 MR. KIRKLIN: Objection, form.
17 A On the advice of counsel, I am respectfully
18 asserting my Fifth Amendment right to not answer that
19 question.
20 BY MS. McELVY:
21 **Q You represented to Plaintiffs that you or**
22 **OMTC could facilitate a final contract between Vitol and**
23 **the ultimate purchasers of fuel through a Vitol auction,**
24 **correct?**
25 A On the advice of my counsel, I'm respectfully

184

1 asserting my Fifth Amendment right to not answer that
2 question.
3 **Q And you represented that you were either**
4 **affiliated with Vitol or had been approved by Vitol to**
5 **serve as an agent for purposes of the fuel auction or**
6 **the sale of the fuel, correct?**
7 MR. KIRKLIN: Form.
8 A On the advice of my counsel, I'm respectfully
9 asserting my Fifth Amendment right to not answer that
10 question.
11 BY MS. McELVY:
12 **Q But those representations were false?**
13 A Could you repeat the question?
14 **Q Yeah. The representations that you had an in**
15 **with Vitol or could serve as Plaintiffs' agent with**
16 **respect to Vitol and purchasing fuel for purposes of**
17 **selling them to ultimate end users or buyers were false**
18 **representations, correct?**
19 MR. KIRKLIN: Form.
20 A On the advice of counsel, I'm respectfully
21 asserting my Fifth Amendment right to not answer that
22 question.
23 BY MS. McELVY:
24 **Q When you told Plaintiffs that you could**
25 **provide services to them in the form of acting as an**

Case 4:22-cv-01618 Document 276-3 Filed on 12/29/2024 in TXSD Page 2 of 26
Case 4:22-cv-01618 Document 276-3 Filed on 12/29/2024 in TXSD Page 2 of 26
Ex. Rogers 11 Page 70 of 489
Dennis Rogers, III December 08, 2020

185

1  agent or intermediary with respect to Vitol, you knew
2  that it was impossible for you to actually do so,
3  correct?
4      MR. KIRKLIN:  Form.
5      A    On the advice of counsel, I respectfully
6  assert my Fifth Amendment right to not answer that
7  question.
8  BY MS. McELVY:
9      Q    You told Plaintiffs about the services that
10  you could supposedly provide with respect to Vitol in
11  order that they would transfer their $6.552 million in
12  funds to OMTC's account, correct?
13      MR. KIRKLIN:  Objection, form.
14      A    On the advice of counsel, I'm respectfully
15  asserting my Fifth Amendment right to not answer that
16  question.
17  BY MS. McELVY:
18      Q    And you understand that Plaintiffs would have
19  no reason to transfer $6.552 million to you if you were
20  not, in fact, an agent or an intermediary that could
21  actually facilitate the purchase and sale of fuel to
22  ultimate buyers that Aaron Webster or others lined up,
23  correct?
24      MS. McELVY:  Objection, form.
25      A    On the advice of counsel, I'm respectfully

186

1  asserting my Fifth Amendment right to not answer that
2  question.
3  BY MS. McELVY:
4      Q    OMTC paid 2.142 million back to Dennis Woods
5  on August 6th by wire transfer, correct?
6      A    On the advice of my counsel, I'm respectfully
7  asserting my Fifth Amendment right to not answer that
8  question.
9      Q    It never paid him interest -- or sorry.
10  Scratch that.  Those funds were past due at the time you
11  paid them back on August 6th to Dennis Woods, correct?
12      A    On the advice of my counsel, I'm respectfully
13  asserting my Fifth Amendment right to not answer that
14  question.
15      Q    And when you made that payment on August 6th,
16  of 2.142 million to Dennis Woods, you did not add on top
17  of that any interest or the time value of money that
18  Dennis Woods lost because you kept the funds -- or OMTC
19  kept the funds for longer than they had a right to?
20      MR. KIRKLIN:  Objection, form.
21      A    On the advice of my counsel, I'm respectfully
22  asserting my Fifth Amendment right to not answer that
23  question.
24  BY MS. McELVY:
25      Q    If you could not swing around in your chair,

187

1  it just makes the video a little dizzying.
2      A    Sorry.
3      Q    That's all right.
4      You -- you're aware have never returned to
5  Steve Webster the 4.41 million that he originally
6  transferred to OMTC on June 19, 2020, correct?
7      A    On the advice of my counsel, I respectfully
8  assert my Fifth Amendment right to not answer that
9  question.
10      Q    And you understand that that -- those funds
11  are more than five months overdue now, correct?
12      MR. KIRKLIN:  Objection, form.
13      A    On the advice of my counsel, I'm respectfully
14  asserting my Fifth Amendment right to not answer that
15  question.
16  BY MS. McELVY:
17      Q    So you agree that Steven Webster has been
18  deprived of his property by you and by OMTC, correct?
19      MR. KIRKLIN:  Objection, form.
20  BY MS. McELVY:
21      Q    Correct?
22      A    On the advice of my counsel, I respectfully
23  assert my Fifth Amendment right to not answer that
24  question.
25      Q    And you agree that once you got Steven

188

1  Webster's money, you purposely transferred portions of
2  that money to third parties we discussed earlier like
3  SHM Architect, Chicago Title of Texas, Mandarin Capital
4  and others without his consent or authorization from him
5  to do that with his funds or Dennis Woods' funds,
6  correct?
7      MR. KIRKLIN:  Form.
8      A    On the advice of my counsel, I'm respectfully
9  asserting my Fifth Amendment right to not answer that
10  question.
11  BY MS. McELVY:
12      Q    And therefore, you were purposely depriving
13  Steve Webster of his funds, correct?
14      MR. KIRKLIN:  Objection, form.
15      A    On the advice of my counsel, I'm respectfully
16  asserting my Fifth Amendment right to not answer that
17  question.
18  BY MS. McELVY:
19      Q    You also purposefully deprived Dennis Woods
20  of his funds during the period that he was entitled to
21  get them back no later than July 1, 2020, to August 6,
22  the date that you at least returned the principal amount
23  due that OMTC owed back to Dennis Woods, the
24  2.142 million, correct?
25      A    You're getting really quiet on me, Meghan.

189

1  I'm sorry.
2      **Q    Can you hear -- is that a little better?  Is**
3  **that any better?**
4      A    Yes.
5          MR. KIRKLIN:  Just faded out on the end of
6      question.
7  BY MS. McELVY:
8      **Q    Yeah.  The question was you also purposefully**
9  **deprived Dennis Woods of his 2.142 million in the period**
10 **of July 1, the latest time that they were due back to**
11 **him, to August 6th, when he got his principal back from**
12 **OMTC, correct?**
13         MR. KIRKLIN:  Objection to form.
14     A    On the advice of my counsel, I'm respectfully
15 asserting my Fifth Amendment right to not answer that
16 question.
17 BY MS. McELVY:
18     **Q    And you also used Dennis Woods' funds in part**
19 **to pay third parties like SHM Architects, your lawyers,**
20 **a title company, Mandarin Capital, without any**
21 **authorization or consent from Dennis Woods, correct?**
22         MR. KIRKLIN:  Objection, form.
23     A    On the advice of my counsel, I'm respectfully
24 asserting my Fifth Amendment right to not answer that
25 question.

190

1  BY MS. McELVY:
2      **Q    You told Plaintiffs that you would act as**
3  **their agent and intermediary with respect to Vitol for**
4  **purposes of purchasing and selling fuel, correct?**
5          MR. KIRKLIN:  Objection, form.
6      A    On the advice of my counsel, I'm respectfully
7  asserting my Fifth Amendment right to not answer that
8  question.
9  BY MS. McELVY:
10     **Q    You did not deal honestly and fairly with the**
11 **Plaintiffs at all times, correct?**
12         MR. KIRKLIN:  Objection, form.
13     A    On the advice of counsel, I'm respectively --
14 respectfully asserting my Fifth Amendment right to not
15 answer that question.
16 BY MS. McELVY:
17     **Q    You have not fully and truthfully disclosed**
18 **what happened to their funds to the Plaintiffs, correct?**
19     A    On the advice of my counsel, I'm respectfully
20 asserting my Fifth Amendment right to not answer that
21 question.
22     **Q    In fact, you engaged in intentional pattern**
23 **of behavior and conduct and actions to deceive them as**
24 **to the current status of their funds, correct?**
25         MR. KIRKLIN:  Form.

191

1      A    On the advice of counsel, I am respectfully
2  asserting my Fifth Amendment right to not answer that
3  question.
4  BY MS. McELVY:
5      **Q    You have engaged in self-dealing with respect**
6  **to your transactions involving Steve Webster and Dennis**
7  **Woods, correct?**
8          MR. KIRKLIN:  Objection, form.
9      A    I don't really understand.  Could you
10 rephrase that question?
11 BY MS. McELVY:
12     **Q    Yeah.  You have -- you entered into the Fuel**
13 **Purchase Orders, or OMTC did, with Steve Webster and**
14 **Dennis Woods.  And you personally represented that you**
15 **could serve as their agent an intermediary with respect**
16 **to Vitol.  But in that process you actually engaged in**
17 **self-dealing to benefit yourself at their expense,**
18 **correct?**
19         MR. KIRKLIN:  Form.
20     A    On the advice of counsel, I'm respectfully
21 asserting my Fifth Amendment right to not answer that
22 question.
23 BY MS. McELVY:
24     **Q    In other words, you took actions after**
25 **receiving Plaintiffs funds that benefited you**

192

1  **individually or OMTC and harmed the Plaintiffs?**
2          MR. KIRKLIN:  Objection to form.
3  BY MS. McELVY:
4      **Q    Correct?**
5      A    On the advice of counsel, I'm respectfully
6  asserting my Fifth Amendment right to not answer that
7  question.
8      **Q    You did not act with any integrity with**
9  **respect to Plaintiffs, correct?**
10         MR. KIRKLIN:  Objection, form.
11     A    On the advice of counsel, I'm respectfully
12 asserting my Fifth Amendment right to not answer that
13 question.
14 BY MS. McELVY:
15     **Q    You did not act in good faith at any point**
16 **with respect to Plaintiffs?**
17         MR. KIRKLIN:  Objection, form.
18     A    On the advice of my counsel, I am
19 respectfully asserting my Fifth Amendment right to not
20 answer that question.
21 BY MS. McELVY:
22     **Q    And you did not exercise any loyalty to**
23 **Plaintiffs in your dealings with them, correct?**
24         MR. KIRKLIN:  Objection, form.
25     A    On the advice of counsel, I'm respectfully

**193**

1 asserting my Fifth Amendment right to not answer that
2 question.
3 BY MS. McELVY:
4 **Q After OMTC received Plaintiffs' funds, it**
5 **immediately transferred those funds to your individual**
6 **Chase checking account ending in 1503 on June 19,**
7 **correct?**
8 MR. KIRKLIN: Form.
9 A On the advice of counsel, I'm respectfully
10 asserting my Fifth Amendment right to not answer that
11 question.
12 BY MS. McELVY:
13 **Q In other words, OMTC disposed of Plaintiffs**
14 **property by placing their funds or the vast majority of**
15 **their funds into your Chase checking account ending in**
16 **1503, correct?**
17 MR. KIRKLIN: Objection, form.
18 A On the advice of my counsel, I respectfully
19 assert my Fifth Amendment right to not answer that
20 question.
21 BY MS. McELVY:
22 **Q And then from there, you disposed of**
23 **Plaintiffs' funds by sending them to various creditors,**
24 **asset protection firm, and to pay off personal debts and**
25 **the like, correct?**

**194**

1 MR. KIRKLIN: Objection, form.
2 A On the advice of counsel, I'm respectfully
3 asserting my Fifth Amendment right to not answer that
4 question.
5 BY MS. McELVY:
6 **Q You specifically used Plaintiffs' funds for**
7 **your personal purposes, correct?**
8 MR. KIRKLIN: Objection, form.
9 A On the advice of counsel, I'm respectfully
10 asserting my Fifth Amendment right to not answer that
11 question.
12 MS. McELVY: Pull up and -- pull up Document
13 No. 47 and mark it as -- what are we on -- Exhibit
14 38?
15 COURT REPORTER: 39.
16 MS. McELVY: Mark it as Exhibit 38 to the
17 deposition.
18 COURT REPORTER: Excuse me, Counsel. It will
19 be 39.
20 (Exhibit 39 was marked for identification)
21 BY MS. McELVY:
22 **Q Sorry. This will be marked as Exhibit 39 to**
23 **your deposition. This is Defendant OMTC and Dennis J.**
24 **Rogers, II's objections and responses to Plaintiffs'**
25 **First Set of Requests for Admissions in this lawsuit.**

**195**

1 **Do you see that?**
2 A On advice of counsel, I'm respectfully
3 asserting my Fifth Amendment right to not answer that
4 question.
5 MS. McELVY: And if you could turn to Page 5
6 of the document.
7 BY MS. McELVY:
8 **Q You agree that you owed Steven Webster funds**
9 **in the amount of $4.41 million, correct?**
10 A On the advice of my counsel, I'm respectfully
11 asserting my Fifth Amendment right not to answer that
12 question.
13 **Q You agree that OMTC owes the amount of**
14 **4.41 million to Steven Webster, correct?**
15 MR. KIRKLIN: Objection, form.
16 A On the advice of my counsel, I'm respectfully
17 asserting my Fifth Amendment right to not answer that
18 question.
19 BY MS. McELVY:
20 **Q Do you agree that you owe Dennis Woods**
21 **interest for the time, value, and money that he lost for**
22 **the period of time that you kept his principal or OMTC**
23 **kept his principal of 2.142 million beyond the point**
24 **that it was due?**
25 MR. KIRKLIN: Objection, form.

**196**

1 A On the advice of counsel, I'm respectfully
2 asserting my Fifth Amendment right to not answer that
3 question.
4 BY MS. McELVY:
5 **Q Go back to Exhibit No. 18 [sic], the Chase**
6 **Bank records. And we looked earlier at your activity in**
7 **your Chase checking account for you personally ending in**
8 **1503 for the period June 16 to July 15. But I want**
9 **to --**
10 MS. McELVY: Actually, yeah, go to that one
11 on Page 13 at the bottom there.
12 BY MS. McELVY:
13 **Q We talked earlier and we looked at a Goldman**
14 **Sachs e-mail thread between your Bootstrap Ventures**
15 **e-mail and Ryan McDonnell at Goldman Sachs about a**
16 **$235,000 wire transfer to your personal Chase checking**
17 **account ending in 1503. You recall that?**
18 A On the advice of counsel, I'm respectfully
19 asserting my Fifth Amendment right to not answer that
20 question.
21 **Q And I'm just wanting to verify that we can**
22 **see down here at the bottom of the page on July 8th**
23 **that wire transfer that we were looking at -- looking at**
24 **in that e-mail for $235,000 from your Goldman Sachs'**
25 **auctions account to this Chase checking account ending**

197

1    in 1503, correct? That's that same transfer, right?
2        A    On advice of counsel, I respectfully assert
3    my Fifth Amendment right to not answer that question.
4        Q    If we turn to the next page, 14, of the Chase
5    Bank records, on -- we see on July 8th you made a wire
6    transfer of $200,000 to a Bank of America account in
7    your name in Albuquerque, New Mexico, correct?
8        A    On advice of my counsel, I respectfully
9    assert my Fifth Amendment right to not answer that
10   question.
11       Q    Did you open, I guess when you stilled lived
12   in New Mexico, an account with Bank of America?
13       A    On advice of my counsel, I respectfully
14   assert my Fifth Amendment right to not answer that
15   question.
16       Q    Who -- is this Bank of America account in
17   your name?
18       A    On the advice of counsel, I'm respectfully
19   asserting my Fifth Amendment right to not answer that
20   question.
21       Q    Who else has access to that account or is on
22   that account?
23       A    On the advice of counsel, I'm respectfully
24   asserting my Fifth Amendment right to not answer that
25   question.

198

1        Q    What do you use that account for?
2        A    On the advice of my counsel, I respectfully
3    assert my Fifth Amendment right to not answer that
4    question.
5        Q    What was this wire transfer to Bank of
6    America for for $200,000?
7        A    On the advice of counsel, I respectfully assert
8    my Fifth Amendment right to not answer that question.
9        Q    On July 8th, you transferred another
10   $50,000 to your Robin Hood investment account, correct?
11       A    On the advice of my counsel, I'm respectfully
12   asserting my Fifth Amendment right to not answer that
13   question.
14       Q    By the end of this period it covered in the
15   statement of June 16 to July 15, you had only $2,409.05
16   left on hand in your personal Chase checking account
17   ending in 1503, correct?
18       A    On the advice of my counsel, I'm respectfully
19   asserting my Fifth Amendment right to not answer that
20   question.
21           MS. McELVY: Turn to Page 21 of the
22   Exhibit 18 [sic] Chase bank records. This is now
23   the statement for the period June 16 to August 17,
24   2020.
25           THE VIDEOGRAPHER: Meghan, you're cutting out

199

1    a little bit. It's soft.
2            MS. McELVY: Sorry. I don't know what the
3    issue is. Seems like we were doing well earlier.
4            THE VIDEOGRAPHER: Thank you.
5            MS. McELVY: I'll try and speak up. Is that
6    better?
7            THE VIDEOGRAPHER: Much better.
8            MS. McELVY: Okay. Maybe there was some
9    papers over the speaker or something.
10   BY MS. McELVY:
11       Q    In this period of July 16 to August 17 of
12   this year, I want to look at certain transactions in
13   this month. On July 17 we see a $500,000 payment again
14   to Padfield Stout, the law firm we talked about earlier
15   that represents Funderz.net in the lawsuit against you
16   and OMTC, correct?
17       A    On the advice of my counsel, I'm respectfully
18   asserting my Fifth Amendment right to not answer that
19   question.
20       Q    You also on July 20th transferred another
21   $787,387 to Chicago Title of Texas, correct?
22       A    On the advice of my counsel, I respectfully
23   assert my Fifth Amendment right to not answer that
24   question.
25       Q    And I'm going to strike that. That was not a

200

1    transfer by -- from you to Chicago Title of Texas. This
2    appears to actually be a deposit into your Chase
3    accounting ending in 1503 from Chicago Title of Texas of
4    $787,387. Is that a fair statement?
5        A    On the advice of my counsel, I'm respectfully
6    asserting my Fifth Amendment right to not answer that
7    question.
8        Q    And why is it that you previously paid
9    Chicago Title of Texas approximately $1.67 million and
10   then you turned around and received $787,000 and change
11   back from Chicago Title of Texas in -- on July 20th?
12           MR. KIRKLIN: Objection, form.
13       A    On the advice of my counsel, I'm respectfully
14   asserting my Fifth Amendment right to not answer that
15   question.
16   BY MS. McELVY:
17       Q    There is some payments here at the beginning
18   of this statement to someone named John H. Hughes in
19   Lafayette, Louisiana. Who is that?
20           MR. KIRKLIN: Objection, form.
21       A    On the advice of counsel, I am respectfully
22   asserting my Fifth Amendment right to not answer that
23   question.
24   BY MS. McELVY:
25       Q    Also, if we go to the next page, on

Case 2:23-cv-00501-JHC   Document 261-3   Filed 12/29/2023   Entered 12/29/23 10:47:11   Page 24 of 26
Case 2:23-cv-00501-JHC   Document 261-3   Filed 12/29/2023   Entered 12/29/23 10:47:11   Page 24 of 26
Ex. Pg. 74 of 489
Dennis Rogers, III - December 08, 2020

---

**201**

1 July 20th, payments or transfers to Kenneth Guilbeau
2 Rayne in Louisiana in the amount of $232,000. What is
3 that for?
4    A    On the advice of my counsel, I'm respectfully
5 asserting my Fifth Amendment right to not answer that
6 question.
7 BY MS. McELVY:
8    Q    We see further down on the same page on
9 July 23rd you made another $500,000 payment to
10 Padfield Stout, plaintiff's counsel for Funderz.net, in
11 the lawsuit currently pending against yourself and OMTC,
12 Inc., correct?
13    A    On the advice of my counsel, I'm respectfully
14 asserting my Fifth Amendment right to not answer that
15 question.
16    Q    As we scroll further down the page, you made
17 an additional payment of that same amount one week later
18 on July 30th in the amount of $500,000, again to
19 Padfield Stout, the plaintiff's counsel in the
20 Funderz.net case against yourself and OMTC, Inc.,
21 correct?
22    A    On the advice of counsel, I'm respectfully
23 asserting my Fifth Amendment right to not answer that
24 question.
25    Q    And so essentially in the span of three weeks

---

**202**

1 from -- on July 17, July 23rd and then July 30th,
2 you paid Funderz.net's counsel $1.5 million from this
3 Chase account ending in 1503, correct?
4    MR. KIRKLIN: Form.
5    A    On the advice of counsel, I'm respectfully
6 asserting my Fifth Amendment right to not answer that
7 question.
8 BY MS. McELVY:
9    Q    And you made those payments in furtherance of
10 a settlement agreement or payment arrangement that you
11 have set up to attempt to resolve the Funderz.net
12 litigation; is that correct?
13    A    On the advice of my counsel, I'm respectfully
14 asserting my Fifth Amendment right to not answer that
15 question.
16    Q    Going back up to July 29, there is a
17 transaction in the amount of $15,000 on that date to a
18 Wells Fargo account for your wife Allison Rogers in
19 Dallas, correct?
20    A    On the advice of my counsel, I respectfully
21 assert my Fifth Amendment right to not answer that
22 question.
23    Q    Is that the same Wells Fargo account that you
24 used to send a screenshot to Aaron Webster on June 30th,
25 2020 purporting to reflect an incoming wire from a Wells

---

**203**

1 Fargo account in the amount of $6.552 million?
2    A    On the advice of my counsel, I'm respectfully
3 asserting my Fifth Amendment right not to answer that
4 question.
5    Q    In other words, did you involve your wife's
6 account at Wells Fargo as part of your scheme to defraud
7 the Plaintiffs?
8    MR. KIRKLIN: Objection, form.
9    A    On the advice of my counsel, I respectfully
10 assert the Fifth Amendment right not to answer that
11 question.
12 BY MS. McELVY:
13    Q    Do you consider yourself to be the head of a
14 Ponzi scheme?
15    MR. KIRKLIN: Objection, form.
16    A    On the advice of my counsel, I am
17 respectfully asserting my Fifth Amendment right to not
18 answer that question.
19 BY MS. McELVY:
20    Q    Are you carrying on a Ponzi scheme or helping
21 to carry on a Ponzi scheme?
22    MR. KIRKLIN: Objection, form.
23    A    On the advice of my counsel, I respectfully
24 assert my Fifth Amendment right not to answer that
25 question.

---

**204**

1    MS. McELVY: Brad, if we can go off the
2 record for a couple of minutes, that may be all I
3 have. But I just want to confirm before we wrap
4 up, okay?
5    MR. KIRKLIN: Okay.
6    THE VIDEOGRAPHER: And we are off the record
7 at 4:07 p.m. Central.
8    (Recess from 4:07 pm to 4:14 p.m.)
9    THE VIDEOGRAPHER: And we are back on the
10 record at 4:14 p.m. Central.
11 BY MS. McELVY:
12    Q    All right, Mr. Rogers. We're back on the
13 record. Are you ready to proceed?
14    A    Yes.
15    Q    You understand that you are still under oath?
16    A    Yes.
17    Q    That is the conclusion of the substance of my
18 questions for you individually and as OMTC's Corp.
19 representative today. Have you understood my questions
20 or if not, asked me to rephrase or clarify them along
21 the way?
22    A    I've understood your questions.
23    Q    Okay. And you've answered them to the best
24 of your ability, correct?
25    A    Yes.

---

205

```
1    Q    There is nothing that you want to go back and
2  add or change at this point in time, correct?
3    A    No.
4        MS. McELVY:  Pass the witness.
5        MR. KIRKLIN:  We will reserve our questions
6  for the time of trial.
7        MS. McELVY:  Thank you.
8        COURT REPORTER:  Do you want to have the
9  witness read or waive.
10       MS. McELVY:  Thank you.  Appreciate it.
11       COURT REPORTER:  Would the witness like to
12 read or waive?
13       MR. KIRKLIN:  Read.
14       COURT REPORTER:  Okay.  And Ms. McElvy, are
15 you ordering this regular turn around or do you
16 need it expedited?
17       MS. McELVY:  What is your regular turnaround?
18 Like 10 days or less?
19       COURT REPORTER:  Yes, ma'am.
20       MS. McELVY:  That's fine.
21       COURT REPORTER:  Okay.  And Mr. Kirklin, do
22 you need to order a copy as well?
23       MR. KIRKLIN:  Yes, please.
24       COURT REPORTER:  Okay.  Thank you very much,
25 everyone.
```

206

```
1        MS. McELVY:  Okay.  Thank you.
2        THE VIDEOGRAPHER:  And that -- and that will
3  conclude the day's proceedings in the deposition of
4  Dennis J. Rogers, II.  We're off the record at 4:15
5  p.m. Central.
6        (Deposition was concluded at 4:15 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

207

```
1                    CHANGES AND SIGNATURE
2  WITNESS: DENNIS J. ROGERS, II  DATE: DECEMBER 8, 2020
3  PAGE LINE        CHANGE              REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
```

208

```
1       I, DENNIS J. ROGERS, II, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6        _____
7                    DENNIS J. ROGERS, II
8  THE STATE OF _____)
9  COUNTY OF _____)
10
11       Before me, _____, on this
12 day personally appeared DENNIS J. ROGERS, II, known to
13 me (or proved to me under oath or through
14 _____) (description of identity card or
15 other document) to be the person whose name is
16 subscribed to the foregoing instrument and acknowledged
17 to me that they executed the same for the purposes and
18 consideration therein expressed.
19       Given under my hand and seal of office on this
20 _____ day of _____, _____.
21
22        _____
         NOTARY PUBLIC IN AND FOR
23
24        THE STATE OF _____
25        COMMISSION EXPIRES:_____
```

**209**

```
 1            CAUSE NO. DC-20-10214
 2  STEVE WEBER, AARON WEBSTER, )    IN THE DISTRICT COURT
    and DENNIS WOODS,          )
 3                             )
    vs.                        )    191st JUDICIAL DISTRICT
 4                             )
    DENNIS J. ROGERS, II and   )
 5  OMTC, INC.,                )
 6            REPORTER'S CERTIFICATE
 7  VIDEOTAPED DEPOSITION OF DENNIS J. ROGERS, II
 8               DECEMBER 8, 2020
 9              (Reported Remotely)
10
11      I, Amber Rodriguez, Certified Shorthand Reporter in
12  and for the State of Texas, hereby certify to the
13  following:
14      That the witness, DENNIS J. ROGERS, II, was duly
15  sworn and that the transcript of the deposition is a
16  true record of the testimony given by the witness:
17      That the deposition transcript was duly submitted
18  on _____ to the witness or to the attorney
19  for the witness for examination, signature, and return
20  to me by _____;
21      That the amount of time used by each party at the
22  deposition is as follows:
23
24      Meghan McElvy (04 hours 03 minutes)
25      Bradley Kirklin (00 hours 00 minutes)
```

**210**

```
 1      That pursuant to information given to the
 2  deposition officer at the time said testimony was taken,
 3  the following includes counsel for all parties of
 4  record:
 5      Meghan McElvy, Attorney for Plaintiffs, Steven
        Webster, Aaron Webster and Dennis Woods,
 6
        Bradley Kirklin, Attorney for Defendants, Dennis
 7      J. Rogers, II and OMTC, Inc.
 8      I further certify that I am neither counsel for,
 9  related to, nor employed by any of the parties or
10  attorneys in the action in which this proceeding was
11  taken, and further that I am not financially or
12  otherwise interested in the outcome of this action.
13
14      Further certification requirements pursuant to
15  Rule 203 of the TRCP will be certified to after they
16  have occurred.
17      Certified to by me on this 15th day of
18  December, 2020.
19
20
21      _____
        Amber Rodriguez, RPR, FPR, CSR
22      Texas CSR 7817
        Expiration Date: 04/30/2022
23      LexitasNG-Premier, Firm No. 95
        13101 Northwest Freeway
24      Houston, Texas 77040
        Phone:  (281) 469-5580
25
```

**211**

```
 1      FURTHER CERTIFICATION UNDER TRCP RULE 203
 2      The original deposition was/was not returned to the
 3  deposition officer on _____.
 4      If returned, the attached Changes and Signature
 5  page(s) contain(s) any changes and the reasons therefor.
 6      If returned, the original deposition was delivered
 7  to Meghan McElvy, Custodial Attorney;
 8      That $_____ is the deposition officer's charges
 9  to the Plaintiffs for preparing the original deposition
10  and any copies of exhibits;
11      That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate was
13  served on all parties shown herein on _____
14  and filed with the Clerk.
15      Certified to by me on this _____ day of
16  _____, _____.
17
18
19      _____
        Amber Rodriguez, RPR, FPR, CSR
20      Texas CSR 7817
        Expiration Date: 04/30/2022
21      LexitasNG-Premier, Firm No. 95
        13101 Northwest Freeway
24      Houston, Texas 77040
        Phone:  (281) 469-5580
22
23
24
25
```

**212**

```
 1  Errata Sheet
 2
 3  NAME OF CASE: Webster vs Rogers
 4  DATE OF DEPOSITION: 12/08/2020
 5  NAME OF WITNESS: Dennis Rogers, II
 6  Reason Codes:
 7      1. To clarify the record.
 8      2. To conform to the facts.
 9      3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25
```

# EXHIBIT F

**Form 424**
**(Revised 05/11)**

Submit in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
Filing Fee: See Instructions



**Certificate of Amendment**

This space reserved for office use.

F I L E D
In the Office of the
Secretary of State of Texas

**NOV 2 8 2018**

**Corporations Section**

## Entity Information

The name of the filing entity is:

OMTC, Inc.

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☒ For-profit Corporation                    ☐ Professional Corporation
☐ Nonprofit Corporation                     ☐ Professional Limited Liability Company
☐ Cooperative Association                    ☐ Professional Association
☐ Limited Liability Company                  ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is:  803049019

The date of formation of the entity is:   06/21/2018

## Amendments

### 1. Amended Name
(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement.)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

**Registered Agent**
(Complete either A or B, but not both. Also complete C.)

☐ A. The registered agent is an organization (cannot be entity named above) by the name of:

_____

OR

☐ B. The registered agent is an individual resident of the state whose name is:

_____

*First Name*          *M.I.*          *Last Name*          *Suffix*

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C. The business address of the registered agent and the registered office address is:

_____ TX _____

*Street Address (No P.O. Box)*          *City*          *State    Zip Code*

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

*Text Area: The attached addendum, if any, is incorporated herein by reference.*

☐ Add each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:

_____

☒ Alter each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:

Article 3 - Directors. The number of directors constituting the board of directors and names and address of the person who is to serve until the next annual meeting of shareholders or until his successor is elected and qualified is set forth below.
Director 1: Dennis James Rogers
Address: 1920 McKinney Ave., Floor 7, Dallas, TX 75201

☐ Delete each of the provisions identified below from the certificate of formation.

_____

### Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424          7

## Effectiveness of Filing (Select either A, B, or C.)

A. [X] This document becomes effective when the document is filed by the secretary of state.

B. [ ] This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: ______________________

C. [ ] This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: ______________________

The following event or fact will cause the document to take effect in the manner described below:

| |
|---|
| |

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: November 27, 2018

By: OMTC inc

[signature]
Signature of authorized person

Dennis James Rogers
Printed or typed name of authorized person (see instructions)

# EXHIBIT G

EXHIBIT

2

**From:** Dennis Rogers <dennisrogers.us@gmail.com>
**Sent:** Tuesday, July 7, 2020 7:36 AM
**To:** Aaron Webster <aaron@wreholdings.net>
**Subject:** Re: Wire transfer in process

> **From:** Goldman Sachs <noreply-notify@gs-enotification.com>
> **Date:** July 7, 2020 at 8:01:12 AM EST
> **To:** Dennis Rogers <dennisrogers.us@gmail.com>
> **Subject: Wire transfer in process**
> **Reply-To:** <noreply-notify@gs-eNotification.com>



EMAIL FOR: Dennis Rogers

The below wire transfer from your account is being processed.
If you did not authorize this transfer or have any questions, contact your Goldman Sachs team.

| | |
|---|---|
| Date: | Jul 07, 2020 |
| From: | XXX-XX708-8 |
| Amount: | USD 4,410,000.00 |
| Recipient: | Steve Webster |
| Recipient Bank Name: | Frost Bank |

You can access more information in the Transfers section on Goldman.com.

Sincerely,
Goldman Sachs
This e-mail was generated from an automated system and replies are not monitored.



24/7 Technical support

| | |
|---|---|
| U.S. & Canada | +1 877 465 3626 |
| Europe | +44 20 7552 2075 |
| Asia | +800 4746 8378 |
| Hong Kong | +852 2978 6267 |
| Sao Paulo | +55 11 3372 0219 |
| Singapore | +65 6889 2509 |
| Tokyo | +81 3 6437 4889 |

Privacy & Security
|
Important Information

For your security, do not reply to this e-mail. If you have any questions, contact your Goldman Sachs team or sign in to Goldman.com to send a secure message. To learn more about how to protect yourself from fraud, go to goldmansachs.com/security.

© 2020 Goldman Sachs. All rights reserved.

EXHIBIT

3

**From:** Dennis Rogers <dennisrogers.us@gmail.com>
**Sent:** Tuesday, July 7, 2020 8:16 AM
**To:** Aaron Webster <aaron@wreholdings.net>
**Subject:** Fwd: Wire transfer in process

**From:** Goldman Sachs <noreply-notify@gs-enotification.com>
**Date:** July 7, 2020 at 9:05:08 AM EST
**To:** Dennis Rogers <dennisrogers.us@gmail.com>
**Subject: Wire transfer in process**
**Reply-To:** <noreply-notify@gs-eNotification.com>



EMAIL FOR: Dennis Rogers

The below wire transfer from your account is being processed.
If you did not authorize this transfer or have any questions, contact your Goldman Sachs team.

| | |
|---|---|
| Date: | Jul 07, 2020 |
| From: | XXX-XX708-8 |
| Amount: | USD 2,142,000.00 |
| Recipient: | Dennis Woods |
| Recipient Bank Name: | Cadence Bank |

You can access more information in the Transfers section on Goldman.com.

Sincerely,
Goldman Sachs
This e-mail was generated from an automated system and replies are not monitored.



24/7 Technical support

| | |
|---|---|
| U.S. & Canada | +1 877 465 3626 |
| Europe | +44 20 7552 2075 |
| Asia | +800 4746 8378 |
| Hong Kong | +852 2978 6267 |
| Sao Paulo | +55 11 3372 0219 |
| Singapore | +65 6889 2509 |
| Tokyo | +81 3 6437 4889 |

Privacy & Security
|
Important Information

For your security, do not reply to this e-mail. If you have any questions, contact your Goldman Sachs team or sign in to Goldman.com to send a secure message. To learn more about how to protect yourself from fraud, go to goldmansachs.com/security.

© 2020 Goldman Sachs. All rights reserved.

EXHIBIT

5

**From:** Dennis Rogers <dennisrogers.us@gmail.com>
**Date:** July 9, 2020 at 1:50:33 PM CDT
**Subject: Fwd: Update**


Dennis Rogers


Begin forwarded message:

> **From:** "McDonnell, Ryan" <Ryan.McDonnell@gs.com>
> **Date:** July 9, 2020 at 1:22:21 PM CDT
> **To:** Dennis Rogers <dennis.rogers@bootstrapventures.com>
> **Subject: RE:  Update**
>
> Dennis,
>
> Fed Reference for the two wires are (Dennis Woods) MMQFMPU7004072 &
> B1Q8021C036103. (Steven Webster)
>
> Ryan
>
> Ryan P. McDonnell
> Private Wealth Management
> Goldman Sachs & Co. LLC
>
> This e-mail does not constitute an offer or solicitation with respect to the purchase

1

authorized or to any person to whom it would be unlawful to make such offer or solicitation. This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete this message. If you are sending confidential information (e.g. name, tax ID), please ensure you are using a secure method of delivery. You may fax confidential information to 214-855-1173. For prospectuses of recent initial public offerings to which this message may be related see http://www.gs.com/disclaimer/ipo/. See www.goldman.com/gs/k/accounts/CFTC.Disclosure for important disclosures related to CFTC-regulated swap transactions. If you currently hold CFTC-regulated swaps, you may access the Dodd-Frank Regulatory Daily Mark through the Client Web. Please contact us if you do not have access to these links or to the Client Web. Goldman Sachs does not provide legal, tax or accounting advice, unless explicitly agreed between the client and Goldman Sachs. Clients of Goldman Sachs should obtain their own independent legal, tax or accounting advice based on their particular circumstances.

For additional information, including how to opt-out of future messages, see http://www.gs.com/disclaimer/pwm.html.

## Confidentiality Notice:

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

# EXHIBIT H

EXHIBIT

4

**From:** Dennis Rogers <dennis.rogers@omtcinc.com>
**Sent:** Wednesday, July 8, 2020 2:53 PM
**To:** Aaron Webster <aaron@wreholdings.net>
**Subject:** Fwd: GS Online Transfer Confirmation

Begin forwarded message:

**From:** "McDonnell, Ryan" <Ryan.McDonnell@gs.com>
**Subject: RE: GS Online Transfer Confirmation**
**Date:** July 8, 2020 at 2:26:00 PM CDT
**To:** "dennis@bootstrapventures.com" <dennis@bootstrapventures.com>

Dennis,

On the other line, wires are still with treasury. I'm expecting them to be sent any out any minute now.

Ryan

**Ryan P. McDonnell**

Private Wealth Management
Goldman Sachs & Co. LLC

This e-mail does not constitute an offer or solicitation with respect to the purchase or sale of any security in any jurisdiction in which such offer or solicitation is not authorized or to any person to whom it would be unlawful to make such offer or solicitation. This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete this message. If you are sending confidential information (e.g. name, tax ID), please ensure you are using a secure method of delivery. You may fax confidential information to 214-855-1173. For prospectuses of recent initial public offerings to which this message may be related see http://www.gs.com/disclaimer/ipo/.

Seewww.goldman.com/gs/k/accounts/CFTC.Disclosure for important disclosures related to CFTC-

regulated swap transactions. If you currently hold CFTC-regulated swaps, you may access the Dodd-Frank Regulatory Daily Mark through the Client Web. Please contact us if you do not have access to these links or to the Client Web. Goldman Sachs does not provide legal, tax or accounting advice, unless explicitly agreed between the client and Goldman Sachs. Clients of Goldman Sachs should obtain their own independent legal, tax or accounting advice based on their particular circumstances.

**For additional information, including how to opt-out of future messages, see** http://www.gs.com/disclaimer/pwm.html.

# EXHIBIT I

## Page 1

NO. DC-20-10214

| | |
|---|---|
| STEVEN WEBSTER, AARON WEBSTER, AND DENNIS WOODS, | ) IN THE DISTRICT COURT |
| Plaintiffs, | ) |
| VS. | ) DALLAS COUNTY, TEXAS |
| DENNIS J. ROGERS, II AND OMTC, INC., | ) |
| Defendants. | ) 191ST JUDICIAL DISTRICT |

------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

RYAN McDONNELL

(VIA ZOOM)

DECEMBER 9, 2020

------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF RYAN McDONNELL, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on December 9, 2020 from 9:32 o'clock a.m. to 1:03 o'clock p.m., Via Zoom, before DEBBIE S. LONGORIA, CSR in and for the State of Texas, reported by machine shorthand, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

A P P E A R A N C E S

FOR THE PLAINTIFFS:
    COREY WEHMEYER (Via Zoom)
    KATHERINE MALLON (Via Zoom)
    SANTOYO WEHMEYER, P.C.
    12400 SAN PEDRO, SUITE 300
    SAN ANTONIO, TEXAS 78216
    (210) 998-4200
    cwehmeyer@swenergylaw.com
    kmallon@swenergylaw.com

    MARGARET L. WITTENMYER (Via Zoom)
    MEGHAN DAWSON McELVY (Via Zoom)
    BAKER BOTTS L.L.P.
    910 LOUISIANA
    HOUSTON, TEXAS 77002
    (713) 229-1234
    margaret.wittenmyer@bakerbotts.com
    meghan.mcelvy@bakerbotts.com

FOR THE DEFENDANTS DENNIS ROBERTS, II AND OMTC, INC.:

    LAURA SAMMONS (Via Zoom)
    HENNEMAN RAU LLP
    815 WALKER STREET, SUITE 1440
    HOUSTON, TEXAS 77002
    (713) 955-6030
    lsammons@hennemanrau.com

FOR RYAN McDONNELL:
    KATIE BROWN (Via Zoom)
    GOLDMAN SACHS & CO., LLC
    1999 BRYAN STREET, SUITE 900
    DALLAS, TEXAS 75201
    katie.brown@gs.com
    ERIN KOENEN (Via Zoom)
    GOLDMAN SACHS & CO., LLC
    200 WEST STREET
    NEW YORK, NEW YORK 10282
    erin.koenen@gs.com

ALSO PRESENT:
    LARRY DELGADO, Videographer (Via Zoom)
    AARON WEBSTER (Via Zoom)

## Page 3

INDEX

| | PAGE |
|---|---|
| Appearances | 2 |
| RYAN McDONNELL | |
| Examination by Mr. Wehmeyer | 4 |
| Examination by Ms. Sammons | 113 |
| Signature and Changes | 118 |
| Reporter's Certificate | 120 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Ex. 1 | Goldman Sachs e-mails | 42 |
| Ex. 2 | Goldman Sachs wire transfer | 47 |
| Ex. 3 | Goldman Sachs wire transfer | 52 |
| Ex. 4 | Webster e-mails | 67 |
| Ex. 5 | Webster e-mail | 87 |
| Ex. 6 | Dennis Rogers texts with Aaron Webster | 96 |
| Ex. 7 | Dennis Rogers e-mails | 109 |

## Page 4

1       VIDEOGRAPHER:  We are on the record on
2   December the 9th, 2020 at 9:32 a.m.  Counsels, would you
3   please state your name, your affiliation and where
4   you're -- where you're located.

5       MR. WEHMEYER:  Corey Wehmeyer joined by
6   my colleague Katherine Mallon.  We are located in San
7   Antonio, Texas at Santoyo Wehmeyer, P.C., 12400 San
8   Pedro Avenue, Suite 300, San Antonio, Texas, 78216.  We
9   represent the plaintiffs.

10      MS. BROWN:  Katie Brown from Goldman
11  Sachs & Co. and I'm here representing the witness and
12  I'm in Dallas, Texas.

13      MS. SAMMONS:  This is Laura Sammons.  I'm
14  representing Dennis Rogers.  I'm with Henneman Rau in
15  Houston, Texas.

16      MS. WITTENMYER:  This is Margaret
17  Wittenmyer with Baker Botts and I'm also representing
18  plaintiffs and I'm in Houston, as well.

19      RYAN McDONNELL,
20  having been first duly sworn, testified as follows:
21          EXAMINATION
22  BY MR. WEHMEYER:
23      Q.  Mr. McDonnell, your full name for the record,
24  please.
25      **A.  Ryan Paul McDonnell.**

1    **A.   Yes, sir.**

2    Q.   In terms of numbers, is this 10 accounts or

3 100 accounts, do you have any rough estimate?

4    **A.   About 40 relationships.**

5    Q.   Mr. Rogers being one of about 40?

6    **A.   Yes, sir.**

7    Q.   Upon receiving responsibility in April of 2020

8 for these new relationships, which included Mr. Rogers,

9 was there any kind of an introduction to those or

10 orientation on them, or was there just coverage assigned

11 and to the extent that activity would be needed you

12 would step in?

13    **A.   There was minor like account history overview**

14 **from Ms. Hughey and the rest of the team just giving**

15 **general transaction tendencies and what their account**

16 **consists of.**

17    Q.   Would this have been verbal or in writing?

18    **A.   Verbal.**

19    Q.   Do you recall, with respect to the overview

20 that Ms. Hughey would have given you, any specific

21 discussion of Mr. Rogers?

22    **A.   I don't.**

23    Q.   Is there a minimum account balance or

24 basically minimum value of the client relationship just

25 in a quantitative sense that one has to have to do

1 business with Goldman Sachs and to receive an assignment

2 to a private wealth advisor?

3         MS. BROWN:  Objection, form.

4         **THE WITNESS:  I'm not aware of a -- of a**

5 **hard dollar amount.  It's changed over the years from my**

6 **knowledge.**

7    Q.   (By Mr. Wehmeyer) Do you have a rough

8 understanding currently what the minimum -- you know,

9 minimum account value would have to be to do business

10 with Goldman Sachs?

11         MS. BROWN:  Objection, form.  Go ahead.

12         **THE WITNESS:  My general understanding is**

13 **approximately five million.**

14    Q.   (By Mr. Wehmeyer) I realize you haven't been

15 with Goldman Sachs for a great number of years, but

16 based on your time at Goldman Sachs, do you have an

17 understanding of how the minimum account value would

18 have changed during your time there?

19    **A.   In general, yes.**

20    Q.   Can you explain that to the jury in general?

21    **A.   Sure, absolutely.  As we've expanded our**

22 **business unit, they've brought down the minimum.  I**

23 **think it was generally understood that if you had 20 to**

24 **25 million of assets, you could -- you could be a**

25 **private wealth client, but they've expanded our offering**

1 **over the last few years to include lower net worth**

2 **clients.**

3    Q.   Your understanding is that presently the --

4 the lower net worth client would be approximately

5 $5 million?

6    **A.   That's my general understanding, yes, sir.**

7    Q.   Do you have an understanding, if an account

8 balance falls below $5 million, what happens?

9    **A.   I do, yes, sir.**

10    Q.   Can you explain that, please?

11    **A.   There is no, you know, set procedure.  We**

12 **don't ask them to leave.  We just have a conversation**

13 **around the reasons why the account has fallen below the**

14 **said minimum, and if there is anticipation of it coming**

15 **back up to that said minimum.**

16    Q.   If the -- if, in the course of that

17 conversation, it's confirmed that there's no

18 anticipation that the balance would rise above

19 $5 million, do you know whether there would be any

20 additional activity taken or not taken?

21    **A.   I don't know that specifically.**

22    Q.   In terms of the length of time that Mr. Rogers

23 has been a client of Goldman Sachs, do you have any idea

24 or understanding as to how long Mr. Rogers has been a

25 Goldman Sachs client?

1    **A.   I do not.**

2    Q.   Do you have any understanding as to what type

3 of business Mr. Rogers is involved in?

4    **A.   Somewhat.**

5    Q.   What is that understanding?

6    **A.   He had a brokerage relationship with Goldman**

7 **Sachs.**

8    Q.   Describe what a brokerage relationship is.

9    **A.   It is a relationship where Goldman doesn't**

10 **have discretion over an -- over an account.**

11    Q.   And help me with that.  What do you mean by it

12 would be a relationship whereby Goldman Sachs doesn't

13 have discretion over the account?

14    **A.   The client would have full authority over**

15 **their account.  We could not make decisions on their**

16 **behalf.**

17    Q.   How does that compare against an account where

18 Goldman Sachs would have discretion or authority, what

19 types of things can you do -- can you do if you have the

20 discretion and authority?

21    **A.   The main difference is in an advisory**

22 **brokerage account where we could place trades in the**

23 **client's behalf.**

24    Q.   Basically, if you identify a financial

25 opportunity or a trade that Goldman Sachs, in its

Page 25

1 discretion, thinks makes sense, you could do that
2 without having advance client approval?
3    A.    In an advisory relationship, yes, sir.
4    Q.    But, in the -- in the specific instance of
5 Mr. Rogers' account, Goldman Sachs wasn't setup with
6 that discretion or authority, and basically the only --
7 moving around dollars, that was exclusively within the
8 province of Mr. Rogers; is that right?
9    A.    That's correct.
10    Q.    Within the different products that Goldman
11 Sachs offers clients, are you familiar with options
12 accounts?
13    A.    A little bit, yes, sir.
14    Q.    Will you describe for the jury what a Goldman
15 Sachs option account is and how it works?
16    A.    Of course, yes.  An options -- in an options
17 account, it would be an account where they would, you
18 know, buy and sell different options, be it puts calls,
19 and that would be an options account.
20    Q.    Thank you, Mr. McDonnell.
21          MR. WEHMEYER:  And whoever's name is
22 showing up as Aaron, I think you're unmuted having a
23 conversation that's coming across on our Zoom.
24          MR. WEBSTER:  I apologize.
25    Q.    (By Mr. Wehmeyer) Mr. McDonnell, with respect

Page 26

1 to the options account and that product offered by
2 Goldman Sachs, would that basically be an account where
3 the client could buy and trade in and out of publicly
4 offered securities?
5    A.    In the form of strict options or in like
6 underliers, as well?
7    Q.    I speak oil and gas all right, I don't speak
8 financial institution, so you help me with that.  In
9 terms of the options account, what types of securities
10 or products could the client buy in and out of or
11 transact in?
12    A.    They could -- they could buy in and out of or
13 transact in any publicly-traded security.
14    Q.    Would they need any Goldman Sachs approval or
15 authority to do that or is this something that could be
16 done electronically with a keyboard and a mouse?
17    A.    It could be done without our interaction, it
18 could be done via keyboard and mouse.
19    Q.    Is that the type of thing that a Goldman Sachs
20 client would call their financial analyst or their
21 private wealth advisor to do for them, or is that
22 something more likely that would be handled by the
23 client themselves?
24    A.    They could call us and they could also do it
25 on their own as to whatever their level of

Page 27

1 comfortability with the trade is.
2    Q.    Are you familiar with the cash account among
3 the products that Goldman Sachs offers clients?
4    A.    Yes, sir.  I am.
5    Q.    Explain to the jury, how does a cash account
6 work?
7    A.    Generally, a cash account is as stated, it is
8 used to hold cash for -- for clients and used to
9 generally transact in money movement activities.
10    Q.    And I'm not holding you down to a particular
11 number, but earlier you discussed that it was your
12 general understanding that a client would need to have a
13 minimum account value of about $5 million to do business
14 with Goldman Sachs and be assigned to a private wealth
15 advisor.  Would it matter whether that $5 million would
16 be disbursed between options accounts and cash accounts
17 or are you-all looking at basically aggregate value?
18    A.    It does not matter.  It can be aggregate.
19    Q.    We've talked about options accounts and cash
20 accounts.  Is there -- are there other just categories
21 of accounts where money can be basically housed within
22 Goldman Sachs that we haven't talked about?
23          MS. BROWN:  Objection, form.
24          THE WITNESS:  No, other than the advisory
25 accounts that we talked about before.

Page 28

1    Q.    (By Mr. Wehmeyer) And I'm sorry,
2 Mr. McDonnell, I've already forgotten that one.  Help me
3 with, what is an advisory account?
4    A.    It is an account where Goldman has discretion
5 over trading activity.
6    Q.    Okay.  As we talk concretely on Mr. Rogers, at
7 some point in time, did Ms. Hughey come back from
8 maternity leave?
9    A.    She did, yes, sir.
10    Q.    Do you recall approximately when that would
11 have happened?
12    A.    Approximately mid-September 2020.
13    Q.    At that point in time, were her 40ish
14 relationships transferred back to her responsibility
15 from yours?
16    A.    Yes, sir.  They were.
17    Q.    Would that have included Mr. Rogers' account?
18    A.    Yes, sir.  It would have.
19    Q.    After September of 2020, have you had any
20 involvement whatsoever in dealing with Mr. Rogers'
21 account for Goldman Sachs?
22    A.    I have not.
23    Q.    Before April of 2020, did you have any
24 association or role with Mr. Rogers' account in any way,
25 shape or form?

1    A.  I did not.

2    Q.  So, just as we visit about the timeframe from

3 April of 2020 to September of 2020, did you come to be

4 personally aware that Mr. Rogers had an options account

5 with Goldman Sachs?

6    A.  I was.

7    Q.  During the period of April 2020 to September

8 of 2020, did you come to know that Mr. Rogers had a cash

9 account with Goldman Sachs?

10   A.  Yes, sir.

11   Q.  During the period of April 2020 to

12 September 2020, it was your personal understanding that

13 he did not -- Mr. Rogers did not have an advisory

14 account with Goldman Sachs; is that right?

15   A.  That was my understanding.

16   Q.  With respect to the timeframe of April 2020 to

17 September 2020, other than one options account and one

18 cash account, were you aware of any other accounts that

19 Mr. Rogers had with Goldman Sachs?

20   A.  There were open accounts with no funds in

21 them.

22   Q.  Okay.  Describe what the open accounts with no

23 funds in them would be.

24   A.  They were mostly setup for advisory

25 relationship had one occurred.

1    Q.  So, these would have been accounts that were

2 likely created upon Mr. Rogers intake as a client, but

3 just never used by him?

4    A.  That's correct.

5    Q.  Any other accounts that would have been

6 associated with Mr. Rogers that we haven't talked about?

7    A.  Not to my knowledge.

8    Q.  There's another defendant in this case besides

9 Mr. Rogers that's being sued called OMTC, Inc.  Is that

10 an entity that you're familiar with at all?

11   A.  No, sir.  It's not.

12   Q.  With respect to Mr. Rogers relationship with

13 Goldman Sachs, did you understand that to be in his

14 individual capacity?

15   A.  I did, yes, sir.

16   Q.  With respect to any company that would be

17 owned or controlled by Mr. Rogers, are you aware of any

18 company that he would own or control?

19   A.  I personally was not.

20   Q.  When you say you personally was not, and I

21 appreciate that, all I can get today is your personal

22 knowledge.  Someone hasn't told you about any company

23 that Mr. Rogers would own or control, have they?

24   A.  They have not.

25   Q.  Okay.  With respect to a wire transfer, if --

1 if I am a Goldman Sachs' client and say I'm assigned to

2 Mr. Allen as a client, and I have an options account and

3 I have a cash account, if I want to make a wire transfer

4 using my cash account funds or my options account funds,

5 can I electronically initiate that on my own?

6    A.  Yes, sir.  You can.

7    Q.  Would that cross the desk of a financial

8 analyst before it would be approved and processed by

9 Goldman Sachs?

10   A.  Yes, sir.  It would.

11   Q.  Would it require an approval by a financial

12 analyst before the wire transfer that I tried to

13 initiate would actually happen?

14   A.  It wouldn't require an approval from a

15 financial analyst.

16   Q.  What would it require to actually accomplish

17 the transfer of funds?

18   A.  It would require us to review the submitted

19 details of the wire transfer and input it into our

20 payment system.

21   Q.  Just speaking concretely, if I desire, as a

22 Goldman Sachs' client, to accomplish a wire transfer out

23 of my cash account, I could electronically initiate

24 that, and then there would be an alert or request

25 received by a financial analyst within Goldman Sachs.

1 And to actually make funds move, you would have to put

2 it into your system and then process it.  Is that -- do

3 I have the procedure correct?

4    A.  That would be correct.

5    Q.  During the period of time between April 2020

6 and September 2020, while you were the financial analyst

7 assigned to Mr. Rogers' account, if he initiated a wire

8 transfer, would that come to basically be an alert to

9 you and you would be the person that would input it?

10   A.  It would come to me and the rest of the team.

11   Q.  Between April 2020 and September 2020, who

12 would be the rest of the team?

13   A.  The rest of the team would be the wealth

14 advisor, Brian Olson.  It would be the other financial

15 analyst, Ashley Ebeck.  Allie Porter did not come to the

16 team until mid-summer, so anything before say August,

17 she would not have had any involvement in.  And up until

18 about mid-summer, it would have included another

19 financial analyst that left the firm, Pedro Nato.  And

20 it also would have come to another individual helping

21 support in the maternity leave absence, Taylor Martin.

22   Q.  Is Taylor a male or a female?

23   A.  Female.

24   Q.  Do you know what Ms. Martin's title is or was?

25   A.  I'm not 100 percent sure, but I know she is a

1 wealth management professional.

2    Q.   So, for the -- for the entire time of
3 April 2020 to September 2020, if Mr. Rogers desired to
4 make a wire transfer, he could have electronically
5 initiated that and then it would have needed -- it would
6 have generated an alert or a distribution to the
7 applicable team.  During that particular time, the team
8 at a minimum would have included Mr. Olson, Ms. Ebeck,
9 for a period of time Ms. Martin, and Ms. Porter and
10 yourself?

**11    A.   That's correct.  Ms. Martin would have been**
**12 there the whole time for that time period that you**
**13 mentioned.**

14    Q.   Okay.  And Ms. Porter for only a period of
15 that time?

**16    A.   For only a period, yes, sir.**

17    Q.   And then how would you-all divvy
18 responsibility amongst yourselves for actually putting
19 the wire transfer requests into the system to make it
20 happen?

**21    A.   When Ms. Hughey went out on maternity leave,**
**22 in discussions with the team, it was kind of decided**
**23 between all of us that -- who would have done certain**
**24 responsibilities.**

25    Q.   So, with respect to Mr. Rogers, would

1 inputting the request have always been you or would
2 anybody else have ever had that role?

**3    A.   Somebody else would have had that role, as**
**4 well.  I was the point person.**

5    Q.   Who else would have had the role when you were
6 the point person?

**7    A.   Anybody listed on the team could have.**

8    Q.   And I'm asking this in a terribly inartful
9 way.  Basically, if I initiate this wire transfer
10 request and the alert goes out to the team, how do
11 you-all know who's actually going to process it, if not
12 any one particular person?

**13    A.   I'm sorry, you broke up right at the end**
**14 there.**

15    Q.   Yes, sir.  If I, as a Goldman Sachs client,
16 initiate a wire transfer request and it generates an
17 alert that would go to Mr. Olson, Ms. Ebeck, Ms. Martin
18 and yourself and for a period of time, Ms. Porter, if
19 any one of you-all could actually input the information
20 to make the wire transfer happen, how would you-all
21 agree amongst yourselves or know who's actually going to
22 accomplish the mechanics of it?

**23    A.   Sure.  It was generally stated that I would be**
**24 responsible for inputting unless I was out of the**
**25 office or tied up on another task.**

1    Q.   With respect to the Dennis Rogers relationship
2 between April 2020 and September 2020, was there ever a
3 wire request made by him where you were out of the
4 office or not the person that was going to actually
5 logistically accomplish the input?

**6    A.   Not that I recall.**

7    Q.   Is it possible for a client to initiate a wire
8 transfer and then not actually get it completed after
9 there's been a confirmation received for the wire
10 transfer?

**11    A.   Not after a confirmation has been received.**

12    Q.   Would the confirmation be auto-distributed to
13 the Goldman Sachs client?

**14    A.   There is a system automated confirmation.**

15    Q.   At what point in time would the computer
16 system automated confirmation go out?

**17    A.   I'm not -- not sure on that specifically on**
**18 the timing.**

19    Q.   And so, again, to just help me with the
20 mechanics because I'm not familiar with them, if I as a
21 client asked for a wire transfer to be taken out of my
22 Goldman Sachs' account, to electronic initiate that,
23 there would be an automatically generated alert that
24 goes out to the team, during the relevant period of time
25 you believe you would have been the person as to

1 Mr. Rogers that would logistically input the wire
2 transfer.  Is there anything else that Goldman Sachs has
3 to actually do to make that wire transfer happen, or at
4 that point after you've input it, is everything else
5 automated?

**6    A.   After we or I input into the system, there is**
**7 an approval process that crosses a few teams desk.**

8    Q.   Explain how that approval process would then
9 happen after you've input the wire transfer request.

**10    A.   In general, it would be sent to a team that**
**11 authenticates the instructions, makes sure that they are**
**12 valid.  And then it would go to a team that would then**
**13 authenticate and make sure that there are the**
**14 appropriate amount of funds in the account.  And then**
**15 from there, it would go to the team that actually sends**
**16 the physical wire.**

17    Q.   How quickly does that process happen?

**18    A.   There is no timeframe as to how quickly that**
**19 happens.**

20    Q.   Okay.  So, if I initiate a wire transfer as a
21 client at 9:00 o'clock a.m., you-all don't have any kind
22 of a guaranteed timeline to accomplish the outgoing wire
23 transfer?

24         MS. BROWN:  Objection, form.

25         THE WITNESS:  Not that I -- not that I

LEXITAS

1 know of.

2    Q.   (By Mr. Wehmeyer) Are you aware of any wire

3 requests taking more than a business day to accomplish?

4    **A.   Not -- not due to other than not having funds**

5 **in the account or wrong instructions.**

6    Q.   Okay.  So, if I'm a Goldman Sachs client and I

7 have good funds to satisfy the wire and I give you

8 correct wire instructions, it's your understanding that

9 that would be processed within a single business day?

10        MS. BROWN:  Objection, form.

11        **THE WITNESS:  Yes, sir.  That's my**

12 **expectation.**

13    Q.   (By Mr. Wehmeyer) Do you have -- is there a

14 wire cutoff that Goldman Sachs sets that if you (audio

15 cutout) wire transfer request after the (audio cutout)

16 only going to happen on the next business day?

17        THE REPORTER:  Can you repeat your

18 question because you broke-up?

19        MR. WEHMEYER:  Yes, ma'am.  I apologize.

20 I haven't had these audio problems via Zoom until today.

21    Q.   (By Mr. Wehmeyer) And Mr. McDonnell, I

22 appreciate you asking to repeat it when we do have an

23 audio hiccup, but otherwise, are you hearing me

24 generally okay?

25    **A.   Yes, sir.**

1        VIDEOGRAPHER:  You're breaking up -- you

2 keep breaking up on your side, Mr. Wehmeyer.

3        MR. WEHMEYER:  I'm sorry, Mr. Delgado?

4        VIDEOGRAPHER:  You keep breaking up, you

5 keep going in and out, so I don't know if it's your

6 speaker or what.

7        MR. WEHMEYER:  Well, okay.  I'll try to

8 speak up here.  I feel like I'm yelling already.

9    Q.   (By Mr. Wehmeyer) Mr. McDonnell, what do you

10 understand the wire cutoff time to be in Goldman Sachs?

11        MS. BROWN:  Objection, form.

12        **THE WITNESS:  My understanding is**

13 **2:30 p.m. Central time.**

14    Q.   (By Mr. Wehmeyer) And so, just concretely

15 illustrating, your understanding is that if a Goldman

16 Sachs client initiates a wire transfer request before

17 2:30 p.m. Central, Goldman Sachs would -- assuming

18 there's good funds and correct wire instructions --

19 would complete the actual transfer out that same

20 business day?

21    **A.   That's correct.**

22    Q.   With respect to the Dennis Rogers

23 relationship, are you aware of him ever making a wire

24 transfer request that didn't go through for the reason

25 that there were insufficient funds?

1    **A.   I am not aware of that.**

2    Q.   With respect to the Dennis Rogers

3 relationship, are you aware of him ever making a wire

4 transfer request and it not issuing for the reason that

5 he gave incorrect wiring instructions?

6    **A.   I'm not aware of that.**

7    Q.   During the period of time that you were

8 responsible on the team for the Dennis Rogers

9 relationship, being April 2020 to September 2020, if he

10 had made a wire transfer request that didn't process for

11 the reason of insufficient funds or for the reason of

12 bad wire instructions, is that the type of thing you

13 think you would have remembered?

14    **A.   Yes, sir.**

15    Q.   Could a wire transfer request also be made by

16 telephone through a client of Goldman Sachs?

17    **A.   It could be initiated through a telephone**

18 **call, yes, sir.**

19    Q.   Would there still have to be some kind of an

20 electronic follow-up or approval by the Goldman Sachs

21 client in writing before that would happen?

22    **A.   Yes, sir.  We would need a letter of**

23 **authorization.**

24    Q.   What would a letter of authorization look

25 like?

1    **A.   It could be as simple as, you know, I approve,**

2 **you know, wiring X number of dollars from, you know,**

3 **this specific Goldman Sachs' account to these final**

4 **beneficiary instructions.  I mean, it could be more**

5 **elaborate if they gave more detail, but in the simplest**

6 **form, that first as I described.**

7    Q.   Would an e-mail be a sufficient writing to ask

8 Goldman Sachs to make a wire transfer, I could just send

9 an e-mail to you?

10    **A.   You could not.**

11    Q.   It would have to be through like a portal

12 where you're logged in?

13    **A.   It would.**

14    Q.   With respect to a wire transfer out of an

15 options account, is there any difference on wire

16 transfers out of a Goldman Sachs options account as

17 opposed to logistically handling a wire transfer out of

18 a cash account?

19    **A.   No, sir.  There's not.**

20    Q.   You could -- as a Goldman Sachs client, if I

21 have good funds in an options account, I could

22 accomplish a wire transfer using the exact same

23 procedures as I would out of my cash account?

24    **A.   Yes, sir.  You could.**

25    Q.   Do you know how long Mr. Rogers has had an

Page 41

1 account with Goldman Sachs?

**2    A.   I do not.**

3    Q.   If Mr. Rogers had an entity that has an
4 account with Goldman Sachs -- well, let me strike that
5 and try to ask you a better question.

6         We've talked about individuals who have
7 accounts with Goldman Sachs.  Can an entity also have an
8 account with Goldman Sachs?

**9    A.   Yes, sir.  They can.**

10    Q.   If Mr. Rogers had an entity with an account at
11 Goldman Sachs, would it be your expectation that as part
12 of the transition into responsibility that you received
13 in April of 2020, that you would have learned about that
14 or heard about that?

**15    A.   That would have been my expectation, yes, sir.**

16    Q.   During your time at Goldman Sachs, has there
17 ever been a freeze or a hold put on an account that
18 you're aware of?

19        MS. BROWN:  Objection, form.

**20        THE WITNESS:  Not that I'm aware of.**

21    Q.   (By Mr. Wehmeyer) And so, with respect to, you
22 know, for example, the Department of Justice says
23 "freeze this account," that's nothing that you've ever
24 personally been involved in or seen happen?

**25    A.   That's correct.**

Page 42

1    Q.   With respect to the account of Dennis Rogers,
2 to your knowledge, has -- have any of his accounts, be
3 they option account, cash account or advisory account
4 had a hold or a freeze placed on them?

**5    A.   Not that I've experienced.**

6        (Exhibit No. 1 marked.)

7    Q.   I want to talk a little bit about the timeline
8 here.  I'm going to try to screen share and then you can
9 tell me if this is legible or not.  Mr. McDonnell, I'm
10 going to show you what we're marking for today's
11 deposition as Exhibit 1.  Can you see -- is it legible
12 an e-mail from you dated July 6th, 2020 up in the
13 left -- top left-hand corner?

**14    A.   Yes, sir.  It's legible.**

15    Q.   For the jury's reference, we're looking at
16 Deposition Exhibit 1, page seven in the bottom
17 right-hand corner.  Do you see an e-mail from you to
18 Taylor Martin on June 5th, 2020?

**19    A.   I see an e-mail copying her on 2020.**

20    Q.   And actually, it's -- this is an e-mail that
21 you sent to Dennis Rogers; is that correct?

**22    A.   That's correct.**

23    Q.   Do you recall why you were telling Mr. Rogers,
24 on June 5th, 2020 at 4:28 p.m. that the requested wire
25 today for $50,000 was sent?

Page 43

**1    A.   It was team procedure, best practice to inform
2 clients when tasks are done.**

3    Q.   Do you see the 4:28 p.m. time indicator on the
4 e-mail?

**5    A.   Yes, sir.  I do.**

6    Q.   Do you know whether that would be Central time
7 or Eastern time?

**8    A.   That would be Eastern time.**

9    Q.   How do you know that that is Eastern time
10 without an Eastern time indicator?

**11    A.   I was working remotely with my family in New
12 York at that time.**

13    Q.   Would this have been sent from a desktop or a
14 handheld device?

**15    A.   That would have been sent from a desktop.**

16    Q.   Under Goldman Sachs' policy, are you allowed
17 to communicate about client financial matters using
18 handheld devices?

**19    A.   We are on firm approved systems.**

20    Q.   And in the time of April 2020 to
21 September 2020, did you have a handheld approved system
22 that you would communicate with concerning Mr. Rogers'
23 account?

**24    A.   I would have, yes.**

25    Q.   Were there more than one?

Page 44

**1    A.   More than one mobile device?**

**2    Q.   Yes, sir.**

**3    A.   There was not.**

4    Q.   Explain to me what the mobile device that you
5 would have used between April 2020 and September 2020
6 is.

**7    A.   My cell phone.**

8    Q.   Between April 2020 and September 2020, during
9 what period of time would you have been working remotely
10 in New York?

**11    A.   A majority of the time.**

12    Q.   In April would you?

**13    A.   In mid-April is when I -- I went back to New
14 York.**

15    Q.   Did you stay in New York until returning to
16 Texas permanently?

**17    A.   I stayed in New York for that period of time
18 before returning to Texas.**

19    Q.   At what point in time did you return to Texas?

**20    A.   I returned to Texas in early October.**

21    Q.   October 2020?

**22    A.   Yes, sir.**

23    Q.   Between mid-April 2020 and early October 2020,
24 did you ever go back and forth from New York to Texas or
25 were you in New York the entire time?

LEXITAS

Page 45

1    A.  I went back to Texas twice.

2    Q.  Do you recall during what period of time
3 between mid-April 2020 and early October 2020 you would
4 have been back in Texas from New York?

5    A.  It would have been mid to late May and then
6 again in late June to early July.

7    Q.  For the late June/early July timeframe, will
8 you help me with your best exact timeframe that you
9 would have been in Texas and not in New York?

10    A.  It would have been probably around the 15th of
11 the month through maybe the 25th of the month of June.

12    Q.  So, you believe approximately June 15th
13 through June 25th, 2020 you would have been in Texas and
14 not New York?

15    A.  That's my best recollection, yes, sir.

16    Q.  How about the month of July 2020, would there
17 have been anytime that you would have been in Texas and
18 not New York in July of 2020?

19    A.  No, sir.

20    Q.  And when you were physically in Texas during
21 approximately June 15th through June 23rd, 2020, would
22 the e-mails that you sent from a desktop or from your
23 handheld have reflected a Central time?

24    A.  I'm sorry, can you repeat the question?

25    Q.  Yes, sir.  During that timeframe of

Page 46

1 approximately June 15th through 23rd of 2020 when you
2 have would have been physically in Texas, if you were
3 conducting business for Goldman Sachs and sending
4 e-mails, would the time indicator on those e-mails be
5 reflected in Central Standard time?

6    A.  To my knowledge, I believe so.

7    Q.  If we look at the next page of Deposition
8 Exhibit 1, we're at page eight, would this have been
9 embedded in your e-mail or an attachment?

10    A.  This would not have been in an e-mail or an
11 attachment.

12    Q.  Explain what this is, if you know.

13    A.  This is a screenshot of our desktop view of an
14 account.

15    Q.  Do you know whose account this is?

16    A.  I don't off the top of my head.

17    Q.  Can you tell whether this is a cash account or
18 an option account?

19    A.  From this view, I cannot.

20    Q.  If I zoom out, does that help at all in terms
21 of identifying the type of account?

22    A.  No, sir.  It does not.

23    Q.  Okay.  Do you recall this particular wire
24 transfer that we've looked at, the $50,000 that is
25 discussed in your June 15th, 2020 e-mail?

Page 47

1    A.  I don't recall that specific wire.

2    Q.  Do you know whether that would have been
3 initiated by a telephone request or by an electronic
4 request?

5    A.  I can't tell from -- from this exhibit here.

6    Q.  Do you remember ever having any communication
7 with Mr. Rogers before June 15th, 2020?

8    A.  Not that I can recall.

9    Q.  Do you believe that this would have been the
10 first communication you would have ever had with
11 Mr. Rogers?

12    A.  It could have been.

13        (Exhibit No. 2 marked.)

14    Q.  I'm going to mark as Exhibit 2 to today's
15 deposition an e-mail that's dated July 7th, 2020.  Do
16 you see that there's an e-mail dated July 7th, 2020 at
17 8:01 a.m. Eastern time from Goldman Sachs to Dennis
18 Rogers?

19    A.  Yes, sir.  I do see that.

20    Q.  If we -- if we continue to scroll down,
21 it's -- it indicates a date of July 7th, 2020 from
22 account 708-8 in the amount of $4,410,000 to recipient
23 Steve Webster at Frost Bank.  We're looking at the same
24 thing?

25    A.  Yes, sir.  I see that.

Page 48

1    Q.  Do you know whether this is auto-generated by
2 Goldman Sachs in response to a wire transfer request?

3    A.  It looks to be something that would be system
4 generated.

5    Q.  We've talked a lot and I appreciate your help
6 explaining the process of how a Goldman Sachs client
7 would initiate and accomplish a wire transfer.  Just
8 describe where in the process this auto-generated e-mail
9 of July 7th, 2020 at 8:01 Eastern time happens.

10    A.  This e-mail would have been generated after a
11 client had submitted a wire request through the Goldman
12 Sachs' web portal.

13    Q.  Okay.  And so, let's just assume
14 hypothetically I have $1.00 in my Goldman Sachs' cash
15 account, I can go in and electronically, as a client,
16 begin the process of a wire transfer and I could do it
17 to the tune of $4,410,000 and this will auto-generate
18 simply upon me as a client just asking for it, correct?

19    A.  That's correct.

20    Q.  There's been no process associated with
21 actually confirming that there would be $4 million in
22 good funds to satisfy the request or, you know, and for
23 that matter, no confirmation that the wire instructions
24 that I would have provided electronically are good or
25 accurate; is that fair?

1    A.  Can you rephrase the question for me?

2    Q.  Yes, sir.  That was a bad question and I
3 appreciate you asking me to break it down.  If I go into
4 the Goldman Sachs system as a client, even if I only
5 have $1.00 in my account, I can ask that a wire transfer
6 be generated and accomplished of $4 million, and it will
7 generate an auto-response similar to what we're looking
8 at together at Exhibit 2, correct?

9    A.  That's correct.

10    Q.  And it makes no matter whether the funds are
11 actually there to satisfy the request, this is going to
12 automatically ping back to my e-mail account that's on
13 file with Goldman Sachs, isn't it?

14    A.  That's correct.

15    Q.  It's only later in the process that Goldman
16 Sachs is going to confirm that there are good funds and
17 that there are -- and that the wire instructions are
18 good?

19    A.  That's correct.

20        MS. BROWN:  Form.

21    Q.  (By Mr. Wehmeyer) With respect to the process
22 of confirming that the funds are good and that the wire
23 instructions are good, you, as the financial analyst,
24 aren't going to do that, you're just -- you're going to
25 receive the request and input it into your system, and

1 it's going to be other folks down the line that are
2 going to do the actual confirming that there's
3 sufficient funds and confirming that the wire
4 instructions are good; is that right?

5    A.  That's right.

6    Q.  If there are not good funds, is that something
7 that the team let's you know if you're the one that
8 input the wire transfer request for the client?

9    A.  That's correct, they will let -- they will let
10 us know.

11    Q.  If the wire instructions are bad, will the --
12 will the team let you know if you were the one that
13 input the client's request for the wire transfer?

14    A.  Yes, sir.  They will.

15    Q.  Would there be anything auto-generated to the
16 client if, on a particular wire transfer, the team
17 behind you determines that there's insufficient funds or
18 that the wire instructions are no good?

19    A.  To my knowledge, there is not.

20    Q.  That would be basically you, as the financial
21 analyst that would follow-up with the Goldman Sachs
22 client to let them know that there were insufficient
23 funds or that the wire instructions were bad?

24    A.  That would be part of our responsibility to
25 let the client know that.

1    Q.  How -- how would you have let the client know
2 that?

3    A.  It could have been e-mail, phone call,
4 whatever their preferred method of contact is.

5    Q.  And as concerns Mr. Rogers, do you recall ever
6 calling him to tell him that his wire instructions were
7 bad?

8    A.  I do not recall that.

9    Q.  Do you recall ever calling Mr. Rogers to tell
10 him that there were insufficient funds to cover a wire
11 request?

12    A.  I don't remember calling him to tell him that.

13    Q.  Do you recall ever e-mailing Mr. Rogers to
14 tell him that there were insufficient funds to satisfy a
15 wire request?

16    A.  I don't recall e-mailing him that there were
17 insufficient funds.

18    Q.  Do you recall ever e-mailing Mr. Rogers to
19 tell him that he had bad wire instructions?

20    A.  I don't recall that.

21    Q.  If he had ever asked for a wire transfer to be
22 processed that had insufficient funds or had bad wire
23 instructions, is that the type of thing that you
24 believe, during your period of responsibility here
25 between April 2020 and September of 2020, you would have

1 remembered?

2    A.  I would have remembered.

3    Q.  With respect to this transaction that is
4 reflected on July 7th of 2020, this wire request of
5 $4.41 million, do you recall -- and just for the jury's
6 reference with respect to this July 7th, 2020
7 transaction in the amount of 4.4 million, this would
8 have been during the period of time that you were the
9 financial analyst assigned to Mr. Rogers; is that right?

10    A.  That's correct.

11    Q.  Do you recall this wire request?

12    A.  I do not recall this wire request.

13    Q.  If this request had been made, is that
14 something that you on the team would have learned about?

15    A.  It is something I would have learned about.

16    Q.  And -- all right.  And you do not recall ever
17 seeing any kind of a $4.41 million wire request by
18 Mr. Rogers, do you?

19    A.  I do not recall that.

20        (Exhibit No. 3 marked.)

21    Q.  Let's -- let's look at Exhibit 3.

22        MS. BROWN:  Excuse me, Corey, I don't
23 want to interrupt your flow here, but we've been going a
24 little over an hour.  I want to make sure we're taking
25 sufficient breaks today.  I don't know how much you have

LEXITAS

Page 53

1 left, but --

2          MR. WEHMEYER: Yes, ma'am. Before the
3 next break, would you indulge me for five minutes?

4          MS. BROWN: Yeah, Ryan, is that -- are
5 you okay for another five minutes?

6          **THE WITNESS: That's okay.**

7          MS. BROWN: Okay.

8    Q.   (By Mr. Wehmeyer) Mr. Rogers, what I've marked
9 now is Exhibit 3. This is a July 7th, 2020 e-mail that
10 appears to be auto-generated from Goldman Sachs to
11 Dennis Rogers. Do you see that this one is in the
12 amount of $2.142 million?

13   **A.   I do.**

14   Q.   This would have been during the period of time
15 that you would have been the financial analyst assigned
16 to Mr. Rogers' account?

17   **A.   That's correct.**

18   Q.   This is the type of electronic request that if
19 put in by the client here, Mr. Rogers, you would have
20 received an automatic electronic notification?

21   **A.   Yes, that's correct.**

22   Q.   You would have been the person that would have
23 actually physically input the request into the system
24 for the subsequent teams behind you to make happen,
25 right?

Page 54

1    **A.   I would have been one of the responsible
2 parties, yes.**

3    Q.   Do you have any recollection of a
4 $2.142 million wire transfer request being initiated by
5 Mr. Rogers on July 7th, 2020?

6    **A.   I don't have any recollection of that.**

7    Q.   And we've looked now at Exhibit 2 and
8 Exhibit 3 together. One of them being a wire transfer
9 request from July 7th, 2020 in the amount of
10 $4.41 million and Exhibit 3 being one in the amount of
11 $2.142 million. If these were actually initiated by
12 Mr. Rogers on his side as a client, you would have
13 absolutely received notice in the way that you-all's
14 wire transfer system works of the request, wouldn't you?

15   **A.   Yes, sir. We would have.**

16   Q.   And these amounts are of sufficient size that
17 had this notification been received by you, you would
18 have remembered it, wouldn't you?

19   **A.   Yes, sir. I would have.**

20   Q.   And you have no recollection of Exhibit 2 or
21 Exhibit 3, of those ever crossing your desk or actually
22 being initiated by Mr. Rogers, do you?

23   **A.   No, sir. I do not.**

24   Q.   Does it appear to you that Exhibits 2 and 3,
25 as we've looked together, were fabricated or falsified

Page 55

1 or tampered with by Mr. Rogers?

2          MS. BROWN: Objection, form.

3          **THE WITNESS: I can't -- I can't tell
4 from the exhibit here.**

5    Q.   (By Mr. Wehmeyer) Do you believe that
6 Exhibit 2 or Exhibit 3 were actually generated by
7 Goldman Sachs?

8    **A.   I do not.**

9    Q.   You do not believe that they were generated by
10 Goldman Sachs?

11   **A.   I don't -- I don't believe that they were
12 generated by Goldman Sachs.**

13   Q.   What is the basis for your belief?

14   **A.   The basis is, I don't recall receiving wire
15 requests in that amount on our end to input into the
16 system.**

17   Q.   So, what explanation would you have as to how
18 Exhibits 2 and 3 came into existence --

19          MS. BROWN: Objection, form.

20   Q.   -- if Goldman Sachs didn't create them?

21          MS. BROWN: Objection, form.

22          **THE WITNESS: I would -- I would believe
23 that they were edited in some form.**

24   Q.   (By Mr. Wehmeyer) By who?

25          MS. BROWN: Objection, form.

Page 56

1          THE WITNESS: I can't be sure of that.

2          MR. WEHMEYER: Let's go off the record.

3          VIDEOGRAPHER: We're off the record at
4 10:48 a.m.

5          (Recess from 10:48 to 11:01.)

6          VIDEOGRAPHER: And we're back on the
7 record at 11:01 a.m.

8    Q.   (By Mr. Wehmeyer) Mr. McDonnell, you
9 understand when we come back from these breaks you're
10 still sworn under oath?

11   **A.   Yes, sir. I understand that.**

12   Q.   I'm going to go back to Deposition Exhibit 2
13 and look at this as an exemplar, but we saw that
14 Exhibit 3 was, more or less, identical in form, the only
15 change being the amounts and the recipient.

16          MS. SAMMONS: I cannot hear anything.
17 This is Laura Sammons. Are you still speaking?

18          MR. WEHMEYER: I'm trying to get my
19 thoughts in such an order that I can make words with
20 them, but here we go.

21   Q.   (By Mr. Wehmeyer) All right. Mr. McDonnell,
22 as we look at Exhibit 2 together, let me just start at
23 the "from" line Goldman Sachs and down, and I'll let you
24 see the second page of Exhibit 2, as well. Okay. You
25 had an opportunity to see that -- the e-mail that's

Case 2:23-cv-00050-wed Doc #: 251-3 Filed 07/22/25 Page 1 of 3
Case 2:23-cv-00050-wed Doc #: 251-3 Filed 08/22/20 25451 Page 102 of 3
Ryan McDowell
Ex. 3    Page 102 of 489                                    Pagess 57..60

1 titled from Goldman Sachs to Dennis Rogers?

**2    A.  Yes, sir.**

3    Q.  Okay.  Is this a form that you are familiar

4 with by way of something auto-generated by Goldman Sachs

5 in response to a wire transfer request?

**6    A.  I've seen it, but I'm not familiar with it.**

7    Q.  Okay.  Do you know whether something like this

8 auto-generates on the client's side upon initiating a

9 wire transfer request?

**10    A.  I do believe so, yes.**

11    Q.  Is there anything in Exhibit 2, as we look at

12 the part that starts from Goldman Sachs down to the

13 second page, that looks like it would have been altered

14 from the original -- original auto system generated

15 Goldman Sachs form?

16        MS. BROWN:  Objection, form.

**17        THE WITNESS:  Not that I can tell.**

18    Q.  (By Mr. Wehmeyer) Okay.  And so, just to talk

19 concretely as an example here, if on July 7th of 2020 I

20 as a client go in and ask -- and electronically initiate

21 a wire transfer in the amount of 4.41 million, it's your

22 understanding that something that looks identical to or

23 substantially identical to Exhibit 2 would ping back to

24 my e-mail?

**25    A.  It is my understanding that that would happen.**

1    Q.  And simultaneously, are you, as the financial

2 analyst, receiving this same notification?

**3    A.  I am not receiving the same notification.**

4    Q.  Do you receive something simultaneously?

**5    A.  Can you repeat the question?  You -- you**

**6 completely froze.**

7    Q.  Yes, sir.  Do you receive something

8 simultaneously with the auto-generated Exhibit 2?

**9    A.  We do.**

10    Q.  What do you receive?

**11    A.  We receive the full wire details for the**

**12 request.**

13    Q.  And with respect to any request on July 7th,

14 2020 associated with Dennis Rogers' account, you didn't

15 receive anything, did you?

**16    A.  I'm not sure I understand the question.**

**17 Apologies.**

18    Q.  Yes, sir.  So, we've discussed that if on

19 July 7th of 2020, that morning, Mr. Rogers would have

20 actually created on his client's side a wire transfer

21 request with Goldman Sachs in the amount of

22 $4.41 million, you would have received a simultaneous

23 notice with all of the details on it, wouldn't you?

**24    A.  That's correct, we would have.**

25    Q.  And you didn't receive any such notice on

1 July 7th, 2020, did you?

**2    A.  I did not.**

3    Q.  You would have remembered if you had, wouldn't

4 you?

**5    A.  I believe I would.**

6    Q.  Do you have any explanation then for how

7 Mr. Rogers came to be in possession of the e-mail called

8 July 7th, 2020 from Goldman Sachs to him?

9        MS. BROWN:  Objection, form.

**10        THE WITNESS:  I can't be certain of how**

**11 he came into possession of this e-mail.**

12    Q.  (By Mr. Wehmeyer) Do you have a belief or

13 understanding as to how he came into possession of the

14 e-mail?

15        MS. BROWN:  Objection, form.

**16        THE WITNESS: I believe it could have**

**17 been from either this specific wire transfer or a**

**18 previous one.**

19    Q.  (By Mr. Wehmeyer) And so, just concretely,

20 with respect to this particular wire transfer of

21 $4.41 million, and we can tell the jury that on

22 July 7th, 2020, you were the financial analyst assigned

23 to Mr. Rogers' account, weren't you?

**24    A.  I was one of them, yes.**

25    Q.  And you would have received a notification if

1 he, in fact, on July 7th, 2020 initiated a $4.41 million

2 wire transfer request, wouldn't you?

**3    A.  Yes, sir.  I would have.**

4    Q.  But, you received no such notification on

5 July 7th, 2020, did you?

**6    A.  That's correct.**

7    Q.  As the financial analyst responsible for

8 Dennis Rogers' account, did he actually initiate a

9 $4.41 million wire transfer request from Goldman Sachs

10 on July 7th?

**11    A.  I don't believe so.**

12    Q.  And so, with respect to how Exhibit 2 would

13 have been created, the only explanation you would be

14 aware of would be if Mr. Rogers took a prior wire

15 transfer request with Goldman Sachs and changed the

16 information in it, isn't it?

17        MS. BROWN:  Objection, form.

**18        THE WITNESS: I believe so.**

19    Q.  (By Mr. Wehmeyer) Now, with respect to -- with

20 respect to the process of the wire transfer request,

21 let's just assume that he did, in fact, process a

22 $4.41 million wire transfer request on July 7th of 2020,

23 you would have had to actually input that to send it to

24 the next process of making it happen, wouldn't you?

**25    A.  Yes, sir.  I would have.**

Page 61

1    Q.   Is there a process whereby a wire transfer
2 request can be cancelled in-between electronically
3 submitting it and you inputting it into the system?
**4    A.   Not that I'm aware of.**
5    Q.   Once you've input a wire transfer request into
6 the system, is there a process to stop the wire transfer
7 before it actually gets made?
**8    A.   There can be.**
9    Q.   How would a client accomplish that?
**10   A.   They would need to contact us to let -- to let**
**11 us know that they would like to cancel the wire.**
12   Q.   At any point in time between April 2020 and
13 September 2020, did Mr. Rogers ever cancel a wire
14 transfer request after he had initiated it?
**15   A.   I don't recall such an event.**
16   Q.   Do you believe that that's the type of event
17 you would have recalled?
**18   A.   I believe so, yes.**
19   Q.   With respect to the auto-generated electronic
20 financial transfer request notification, the one that we looked at
21 as an example in Exhibit 2, the subject line was, quote,
22 wire transferring process.  Is that sent to the client
23 in a PDF form or is it in a native Word form that could
24 be manipulated?
**25   A.   I believe it's in an e-mail form.**

Page 62

1    Q.   Where you could copy and highlight, paste,
2 delete, basically alter it if you were forwarding the
3 e-mail?
4        MS. BROWN:  Objection, form.
**5        THE WITNESS:  I'm not totally familiar on**
**6 how to do that, so I don't know if I can say that**
**7 definitively.**
8    Q.   (By Mr. Wehmeyer)  But, your understanding is
9 that the wire transferring process notification is not
10 in a PDF, it would be in just an e-mail native form; is
11 that right?
**12   A.   That is my general understanding, correct.**
13   Q.   As the financial analyst assigned to
14 Mr. Rogers between April 2020 and September of 2020, you
15 did process some wire transfer requests for him, didn't
16 you?
**17   A.   Yes, sir.  I did.**
18   Q.   The largest one being approximately 200 and
19 something thousand dollars?
**20   A.   I believe the largest was approximately a**
**21 million.**
22   Q.   With respect to any wire transfer requests
23 made by Mr. Rogers between April 2020 and September 2020
24 with Goldman Sachs, the largest one that ever occurred
25 would have been approximately $1 million; is that right?

Page 63

**1    A.   That's what I recall, yes, sir.**
2    Q.   Did you ever have occasion, as the financial
3 analyst, to look at the account balance that Mr. Rogers
4 had on file with Goldman Sachs?
**5    A.   I could see his account balance, yes, sir.**
6    Q.   Was that account balance approximately
7 $5.2 million?
**8    A.   I'm not 100 percent sure on that.**
9    Q.   What do you recall, as the financial analyst
10 responsible for Mr. Rogers' account between April 2020
11 and September 2020, about his account balance with
12 Goldman Sachs?
**13   A.   I remember it being roughly around the**
**14 $5 million range with no specific dollar amount in mind.**
15   Q.   Do you recall it ever being $6 million or
16 more?
**17   A.   Not that I can recall.**
18   Q.   Seven million dollars or more?
**19   A.   Not that I can recall.**
20   Q.   Eight million dollars or more?
**21   A.   Not that I can recall.**
22        MS. BROWN:  Objection, form.
23   Q.   (By Mr. Wehmeyer)  Nine million dollars or
24 more?
**25   A.   Not that I can recall.**

Page 64

1        MS. BROWN:  Objection, form.
2    Q.   (By Mr. Wehmeyer)  If his account balance was
3 $6 million or more during the period of time April 2020
4 to September 2020, do you think that would be the type
5 of thing you would have remembered?
**6    A.   I'm not totally sure on that just because**
**7 account balances can change on a daily basis due to**
**8 market fluctuations.**
9    Q.   Let's go back and I want to look with you now
10 at Deposition Exhibit 1.  Mr. McDonnell, is Exhibit 1
11 being published to you in a way that's legible right now
12 or do you need me to zoom in on it?
**13   A.   Could you zoom in one more time, please?**
14   Q.   Yes, sir.  Does that help?
**15   A.   That does, thank you.**
16   Q.   Okay.  We're looking together at Exhibit 1.
17 And do you see that this is an e-mail indicating that
18 it's from you to Dennis Rogers on July 8th, 2020 at
19 3:26 p.m.?
**20   A.   I do see that, yes, sir.**
21   Q.   Do you -- and just for reference, do you see
22 in the bottom right-hand corner, this is Bates labeled
23 GS-0001.  I'm going to -- I'm going to scroll down so
24 you can see that this is a document produced by Goldman
25 Sachs.  Do you see that?

LEXITAS

Page 65

1    A.  Yes, sir.  I do see GS-00001.

2    Q.   Let me go back to the top.  Let's look at your

3 e-mail of July 8th, 2020 at 3:26 p.m.  In July -- on

4 July 8th of 2020, you would have been back in New York;

5 is that right?

6    A.  Yes, sir.

7    Q.   So, the time stamp of 3:26 p.m., that would be

8 a time indicated in Eastern time; is that right?

9    A.  I believe it would be, yes, sir.

10    Q.   For the jury's reference, this July 8th, 2020

11 e-mail would correspond to 2:26 p.m. Central time,

12 wouldn't it?

13    A.  I believe so.

14    Q.   What did you communicate to Mr. Rogers on

15 July 8th at 3:26 p.m. Eastern time?

16    A.  That the wire reference below my e-mail

17 with the treasury department getting ready to be sent

18 out.

19    Q.   And you've said, "The wire is still with

20 treasury.  I'm expecting it to be sent any out any

21 minute now," correct?

22    A.  Yes, sir.

23    Q.   For the jury's reference, the wire that you're

24 referring to is the one reflected in the e-mail below

25 of July 8th, 2020 at 8:16 p.m., if we can scroll down.

Page 66

1 Is that the wire that you were referring to in your 3:26

2 Eastern time e-mail?

3    A.  That looks to be the wire I was referencing.

4    Q.   For the jury's reference, it's in the amount

5 of $235,000?

6    A.  Yes, sir.  That's what I see here.

7    Q.   The options account reflecting ending in 052,

8 that was the account that you were familiar with

9 Mr. Rogers had with Goldman Sachs?

10    A.  I believe that's the case, yes.

11    Q.   Explain where in the process the e-mail of

12 8:16 a.m. is -- is created as Goldman Sachs handles the

13 client's wire transfer requests?

14    A.  This would have been after submission on the

15 client website.

16    Q.   And so, if I'm a Goldman Sachs client and I

17 make a wire transfer request on the -- electronically on

18 the -- on the website, I will immediately receive an

19 e-mail confirmation that you-all have received the

20 transfer request, right?

21    A.  Yes, sir.  You would.

22    Q.   The subject line of this one says "GS online

23 transfer confirmation."  What does a transfer

24 confirmation mean?

25    A.  To my knowledge, it's the confirmation that

Page 67

1 the wire has been submitted by the client and received

2 to us on the team.

3    Q.   Just sitting in the -- in the seat being the

4 person with actual knowledge, do you, Mr. McDonnell

5 have an actual concrete recollection of this $235,000

6 wire transfer request by Mr. Rogers?

7    A.  I don't have a specific recollection of this

8 one.

9    Q.   Do you recall sending him the e-mail that we

10 look at together at Exhibit 1?

11    A.  I do recall sending him the e-mail.

12    Q.   And I'm sorry, it cutout just as you were

13 answering.  Your answer to that was what?

14    A.  Yes, sir.  I do -- I do recall sending the

15 e-mail above.

16          (Exhibit No. 4 marked.)

17    Q.   I want to now look at an e-mail that was

18 produced by Mr. Rogers.  And if we go now to Exhibit --

19 what I'm going to mark Exhibit 4, I do very much

20 appreciate you bearing with us as we navigate exhibits

21 through the virtual world.  For the jury's reference,

22 we're looking together at what's been marked Exhibit 4.

23 At the bottom right-hand corner, I just want to show you

24 that this has been produced by my clients.  Do you see

25 Webster 134 in the bottom right-hand corner?

Page 68

1    A.  Yes, sir.  I do.

2    Q.   If we can scroll up, do you see that in the

3 top left-hand corner this purports to be an e-mail from

4 Mr. Rogers that has been sent to Aaron Webster on

5 July 8th, 2020 at 2:53 p.m.?

6    A.  I can see that, yes, sir.

7    Q.   On the assumption that 2:53 p.m. is reflected

8 in Standard time, this would be approximately 30 minutes

9 after the e-mail that we just looked at together that

10 you sent Mr. Rogers on -- on July 8th; isn't that right?

11    A.  That looks to be the case.

12    Q.   If we look at -- do you see that Mr. Rogers

13 purports to be forwarding an e-mail from you on

14 July 8th, 2020?

15    A.  I do see that, yes, sir.

16    Q.   And it says, "Dennis, on the other line, wires

17 are still with treasury.  I'm expecting them to be sent

18 any out any minute now."  Did I read that correctly?

19    A.  From the looks of it, yes, sir.

20    Q.   Okay.  And we looked together at the earlier

21 e-mail that you'd sent at 2:26 Central time, 3:26

22 Eastern time, and what you actually communicated to

23 Mr. Rogers on that day and at that time was discussion

24 about one particular wire, and you said that you

25 expected it to be sent out any out any minute now,

LEXITAS

Ex. Pg. 137

Page 69

1 didn't you?

**2    A.    That's correct.**

3    Q.    But, you see that in the e-mail that is
4 purportedly sent by you at 2:26 Central time that has
5 been forwarded by Mr. Rogers, the actual true e-mail you
6 sent has been tampered with, hasn't it?

**7    A.    I can't be sure of that, but it looks to be**
**8 the case.**

9    Q.    Did you ever send Mr. Rogers an e-mail that
10 said, quote, on the other line, wires are still with
11 treasury?

**12    A.    Not that I can recall.**

13    Q.    Did you ever send Mr. Rogers an e-mail that
14 said, quote, I'm expecting them to be sent any out any
15 minute now?

**16    A.    Not that I can recall.**

17    Q.    And for the jury's reference, this is
18 precisely the same day and precisely the same time as
19 the e-mail that you did actually send that we looked at
20 together as part of Exhibit 1, isn't it?

**21    A.    That does seem to be the case, yes, sir.**

22    Q.    Do you have any explanation for how your true
23 e-mail on July 8th, 2020 at 2:26 p.m. Central time that
24 spoke to a single wire is now being forwarded by
25 Mr. Rogers to Mr. Webster, but it indicates wires

Page 70

1 plural?

2            MS. BROWN:  Objection, form.

**3            THE WITNESS:  I can't be 100 percent sure**
**4 on that.**

5    Q.    (By Mr. Wehmeyer) What is your belief?

**6    A.    My belief is that somebody, you know, edited**
**7 the original e-mail.**

8    Q.    Altered your actual true e-mail?

**9    A.    That's what I believe.**

10    Q.    And so that the jury is perfectly clear,
11 Exhibit 1 that we looked at that was produced by Goldman
12 Sachs indicating an e-mail sent by you on July 8th, 2020
13 at 2:26 Central time, 3:26 Eastern time, you can testify
14 to the jury that that one is 100 percent true and
15 correct, isn't it?

**16    A.    Yes, sir.**

17    Q.    And your testimony to the jury is not that the
18 e-mail that we look at together in Exhibit 4 is true and
19 correct, is it?

**20    A.    It doesn't appear to be the case.**

21    Q.    And with respect to any alteration of the
22 e-mail reflected on Exhibit 4, you didn't make that
23 alteration, it was some other person in the world,
24 wasn't it?

**25    A.    Yes, sir.**

Page 71

1    Q.    Did you authorize any other person in the
2 world to alter in any way your e-mail communication on
3 behalf of Goldman Sachs that we've looked at at
4 Exhibit 1?

**5    A.    I did not authorize that.**

6    Q.    Looking together at Exhibit 4 where your
7 e-mail has been altered, does that cause you concern as
8 a person whose name is associated with this?

**9    A.    Yes, sir.  It does.**

10    Q.    Explain to the jury why.

**11    A.    It concerns me as to it's not truthful to what**
**12 I sent.  It's not my exact e-mail and it represents**
**13 something I did not say.**

14    Q.    And just for the -- for the jury's timeline,
15 when we look together at Exhibits 2 and 3, being the
16 wire transfer requests in the amount of $4.41 million
17 and $2.142 million, those were just the day prior if you
18 accepted the dates reflected in the e-mail was true,
19 correct?

**20    A.    That appears to be the case, yes, sir.**

21    Q.    And based on your knowledge as a financial
22 analyst for Goldman Sachs assigned to Mr. Rogers'
23 account, on July 7th, he never did make any wire request
24 in the amount of $4.41 million or $2.142 million, did
25 he?

Page 72

**1    A.    I don't recall that happening.**

2    Q.    And you would have recalled if it would have
3 happened, wouldn't you?

**4    A.    I believe I would, yes, sir.**

5    Q.    Is falsifying Goldman Sachs communications
6 conduct that Goldman Sachs condones?

7            MS. BROWN:  Objection, form.

**8            THE WITNESS:  I can't speak on behalf of**
**9 the firm on that, but I don't believe so.**

10    Q.    (By Mr. Wehmeyer) Is illegal conduct by its
11 client in financial matters conduct that Goldman Sachs
12 would condone?

13            MS. BROWN:  Objection, form.

**14            THE WITNESS:  No, sir.  I don't believe**
**15 so.**

16    Q.    (By Mr. Wehmeyer) In your entire time at
17 Goldman Sachs, ever once have you seen your Goldman
18 Sachs communication altered before this one?

**19    A.    I have not, no, sir.**

20    Q.    In your entire time at Goldman Sachs, has it
21 ever come to your attention that one of your clients has
22 been engaged in illegal activity?

23            MS. BROWN:  Objection, form.

**24            THE WITNESS:  Not to my knowledge.**

25    Q.    (By Mr. Wehmeyer) Have you had any conference



1 calls with Dennis Rogers -- strike that.

2        Have you had any conference calls with
3 Dennis Rogers about wire transfer requests?

**4    A.  Can you define conference call for me?**

5    Q.  A call that would involve more than you and
6 Mr. Rogers on the line.

**7    A.  Yes, sir.**

8    Q.  Who else would have been on the line on any
9 calls with Mr. Rogers that you participated in
10 personally?

**11    A.  I don't recall the name of the specific
12 person.**

13    Q.  Do you recall why there would have been more
14 than just you on the call with Mr. Rogers?

**15    A.  I don't recall why.**

16    Q.  Do you recall what you-all discussed?

**17    A.  I do recall just discussing or being asked,
18 you know, if a wire was in process of being, you know,
19 processed and sent.**

20    Q.  Do you recall, was Aaron Webster perhaps on
21 that call?

**22    A.  I can't be 100 percent sure on that.**

23    Q.  I'll just represent that one of my clients in
24 this case is a gentleman by the name of Aaron Webster,
25 who is a plaintiff that is suing Mr. Rogers.  Do you

1 know whether you've ever spoken to Aaron Webster on the
2 phone?

**3    A.  I can't be 100 percent sure.  I don't recall
4 if I specifically talked to him.**

5    Q.  As to this conference call that you do recall
6 participating in that involved Mr. Rogers and at least
7 one other person, do you know whether there were more
8 times than one that you would have had a group call
9 involving Mr. Rogers or was it just once?

**10    A.  To my recollection, I believe it was just
11 once.**

12    Q.  Tell the jury everything you can recall about
13 this one conference call that you participated in with
14 Mr. Rogers and an unknown additional participant.

**15    A.  I just remember receiving a call from
16 Mr. Rogers asking to bring a third-party on the line,
17 which is, you know, not atypical for a client to ask,
18 and he brought the third-party on the line and asked me
19 if a wire he had submitted was in process and I
20 confirmed that back to him and that's all I remember
21 about the conversation.**

22    Q.  Do you recall which wire was being discussed?

**23    A.  I don't specifically recall which wire.**

24    Q.  Do you recall the approximate amount of the
25 wire?

**1    A.  I don't recall the specific amount of that
2 wire.**

3    Q.  Was the amount of the wire disclosed on this
4 conference call that you've described?

**5    A.  Not that I can recall.**

6    Q.  I apologize for jumping around like this.  I
7 think this is going to be my last question on it.  But,
8 as we look together at Exhibit 2 and Exhibit 3, being
9 the $4.41 million and $2.142 million auto-generated wire
10 transfer request, you know the documents I'm referring
11 to?

**12    A.  Yes, sir.  I do.**

13    Q.  Do you believe that Mr. Rogers actually put
14 those in and processed them in the Goldman Sachs system?

**15    A.  I don't believe so.**

16    Q.  Why?

**17    A.  As stated earlier, I don't remember receiving
18 notification on our end to input those specific dollar
19 amounts into our system.**

20    Q.  Going back to the conference call that you
21 participated in with Mr. Rogers and the one other
22 person, do you have an understanding as to why that call
23 was happening?

**24    A.  I don't have an understanding as to why that
25 call was happening.**

1    Q.  Did you have an understanding as to who was
2 requesting that call?

**3    A.  I don't have an understanding who was
4 requesting that call.**

5    Q.  Do you recall an approximate timeframe when
6 that call would have happened?

**7    A.  I believe it was in the morning sometime.**

8    Q.  Do you recall an approximate day or month and
9 year?

**10    A.  Not -- not specifically, no, sir.**

11    Q.  How about just generally, I'm just trying to
12 get an idea, is this April 2020, September of 2020 or
13 something in-between?

**14    A.  I believe it was early July 2020.**

15    Q.  From your perspective, did you have an
16 understanding as to what the purpose of the call was?

**17    A.  Not -- not entirely.**

18    Q.  And so, obviously, you, Mr. McDonnell, as an
19 individual find yourself in a position being asked to
20 participate in this conference call, just subjectively
21 in your head, why did you believe you were participating
22 in it?

**23    A.  Honestly, not 100 percent sure other than
24 asked to confirm that a wire being processed, as --
25 as stated earlier.**

Page 77

1    Q.   In terms of any conversation -- strike that.
2         I appreciate, and you've testified
3 several times now that you remember this call with
4 Mr. Rogers and with a third-party and you don't know the
5 third-party's particular identity.  Did you understand
6 that the third-party that was on the conference line at
7 least occupied the position of a party that was
8 expecting a wire transfer to come to them?
9    **A.   Not specifically, no.**
10   Q.   Did you have an understanding as to whether
11 the third-party that was on this conference call was
12 associated with Mr. Rogers in some fashion or was just a
13 standalone third-party, what this third person's
14 involvement was in any way, shape or form?
15   **A.   I had no idea what the third-party's**
16 **involvement was on this call.**
17   Q.   With respect to the third-party who you don't
18 recall their specific identity, do you remember ever
19 having another conversation with that person after that
20 time?
21   **A.   I do recall receiving a phone call at a later**
22 **date.**
23   Q.   From this person whose identity you don't
24 remember?
25   **A.   I believe it was the same person.**

Page 78

1    Q.   Tell me everything you can recall about that
2 conversation.
3    **A.   I remember that -- this party inquiring about**
4 **a wire transfer and I remember telling him that I**
5 **couldn't pass along information because he was not a**
6 **client of Goldman Sachs.**
7    Q.   Anything else you can recall about the
8 conversation?
9    **A.   I recall saying that and telling him to check**
10 **with Mr. Rogers, as he referenced something about**
11 **Mr. Rogers, so I told him to refer to him, or that I**
12 **would communicate with him since he is the client of**
13 **Goldman Sachs.**
14   Q.   Anything else you can recall about that
15 conversation?
16   **A.   No, sir.  That's it.**
17   Q.   At that point in time, did you alert any
18 management to the possibility of a problem?
19   **A.   I don't know if it was specifically at that --**
20 **that time.**
21   Q.   Did you eventually alert management to the
22 possibility of a problem involving Mr. Rogers?
23   **A.   Yes, sir.  I did.**
24   Q.   Who did you alert?
25   **A.   I first alerted the advisor, who's the**

Page 79

1 **relationship head, Mr. Brian Olson.  And then I did**
2 **contact our regional compliance manager.**
3    Q.   That person's identity is what?
4    **A.   Janice Curlin.**
5    Q.   Can you spell the last name for me?
6    **A.   Sure thing.  I believe it's C-u-r-l-i-n.**
7    Q.   Tell me about those conversations.
8    **A.   So, in both cases, I just -- I told them just**
9 **that something didn't -- didn't feel right to me and**
10 **that I was getting calls from an outside third-party.**
11   Q.   Was there any action agreed to or suggested?
12   **A.   Other than I had expressed concern with**
13 **communicating with an outside third-party that wasn't a**
14 **client of Goldman Sachs and didn't have authority over**
15 **an account at Goldman Sachs.  All was agreed upon in**
16 **those parties to not communicate with outside**
17 **third-parties that are not Goldman Sachs clients.**
18   Q.   Going back briefly to the conversation that
19 you participated in with Mr. Rogers and the third-party,
20 did Mr. Rogers tell you in advance that he was going to
21 setup this call that included the third party
22 participant?
23   **A.   Not until he had me on the line.**
24   Q.   And so, Mr. Rogers has you on the line,
25 you-all are having a conversation about his account, and

Page 80

1 as part of that conversation, he says "I'm going to
2 patch in this third-party"?
3    **A.   That's what I recall.**
4    Q.   Did Mr. Rogers tell you, before patching in
5 the third-party, the things that you were allowed to
6 talk about or not allowed to talk about?
7    **A.   From what I recall, he just asked me to**
8 **confirm if we received a wire request and if that has**
9 **been in process.**
10   Q.   Was his request that you simply inform the
11 third-party that a wire transfer request was in process
12 and happening?
13   **A.   That's what I recall.**
14   Q.   And he didn't want you to discuss anything
15 beyond that?
16   **A.   He didn't specifically tell me that.**
17   Q.   Did you feel like you were authorized to
18 discuss anything beyond confirming to this third-party
19 that a wire transfer was in process?
20   **A.   No.**
21   Q.   If Mr. Rogers called you, would he have to
22 give any kind of authentication confirmation or criteria
23 so that you knew you were talking to the real Dennis
24 Rogers?
25   **A.   He wouldn't have to, no, sir.**

Page 81

1    Q.    Would you have confirmed with Mr. Rogers his
2 identity in some way, for example, a Social Security
3 number or account number or something to make sure it's
4 not just a random person calling off the street?
5    **A.    I would have cross-referenced the phone number**
6 **that he called in on with one that we would have had on**
7 **file.**
8    Q.    With respect to the wire -- I'm just going to
9 try to nail down the timeline and the specific wire
10 transfer being discussed.  If we look back at Deposition
11 Exhibit 1, specifically the first page of Deposition
12 Exhibit 1, for reference, this was the document that was
13 produced by Goldman Sachs.  In the bottom right-hand
14 corner, I'll show you the GS Bates label identifier, and
15 when we go to the top, you've testified earlier that you
16 do remember sending this July 8th, 2020 e-mail at 3:26
17 Eastern time, 2:26 Central time, right?
18    **A.    Yes, sir.  I do.**
19    Q.    This corresponds with the timeframe that you
20 visited about earlier, being the early July 2020 when
21 you received the call from Mr. Rogers and he asked to
22 patch in a third-party, for you to inform them that a
23 wire transfer had been processed; is that right?
24    **A.    I'm not 100 percent sure, but it seems close**
25 **to the timeframe.**

Page 82

1    Q.    If we scroll down to the bottom, the amount of
2 this wire transfer being $235,000 on July 8th, 2020, do
3 you remember you inputting a wire transfer of
4 approximately that amount at approximately that date and
5 time?
6    **A.    I'm not 100 percent sure on that, but I would**
7 **believe so.**
8    Q.    Is it your understanding that on this
9 conference call with Mr. Rogers and the third-party,
10 that this was the wire transfer that when you confirmed
11 it that you were referring to?
12    **A.    I don't recall that.**
13    Q.    In terms of the idea that this would have been
14 any other wire transfer, do you have any personal
15 knowledge about any other wire transfer being requested
16 by Mr. Rogers that you would have been involved in
17 processing in July 2020 besides this one?
18    **A.    I can recall that there were other wires that**
19 **he had requested.**
20    Q.    In July of 2020?
21    **A.    Yes, sir.**
22    Q.    Did any of them ever exceed the amount of
23 $1 million?
24    **A.    I'm not 100 percent sure.  I think there was**
25 **at least one of -- of about a million dollars.**

Page 83

1    Q.    But, with respect to, you testified you do
2 recall between the timeframe of April 2020 to
3 September 2020, Mr. Rogers requesting and you being
4 involved in multiple wire transfers; is that right?
5    **A.    That's correct.  I recall that.**
6    Q.    The idea of any of them being for an amount
7 over $1 million, did that ever happen?
8    **A.    I'm not 100 percent sure on that.**
9    Q.    Based on your personal recollection, do you
10 recall any amount over $1 million ever being requested
11 as a wire transfer by Mr. Rogers?
12    **A.    I do -- I do believe so.**
13    Q.    Approximately, what amount?
14    **A.    I can recall approximately 1.2 being**
15 **requested.**
16    Q.    If we look at Deposition Exhibit 1, page five
17 at the bottom, are you with me there?
18    **A.    I don't believe so.**
19    Q.    I apologize for that.
20    **A.    No worries.**
21    Q.    We're working still within Deposition
22 Exhibit 1 and we are at page five.  Do you see Goldman
23 Sachs five in the bottom right-hand corner?
24    **A.    Yes, sir.  I do.**
25    Q.    Let's scroll up to the top.  Do you see the

Page 84

1 date of this e-mail is July 6th of 2020?
2    **A.    Yes, sir.  I do.**
3    Q.    What you communicated to Mr. Rogers is,
4 "Dennis, quick update.  Per our conversation, I amended
5 the one wire from 1.2 million to 1 million.  As we
6 talked about, the day trade call is holding up the
7 approval process, so still working on the approval
8 there.  Will follow-up with you shortly."  Did I read
9 that correctly?
10    **A.    Yes, sir.  Yes, you did.**
11    Q.    Do you recall sending this e-mail to
12 Mr. Rogers?
13    **A.    I do recall sending him that e-mail.**
14    Q.    So, if we look at the auto-generated online
15 transfer confirmation, on July 6th of 2020 at
16 12:10 p.m. -- would that be Central time or Eastern
17 time?
18    **A.    I believe that would be Central time, but I'm**
19 **not sure.  I'm not -- I'm not 100 percent sure, but I**
20 **believe it's Central time.**
21    Q.    Well, and actually, if we look at the "dear
22 client," I wasn't playing hide the ball, I'm just seeing
23 this myself.  If you just scroll down a hair.  We're
24 looking together at Exhibit 1, page five.  Do you see
25 that it says, "Dear client:  An asset transfer request



1 was submitted by you via the Goldman Sachs website on 6
2 July 2020 at 1:08 p.m. Eastern time"?

**3     A.   I do see that, yes, sir.**

4     Q.   And the amount would have been $1.2 million
5 would have been Mr. Rogers' request?

**6     A.   That's what appears to be seen here.**

7     Q.   And for the jury's reference, 1:08 Eastern
8 time would correspond to 12:08 p.m. Central time, right?

**9     A.   Yes, sir.**

10     Q.   And then if we scroll up to your e-mail, your
11 e-mail is coming at 5:14 p.m.  That would be Eastern
12 time, wouldn't it?

**13     A.   I believe so, it would, yes, sir.**

14     Q.   You reference having a conversation with
15 Mr. Rogers.  Do you see that?

**16     A.   I do see that.**

17     Q.   Tell the jury what you recall of your
18 conversation with Mr. Rogers on July 6th of 2020.

**19     A.   Not -- not anything very specific other than
20 he did -- he was still inquiring about the wire
21 transfer.  I don't believe it had gone out at this -- at
22 this time and he -- he did -- he did ask me to amend the
23 wire amount down.**

24     Q.   Did he -- did he say why?

**25     A.   He didn't say why.**

1     Q.   With respect to the amending the wire transfer
2 from 1.2 to 1 million, was there anything required on
3 Mr. Rogers side to accomplish that other than a verbal
4 phone call with you?

**5     A.   There is -- there is not.**

6     Q.   So, he would have gone in and electronically
7 started the wire transfer at 1:08 p.m. Eastern time,
8 12:08 Central for 1.2 million, and then through just a
9 phone call with you, he could have amended that from
10 1.2 million to 1 million?

**11     A.   Yes, sir.  That's correct.**

12     Q.   You did actually follow-up with the teams
13 behind you and change the wire from 1.2 to 1 million?

**14     A.   From what I recall, yes, sir.**

15     Q.   Do you know whether the $1 million wire
16 transfer ever actually processed and went through?

**17     A.   I'm not 100 percent sure, but I do believe so.**

18     Q.   With respect to that wire transfer, so that
19 we've put a bow around this, this was the 1 million or
20 $1.2 million wire transfer that you said you recalled;
21 is that right?

**22     A.   Yeah, this is the one I recalled.**

23     Q.   And between the time of April 2020 to
24 September 2020, there were no wire transfers for any
25 amount over $1.2 million associated with Dennis Rogers'

1 account, was there?

**2     A.   I don't recall there being such wires.**

3     Q.   You would have received an automatic notice
4 contemporaneous with the wire transfer request during
5 that period of time, wouldn't you?

**6     A.   Yes, sir.  I would have received an automated
7 message for that.**

8     Q.   And I understand that you're saying you don't
9 recall any over $1.2 million, but you also expect, based
10 on your work with Goldman Sachs and this particular
11 account, that if there was one over $1.2 million, that
12 is the type of transaction you would have personally
13 remembered, isn't it?

**14     A.   Yes, sir.  I do -- I do believe I would have
15 remembered that.**

16         (Exhibit No. 5 marked.)

17     Q.   I'm going to mark Deposition Exhibit 5.  Okay.
18 This e-mail was not produced by Goldman Sachs.  I don't
19 want you to be mistaken or understand it to have been.
20 Do you see that this is purportedly forwarded by Dennis
21 Rogers to somebody on July 9th, 2020?

**22     A.   That's what it appears to me to have happened.**

23     Q.   Do you see that there purports to be an e-mail
24 from you on July 9th, 2020 at 1:22 Central time?

**25     A.   I do see that, yes, sir.**

1     Q.   Do you recall ever sending -- and the e-mail
2 says, "Re -- the subject line is "Re:  Update."  Do you
3 see that?

**4     A.   I do see that, yes, sir.**

5     Q.   "Dennis, federal reference for the two wires
6 are Dennis Woods, MMQFMPU7004702 and B1Q8021C036103
7 Steven Webster."  Did I read that correctly?

**8     A.   Yes, you did.**

9     Q.   For the jury's reference when we looked at
10 Exhibit 8, the Steven Webster -- I'm sorry, strike that.

11         For the jury's reference, if we just
12 briefly look at Exhibit 2 -- and I'm just tying back
13 these names, Steven Webster and Dennis Woods -- this was
14 the July 7th auto-generated $4.41 million wire
15 associated with -- with recipient Steven Webster.  Do
16 you see that?

**17     A.   Yes, sir.  I do.**

18     Q.   Steve Webster being somebody that you've never
19 heard of before and have no idea who it is and this wire
20 transfer during your time working on this account in
21 July of 2020 never being asked for of Goldman Sachs,
22 correct?

**23     A.   That's correct.**

24     Q.   If we look at Deposition Exhibit 3, this,
25 again, for the jury's reference, is a July 7th, 2020

Page 89

1 what appears to be auto-generated by Goldman Sachs, but
2 it's associated with recipient name Dennis Woods in the
3 amount of $2.142 million.  Do you see that?

**4    A.   Yes, sir.  I do.**

5    Q.   This also being a period of time that you're
6 responsible as the financial analyst for Mr. Rogers'
7 account and not being any actual wire transfer request
8 that was generated with Goldman Sachs; isn't that right?

**9    A.   That's correct.**

10    Q.   Now, if we look back at Deposition Exhibit 5,
11 on July 9th, 2020, the person named Dennis Woods is
12 nobody that is known to you, is he?

**13    A.   No, sir.**

14    Q.   Steven Webster is nobody that's known to you,
15 is he?

**16    A.   No, sir.**

17    Q.   And, in fact, if we just looked at the
18 purported auto-generated Exhibit 2, he wasn't called
19 Steven Webster, what he was called on that paper is,
20 quote, Steve Webster.  Do you remember that?

**21    A.   I'm not 100 percent sure.**

22    Q.   Okay.  These federal reference on the wires,
23 as we look at Exhibit 5 together, those are not federal
24 reference numbers you're in any way familiar with, are
25 you?

Page 90

**1    A.   That's -- I'm -- I'm familiar with those**
**2 federal reference numbers.**

3    Q.   These specific federal reference numbers?

**4    A.   Not -- not as to what they pertain to, but I**
**5 do remember passing them along to Mr. Rogers.**

6    Q.   What do these federal reference numbers
7 pertain to that you provided to Mr. Rogers?

**8    A.   To the best of my knowledge, two wires that**
**9 were requested by him.  I'm not sure of the amounts or**
**10 parties that those specifically represent.**

11    Q.   Did they have anything to do with Dennis Woods
12 or Steven or Steve Webster?

**13    A.   I don't recall that.**

14    Q.   Did you send this e-mail on July 9th, 2020 to
15 Mr. Rogers?

**16    A.   I remember sending an e-mail at or around this**
**17 time, but I don't believe that this is my original**
**18 e-mail.**

19    Q.   Why do you not believe that this is your
20 original e-mail?

**21    A.   I don't believe that because the original**
**22 e-mail I recall sending does not have names of two**
**23 parties in parenthesis in it.**

24    Q.   This would be another instance of what
25 purports to be an e-mail from you that has been tampered

Page 91

1 with or changed without your approval or knowledge,
2 isn't it?

3    MS. BROWN:  Objection, form.

**4    THE WITNESS:  That appears to be the case**
**5 to me.**

6    MR. WEHMEYER:  The problem with the
7 question?

8    MS. BROWN:  Excuse me?

9    MR. WEHMEYER:  The problem with the
10 question?

11    MS. BROWN:  I'm sorry, I can't remember
12 what the question was now.

13    MR. WEHMEYER:  Ms. Longoria, Madam Court
14 Reporter, can you read back the exact question?

15    (Requested portion was read.)

16    MS. BROWN:  Yeah, I think the words
17 "tampered with" and "altered," I'm not sure that that
18 matches exactly how he testified to the first e-mails.

19    Q.   (By Mr. Wehmeyer) Okay.  Mr. McDonnell, have
20 you ever once in your entire life taken an e-mail from
21 another party and altered it in such a manner and then
22 forwarded it on to make someone else believe that that
23 was another party's communication?

**24    A.   No, sir.  Not that I can recall.**

25    Q.   It would be pretty unethical, if not illegal,

Page 92

1 wouldn't it?

2    MS. BROWN:  Objection, form.

**3    THE WITNESS:  I do believe so, yes, sir.**

4    Q.   (By Mr. Wehmeyer) Are you okay with another
5 party taking your business communication and changing it
6 without your knowledge?

**7    A.   I'm not comfortable with it at all, no, sir.**

8    Q.   And in this particular instance, as we look
9 together at Exhibit 5, you are confident that you did
10 not write the e-mail that purports to be from you to
11 Mr. Rogers on July 9th, 2020 at 1:22 Central time, did
12 you?

**13    A.   And this specific exhibit that I'm looking at**
**14 is the exhibit you're referencing?**

15    Q.   Yes, sir.

**16    A.   That's correct.  I don't believe that this is**
**17 the original e-mail that I sent to him at that time.**

18    Q.   Somebody changed the original e-mail that you
19 sent to Mr. Rogers, you know that?

**20    A.   It does appear to be the case, yes, sir.**

21    Q.   Did you have knowledge that your original
22 e-mail had been changed?

**23    A.   I did not, no, sir.**

24    Q.   Did you approve your original e-mail being
25 changed?

1   A.   No, sir.

2   Q.   Does it concern you that you now look at

3 Exhibit 5 and there is an e-mail associated with your

4 official Goldman Sachs' e-mail address that has been

5 changed?

6   A.   It does concern me, yes, sir.

7   Q.   Why?

8   A.   Because it -- it appears to state something

9 that I did not say or intend to say at all.

10   Q.   With respect to these two particular federal

11 reference numbers, do you believe that those numbers do,

12 in fact, coincide with a wire transfer that was

13 completed by Goldman Sachs?

14   A.   I do believe that those correspond with such

15 wire requests.

16   Q.   Do you know who the recipients would be on

17 those two wires?

18   A.   I'm not 100 percent sure.

19   Q.   Do you have any -- just give me a guess at it.

20   A.   I'm not -- I'm not 100 percent sure.  I'm not

21 remembering exactly which wires those specifically

22 reference.

23   Q.   Would you have a way to go back and confirm

24 which wires those actually corresponded with?

25   A.   I do believe there's a way to trace what those

1 correspond with.

2   Q.   Have you tried to do that before today?

3   A.   Not that I can recall.

4   Q.   I understand you don't know who they would

5 have gone to.  Do you have an idea as to the approximate

6 amounts of dollars that would be associated with those

7 two federal reference numbers?

8   A.   Not that I can tell from what's presented in

9 front of me.

10   Q.   And I'm just asking, do you know if that was

11 $50,000 or $10 million, do you even have a rough order

12 of magnitude understanding?

13   A.   Not that I can recall.

14   Q.   Mr. McDonnell, why don't we go off the record.

15        VIDEOGRAPHER:  Okay.  We're off the

16 record at 11:59 a.m.

17        (Recess from 11:59 to 12:10.)

18        VIDEOGRAPHER:  And we are back on the

19 record at 12:11 p.m.

20   Q.   (By Mr. Wehmeyer) Mr. McDonnell, we've

21 discussed that there were both a cash account and an

22 options account associated with Mr. Rogers and Goldman

23 Sachs?

24   A.   That's correct.

25   Q.   Is there any -- are they tied together or

1 linked together?  So, for example, with respect to the

2 cash account, if it overdraws, would it automatically

3 pull from the option account, or if the option account

4 somehow overdraws, would it pull from the cash account?

5   A.   Not directly or necessarily.

6   Q.   Is there a way to set it up in that fashion?

7   A.   Not -- not that I -- not that I know of to

8 like set it up automatically.

9   Q.   And so, if a -- if a single dollar was

10 withdrawn out of Mr. Rogers' cash account or if a single

11 dollar was withdrawn out of Mr. Rogers' option account,

12 he would have had to have been the party to initiate

13 that with respect to that particular account?

14   A.   Yes, I do believe so.

15   Q.   Are there any monthly fees or costs associated

16 with Mr. Rogers' cash account or options account with

17 Goldman Sachs?

18   A.   Not that I'm aware of.

19   Q.   There was an August 7th temporary restraining

20 order entered against Mr. Rogers, and specifically

21 freezing his Goldman Sachs' account.  There was an

22 August 28th, 2020 temporary injunction that was issued

23 by the court continuing a freeze on Mr. Rogers' Goldman

24 Sachs' account.  With respect to that time period, you

25 would have been the financial analyst associated with

1 Mr. Rogers' account; is that right?

2   A.   That sounds right.

3   Q.   Did you ever acquire any knowledge that the

4 court had issued a restraining order and/or an

5 injunction freezing his Goldman Sachs' account during

6 this time?

7   A.   I was unaware of that.

8   Q.   And other than my representations today, you

9 have no knowledge of that one way or the other?

10   A.   That's correct.

11   Q.   Would you have known if Mr. Rogers' account

12 had a freeze put on it by Goldman Sachs as of

13 September 2020 when you were still the financial analyst

14 on the account?

15   A.   That it happened, I believe I would have -- I

16 would have known.

17   Q.   Okay.  And you acquired no such knowledge that

18 the account had ever been frozen; is that right?

19   A.   Not that I can recall.

20        (Exhibit No. 6 marked.)

21   Q.   I want to look -- I'm going to mark as

22 Deposition Exhibit 6 some text messages.  I will just

23 represent that these are text messages between

24 Mr. Rogers on the one hand and my client on the other

25 hand.  These are not text messages that involve you at

1 all.  But, I want to ask about a printout.  And I'm
2 going to go to page 54 at the bottom.
3        All right.  Just in terms of the Goldman
4 Sachs' account dashboard, are you familiar with how that
5 would look from a mobile device?
**6     A.  I'm not 100 percent familiar with it.  We**
**7 don't -- we don't get to see the client mobile side.**
8    Q.  Okay.  In terms of the Goldman Sachs'
9 accounts, 9,255,476 that's being published in Deposition
10 Exhibit 6 at page 54, is this a detail that you've ever
11 seen before?
**12    A.  I have not seen that before.**
13    Q.  Do you know whether this would be Goldman
14 Sachs created or generated or maintained?
**15    A.  I don't know 100 percent, but it looks like**
**16 something that could.**
17    Q.  With respect to the units 9,255,476, do you
18 know what kind of units that would be?
**19    A.  I don't know specifically, but I would imagine**
**20 USC.**
21    Q.  U.S. dollars?
**22    A.  Yes, sir.**
23    Q.  To the right of that, it reflects plus
24 131,250, do you know what kind of units that would be?
**25    A.  That would be, I believe, U.S. dollars, as**

**1 well.**
2    Q.  Okay.  And then -- and so, as we look, there's
3 a Dennis Rogers advisory that reflects zero.  Do you see
4 that?
**5    A.  I do see that, yes, sir.**
6    Q.  There's a Dennis Rogers bank loan A.  Do you
7 have any idea what kind of account that would be or what
8 that is?
**9    A.  I'm not 100 percent sure as to the exact, but**
**10 it looks to be some sort of bank loan to me.**
11    Q.  And Dennis Rogers, Brown S-m-a-l, do you know
12 what that would be?
**13    A.  That looks to be a third-party advisory**
**14 manager that we would use Brown Small-Cap.**
15    Q.  Do you know whether a third-party advisory
16 firm was involved with Mr. Rogers' Goldman Sachs
17 account?
**18    A.  Not that I'm aware.**
19    Q.  How about Dennis Rogers, cardinal SCV, what is
20 that, if you know?
**21    A.  It would be another third-party manager that's**
**22 a Small-Cap value manager.**
23    Q.  And I'm not fussing at all, I'm just trying to
24 understand, would these other line items be the types of
25 other accounts besides a cash account or option account

1 that might be just setup as part of the initial intake
2 of a client like Mr. Rogers, but not necessarily ever
3 funded or used?
**4    A.  That appears to be the case, yes, sir.**
5    Q.  And then, there's a Dennis Rogers' cash
6 account that we can see valued at 5,060,032, you believe
7 that would be U.S. dollars, the increment?
**8    A.  I would believe that, yes, sir.**
9    Q.  What's not reflected on here would be the line
10 item of what you've discussed as the Dennis Rogers'
11 option account.
**12    A.  I do not see that on here.**
13    Q.  Okay.  And it would be your belief that if
14 this was an accurate printout, then the option account,
15 on whatever day this was generated, would makeup the
16 balance between $5,060,032 U.S. and the $9,255,476 U.S.
17 in the top left-hand corner?
**18    A.  I'm not 100 percent sure that it would makeup**
**19 the exact difference.**
20    Q.  You see that the text was sent as of
21 July 6th, 2020 at 5:25 p.m.?
**22    A.  Yes, sir.  I do.**
23    Q.  As of July of 2020, did Mr. Rogers have
24 $9 million with Goldman Sachs?
**25    A.  I don't recall that.**

1    Q.  What you recall was that he had approximately
2 $5 million, based on what you personally remember; isn't
3 that right?
**4    A.  That's what I remember.**
5    Q.  I'm just trying to nail down some timeline.
6 If we go to page 47 of Deposition Exhibit 6, I'm just
7 grabbing the date here, do you see that it's dated
8 July 6th of 2020 at 9:53 a.m.?
**9    A.  Yes, sir.  I see that.**
10    Q.  We're going to continue gradually forward just
11 because it's a long string of communication here, and I
12 want to stop at page 50, which is still part of this
13 July 6th, 2020 communication.  And I'm going to zoom in
14 there.  All right.  What -- what is being communicated
15 by my client is that, quote, that Ryan character was
16 barely understanding.  Are you with me there?  It's in
17 the middle of the blue text message.
**18    A.  I do see what you're referencing.**
19    Q.  Okay.  And in terms of the conference call, do
20 you remember -- I'm just seeing if this helps refresh
21 your memory at all.  Do you believe that the conference
22 call would have happened on or around July 6th of 2020
23 that you participated in with Mr. Rogers and the
24 unidentified third-party?
**25    A.  That seems to be about the timeframe from what**

LEXITAS

Case 2:23-cv-05053-WB Document 25-1 Filed 07/22/24 Page 113 of 489
Case 2:23-cv-05053-WB Document 25-1 Filed 07/22/24 Page 113 of 489
Ex. 3    Page 113 of 489
Ryan McDonell
Pages 101..104

Page 101

1    I recall.

2    Q.    Okay.  If we go to the next page, page 51,
3    still a July 6th, 2020 conversation, it's at the one that
4    starts, "Or were you playing with me with that phone
5    call?  Ryan never confirmed."  Are you with me there?

6    A.    One second.  Can I -- can I read the text
7    message for you so I can make sure I'm on the same page?

8    Q.    Yes, sir.

9    A.    I see -- I see the line item that you're
10   referencing now.

11   Q.    Okay.  And I'm just trying to -- you've slept
12   a few nights, and so I'm just trying to see if anything
13   jogs memories or not.  What's stated to Mr. Rogers there
14   was "Or were you playing me with that phone call?  Ryan
15   never confirmed any amounts or how many wires we were
16   looking for.  For all I know, you could have sent a
17   request for a completely different wire that had nothing
18   to do with me."

19          In terms of the conversation that you
20   remember having with Mr. Rogers and the unidentified
21   third-party, if it's testified that on that call you
22   never confirmed any specific amounts or any particular
23   numbers of wires that were in issue, would you disagree
24   with that?

25   A.    I'm sorry, could you rephrase that for me?

Page 102

1    Q.    Sure.  Stated differently, in terms of this
2    call, the conference call you had with Mr. Rogers and
3    the unidentified third-party, you don't remember ever
4    disclosing how many wires were being inquired about or
5    the amounts of any wires, do you?

6    A.    I don't recall that, no.

7    Q.    You just recall saying a wire is being
8    processed or has been processed?

9    A.    That's -- that's what I recall.

10   Q.    If we go to page 57, this is continuing to
11   July 6th conversation, and I'll just represent that this
12   is Mr. Rogers communicating with my client.  And do you
13   see where he just "Just confirming that GS will complete
14   the wires today"?  Are you with me there?

15   A.    I see that, yes, sir.

16   Q.    He says, "I just spoke with Ryan again and he
17   is on top of them," and then he says "these" with an
18   asterisks.  Do you see that?

19   A.    I do see that.

20   Q.    Do you have any recollection of speaking with
21   Mr. Rogers on July 6th where you would have told him
22   that Goldman Sachs is completing multiple wires for him
23   that day?

24   A.    I don't recall that specifically.

25   Q.    Do you believe that that conversation happened

Page 103

1    or do you just not -- let me re-ask that.  Strike that.

2          Do you just not remember one way or the
3    other, or do you believe that you wouldn't have had any
4    conversation on July 6th telling Mr. Rogers that you
5    were processing multiple wires?

6    A.    I just -- I don't remember that one way or the
7    other in this -- in this situation.

8    Q.    If we go to page 58, this is a July 7th
9    communication.  Do you see that my client asks
10   Mr. Rogers, "Okay.  Any reason for holdup from Ryan"?

11   A.    I see that, yes, sir.

12   Q.    And Mr. Rogers answers, "Yes, they had a day
13   trade call when they sold the positions and that has
14   caused the delay and that's what he was waiting on
15   approval for, which is as soon as he does, this is
16   done."  And then in the lower box, Mr. Rogers says,
17   "Those were confirmations that they were processing it
18   and the money is there to support it.  They are just
19   waiting on this last piece."  Do you see those two
20   communications?

21   A.    I do see those.

22   Q.    And what Mr. Rogers is indicating is that he's
23   spoken to you because my client just asked "Any reason
24   for holdup from Ryan," right?

25   A.    That seems to be the case.

Page 104

1    Q.    Okay.  Did you have any conversation with
2    Mr. Rogers on or around July 7th about a day trade call
3    when you-all sold positions for him?

4    A.    I remember having a conversation on a day
5    trade call.

6    Q.    Tell me about that conversation.

7    A.    From what I recall, it was as simple as
8    telling him that there was a day trade call in -- in his
9    options account that wasn't letting money be sent out
10   from the account, and that we were working to resolve it
11   with one of our internal teams.

12   Q.    Do you recall whether this frustrated any
13   actual wire transfers going out?

14   A.    Not that I can recall.

15   Q.    Okay.  And so, whatever the day trade issue
16   was, Goldman Sachs got that resolved on its side and no
17   day trade would have in any way impeded, encumbered or
18   delayed a wire transfer request by Mr. Rogers being
19   processed, would it?

20   A.    I do remember it getting resolved.  As to a
21   specific delay on a transaction, I'm not 100 percent
22   sure if it had any sort of effect on a delay.

23   Q.    Okay.  Was there a delay on a wire transfer
24   by Mr. Rogers that would have been delayed by more than
25   24 hours because of a day trade issue, is that something

1 that you, as the financial analyst, would have known
2 about?

**3   A.   Yes, sir.  I would have known about that.**

4   Q.   Was there any delay by more than 24 hours on
5 any wire transfer request by Mr. Rogers because of any
6 day trade issues?

**7   A.   Not that I can recall.**

8   Q.   Again, if that was the case, that is something
9 that you would have recalled, isn't it?

**10   A.   I do believe so.**

11   Q.   At page 59, do you see that Mr. Rogers is
12 telling my client, on July 8th at 7:09 a.m., "Please let
13 me know when you receive the wire this morning.  You
14 should have received it no later than 2:00 o'clock p.m.
15 Central standard time today"?

**16   A.   Yes, sir.  I do see that.**

17   Q.   And that -- that would be in response --
18 there's a question from the evening before on July 7th
19 about "Does Ryan tell you why this takes so long?
20 Doesn't seem like he has a big sense of urgency here."

**21   A.   I see that, uh-huh.**

22   Q.   Had Mr. Rogers asked you or involved you in
23 processing any wire to Steve Webster -- strike that.
24        As of July 7th or July 8th, had
25 Mr. Rogers asked Goldman Sachs or you to process any

1 wire transfer to Steven Webster, Aaron Webster or Dennis
2 Woods?

**3   A.   Not that I can recall.**

4   Q.   And based on your involvement here, if
5 Mr. Rogers had asked you to process a wire from Goldman
6 Sachs to any one of those three persons, that is the
7 type of thing you would recall, isn't it?

**8   A.   Yes, sir.  I would recall that.**

9   Q.   And so, on July 8th, 2020 at 7:09 a.m. when
10 Mr. Rogers tells my client, quote, please let me know
11 when you receive the wire this morning.  You should have
12 received it no later than 2:00 o'clock Central Standard
13 time today.  If the idea is that that wire would be
14 transferred or accomplished by Goldman Sachs, based on
15 your involvement here as the financial analyst, you know
16 that that communication would be false, wouldn't it?

**17   A.   I'm sorry, can you repeat the question?  I
18 just didn't quite understand it.**

19   Q.   Yes, sir.  On July 8th of 2020 what Mr. Rogers
20 tells my client is that, quote, please let me know when
21 you receive the wire this morning.  You should have
22 received it no later than 2:00 o'clock Central Standard
23 time today, correct?

**24   A.   Correct, I see that.**

25   Q.   And although the text immediately prior is

1 referring to you, it doesn't necessarily say Goldman
2 Sachs, does it?

**3   A.   No, not necessarily.**

4   Q.   If the jury is of the belief that the wire
5 being referred to here would be a Goldman Sachs wire,
6 and I recognize it doesn't say Goldman Sachs in the
7 text, but if this is in reference to a Goldman Sachs
8 wire, you can tell the jury that the statement by
9 Mr. Rogers on July 8th that, quote, please let me know
10 when you receive the wire this morning, you should have
11 received it no later than 2:00 o'clock p.m. Central
12 Standard time today, that that would be false.  Goldman
13 Sachs was producing no wire on July 8th to my clients,
14 was it?

**15   A.   Not that I can recall.**

16   Q.   And because you were the financial analyst
17 assigned to Mr. Rogers' account, if there was a wire, in
18 fact, being produced to my client on July 8th through
19 Goldman Sachs, you would have known about it, wouldn't
20 you?

**21   A.   Yes, sir.  I would have.**

22   Q.   At page 62 -- actually, I'm sorry, let's go to
23 61.  This is still a July 8th conversation.  Do you see
24 that my client is asking Mr. Rogers "Can we get on the
25 phone with Ryan"?

**1   A.   I see that, yes, sir.**

2   Q.   Mr. Rogers answers "I've been calling, I
3 haven't gotten him since 11:46 a.m."  Do you see that?

**4   A.   I do see that.**

5   Q.   Do you recall Mr. Rogers trying to contact you
6 on July 8th?

**7   A.   Not specifically, no.**

8   Q.   On the next page, he tells my client, "This is
9 getting done, Aaron, today.  I told GS this had to
10 happen."  Did I read that correctly?

**11   A.   I do see that, yes, sir.**

12   Q.   If the jury decides that GS is a reference by
13 Mr. Rogers to Goldman Sachs, is it a true statement that
14 on July 8th, Mr. Rogers told you that, quote, this has
15 to happen?

**16   A.   I don't recall that.**

17   Q.   If Mr. Rogers had contacted you and told you
18 that this wire transfer has to happen on July 8th, that
19 would be something you would remember, isn't it?

**20   A.   Yes, sir.**

21   Q.   And you have no such recollection on July 8th
22 of Mr. Rogers telling you that, do you?

**23   A.   I do not.**

24   Q.   And so, this statement that he has been on the
25 phone with you and told you that this has to happen

Page 109

1 would be false, wouldn't it?

**2    A.    I do believe so.**

3    Q.    At page 64, this is a continuation of the
4 July 8th communication.  And what Mr. Rogers tells my
5 client is that, quote, last thing Ryan said was they
6 were outbound.  As soon as I have any confirmation, will
7 I send it to you.  If there was any outbound wire transfer
8 that Goldman Sachs was accomplishing on July 8th, that
9 would be something you would know, isn't it?

**10    A.    Yes, sir.  Apologies for interrupting you.**

11    Q.    There was no outbound Goldman Sachs wire
12 transfer on July 8th, 2020 from Mr. Rogers, was there?

**13    A.    I don't recall that specifically.**

14    Q.    But, it is the type of thing you would have
15 recalled if it was happening, isn't it?

**16    A.    I do believe so, yes.**

17    Q.    And so, when Mr. Rogers tells my client that,
18 quote, last thing Ryan said was they were outbound, that
19 would be a lie, wouldn't it?

**20    A.    It could be, yeah, absolutely.**

21         (Exhibit No. 7 marked.)

22    Q.    This is the last exhibit I'm going to mark.
23 This is Exhibit 7.  These are e-mails between Mr. Rogers
24 and one of my clients.  I want to ask you about the
25 July 10th e-mail that's going to be found at the second

Page 110

1 page of Exhibit 7.  If we continue to scroll down, do
2 you see there's a July 10th, 2020 at 7:51 a.m. e-mail
3 from Mr. Rogers?

**4    A.    Yes, I see that.**

5    Q.    What Mr. Rogers tells my client is, "Good
6 morning.  Please let me know when -- if you receive your
7 wires this morning.  I'm asking my team to run a trace
8 on each wire and figure out why you haven't received
9 them.  Again, I am very sorry for these delays, but will
10 fix this as soon as possible."  I read that correctly?

**11    A.    It appears so, yes, sir.**

12    Q.    And you see that my client responds and says,
13 "Dennis, this should be simple.  If you ask Goldman to
14 do something, they do it.  We need explanations from
15 Ryan/Goldman as to why nothing has been executed."  I
16 read that correctly?

**17    A.    Yes, you did.**

18    Q.    With respect to the idea that on July 10th,
19 2020, Goldman Sachs was working on any wire transfers on
20 behalf of Mr. Rogers, you were not, were you?

**21    A.    Not that I can recall specifically.**

22    Q.    And as the financial analyst responsible for
23 Mr. Rogers' account, if you were, that's something you
24 would have known about and that you would remember
25 today, isn't it?

Page 111

**1    A.    Yes, sir.**

2    Q.    And no such wire transfers were happening
3 because Mr. Rogers hadn't asked for any; isn't that
4 right?

**5    A.    I don't recall that.**

6    Q.    But, if it had happened, if Mr. Rogers had
7 asked for it to happen, you would know about it and you
8 would have remembered it, wouldn't you?

**9    A.    I would know about it and I believe I would**
**10 remember it.**

11    Q.    And so, the idea that Goldman Sachs is
12 processing any wire to my clients on July 10th, 2020,
13 you know that it was not processing any wires to my
14 clients on July 10th, 2020, was it?

**15    A.    I don't recall that.**

16    Q.    And with respect to the idea of Mr. Rogers
17 asking his team to run a trace on each wire, if
18 Mr. Rogers had asked Goldman Sachs to accomplish a wire
19 transfer and it had somehow been lost or unaccomplished,
20 is that the type of thing that you would have known
21 about as the financial analyst assigned to his account?

**22    A.    Yes, sir.**

23    Q.    There would be bells and whistles going off
24 within Goldman Sachs that there had been a significant
25 problem on this wire transfer that never went, wouldn't

Page 112

1 there?

**2    A.    I do believe so.**

3    Q.    And you weren't alerted to any because there
4 had been no wire transfer requests to my clients by
5 Mr. Rogers; isn't that right?

**6    A.    I do believe so.**

7    Q.    And if there had been a request made that
8 Goldman Sachs internally run a trace on the missing
9 wires, that's also something that you would have learned
10 about and known about it, isn't it?

**11    A.    Yes, sir.**

12    Q.    And there was no such request within Goldman
13 Sachs associated with Mr. Rogers whereby you-all were
14 running any trace, was there?

**15    A.    Not that I can recall.**

16    Q.    And so, with respect to the idea of Mr. Rogers
17 telling my client in this e-mail that we've marked as
18 Exhibit 7 dated July 10th, 2020 that he has had his team
19 run a trace on each wire that would be false, isn't it?

**20    A.    I do believe so.**

21         MR. WEHMEYER:  Mr. McDonnell, I very much
22 appreciate your time.  I pass the witness.

23         MS. SAMMONS:  I would ask that we take
24 just a few minute break so that I could get-together a
25 few questions.

1          VIDEOGRAPHER:  Okay.  We're off the
2 record at 12:39 p.m.
3          (Recess from 12:39 to 12:56.)
4          VIDEOGRAPHER:  We are back on the record
5 at 12:56 p.m.
6          EXAMINATION
7 BY MS. SAMMONS:
8    Q.  All right.  Mr. McDonnell, you testified
9 earlier that you had no knowledge of any kind of TI that
10 was in place, is that correct, or excuse me, temporary
11 injunction that was in place?
12    **A.  That's correct, I had no -- no recollection of**
13 **that.**
14    Q.  All right.  And you also testified that
15 Mr. Rogers had a cash account and that if one overdrew
16 that cash account, that money would not withdraw from
17 the option account; is that correct?
18    **A.  Correct, not directly.**
19    Q.  Okay.  And vice versa, the -- if the option
20 account overdrew, money would not withdraw from the cash
21 account.  Is that also correct?
22    **A.  Correct.**
23    Q.  All right.  Now, is there anytime when an
24 action could take place withdrawing money from either
25 the cash account -- well, excuse me -- from the cash

1 account without an action taking place directly on
2 behalf of the accountholder?
3    **A.  Can you rephrase the question for me?**
4    Q.  Yes, I'm sorry.  Can a withdraw from an
5 account take place without direct action on behalf of
6 the accountholder?
7    **A.  Not that I'm aware of.**
8    Q.  All right.  Can you describe the types of
9 action that must take place in order for money to be
10 withdrawn?
11    **A.  In order for money to be withdrawn from a**
12 **Goldman Sachs' account, we need either online**
13 **authentication through our web portal or we need a**
14 **letter of authorization signed or approved by the client**
15 **via an approved method and verbal confirmation.**
16    Q.  Is it possible that a client can put in a
17 withdraw action that could be recurring?
18    **A.  It is possible.**
19    Q.  Okay.  Is it possible that Mr. Rogers may have
20 had a withdraw action in place prior to August 2020?
21    **A.  I'm not certain of that.**
22    Q.  Okay.  But, if he did, as the financial
23 analyst who was currently filling in because of the
24 maternity leave, would you have been aware of any
25 recurrent transfer or recurrent withdraw that was setup

1 on either of his accounts?
2          MR. WEHMEYER:  Objection, form.
3          **THE WITNESS:  I don't believe so.**
4    Q.  (By Ms. Sammons)  Okay.  Thank you.  Would you
5 be -- okay.  If there had been a -- if there had been an
6 authorization for a withdraw from his cash account that
7 was in place as his financial analyst but filling in,
8 would you be aware of that withdraw authorization?
9    **A.  I do believe so.**
10    Q.  And if there was a similar withdraw
11 authorization on his option account in place prior to
12 August 7th, would you be aware of that?
13    **A.  I do believe so.**
14    Q.  Okay.  Now, is it possible in any way that you
15 would not be aware of that?
16    **A.  I guess there would be a scenario where I**
17 **wouldn't be knowledgeable of that, but it would be**
18 **highly unlikely.**
19    Q.  Okay.  And a cash withdraw, does that mean --
20 can you explain what a cash withdraw means?  If there
21 was a cash withdraw on an account statement, can you
22 explain what that means in basic terms?
23    **A.  In basic terms, it just means cash has left**
24 **whatever account it was being sent from.**
25    Q.  Okay.  Does that mean ATM withdraw?

1    **A.  Not necessarily.**
2    Q.  Would it specify if it was a wire withdraw?
3    **A.  I do believe so.**
4    Q.  Would it specify if it was a transfer to
5 another account?
6    **A.  I do believe so, as well.**
7    Q.  If you'll just give me one second.  All right.
8 Now, if a person did have a standing withdraw in place
9 through a prior authorization, on the particular date of
10 those withdraws, would they need to take an action to
11 evaluate that withdraw?
12    **A.  They would not.**
13    Q.  And if you need clarification, okay.  I'm
14 sorry.  So, they would not have to do another online
15 authentication on that date?
16    **A.  If we're referring to a standing withdraw that**
17 **was in place, no, they would not.**
18    Q.  Okay.  Nor would they need to do the letter of
19 authorization?
20    **A.  Not if it's already in place.**
21    Q.  Okay.  All right.  Well, then that is the --
22 excuse me.  Those are the only questions I have at this
23 time.  I appreciate your time.
24    **A.  Thank you.**
25          MS. SAMMONS:  I'll pass.

LEXITAS

---

**Page 117**

1        MR. WEHMEYER:  Reserve future questions.
2 I think that's everybody.  Ms. Brown, I don't know how
3 you want to handle the read and sign, but Ms. Longoria
4 is always wonderful to make sure it goes around to the
5 right people.

6        VIDEOGRAPHER:  Do you want me to go ahead
7 and get us off the record for now?  Are we done
8 completely?

9        MS. BROWN:  Yes.

10        VIDEOGRAPHER:  Okay.  So, we're off the
11 record on December the 9th, 2020 at 1:03 p.m.

12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 119**

1        I, RYAN McDONNELL, have read the foregoing
deposition and hereby affix my signature that same is
2 true and correct, except as noted above.

3

4

5        RYAN McDONNELL

6

7 THE STATE OF _____)

8 COUNTY OF _____)

9

10        Before me, _____, on this day

11 personally appeared RYAN McDONNELL, known to me (or

12 proved to me under oath or through

13 _____) (description of identity

14 card or other document) to be the person whose name is

15 subscribed to the foregoing instrument and acknowledged

16 to me that they executed the same for the purposes and

17 consideration therein expressed.

18        Given under my hand and seal of office this

19 _____ day of _____, _____.

20

21

22        _____

NOTARY PUBLIC IN AND FOR

23        THE STATE OF _____

COMMISSION EXPIRES:  _____

24

25

---

**Page 118**

1                CHANGES AND SIGNATURE

2 WITNESS NAME:  RYAN McDonnell    DATE:  DECEMBER 9, 2020

3 PAGE LINE    CHANGE            REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

---

**Page 120**

1                NO. DC-20-10214

2 STEVEN WEBSTER, AARON      )  IN THE DISTRICT COURT
   WEBSTER, AND DENNIS WOODS,  )
3                            )
          Plaintiffs,       )
4                            )
   VS.                      )  DALLAS COUNTY, TEXAS
5                            )
   DENNIS J. ROGERS, II AND   )
6 OMTC, INC.,               )
                            )
7        Defendants.        )  191ST JUDICIAL DISTRICT

8

9           REPORTER'S CERTIFICATION
         DEPOSITION OF RYAN McDONNELL
10             DECEMBER 9, 2020

11

12        I, DEBBIE S. LONGORIA, Certified Shorthand Reporter

13 in and for the State of Texas, hereby certify to the

14 following:

15        That the witness, RYAN McDONNELL, was duly sworn by

16 the officer and that the transcript of the oral

17 deposition is a true record of the testimony given by

18 the witness;

19        That the deposition transcript was submitted on

20 December 16, 2020 to the witness or to the attorney

21 for the witness for examination, signature and return to

22 me by January 6, 2021;

23        That the amount of time used by each party at the

24 deposition is as follows:

25

---

Page 121

```
1       COREY WEHMEYER - 02 HOURS:43 MINUTE(S)
        KATHERINE MALLON - 00 HOURS:00 MINUTE(S)
2       KATIE BROWN - 00 HOURS:00 MINUTE(S)
        ERIN KOENEN - 00 HOURS:00 MINUTE(S)
3       MARGARET L. WITTENMYER - 00 HOURS:00 MINUTE(S)
        MEGHAN DAWSON McELVY - 00 HOURS:00 MINUTE(S)
4       LAURA SAMMONS - 00 HOURS:07 MINUTE(S)
5       That pursuant to information given to the
6  deposition officer at the time said testimony was taken,
7  the following includes counsel for all parties of
8  record:
9       COREY WEHMEYER & KATHERINE MALLON, Attorneys for
   Plaintiffs
10      KATIE BROWN & ERIN KOENEN, Attorneys for RYAN
   McDONNELL
11      MARGARET L. WITTENMYER & MEGHAN DAWSON McELVY,
   Attorneys for Plaintiffs
12      LAURA SAMMONS, Attorney for Defendants DENNIS J.
   ROGERS, II AND OMTC, INC.
13
14      I further certify that I am neither counsel for,
15 related to, nor employed by any of the parties or
16 attorneys in the action in which this proceeding was
17 taken, and further that I am not financially or
18 otherwise interested in the outcome of the action.
19      Further certification requirements pursuant to Rule
20 203 of TRCP will be certified to after they have
21 occurred.
22
23
24
25
```

Page 122

```
1       Certified to by me this 16th day of December,
2  2020.
3
4
5
        Debbie S. Longoria, Texas CSR #5232
6       Expiration Date:  10/31/21
        Lexitas - Firm Registration No. 539
7       100 N.E. Loop 410, Suite 955
        San Antonio, Texas 78216
8       (210) 481-7575
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 123

```
1       FURTHER CERTIFICATION UNDER RULE 203 TRCP
2       The original deposition was/was not returned to the
3  deposition officer on _____;
4       If returned, the attached Changes and Signature page
5  contains any changes and the reasons therefor;
6       If returned, the original deposition was delivered
7  to _____, Custodial Attorney;
8       That $_____ is the deposition officer's charges
9  to the Plaintiffs for preparing the original deposition
10 transcript and any copies of exhibits;
11      That the deposition was delivered in accordance with
12 Rule 203.3, and that a copy of this certificate was
13 served on all parties shown herein on and filed with the
14 Clerk.
15      Certified to by me this _____ day of _____,
16 _____.
17
18
19
        Debbie S. Longoria, Texas CSR #5232
20      Expiration Date:  10/31/21
        Lexitas - Firm Registration No. 539
21      100 N.E. Loop 410, Suite 955
        San Antonio, Texas 78216
22      (210) 481-7575
23
24
25
```

FILED
4/14/2022 3:02 PM
Case 22-30500-dw7 Doc 251 Filed 07/22/22 Entered 08/22/22 20:54:17 Page 2 of 3 FELICIA PITRE
Ex. 3    Page 119 of 489      Ryan McDonnell      DISTRICT CLERK
DALLAS CO., TEXAS
Debra Clark DEPUTY

```
  1                  NO. DC-20-10214

  2  STEVEN WEBSTER, AARON        ) IN THE DISTRICT COURT
     WEBSTER, AND DENNIS WOODS,   )
  3                               )
              Plaintiffs,         )
  4                               )
     VS.                          ) DALLAS COUNTY, TEXAS
  5                               )
     DENNIS J. ROGERS, II AND     )
  6  OMTC, INC.,                  )
                                  )
  7       Defendants.             ) 191ST JUDICIAL DISTRICT

  8

  9            REPORTER'S CERTIFICATION
            DEPOSITION OF RYAN McDONNELL
 10              DECEMBER 9, 2020

 11

 12      I, DEBBIE S. LONGORIA, Certified Shorthand Reporter

 13  in and for the State of Texas, hereby certify to the

 14  following:

 15      That the witness, RYAN McDONNELL, was duly sworn by

 16  the officer and that the transcript of the oral

 17  deposition is a true record of the testimony given by

 18  the witness;

 19      That the deposition transcript was submitted on

 20  December 16, 2020 to the witness or to the attorney

 21  for the witness for examination, signature and return to

 22  me by January 6, 2021;

 23      That the amount of time used by each party at the

 24  deposition is as follows:

 25
```

```
 1      COREY WEHMEYER - 02 HOURS:43 MINUTE(S)
        KATHERINE MALLON - 00 HOURS:00 MINUTE(S)
 2      KATIE BROWN - 00 HOURS:00 MINUTE(S)
        ERIN KOENEN - 00 HOURS:00 MINUTE(S)
 3      MARGARET L. WITTENMYER - 00 HOURS:00 MINUTE(S)
        MEGHAN DAWSON McELVY - 00 HOURS:00 MINUTE(S)
 4      LAURA SAMMONS - 00 HOURS:07 MINUTE(S)
```

5      That pursuant to information given to the

6  deposition officer at the time said testimony was taken,

7  the following includes counsel for all parties of

8  record:

```
 9      COREY WEHMEYER & KATHERINE MALLON, Attorneys for
    Plaintiffs
10      KATIE BROWN & ERIN KOENEN, Attorneys for RYAN
    McDONNELL
11      MARGARET L. WITTENMYER & MEGHAN DAWSON McELVY,
    Attorneys for Plaintiffs
12      LAURA SAMMONS, Attorney for Defendants DENNIS J.
    ROGERS, II AND OMTC, INC.
13
```

14      I further certify that I am neither counsel for,

15  related to, nor employed by any of the parties or

16  attorneys in the action in which this proceeding was

17  taken, and further that I am not financially or

18  otherwise interested in the outcome of the action.

19      Further certification requirements pursuant to Rule

20  203 of TRCP will be certified to after they have

21  occurred.

22

23

24

25

1        Certified to by me this 16th day of December,

2   2020.

3

4

5   _____
    Debbie S. Longoria, Texas CSR #5232
6   Expiration Date:  10/31/21
    Lexitas - Firm Registration No. 539
7   100 N.E. Loop 410, Suite 955
    San Antonio, Texas 78216
8   (210) 481-7575

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
                    (Signature Not Notarized)

2        The original deposition was/was~~XXXXXXXX~~ returned to the

3   deposition officer on ___January 5, 2021_____ ;

4        If returned, the attached Changes and Signature page

5   contains any changes and the reasons therefor;

6        If returned, the original deposition was delivered

7   to ___Corey Wehmeyer_____ , Custodial Attorney;

8        That $ _1,414.05_ is the deposition officer's charges

9   to the Plaintiffs for preparing the original deposition

10  transcript and any copies of exhibits;

11       That the deposition was delivered in accordance with

12  Rule 203.3, and that a copy of this certificate was

13  served on all parties shown herein on and filed with the

14  Clerk.

15       Certified to by me this __14th__ day of __January_____ ,

16  __2022_____ .

17

18                

19  _____
        Debbie S. Longoria, Texas CSR #5232

20      Expiration Date:  10/31/21
        Lexitas - Firm Registration No. 539

21      100 N.E. Loop 410, Suite 955
        San Antonio, Texas 78216

22      (210) 481-7575

23

24

25

| | |
|---|---|
| **From:** | Sheri Sullivan |
| **To:** | Maria Perez |
| **Subject:** | RE: Ryan McDonnell - 12/09/2020 Deposition Transcripts |
| **Date:** | Friday, January 14, 2022 1:15:00 PM |

**From:** Koenen, Erin <ekoenen@ayco.com>
**Sent:** Tuesday, January 05, 2021 5:44 PM
**To:** TranscriptsTX <transcriptstx@lexitaslegal.com>
**Cc:** cwehmeyer@swenergylaw.com; hinocencio@swenergylaw.com; kmallon@swenergylaw.com;
meghan.mcelvy@bakerbotts.com; kendall.black@bakerbotts.com;
margaret.wittenmyer@bakerbotts.com; lsammons@hennemanrau.com
**Subject:** [EXTERNAL] RE: Ryan McDonnell - 12/09/2020 Deposition Transcripts

The witness has reviewed the deposition and has only one change. On page 11, line 6 – change
"Saratogo Springs" to "Cohoes". He does not have the ability to print or have it notarized while
working remotely. Is virtual notarization available in Texas? Is it possible for someone to send a hard
copy with a return envelope for him to sign? Any ideas on how to deal with this would be
appreciated…

# EXHIBIT J

FILED
1/20/2020 9:16 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Kevin Molden DEPUTY

CAUSE NO. DC-20-10214

| | | |
|---|---|---|
| Steven Webster, Aaron Webster, and Dennis Woods, | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| Dennis J. Rogers, II and OMTC, Inc., | § § § | |
| Defendants. | § | 191st JUDICIAL DISTRICT |

## PLAINTIFFS' VERIFIED SECOND AMENDED PETITION AND APPLICATION TO EXPAND TEMPORARY INJUNCTION

Plaintiffs Steven Webster, Aaron Webster, and Dennis Woods (collectively, "Plaintiffs") file this second amended petition and application to expand temporary injunction against Defendants Dennis J. Rogers, II ("Rogers") and OMTC, Inc. ("OMTC") (Rogers and OMTC are together referred to as "Defendants"), and show in support as follows:

### I. DISCOVERY CONTROL PLAN

1.      Plaintiffs intend to conduct discovery under Level 2 of Rule 190.3 of the Texas Rules of Civil Procedure.

### II. PARTIES

2.      Plaintiffs Steven Webster, Aaron Webster, and Dennis Woods are individuals who are residents of Texas.  The last three digits of Steven Webster's social security number are 326 and the last three digits of his Texas driver's license are 307.  The last three digits of Aaron Webster's social security number are 544 and the last three digits of his Texas driver's license are 814.  The last three digits of Dennis Woods' social security number are 426 and the last three digits of his Texas driver's license are 836.

3.      Defendant Rogers is an individual who resides in Dallas County, Texas.  Rogers can be served with process at 6520 Del Norte Lane, Dallas, Texas 75225 or wherever he may be found.

4.      Defendant OMTC is a Texas corporation with a principal place of business located at 1920 McKinney Avenue, Floor 7, Dallas, Texas 75201.  OMTC can be served through its registered agent, United States Corporation Agents, Inc., 9900 Spectrum Drive, Austin, Texas 78717.

### III.    JURISDICTION AND VENUE

5.      The Court has jurisdiction over the subject matter of this lawsuit because it is a civil suit for relief, and the amount in controversy, at least $6,552,000, exceeds the minimum jurisdictional limits of the Court.

6.      Venue is proper in Dallas County, Texas under Texas Civil Practice and Remedies Code § 15.002 because one or more of the Defendants is a resident of Dallas County and a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in Dallas County.

7.      Furthermore, the parties to this action agreed in contracts that are partly the subject of this dispute that any action taken to enforce the terms of the contracts shall be undertaken in Dallas County, Texas.

### IV.    FACTUAL BACKGROUND

8.      Plaintiffs bring this action to recover funds that OMTC, Inc. and Rogers, individually, have wrongfully refused to return to them, in violation of contractual and other legal obligations, in the total amount of $6,552,000.

9.      Steven Webster, Aaron Webster, and Dennis Woods are investors who invest in the energy sector, including in fuel.

## A.     The purported Vitol auction

10.     In 2020, an energy and commodities company called Vitol decided to exit a large fuel position that it held at a storage facility located in the Port of Brownsville, Texas.  To do so, according to Rogers, Vitol purportedly hosted an auction through which potential buyers would bid for portions of its fuel position (also called allocations).[1]  According to Rogers, the Vitol auction was not open to the public; it was by invitation only.

11.     According to Rogers, Vitol had invited OMTC and/or Rogers to participate in the auction on behalf of prospective buyers.  Rogers approached Aaron Webster about participating in the purported Vitol auction through OMTC, acting as intermediary and agent.  Aaron Webster then approached Steven Webster and Dennis Woods about purchasing portions of Vitol's fuel position through the purported auction, and each of them agreed to post funds to reserve an allocation of various refined fuels offered through the auction.  According to Rogers, in order to participate in the auction, an upfront cash deposit was required and, since the final awards had not yet been made, the dollar amounts posted were estimated based on the anticipated volumes awarded and the current market prices for those products.

12.     On June 18, 2020, Steven Webster and Dennis Woods each executed a Fuel Purchase Order with OMTC.  *See* **Exhibit A**, Webster-OMTC Fuel Purchase Order and **Exhibit B**, Woods-OMTC Fuel Purchase Order (collectively, the "Purchase Orders").  During the "Option Period," the Purchase Orders could be terminated without cause by either party.  If Steven Webster and Dennis Woods, each as a "Buyer," provided notice of their election to terminate the Purchase Orders, then OMTC, as "Seller," was obligated to "immediately request the return of funds from Vitol" and to "provide evidence of such to Buyer."  Further, once

---

[1]     Based on the information Plaintiffs have learned through discovery to date, it appears possible that the Vitol auction described by Defendants was fabricated by Defendants as part of their scheme to defraud and rob Plaintiffs, and never actually took place.

OMTC, as Seller, received the funds, it was obligated to "remit funds to Buyer *within one banking day*." *See* **Exhibits A & B**, Purchase Orders ¶ 3 (emphasis added).

13.    Per Vitol's protocol, as relayed to Aaron Webster by Rogers, Steven Webster and Dennis Woods deposited $4,410,000 and $2,142,000, respectively, for a total of $6,552,000 (the "Funds"), into OMTC's Chase bank account ending in xxx7879 in order to participate in the purported Vitol auction. *See* **Exhibits C & D**, Deposit Confirmations.

14.    Rogers claimed to have transferred these Funds to Vitol, and, according to Rogers, through the purported Vitol auction, Steven Webster received an allocation for 100,000 barrels of diesel fuel and Dennis Woods received an allocation for 50,000 barrels of jet fuel. But before any deal with Vitol for these allocations was consummated, on June 29, 2020, Rogers recommended the Purchase Orders be terminated. Rogers claimed that he had receiving the final contracts from Vitol and learned that Vitol would charge additional, unexpected fees as part of the contracts to consummate the sales of the allocations, which he advised would result in the deal being less beneficial to Plaintiffs than expected. Relying on this advice, Plaintiffs agreed to terminate the Purchase Orders. Acting on behalf of Steven Webster and Dennis Woods, Rogers purportedly notified Vitol of such decision, purportedly initiating the process of Vitol's return of Plaintiffs' $6,552,000 to OMTC.

**B.    Defendants' actual use of Plaintiffs' Funds**

15.    In reality, much, if not all, of Defendants' representations about the Vitol auction and using Plaintiffs' Funds to participate in such auction were untrue.

16.    Defendants' bank records, obtained by Plaintiffs through discovery, show what actually happened to the Funds. On June 19, 2020, the same date that OMTC received Plaintiffs' $6,552,000, Rogers transferred $6,550,000 (all but $2,000 of the Funds) to his personal Chase

checking account ending in xxx1503.  *See* **Exhibit Q**, Chase Bank Records, at 12-13, 31.

Rogers's transfer of $6,550,000 to account xxx1503 (and from there, his transfers to other

accounts and creditors) was not authorized by the parties' Fuel Purchase Orders, which clearly

provide that in the event those agreements were terminated, Plaintiffs' Funds would be returned

immediately (and in any event no later than one banking day).  **Exhibits A & B**, Purchase

Orders.

17.    Rogers then used account xxx1503 as a launch pad to transfer a total of

$6,474,928 of Plaintiffs' Funds to his other personal accounts at Frost bank and Chase bank

and/or to pay several personal creditors, including *inter alia* his defense attorneys, an architect

and a title company—none of which was authorized by Plaintiffs.  *See* **Exhibit Q**, Chase Bank

Records, at 12-13, 31.  These unauthorized transfers included transfers of portions of Plaintiffs'

Funds to the following accounts:

i. **Rogers's Frost checking account ending in xxx9321.**  On the same
day Rogers transferred $6,550,000 into his checking account ending in
xxx1503 (June 19, 2020), he transferred $20,000 from account xxx1503
to his personal checking account at Frost.  *Id*. at 12.  Rogers transferred
an additional $5,000 to this same Frost account just three days later on
June 22, 2020.  *Id*.  Both of these transfers were made almost
immediately after receiving Plaintiffs' Funds and before any other funds
had been deposited or transferred into Rogers's xxx1503 account,
making it obvious that the funds Rogers transferred to his Frost account
actually belonged to Plaintiffs.

ii. **Rogers's checking account ending in xxx8315.**  Just three days after
Rogers transferred $6,550,000 of Plaintiffs' Funds into his Chase
checking account ending in xxx1503, he transferred $59,000 from
account xxx1503 to a checking account ending in xxx8315.  *Id*.  The
banking institution associated with this account is not identified, but
given that it is described in the same format as OMTC's Chase account
ending in xxx7879, is presumed to be a Chase account.  *Id*.  This transfer
was made before any other funds had been deposited or transferred into
Rogers's xxx1503 account, making it obvious that the funds Rogers
transferred to his checking account ending in xxx8315 actually belonged
to Plaintiffs.

5

iii. **Rogers's Robinhood investment account ending in xxx9254.** Just three days after Rogers transferred $6,550,000 of Plaintiffs' Funds into his Chase checking account ending in xxx1503, he transferred $25,000 from account xxx1503 to a Robinhood investment account. *Id.* Robinhood is a well-known online investment platform—similar to E*Trade—that accommodates commission-free investing in a variety of securities like stocks, mutual funds, exchange traded funds and the like. This transfer was made before any other funds had been deposited or transferred into Rogers's xxx1503 account, making it obvious that the funds Rogers transferred to his Robinhood account actually belonged to Plaintiffs.

iv. **OMTC's Chase account ending in xxx1628.** On the same day Rogers received Plaintiffs' $6,552,000 in OMTC's Chase account ending in xxx7879, he transferred the remaining $2,000 of Plaintiffs' Funds that he had not already transferred to his Chase account ending in xxx1503 to another one of OMTC's Chase checking accounts ending in xxx1628. *Id.* at 31. This $2,000 is directly traceable to Plaintiffs' Funds.

v. **Mandarin Capital LLC account.** On June 19, 2020, Rogers transferred $4,000,000 into his Goldman Sachs account xxx708-8, which account is currently subject to the agreed temporary injunction. On July 6, Rogers transferred from his Goldman Sachs account $2,500,000 of that $4,000,000 back into the Chase account xxx1503. From there, on July 7, the next day after the $2,500,000 was received back into Chase account xxx1503, Rogers transferred $2,473,000 to Mandarin Capital LLC. *See* **Exhibit R**, Goldman Sachs July Records, at 20. This $2,473,000 is also directly traceable to Plaintiffs' Funds.

18.    Additionally, OMTC holds a Chase account ending in xxx3756. This account had a beginning balance of $0.14 in May 2020, with no apparent subsequent transactions in June, July or August (the period of time for which Chase bank records were received in response to Plaintiffs' subpoena). Yet, the balance today could very likely be different, and this account should also be frozen to preserve whatever OMTC assets remain to satisfy Plaintiffs' judgment against it.

**C.    Defendants' repeated broken promises to return the Funds**

19.    While Defendants' bank records show the true story of what happened to Plaintiff's Funds, Defendants misled Plaintiffs about the status of their Funds repeatedly from

June 2020 onward.  On June 30, 2020, Rogers provided a screenshot to Aaron Webster, which appears to reflect a wire transfer credit of $6,552,000 coming into OMTC's Chase bank account ending in xxx7879 from Wells Fargo—the exact amount due Steven Webster and Dennis Woods:



20.    This screenshot, attached as **Exhibit E**, appears to show that OMTC received the $6,552,000 in funds belonging to Steven Webster and Dennis Woods on or about June 30, 2020, and Rogers sent it Aaron Webster to suggest that Defendants would soon return the Funds to Plaintiffs.  *See also* **Exhibit F**, Rogers 6/30/20 Text Message (showing screenshot attached as **Exhibit E** was sent to Aaron Webster on June 30).

21.    Despite this, OMTC and Rogers failed to remit the Funds to Plaintiffs within one banking day.  In fact, to date—nearly five months after purportedly receiving the Funds from

Vitol—OMTC and Rogers still have not returned Steven Webster's Funds.  Dennis Woods's

Funds were not returned until August 6, 2020.

22.     Plaintiffs, individually and through their counsel, have repeatedly contacted

Rogers to inquire about why their Funds have not been timely returned, including by sending a

formal demand letter on July 13, 2020.  In response, while repeatedly and fully admitting that he

owes Steven Webster and Dennis Woods the full $6,552,000 due, Rogers communicated to

Plaintiffs, verbally and in writing, a wide array of excuses and misrepresentations.

23.     Initially, Rogers claimed he would return at least a portion of the Funds due

($1,785,122.23) from a different Chase account ending in xxx1503.  *See* **Exhibit G**, Rogers

6/30/20 Text Messages (claiming "it will go out to you guys").  Soon thereafter, Rogers also

promised that he would return the $4,410,000 due to Steven Webster and the $2,142,000 due to

Dennis Woods using funds from his personal Goldman Sachs account ending in xxx708-8.  *See,*

*e.g.,* **Exhibit H**, Rogers 7/5/20 Text Message (promising payment to Plaintiffs from Goldman

Sachs account).  Rogers provided false federal reference numbers for the Chase and Goldman

Sachs wires.  *See* **Exhibit I**, Rogers 7/1/20 Text Message.

24.     On July 7, 2020, Rogers forwarded to Aaron Webster two purported Goldman

Sachs confirmations, showing wire transfers "in process" in the amount of $4,410,000 to Steven

Webster and $2,142,000 to Dennis Woods.  *See* **Exhibits J & K**, Goldman Sachs Wire Transfer

Confirmations; *see also* **Exhibit L**, Rogers 7/9/20 Text Message (stating there is "absolutely zero

chance" the wires would not be received by July 9).  When those wire transfers never came

through to Steven Webster's or Dennis Woods's bank accounts, Rogers claimed he had

mistakenly provided the wrong account information.  *See* **Exhibit M**, Rogers 7/10/20 Email.

Subsequently, Rogers claimed there was a delay on Chase bank's end, and that the funds that had

been wired back into OMTC's account from Vitol were on a hold until at least July 16, 2020. *See* **Exhibit N**, Rogers 7/13/20 Email.   Most recently, Rogers assured Plaintiffs that wire transfers for the full $6,552,000 due had been initiated and would arrive by July 17, 2020. *See* **Exhibit O**, Rogers 7/17/20 4:24pm Email. He even agreed to pay for Plaintiffs' legal fees to that point. *See* **Exhibit P**, Rogers 7/17/20 12:05pm Email. Despite this parade of manufactured excuses and empty promises, Rogers and OMTC still have not returned Plaintiffs' Funds. Plaintiffs legitimately fear that Rogers has unlawfully spent the funds himself or secreted them elsewhere.

25.     Plaintiffs therefore bring this action to recover the amounts still owed and to pursue all other damages and remedies available to them at law and in equity as a result of Defendants' conduct.

### V.     CAUSES OF ACTION

### Count One — Breach of Contract (Steven Webster)

26.     Plaintiffs incorporate by reference paragraphs 1-25.

27.     The Webster-OMTC Purchase Order is a valid, enforceable contract.

28.     The Webster-OMTC Purchase Order required OMTC, through Rogers, to remit Steven Webster's Funds within one banking day if the agreement was terminated within the Option Period.

29.     The Webster-OMTC Purchase Order was terminated on June 29, 2020 but, to date, OMTC and Rogers have refused to remit Steven Webster's Funds, thereby breaching the Webster-OMTC Purchase Order.

30.     Steven Webster has suffered damages of at least $4,410,000 as a proximate result of this breach and has been deprived of the funds to which he is rightfully entitled.

31.     Steven Webster has fully satisfied and performed all conditions precedent and obligations under the Webster-OMTC Purchase Order.

### Count Two — Breach of Contract (Dennis Woods)

32.     Plaintiffs incorporate by reference paragraphs 1-31.

33.     The Woods-OMTC Purchase Order is a valid, enforceable contract.

34.     The Woods-OMTC Purchase Order required OMTC, through Rogers, to remit Dennis Woods's Funds within one banking day if the purchase order was terminated within the Option Period.

35.     The Woods-OMTC Purchase Order was terminated on June 29, 2020 but, to date, OMTC and Rogers refused to remit Dennis Woods's Funds until August 6, 2020, thereby breaching the Woods-OMTC Purchase Order.

36.     Dennis Woods suffered damages as a proximate result of this breach, such as lost interest and lost use of the Funds during the time they were owed until the time they were returned.

37.     Dennis Woods has fully satisfied and performed all conditions precedent and obligations under the Woods-OMTC Purchase Order.

### Count Three — Breach of Fiduciary Duties (Steven Webster)

38.     Plaintiffs incorporate by reference paragraphs 1-37.

39.     Steven Webster had a fiduciary relationship with Defendants.  Defendants acted as Steven Webster's agent and intermediary in respect of the Vitol auction and timely securing the return of Funds that Steven Webster entrusted to Defendants' possession and care.  Steven Webster relied on Defendants for financial and business guidance in respect of the Vitol auction.

40.     As such, Rogers and OMTC owed to Steven Webster:  (1) the duty of loyalty and utmost good faith; (2) the duty of candor; (3) the duty to refrain from self-dealing; (4) the duty to act with integrity of the strictest kind; (5) the duty of fair, honest dealing; and (6) the duty to make full disclosure.

41.     Defendants breached these duties through their deceitful actions including: refusing to return Steven Webster's Funds, repeatedly misleading Plaintiffs about their intentions to promptly return Steven Webster's Funds, keeping Steven Webster's Funds after they were due to be remitted, and failing to disclose the true status of Steven Webster's Funds and payments, among other unlawful, misleading, and deceitful conduct.

42.     Steven Webster has suffered damages as a proximate result of Defendants' breach of fiduciary duties, including by being deprived of funds in the amount of $4,410,000 and other damages.

43.     Steven Webster further seeks disgorgement of any ill-gotten profits or gains Defendants obtained as a result of misuse and/or misappropriation of Steven Webster's Funds and breach of the aforementioned fiduciary duties.

**Count Four — Breach of Fiduciary Duties (Dennis Woods)**

44.     Plaintiffs incorporate by reference paragraphs 1-43.

45.     Dennis Woods had a fiduciary relationship with Defendants.  Defendants acted as Dennis Woods's agent and intermediary in respect of the Vitol auction and timely securing the return of funds that Dennis Woods entrusted to Defendants' possession and care.  Dennis Woods relied on Defendants for financial and business guidance in respect of the Vitol auction.

46.     As such, Rogers and OMTC owed to Dennis Woods:  (1) the duty of loyalty and utmost good faith; (2) the duty of candor; (3) the duty to refrain from self-dealing; (4) the duty to

act with integrity of the strictest kind; (5) the duty of fair, honest dealing; and (6) the duty to make full disclosure.

47.    Defendants breached these duties through their deceitful actions including: refusing to return Dennis Woods's Funds, repeatedly misleading Plaintiffs about their intentions to promptly return Dennis Woods's Funds, keeping Dennis Woods's Funds after they were due to be remitted, and failing to disclose the true status of Dennis Woods's Funds and payments, among other unlawful, misleading, and deceitful conduct.

48.    Dennis Woods has suffered damages as a proximate result of Defendants' breach of fiduciary duties, including by being deprived of funds in the amount of $2,142,000 for several weeks and other damages.

49.    Dennis Woods further seeks disgorgement of any ill-gotten profits or gains Defendants obtained as a result of misuse of Dennis Woods's Funds and breach of the aforementioned fiduciary duties.

### Count Five — Conversion

50.    Plaintiffs incorporate by reference paragraphs 1-49.

51.    OMTC and Rogers are also liable for conversion, as Steven Webster and Dennis Woods are the owners, respectively, of $4,410,000 and $2,142,000, are entitled to immediate possession of such amounts, and have made proper demand for the return of their property, which OMTC and Rogers have refused to honor.

52.    By failing to return Plaintiffs' money, OMTC and Rogers have unlawfully and without authorization assumed and exercised control over the property to the exclusion of and inconsistent with the Steven Webster and Dennis Woods's rights as owners.

53.    This conversion is the proximate cause of financial harm to Steven Webster and Dennis Woods, and they are entitled to recover from OMTC and Rogers all damages caused by this conversion and their unlawful actions.

### Count Six — Fraud

54.    Plaintiffs incorporate by reference paragraphs 1-53.

55.    Rogers, by and through OMTC, represented to Plaintiffs that he would act as a trustworthy agent and intermediary on their behalf in respect of the Vitol action, and that if no agreement with Vitol was consummated for the purchase of the allocations, he would promptly, and within one business day, remit Plaintiffs' funds to them.

56.    These representations were material and made with the intent that Plaintiffs act on them to participate in the Vitol auction.

57.    Plaintiffs in fact relied on these representations and deposited, or caused to be deposited, $6,552,000 into OMTC's account.  Plaintiffs would not have agreed to the Purchase Orders or deposited Steven Webster and Dennis Woods's Funds into OMTC's account had Rogers's material, false representations not been made.

58.    These representations were false because Rogers at all times had no intention of timely remitting Plaintiffs' funds.  That Rogers' representations were false at the time he made them is shown through his pattern of misleading and deceptive conduct as soon as the Purchase Orders at issue in this lawsuit were terminated (e.g., manufacturing bank delays and multiple promised wire transfers that never came through), and through several other lawsuits currently and recently pending against Rogers, which reveal highly similar fact patterns of Rogers

13

wrongfully refusing to return millions of dollars of his clients' funds in connection with fuel trading and other types of agreements.[2]

59.     As a proximate result of Rogers's material, false representations, Plaintiffs have suffered damages.   As a result of this fraud, Plaintiffs are entitled to damages, including $6,552,000, plus additional losses proximately resulting from Defendants' conduct, including exemplary damages.

60.     Any cap on exemplary damages under Texas Civil Practices and Remedies Code Section 41.008 does not apply to this cause of action because Plaintiffs seek recovery of exemplary damages based on Defendants' conduct described as a felony in Texas Penal Code Section 32.45 (Misapplication of Fiduciary Property or Property of Financial Institution), and the conduct was committed knowingly or intentionally.

### Count Seven — Violations of the Texas Deceptive Trade Practices Act

61.     Plaintiffs incorporate by reference paragraphs 1-60.

62.     Dennis Woods is a consumer as defined by the Texas Deceptive Trade Practices Act ("DTPA").

---

[2]       *See* Cause No. 19LBCV00725, *ACMC Finance and Trade LLC v. Dennis Rogers Jr., et al.*; in the Superior Court of the State of California, County of Los Angeles (alleging that Rogers, in connection with oil venture, acted as intermediary between borrower and lender, improperly retained loan proceeds, and committed money had and received, unjust enrichment, promissory fraud (fraud in the inducement), fraud (intentional misrepresentation), negligent misrepresentation, conversion, intentional interference with contractual relations, intentional fraudulent transfers, constructive fraudulent transfers, and civil conspiracy); Cause No. DC-20-01897, *Funderz.net LLC v. OMTC, Inc., Dennis James Rogers, II, et al.*; in the 191st Judicial District Court of Dallas County, Texas (alleging that Rogers and/or OMTC (as applicable), entered into three separate promissory notes, security, collateral assignment, and guarantee agreements for the purchase of ultra-low sulfur diesel, and thereafter defaulted on the notes by failing to timely pay amounts due and then fraudulently used the funds for other purposes); Cause No. DC-19-12251, *Anthony J. Capano and Joanne Capano v. Push Start Indus. LLC and Dennis Rogers*; in the 192nd Judicial District Court of Dallas County, Texas (suit for breach of promissory notes and guarantees in connection with funding of water rights deals); Cause No. DC-19-01434, *Luxemborg Trading LLC v. Organ Mountain Energy LLC and Dennis J. Rogers, II*; In the 162nd Judicial District Court of Dallas County, Texas (now-settled and dismissed suit to recover $1 million payment for ultra-low sulfur diesel that defendants never delivered to plaintiff).

63.    Defendants Rogers and OMTC, as alleged above and detailed below, have in the course of business with Dennis Woods engaged in false, misleading, and deceptive acts and practices declared unlawful in Section 17.46 of the DTPA.  Such acts include:

    a.    False, misleading, or deceptive acts or practices in the conduct of any trade or commerce, in violation of DTPA Section 17.46(a);

    b.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not, in violation of DTPA Section 17.46(b)(5);

    c.    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, in violation of DTPA Section 17.46(b)(7);

    d.    Failing to disclose information concerning goods or services which was known at the time of the transaction with the intent to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed, in violation of DTPA Section 17.46(b)(24).

64.    Defendants' misconduct was committed intentionally.

65.    Dennis Woods relied on Defendants' misrepresentations, false, misleading, or deceptive acts, and failures to disclose information, and has suffered damages as a result of Defendants' violations of the DTPA.

66.    Dennis Woods is entitled to recover its economic damages plus treble damages as permitted by DTPA Section 17.50(b)(3).

**Count Eight — Texas Theft Liability Act**

67.    Plaintiffs incorporate by reference paragraphs 1-66.

68.    Plaintiffs Steven Webster and Dennis Woods have a possessory right to the $6,552,000 in funds and bring this claim under the Texas Theft Liability Act for an unlawful appropriation of property under Texas Penal Code Section 31.03.  *See* Tex. Civ. Prac. & Rem. Code §§ 134.001 et seq.

69.    Defendants Rogers and OMTC unlawfully appropriated Plaintiffs' funds without their consent and with the intent to deprive Plaintiffs of their property in violation of Texas Penal Code Sections 31.01(5)(C) and 31.03.

70.    The appropriation of such funds by Defendants was induced by deception in violation of Texas Penal Code Section 31.01, based on, but not limited to, the following deceptive acts: (1) Rogers, by and through OMTC, created a false impression that he would act as a trustworthy agent and intermediary on Plaintiffs' behalf in respect to the Vitol action, on which Plaintiffs' relied in their transaction with Defendants; (2) Rogers, by and through OMTC, promised to Plaintiffs that if no agreement with Vitol was consummated for the purchase of the allocations, he would promptly, and within one business day, remit Plaintiffs' funds to them, on which promise of performance Plaintiffs' relied judgment in the transaction with Defendants.

71.    Plaintiffs sustained damages of at least $6,552,000 as a result of Defendants' unlawful appropriation, which is equivalent to a first-degree felony under Texas Penal Code Section 31.03(e)(7).

72.    Because Plaintiffs' injuries resulted from Defendants' gross negligence, fraud or malice, Plaintiffs are entitled to an award of exemplary damages.  *See* Tex. Civ. Prac. & Rem. Code § 41.003(a).  This remedy is in addition to, or alternatively to, other remedies sought in this petition.

73.    Plaintiffs are also entitled to an award of their reasonable attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code § 134.005(b).

**Count Nine — Money Had and Received (Unjust Enrichment)**

74.    Plaintiffs incorporate by reference paragraphs 1-73.

75.    Defendants hold money, which in equity and good conscience, belongs to the Plaintiffs.  However, Defendants have failed and refused to turn over the funds to Plaintiffs despite their demand for their return.

**Count Ten — Constructive Trust as to OMTC's Chase Bank Account ending in xxx7879**

76.    Plaintiffs incorporate by reference paragraphs 1-75.

77.    Rogers and OMTC are still in possession of $4,410,000 of Plaintiffs' Funds, procured through fraud and breach of fiduciary duties, and should not be permitted to retain such funds.

78.    By virtue of Defendants' fraud and breach of fiduciary duties, Plaintiffs are entitled to appropriate equitable relief, including imposition of a constructive trust over OMTC's Chase bank account with account number ending in xxx7879 to prevent OMTC and Rogers from either spending or transferring Plaintiffs' money elsewhere, potentially forever precluding Plaintiffs from obtaining recovery.

79.    Accordingly, Plaintiffs request that the Court institute a constructive trust against Rogers and OMTC regarding the funds in Rogers' and OMTC's possession which belong to Plaintiffs.  Specifically, Plaintiffs request that the Court institute a constructive trust over OMTC's Chase bank account ending in xxx7879, because there is evidence that Vitol deposited Plaintiffs' funds in such account and that Rogers, acting through OMTC, has wrongfully refused to return those funds to Plaintiffs.  A constructive trust over this account is appropriate because Plaintiffs' property can be directly traced to such account, as demonstrated by Rogers'

Ex. Pg. 174

screenshot of the account showing that the funds from Vitol were held in such account, Rogers' repeated admission of liability to Plaintiffs, and Rogers' repeated false assurances to Plaintiffs.

## Count Eleven —
## Constructive Trust as to Dennis Rogers' Goldman Sachs Account ending in xxx708-8

80.    Plaintiffs incorporate by reference paragraphs 1-79.

81.    Rogers and OMTC are still in possession of $4,410,000 of Plaintiffs' funds, procured through fraud and breach of fiduciary duties, and should not be permitted to retain such funds.

82.    By virtue of Defendants' fraud and breach of fiduciary duties, Plaintiffs are entitled to appropriate equitable relief, including imposition of a constructive trust over Dennis Rogers's Goldman Sachs account ending in xxx708-8 to prevent Rogers from either spending or transferring Plaintiffs' money elsewhere, potentially forever precluding Plaintiffs from obtaining recovery.

83.    Accordingly, Plaintiffs request that the Court institute a constructive trust against Rogers and OMTC regarding the funds in Rogers' and OMTC's possession which belong to Plaintiffs.  Specifically, Plaintiffs request that the Court institute a constructive trust over Dennis Rogers's Goldman Sachs account ending in xxx708-8, because there is evidence that funds in such account were to be used to return to Plaintiffs the amounts they are owed and because Dennis Rogers represented to Plaintiffs that he would return to Plaintiffs the amounts they are owed using such account and the funds held therein.  A constructive trust over this account is appropriate because Plaintiffs' property can be directly traced to such account, as demonstrated by Rogers' emails and text messages representing that Plaintiffs' funds were being transferred to them from his Goldman Sachs account, Rogers' repeated admission of liability to Plaintiffs, and Rogers' repeated false assurances to Plaintiffs.

## Count Twelve —
## Constructive Trust as to Rogers's Chase Bank Checking Account ending in xxx1503

84.    Plaintiffs incorporate by reference paragraphs 1-83.

85.    Rogers and OMTC are still in possession of $4,410,000 of Plaintiffs' Funds, procured through fraud and breach of fiduciary duties, and should not be permitted to retain such funds.

86.    By virtue of Defendants' fraud and breach of fiduciary duties, Plaintiffs are entitled to appropriate equitable relief, including imposition of a constructive trust over Rogers's Chase Bank checking account ending in xxx1503 to prevent OMTC and Rogers from either spending or transferring Plaintiffs' money elsewhere, potentially forever precluding Plaintiffs from obtaining recovery.

87.    Accordingly, Plaintiffs request that the Court institute a constructive trust against Rogers and OMTC regarding the funds in Rogers' and OMTC's possession which belong to Plaintiffs.  Specifically, Plaintiffs request that the Court institute a constructive trust over Rogers's Chase Bank checking account ending in xxx1503, because there is evidence that Defendants unauthorizedly and fraudulently transferred a portion of Plaintiffs' Funds into such account.  A constructive trust over this account is appropriate because Plaintiffs' property can be directly traced to such account, as demonstrated by Defendants' bank records, attached as **Exhibit Q**.

## Count Thirteen —
## Constructive Trust as to Rogers's Frost Bank Checking Account ending in xxx9321

88.    Plaintiffs incorporate by reference paragraphs 1-87.

89.     Rogers and OMTC are still in possession of $4,410,000 of Plaintiffs' Funds, procured through fraud and breach of fiduciary duties, and should not be permitted to retain such funds.

90.     By virtue of Defendants' fraud and breach of fiduciary duties, Plaintiffs are entitled to appropriate equitable relief, including imposition of a constructive trust over Rogers's Frost Bank checking account ending in xxx9321 to prevent OMTC and Rogers from either spending or transferring Plaintiffs' money elsewhere, potentially forever precluding Plaintiffs from obtaining recovery.

91.     Accordingly, Plaintiffs request that the Court institute a constructive trust against Rogers and OMTC regarding the funds in Rogers' and OMTC's possession which belong to Plaintiffs.  Specifically, Plaintiffs request that the Court institute a constructive trust over Rogers's Frost Bank checking account ending in xxx9321, because there is evidence that Defendants unauthorizedly and fraudulently transferred a portion of Plaintiffs' Funds into such account.  A constructive trust over this account is appropriate because Plaintiffs' property can be directly traced to such account, as demonstrated by Defendants' bank records, attached as **Exhibit Q**.

<div align="center">

**Count Fourteen —**
**Constructive Trust as to Rogers's Chase Bank Checking Account ending in xxx8315**

</div>

92.     Plaintiffs incorporate by reference paragraphs 1-91.

93.     Rogers and OMTC are still in possession of $4,410,000 of Plaintiffs' Funds, procured through fraud and breach of fiduciary duties, and should not be permitted to retain such funds.

94.     By virtue of Defendants' fraud and breach of fiduciary duties, Plaintiffs are entitled to appropriate equitable relief, including imposition of a constructive trust over Rogers's

<div align="center">20</div>

Chase Bank Checking Account ending in xxx8315 to prevent OMTC and Rogers from either spending or transferring Plaintiffs' money elsewhere, potentially forever precluding Plaintiffs from obtaining recovery.

95.     Accordingly, Plaintiffs request that the Court institute a constructive trust against Rogers and OMTC regarding the funds in Rogers' and OMTC's possession which belong to Plaintiffs.    Specifically, Plaintiffs request that the Court institute a constructive trust over Rogers's Chase Bank Checking Account ending in xxx8315, because there is evidence that Defendants unauthorizedly and fraudulently transferred a portion of Plaintiffs' Funds into such account.  A constructive trust over this account is appropriate because Plaintiffs' property can be directly traced to such account, as demonstrated by Defendants' bank records, attached as **Exhibit Q**.

<div align="center">

**Count Fifteen —**
**Constructive Trust as to Rogers's Robinhood Investment Account ending in xxx9254**

</div>

96.     Plaintiffs incorporate by reference paragraphs 1-95.

97.     Rogers and OMTC are still in possession of $4,410,000 of Plaintiffs' Funds, procured through fraud and breach of fiduciary duties, and should not be permitted to retain such funds.

98.     By virtue of Defendants' fraud and breach of fiduciary duties, Plaintiffs are entitled to appropriate equitable relief, including imposition of a constructive trust over Rogers's Robinhood investment account ending in xxx9254 to prevent OMTC and Rogers from either spending or transferring Plaintiffs' money elsewhere, potentially forever precluding Plaintiffs from obtaining recovery.

99.     Accordingly, Plaintiffs request that the Court institute a constructive trust against Rogers and OMTC regarding the funds in Rogers' and OMTC's possession which belong to

Plaintiffs. Specifically, Plaintiffs request that the Court institute a constructive trust over Rogers's Robinhood investment account ending in xxx9254, because there is evidence that Defendants unauthorizedly and fraudulently transferred a portion of Plaintiffs' Funds into such account. A constructive trust over this account is appropriate because Plaintiffs' property can be directly traced to such account, as demonstrated by Defendants' bank records, attached as **Exhibit Q**.

<div align="center">

**Count Sixteen —**
**Constructive Trust as to OMTC's Chase Bank Account ending in xxx1628**

</div>

100.    Plaintiffs incorporate by reference paragraphs 1-99.

101.    Rogers and OMTC are still in possession of $4,410,000 of Plaintiffs' Funds, procured through fraud and breach of fiduciary duties, and should not be permitted to retain such funds.

102.    By virtue of Defendants' fraud and breach of fiduciary duties, Plaintiffs are entitled to appropriate equitable relief, including imposition of a constructive trust over Constructive Trust as to OMTC's Chase bank account ending in xxx1628 to prevent OMTC and Rogers from either spending or transferring Plaintiffs' money elsewhere, potentially forever precluding Plaintiffs from obtaining recovery.

103.    Accordingly, Plaintiffs request that the Court institute a constructive trust against Rogers and OMTC regarding the funds in Rogers' and OMTC's possession which belong to Plaintiffs. Specifically, Plaintiffs request that the Court institute a constructive trust over OMTC's Chase bank account ending in xxx1628, because there is evidence that Defendants unauthorizedly and fraudulently transferred a portion of Plaintiffs' Funds into such account. A constructive trust over this account is appropriate because Plaintiffs' property can be directly traced to such account, as demonstrated by Defendants' bank records, attached as **Exhibit Q**.

<div align="center">

22

</div>

**Count Seventeen —**
**Constructive Trust as to OMTC's Chase Bank Account ending in xxx3756**

104.    Plaintiffs incorporate by reference paragraphs 1-103.

105.    Rogers and OMTC are still in possession of $4,410,000 of Plaintiffs' Funds, procured through fraud and breach of fiduciary duties, and should not be permitted to retain such funds.

106.    By virtue of Defendants' fraud and breach of fiduciary duties, Plaintiffs are entitled to appropriate equitable relief, including imposition of a constructive trust over OMTC's Chase Bank account ending in xxx3756 to prevent OMTC and Rogers from either spending or transferring Plaintiffs' money elsewhere, potentially forever precluding Plaintiffs from obtaining recovery.

107.    Accordingly, Plaintiffs request that the Court institute a constructive trust against Rogers and OMTC regarding the funds in Rogers' and OMTC's possession which belong to Plaintiffs.    Specifically, Plaintiffs request that the Court institute a constructive trust over OMTC's Chase Bank account ending in xxx3756, because, though there were apparently no transactions involving this account in June, July or August (the period of time for which Chase bank records were received in response to Plaintiffs' subpoena), the balance today could be different, and given that Plaintiffs have already obtained partial summary judgment on their breach of contract and conversion claims against OMTC, this account should also be frozen to preserve whatever OMTC assets remain to satisfy Plaintiffs' judgment against it.

**Count Eighteen —**
**Constructive Trust as to Defendants' Mandarin Capital LLC Account**

108.    Plaintiffs incorporate by reference paragraphs 1-107.

Ex. Pg. 180

109.    Rogers and OMTC are still in possession of $4,410,000 of Plaintiffs' Funds, procured through fraud and breach of fiduciary duties, and should not be permitted to retain such funds.

110.    By virtue of Defendants' fraud and breach of fiduciary duties, Plaintiffs are entitled to appropriate equitable relief, including imposition of a constructive trust over Defendants' Mandarin Capital LLC account to prevent OMTC and Rogers from either spending or transferring Plaintiffs' money elsewhere, potentially forever precluding Plaintiffs from obtaining recovery.

111.    Accordingly, Plaintiffs request that the Court institute a constructive trust against Rogers and OMTC regarding the funds in Rogers' and OMTC's possession which belong to Plaintiffs.    Specifically, Plaintiffs request that the Court institute a constructive trust over Defendants' Mandarin Capital LLC account(s), because there is evidence that Defendants unauthorizedly and fraudulently transferred a portion of Plaintiffs' Funds into such account(s). A constructive trust over this account is appropriate because Plaintiffs' property can be directly traced to such account, as demonstrated by Defendants' bank records, attached as **Exhibits Q & R**.

## VI.    ALTER EGO

112.    Plaintiffs incorporate by reference paragraphs 1-111.

113.    The corporate form should be disregarded as between OMTC and Rogers for the following reasons, among others:

     a.    Defendant OMTC's corporate form was used as a sham by Defendant Rogers to perpetuate fraud against Plaintiffs and others;

     b.    such unity exists between OMTC and Rogers that they have ceased to be separate and holding only one liable would promote injustice, as

**Ex. Pg. 181**

demonstrated in part by Rogers' stated intention to return the funds owed to Plaintiffs from his personal Goldman Sachs account;

c.      On information and belief, Defendants failed to observe corporate formalities.

## VII.   ATTORNEYS' FEES

114.    Plaintiffs incorporate by reference paragraphs 1-113.

115.    Plaintiffs request an award of attorneys' fees and costs incurred in prosecuting these claims.  Plaintiffs are entitled to recover its reasonable and necessary attorneys' fees pursuant to Section 38.001(8) and Section 134.005(b) of the Texas Civil Practices and Remedies Code.

## VIII.   PRE- AND POST-JUDGMENT INTEREST

116.    Plaintiffs incorporate by reference paragraphs 1-115.

117.    Plaintiffs sue for pre-judgment and post-judgment interest at the maximum rates allowed by law on any judgment awarded in their favor.

## IX.   APPLICATION TO EXPAND TEMPORARY INJUNCTION

118.    Plaintiffs incorporate by reference paragraphs 1-117.

119.    Pursuant to Rules 680, 681, and 683 of the Texas Rules of Civil Procedure, Plaintiffs request that the Court enter an amended and expanded temporary injunction (1) imposing a constructive trust over OMTC's Chase Bank account with account number ending in xxx7879 ("Chase Bank account number xxx7879") and freezing all cash or other assets held therein; (2) imposing a constructive trust over Rogers' Goldman Sachs account with account number ending in xxx708-8 ("Goldman Sachs account") and freezing all cash or other assets held therein; (3) imposing a constructive trust over Rogers's Chase Bank checking account with account number ending in xxx1503 ("Chase Bank account number xxx1503") and freezing all cash or other assets held therein; (4) imposing a constructive trust over Rogers's Frost Bank

25

checking account with account number ending in xxx9321 ("Frost account") and freezing all cash or other assets held therein; (5) imposing a constructive trust over Roger's Chase Bank account with account number ending in xxx8315 ("Chase Bank account number xxx8315") and freezing all cash or other assets held therein; (6) imposing a constructive trust over Rogers' Robinhood account with account number ending in xxx9254 ("Robinhood account") and freezing all cash or other assets held therein; (7) imposing a constructive trust over OMTC's Chase Bank account with account number ending in xxx1628 ("Chase Bank account number xxx1628") and freezing all cash or other assets held therein; (8) imposing a constructive trust over OMTC's Chase Bank account with account number ending in xxx3756 ("Chase Bank account number xxx3756") and freezing all cash or other assets held therein; and (9) imposing a constructive trust over any account held by either Defendant at Mandarin Capital LLC ("Mandarin Capital account(s)") and freezing all cash or other assets held therein.

120.    Plaintiffs seek this injunctive relief to enjoin Defendants OMTC and Dennis Rogers from taking any further unlawful actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of Plaintiffs' property which Defendants have unlawfully and fraudulently refused to return to Plaintiffs.  Specifically, Defendants have failed to timely remit to Plaintiffs $6,552,000, which Defendant Rogers has repeatedly admitted is owed, despite such amount being long past due.  *See* supra ¶¶ 22-24.

121.    Injunctive relief may be granted upon a showing of the following: (1) a cause of action against Defendants; (2) a probable right to the relief sought; (3) a probable, imminent, and irreparable injury in the interim; and (4) the absence of an adequate legal remedy at law.

122.    As set forth above, Plaintiffs have established their causes of action, including among others fraud, breach of fiduciary duty, breach of contract, and have established a probable right to recover the relief sought, including a probable right to recover the $6,552,000.

123.    The Defendants' own actions and wrongdoing, in using Plaintiffs' funds for non-approved purposes, refusing to return the funds timely, and misleading Plaintiffs about the status of the funds and their intentions to timely return the funds Plaintiffs, establish the existence of a substantial threat of probable, imminent, and irreparable injury.    The Defendants, despite multiple warnings and pleas from Plaintiffs, continue to unlawfully possess Plaintiffs' funds and refuse to remit them, even after readily admitting that they owe Plaintiffs the $6,552,000 and promising to pay.  *See supra* ¶¶ 21-24.  Plaintiffs have a valid and justified fear that without an injunction, Defendants will unauthorizedly and unlawfully use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the Plaintiffs' property, making it impossible for Plaintiffs to ever recover the $4,410,000 that remains unreturned.  Plaintiffs' concern is further bolstered by the fact that Dennis Rogers and/or OMTC are currently embroiled in at least two other, separate lawsuits where they are alleged to have similarly misused and/or misappropriated funds owed to the plaintiffs in those lawsuits and have refused to return the amounts allegedly owed.  *See supra*, ¶ 58 & fn. 2.  Accordingly, without an injunction, it is probable that Plaintiffs will suffer an imminent and irreparable injury at Defendants' hands.

124.    Injunctive relief is necessary and warranted in this situation to preserve Plaintiffs' legal status quo and contractual rights while protecting what remains of Plaintiffs' property in the following accounts and preventing their property from being unlawfully used, transferred, converted, or secreted, such that Plaintiffs are permanently deprived from recovering their property:

**Ex. Pg. 184**

- Chase Bank account number xxx7879

- Goldman Sachs account number xxx708-8

- Chase Bank account number xxx1503

- Frost account number xxx9321

- Chase Bank account number xxx8315

- Robinhood account number xxx9254

- Chase Bank account number xxx1628

- Chase Bank account number xxx3756

- Mandarin Capital account(s)

Thus, it is appropriate and necessary for this court to grant immediate injunctive relief, and no other adequate remedy exists at law.

125.    An injunction freezing assets in the following accounts is appropriate and permissible because the assets in those accounts directly relate to this subject matter of this lawsuit:

- Chase Bank account number xxx7879

- Goldman Sachs account number xxx708-8

- Chase Bank account number xxx1503

- Frost account number xxx9321

- Chase Bank account number xxx8315

- Robinhood account number xxx9254

- Chase Bank account number xxx1628

- Chase Bank account number xxx3756

- Mandarin Capital account(s)

28

Indeed, according to Rogers's representations, as of June 30, 2020, the Chase Bank account xxx7879 contained the very funds Plaintiffs seek to recover. *See supra* ¶ 16 (including June 30, 2020 screenshot of Chase Bank account xxx7879 sent by Dennis Rogers to Aaron Webster showing that $6,552,000 had recently been transferred into the account). Additionally, in July, Rogers promised Plaintiffs that he would return the $6,552,000 using funds from his Goldman Sachs account, and even forwarded two purported Goldman Sachs confirmation emails showing wire transfers "in process" in the amount of $4,410,000 to Steven Webster and $2,142,000 to Dennis Woods. *Supra* ¶ 21. Moreover, the bank records attached as Exhibits Q and R speak for themselves regarding the remaining accounts into which Plaintiffs' Funds were unauthorizedly deposited. Accordingly, it is permissible to freeze the assets in each of these accounts because the cash and other assets held in both accounts are directly related to the subject matter of Plaintiffs' suit. *See, e.g., Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 527 S.W.3d 579, 586–87 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[T]he general rule prohibiting an injunction to secure the legal remedy of damages by freezing a defendant's assets that are completely unrelated to the subject matter of the suit… *does not preclude relief under circumstances where the very assets at issue in the preliminary injunction are at issue in and may be used to satisfy claims in the parties' dispute*.") (emphasis added); *All. Royalties, LLC v. Boothe,* 313 S.W.3d 493, 497 (Tex. App.—Dallas 2010, no pet.) ("[T]here must be some connection between the claims alleged and the acts sought to be enjoined.").

126.    Additionally, courts have found that issuing injunctive relief as to assets subject to equitable remedies such as constructive trust is appropriate. *See, e.g., Reyes v. Burrus*, 411 S.W.3d 921, 925 (Tex. App.—El Paso 2013, pet. denied) (citing *Deckert v. Indep. Shares Corp.,* 311 U.S. 282, 289 (1940) (party seeking injunction to preserve

assets or their proceeds that are subject to a pled equitable remedy such as rescission, constructive trust, or restitution)); *Federal Sav. & L. Ins. Corp. v. Dixon,* 835 F.2d 554, 560-61 (5th Cir. 1987) (equitable causes of action for constructive trust, accounting, and restitution vested district court with discretion to issue preliminary injunction, but only as to assets subject to equitable remedies).  Here, Plaintiffs have pled as an equitable remedy that the court institute constructive trusts over the following accounts:

- Chase Bank account number xxx7879

- Goldman Sachs account number xxx708-8

- Chase Bank account number xxx1503

- Frost account number xxx9321

- Chase Bank account number xxx8315

- Robinhood account number xxx9254

- Chase Bank account number xxx1628

- Chase Bank account number xxx3756

- Mandarin Capital account(s)

*Supra* ¶¶ 76-111.  Accordingly, issuing an injunction to preserve these assets that are the subject of Plaintiffs' pled constructive trusts is appropriate and warranted.

127.    Moreover, an injunction is appropriate here because without issuance of such injunction, there is a possibility that Defendants will be judgement-proof by the time a judgment is rendered, preventing Plaintiffs from ever recovering an award that is rightfully theirs.  *See Reyes v. Burrus*, 411 S.W.3d at 925 ("[I]t is permissible to freeze these type of assets when the defendant is insolvent or likely to be insolvent at the time a judgment is rendered.").

Accordingly, there exists the threat of imminent harm, irreparable injury, and the absence of an adequate remedy at law.

128.    Additionally, there is no adequate remedy because Defendants are in breach of their fiduciary duties to Plaintiffs, and there is never an adequate remedy at law for a breach of fiduciary duty claim. *See 183/620 Group Joint Venture v. SPF Joint Venture*, 765 S.W.2d 901, 903 (Tex. App.—Austin 1989, writ dism. w.o.j.) (finding that where an injunction seeks to restrain a party from expending sums held by them as fiduciaries, damages are not an adequate remedy, and concluding that a temporary injunction was necessary to maintain the existing status of the trust funds).

129.    The benefit of injunctive relief in favor of Plaintiffs far outweighs any detriment to the Defendants and serves the public interest.  Plaintiffs seek merely to maintain the status quo by preventing further unlawful and fraudulent actions by Defendants related to Plaintiffs' property contained in the aforementioned accounts while this matter is litigated.

130.    Plaintiffs therefore request issuance of an amended Temporary Injunction enjoining Defendants as set forth in Plaintiffs' prayer for relief below and in the proposed order granting Temporary Injunction filed concurrently herewith.

## XII.  PRAYER

For the reasons stated, Plaintiffs pray for judgment against OMTC and Dennis Rogers, including the following relief:

a)    an amended temporary injunction which orders:

    a.    Defendants OMTC and Rogers, along with their members, managers, agents, directors, officers, employees, attorneys, or assigns, refrain from taking any actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of a total amount not to exceed $1000, contained in OMTC's Chase Bank account with account number ending in xxx7879; and

Ex. Pg. 188

b.      Defendants OMTC and Rogers, along with their members, managers, agents, directors, officers, employees, attorneys, or assigns, refrain from taking any actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of a total amount not to exceed $1000, contained in Rogers' Goldman Sachs account with account number ending in xxx708-8.

c.      Defendants OMTC and Rogers, along with their members, managers, agents, directors, officers, employees, attorneys, or assigns, refrain from taking any actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of a total amount not to exceed $1000, contained in Roger's Chase Bank account with account number ending in xxx1503; and

d.      Defendants OMTC and Rogers, along with their members, managers, agents, directors, officers, employees, attorneys, or assigns, refrain from taking any actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of a total amount not to exceed $1000, contained in Rogers' Frost Bank account with account number ending in xxx9321.

e.      Defendants OMTC and Rogers, along with their members, managers, agents, directors, officers, employees, attorneys, or assigns, refrain from taking any actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of a total amount not to exceed $1000, contained in Roger's Chase Bank account with account number ending in xxx8315; and

f.      Defendants OMTC and Rogers, along with their members, managers, agents, directors, officers, employees, attorneys, or assigns, refrain from taking any actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of a total amount not to exceed $1000, contained in Rogers' Robinhood account with account number ending in xxx9254.

g.      Defendants OMTC and Rogers, along with their members, managers, agents, directors, officers, employees, attorneys, or assigns, refrain from taking any actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of a total amount not to exceed $1000, contained in OMTC's Chase Bank account with account number ending in xxx1628;

h.      Defendants OMTC and Rogers, along with their members, managers, agents, directors, officers, employees, attorneys, or assigns, refrain from taking any actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the

exception of a total amount not to exceed $1000, contained in OMTC's Chase Bank account with account number ending in xxx3756; and

i.    Defendants OMTC and Rogers, along with their members, managers, agents, directors, officers, employees, attorneys, or assigns, refrain from taking any actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of a total amount not to exceed $1000, contained in any account held by either Defendant at Mandarin Capital LLC.

b)    compensatory damages in the amount of $6,552,000, plus interest, resulting from OMTC's breaches of contract;

c)    damages for additional losses proximately resulting from Defendants' other unlawful conduct, including breach of fiduciary duties, conversion, fraud, and money had and received (unjust enrichment);

d)    equitable disgorgement of any ill-gotten gains or profits through the improper use of Steven Webster and Dennis Woods's Funds in breach of the fiduciary duties that Defendants owed to Steven Webster and Dennis Woods;

e)    exemplary damages for Defendants' unlawful conduct, including breach of fiduciary duties and fraud;

f)    statutory, treble and other damages under the Texas Deceptive Trade Practices Act;

g)    damages under the Texas Theft Liability Act, including actual damages, exemplary damages, and attorneys' fees and court costs;

h)    equitable relief in the form of a constructive trust over OMTC's Chase bank account ending in xxx7879; Rogers' Goldman Sachs account ending in xxx708-8; Rogers's Chase Bank checking account with account number ending in xxx1503; Rogers's Frost Bank checking account with account number ending in xxx9321; Roger's Chase Bank account with account number ending in xxx8315; Rogers' Robinhood account with account number ending in xxx9254; OMTC's Chase Bank account with account number ending in xxx1628; OMTC's Chase Bank account with account number ending in xxx3756; and any account held by either Defendant at Mandarin Capital LLC.

i)    attorneys' fees, costs, and expenses, including expert fees;

j)    prejudgment and post-judgment interest as provided by law; and

k)    all other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

33

Dated November 20, 2020.

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: */s/ Meghan Dawson McElvy*____
    Meghan Dawson McElvy
    State Bar No. 24065127
    meghan.mcelvy@bakerbotts.com
    Margaret L. Wittenmyer
    State Bar No. 24106593
    margaret.wittenmyer@bakerbotts.com
    One Shell Plaza
    910 Louisiana
    Houston, Texas 77002
    Telephone:  (713) 229-1234
    Facsimile:  (713) 229-1522

ATTORNEYS FOR PLAINTIFFS STEVEN WEBSTER,
AARON WEBSTER, AND DENNIS WOODS

34

CAUSE NO. DC-20-10214

| | | |
|---|---|---|
| Steven Webster, Aaron Webster, and Dennis Woods, | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| Dennis J. Rogers, II and OMTC, Inc., | § § § | |
| Defendants. | § | 191st JUDICIAL DISTRICT |

## <u>VERIFICATION OF DENNIS WOODS</u>

STATE OF TEXAS            §
                          §
COUNTY OF HARRIS          §

    1.    My name is Dennis Woods, my date of birth is August 29, 1975, and my address is 4123 Villanova Street, Houston, Texas 77005.  I am over the age of 21, of sound mind and fully competent to make this declaration.  I am an investor who invests in the energy sector, and I am a plaintiff in the above-captioned matter.

    2.    I have read the foregoing Second Amended Petition and Application to Expand Temporary Injunction.  The factual statements contained therein are within my personal knowledge and are true and correct.

    3.    I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on November 20, 2020.


RJ Wood RJEW,

_____
Dennis Woods

CAUSE NO. DC-20-10214

| | | |
|---|---|---|
| Steven Webster, Aaron Webster, and Dennis Woods, | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| Dennis J. Rogers, II and OMTC, Inc., | § § § | |
| Defendants. | § | 191st JUDICIAL DISTRICT |

## VERIFICATION OF STEVEN WEBSTER

STATE OF TEXAS          §
                                    §
COUNTY OF HARRIS    §

     1.    My name is Steven Webster, my date of birth is September 15, 1951, and my address is 1908 River Oaks Blvd, Houston, Texas 77019. I am over the age of 21, of sound mind and fully competent to make this declaration. I am an investor who invests in the energy sector, and I am a plaintiff in the above-captioned matter.

     2.    I have read the foregoing Second Amended Petition and Application to Expand Temporary Injunction. The factual statements contained therein are within my personal knowledge and are true and correct.

     3.    I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas on November 20, 2020.

_____
Steven Webster

1

# EXHIBIT K

**JPMorganChase** ◆

**National Subpoena Processing**
**Mail Code IN1-4054**
**7610 West Washington Street**
**Indianapolis, Indiana 46231**

10/16/2020

MEGHAN DAWSON MCELVY
BAKER BOTTS LLP
910 LOUISIANA ST
HOUSTON TX 77002

**Case Name:  Steven Webster, Aaron Webster, and Dennis Woods, V. Dennis J. Rogers, II and OMTC, Inc.,**
**Case No.:  DC-20-10214 , 22603.001**
**JPMorgan Chase File No.:  SB1162723-F3**

Dear Sir/Madam:

Here is the information that fulfills your request on the matter referenced above.

If you have questions, please call us at 1-844-751-7728.  We're here to help Monday through Friday from 8:30 a.m. to 7:00 p.m. Eastern Time.  Please know that we are only able to provide a status of this request.  We can't verbally disclose further information related to the records and/or information provided.

Please notify our office immediately of any email address changes to avoid electronic delivery delays for future productions.


Sincerely,


Leah Lucas
Operations Manager, VP
Chase Customer Service

JPMorgan Chase Bank, N.A. Member FDIC
SUBP17

Evelyn A Esqueda, certifies and declares as follows:

1. I am over the age of 18 years and not a party to this action.

2. My business address is 7610 West Washington Street, Indianapolis, Indiana 46231.

3. I am a  Transactions Specialist III  and Custodian of Records for JPMorgan Chase Bank, N.A. (hereinafter referred to as in the "Bank") in the National Subpoena Processing Department located in Indianapolis, Indiana.

4. Based on my knowledge of the Bank's business records practices and procedures, the enclosed records are a true and correct copy of the original documents kept by the Bank in the ordinary course of business.

5. Based on my knowledge of the Bank's business records practices and procedures, the records were made at or near the time of the occurrence of the matters set forth in the records by, or from information transmitted by, a person with knowledge of those matters.

6. It is the regular practice of the Bank to make such a record of transactions in the ordinary course of business.

7. Total page count is 54 .

I declare under penalty of perjury, under the laws of the State of Indiana, that the foregoing is true and correct.

Dated: October 16, 2020

By: *Evelyn A Esqueda*
    Evelyn A Esqueda
    Transactions Specialist III
    JPMORGAN CHASE BANK, N.A.

SB1162723-F3

Subp75a



**CHASE** ◻

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

June 16, 2020 through July 15, 2020

Account Number: ████████1503

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-888-262-4273 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| International Calls: | 1-713-262-1679 |

00031480 DRE 201 219 19620 NNNNNNNNNNN  1 000000000 11 0000
DENNIS J ROGERS
6520 DEL NORTE LN
DALLAS TX 75225-2619



---

### CHECKING SUMMARY    Chase Sapphire Checking

| | AMOUNT |
|---|---|
| Beginning Balance | $7,057.93 |
| Deposits and Additions | 11,191,289.00 |
| ATM & Debit Card Withdrawals | -4,600.00 |
| Electronic Withdrawals | -10,631,337.88 |
| Other Withdrawals | -560,000.00 |
| Ending Balance | $2,409.05 |
| | |
| Annual Percentage Yield Earned This Period | 0.01% |
| Interest Paid This Period | $1.00 |
| Interest Paid Year-to-Date | $1.44 |

Good news! Your Chase Sapphire Checking Monthly Service Fee was waived because you kept an average beginning day balance of $75,000 or more in qualifying linked deposits and investments during the statement period.

### TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | $7,057.93 |
| 06/19 | Online Transfer From Chk ...7879 Transaction#: 9805998254 | 4,400,000.00 | 4,407,057.93 |
| 06/19 | Online Transfer From Chk ...7879 Transaction#: 9806407976 | 2,150,000.00 | 6,557,057.93 |
| 06/19 | 06/19 Online Domestic Wire Transfer Via: Amegy Bank/████ A/C: Henneman Rau Llp Houston TX 77002 US Ref: Rogers Trust Account/Time/12:52 Imad: 0619B1Qgc05C006438 Trn: 5387820171Es | -60,000.00 | 6,497,057.93 |
| 06/19 | 06/19 Online Domestic Wire Transfer Via: ████ Houston TX US Ben: Mccathern Pllc Dallas TX 75219 US Imad: 0619B1Qgc05C006445 Trn: 5399020171Es | -35,000.00 | 6,462,057.93 |
| 06/19 | 06/19 Online Domestic Wire Transfer Via: Capital One NA/████ A/C: Shm Architects Dallas TX 75205 US Ref: Rogers Residence Imad: 0619B1Qgc01C006232 Trn: 5505820171Es | -50,000.00 | 6,412,057.93 |
| 06/19 | 06/19 Withdrawal | -560,000.00 | 5,852,057.93 |
| 06/19 | 06/19 Domestic Wire Transfer Via: Citibank Nyc/████ A/C: Goldman Sachs And CO LLC Ref: Further Credit To: Dennis Rogers Account Number: ████7088/Bnf/Further Credit To: Dennis Rogers Account N Umber: ████7088/Time/14:34 Imad: 0619B1Qgc01C010229 Trn: 5887120171Es | -4,000,000.00 | 1,852,057.93 |
| 06/19 | 06/19 Domestic Wire Transfer Via: Bbva USA/████ A/C: Chicago Title of Texas LLC Ref: Reference Gf #: ████/Bnf/Reference Gf #: ████ Imad: 0619B1Qgc01C010907 Trn: 5886320171Es | -1,679,750.33 | 172,307.60 |

Page 1 of 4

**CHASE** ⬥

June 16, 2020 through July 15, 2020
Account Number:  ████1503

## TRANSACTION DETAIL *(continued)*

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 06/19 | 06/19 Payment To Chase Card Ending IN 3121 | -4,142.42 | 168,165.18 |
| 06/19 | 06/19 Online Transfer 9808207387 To Personal Frost Account ####9321 Transaction #: 9808207387 | -20,000.00 | 148,165.18 |
| 06/19 | American Express ACH Pmt    M5890        Web ID: 2005032111 | -27,035.54 | 121,129.64 |
| 06/22 | 06/22 Online Transfer To Chk ...8315 Transaction#: 9818053357 | -59,000.00 | 62,129.64 |
| 06/22 | 06/22 Online Transfer 9820811741 To Personal Frost Account ####9321 Transaction #: 9820811741 | -5,000.00 | 57,129.64 |
| 06/22 | Robinhood    Funds        Web ID: | -25,000.00 | 32,129.64 |
| 06/24 | Fedwire Credit Via: Goldman Sachs Bank USA (Formerly Gov██████5079 B/O: Dennis Rogers 6520 Del Norte Lane Dallas TX 75225 Dallas TX Ref: Chase Nyc/Ctr/Bnf=Dennis J Rogers Dallas TX 75225-2619 Rfb=Gtos30Vebvtqy1E Obi=Per You R Request Bbi=/Acc/DDA/██████1503 De Nnis Rogers Imad: 0624Mmqimpu7002100 Tm: 2330909176Fl | 1,600,000.00 | 1,632,129.64 |
| 06/24 | Fedwire Credit Via: Citibank N.A.,██████ B/O: Dennis Rogers Dallas TX Ref: Chase Nyc/Ctr/Bnf=Dennis J Rogers Dallas TX 75225-2619 Rfb=O/B Citibank Nyc Obi=Per Yo Ur Request Bbi=/Acc/DDA/██████1503 D Ennis Rogers Imad: 0624B1Q8021C035947 Tm: 7193309176Fl | 250,000.00 | 1,882,129.64 |
| 06/24 | 06/24 Online Transfer To Chk ...8315 Transaction#: 9829528420 | -615,000.00 | 1,267,129.64 |
| 06/24 | 06/24 Online Transfer To Chk ...7879 Transaction#: 9829817132 | -1,016,000.00 | 251,129.64 |
| 06/24 | 06/24 Online Transfer To Chk ...8315 Transaction#: 9832205225 | -6,500.00 | 244,629.64 |
| 06/24 | 06/24 Online Transfer To Chk ...8315 Transaction#: 9832620720 | -61,000.00 | 183,629.64 |
| 06/25 | 06/25 Online Domestic Wire Transfer Via: Bold NA/██████ A/C: Padfield Stout Llp Trust Account Forth Worth TX 76102 US Ref: Omtc Ino Matters Imad: 0625B1Qyc04C008207 Tm: 4965620177Es | -100,000.00 | 83,629.64 |
| 06/29 | 06/28 Payment To Chase Card Ending IN 3121 | -1,792.42 | 81,837.22 |
| 06/29 | Discover      E-Payment  7832        Web ID: | -1,117.17 | 80,720.05 |
| 06/30 | ATM Check Deposit        06/30 8111 Preston Rd Dallas TX Card 5210 | 607.00 | 81,327.05 |
| 06/30 | 06/30 Online Transfer To Chk ...7879 Transaction#: 9862798185 | -2,000.00 | 79,327.05 |
| 06/30 | 06/30 Online Domestic Wire Transfer A/C: Mandarin Capital LLC Holladay UT 84124-2906 US Tm: 7113620182Es | -24,000.00 | 55,327.05 |
| 06/30 | ATM Withdrawal        06/30 8111 Preston Rd Dallas TX Card 5210 | -2,000.00 | 53,327.05 |
| 06/30 | Lincoln AFS    Fordcredit        Web ID: ██████ | -30,000.00 | 23,327.05 |
| 07/02 | Online Transfer From Chk ...8315 Transaction#: 9879984221 | 4,000.00 | 27,327.05 |
| 07/02 | 07/02 Online Domestic Wire Transfer A/C: Mandarin Capital LLC Holladay UT 84124-2906 US Tm: 7420120184Es | -24,000.00 | 3,327.05 |
| 07/06 | Fedwire Credit Via: Citibank N.A.,██████ B/O: Dennis Rogers Dallas TX Ref: Chase Nyc/Ctr/Bnf=Dennis J Rogers Dallas TX 75225-2619 Rfb=O/B Citibank Nyc Obi=Per Yo Ur Request Bbi=/Acc/DDA/██████1503 D Ennis Rogers Imad: 0706B1Q8021C036103 Tm: 7318709188Fl | 1,500,000.00 | 1,503,327.05 |
| 07/06 | Fedwire Credit Via: Citibank N.A./021000089 B/O: Dennis Rogers Dallas TX Ref: Chase Nyc/Ctr/Bnf=Dennis J Rogers Dallas TX 75225-2619 Rfb=O/B Citibank Nyc Obi=Per Yo Ur Request Bbi=/Acc/DDA/██████1503 D Ennis Rogers Imad: 0706B1Q8021C036115 Tm: 7320609188Fl | 1,000,000.00 | 2,503,327.05 |
| 07/06 | Online Transfer From Chk ...8315 Transaction#: 9902018138 | 50,000.00 | 2,553,327.05 |
| 07/07 | 07/07 Domestic Wire Transfer A/C: Mandarin Capital LLC Holladay UT 84124-2906 US Tm: 4503720189Es | -2,473,000.00 | 80,327.05 |
| 07/07 | 07/07 Online Transfer To Chk ...8315 Transaction#: 9905766957 | -62,000.00 | 18,327.05 |
| 07/08 | Fedwire Credit Via: Goldman Sachs Bank USA (Formerly Gov██████5079 B/O: Dennis Rogers Trade 6520 Del Norte Lane Dallas TX 75225 Dallas TX Ref: Chase Nyc/Ctr/Bnf=Dennis J Rogers Dallas TX 75225-2619 Rfb=Gtos484Eoewfnrr Obi=Per You R Request Bbi=/Acc/DDA/██████1503 De Nnis Rogers Imad: 0708Mmqimpu7004072 Tm: 5978609190Fl | 235,000.00 | 253,327.05 |

Page 2 of 4



**CHASE** ⬡

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

May 30, 2020 through June 30, 2020
Account Number: 7879

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00126749 DRE 201 219 18320 NNNNNNNNNNN  1 000000000 64 0000
OMTC, INC.
1920 MCKINNEY AVE FL 7
DALLAS TX 75201-2483



---

### CHECKING SUMMARY | Chase Performance Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| Beginning Balance | | $239.82 |
| Deposits and Additions | 5 | 7,817,680.00 |
| Electronic Withdrawals | 5 | -7,817,100.00 |
| Fees | 1 | -34.00 |
| Ending Balance | 11 | $785.82 |

### DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/10 | Chqs Credit Via: Bank of America, N.A./0959 B/O: 5 Oaks Commodities, Llp TX 77573 US Ref: Nbnf=Omtc, Inc. Dallas TX 75201-1702 US/ Org= TX 77573 US Ogb=Bank of America , N.A. New York NY US Bbf=/Chgs/USD 0,/Chgs/USD0,/Ocmt/USD247680,/Teleb En/Dennis Rogers /Rec/Uis D Gold Ssn: Trn: 675270016Fc | $247,680.00 |
| 06/19 | Fedwire Credit Via: Origin Bank/ B/O: Steven A Webster Houston TX 77002-5049 Ref: Chase Nyc/Ctr/Bnf=Omtc, Inc. Dallas TX 75201-1702 US/ R Fb=O/B Origin Bank Imad: 0619Mmqfmpq4000347 Tm: 3593309171Fi | 4,410,000.00 |
| 06/19 | Fedwire Credit Via: Cadence Bank, NA/ B/O: Dennis J Woods Houston TX Ref: Chase Nyc/Ctr/Bnf=Omtc, Inc. Dallas TX 75201-1702 US/ R Fb=O/B Cadence Bank Imad: 0619Mmqfmpay000307 Trn: 4371509171Fi | 2,142,000.00 |
| 06/24 | Online Transfer From Chk ...1503 Transaction#: 9829617132 | 1,016,000.00 |
| 06/30 | Online Transfer From Chk ...1503 Transaction#: 9862796185 | 2,000.00 |
| **Total Deposits and Additions** | | **$7,817,680.00** |

### ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/10 | 06/10 Online Transfer To Chk ...1503 Transaction#: 9756145672 | $240,000.00 |
| 06/19 | 06/19 Online Transfer To Chk ...1503 Transaction#: 9805998254 | 4,400,000.00 |
| 06/19 | 06/19 Online Transfer To Chk   1503 Transaction#: 9806407976 | 2,150,000.00 |
| 06/24 | 06/24 Domestic Wire Transfer Via: Bk Amer Nyc/ A/C: 5 Oaks Commodities, Llp Ref: Main Account C/O Partners Imad: 0624B1Qgc02C006930 Trn: 5039120176Es | 1,025,100.00 |
| 06/30 | 06/30 Online Transfer To Chk ...1628 Transaction#: 9862807716 | 2,000.00 |
| **Total Electronic Withdrawals** | | **$7,817,100.00** |

Page 1 of 4

**CHASE ◻**

May 30, 2020 through June 30, 2020
Account Number: ████████7879

## FEES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 06/01 | Service Charges For The Month of May | $34.00 |
| **Total Fees** | | **$34.00** |

You were charged a monthly service fee of $30.00 this period. You can avoid this fee in the future by maintaining a relationship balance (combined business deposits) of $35,000.00. Your relationship balance was $4,541.00.

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|------|--------|
| 06/01 | $205.82 |
| 06/10 | 7,885.82 |
| 06/19 | 9,885.82 |
| 06/24 | 785.82 |
| 06/30 | 785.82 |

## SERVICE CHARGE SUMMARY

Chase Performance Business Checking Accounts Included: ████████1628

| | |
|--|--|
| Maintenance Fee | $30.00 |
| Excess Product Fees | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$30.00** Will be assessed on 7/1/20 |

| TRANSACTIONS FOR SERVICE FEE CALCULATION | NUMBER OF TRANSACTIONS |
|--|--|
| Checks Paid / Debits | 2 |
| Deposits / Credits | 3 |
| Deposited Items | 0 |
| **Total Transactions** | **5** |

## SERVICE CHARGE DETAIL

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/UNIT | TOTAL |
|-------------|--------|---------|---------|------------|-------|
| Your Product Includes: | | | | | |
| **ACCOUNT** ████7879 | | | | | |
| Monthly Service Fee | 1 | | | $30.00 | $30.00 |
| Transactions | 5 | 0 | 5 | $0.00 | $0.00 |
| **Subtotal** | | | | | **$30.00** |
| **Other Fees** | | | | | |
| Electronic Credits | 3 | 999,999,999 | 0 | $0.40 | $0.00 |
| Non-Electronic Transactions | 2 | 250 | 0 | $0.40 | $0.00 |
| Domestic Wire Fee | 1 | 1 | 0 | $35.00 | $0.00 |
| Domestic Incoming Wire Fee | 3 | 1 | 2 | $0.00 | $0.00 |
| **Total Service Charge (Will be assessed on 7/1/20)** | | | | | **$30.00** |
| **ACCOUNT** ████7879 | | | | | |
| Monthly Service Fee | 1 | | | | |
| Electronic Credits | 3 | | | | |
| Non-Electronic Transactions | 1 | | | | |
| Domestic Wire Fee | 1 | | | | |
| Domestic Incoming Wire Fee | 3 | | | | |
| **ACCOUNT** ████1628 | | | | | |
| Non-Electronic Transactions | 1 | | | | |

Page 2 of 4



May 30, 2020 through June 30, 2020
Account Number: ████████7879



**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 **JPMorgan Chase Bank, N.A. Member FDIC**

Page 3 of 4

**CHASE ○**

May 30, 2020 through June 30, 2020
Account Number:                7879

This Page Intentionally Left Blank

Page 4 of 4

# EXHIBIT L

## MANDARIN CAPITAL LLC

Update this Business

**Entity Number:** 8943441-0160
**Company Type:** LLC - Domestic
**Address:** 5314 N River Run Dr Ste 350 Provo, UT 84604
**State of Origin:**
**Registered Agent:** MCCULLOUGH SPARKS
**Registered Agent Address:**
5314 N RIVER RUN DR STE 350
PROVO, UT 84604

View Management Team

Status: Active

Purchase Certificate of Existence

**Status:** Active 🟢 *as of 06/21/2017*
**Renew By:** 02/28/2021
**Status Description:** Current
The "Current" status represents that a renewal has been filed, within the most recent
renewal period, with the Division of Corporations and Commercial Code.
**Employment Verification:** <u>Not</u> Registered with Verify Utah

History

View Filed Documents

**Registration Date:** 02/20/2014
**Last Renewed:** 02/12/2020

Additional Information

**NAICS Code:** 5511 **NAICS Title:** 5511-Management of Companies and Enterpr

<< Back to Search Results

Business Name:

Privacy · Terms

# EXHIBIT M

   

# Our Services

Our mission is to ensure that your legacy is secured through proper estate planning. Every service we provide uses expert solutions, tailored to your specific needs and wishes. Our highly trained team is dedicated to providing you with an elevated experience every step of the way.



 

## McCULLOUGH LAW



# Essential Estate Planning

Essential estate planning safeguards your estate from probate after you pass away, saving significant time, money, and stress for the loved ones you leave behind. The essential components of estate planning include Wills, ...read more






## MCCULLOUGH LAW



# Asset Protection

We believe in using asset protection trusts and strategies with legal precedent to back them. We offer a variety of asset protection trusts and we personalize them according to your needs. Each type of trust is designed to accomplish your specific goals, allowing hard-earned assets to be distributed according to your wishes. These trusts are designed to assist you in tax planning, as well as protect your home, savings, and businesses from future legal action against you and your heirs. read less





## MCCULLOUGH LAW



# Business Planning

When creating a well-structured estate plan, the formation or update of business entities is often required. This can include corporations, limited liability companies or charitable foundations. To ensure that you have the ...read more



 

# McCULLOUGH LAW



## Tax Planning

With careful planning and specialized techniques, we offer tried-and-true strategies to minimize or eliminate estate taxes.





 

# Trust Administration

Trust and estate administration often requires legal counsel and assistance. We provide this help to ensure that the administration process is low-stress, confidential and cost-effective. This process can ...read more



# Informal Probate

Probate is the court-supervised process through which the deceased's estate is administered and distributed. Probate is required if the deceased owned assets totaling more than $100,000, and did not have a trust, ...read more



 

## Contact Us

First Name

Last Name

Email

Phone

Message

SUBMIT

The contents of this website is for general, informational purposes only. This information does not constitute as legal advice and should not be treated as such. No action should be taken based off of any information on this website. An attorney should be contacted for legal advice.

© 2022 McCullough Law
Privacy Policy

 



# EXHIBIT N



**801 765-0279**   CONTACT US TODAY!
McCULLOUGH | SPARKS

CALL US NOW FOR A
# FREE CONSULTATION

# 801 765-0279

### 541TRUST™ - SUPERIOR ASSET PROTECTION

The 541Trust™ is an asset protection trust developed by the law firm McCullough Sparks. The 541Trust™ is an irrevocable trust carefully designed to provide the best asset protection while affording enormous flexibility. The 541Trust™ protects assets from a person's potential future liabilities by removing the assets from the person's legal ownership. The 541Trust™ has been successfully tested in lawsuits, bankruptcy, an IRS audits. The 541 Trust™ has been proven to work better than offshore trusts and other asset protection strategies. **CALL NOW for a diagram and explanation of the 541 Trust™.**

## The 541Trust™ is the best asset protection strategy

• The first rule of asset protection is, "If you don't own it, it can't be taken away from you." The 541 Trust™ removes assets from your personal ownership so they cannot be taken from you due to a lawsuit, bankruptcy, government action, or other liability.

• The 541 Trust™ cannot be discovered through a disclosure of your assets or a search of public records under your name.

• The 541 Trust™ is upheld by the laws of all 50 states and the federal bankruptcy code. It can protect assets of any kind and in any location.

• The 541 Trust™ is trusted by distinguished law firms throughout the country because it relies on fundamental legal principles which have not changed for hundreds of years. There are many statutes and court cases supporting the 541Trust™ and McCullough Sparks has extensive experience defending it. Unlike the competition, McCullough Sparks can actually send you court cases showing that these trusts hold up in court.

• The 541 Trust™ is extremely flexible because the trustees, beneficiaries, and the terms of the trust can be changed at any time.

• The 541 Trust™ is easy to set-up, maintain, or terminate. You can add or remove assets at any time without tax consequences.

### The 541Trust™ Success Story

Recently one of the 541Trusts™ prepared by McCullough Sparks was sued in California and the court threw out the case. This, among many other examples, further proves the superior asset protection provided by the 541Trust™.

10 Reasons the 541 Trust™ is the Best Asset Protection

Better Than an Offshore Trust

Better Than a Limited Partnership

Law Supporting the 541 Trust™

## WHAT YOU CAN EXPECT FROM US

• We will give you a free initial consultation with complete confidentiality.

• We will give you the latest, most innovative and effective strategies.

• We will quote you a comprehensive fixed fee - with no surprises.

• We will provide legal services that are honest, ethical and reliable.

• We will implement your strategy in days, not months.

• We will provide ongoing support for every plan that we implement.

CALL US NOW FOR A FREE CONSULTATION

### CONTACT US

#### McCULLOUGH | SPARKS

5314 N River Run Dr., Suite 350
Provo, UT 84604

Phone: 801-765-0279
Fax: 801-765-0320

EMAIL US TODAY!

**Ex. Pg. 215**

# 801 765-0279

Copyright 2013 McCullough Sparks All Rights Reserved

Disclaimer: This web site is designed for general information only. The information presented at this site should not be construed to be formal legal advice nor the formation of a lawyer/client relationship.

# EXHIBIT O

COPY

# MONTAÑA AMOROSA REVOCABLE TRUST

THIS TRUST AGREEMENT is entered into on the 20th day of August, 2019, between DENNIS JAMES ROGERS II (also known as Denny Rogers) (the "Husband") and ALLISON MERYL ROGERS (also known as Allie Rogers) (the "Wife"), of Dallas County, Texas, as grantors (the "Grantors"), and DENNIS JAMES ROGERS II, of Dallas County, Texas, as initial trustee (the "Trustee").

## WITNESSETH:

The Grantors desire to create a trust to be held, administered and distributed in accordance with the provisions of this Trust Agreement. Accordingly, the Grantors have transferred to the Trustee, and the Trustee acknowledges receipt from the Grantors of the sum of ten dollars ($10.00) in cash. This property, together with any other property which may hereafter be conveyed to the Trustee subject to the trust hereby created, shall be held, administered and distributed by the Trustee, upon the trust and for the purposes and uses herein set forth. The trust initially created by this Trust Agreement shall be known as the "MONTAÑA AMOROSA REVOCABLE TRUST."

## Article I.
### Identification

The Grantors have one daughter, Evelyn Harper Rogers. All references in this Trust Agreement to the "Grantors' children" are to her and to all children hereafter born to or adopted by the Grantors.

## Article II.
### Revocable Trust

**A.    Distributions.** The Trustee shall hold, manage, sell, exchange, invest and reinvest the trust property, collect all income and, after deducting such expenses as are properly payable, shall accumulate and distribute the income and principal as herein provided. The Trustee shall distribute the income and principal of the trust to the Grantors in such amounts as the Grantors may direct. All undistributed trust income shall be accumulated and invested. Following the

DJR

AMR

1

COPY

death of the first Grantor to die (the "deceased Grantor"), all of the income of this trust shall be distributed to the other Grantor (the "surviving Grantor") at least annually, and the principal of the trust shall be distributed to the surviving Grantor in such amounts as the surviving Grantor may direct. Prior to the death of the deceased Grantor, if either Grantor becomes incapacitated, the Trustee shall distribute such amounts of the income and principal of the trust for the comfort, health, support, maintenance or other needs of the Grantors as the Trustee shall determine, in the Trustee's discretion, to be necessary or appropriate to maintain the Grantors in accordance with the Grantors' accustomed standard of living at the time of the execution of this Trust Agreement. After the death of the deceased Grantor, if the surviving Grantor becomes incapacitated, the Trustee shall distribute such amounts of the principal of the trust for the comfort, health, support, maintenance or other needs of the surviving Grantor as the Trustee shall determine, in the Trustee's discretion, to be necessary or appropriate to maintain the surviving Grantor in accordance with the surviving Grantor's accustomed standard of living at the time of the execution of this Trust Agreement.

B.    **Character of Property.** Property transferred to this trust which consists of a Grantor's separate property shall retain its character as separate property and shall be accounted for separately by the Trustee so that it can be returned to such Grantor as such Grantor's separate property if this instrument is completely or partially revoked. Property transferred to this trust which consists of the Grantors' community property shall retain its character as community property and shall be accounted for separately by the Trustee so that it can be returned to the Grantors as their community property if this instrument is completely or partially revoked. The powers of the Trustee over the Grantors' community property shall be no more extensive than those possessed from time to time by either Grantor over such property.

C.    **Additions Following Death of Each Grantor.** Following the death of each Grantor, the Trustee shall add to this trust all property which was owned by such Grantor and which is received by the Trustee under such Grantor's Will and all non-probate assets (which shall include, but not be limited to, any payments from an employee or self-employed benefit plan, individual retirement account or annuity or any proceeds of any insurance policy on the life of such Grantor) which are payable to the Trustee hereunder.

D.    **Payment of Taxes.** Following the death of either Grantor, the Trustee shall pay from the property of this trust the difference between all taxes which must be paid by reason of such Grantor's death and those taxes which would be payable by reason of such Grantor's death had all or part of the property of this trust not been includable in the gross estate of such Grantor for the purpose of calculating such taxes. Except as otherwise specifically provided herein, any taxes caused by the inclusion in either Grantor's estate of property not passing under this Trust

DJR

AMR

2

MONTAÑA AMOROSA REVOCABLE TRUST

**COPY**

Agreement or under such Grantor's Will shall be apportioned and paid in accordance with Sections 124.001 through 124.018 of the Texas Estates Code (or any successor statute), and in such case, Federal law shall control if Texas law and Federal laws conflict or if Texas law fails to address an apportionment or tax payment issue. This Section shall not apply to any generation skipping transfer taxes imposed by Section 2601 of the Code, which taxes shall instead be payable in accordance with the provisions of Section 2603 of the Code.

E.     **Payment of Expenses.** The Trustee, in the Trustee's discretion, may pay from the trust property all or any part of either Grantor's funeral expenses, claims which are legally enforceable against the Grantors' estates and reasonable expenses of administration of the Grantors' estates, but the Trustee shall not make any such payments that are not in the best interests of any person having a beneficial interest in the remaining property of this trust upon termination. The payments made pursuant to this Section shall be made prior to the distributions provided for in Article II, Section F. The Trustee may make such payments directly or may pay over the amounts thereof to the duly qualified executor, personal representative, or administrator of such Grantor's estate. Written statements by the executor, personal representative, or administrator of such Grantor's estate of the sums that may be paid under this Section shall be sufficient evidence of their amounts, and the Trustee shall be under no duty to confirm that such payments were applied properly.

F.     **Termination.** The trust created by this Article shall terminate upon the death of the surviving Grantor. The surviving Grantor shall have the general power to appoint all or part of this trust to the surviving Grantor's estate. To the extent the surviving Grantor does not exercise such general power of appointment, the remaining income and principal of the trust created by this Article upon termination shall be distributed to the Grantors' descendants who survive the Grantors per stirpes. If none of the Grantors' descendants survives the Grantors, one-half of the remaining trust property shall be distributed to the Husband's heirs, and the other half of the remaining trust property shall be distributed to the Wife's heirs.

### Article III.
### Contingent Trusts

A.     **Applicability.** With regard to any property which will pass outright to a beneficiary upon the death of either Grantor or upon the termination of a trust created hereunder, if such property is to be distributed to an individual who is under age 25 or who is incapacitated (such person is referred to as the "Ward"), such property shall be held by the Trustee as a separate trust for the benefit of such Ward; provided, however, the provisions of this Article shall

DJR

AMR

3

*Ex. Pg. 220*

COPY

MONTAÑA AMOROSA REVOCABLE TRUST

not apply to property distributed to the surviving Grantor. Alternatively, the Trustee, in the Trustee's discretion, may hold such property as custodian under the uniform transfers to minors act of any state, as it is the Grantors' intention to ensure maximum flexibility in the administration of such property.

**B.** **Distributions.** The Trustee shall utilize such amounts of the income and principal of the Ward's trust as the Trustee, in the Trustee's discretion, deems desirable from time to time to provide for the Ward's health, support, maintenance or education, directly and without the interposition of any guardian or conservator.

**C.** **Termination.** Each trust created by this Article for a Ward who is under age 25 shall terminate when such Ward attains that age. Each trust created by this Article for a person who is incapacitated shall terminate when the Ward of such trust, in the discretion of the Trustee, is no longer incapacitated. Upon the termination of a trust created by this Article, the remaining property of such trust shall be distributed to the Ward of such trust, but if a Ward dies before the termination of such Ward's trust, then upon such Ward's death the remaining property of such trust shall be distributed to such Ward's estate.

## Article IV.
## Trustee Appointments

**A.** **Successor Trustee.** If DENNIS JAMES ROGERS II dies, resigns, becomes incapacitated, or otherwise ceases to serve as Trustee of a trust created under this Trust Agreement, then ALLISON MERYL ROGERS shall become Trustee of such trust. If ALLISON MERYL ROGERS fails to qualify, dies, resigns, becomes incapacitated, or otherwise ceases to serve as Trustee of a trust created under this Trust Agreement, then the Husband's father, DENNIS ROGERS SR., shall become Trustee of such trust.

**B.** **Powers Over Trusteeship by Grantors.** While both Grantors are living, the Grantors (acting jointly) may at any time or from time to time remove the Trustee of the trust created under Article II, with or without cause, and shall contemporaneously appoint a replacement Trustee or Co-Trustees if no Trustee is serving following such removal. Furthermore, while both Grantors are living, the Grantors (acting jointly) may prospectively designate a successor individual or corporate Trustee, or a series of successor individual or corporate Trustees or Co-Trustees, to serve in the event the then-serving Trustee of the trust created under Article II dies, resigns, becomes incapacitated, or otherwise ceases to serve, and such designation shall take precedence over any successor Trustees named by the Grantors in this Trust Agreement.

DJR

AMR

4

MONTAÑA AMOROSA REVOCABLE TRUST

COPY

   C.    <u>Powers Over Trusteeship by Surviving Grantor.</u> After the death of one of the Grantors, the surviving Grantor may at any time or from time to time remove the Trustee of the trust created under Article II, with or without cause, and shall contemporaneously appoint a replacement Trustee or Co-Trustees if no Trustee is serving following such removal. Furthermore, after the death of one of the Grantors, the surviving Grantor may prospectively designate a successor individual or corporate Trustee, or a series of successor individual or corporate Trustees or Co-Trustees, to serve in the event the then-serving Trustee of the trust created under Article II dies, resigns, becomes incapacitated, or otherwise ceases to serve, and such designation shall take precedence over any successor Trustees named by the Grantors in this Trust Agreement or designated prospectively by the Grantors.

   D.    <u>Appointment of Successor Trustee.</u> After the surviving Grantor's death, any then-serving Trustee of a trust created hereunder may appoint a successor individual or corporate Trustee, or a series of successor individual or corporate Trustees, to serve if such Trustee dies, resigns, becomes incapacitated, or otherwise ceases to serve as Trustee of such trust. Such appointment shall be made by an acknowledged instrument, a copy of which shall be delivered to the primary beneficiary of such trust. Notwithstanding the foregoing provisions of this Section, the right or power of a beneficiary of a trust created hereunder to remove and replace Trustees, to elect to serve as Trustee or as Co-Trustee, and to designate successor Trustees shall supersede the power granted to the Trustee granted by this Section. If more than one Trustee is serving at such time, then all such Trustees must make the appointment unanimously. If a Trustee appoints one or more successor Trustees, then such appointment shall replace the successor Trustees, if any, who are named herein, except that if the successors named in such written instrument all fail to qualify, die, resign, become incapacitated, or otherwise cease to serve, the successor Trustee provisions contained herein shall apply. Notwithstanding the foregoing provisions of this Section, the power to appoint one or more successor Trustees shall not be exercisable if a corporate Trustee is serving as the sole Trustee or as a Co-Trustee of such trust.

   E.    <u>Trustee Resignation or Vacancy.</u> Any Trustee may resign by giving notice to the Grantors while either Grantor is living, and thereafter to the beneficiary of such trust. While both of the Grantors are living, if the trusteeship of the trust created by Article II should become vacant for any reason, the power to appoint a successor shall be exercisable by the Grantors (acting jointly) for a period of 60 days; provided, however, if both Grantors fail to appoint a successor within such 60 day period, and if no successor Trustee has been appointed pursuant to the terms of any other Section of this Article, the power to appoint a successor shall be exercisable by the Grantors' children (acting by majority, or by the survivor acting alone) for an additional 30 days. After the death of a Grantor, if the trusteeship of any trust should become

DJR

5

AMR

COPY

MONTAÑA AMOROSA REVOCABLE TRUST

vacant for any reason, the power to appoint a successor shall be exercisable by the surviving Grantor for a period of 60 days; provided, however, if the surviving Grantor fails to appoint a successor within such 60 day period, and if no successor Trustee has been appointed pursuant to the terms of any other Section of this Article, the power to appoint a successor shall be exercisable by the Grantors' children (acting by majority, or by the survivor acting alone) for an additional 30 days. After the surviving Grantor's death, if the trusteeship of any trust should become vacant for any reason, the power to appoint a successor shall be exercisable by the Grantors' children (acting by majority, or by the survivor acting alone) for 90 days. If no successor Trustee has been appointed within 90 days of such vacancy or such notice of resignation, then a successor Trustee shall be appointed by a court of competent jurisdiction.

F.      **Expenses and Compensation.** Every Trustee shall be reimbursed for the reasonable costs and expenses incurred in connection with such Trustee's duties. Every Trustee, except one of the Grantors, shall be entitled to fair and reasonable compensation for services rendered by such Trustee in an amount not exceeding the customary and prevailing charges for services of a similar character at the time and place such services are performed.

G.      **Waiver of Bond; Ancillary Trustees.** No Trustee acting hereunder shall be required to give bond or other security in any jurisdiction. If any trust created by this Trust Agreement contains property located in another state or a foreign jurisdiction, and the Trustee cannot or chooses not to serve under the laws thereof, the power to appoint an ancillary Trustee for such property (as well as any successor ancillary Trustee) shall be exercisable by the Grantors acting jointly, or the surviving Grantor acting alone, or by the Trustee if the Grantors are both not living or are both not competent to act. An ancillary Trustee appointed pursuant to this Section may be an individual or corporate Trustee.

H.      **"Trustee" Defined.** Unless another meaning is clearly indicated or required by context or circumstances, the term "Trustee" shall mean and include the initial Trustee and any successor Trustee or Co-Trustees. Except as otherwise specifically provided in this Trust Agreement, if Co-Trustees are designated to serve hereunder or if Co-Trustees are already serving, and one such Co-Trustee declines to serve, fails to qualify, dies, resigns, becomes incapacitated, or otherwise ceases to serve for any reason, then the remaining Trustee or Co-Trustees, as the case may be, shall serve or continue to serve in such capacity.

I.      **Actions by Co-Trustees.** In all matters relating to each trust created under this Trust Agreement, when the Grantors are serving as Co-Trustees (and no other Co-Trustee is serving), each such Co-Trustee shall have the authority to act alone and independently of the other Co-Trustee then serving, without the necessity of consultation with or approval of the other Co-Trustee. In all matters relating to each trust created under this Trust Agreement, when a

DJR

AMR

6

MONTAÑA AMOROSA REVOCABLE TRUST

COPY

person other than one of the Grantors is serving as a Co-Trustee, the decision of a majority of the Trustees then serving shall control. Any writing signed by a person with the authority to act alone and independently, or by the persons whose decision shall control, shall be valid and effective for all purposes as if signed by both all such Trustees.

**J.     "Corporate Trustee" Defined.** The term "corporate Trustee" shall mean a bank having trust powers or a trust company either of which must have (alone or when combined with its parent organization and affiliate) assets beneficially owned by others under its management with a value in excess of $100,000,000 (U.S.), and such term shall also mean the successor (by merger, consolidation, change of name or any other form of reorganization, or if such corporate Trustee ever transfers all of its existing business of serving as a fiduciary to any other bank or trust company or corporation) bank or trust company to any such corporate Trustee named herein or serving hereunder. If a bank or trust company is specifically named herein or was a corporate Trustee (as defined above) when it accepted its fiduciary position hereunder, it shall not cease to be considered a corporate Trustee because its assets under management presently are or later decline below the amount stated above. In any instance where a corporate Trustee is required to be appointed as a successor Trustee or Co-Trustee in connection with the removal of any Trustee or Co-Trustee, the instrument of removal shall contain the acceptance of the corporate Trustee so appointed evidenced on it. If a corporate Trustee is serving as a Co-Trustee, it shall have exclusive custody of the properties, books and records of the trust as to which it is serving, but shall make such properties, books and records available for inspection and copying by every other Trustee of such trust.

## Article V.
## Revocability

While both of the Grantors are living, the Grantors acting jointly may by acknowledged instrument alter, amend, modify, revoke or terminate this instrument on thirty days' notice to the Trustee (unless waived). No gift is intended by either spouse in executing this instrument. All property transferred to the trust initially created by this Trust Agreement shall at all times (while held in trust or upon distribution from the trust or upon revocation of this instrument) retain its character as community property or separate property under the marital property laws of Texas; provided that the Trustee may presume that all property added to the trust initially created by this Trust Agreement by a Grantor while both Grantors are alive is community property unless stipulated to the contrary in the instrument by which such transfer is made. Upon the death of the first Grantor to die, the surviving Grantor may by acknowledged instrument thereafter alter,


DJR

ÐMrL
AMR

7

COPY

amend, modify, revoke or terminate this instrument on thirty days' notice to the Trustee (unless waived). Notwithstanding any of the provisions in this instrument to the contrary, prior to the death of either Grantor, each Grantor shall have the power at any time to withdraw all or any part of such Grantor's separate property which is held in trust hereunder upon thirty days' notice to the other Grantor and the Trustee (unless waived), and no distribution of any separate property of a Grantor shall be made without the consent of such Grantor. Upon the death of the surviving Grantor, the trusts created under this Trust Agreement shall become irrevocable.

## Article VI.
### Trustee Provisions

A.    **Powers.** The Trustee shall have all of the powers and authorities conferred upon trustees by statute or common law in any jurisdiction in which the Trustee may act, including all powers and authorities conferred by the Texas Trust Code and by any future amendments thereto, except for any instance in which such powers and authorities may conflict with the express provisions of this Trust Agreement, in which case the express provisions of this Trust Agreement shall control. In addition to such powers, the Trustee is specifically authorized:

(1)    To retain, in the discretion of the Trustee, any property transferred to the Trustee by the Grantors or any other person, including securities of any corporate Trustee, without regard to the duty to diversify investments under the laws governing any trust created hereunder and without liability for any depreciation or loss occasioned by such retention;

(2)    To exchange, sell or lease (including leases for terms exceeding the duration of the trusts created by this Trust Agreement) for cash, property or credit, or to partition, from time to time, publicly or privately, at such prices, on such terms, times and conditions and by instruments of such character and with such covenants as the Trustee may deem proper, all or any part of the assets of the trusts, specifically including the power to sell and convey real property and the power to execute deeds with regard to any such sale or conveyance, and no vendee or lessee of the Trustee shall be required to look to the application made by the Trustee of any funds paid to the Trustee;

(3)    To borrow money from any source (including any Trustee) and to mortgage, pledge or in any other manner encumber all or any part of the assets of the trusts as may be advisable in the judgment of the Trustee for the advantageous administration of the trusts;

DJR

AMR

8

COPY

(4)    To invest and reinvest the property of the trusts in any kind of property whatsoever, real or personal (including oil, gas and other mineral leases, royalties, overriding royalties and other interests), whether or not productive of income and without regard to the proportion that such property or property of a similar character held may bear to the entire trust estate; provided, however, the Grantors may direct the Trustee as to the investments to be made by the Trustee, and the Trustee shall not be liable to any person for any losses resulting from following the written direction of the Grantors in investing the trust assets;

(5)    To employ attorneys, accountants, investment managers, specialists and such other agents as the Trustee shall deem necessary or desirable; to have the authority to appoint an investment manager or managers to manage all or any part of the assets of the trusts, and to delegate to said manager investment discretion, and such appointment shall include the power to acquire and dispose of such assets; and to charge the compensation of such attorneys, accountants, investment advisors, investment managers, specialists and other agents and any other expenses against such trusts;

(6)    To register and carry any securities or other property in the name of the Trustee or in the name of the nominee of any corporate Trustee (or to hold any such property unregistered) without increasing or decreasing the fiduciary liability of the Trustee; to exercise any option, right or privilege to purchase or to convert bonds, notes, stocks (including shares or fractional shares of stock of any corporate Trustee), securities or other property, and to borrow money for the purpose of exercising any such option, right or privilege; to vote any stock which may be held in the trusts; and if two or more Trustees are serving hereunder and no such Trustee is a corporate Trustee, to open any type of account in such a manner that all activities associated with such account may be handled by one of the Co-Trustees acting alone;

(7)    To enter into any transaction on behalf of the trusts (including loans to beneficiaries for adequate security and adequate interest) despite the fact that another party to any such transaction may be (i) a trust of which any Trustee under this Trust Agreement is also a trustee; (ii) an estate of which any Trustee under this Trust Agreement is also an executor, personal representative, or administrator; (iii) a business or trust controlled by any Trustee under this Trust Agreement or of which any such Trustee, or any director, officer or employee of any such corporate Trustee, is also a director, officer or employee; or (iv) the Grantors, any other beneficiary or any Trustee under this Trust Agreement acting individually;

(8)    To make, in the Trustee's discretion, any distribution required or permitted to be made to any beneficiary under this Trust Agreement, in any of the following ways when such beneficiary is a minor or is incapacitated: (i) to such

DJR

AMR

9

COPY

beneficiary directly; (ii) to the guardian or conservator of such beneficiary's person or estate; (iii) by applying the required or permitted distribution for the benefit of such beneficiary; (iv) to a person or financial institution serving as custodian for such beneficiary under a uniform transfers to minors act of any state; (v) by reimbursing or advancing funds to the person who is actually taking care of such beneficiary (even though such person is not the legal guardian or conservator) for expenditures made or to be made by such person for the benefit of such beneficiary; and (vi) by managing such distribution as a separate fund on the beneficiary's behalf, subject to the beneficiary's continuing right to withdraw the distribution; and the written receipts of the persons receiving such distributions shall be full and complete acquittances to the Trustee;

(9)    To access, establish, control, use, cancel, deactivate, or delete either Grantor's Digital Accounts and Digital Assets, and to access, control, use, deactivate, or dispose of either Grantor's Digital Devices. "Digital Accounts" are electronic systems for creating, generating, sending, sharing, communicating, receiving, storing, displaying, or processing information which provides access to a Digital Asset which is stored on any type of Digital Device, regardless of the ownership of the Digital Device upon which the Digital Asset is stored. "Digital Assets" mean data, files, text messages, emails, documents, audio, video, images, sounds, social media content, social networking content, apps, codes, health care records, health insurance records, credit card points, travel-related miles and points, computer source codes, computer programs, software, software licenses, databases, or the like, including access credential such as usernames, passwords and answers to secret questions, which are created, generated, sent, communicated, shared, received, or stored by electronic means on a Digital Device. "Digital Devices" are electronic devices that can create, generate, send, share, communicate, receive, store, display, or process information;

(10)    To invest the assets of the trusts in any life insurance policy or policies (including term insurance) on the life of the Grantors, or on the life of any person or persons in whom the Grantors have an insurable interest;

(11)    To store personal property given to a person who is a minor or who is incapacitated for later distribution to such person, or to sell such property and add the proceeds of sale to a trust of which such person is a beneficiary;

(12)    To make divisions, partitions, or distributions in money or in kind, or partly in each, whenever required or permitted to divide, partition, or distribute all or any part of the trusts; and, in making any such divisions, partitions, or distributions, the judgment of the Trustee in the selection and valuation of the assets to be so divided, partitioned, or distributed shall be binding and conclusive, and the Trustee shall not be liable for any differing tax consequences to the beneficiaries hereunder; and, further, the Trustee shall be authorized to make

DJR

AMR

10

COPY

distributions in divided or undivided interests and on a pro rata or non-pro rata basis (including but not limited to non-pro rata distributions of community property) and to adjust distributions for resulting differences in valuation;

(13)    To release, in the discretion of the Trustee, any fiduciary power at any time, in whole or in part, temporarily or permanently, whenever the Trustee may deem it advisable, by an instrument in writing executed and acknowledged by the Trustee;

(14)    To invest and reinvest all or part of the assets of the trusts in any common trust fund of any corporate Trustee;

(15)    To open and maintain margin accounts or similar accounts with brokerage firms, banks or others for purposes of investing the properties of each trust; to conduct, maintain and operate these accounts, directly or through designation of another as agent, for purchase, sale and exchange of stocks, bonds, commodities, options (including puts and calls, both covered and uncovered), and other securities; and in connection therewith, to borrow money, obtain guarantees and engage in all other activities necessary or incidental to conducting, maintaining and operating such accounts;

(16)    To continue any business (whether a proprietorship, corporation, partnership, limited partnership or other business entity) which may be transferred to the trusts for such time as the Trustee may deem it to be in the best interest of the trusts; to employ in the conduct of any such business such capital out of the trusts as the Trustee may deem proper; to borrow money for use in any such business alone or with other persons financially interested in such business, and to secure such loan or loans by a mortgage, pledge or any other manner of encumbrance of, not only the interest of such trusts in such business, but also such portion of such trust outside of such business as the Trustee may deem proper; to organize or acquire, either alone or jointly with others, corporations, partnerships, limited partnerships, limited liability companies or other business entities; and generally to exercise with respect to the continuance, management, sale or liquidation of any business which may be transferred to the trust estate, or of any new business or business interest, all the powers which may be necessary for its successful operation;

(17)    To execute lease, pooling or unitization agreements (including agreements of such nature extending beyond the terms of the trust) with respect to any mineral or royalty interest held or acquired by the trusts; to drill or contract for the drilling of wells for oil, gas or other minerals; to make dry hole or bottom hole contributions; to enter into any operating agreements with reference to any mineral leases or properties held or acquired by the trusts; and generally, with reference to oil, gas and other mineral properties and operations, to enter into such

DJR

AMR

11

COPY

agreements and to do all such other things (whether or not presently recognized as common or proper practice by those engaged in the business of prospecting for, developing, producing, processing, transporting or marketing oil, gas or other minerals) as the Trustee may deem to be advantageous;

(18)    To transfer such sums of the property of a Grantor to an individual serving as agent or attorney-in-fact under a valid power of attorney signed by such Grantor (or to several individuals serving jointly as agents or attorneys-in-fact under a valid power of attorney signed by such Grantor) as such agent or agents may request in order to make gifts, which are specifically authorized by such power of attorney, on behalf of such Grantor, or alternatively, to transfer such sums of the property of a Grantor directly to one or more persons or charities as directed by such Grantor's agent or attorney-in-fact under a valid power of attorney as long as such transfers are specifically authorized by such power of attorney;

(19)    To select and employ, at the discretion of the Trustee but at the expense of the trusts, any person, firm or corporation, engaged in rendering investment advisory services or investment management services, to furnish professional assistance or management in connection with making investments, managing securities, or making any other decisions with respect to the purchase, retention, sale or other disposition of property or securities belonging to the trusts; and

(20)    To employ a bank or trust company located anywhere within the United States, at the discretion of the Trustee but at the expense of the trusts, as custodian or agent; to have stock and securities registered in the name of such agent or custodian or a nominee thereof without designation of fiduciary capacity; and to appoint such bank or trust company to perform such other ministerial functions as the Trustee may direct. While such stock or securities are in the custody of any such bank or trust company, the Trustee shall be under no obligation to inspect or verify such stock or securities nor shall the Trustee be responsible for any loss by such bank or trust company.

**B.    Property, Books of Account and Records.** All properties, books of account and records of the trust created under Article II shall be made available for inspection at all times during normal business hours by the Grantors or by any person designated by the Grantors. Prior to the death of the last to die of the Grantors, the Trustee shall provide an accounting to the Grantors, or the surviving Grantor, if requested by either of them. Furthermore, within 60 days of receiving a written request from a beneficiary of a trust created hereunder who is entitled to receive an accounting, the Trustee shall furnish an accounting to such beneficiary. Any such accounting shall comply with the requirements of the Texas Trust Code and shall be deemed

DJR

AMR

12

MONTAÑA AMOROSA REVOCABLE TRUST

COPY

correct and binding one year after receipt by the requesting beneficiary.

**C.** **Notice.** Any notice required or permitted to be given by or to a person or a Trustee acting under this Trust Agreement must be given by acknowledged instrument actually delivered to the person or Trustee to whom it is required or permitted to be given. Any notice required or permitted to be given to a minor shall be given to such minor's parent who is closest in relation to the Grantors, or if no such parent is able to receive such notice, to such minor's guardian. Any notice required or permitted to be given to an adult incapacitated person shall be given to such adult incapacitated person's guardian, conservator, or agent under a validly executed and effective power of attorney. If such notice concerns a trusteeship, it shall state its effective date and shall be given at least 30 days prior to such effective date, unless such period of notice is waived. Any action permitted to be taken by a minor shall be taken by such minor's parent who is closest in relation to the Grantors, or if no such parent is able to take such action, by such minor's guardian. Any action permitted to be taken by an adult incapacitated person shall be taken by such adult incapacitated person's guardian, conservator, or agent under a validly executed and effective power of attorney.

**D.** **Acts of Prior Trustees.** Each Trustee shall be relieved of any duty to examine the acts of any prior Trustee and no court accounting shall be required. Each successor Trustee shall be responsible only for those properties which are actually delivered to such Trustee. Each successor Trustee, upon executing an acknowledged acceptance of the trusteeship and upon receipt of those properties actually delivered to such successor Trustee, shall be vested with all of the estates, titles, rights, powers, duties, immunities and discretions granted to the prior Trustee.

**E.** **Reliance on Legal Opinion.** In acting or declining to act, each Trustee may rely upon the written opinion of a competent attorney, any facts stated in any instrument in writing and believed true, or any other evidence deemed sufficient. Each Trustee shall be saved harmless from any liability for any action taken, or for the failure to take any action, if done in good faith and without gross negligence.

**F.** **Survivorship Provisions.** For purposes of this Trust Agreement, no person shall be deemed to have survived a Grantor if such person shall die within 60 days after such Grantor's death. Any person who is prohibited by law from inheriting property from a Grantor shall be treated as having failed to survive such Grantor.

**G.** **Combination of Trusts.** After the death of the last to die of the Grantors, the Trustee, in the Trustee's discretion, may combine any trust created under this Trust Agreement with any other trust or trusts if the terms of such trusts are substantially similar, if such trusts have the same primary beneficiaries, and if such trusts have the same inclusion ratio as defined in Section 2642(a) of the Code. The Trustee shall not be obligated to combine such trusts. If

DJR

AMR

13

COPY

trusts which are combined are to terminate at different times, the combined trust shall terminate in stages, with a pro rata portion of the combined trust being distributed to the appropriate beneficiaries when each such trust terminates. If trusts which are combined are to terminate at the same time but have different contingent beneficiaries, the remaining property of the combined trust shall be divided pro rata among the contingent beneficiaries of each trust. Any such pro rata distributions shall be made in proportion to the value of each trust at the time such trusts were combined.

      **H.**    **Property Subject to Mortgage.** If at the time of the death of a Grantor any real estate is subject to a mortgage, lien, or other debt, the beneficiary taking such real estate shall take it subject to such mortgage, lien, or other debt, and such beneficiary shall not be entitled to have the obligation secured thereby paid out of the trust estate. The Trustee is specifically given the right to renew, refinance and extend, in any form that the Trustee deems best, any secured or unsecured debt or charge existing at the time of such Grantor's death. Under no circumstances shall the Trustee be required to prepay any such debt.

      **I.**    **Maximum Duration of Trusts.** Notwithstanding anything to the contrary contained in this Trust Agreement, any trust created by this Trust Agreement, unless earlier terminated according to the terms of this Trust Agreement, shall terminate one day less than 21 years after the date of death of the first Grantor to die and the following persons who are living on the date of death of the first Grantor to die: (1) the descendants of the Grantors, (2) the descendants of the Husband's parents, and (3) the descendants of the Wife's parents. If the Trustee at any time combines and administers as one trust any trust or trusts created hereunder and any trust or trusts under any other instrument, such combined trust shall not continue beyond the earlier date on which either of such trusts would, without regard to such combination, have been required to terminate under the rule against perpetuities or other applicable law governing the maximum duration of trusts. If any trust (including a combined trust) would, but for the terms of this Section, continue beyond such date, such trust shall nevertheless at that time terminate and the remaining property of such trust shall be distributed as provided in the Article which creates such trust.

### Article VII.
### Miscellaneous Provisions

      **A.**    **Additions To Trust.** The Grantors, or any other person, may at any time, grant, transfer or convey, either by inter vivos transfer or by Will, to the Trustee such additional property as he or she desires to become a part of any trust hereby created and, subject to

DJR

AMR

14

COPY

acceptance by the Trustee, such additional property shall thereafter be held, administered and distributed by the Trustee in accordance with the provisions of this Trust Agreement.

**B.**    **Right To Use Principal Residence.** The Grantors or the primary beneficiary of a trust created hereunder shall have the right to use and occupy real or personal property owned by any trust created under this Trust Agreement as the Grantors' or such primary beneficiary's principal residence rent free and without charge for life or until this Trust Agreement is revoked or terminated, whichever occurs first. Further, any such property (or any interest therein) shall be acquired by an instrument of title that describes the property with sufficient certainty to identify it and the interest acquired, and the instrument shall be recorded in the real property records of the county in which the property is located. This section shall be construed in accordance with the Grantors' intentions that all eligible real or personal property which is owned by a trust created hereunder qualify for the homestead exemption and that the trust which owns such property is a "qualifying trust" as defined and described in Section 11.13(j) of the Texas Tax Code and, if applicable, Section 41.0021 of the Texas Property Code.

**C.**    **Descendants.** References to "descendant" or "descendants" mean lineal blood descendants of the first, second or any other degree of the ancestor designated; provided, however, that such references shall include, with respect to any provision of this Trust Agreement, descendants who have been conceived at any specific point in time relevant to such provision and who thereafter survive birth; and provided, further, an adopted child and such adopted child's lineal descendants by blood or adoption shall be considered under this Trust Agreement as lineal blood descendants of the adopting parent or parents and of anyone who is by blood or adoption a lineal ancestor of the adopting parent or of either of the adopting parents.

**D.**    **Discretion.** Whenever in this Trust Agreement an action is authorized in the discretion of the Trustee, the term "discretion" shall mean the absolute and uncontrolled discretion of the Trustee.

**E.**    **Spendthrift Provisions.** After the death of the last to die of the Grantors, each trust created by this Trust Agreement shall be a spendthrift trust to the fullest extent allowed by law. Prior to the actual receipt of trust property by any beneficiary, no property (income or principal) distributable under any trust created by this Trust Agreement shall, voluntarily or involuntarily, be subject to anticipation or assignment by any beneficiary, or to attachment by or to the interference or control of any creditor or assignee of any beneficiary, or be taken or reached by any legal or equitable process in satisfaction of any debt or liability of any beneficiary, and any attempted transfer or encumbrance of any interest in such property by any beneficiary hereunder prior to distribution shall be void.

DJR

AMR

15

MONTAÑA AMOROSA REVOCABLE TRUST

COPY

F.    **Incapacitated.** A beneficiary (other than one of the Grantors) shall be deemed "incapacitated" if the Trustee, in the Trustee's discretion, determines that such beneficiary lacks the ability, due to a physical or mental condition, to manage his or her own personal and financial affairs. A Grantor or a Trustee shall be deemed "incapacitated" if and for as long as (i) a court of competent jurisdiction has made a finding to that effect, (ii) a guardian or conservator of such Grantor's or such Trustee's person or estate has been appointed by a court of competent jurisdiction and is serving as such, or (iii) two physicians (licensed to practice medicine in the state where the Grantor or Trustee is domiciled at the time of the certification, and one of whom shall be board certified in the specialty most closely associated with the cause of the Grantor's or Trustee's incapacity) certify that due to a physical or mental condition such Grantor or Trustee lacks the ability to manage his or her own personal and financial affairs. A Trustee shall immediately cease to serve upon being deemed incapacitated. A Grantor shall be deemed to have regained capacity if there is a finding to that effect by a court of competent jurisdiction or if two physicians (with the same qualifications described above) certify that such Grantor is capable of managing such Grantor's personal and financial affairs.

G.    **Internal Revenue Code.** References to various Sections of the "Code" are to such designated Sections of the Internal Revenue Code of 1986, as amended.

H.    **Heirs.** References to "heirs" are to those persons who would inherit separate personal property from the person designated under the statutes of descent and distribution of the State of Texas, if such person died intestate and single at such time.

I.    **Governing Law.** The construction, validity and administration of each trust created under this Trust Agreement shall be controlled by the laws of the State of Texas. After the death of the last to die of the Grantors, the Trustee may designate the laws of another jurisdiction as the controlling law with respect to the construction, validity and administration of a particular trust if either (i) the Trustee resides in, or administers that trust in, such designated jurisdiction (or in the case of a corporate Trustee, if such corporate Trustee is chartered in such designated jurisdiction), or (ii) the primary beneficiary of such trust resides in such designated jurisdiction, in which case the laws of such designated jurisdiction shall apply to such trust as of the date specified in such designation. Any such designation shall be in writing and shall be delivered to each beneficiary of the affected trust.

J.    **Per Stirpes.** When a distribution is to be made to a person's descendants "per stirpes," property shall be divided into as many equal shares as there are (i) members of the nearest generation of descendants who are then living, and (ii) deceased members of that generation who left descendants who are then living. This division into shares shall begin at the generation nearest to such person that has a living member. Each living member of the nearest

DJR

AMR

16

MONTAÑA AMOROSA REVOCABLE TRUST

**COPY**

generation of descendants with a member then living shall receive one share, and the share that would have passed to each deceased member of that generation who left descendants who are then living shall be divided in a similar manner (by reapplying the preceding rule) among his or her then living descendants. For example, if a person has deceased children and living children when a distribution is to be made, the assets will be divided into equal shares at the child level and distributed per stirpes below that level; however, if the person has no living children at that time, that equal division will be made at the grandchild level (or lower, if appropriate) and distributed per stirpes below that level. This definition is intended to override any conflicting or contrary common law definition. In the case of a distribution which is to be made "per stirpes" in the event of the death of one of the Grantors, references in this Section to "then living" or to "living" shall mean persons who survive the Grantors.

IN WITNESS WHEREOF, the Grantors and the Trustee have hereunto set their hands as of the date first above written.

_____
DENNIS JAMES ROGERS II, Grantor

_____
ALLISON MERYL ROGERS, Grantor

_____
DENNIS JAMES ROGERS II, Trustee

STATE OF TEXAS §
COUNTY OF DALLAS §

This instrument was acknowledged before me on the 20th day of August, 2019, by DENNIS JAMES ROGERS II as Grantor and as Trustee of the Montaña Amorosa Revocable Trust.

MELINDA LLOYD
Notary Public, State of Texas
Comm. Expires 03-30-2021
Notary ID 126412381

_____
Notary Public, State of Texas

STATE OF TEXAS §
COUNTY OF DALLAS §

This instrument was acknowledged before me on the 20th day of August, 2019, by ALLISON MERYL ROGERS as Grantor of the Montaña Amorosa Revocable Trust.

MELINDA LLOYD
Notary Public, State of Texas
Comm. Expires 03-30-2021
Notary ID 126412381

_____
Notary Public, State of Texas

DJR

AMR

17

# EXHIBIT P

CAUSE NO. DC-20-10214

| | | |
|---|---|---|
| Steven Webster, Aaron Webster, and Dennis Woods, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| Dennis J. Rogers, II and OMTC, Inc., | § § § | |
| *Defendants*. | § | 191st JUDICIAL DISTRICT |

## FULL AND FINAL SETTLEMENT AGREEMENT AND RELEASE

This FULL AND FINAL SETTLEMENT AGREEMENT AND RELEASE (the "Agreement") is made by and between Plaintiffs Steven Webster, Aaron Webster, and Dennis Woods (collectively, "Plaintiffs"), on the one hand, and Defendants Dennis J. Rogers, II and OMTC, Inc. (together, "Defendants"), on the other hand. Plaintiffs and Defendants shall be collectively referred to herein as the "Parties" and individually as a "Party."

## RECITALS

**WHEREAS**, Plaintiffs filed the above-referenced lawsuit against Defendants, Cause No. DC-20-10214, *Steven Webster, Aaron Webster, and Dennis Woods v. Dennis J. Rogers, II and OMTC, Inc.*, in the District Court of Dallas County, Texas, 191st Judicial District (the "Lawsuit");

**WHEREAS**, in the Lawsuit, Plaintiffs asserted certain claims and causes of action against Defendants, all as set forth with more particularity in Plaintiffs' Verified Second Amended Petition and Application for Expanded Temporary Injunction, which is incorporated fully herein by reference (the "Dispute");

**WHEREAS**, Defendants appeared and answered in the Lawsuit, denying and disputing any and all liability with regard to any of the claims or damages alleged or asserted by Plaintiffs;

**WHEREAS**, to avoid further expense, inconvenience, and uncertainty of litigation, the Parties wish to compromise and settle the Lawsuit and the matters in dispute among them with respect to the Lawsuit, upon the terms and conditions set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AGREEMENT

**1.1    Settlement Payment.** For and in consideration of the mutual promises and covenants contained herein, Defendant Dennis J. Rogers, II shall pay to Steven Webster

$5,250,000.00 (Five Million, Two Hundred Fifty Thousand Dollars, and Zero Cents) by March 1, 2021 (the "Payment").  The Payment shall be paid in full to Steven Webster by wire transfer completed on or before March 1, 2021 in accordance with the wire transfer information provided in **Exhibit A**.

      **1.2**     For the sake of clarity, it shall not be sufficient for performance under Section 1.1 for any partial payments to be made or for the wire transfer of the Payment to be reflected merely as pending on or before March 1, 2021; it shall only be sufficient for performance of under Section 1.1 for the Payment to be fully and unconditionally received into Steven Webster's bank account before the end of the day on March 1, 2021.

      **1.3**     On condition of the full and timely payment of the Payment set forth in Section 1.1, the following provisions shall apply:

          **1.3.1**   **Release and Discharge as to Defendants.**  For and in consideration of the mutual promises and covenants contained herein, Plaintiffs, on behalf of themselves and any and all of their predecessors, successors, assigns, representatives, employees, and agents, fully and completely **RELEASE, ACQUIT, and FOREVER DISCHARGE** Defendants from all claims and damages asserted or that could have been asserted by Plaintiffs against Defendants in this Lawsuit.

          **1.3.2**   **Release and Discharge as to Plaintiffs.**  For and in consideration of the mutual promises and covenants contained herein, Defendants, on behalf of themselves and any and all of their predecessors, successors, assigns, representatives, employees, and agents, fully and completely **RELEASE, ACQUIT, and FOREVER DISCHARGE** Plaintiffs from all claims and damages asserted or that could have been asserted by Defendants against Plaintiffs in this Lawsuit.

          **1.3.3**   **Filing of Dismissal with Prejudice.**  Within ten (10) business days of full and timely receipt of the Payment, the Parties will execute and file an Agreed Motion to Dismiss With Prejudice dismissing all claims in the Lawsuit with prejudice and with taxable court costs taxed to the Party incurring same in the form attached hereto as **Exhibit B**.

      **1.4**     In the event Defendants fail to timely provide the Payment set forth in Section 1.1, Plaintiffs shall file the signed Agreed Final Judgment attached hereto as **Exhibit C**, which shall entitle Plaintiffs to, *inter alia*, compensatory damages of $6,250,000 (Six Million, Two Hundred Fifty Thousand Dollars, and Zero Cents) with pre- and post-judgment interest.  To be clear, the provisions set forth in Sections 1.3.1 to 1.3.3 above and Section 9.1 below shall not apply in the event that Defendants fail to timely provide the Payment.

### 3.1    Warranties

#### 3.1.1    Mutual Representations and Warranties

**3.1.1.1** Each signatory to this Agreement hereby warrants and represents that such person has authority to bind the Party or Parties for whom such person acts.

**3.1.1.2** The Parties warrant and represent that, other than as provided herein, they have not assigned, authorized, or transferred (in any way, whether directly or indirectly, by operation of law or otherwise) any right, title, or interest in the claims, demands, obligations, or causes of action referred to in this Agreement to any third party, and that no other entity or person has any right or interest in the claims, demands, obligations, or causes of action referred to in this Agreement.

**3.1.1.3** The Parties represent and agree that this Agreement is entered into without duress, in good faith, and for reasonable and sufficient consideration given the nature of Plaintiffs' claims and the evidence developed prior to and during the course of the discovery in the Lawsuit.

**3.1.1.4** In executing this Agreement, the Parties unequivocally represent, acknowledge, and state that they were at all times represented effectively by counsel in the negotiation and formation of this Agreement, which negotiation was conducted by the Parties at arm's length, and the Parties are relying solely upon each Party's own independent knowledge, understanding, and investigation of the matters pertinent hereto and have not seen, heard, or relied upon any promises, statements, representations, covenants, or warranties, whether written or oral, express or implied, made by one another or by any representative or other person or entity and that no such Party had any duty to make any disclosures, except to the extent that a matter is expressly stated in this Agreement.  The Parties hereby waive, release, and disclaim any right or ability to seek to revoke, rescind, vacate, or otherwise avoid the operation and effect of this Agreement on the basis of any alleged fraudulent inducement, misrepresentation, or material omission by any of the undersigned or their representatives, or on the basis of mutual or unilateral mistake of fact or law, or newly discovered information, and acknowledge that they are completely satisfied with this Agreement.

**3.1.1.5** Each signatory warrants that he or she is of legal age and legally competent to execute this Agreement in his or her respective capacity.

#### 3.1.2    Defendants' Representations and Warranties

**3.1.2.1** Defendants represent and warrant that all of the monies used to make the Payment to Steven Webster set forth in Section 1.1 above belong to Defendants, free and clear of all encumbrances, and that no other party is the legal or beneficial owner or claimant of any of such monies.

**3.1.2.2** Defendants represent and warrant that all of the monies used to make the Payment to Steven Webster set forth in Section 1.1 above are not directly or indirectly the product or proceeds, substituted or otherwise, of any fraudulent or criminal conduct or scheme of any kind.

3

**4.1    Additional Documents.**  The Parties to this Agreement agree to cooperate fully and execute any and all supplementary documents and to take all additional actions which may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement.

**5.1    Governing Law, Validity, Venue, and Attorneys' Fees**

**5.1.1**    This Agreement shall be construed as a whole in accordance with its fair meaning and not strictly for or against any of the Parties, and in accordance with the laws of the State of Texas.  The headings used herein are for reference only and shall not affect the construction of this Agreement.

**5.1.2**    This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable legal requirements.  If any provision of this Agreement or the application of this Agreement to any person or circumstance shall for any reason and to any extent, be invalid or unenforceable, the part of this Agreement in which such provision is contained, the remainder of this Agreement, and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

**5.1.3**    Venue for any disputes relating in any way to this Agreement shall lie exclusively in Dallas County, Texas.

**5.1.4**    If either Party brings an action at law or equity against the other in order to enforce the provisions of this Agreement or as a result of an alleged default under this Agreement, the prevailing Party in such action shall be entitled to recover court costs and reasonable attorneys' fees (at all levels of trial and appeal) to the extent provided by Texas law.

**6.1    Execution.**  This Agreement may be executed in multiple originals.  Properly executed signature pages, whether they constitute original signature pages, copied signature pages, or facsimile-copied signature pages, may be attached to the Agreement.  Any such copied signature page or facsimile-copied signature page attached to the Agreement will have the same force and effect as an original signature page.

**7.1    Effectiveness.**  This Agreement shall become effective following execution by the Parties.

**8.1    Entire Agreement and Successors in Interest.**  This Agreement contains the entire agreement between the Parties with regard to the matters set forth herein and shall be binding upon and inure to the benefit of the executors, administrators, personal representatives, heirs, successors, and assigns of each.  This specifically includes, without limitation, the Parties, their parents and subsidiaries, and their employees, officers, directors, shareholders, representatives, agents, insurers, and servants.

**9.1    Confidentiality and Non-disparagement.**  For and in consideration of the promises and covenants contained herein, and on condition of the full and timely payment of the Payment set forth in Section 1.1., the Parties agree to keep the terms of this Agreement confidential.  The Parties shall not reveal this confidential information to any person, firm,

4

corporation, or entity, except for the following purposes:  (a) as required by law or court order, or any agency or authority having jurisdiction to require disclosure; (b) to enforce the terms of this Agreement; (c) to the Parties' respective lenders and direct or indirect owners at each tier, contractors, and subcontractors, and the legal, tax and financial advisors, auditors, legal counsel and officers, directors, employees and agents of a Party, its lenders and its direct or indirect owners at each tier  as may be necessary in their respective business affairs and provided such persons have a professional or contractual duty to maintain confidentiality; or (d) upon obtaining the written consent of the other Parties.

Additionally, for and in consideration of the promises and covenants contained herein, and on condition of the full and timely payment of the Payment set forth in Section 1.1., the Parties agree not to publish, declare, write, or otherwise communicate any negative or disparaging statement or communication about the other Party that stem from the subject matter of this dispute following receipt of the executed Agreement, including Exhibit C.  Nothing herein shall prohibit the Parties from disclosing this Agreement or its terms as required by law.

**(signatures appear on the following pages)**

STEVEN WEBSTER

Date: _____ 1·14·21 _____

AARON WEBSTER

Date: _____ 1.14.21 _____

DENNIS WOODS

Date: _____ 1/14/21 _____

*Ex. Pg. 241*

WITNESS MY HAND to this instrument on this the 14 day of January _____, 2021.

DENNIS J. ROGERS, II

STATE OF TEXAS          §
                        §
COUNTY OF  Dallas       §

BEFORE, ME, the undersigned authority, on this day personally appeared Dennis J. Rogers, II, known to me to be the person whose name is subscribed to the foregoing instrument.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this 14th day of January _____, 2021.

Notary Public
In and for the State of Texas

Seal:

CHRISTOPHER LOUIS TAYLOR
Notary ID #128139691
My Commission Expires
January 9, 2022

57232087

7

WITNESS MY HAND to this instrument on this the 14 day of January , 2021.

_____
OMTC, INC.

By:      Dennis J. Rogers, II

Title:   President and Sole Director

STATE OF TEXAS          §
                        §
COUNTY OF Dallas        §

BEFORE, ME, the undersigned authority, on this day personally appeared Dennis J. Rogers, II, on behalf of OMTC, Inc., known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same on behalf of OMTC, Inc. for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this 14th day of January , 2021.

_____
Notary Public
In and for the State of Texas

Seal:

CHRISTOPHER LOUIS TAYLOR
Notary ID #128139691
My Commission Expires
January 9, 2022

# EXHIBIT Q

CAUSE NO. DC-20-10214

| | | |
|---|---|---|
| Steven Webster, Aaron Webster, and | § | IN THE DISTRICT COURT OF |
| Dennis Woods, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | DALLAS COUNTY, TEXAS |
| v. | § | |
| | § | |
| Dennis J. Rogers, II and OMTC, Inc., | § | |
| | § | |
| *Defendants*. | § | 191st JUDICIAL DISTRICT |

## AGREED FINAL JUDGMENT

Plaintiffs Steven Webster, Aaron Webster, and Dennis Woods (collectively, "Plaintiffs") and Defendants Dennis J. Rogers, II ("Rogers") and OMTC, Inc. (together, "Defendants") have respectfully submitted this Agreed Final Judgment to the Court for approval. Plaintiffs and Defendants are collectively referred to herein as the "Parties."

On July 28, 2020, Plaintiffs filed this lawsuit against Defendants, which was amended on August 3, 2020 and again on November 20, 2020. Plaintiffs' Verified Second Amended Petition and Application for Expanded Temporary Injunction, which is the live pleading, is hereby incorporated by reference.

On October 21, 2020, the Court signed an Order Granting In Part Plaintiffs Steven Webster and Dennis Woods's Traditional Motion for Partial Summary Judgment ("Summary Judgment Order"), which is hereby incorporated by reference. The Summary Judgment Order granted summary judgment to Steven Webster and Dennis Woods on their claims for breach of contract and conversion against OMTC. The Summary Judgment Order denied summary judgment on Steven Webster and Dennis Woods's claims for

money had and received against OMTC. The Summary Judgment Order further ordered Steven Webster and Dennis Woods to file a motion for an award of attorneys' fees, costs, expenses, and other damages associated with their breach of contract and conversion claims.

On October 29, 2020, the Court signed an Order Denying Defendants' Rule 91a Motion to Dismiss Plaintiffs' Fiduciary Duty and Texas Deceptive Trade Practices Act Claims ("Rule 91a Order"), which is hereby incorporated by reference. The Rule 91a Order denied Defendants' Rule 91a Motion to Dismiss Steven Webster and Dennis Woods's Fiduciary Duty and Dennis Woods's Texas Deceptive Trade Practices Act Claims ("Rule 91a Motion") and held that Steven Webster and Dennis Woods were prevailing parties and entitled to recover their reasonable attorneys' fees incurred in defending against the Rule 91a Motion.

On December 15, 2020, the Court signed an Unopposed Order Granting Plaintiffs' Motions for Attorneys' Fees, Costs and Expenses ("Attorneys' Fees Order"), which is hereby incorporated by reference. The Attorneys' Fees Order awarded Steven Webster $84,334.80 in attorneys' fees, costs, and expenses for prevailing on his breach of contract claim against OMTC. The Attorneys' Fees Order further awarded Steven Webster $17,273.21 in reasonable and necessary attorneys' fees and costs for prevailing against Defendants' Rule 91a Motion, to be paid to Steven Webster by delivery of a cashier's check within 14 days of the Court's Order (i.e., by December 29, 2020). Defendants paid the $17,273.21 in full as ordered.

2

Pursuant to the Summary Judgment Order, Rule 91a Order, and the Attorneys' Fees Order, and as agreed to by Defendants, the Court hereby RENDERS judgment for Steven Webster and Dennis Woods on their breach of contract and conversion claims against OMTC. The Court further RENDERS judgment for Steven Webster on his breach of contract, breach of fiduciary duty, conversion, and fraud claims against Rogers. With regard to Steven Webster's fraud claims against Rogers, the Court has determined that Rogers made representations to Steven Webster, which representations Rogers knew to be false, with the intent to deceive Steven Webster. The Court has further determined that Steven Webster actually and justifiably relied on Rogers' false representations and sustained a loss as a proximate result thereof. All other claims not mentioned in this paragraph are dismissed with prejudice by agreement of the Parties.

The Court further ORDERS that Steven Webster recover the following from OMTC and Rogers, jointly and severally:

1.      Compensatory damages in the amount of $6,250,000;

2.      Prejudgment interest on the $6,250,000 awarded at the rate of 5% from July 28, 2020 until the date of this judgment; and

3.      Post-judgment interest on all of the above at the rate of 5%, compounded annually, from the date of this judgment until all amounts are paid in full.

Defendants voluntarily, knowingly, and intentionally waive their right to appeal this judgment.

The Agreed Temporary Injunction signed by the Court on August 28, 2020, the Agreed Amended Temporary Injunction signed by the Court on December 15, 2020, and

3

the Agreed Second Amended Temporary Injunction agreed to by the Parties on December 22, 2020 and signed by the Court on January 6, 2021, are all incorporated herein by reference. The Agreed Second Amended Temporary Injunction shall remain in effect through the end of the Court's plenary power over this case.

Additionally, as discussed above, the Court has determined and the Parties have agreed that one or more of the Steven Webster's claims are of such character and nature that they cannot be discharged in bankruptcy under title 11 of the United States Code (the "Bankruptcy Code"), including but not limited to, under sections 523, 727, and 1328 of the Bankruptcy Code. Defendants voluntarily, knowingly, and intentionally waive all claims and defenses to the nondischargeability of such claims in a bankruptcy.

This judgment is binding on Defendants' heirs, successors, assigns, and any trustee or similar person appointed in any case under commenced under the Bankruptcy Code.

The Parties intend for the factual stipulations made in this judgment to have a preclusive effect in subsequent proceedings, including, but not limited to, in any bankruptcy case of the Defendants.

This judgment finally disposes of all claims and all parties, and it is appealable.

All writs and processes for the enforcement and collection of this judgment may issue as permitted by law.

SIGNED this _____ day of _____, 20____.

4th day of March, 2021

HON. GENA SLAUGHTER

4

**APPROVED AS TO FORM AND SUBSTANCE
AND ENTRY REQUESTED:**

BAKER BOTTS L.L.P.


By: */s/Meghan Dawson McElvy*
Meghan Dawson McElvy
State Bar No. 24065127
meghan.mcelvy@bakerbotts.com
Margaret L. Wittenmyer
State Bar No. 24106593
margaret.wittenmyer@bakerbotts.com
910 Louisiana Street
Houston, Texas 77002
Telephone:  (713) 229-1196
Facsimile:  (713) 229-2896

**ATTORNEYS FOR PLAINTIFFS**


HENNEMAN RAU LLP

By:
Bradley M. Kirklin
State Bar No. 24046222
bkirklin@hennemanrau.com
George H. Rau III
State Bar No. 24037335
grau@hennemanrau.com
815 Walker Street, Suite 1440
Houston, Texas 77002
Telephone:  (713) 955-6030
Facsimile:  (713) 955-6141

**ATTORNEYS FOR DEFENDANTS**

5

## CERTIFICATE OF SERVICE

    This certifies that on   March 2  , 20 21  , a true and correct copy of the foregoing document was served on all known counsel for defendants as shown below through the Court's E-filing System:

    Bradley M. Kirklin
    George H. Rau III
    HENNEMAN RAU LLP
    815 Walker Street, Suite 1440
    Houston, Texas 77002
    (713) 955-6030
    *bkirklin@hennemanrau.com*
    *grau@hennemanrau.com*

                            */s/ Meghan Dawson McElvy*
                            Meghan Dawson McElvy

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kendall Black on behalf of Meghan McElvy
Bar No. 24065127
kendall.black@bakerbotts.com
Envelope ID: 51064682
Status as of 3/2/2021 2:06 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Meghan DawsonMcElvy | | meghan.mcelvy@bakerbotts.com | 3/2/2021 11:14:03 AM | SENT |
| Corey F.Wehmeyer | | cwehmeyer@swenergylaw.com | 3/2/2021 11:14:03 AM | SENT |
| Meghan McElvy | 24065127 | meghan.mcelvy@bakerbotts.com | 3/2/2021 11:14:03 AM | SENT |
| Laura Sammons | | lsammons@hrkslaw.com | 3/2/2021 11:14:03 AM | SENT |
| Henri Inocencio | | hinocencio@swenergylaw.com | 3/2/2021 11:14:03 AM | SENT |
| Margaret Wittenmyer | | margaret.wittenmyer@bakerbotts.com | 3/2/2021 11:14:03 AM | SENT |
| Kendall Black | | kendall.black@bakerbotts.com | 3/2/2021 11:14:03 AM | SENT |
| Alexandra J.Kushner | | alexandra.kushner@gs.com | 3/2/2021 11:14:03 AM | SENT |
| Erin Koenen | | ekoenen@ayco.com | 3/2/2021 11:14:03 AM | SENT |
| Kevin Kassner | | kkassner@swenergylaw.com | 3/2/2021 11:14:03 AM | SENT |
| Emily Leal | | eleal@swenergylaw.com | 3/2/2021 11:14:03 AM | SENT |
| Sandra Watson | | swatson@swenergylaw.com | 3/2/2021 11:14:03 AM | SENT |

Associated Case Party: STEVEN WEBSTER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Tina Q.Nguyen | | tina.nguyen@bakerbotts.com | 3/2/2021 11:14:03 AM | SENT |

Associated Case Party: DENNISJ.ROGERS, II

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brett Chisum | 24082816 | bchisum@mccathernlaw.com | 3/2/2021 11:14:03 AM | SENT |
| Bradley McMahon Kirklin | 24046222 | bkirklin@hennemanrau.com | 3/2/2021 11:14:03 AM | SENT |

Associated Case Party: AARON WEBSTER

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Kendall Black on behalf of Meghan McElvy
Bar No. 24065127
kendall.black@bakerbotts.com
Envelope ID: 51064682
Status as of 3/2/2021 2:06 PM CST

Associated Case Party: AARON WEBSTER

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Margaret Wittenmyer | 24106593 | mlwittenmyer@gmail.com | 3/2/2021 11:14:03 AM | SENT |

Associated Case Party: OMTC, INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| George Henry Rau | 24037335 | grau@hennemanrau.com | 3/2/2021 11:14:03 AM | SENT |

# EXHIBIT R

CAUSE NO. DC-20-10214

| | | |
|---|---|---|
| Steven Webster, Aaron Webster, and<br>Dennis Woods, | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | DALLAS COUNTY, TEXAS |
| Dennis J. Rogers, II and OMTC, Inc., | §<br>§ | |
| Defendants. | §<br>§ | 191st JUDICIAL DISTRICT |

## JUDGMENT OF CONTEMPT FOR DEFENDANT DENNIS ROGERS' VIOLATION OF THE COURT'S AGREED SECOND AMENDED TEMPORARY INJUNCTION

On the 18th day of August, 2021, the Court heard Plaintiffs Steven Webster, Aaron Webster, and Dennis Woods' ("Plaintiffs") Verified Motion for Contempt for Violation of the Court's Agreed Second Amended Temporary Injunction (hereafter the "Second Amended TI") (the "Motion") against Defendant Dennis J. Rogers, II ("Rogers").

This Court, having reviewed the Motion, entered an Order to Show Cause requiring Rogers to appear and provide evidence as to why he should not be held in contempt of this Court. Rogers appeared in person, and by Counsel, and evidence was taken.

The Court thereafter made the following findings:

On August 7, 2020, following a hearing with both parties' counsel, this Court entered a Temporary Restraining Order against Defendants OMTC Inc. ("OMTC") and Rogers (together, "Defendants"). Under the TRO, Defendants were ordered to "refrain from taking any actions to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of a total amount not to exceed $1000, contained in OMTC's Chase Bank account with account number ending in xxx7879."

The TRO was initially in effect through August 21, 2020, was then extended through September 4, 2020, and prior to its expiration was replaced by the Agreed Temporary Injunction

("Agreed TI") containing the same terms.

On December 15, 2020, the Court, upon application of Plaintiffs and Defendants, amended the Agreed TI and entered the Agreed Amended Temporary Injunction ("Amended TI").

The Amended TI ordered Defendants to "refrain from taking, *or causing to be taken, whether directly or indirectly,* any action to use, expend, transfer, dispossess, convert, secrete, or otherwise divest themselves of the cash and other assets, with the exception of a total amount not to exceed $1000, contained in" OMTC's Chase Bank account with account number ending in xxx7879 and other accounts held by Rogers and OMTC.

The Court, by joint motion of the Plaintiffs and Defendants, amended the live TI a second time and entered the Agreed Second Amended TI on January 6, 2021 ("Second Amended TI"). The Second Amended TI contained the same terms as the Amended TI along with an order that Defendants "*shall not sell, encumber, pledge, use as collateral or the like, or otherwise divest themselves of the cash and other assets in the Accounts in any way.*"

On March 4, 2021, the Court entered an agreed final judgment between Plaintiffs and Defendants ("Agreed Final Judgment"). The Agreed Final Judgment resolved all claims between Plaintiffs and Defendants and provided that "[t]he Agreed Second Amended Temporary Injunction shall remain in effect through the end of the Court's plenary power over this case." In the Agreed Final Judgment, Rogers expressly admitted that "Rogers made representations to Steven Webster, which representations Rogers knew to be false, with the intent to deceive Steven Webster."

From the initial entry of the TRO on August 7, 2020 and continuing through the expiration of the Second Amended TI on April 5, 2021, Defendants were under continuous Court order to refrain from divesting any funds from OMTC's Chase Bank account with account number ending in xxx7879.

2

*Ex. Pg. 255*

As of August 7, 2020, while the restraining order went into effect, OMTC's Chase Bank account with account number ending in xxx7879 had a balance of $7,654.94. On March 26, 2021, a writ of garnishment was issued against JPMorgan Chase Bank, N.A. ("Chase"), and the writ was served on Chase on March 30, 2021 while the Second Amended TI remained in effect.

As of March 30, 2021, OMTC's Chase Bank account with account number ending in xxx7879 had a balance of $10.94. Rogers is the sole officer and director of OMTC and is the only person with access to and control over OMTC's bank account ending in xxx7879. This difference in balance demonstrates that Rogers violated the terms of the Second Amended TI by transferring or causing to be transferred $7,644.00 out of OMTC's Chase Bank account with account number ending in xxx7879. During the hearing, Rogers stated that he did not recall moving the funds out of the account, but did not deny that he was the sole person with access to and control over it, and provided no other credible basis for the transfer of the funds besides his own intentional acts.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED that Rogers, having been found in Criminal and Civil Contempt of this Court:

1.　shall pay Plaintiffs the costs of this contempt proceeding, including their reasonable and necessary attorneys' fees (which Plaintiffs shall submit by separate application within 21 days of this order);

2.　shall pay Plaintiffs the amount of all costs and fees associated with Plaintiffs' Second Writ of Garnishment upon Chase Bank, which writ is necessary to capture the $7,644.00 that was unlawfully removed by Rogers from OMTC's Chase Bank account with account number ending in xxx7879. Plaintiffs will submit the amount of these costs and fees to the Court at a later date;

3.　shall pay a $500 fine for disobeying the Court's Second Amended TI as criminal contempt, to be paid no later than September 19, 2021. Proof of payment must be provided to the Court and all Parties to this action;

4.　is hereby sentenced to 50 hours of jail time, which is suspended pending Rogers' completion of 50 hours of community service at a non-profit organization of his choosing. Rogers must complete these 50 hours of community service no later than October 17, 2021 and must provide to the Court and all Parties to this action documentation, such as a letter from the non-profit organization, confirming his

3

compliance with this Order.

SIGNED this ___ day of _____, 2021.

_____
JUDGE PRESIDING

4

### CERTIFICATE OF SERVICE

This certifies that on August 23, 2021, a true and correct copy of the foregoing document was served on Defendant Dennis J. Rogers, II by electronic mail at dennisrogers.us@gmail.com.

/s/ Margaret L. Wittenmyer
Margaret L. Wittenmyer

# EXHIBIT S

CAUSE NO. DC-20-10214

| | | |
|---|---|---|
| STEVEN WEBSTER, AARON WEBSTER, and DENNIS WOODS. | § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| vs. | § § | DALLAS COUNTY, TEXAS |
| OMTC, INC. and DENNIS ROGERS | § § | |
| *Defendants.* | § | 191ST JUDICIAL DISTRICT |

## ORDER OF CONTEMPT AND ORDER FOR ATTACHMENT AND COMMITTMENT

On the 18TH day of November, 2021, came on to be heard the Order to Show Cause regarding whether Defendant Dennis Rogers should be held in contempt of court for failing to comply with an order of this Court dated August 18, 2021. Furthermore, Defendant Rogers was previously held in contempt of court for violating the Court's Temporary Injunction and sentenced to fifty (50) hours of confinement in jail, such confinement suspended upon Defendant Rogers completing fifty (50) hour of community service by October 17, 2021. Both Plaintiffs and Defendants appeared through their respective counsels of record.

All matters of fact and law having been submitted to the Court, and the Court having heard the evidence and reviewed the pleadings, is of the opinion and so finds that Defendant Dennis Rogers has failed to comply with the Court's Order to Compel dated August 18, 2021. The Court is further of the opinion and so finds that Defendant Dennis Rogers has also failed to comply with the Court's Judgment of Contempt dated September 8, 2021.

Contempt is the disobedience to or disrespect of a person acting in opposition to the Court's authority. The Court FINDS that Defendant Rogers has repeatedly and knowingly disregarded and disobeyed the orders of this Court. The Court further FINDS that Defendant Rogers has already been held in contempt of court for knowingly violating orders of this Court and even after that finding, has failed to obey the valid orders of this Court.

The Court's Judgment of Contempt signed September 8, 2021 required Defendant Rogers to complete fifty (50) hours of community service and provide documentation thereof by October 17, 2021. Defendant Rogers admitted that he has not performed *any* of the required hours of community service despite having had an

additional month (from October 17 to November 18) in which to do so. The provision of the Court's prior Judgment of Contempt dated September 8, 2021 which suspended Defendant Roger's confinement is now vacated. The Court, having already found Defendant Rogers in criminal contempt of Court on September 8, 2021, **hereby ORDERS Defendant Dennis Rogers to be confined in the county jail for fifty (50) hours.**

The Court further finds that Defendant Rogers has not complied with the Order to Compel signed on August 18, 2021. **THEREFORE, the Court FINDS Defendant Dennis Rogers in criminal contempt of Court of the August 18, 2021 Order to Compel.** The Court FINDS that Defendant Rogers' behavior affronts the dignity and authority of this Court and obstructs this Court's administration of justice. **The Court therefore ORDERS Defendant Dennis Rogers to be confined in the county jail for an additional fourteen (14) days, in addition to the previously stated fifty (50) hours.**

The Court further finds that despite repeated promises to either comply with the Court's Order to Compel or, alternatively, pay the Final Judgment in this case in order to make post-judgment discovery moot, Defendant Rogers has still failed to comply. **The Court further finds Defendant Dennis Rogers to be in civil contempt of Court.** After Defendant Rogers has completed the prior sentences of **criminal contempt, the Court ORDERS Defendant Rogers to continue to be confined in the county jail until further Order of this Court authorizing Defendant Rogers' release from confinement.** Defendant Rogers is to be held until he has purged himself of the **civil contempt for failing to comply with the August 18, 2021 Order to Compel.** In order to purge himself of the civil contempt, Defendant Rogers must either provide all responses to discovery as required by the August 18 Order to Compel or make arrangements with Plaintiffs such that post-judgment discovery is not necessary.

In addition, Defendant Rogers shall pay Plaintiffs the costs of their reasonable and necessary attorneys' fees in the amount of $18,994.75 within thirty (30) days of this Order.

**The Court ORDERS the Sheriff of Dallas County, Texas to arrest Defendant Dennis Rogers and confine him to the Dallas County Jail. It is FURTHER ORDERED that all commitments, writs, attachments and other process necessary for the enforcement of this Order by issued.**

Signed on 18 November 2021 at _1:25_ _p_.m.

_____
Judge Gena Slaughter
Presiding Judge, 191st District Court

# EXHIBIT T

CAUSE NO. DC-20-10214

| | | |
|---|---|---|
| STEVEN WEBSTER, AARON WEBSTER, and DENNIS WOODS, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| DENNIS J. ROGERS, II and OMTC, INC., | § § § | |
| *Defendants*. | § | 191ST JUDICIAL DISTRICT |

---

**DEFENDANTS OMTC, INC. AND DENNIS J. ROGERS, II'S FIRST AMENDED ANSWERS TO PLAINTIFF STEVEN WEBSTER'S INTERROGATORIES TO AID IN THE ENFORCEMENT OF JUDGMENT**

---

TO:    Steven Webster, by and through his attorney of record, Meghan McElvy, Baker Botts L.L.P., One Shell Plaza, 910 Louisiana, Houston, Texas 77002.

Pursuant to the Texas Rules of Civil Procedure, Defendants OMTC, INC. ("OMTC") and Dennis James Rogers, II ("Rogers"), serves their First Amended Answers to Plaintiff's Interrogatories.

Respectfully submitted,

**HENNEMAN RAU KIRKLIN & SCOTT LLP**

By:    */s/ Bradley M. Kirklin*
Bradley M. Kirklin
State Bar No. 24046222
George H. Rau III
State Bar No. 24037335
815 Walker Street, Suite 1440
Houston, Texas 77002
Telephone: 713-955-6030
Facsimile: 713-955-6141
Email: bkirklin@hrkslaw.com
Email: grau@hrkslaw.com

**ATTORNEYS FOR DEFENDANTS OMTC, INC. & DENNIS J. ROGERS, II**

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served pursuant to the Texas Rules of Civil Procedure, on December 10, 2021, upon the following:

Meghan Dawson McElvy                     *Via E-Service*
Margaret L. Wittenmyer
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana
Houston, Texas 77002
Email: meghan.mcelvy@bakerbotts.com
Email: margaret.wittenmyer@bakerbotts.com

Corey Wehmeyer
Santoyo Wehmeyer P.C.
IBC Highway 281 North Centre Building
12400 San Pedro Avenue, Suite 300
San Antonio, TX 78216
Email: cwehmeyer@swenergylaw.com

Attorneys for Plaintiffs


                                          */s/ Bradley M. Kirklin*

2

## INTERROGATORIES

**INTERROGATORY NO. 1:** State the name, employer, position and business address of all persons who have provided any information used or relied upon in answering these interrogatories or who has assisted in responding to the accompanying requests for production.

**ANSWER:** Dennis J. Rogers II states as follows:

I prepared these answers to Interrogatories with the assistance of counsel. I am primarily self-employed, but I am also employed by Bootstrap Ventures, LLC, an entity which I solely own and operate. I am the managing member of Bootstrap Ventures, LLC. I am not employed by any other entity. I am the sole owner of several other entities as set forth in response to Interrogatory No. 4.

The address for Bootstrap Ventures, LLC is:
1920 McKinney Ave. Floor 7
Dallas TX, 75201

My home address is:
6520 Del Norte Lane
Dallas, Texas 75225
No Home Phone Number
Mobile No. (575) 649-5004

**INTERROGATORY NO. 2:** For each person or entity who has been a shareholder, owner, officer, director or employee of OMTC within the past five years, state:

      (a)      The entity or person's full name.

      (b)      The entity or person's business address and telephone number and home address and telephone number.

      (c)      The entity or person's citizenship, state of domicile, state of incorporation, or primary place of business, as may be applicable.

      (d)      List the names of any other related entity, including but not limited to, any partner of OMTC, any parent entity of OMTC, any subsidiary entity of OMTC, any other subsidiary of any parent entity of OMTC, and any company holding an interest in the parent entity of OMTC, for which the person is an officer or director.

**ANSWER:**

      Dennis James Rogers II
      6520 Del Norte Lane

3

Dallas, Texas 75225
No Home Phone Number
Rogers Mobil No. (575) 649-5004.

**Rogers / OMTC Inc. Business Address**
1920 McKinney Ave., Fl. 7
Dallas, Texas 75201
(575) 649-5004

Thomas Ross



I do not know any other contact information for Mr. Ross.  I believe Mr. Ross is a United
States citizen, but I do not know that for certain. I am a United States citizen residing in
Dallas, Texas.  OMTC is incorporated in Texas and its primary place of business is in
Dallas, Texas.  I do not believe there are other entities that are related to OMTC.  However,
I am president and sole shareholder of several entities listed herein in these Interrogatory
Responses and OMTC did make loans to other entities controlled by me.

**INTERROGATORY NO. 3:**   For each person or entity who has been a business partner or
business affiliate of Rogers within the past five years, state:

    (a)     The entity or person's full name.

    (b)     The entity or person's business address and telephone number and home address
            and telephone number.

    (c)     The entity or person's citizenship, state of domicile, state of incorporation, or
            primary place of business, as may be applicable.

    (d)     List the names of any other persons or entities related to or affiliated with Rogers'
            business undertakings.

**ANSWER:**   For this answer, I do not have personal knowledge as to the individual's citizenship,
though I believe all persons listed are American citizens. My only business partner in the last five
years was Mr. Thomas Ross.  He helped me start OMTC in June 2018.  In November 2018, Mr.
Ross left OMTC.  His last known contact information is provided in response to Interrogatory No.
2.

I also had one employee who worked for Bootstrap Ventures, LLC, Mr. Hunter Fedden.  Mr.
Fedden's last known address and contact information are:

4



My other companies are as follows:

    Bootstrap Ventures, LLC
    1920 McKinney Ave. Floor 7
    Dallas TX, 75201
    (575) 649-5004

    Nomad Development, LLC
    1920 McKinney Ave. Floor 7
    Dallas TX, 75201
    (575) 649-5004

    Organ Mountain Energy, LLC
    1920 McKinney Ave. Floor 7
    Dallas TX, 75201
    (575) 649-5004

    Push Start Industries, LLC*
    1920 McKinney Ave. Floor 7
    Dallas TX, 75201
    (575) 649-5004

    *Push Start Industries is no longer registered in Texas.

I am also the trustee for the Montana Amorosa Revocable Trust.

Subpart (d) to this Interrogatory requests the "names of any other persons or entities related to or affiliated with Rogers' business undertakings."  I understand this request to be requesting names of any person or entity with whom I have done business in the last five years (other than Plaintiffs in this Lawsuit.)  To answer this interrogatory further, please attached as Exhibit A – Business Affiliates, a spreadsheet which is fully incorporated as if set forth herein.  To answer this subpart, I have tried to be inclusive as possible.  To the extent, I inadvertently omitted any persons or entities, please see documents produced in response to Plaintiff's Post Judgment Requests for Production.

**INTERROGATORY NO. 4:** For Rogers, state:

5

(a)     The name and address of your employer.

(b)     The name and address of your spouse.

(c)     The name and address of your spouse's employer.

(d)     Your income and expenses.

(e)     Your spouse's income and expenses.

(f)     A description and the location of your and/or your spouse's real estate and personal property.

(g)     The name and address of all other existing creditors of you and/or your spouse and amounts owed to each.

**ANSWER:**

(a)     Bootstrap Ventures, LLC
        1920 Mckinney Ave. Floor 7
        Dallas TX, 75201

(b)     Allison M. Rogers
        6520 Del Norte Lane
        Dallas, Texas 75225-2619

(c)     Sowell & Co.
        1601 Elm St.,
        Dallas, TX 75201

(d)     My income is currently approximately $2,000 each month, and my current expenses are approximately between $120,000 and $150,000 per year.

(e)     ████████████████████████████████████████████████████████████

(f)     **Real Property:**
        6520 Del Norte Lane
        Dallas, Texas 75225-2619

        **Personal Property:**
        - 2015 Ford F150
        - 2020 Lincoln Aviator
        - Furniture

6

- Clothes
- Mr. Rogers has a wedding band, and his spouse has a wedding band and an engagement ring.
- Electronics: 3 iPhones used for both business and personal use, 4 televisions, 2 personal computers, 2 iPads for personal use, 4 company computers.

(g)     Attached hereto as Exhibit B is a list of individuals and entities who I believe are my creditors. Exhibit B – Creditor List is incorporated by reference as if fully set forth herein.  Additionally, to answer this interrogatory pursuant to Rule 197.2(c), I am producing loan agreements that can be found in two productions folders named "Rogers Loan Agreements and Settlement Agreements" and "OMTC Loan Agreements."  Further, I am producing all legal actions against me located in the production folder "Lawsuit Petitions" though I do not believe all who have claims against me are current creditors.  To the best of my knowledge, I do not believe my wife has any existing creditors.

**INTERROGATORY NO. 5:** State the name and address of all entities, including any corporations, partnerships, persons, and any other entity, who owns any share and/or percentage of OMTC.  Include in your answer the total number of outstanding OMTC shares, the number of shares held by each entity listed, and the percentage of ownership for each entity listed.

**ANSWER:** I am the sole owner of OMTC.  There are 100,000 outstanding shares, all of which I own.

**INTERROGATORY NO. 6:**  State the name and business address of all entities affiliated with OMTC and/or Rogers, including any parent and subsidiary entities and any other entity who may own an interest either directly or indirectly in any parent entities, all subsidiary entities, all subsidiaries of any other entity listed, and all entities in which Rogers owns an interest.  Include in your answer the relationship(s) of all entities listed.

**ANSWER:**  The companies set forth herein are all entities solely owned by me, or formerly owned by me ("Rogers Entities").  To my knowledge, none of the Rogers Entities are parent or subsidiary entities.  The relationship between all the Rogers Entities is that they are, or were, owned by me.

Bootstrap Ventures, LLC
1920 McKinney Ave. Floor 7
Dallas TX, 75201
(575) 649-5004

Nomad Development, LLC
1920 McKinney Ave. Floor 7
Dallas TX, 75201
(575) 649-5004

7

Organ Mountain Energy, LLC
1920 McKinney Ave. Floor 7
Dallas TX, 75201
(575) 649-5004

Push Start Industries, LLC*
1920 McKinney Ave. Floor 7
Dallas TX, 75201
(575) 649-5004

*Push Start Industries is no longer registered in Texas.

While I do not believe the following is an "entity", I am also the trustee for the Montana Amorosa Revocable Trust.

**INTERROGATORY NO. 7:** Have any shares or units of OMTC been sold since 2015?  If so, for each person or entity who has purchased shares, state:

      (a)      The full name and complete address of the purchaser.

      (b)      The number of shares purchased.

      (c)      The amount or other consideration paid for each share.

      (d)      The date of purchase.

**ANSWER:** When I originally answered this interrogatory, I did not believe that any shares or units of OMTC had been purchased or sold, and I still do not believe that any actual funds were used for that purpose.  However, in working on amending this interrogatory answer, I reviewed OMTC's bylaws and a certain Written Consent in Lieu of First Meeting by the Board of Directors of OMTC, Inc. ("Written Consent").  The bylaws indicate that on or about June 22, 2018, I purchased 51,000 shares for $5,000.00 and that Mr. Thomas Ross purchased 49,000 shares for $5,000.00.   The Written Consent indicates that on or about November 27, 2018, OMTC determined to redeem 49,000 originally held by Mr. Thomas Ross for $5,000.00. Again I do not recall that either I or Mr. Ross actually paid $5,000.00 each for the initial purchase, or that Mr. Ross actually sold his shares back to the company for $5,000.  Mr. Ross did leave OMTC in November 2018.  The documents referenced in this answer are located in the folder labeled "OMTC Company Documents."

 **INTERROGATORY NO. 8:** State by location, including street address, city, county and state, all real property in which Rogers or OMTC owns any interest, including any options to purchase property.  For each property listed state the following:

    (a)     The amount for any appraisal made on the property, including the date(s) of appraisal and the name, address and telephone number of the person who did the appraisal.

    (b)     The current fair market value of the property.

    (c)     Any mortgages, liens or other encumbrances on the property, including the amount owed and the name, address and telephone number of the person holding the lien or encumbrance.

    (d)     If the property is currently listed or has been listed for sale in the past five years, state the asking price and the name, address and telephone number of the realtor or agent involved.

    (e)     List all improvements on the property, including a description, the square footage and cost of construction or purchase of any buildings or other structures.

## ANSWER:

**Dennis J. Rogers II:**

(a)     The only appraisal I was able to locate was one performed by John Kirchen, 6610 Robin Road Dallas TX, 75209, 214-769-7769 on 11/12/2015. The amount of the appraisal was $800,000.00.  The appraisal is located in the folder labeled "Rogers Mortgage and Appraisal."

(b)     The current fair market value of my homestead is $812,250.00 according to the Dallas County Appraisal District.

(c)     Mortgage: $672,031.64, B.A.M. Mortgage Capital Group, 13800 Senlic Drive, Suite 200, Dallas, Texas 75234.  Telephone number is unknown.

(d)     My homestead is not currently listed for sale, nor has it been listed for sale within the last five years.

(e)     I have not made any improvements to my homestead.

**OMTC, Inc.:**

     OMTC, Inc. does not own any real property.

9

**INTERROGATORY NO. 9:** If there are any federal, state, county or other tax liens against Rogers or OMTC or property owned by Rogers or OMTC, state the governmental entity holding the lien, the amount of the lien, and where the lien is filed.

**ANSWER:** I believe there is a current tax lien held by the Dallas County Appraisal District (or the Dallas County taxing authority that holds such liens) on my Del Norte property of at least $20,546.12. That is the amount of property taxes I still owe for 2020 and are past due. I currently owe an additional property tax of $17,843.48 if paid by December 31, 2021. In my production responses, I am producing the latest Dallas County Appraisal District tax statement which shows the amount of taxes currently owed on the Del Norte property. That statement is located in the folder labeled "Rogers Del Norte Property Tax Statement." I do not believe that there are any other active liens against me.

**INTERROGATORY NO. 10:** For all debts owed by Rogers or OMTC that total in excess of $10,000, state:

      (a)      The name, address and telephone number of the person or entity to whom the debt is owed.

      (b)      The reason why the debt is owed.

      (c)      The amount of the debt.

      (d)      How the debt is being paid.

      (e)      When final payment is due.

**ANSWER:**

**Rogers:** Pursuant to 197.2(c), please see the spreadsheet attached hereto as Exhibit B – Creditor List which is incorporated as if fully set forth herein, and please also see the documents I am producing in the folder "Rogers Loan Agreements and Settlement Agreements" and "OMTC Loan Agreements." To date, the debts set forth in Exhibit B have not been paid.

**OMTC:** OMTC contends that it owes no debts other than the judgment in this case.

 **INTERROGATORY NO. 11:** If Rogers or OMTC has issued any bonds or other debentures, state:

      (a)      The amount of the bonds or debentures.

      (b)      When they were issued.

    (c)       When they become due.

    (d)       The persons or entities who hold these bonds and/or debentures.

**ANSWER:**  I do not believe that either I or OMTC have issued any bonds of other debentures.

**INTERROGATORY NO. 12:** For each item of personal property with value greater than $1,000, including but not limited to automobiles, jewelry, clothing, bicycles, technology, tools, equipment, inventory that Defendant(s) now own, claim any interest in, or have title to, state:

    (a)       A complete description of the item, including the year, make, model, serial number, and any other permanent identification numbers.

    (b)       The estimated present market value of the item.

    (c)       The complete address of its present location and any other addresses of its possible or intended location within the next year.

**ANSWER:**

**Rogers:**

    **Cars:** 2015 Ford F150 VIN ███████████████, approximately $20,000.00; 2020 Lincoln Aviator, VIN ███████████████, approximately $60,000.00

    **Jewelry:** Rogers' spouse's wedding band engagement ring: approximately $12,000; Rogers wedding band: approximately $6,000.

    **Electronics:** Value unknown, but likely less than $5,000.

    **Furniture:** Value unknown, but likely greater than $1,000.00

    **Clothes:** Value unknown, but likely less than $5,000.

    The above items are located at the Del Norte property. There is no other intended location for these items within the next year.

**OMTC, Inc.:**

    OMTC, Inc. has no assets over $1,000.00.

**INTERROGATORY NO. 13:** List all stocks, bonds and any type of commercial paper in which Rogers or OMTC own or claim an interest.  In your answer, please state:

11

(a)       A full description of the stock, bond or commercial paper, including its present market value.

(b)       The number of shares or certificates owned.

(c)       The name, address and telephone number of the corporation, business or other entity who issued the stock, bond or commercial paper.

**ANSWER:** Neither I nor OMTC claim an interest in any stocks, bonds or any type of commercial paper other than possibly the shares that I own in OMTC. I do not believe that the OMTC shares have any value as of the answering this interrogatory. My other entities are limited liability companies, and I do not believe I own any shares in those entities, though I am the 100% owner of each.

**INTERROGATORY NO. 14:** For all transfer of funds from Rogers or OMTC to any affiliated entity, or between Rogers and OMTC's own bank accounts, from 2015 to the present, state the date each fund transfer was made, the reason for each transfer of funds and each amount of transfer.

**ANSWER:** Pursuant to Rule 197.2(c) I and OMTC are producing bank records to answer this interrogatory. All of my bank records since 2015 are contained in a folder titled "Rogers Bank Statements 2015 - Present" and "OMTC Bank Statements 2015 – Present" that I am providing in response to Plaintiff's Post-Judgment Requests for Production.

**INTERROGATORY NO. 15:** For all transfer of funds from Rogers or OMTC to any party from June 19, 2020 to present, state the date each fund transfer was made, the reason for each transfer of funds and each amount of transfer.

**ANSWER:** Pursuant to Rule 197.2(c) I and OMTC are producing bank records to answer this interrogatory. All of my bank records since 2015 are contained in a folder titled "Rogers Bank Statements 2015 - Present" and "OMTC Bank Statements 2015 – Present" that I am providing in response to Plaintiff's Post-Judgment Requests for Production.

**INTERROGATORY NO. 16:** For the period 2015 to the present, list by cause number, style of case, state and county, all lawsuits, arbitrations or other proceedings in which either Defendant is a party or has any interest that are currently pending, including any lawsuits, arbitrations or other proceedings in which a judgment has been entered, but not satisfied because of an appeal or any other reason.

**ANSWER:** With the exception of this lawsuit, pursuant to Rule 197.2(c), I am producing copies of all the lawsuits, arbitrations or other proceedings in which I, OMTC, or any of my entities were a party from 2015 to the present. Those materials are located in the folder labeled "Lawsuit Petitions." Additionally, the style of each matter is set forth below:

12

- **2016** Civil Action No. 3:16-CV-1315-G; *Dennis J. Rogers II and Push Start Industries, LLC v. Mark Tammariello v. Lewis Ashbey;* in the United States District Court for the Northern District of Texas, Dallas Division;

- **2016** Cause No. DC-16-04625; *Dennis J. Rogers, II v. James Gilbert;* in the 162nd Judicial District Court of Dallas County, Texas;

- **2018** Cause No. DC-18-15521; *Organ Mountain Energy, LLC v. Mexam Export Import Corporation, Firehorse Procurement & Logistics, LLC, and David Garza;* in the 116th Judicial District Court of Dallas County, Texas;

- **2018** Cause No. DC-18-18866; *Push Start Industries, LLC and Organ Mountain Energy, LLC v. Houston Gulf Energy Corp.;* in the 192nd Judicial District Court of Dallas County, Texas (transferred to Montgomery County, Texas, Cause No 19-03-04392 set forth more fully below);

- **2018** Case No. 30-2018-00984385-CU-BC-CJC; *Bootstrap Ventures, LLC v. Equifunds, Inc.;* in the Superior Court of California, County of Orange;

- **2019** Cause No. DC-19-01434; *Luxemborg Trading, LLC v. Organ Mountain Energy, LLC and Dennis J. Rogers, II;* in the 162nd Judicial District Court of Dallas County, Texas;

- **2019** Cause No. DC-19-12251; *Anthony J. Capano and Joanne Copano v. Push Start Industries, LLC and Dennis Rogers;* in the 192nd Judicial District Court of Dallas County, Texas;

- **2019** Cause No. AAA No. 01-19-0004-2343; *Organ Mountain Energy, LLC and Push Start Industries, LLC vs. Houston Gulf Energy Corporation, Donald Petrillo, Jack Tompkins, Paul Bornstein and John Ehrman*;

- **2019** Cause No.19-03-04392; *Push Start Industries, LLC & Organ Mountain Energy, LLC v. Houston Gulf Energy Corporation, Jack Tompkins, Phil Tuttle, Paul Bornstein, and John Ehrman,* in the 284th Judicial District Court of Montgomery County, Texas.

- **2019** Case No. 19LBCV00725; *ACMC Finance and Trade, LLC v. Energy Trading Company, LLC, Petro Diamond, Inc. Jack Khachatryan, Sona Apikian, Sargis Khachatryan, Gianni Saryan, John Davids, Dennis Rogers, Jr.;* Superior Court of California, County of Los Angeles;

- **2020** Case No. DC-20-01897; *Funderz.net LLC v. OMTC, Inc. and Dennis James Rogers II;* in the 191st Judicial District Court of Dallas County;

13

- **2020** Cause No. DC-20-17073; *Clark Hodges v. Bootstrap Ventures, LLC and Dennis Rogers;* in the 160th Judicial District Court of Dallas County, Texas;

- **2020** Civil No. 200907123; *Mandarin Capital, LLC v. Montana Amorosa Revocable Trust, a Texas Trust; Dennis J. Rogers II;* in the Third Judicial District Court for Salt Lake County, Utah;

- **2021** Civil Action No. 3:21-cv-00013; *John S. Foreman, III and Andre C. LeBlanc v. Dennis Rogers and Bootstrap Ventures, LLC,* in the United States District Court for the Northern District of Texas, Dallas Division;

- **2021** Cause No. DC-21-00960; *Scott Faulkner v. Dennis Rogers and Bootstrap Ventures, LLC*; in the 116th Judicial District Court of Dallas County, Texas;

- **2021** Cause No. DC-21-03076; Debra A. Van Cleve, Russell Van Cleve, and Angela Garbiso v. Bootstrap Ventures, LLC and Dennis Rogers; in the 68th Judicial District Court of Dallas County, Texas;

- **2021** Case No. A-21-842897-C; *Tony May vs. Dennis Rogers, Bootstrap Ventures, LLC;* in Department 27, District Court of Clark County, Nevada.

**INTERROGATORY NO. 17:** List all agreements, now in effect, entered into by Rogers or OMTC which include any language concerning Rogers or OMTC indemnifying or holding harmless some other entity. Include in your answer, a description of each such agreement, the name, address and telephone number of each person who is a possible beneficiary of the indemnity, and the maximum potential obligation to indemnify or hold harmless.

**ANSWER:**    Pursuant to Rule 197.2(c), I am producing all loan agreements, security agreements, collateral assignments, promissory notes and settlement agreements in my possession that may require me or OMTC to indemnify or hold harmless some other entity. They are located in folders labeled "Rogers Loan Agreements and Settlement Agreements" and "OMTC Loan Agreements." In response to these interrogatories I have also attached a creditor list attached hereto as Exhibit B. I do not know the maximum potential obligation to indemnify or hold harmless, but would refer to the language of any such agreement.

**INTERROGATORY NO. 18:** List by name of insurance carrier, policy number, and amount of coverage all insurance policies which may afford coverage for all or part of the judgment in this case.

**ANSWER:** I do not believe I or OMTC have an insurance policy which may afford coverage for all or part of the judgment in this case. However, in an abundance of caution, I am producing a Gemini Insurance Company Policy, Policy No. ███████. It is located in the folder labeled "Insurance Agreements."

14

**INTERROGATORY NO. 19:** List all banks or other financial institutions where Rogers or OMTC has a checking, savings or any other type of account. In your answer, include the following information:

        (a)      The name of bank.

        (b)      The account number and current balance.

        (c)      The address and telephone number of the bank.

        (d)      The date the account was opened.

**ANSWER:**

Pursuant to Rule 197.2(c), I and OMTC are producing bank records to answer this interrogatory. All of my bank records since 2015 are contained in folders titled "Rogers Bank Statements 2015 - Present" and "OMTC Bank Statements 2015 – Present."  Please also see Exhibit C, which is a summary of my accounts and includes the month and year each account was opened.  Exhibit C is incorporated as if fully set forth herein.

**INTERROGATORY NO. 20:** List all persons who have audited the financial records of Rogers or OMTC anytime during the past 10 years. Please include in your answer the name, address and telephone number for such persons.

**ANSWER:**  To my knowledge, no persons have audited my financial records or OMTC's financial records in the last 10 years.

**INTERROGATORY NO. 21:** Do Rogers or OMTC have any money on deposit in a name other than their own?  If it does for each such account state:

        (a)      The type of account.

        (b)      The name, address and telephone number of the institution which holds the account.

        (c)      The full name and number under which the account is maintained.

        (d)      The current balance of the account.

**ANSWER:**  I do not have any money on deposit in a name other than my own.  OMTC does not have any money on deposit in a name other than OMTC.

15

CAUSE NO. DC-20-10214

| | | |
|---|---|---|
| STEVEN WEBSTER, AARON WEBSTER, and DENNIS WOODS, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § § | |
| v. | § § | DALLAS COUNTY, TEXAS |
| DENNIS J. ROGERS, II and OMTC, INC., | § § | |
| *Defendants.* | § | 191ST JUDICIAL DISTRICT |

## VERIFICATION

My name is Dennis J. Rogers II. My date of birth is September 30, 1988. My address is

6520 Del Norte Lane, Dallas, Texas 75225. I declare under the penalty of perjury under the laws

of the State of Texas that my First Amended Answers to Plaintiff Steven Webster's Interrogatories

to Aid in the Enforcement of Judgment are true and correct.

SIGNED this *10th* day of December, 2021 in Dallas County, Texas.

Dennis J. Rogers, II

**LIST OF ROGERS' KNOWN CREDITORS**

| NAME OF CREDITOR | ADDRESS | PHONE NUMBER | AMOUNT OWED | WHEN DEBT DUE |
|---|---|---|---|---|
| ███ | ███ | ███ | $1,500,000 | Past Due |
| ███ | ███ | | $500,000 | Past Due |
| ███ | ███ | | $350,000 | Past Due |
| ███ | ███ | | $500,000 | Past Due |
| | ███ | | $350,000 | Past Due |
| Andre Leblanc | ███ | | $350,000 | Past Due |
| John Foreman | ███ | | $350,000 | Past Due |
| | ███ | | $400,000 | Past Due |
| | ███ | | $400,000 | Past Due |
| Scott Faulkner | ███ | ███ | $250,000 | Past Due |
| Angela Garbiso | ███ | | $300,000 | Past Due |
| ███ | ███ | ███ | $850,000 | Past Due |
| Tony May | ███ | | $65,000.00 | Past Due |
| ███ | ███ | ███ | $50,000 | Past Due |
| | ███ | | $125,000 | Past Due |
| Russell Van Cleve | ███ | | $65,000 | Past Due |
| Debra Van Cleve | ███ | | $65,000 | Past Due |
| | ███ | | $150,000 | Past Due |
| | ███ | | $700,000 | Past Due |
| Gerard Ballanco Jr | ███ | | $250,000 | Past Due |
| David Meche | ███ | | $100,000 | Past Due |
| Perry Judice | ███ | | $100,000 | Past Due |
| Steven A Webster | ███ | | $6,250,000 | Past Due |
| Funderz.net | ███ | | $0.00 | Past Due |
| Mandarin Capital | ███ | | $6,500,000 | Past Due |
| | ███ | | $175,000 | Past Due |
| ███ | ███ | ███ | $250,000.00 | Past Due |
| | ███ | | $250,000 | Past Due |

CONFIDENTIAL

## Summary of Dennis Rogers's Cash and Accounts with Financial Institutions

| Name of Account/Institution | Account Name | Account number | Type of Account | Name on Withdrawal | Most Recent Balances | Miscellaneous Comments | Month and Year the account was opened |
|---|---|---|---|---|---|---|---|
| **Acorns** | Dennis Rogers | | Investment Account | Dennis Rogers | $437.28 | | Oct-14 |
| **Amazon Store Card** | Dennis Rogers | | Credit Card | Dennis Rogers | ($853.02) | I do not have a physical card, and the statements only have 4 digits. | Jan-18 |
| **Amex** | Dennis Rogers | | Credit Card | Dennis Rogers & Allison Rogers | ($92,545.04) | | Mar-17 |
| **Apple Card** | Dennis Rogers | | Credit Card | Dennis Rogers | ($6,251.24) | | Jan-21 |
| **Bank of America CC** | Dennis Rogers | | Credit Card | Dennis Rogers | ($531.59) | | Jun-16 |
| **Best Buy** | Dennis Rogers | | Credit Card | Dennis Rogers | $0.00 | I do not have a physical card, and the statements only have 4 digits. | Jul-20 |
| | | | | | | | |
| **Chase Bank** | | | | | | | |
| Bootstrap_8315 | Bootstrap Ventures, LLC | | Checking Account | Dennis Rogers | $38.03 | | Jun-19 |
| OMTC_7879 | OMTC, INC | | Checking Account | Dennis Rogers | $7,545.88 | Account has a hold of $7,813,500.00 | Jan-19 |
| OMTC_1628 | OMTC, INC | | Checking Account | Dennis Rogers | $11.87 | Account has a hold of $7,813,500.00 | Mar-19 |
| OMTC_3756 | OMTC, INC | | Savings Account | Dennis Rogers | $40.14 | Account has a hold of $7,813,500.00 | Aug-19 |
| Organ_8909 | Organ Mountain Energy, LLC | | Checking Account | Dennis Rogers | $21.68 | | Aug-19 |
| Personal_1503 | Dennis Rogers | | Checking Account | Dennis Rogers | $18.96 | Account has a hold of $7,813,500.00 | Jun-18 |
| SW Credit Card | Dennis Rogers | | Credit Card | Dennis Rogers | ($11,304.29) | | Jan-14 |
| Brokerage - 0938 | Dennis Rogers | | Brokerage Account | Dennis Rogers | $0.00 | Was never funded there are no statements | Never opened |
| Managed Brokerage 9358 | Dennis Rogers | | Brokerage Account | Dennis Rogers | $0.00 | Was never funded there are no statements | Never opened |
| | | | | | | | |
| **Discover Card** | Dennis Rogers | | Credit Card | Dennis Rogers | -15,234.75 | I do not have a physical card, and the statements only have 4 digits. | Jun-18 |
| | | | | | | | |
| **Frost Bank** | | | | | | | |
| Bootstrap_8457 | Bootstrap Ventures, LLC | | Checking Account | Dennis Rogers | ($64.85) | | 1-May |
| Dennis Personal_9321 | Dennis Rogers | | Checking Account | Dennis Rogers | ($0.31) | | May-18 |
| Household Checking_6271 | Household Checking | | Checking Account | Dennis Rogers & Allison Rogers | $76.00 | | Jun-19 |
| Household Savings_3423 | Household Savings | | Savings Account | Dennis Rogers & Allison Rogers | $2.25 | Quarterly Statements unless there was monthly activities | May-19 |
| Nomad_8449 | Nomad Development, LLC | | Checking Account | Dennis Rogers | ($34.24) | | May-18 |
| OMTC_2460 | OMTC, INC | | Checking Account | Dennis Rogers | $10.00 | | Feb-19 |
| OMTC_2223 | OMTC, INC | | Checking Account | Dennis Rogers | $63.77 | | Mar-19 |
| Organ_8430 | Organ Mountain Energy, LLC | | Checking Account | Dennis Rogers | $5.00 | | May-18 |
| | | | | | | | |
| **Goldman Sachs** | | | | | | | |
| Dennis Cash Account_7088 | Dennis Rogers Cash Account | | Investment Account | Dennis Rogers | $5,262,357.00 | This account is securing the loan as set forth in GS Account # 8920. Additionally, I have reviewed my GS account statements, and I do not see the full account number. That is why I only included the last four digits. | Dec-19 |
| Dennis Bank Loan_8920 | Dennis Rogers Bank Loan | | Bank Loan | Dennis Rogers | ($5,000,000.00) | | Dec-19 |
| Dennis_0488 | Dennis Rogers | | Investment Account | Dennis Rogers | $0.00 | | Dec-19 |
| Dennis_0496 | Denis Rogers Cardinal: SCV | | Investment Account | Dennis Rogers | $0.00 | | Dec-19 |

CONFIDENTIAL

## Summary of Dennis Rogers's Cash and Accounts with Financial Institutions

| Name of Account/Institution | Account Name | Account number | Type of Account | Name on Withdrawal | Most Recent Balances | Miscellaneous Comments | Month and Year the account was opened |
|---|---|---|---|---|---|---|---|
| Dennis_0579 | Dennis Rogers Municipal Fixed Income | | Investment Account | Dennis Rogers | $0.00 | | Dec-19 |
| Dennis_0587 | Dennis Rogers Advisory | | Investment Account | Dennis Rogers | $0.00 | | Dec-19 |
| Dennis_3052 | Dennis Rogers Options Account | | Investment Account | Dennis Rogers | $13,940.42 | | Dec-19 |
| Dennis_6130 | Dennis Rogers MLP | | Investment Account | Dennis Rogers | $0.00 | | Dec-19 |
| Dennis_6148 | Dennis Rogers Tax Adv | | Investment Account | Dennis Rogers | $0.00 | | Dec-19 |
| Dennis_6163 | Dennis Rogers Brown: Small Cap | | Investment Account | Dennis Rogers | $0.00 | | Dec-19 |
| Dennis_6171 | Dennis Rogers Eagle Dynamic Equity | | Investment Account | Dennis Rogers | $0.00 | | Dec-19 |
| | | | | | | | |
| **Paypal** | Dennis Rogers | | Credit Line | Dennis Rogers | ($1,873.87) | | 18-Dec |
| | | | | | | | |
| **Robinhood** | Dennis Rogers | | Investment Account | Dennis Rogers | $309.27 | When there was no montly activity, Robinhood did not provide a statement. | Feb-15 |

CONFIDENTIAL

# EXHIBIT U

FILED
1/22/2021 2:23 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Alicia Mata DEPUTY

CAUSE NO. DC-21-00960 _____

| | | |
|---|---|---|
| **SCOTT FAULKNER** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | 116th _____ **JUDICIAL DISTRICT** |
| | § | |
| **DENNIS ROGERS and BOOTSTRAP** | § | |
| **VENTURES, LLC** | § | |
| | § | |
| **Defendant.** | § | **DALLAS COUNTY, TEXAS** |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW Scott Faulkner (hereinafter "Plaintiff") and files this Plaintiff's Original Petition against Dennis Rogers and Bootstrap Ventures, LLC (collectively "Defendants") and in support respectfully shows the Court as follows:

### I. DISCOVERY CONTROL PLAN

1.    Plaintiff intends to conduct discovery under Level 3 and requests entry of a scheduling order tailored to the particular circumstances of this suit. Pursuant to TEX. R. CIV. P. 47(c) Plaintiff seeks monetary relief over $200,000 but not more than $1,000,000.

### II. PARTIES

2.    Plaintiff Scott Faulkner is an individual and resident of Dallas County, Texas. The last three digits of his Texas Driver's License are 116 and the last three digits of his Social Security Number are 099.

3.      Defendant Dennis Rogers (hereinafter "Rogers") is an individual Texas resident who resides at 6520 Del Norte Lane, Dallas, Dallas County, Texas 75225. Defendant Rogers may be served with process wherever he may be found.

4.      Defendant Bootstrap Ventures, LLC (hereinafter "Bootstrap") is a Texas limited liability company with its principal office located at 1920 McKinney Ave., FL 7, Dallas, Dallas County, Texas 75201. Defendant Bootstrap may be served with process through its registered agent, United States Corporation Agents, Inc., 9900 Spectrum Drive, Austin, Texas 78717.

## III.  JURISDICTION AND VENUE

5.      The amount in controversy and other relief sought are within the jurisdiction of this court. Venue is proper in Dallas County, Texas because all or a substantial part of the events giving rise to the causes of action asserted herein occurred in Dallas County, Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(1). Venue is also proper in Dallas County, Texas because it was the county of Defendant Rogers' residence at the time the causes of action asserted herein accrued. TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(2). Venue is also proper in Dallas County, Texas because it was the county of Defendant Bootstrap Ventures' principal office in Texas at the time the causes of action asserted herein accrued. TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(3).

## IV.  FACTS

6.      In September 2020, Rogers approached Faulkner about an investment opportunity that his company, Boostrap Ventures, had identified. Rogers represented that Bootstrap was in the business of identifying, purchasing, and re-selling valuable water rights. Rogers further represented that he and Bootstrap had been very successful and closed numerous similar transactions.

7.      In this particular instance, Rogers represented that he and Bootstrap had secured the opportunity to purchase water rights in New Mexico, as well as a buyer to whom they could immediately re-sell the water rights.  Rogers represented that had and Bootstrap did not have $5,500,000 in liquid capital necessary to close the transaction and that he needed investors to raise the necessary funds.  Rogers represented that the funds were only necessary for the short period of time to purchase and re-sell the water rights, at most a couple of weeks.  Once the water rights had been re-sold, Faulkner would be repaid.

8.      Initially, Rogers provided Faulkner with a purported proposed promissory note dated September 18, 2020 in which Bootstrap offered to borrow, and Rogers offered to personally guarantee, repayment of $200,000 by September 30, 2020.  However, Faulkner declined to sign the purported promissory note and instead moved forward as an investor rather than a lender.

9.      Based upon Rogers and/or Bootstrap's representations, Faulkner wired $200,000 to Rogers/Bootstrap on September 18, 2020.  Afterward, Rogers told Faulkner that closing had been delayed until October 9, 2020 and additional funds were needed to complete the transaction. Further, Rogers and/or Bootstrap represented that Faulkner could increase the return on his investment if he put in the funds needed to close the deal.  Based on these representations by Rogers and/or Bootstrap, Faulkner wired an another $30,000 on September 28, 2020 and an additional $160,000 on September 29, 2020.  These funds were wired based on the representation of Mr. Rogers and/or Bootstrap that the New Mexico water rights transaction would close on October 9, 2020.  However, the transaction did not close as represented, and it is not clear whether it ever existed in the first place.

10.      After the closing of the New Mexico water rights deal was supposed to take place, Faulkner repeatedly asked the status and was given several conflicting and untrue explanations by

---

Mr. Rogers and/or Bootstrap Ventures.  Once it became apparent that the transaction did not and was not going to close, Mr. Faulkner requested the return of the money he had given Rogers and/or Bootstrap to fund the New Mexico water rights transaction.

11.    In response to Faulkner's request for the return of his money, Rogers and/or Bootstrap made numerous false representations concerning the return of the funds.  For example, Mr. Rodgers and/or Bootstrap set up meetings at a bank with Mr. Faulkner where he was supposed to obtain a cashier's check, only to not show up.  Similarly, Mr. Rogers and/or Bootstrap provided screenshots of purported transfers or wires of funds that were allegedly going to be used to repay Mr. Faulkner.  However, those screenshots were either fake or doctored.  At one point, Rogers claimed that he was unable to meet with Faulkner because he had COVID-19.  However, upon information and belief, all of these representations were false.

12.    It appears that the New Mexico water rights transaction was either entirely a fiction designed to defraud Faulkner, or if it was real, Rogers and/or Bootstrap illegally diverted the funds supplied by Faulkner.

13.    After Faulkner threatened to file suit, Rogers and/or Bootstrap offered to pay Faulkner back in installments as part of a settlement agreement.  On December 15, 2020, Faulkner, Rogers, and Bootstrap executed a Settlement Agreement and Mutual Release ("Settlement Agreement") that provided, among other things, for Rogers and/or Bootstrap to pay Faulkner a total of $450,000 in seven installments between December 10, 2020 and March 2, 2021.  The Settlement Agreement provided that Faulkner's claims against Rogers and/or Bootstrap would be released only "[u]pon timely receipt of the full Settlement Amount."

14.    While Rogers and/or Bootstrap paid the first installment due under the Settlement Agreement, they failed to make any other payments.  Instead, Rogers and/or Bootstrap have

resorted to their earlier pattern of lying and attempting to delay instead of complying with their obligations under the Settlement Agreement.

15.    Despite numerous demands orally and in writing, Rogers and Bootstrap have failed and refused to perform under the Settlement Agreement and Faulkner was left with no alternative but to initiate this lawsuit.

## V.  CAUSES OF ACTION

### Count 1 – Fraud Against Rogers and Bootstrap

16.    Plaintiff incorporates by reference all previous and subsequent paragraphs as if set forth in full.

17.    Rogers and/or Bootstrap made numerous false statements regarding the existence of the New Mexico water rights transaction, the closing of that transaction, and the return of Faulkner's funds once it became clear that the transaction was either fictitious or would not take place.  These representations were material in that they were designed to induce Faulkner to wire money to Rogers and/or Bootstrap, and refrain from taking action after closing was supposed to take place.   These representations were false, and Rogers and/or Bootstrap knew the representations were false when made and/or made the representations recklessly, as a positive assertion, and without knowledge of their truth.  Rogers and/or Bogart made the representations with the intent that Faulkner rely on them.  Faulkner did in fact rely on Rogers and/or Bootstrap's representations, which caused Faulkner injury within the jurisdictional limits of this Court and for which he now sues.

### Count 2 – Statutory Fraud Against Rogers and Bootstrap

18.    Plaintiff incorporates by reference all previous and subsequent paragraphs as if set forth in full.

19.    The New Mexico water rights deal was a transaction involving real estate or stock. During the New Mexico water rights transaction, Rogers and/or Bootstrap made false representations of fact, made false promises, or benefited by not disclosing that another party's representation or promise was false.  These false representations and promises were made for the purpose of inducing Faulkner into an investment in the New Mexico water rights deal.  Faulkner relied on the false misrepresentations or promises made by Rogers and/or Bootstrap by entering into the New Mexico water rights deal.  This reliance caused Faulkner injury within the jurisdictional limits of this Court and for which he now sues.

## Count 3 – Theft/Conversion Against Rogers and Bootstrap

20.    Plaintiff incorporates by reference all previous and subsequent paragraphs as if set forth in full.

21.    Faulkner had a possessory right to the money he wired Rogers and/or Bootstrap for the New Mexico water rights transaction.  Rogers and/or Bootstrap unlawfully appropriated the money by taking it without Faulkner's effective consent and with the intent to deprive Faulkner of the money.  Rogers and/or Bootstrap's unlawful appropriation caused Faulkner injury within the jurisdictional limits of this Court and for which he now sues.

## Count 4 – Breach of Contract Against Rogers and Bootstrap

22.    Plaintiff incorporates by reference all previous and subsequent paragraphs as if set forth in full.

23.    The Settlement Agreement is a valid enforceable contract between Faulkner, Rogers, and Bootstrap.  Faulkner performed, tendered performance, or was excused from performing all his contractual obligations.  Rogers and Bootstrap breached the Settlement Agreement by failing to make payment to Faulkner in violation of Paragraph 1 of the Settlement

---

Agreement.  Rogers and Bootstrap's breaches have caused Faulkner actual damage for which he now sues.

**Count 5 – Attorney's Fees and Costs**

24.    Plaintiff incorporates by reference all previous and subsequent paragraphs as if set forth in full.

25.    Due to Rogers and Bootstrap's actions, Faulkner was compelled to retain the services of the undersigned counsel.

26.    Faulkner is entitled to recover his attorney's fees, court costs, and expenses under Paragraph 9 of the Settlement Agreement which contains prevailing party language.

27.    Because this is a suit on a written contract, Faulkner is also entitled to recover his attorney's fees, court costs, and expenses under Chapter 38 of the Texas Civil Practice & Remedies Code, including fees and costs for any appeals to the Court of Appeals, and/or the Supreme Court of Texas.

**Count 6 - Interest**

28.    Plaintiff incorporates by reference all previous and subsequent paragraphs as if set forth in full.

29.    Plaintiff seeks pre- and post-judgment interest on all amounts sought herein at the maximum rate allowed by law.

## VI.  CONDITIONS PRECEDENT

30.    All conditions precedent to the relief requested herein have been performed or have occurred.

Ex. Pg. 289

## VII.  <u>REQUEST FOR DISCLOSURE</u>

31.    Pursuant to Texas Rule of Civil Procedure 194, Faulkner requests that Rogers and Bootstrap disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## VIII.  <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff Scott Faulkner prays that Defendant Dennis Rogers and Defendant Bootstrap Ventures, LLC, be cited to answer and appear herein, and after a trial on the merits, the Court enter a final judgment against Defendants, awarding to Plaintiff:

1.    Actual damages;

2.    Exemplary damages;

3.    Attorney's fees, expenses, and costs of court; and

4.    Pre- and post-judgment interest at the maximum rate allowed by law.

Plaintiff also prays for such other and further relief, at law or in equity, to which he may be justly entitled.

Respectfully submitted,

Eamonn J. Wiles          24049556
Anthony R. Cuesta        24084378

**DECKER JONES, P.C.**
801 Cherry Street, Unit 46
Burnett Plaza, Suite 2000
Fort Worth, Texas 76102
(817) 336-2400 Telephone
(817) 336-2181 Facsimile
ewiles@deckerjones.com
acuesta@deckerjones.com
**ATTORNEYS FOR PLAINTIFF
SCOTT FAULKNER**

# EXHIBIT V

## CAUSE NO. DC-21-00960

| | | |
|---|---|---|
| SCOTT FAULKNER | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 116TH JUDICIAL DISTRICT |
| | § | |
| DENNIS ROGERS and BOOTSTRAP | § | |
| VENTURES, LLC | § | |
| | § | |
| Defendant. | § | DALLAS COUNTY, TEXAS |

## AGREED FINAL JUDGMENT

On this day came on to be heard the above-entitled and numbered cause between Plaintiff Scott Faulkner ("Plaintiff") and Defendants Dennis Rogers and Bootstrap Ventures, LLC (collectively "Defendants") (Plaintiff and Defendants are collectively referred to herein as the "Parties"). The Parties announced to the Court that they have reached an agreement with respect to all matters in controversy between them, and request that the Court enter an Agreed Final Judgment memorializing such agreement. The Court, noting the agreement of the parties, is of the opinion that such agreement be and the same is hereby made the order of the Court.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS** that Plaintiff is entitled to recover from Defendants, jointly and severally, for his cause of action for fraud.

**THE PARTIES FURTHER AGREE AND THE COURT FURTHER FINDS** that Plaintiff is entitled to recover from Defendants, jointly and severally, for his cause of action for statutory fraud.

**THE PARTIES FURTHER AGREE AND THE COURT FURTHER FINDS** that

Plaintiff is entitled to recover from Defendants, jointly and severally, for his cause of action for theft/conversion.

THE PARTIES FURTHER AGREE AND THE COURT FURTHER FINDS that Plaintiff is entitled to recover from Defendants, jointly and severally, for his cause of action for breach of contract.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff have and recover Judgment against Defendants, jointly and severally, in the principal amount of Four Hundred Thirty Thousand and NO/100 Dollars ($430,000.00), together with all post-judgment interest on such sum at the maximum rate allowed by law from the date this Agreed Judgment is signed by the Court until paid.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff shall be entitled to all writs and processes as may be necessary in the enforcement and collection of this Judgment.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff shall be entitled to recover all attorney's fees and reasonable costs incurred for any future enforcement of this Judgment.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that in the event of an unsuccessful appeal by either or both Defendants to the court of appeals, Plaintiff shall be entitled to attorney's fees in the amount of Twenty-Five Thousand and NO/100 Dollars ($25,000.00). In the event of an unsuccessful appeal by either or both Defendants to the Supreme Court of Texas, Plaintiff shall be entitled to additional attorneys' fees in the amount of Twenty-Five Thousand and NO/100 Dollars ($25,000.00).

All other relief requested and not expressly granted herein is denied. This judgment fully and finally disposes of all parties and all claims.

AGREED FINAL JUDGMENT                                                    PAGE 2 OF 4

SIGNED on the 30th day of November , 2021.

JUDGE PRESIDING

## AGREED AND APPROVED AS TO FORM AND SUBSTANCE:

By: 

Eamonn J. Wiles
State Bar No. 24049556

**DECKER JONES, P.C.**
801 Cherry Street, Suite 2000, Unit #46
Fort Worth, Texas 76102
Telephone: (817) 336-2400
Telecopier: (817) 336-2181
E-mail: ewiles@deckerjones.com

**ATTORNEY FOR PLAINTIFF**

[REMAINDER OF PAGE INTENTIONALLY BLANK – SIGNATURE PAGE FOLLOWS]

Ex. Pg. 294

## AGREED AND APPROVED AS TO FORM AND SUBSTANCE:

Signature: _____

Dennis J. Rogers II, Individually, *pro se*

Date Executed:    09-16-21

Signature: _____

Dennis J. Rogers II, on Behalf of Bootstrap
Ventures, LLC

Title:    President

Date Executed:    09-16-21

# EXHIBIT W

JASON R. HULL [11202]
JHULL@MOHTRIAL.COM
KEVIN M. PAULSEN [15219]
KPAULSEN@MOHTRIAL.COM
CONNOR B. ARRINGTON [17560]
CARRINGTON@MOHTRIAL.COM
**MARSHALL OLSON & HULL, P.C.**
NEWHOUSE BUILDING
TEN EXCHANGE PLACE, SUITE 350
SALT LAKE CITY, UTAH 84111
TELEPHONE: 801.456.7655

ATTORNEYS FOR PLAINTIFF

## IN THE THIRD JUDICIAL DISTRICT COURT FOR
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MANDARIN CAPITAL, LLC, a Utah limited liability, | **COMPLAINT** |
| Plaintiffs, | |
| v. | Civil No. |
| MONTANA AMOROSA REVOCABLE TRUST, a Texas Trust; DENNIS J. ROGERS II, an individual and manager of the Montana Amorosa Revocable Trust, | Judge |
| Defendants. | |

Plaintiff Mandarin Capital, LLC hereby complains of defendants and alleges as follows:

## GENERAL ALLEGATIONS

### *The Parties, Jurisdiction, and Venue*

1.      Plaintiff Mandarin Capital, LLC ("Mandarin") is a Utah limited liability company

that has its principal place of business in Holladay, Utah.

2.      Defendant Montana Amorosa Revocable Trust (the "Trust") is a revocable trust formed under the laws of the state of Texas.

3.      Defendant Dennis J. Rogers II ("Rogers") is an individual who resides in Dallas, Texas.

4.      This Court has jurisdiction over this matter pursuant to Utah Code §§ 78A-5-102(2).

5.      Venue is proper in this court pursuant to Utah Code §§ 78B-3-304(2) or 78B-3-307(2)–(3).

### *Factual Background*

6.      Jason Meyer ("Meyer"), the principal of Mandarin, was introduced to Rogers through a mutual friend in 2019.  Rogers represented to Meyer that his family had made millions of dollars in the water business in New Mexico and that he continued to make millions as a water broker in Texas and New Mexico.

7.      In February 2020, Rogers contacted Meyer regarding a transaction in which he had a client that required water rights in New Mexico for a construction project.

8.      He represented the transaction as follows:

9.      The client would acquire a certain number of water shares for a predetermined price.

10.     Rogers would then acquire the water rights from individuals at a lower price, and then sell them to the client.

11.     Rogers represented that the client must escrow funds so that the transaction has no risk.

12.    He represented that the funds would be held by Fidelity Title in New Mexico.

13.    Capital was required to purchase the actual water rights that would then be instantly transferred to the client, who would release funds.

14.    Meyer agreed to fund this transaction utilizing Mandarin.

15.    Mandarin took as collateral for this transaction properties owned by Rogers in Dallas, Texas.

16.    Mandarin funded one other transaction, taking the same properties as collateral.

17.    Rogers paid back both of these transactions.

18.    In July 2020, Rogers indicated that a large client, Midfrisian Dairy ("Midfrisian"), was building a dairy/yogurt factory in New Mexico and required over 1,000 acre feet of water, for which it would pay over $10 million.

19.    Rogers represented that Midfrisian had ample funds escrowed to cover the purchase, that Mandarin's funds would sit in escrow until Rogers had identified the water rights, only leaving the account once he had identified all of the water rights and was sure that the transaction could be completed, and that if for some reason Midfrisian did not release funds, Mandarin's money would be secured in escrow and simply released back to Mandarin.

20.    Rogers guaranteed a return of Mandarin's money regardless of the closing described above with the following:  (1) First Trust Deed on two lots in Dallas, Texas worth $3.6 million dollars owned by the Montana Amorosa Revocable Trust (the "Trust") and located at 6339 Deloache Ave., Dallas, TX, 75225 APN # 00000406807000000, and 6347 Deloache Ave., Dallas, TX, 75225 APN# 00000406810000000 (the "Properties"), (2) a personal guarantee by Rogers that was backed by liquid securities held at Goldman Sachs in account numbers XXX-

XX057-9, XXX-XX305-2, and XXX-XX708-8 (the "Account") with a value in excess of $9

million dollars with a promise that funds from that account would not be transferred or

withdrawn and that Rogers would provide monthly statements from the Account to Mandarin to

show that no funds were being transferred or withdrawn.

21.    Rogers sent a screenshot to Meyer to show the amount of money, $9,482,608, he

held in the Account.

22.    Rogers also represented that he had no debt individually or in any of his

businesses.

23.    He also represented that through his business Bootstrap Ventures, he owned a

position in Perpetual Media valued at $15 million dollars.

24.    He also sent Meyer a signed personal financial statement representing a liquid net

worth of $14 million dollars.

25.    Based on Rogers' representations, Meyer agreed to loan $5,000,000 to the Trust

and Rogers through Mandarin on July 24, 2020.

26.    This loan was memorialized in a loan agreement dated July 24, 2020 (the "First

Loan Agreement").  The First Loan Agreement included provision of collateral in the form of the

Properties, as well as a personal guarantee by Rogers, with the representation that he held over

$9 million dollars in liquid assets in the Account and that he would not transfer or withdraw

money out of the Account.

27.    Under the First Loan Agreement, the Trust and Rogers were required to repay the

loan plus a $600,000 loan fee by November 15, 2020.

Ex. Pg. 300

28.    The First Loan Agreement provided that the loan would be in default, if, among

other reasons, the

> Borrower fails to timely observe or perform any covenant, condition, requirement,
> or agreement required to be observed or performed by Borrower under this
> Agreement; Borrower fails to make any payment required by this Agreement
> when the same becomes due and payable in accordance with the terms hereof;
> Any warranty, representation, or statement made of furnished to Lender by or on
> behalf of Borrower in relation to this Loan Agreement proves to have been false
> in any material respect when made or furnished; The Borrower files or has filed
> against it any bankruptcy proceeding; or Lender deems itself unsecured in
> Lender's reasonable, sole discretion.

29.    In the event of default, the loan fee of $600,000 becomes immediately due and

payable,

> while additional interest will accrue on the unpaid Principal Loan, Loan Fee, and
> all other unpaid costs, fees and expenses at the rate of two percent (2%) every
> fourteen (14) days ("Default Rate"), until the Loan Commitment is paid in full.
> Additionally, Borrower will pay a one time four present fee (4%) on all
> outstanding amounts.

30.    The First Loan Agreement contains an attorney fees provision, providing that the

defaulting party "agrees to pay all costs and expenses of collection, as well as costs incurred to

enforce this Agreement, including a reasonable attorney fee."

31.    Defendants have not repaid the amounts owed under the First Loan Agreement.

32.    On July 24, 2020, Rogers and Meyer entered into a fee agreement (the "First Fee

Agreement") whereby Rogers agreed to pay an additional loan fee of $325,000 together with the

loan fee contained in the First Loan Agreement before the due date of November 15, 2020.

33.    Rogers has not paid the amounts owed under the First Fee Agreement.

34.     In August 2020, Rogers informed Meyer that he had secured all of the water

rights, but that Midfrisian had expanded its project and required additional water rights.  To this

end, he stated that he needed an additional $1.4 million dollars.

35.     Based on Rogers' representations, Meyer agreed to loan $1.4 million dollars to

the Trust and Rogers through Mandarin on or about August 28, 2020.

36.     This loan was memorialized in a loan agreement dated August 27, 2020 (the

"Second Loan Agreement").  The Second Loan Agreement, like the First Loan Agreement,

included provision of collateral in the form of the Properties, as well as a personal guarantee by

Rogers, with the representation that he held over $9 million dollars in liquid assets in the

Account and that he would not transfer or withdraw money out of the Account.

37.     Under the Second Loan Agreement, the Trust and Rogers were required to repay

the loan plus a $168,000 loan fee by October 15, 2020.

38.     The Second Loan Agreement provided that the loan would be in default, if,

among other reasons, the

> Borrower fails to timely observe or perform any covenant, condition, requirement,
> or agreement required to be observed or performed by Borrower under this
> Agreement; Borrower fails to make any payment required by this Agreement
> when the same becomes due and payable in accordance with the terms hereof;
> Any warranty, representation, or statement made of furnished to Lender by or on
> behalf of Borrower in relation to this Loan Agreement proves to have been false
> in any material respect when made or furnished; The Borrower files or has filed
> against it any bankruptcy proceeding; or Lender deems itself unsecured in
> Lender's reasonable, sole discretion.

39.     In the event of default, the loan fee of $168,000 becomes immediately due and

payable,

> while additional interest will accrue on the unpaid Principal Loan, Loan Fee, and
> all other unpaid costs, fees and expenses at the rate of two percent (2%) every

fourteen (14) days ("Default Rate"), until the Loan Commitment is paid in full. Additionally, Borrower will pay a one time four present fee (4%) on all outstanding amounts.

40.    The Second Loan Agreement contains an attorney fees provision, providing that the defaulting party "agrees to pay all costs and expenses of collection, as well as costs incurred to enforce this Agreement, including a reasonable attorney fee."

41.    Defendants have not paid the amounts owed under the Second Loan Agreement.

42.    Under both the First Loan Agreement and Second Loan Agreement, Rogers promised to send "monthly statements to Lender no later than the 5th of each month."

43.    Rogers stopped sending those monthly statements after July 2020.

44.    On August 28, 2020, Rogers and Mandarin entered into a fee agreement (the "Second Fee Agreement") whereby Rogers agreed to pay an additional loan fee of $91,000 together with the loan fee contained in the Second Loan Agreement before the due date of October 15, 2020.  This amount remains unpaid.

45.    On September 14, 2020, Rogers showed Meyer that the Account contained $13.6 million dollars.  He represented that Goldman Sachs had completed a transaction on his behalf that netted him over $4 million dollars.

46.    Rogers represented that Midfrisian was ready to close on its deal, but needed a few more water shares.

47.    He represented that he needed $900,000 to help close the deal, but that he would repay the entire amount with interest in one week.

48.     He also represented that he was going to make a much larger amount on the deal

than he originally disclosed.  He represented that he was going to make a gross amount of $15.3

million dollars.

49.     Accordingly, he told Meyer if Mandarin could fund the addition $900,000, he

would repay to Mandarin its original loans with an additional fee bringing the total amount to be

paid to Mandarin $8.35 million dollars, exclusive of the $900,000 (the "900,000 Loan

Agreement").

50.     Based on Rogers' representations, Meyer agreed to loan $900,000 to the Trust and

Rogers through Mandarin on September 14, 2020.

51.     On September 18, 2020, Rogers sent a transfer confirmation document purporting

to confirm a transfer to Mandarin of $4 million dollars from the Account.

52.     A few days later, Rogers called on the phone together with someone he identified

as "Thomas", a purported member of the Treasury or Transfer department of Goldman Sachs.

"Thomas" confirmed that that transfer had gone through.  Meyer later learned from Goldman

Sachs that no such person exists.

53.     No such transfer was ever received.

54.     On September 21, 2020, Rogers represented that the Midfrisian transaction had

closed and that he had wired $8.35 million dollars from his JPMorgan Chase account.  He sent

Meyer a wire number, 2020092100077659, stating that was the wire number for the transfer.

55.     By September 22, 2020, the purported wire did not come through.  Rogers

represented to Meyer that he had made a mistake and resent the wire transfer.  He sent Meyer a

second wire number, 2020092200145567.  This wire transfer also did not come through.

56.    On September 23, 2020, Rogers represented that JPMorgan Chase bank had made a mistake and had frozen Rogers' funds.  He represented that he would instead send funds from the Account.

57.    On September 29, 2020, Rogers repaid to Mandarin the $900,000 loan and represented that the balance of the $8.35 million dollars due to Mandarin would arrive the following day.

58.    On October 1, 2020, Rogers claimed that Goldman Sachs had mistakenly attempted to send funds from the wrong account, which is why his purported wire transfer did not go through.

59.    Soon thereafter, Rogers sent Meyer a screenshot of his JPMorgan Chase bank account to prove that he had received $15.3 million dollars from the Midfrisian transaction.

60.    Based on this representation, Mandarin did not file any notice of default at or around the payment deadline of October 15 set forth in the Second Loan Agreement and Fee Agreement.

61.    On October 15, 2020, Rogers sent Meyer a wire confirmation.

62.    On that same day, Rogers called Meyer with Marcus Patterson, who he represented was his banker, who verified that the wire had been sent.

63.    On October 16, 2020, Rogers sent a wire number, 1016B1QGC01C002375.

64.    On that same day, Meyer's banker at JPMorgan Chase bank indicated to Meyer that the account from which the wire was supposed to have been sent did not have any funds in it.

65.    No such wire transfer ever occurred.

COMPLAINT

66.     On October 26, 2020, Rogers represented that the money owed to Mandarin had been sent from the Account.  To prove this, he sent a screenshot of the Account, which showed that the Account assets had been reduced to $5.2 million dollars.

67.     At some point in October, Rogers admitted that he had invested $4 million dollars from the Account into a different investment.

68.     On November 3, 2020, Meyer confronted Rogers about the drop in value of the Account and the fact that no funds had been transferred to Mandarin as represented.  Rogers represented that Goldman Sachs had made a mistake and that the funds returned to the Account. Rogers represented that he would wire funds on November 6, 2020.

69.     On November 5, 2020, Rogers represented that the owed funds had left the Account and sent a screenshot as confirmation.

70.     On November 6, 2020, Rogers sent a screenshot to show that the owed funds were sent from the Account.

71.     In or around this same time period, Rogers represented to Meyer that he had made a $1.7 million dollar investment in another project.

72.     Soon thereafter, Rogers texted Meyer, indicating that he had contracted COVID 19 and had to be taken to the hospital.

73.     Rogers represented that he would have his accountant, who is also an attorney, resolve the payment issue and that the accountant had full access to the Account and to his JPMorgan Chase bank account.  He represented that the accountant would ensure that the funds would be transferred to Mandarin.

74.     On November 6, 2020, Meyer called the accountant, Michael Sanchez.

Ex. Pg. 306

75.     Sanchez represented that the funds would be released to Mandarin on November 9, 2020.

76.     On November 9, 2020, Rogers called Meyer in the morning and promised that the funds would arrive that day.

77.     The funds never arrived and remain unpaid.

78.     Meyer has not heard from Rogers or Sanchez since that point.

79.     Meyer has never been informed that the escrow account that Rogers represented would hold the funds Mandarin loaned as part of the Midfrisian deal was released.

80.     Rogers never provided documentation showing that the funds had been transferred to Fidelity Title.

81.     Since November 9, 2020, Meyer has spoken with individuals he had previously never met or been aware of who informed him that they had loaned money to Rogers relating to the Midfrisian transaction prior to the time Mandarin had made its loans for that transaction.

82.     Indeed, Meyer has learned that there were at least four other investors who had loaned as much as $12 million dollars to Rogers, including Alex Kang, who loaned $500,000, and Scott Falkner, who loaned $700,000.

83.     Falkner represented to Meyer that he had knowledge that the Midfrisian transaction was fake.

84.     These discoveries surprised Meyer because Rogers had represented to Meyer that he had no other debt and that there were no other lenders relating to the Midfrisian transaction.

Ex. Pg. 307

85.     Mandarin would not have lent money to Rogers or the Trust if Meyer had known they had already incurred debts relating to the Midfrisian transaction, and certainly would not have made any loan if Meyer had known the Midfrisian transaction was fake.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract—First Loan Agreement)

86.     Mandarin realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

87.     The First Loan Agreement is a valid and enforceable contract under Utah law.

88.     Mandarin has performed as required under the First Loan Agreement.

89.     Defendants agreed to repay the loan amounts given to them by Mandarin, plus a loan fee of $600,000, by November 15, 2020.

90.     Defendants have failed to make the payments required under the First Loan Agreement.

91.     Defendants' inaction constitutes a material breach of the First Loan Agreement.

92.     Defendants likewise materially breached the First Loan Agreement by making false representations to Mandarin, as a result of Rogers' failure to keep his promise not to withdraw or to transfer the funds in the Account, and by rendering Mandarin unsecured in this transaction.

93.     Mandarin has been damaged by defendants' material breaches of the First Loan Agreement in the principal amount of $5,000,0000; a $600,000 loan fee; and the costs, expenses, and reasonable attorney fees incurred in enforcing the First Loan Agreement.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract—Second Loan Agreement)

94.    Mandarin realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

95.    The Second Loan Agreement is a valid and enforceable contract under Utah law.

96.    Mandarin has performed as required under the Second Loan Agreement.

97.    Defendants agreed to repay the loan amounts given to them by Mandarin, plus a loan fee of $168,000, by October 15, 2020.

98.    Defendants have failed to make the payments required under the Second Loan Agreement.

99.    Defendants' inaction constitutes a material breach of the Second Loan Agreement.

100.    Defendants likewise materially breached the Second Loan Agreement by making false representations to Mandarin, as a result of Rogers' failure to keep his promise not to withdraw or to transfer the funds in the Account, and by rendering Mandarin unsecured in this transaction.

101.    Mandarin has been damaged by defendants' material breaches of the Second Loan Agreement in the principal amount of $1,400,0000; a $168,000 loan fee; and the costs, expenses, and reasonable attorney fees incurred in enforcing the Second Loan Agreement.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract—First Fee Agreement)

102.    Mandarin realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

COMPLAINT

103.    The First Fee Agreement is a valid and enforceable contract under Utah law.

104.    Mandarin has performed as required under the First Fee Agreement.

105.    Rogers agreed to pay to Mandarin a loan fee of $325,000.

106.    Rogers has failed to make the payments required under the First Fee Agreement.

107.    Rogers' inaction constitutes a material breach of the First Fee Agreement.

108.    Mandarin has been damaged by Rogers' material breach of the First Fee Agreement in the principal amount of $325,000, interest at 2% per every 14 days, a one time 4% fee, and reasonable attorney fees incurred in enforcing the First Fee Agreement.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**(Breach of Contract—Second Fee Agreement)**

</div>

109.    Mandarin realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

110.    The Second Fee Agreement is a valid and enforceable contract under Utah law.

111.    Mandarin has performed as required under the Second Fee Agreement.

112.    Rogers agreed to pay to Mandarin a loan fee of $91,000.

113.    Rogers has failed to make the payments required under the Second Fee Agreement.

114.    Rogers' inaction constitutes a material breach of the Second Fee Agreement.

115.    Mandarin has been damaged by Rogers' material breach of the Second Fee Agreement in the principal amount of $91,000, interest at 2% per every 14 days, a one time 4% fee, and reasonable attorney fees incurred in enforcing the Second Fee Agreement.

Ex. Pg. 310

## FIFTH CLAIM FOR RELIEF
### (Breach of Personal Guarantee-First Loan Agreement)

116.    Mandarin realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

117.    The personal guarantee Rogers executed in conjunction with the First Loan Agreement is a valid and enforceable guarantee under Utah law.

118.    Rogers agreed to guarantee the repayment obligations of defendants under the First Loan Agreement.

119.    Defendants' obligations remain unsatisfied.

120.    Rogers has failed to make any payment pursuant to his personal guarantee.

121.    Rogers' inaction constitutes a breach of his personal guarantee.

122.    Mandarin has been damaged by Rogers' material breaches of his personal guarantee in the principal amount of $5,000,0000; a $600,000 loan fee; and the costs, expenses, and reasonable attorney fees incurred in enforcing the personal guarantee.

## SIXTH CLAIM FOR RELIEF
### (Breach of Personal Guarantee-Second Loan Agreement)

123.    Mandarin realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

124.    The personal guarantee Rogers executed in conjunction with the Second Loan Agreement is a valid and enforceable guarantee under Utah law.

125.    Rogers agreed to guarantee the repayment obligations of defendants under the Second Loan Agreement.

126.    Defendants' obligations remain unsatisfied.

127.    Rogers has failed to make any payment pursuant to his personal guarantee.

128.    Rogers' inaction constitutes a breach of his personal guarantee.

129.    Mandarin has been damaged by Rogers' material breaches of his personal guarantee in the principal amount of $1,400,0000; a $168,000 loan fee; and the costs, expenses, and reasonable attorney fees incurred in enforcing the personal guarantee.

### SEVENTH CLAIM FOR RELIEF
**(Breach of Contract—$900,000 Loan Agreement)**

130.    Mandarin realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

131.    The $900,000 Loan Agreement is a valid and enforceable contract under Utah law.

132.    Mandarin has performed as required under the $900,000 Loan Agreement.

133.    Rogers agreed to repay the $900,000 loaned by Mandarin and to repay Mandarin a total of $8.35 million dollars on the other loan agreements.

134.    Rogers has failed to make the payment of $8.35 million dollars required under the $900,000 Loan Agreement.

135.    Rogers' inaction constitutes a material breach of the First Fee Agreement.

136.    Mandarin has been damaged by Rogers' material breach of the $900,000 Loan Agreement in the principal amount of $8.35 million dollars.

### EIGHTH CLAIM FOR RELIEF
**(Common Law Fraud)**

137.    Mandarin realleges and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

138.    Defendants knowingly, intentionally, or recklessly, made misrepresentations of material facts or omissions to state material facts necessary in order to make other statements, in the light of the circumstances under which they were made, not misleading, as more particularly alleged above.  Such misrepresentations were made verbally and in writing by the defendants.

139.    At the time these representations were made, the defendants knew that they were false.

140.    Defendants intended through such misrepresentations and omissions to induce Mandarin to loan millions of dollars to defendants.

141.    Mandarin justifiably relied on defendants' misrepresentations and omissions, in ignorance of their falsity and without knowledge that omitted facts had been withheld, and was thereby induced to loan millions of dollars to defendants.  Mandarin has been damaged thereby.

142.    Mandarin is entitled to a judgment against defendants for damages, in an amount to be proved at trial, which shall not be less than the amount of funds Mandarin loaned to defendants, together with prejudgment and post-judgment interest as provided by law.

143.    The conduct of defendants was willful and malicious, was intentionally fraudulent, or manifested a knowing and reckless indifference toward, and a disregard of, the rights of Mandarin.

144.    Public policy supports an award of punitive damages against defendants based on their conduct as described above.

145.    The Court should award punitive damages in an amount sufficiently large enough both to punish defendants and to discourage comparable behavior from others similarly situated.

## NINTH CLAIM FOR RELIEF
### (Negligent Misrepresentation – Crest Defendants)

146.    Each of the above paragraphs is realleged and by this reference incorporated into this claim for relief.

147.    Defendants' false, material representations and material omissions, as detailed above, were at minimum negligent.

148.    As detailed above, defendants had a duty to disclose the facts set forth in the foregoing paragraphs.

149.    The representations made to Mandarin were, in fact, false, which falsity could have been determined by defendants in the exercise of ordinary and reasonable care, and defendants made the representations for the purpose of inducing Mandarin to loan to defendants millions of dollars.  Defendants were in a superior position to know the falsity of the representations made and Mandarin did not have this information.

150.    The omissions were false, when taken together with the other facts represented by defendants to Mandarin, which falsity should have been known by defendants in the exercise of ordinary and reasonable care.  Defendants omitted to disclose the material facts for the purpose of inducing Mandarin to loan to defendants millions of dollars.

151.    In reasonable reliance on the representations, without knowledge of their falsity, and without knowledge of the material facts that defendants omitted to disclose, Mandarin loaned millions of dollars to defendants.  Had Mandarin known of the falsity of the representations made by defendants, or had defendants disclosed the material omissions, Mandarin would not have loaned any money to defendants.

152.    As a direct and proximate result of the negligent misrepresentations made by defendants, and the omissions to disclose material facts, Mandarin has been damaged.

153.    Mandarin is entitled to a judgment against defendants for damages, in an amount to be proved at trial but which shall not be less than the amount of funds Mandarin loaned to defendants, together with prejudgment and post-judgment interest at the highest legal rate.

## **ELECTION OF DISCOVERY TIER**

Pursuant to Rule 8(a) of the Utah Rules of Civil Procedure, Mandarin states that its claims for relief qualify for Tier 3 discovery as defined in Rule 26 of the Utah Rules of Civil Procedure.

## **PRAYER FOR RELIEF**

WHEREFORE, Mandarin respectfully prays for the following relief against defendants:

1.    On the FIRST CLAIM FOR RELIEF for a judgment against defendants for damages, in an amount to be proved at trial, which shall not be less than the principal loan amount of $5,000,0000; a $600,000 loan fee; and the costs, expenses, and reasonable attorney fees incurred by Mandarin;

2.    On the SECOND CLAIM FOR RELIEF for a judgment against defendants for damages, in an amount to be proved at trial, which shall not be less than the principal loan amount of $1,400,0000; a $168,000 loan fee; and the costs, expenses, and reasonable attorney fees incurred by Mandarin;

3.    On the THIRD CLAIM FOR RELIEF for a judgment against Rogers for damages, in an amount to be proved at trial, which shall not be less than the principal amount of

$325,000, interest at 2% per every 14 days, a one time 4% fee, and reasonable attorney fees incurred by Mandarin;

4.    On the FOURTH CLAIM FOR RELIEF for a judgment against Rogers for damages, in an amount to be proved at trial, which shall not be less than the principal amount of $91,000, interest at 2% per every 14 days, a one time 4% fee, and reasonable attorney fees incurred by Mandarin;

5.    On the FIFTH CLAIM FOR RELIEF for a judgment against Rogers for damages, in an amount to be proved at trial, which shall not be less than the principal loan amount of $5,000,0000; a $600,000 loan fee; and the costs, expenses, and reasonable attorney fees incurred by Mandarin;

6.    On the SIXTH CLAIM FOR RELIEF for a judgment against Rogers for damages, in an amount to be proved at trial, which shall not be less than the principal loan amount of $1,400,0000; a $168,000 loan fee; and the costs, expenses, and reasonable attorney fees incurred by Mandarin;

7.    On the SEVENTH CLAIM FOR RELIEF for a judgment against Rogers for damages, in an amount to be proved at trial, which shall not be less than $8.35 million dollars, together with prejudgment and post-judgment interest as provided by law;

8.    On the EIGHTH CLAIM FOR RELIEF for a judgment against defendants for damages, which shall not be less than the amount of funds Mandarin loaned to defendants, together with prejudgment and post-judgment interest as provided by law, and punitive damages;

Ex. Pg. 316

9.      On the NINTH CLAIM FOR RELIEF for a judgment against defendants for damages, which shall not be less than the amount of funds Mandarin loaned to defendants, together with prejudgment and post-judgment interest as provided by law.

10.     Such other and further relief as may be available.

DATED this 16th day of November, 2020.

MARSHALL OLSON & HULL, PC

BY:    /s/ Kevin M. Paulsen
      JASON R. HULL
      KEVIN M. PAULSEN
      CONNOR B. ARRINGTON

ATTORNEYS FOR PLAINTIFF

# EXHIBIT X

Jason R. Hull [11202]
JHULL@MOHTRIAL.COM
Kevin M. Paulsen [15219]
KPAULSEN@MOHTRIAL.COM
Connor B. Arrington [17560]
CARRINGTON@MOHTRIAL.COM
**Marshall Olson & Hull, p.c.**
Newhouse Building
Ten Exchange Place, Suite 350
Salt Lake City, Utah 84111
Telephone: 801.456.7655

Attorneys for Plaintiff

## IN THE THIRD JUDICIAL DISTRICT COURT FOR
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MANDARIN CAPITAL, LLC, a Utah limited liability, <br><br> Plaintiffs, <br><br> v. <br><br> MONTANA AMOROSA REVOCABLE TRUST, a Texas Trust; DENNIS J. ROGERS II, an individual and manager of the Montana Amorosa Revocable Trust, <br><br> Defendants. | **JUDGMENT** <br><br> CIVIL NO. 200907123 <br><br> Judge Randall Skanchy |

This matter came before the Court pursuant to the Stipulated Judgment by Confession filed on April 5, 2021.  Based on the Stipulated Judgment by Confession and good cause appearing,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1.      Judgment is hereby entered in favor of plaintiff Mandarin Capital, LLC, and

against defendants Dennis J. Rogers and the Montana Amorosa Revocable Trust for $6,446,086

in damages.

2.      The judgment may be augmented by the attorney fees and costs incurred by

plaintiff in collecting the amount owed.

<div align="center">——END OF JUDGMENT——</div>

<div align="center">—COURT SEAL IS AFFIXED ON THE FIRST PAGE OF THIS JUDGMENT—</div>

# EXHIBIT Y

Electronically Received 08/14/2020 07:30 PM

Joshua T. Kluewer (SBN 314105)
KLUEWER LAW P.C.
811 Wilshire Blvd. Suite 1763
Los Angeles, CA 90017
T: (213) 465-2647
F: (213) 377-5771
Email: jkluewer@kluewerlaw.com

**FILED**
Superior Court of California
County of Los Angeles

08/14/2020

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ J. Ballesteros _____ Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

|  |  |
|---|---|
| ACMC FINANCE and TRADE LLC, a Delaware Limited Liability Company, | CASE NO. 19LBCV00725 |
| Plaintiff, | FIRST AMENDED COMPLAINT FOR: |
| v. | 1.  Breach of Contract |
|  | 2.  Money Had and Received |
| ENERGY TRADING COMPANY LLC., a Delaware Limited Liability Company; PETRO DIAMOND INC. a Delaware Corporation; JACK KHACHATRYAN a/k/a JACK SARYAN, an individual; SONA APIKIAN a/k/a SONA SARYAN, an individual; SARGIS KHACHATRYAN a/k/a SAM SARYAN, an individual; GIANNI SARYAN an individual; JOHN GESSIN an individual, and DENNIS J. ROGERS II, an individual and DOES 1-60. | 3.  Common Count to Recover Money Paid by Mistake or Fraud |
|  | 4.  Common Count for Money Lent |
|  | 5.  Promissory Fraud |
|  | 6.  Fraud – Intentional Misrepresentation |
|  | 7.  Negligent Misrepresentation |
|  | 8.  Conversion |
| Defendants. | 9.  Intentional Fraudulent Transfers per the Uniform Voidable Transactions Act Cal. Civ. Code § 3439.04(a)(1) |
|  | 10.  Constructive Fraudulent Transfers per the Uniform Voidable Transactions Act Cal. Civ. Code § 3439.04(a)(2)(B) |

## DEMAND FOR JURY TRIAL

Plaintiff, ACMC Finance and Trade LLC ("ACMC" or "Plaintiff") hereby asserts this

complaint against defendants, Energy Trading Company LLC ("Energy Trading"), Petro-

-1-

FIRST AMENDED COMPLAINT

Diamond Incorporated ("Petro-Diamond") Jack Khachatryan a/k/a Jack Saryan ("Khachatryan"), Sargis Khachatryan, a/k/a Sam Saryan ("Sargis"), Sona Apikian a/k/a Sona Saryan ("Sona") Gianni Saryan ("Gianni"), John Gessin[1] ("Gessin") and Dennis J. Rogers II ("Rogers") (collectively, Energy Trading, Petro-Diamond, Khachatryan, Sargis, Sona, Gianni, Gessin and Rogers are "All Defendants") and states as follows:

## INTRODUCTION

1.  This action is necessary as a result of the fact that defendant, Energy Trading has simply refused to pay plaintiff, ACMC substantial sums of money that Energy Trading owes ACMC per a promissory note.  As discussed more fully herein, the predecessor to ACMC, OSA Finance and Trade LLC ("OSA") loaned $2,450,000 to Energy Product Company LLC ("Energy Product"). Thereafter, Energy Product's affiliated entity, Energy Trading assumed Energy Product's duty to repay the loan. Energy Trading has simply refused to pay back the relevant loan.  Indeed, those who were involved in the receipt  of funds per the relevant loan - Khachatryan, Gessin and Rogers – deliberately made false representations to OSA in order to cause OSA to extend the loan. Moreover, Energy Product's affiliate, Petro-Diamond was involved in the receipt of the loan proceeds and similarly has not paid back these funds.  Furthermore, on information and belief, Khachatryan and Khachatryan's family members - Sargis, Sona and Gianni -  own and/or control Energy Product and Energy Trading and have participated in a scheme to strip these entities of their assets while misappropriating the relevant loan proceeds for themselves.

2.  As such, ACMC asserts this action such that ACMC can be repaid on the relevant

---

[1] As noted in previous pleadings in this matter, Plaintiff had initially been led to believe that John Gessin's name is John Davids. As such, Plaintiff initially sued John Gessin as John Davids. Plaintiff subsequently made an application to amend the caption to reflect Gessin's correct name, which the court granted. With this amended complaint, Plaintiff has used Gessin's correct name in lieu of the name John Davids.

FIRST AMENDED COMPLAINT

promissory note and such that Khachatryan, Rogers and Gessin can be held liable for their actionable, tortious, conduct in connection with this matter, and such that Khachatryan and Khachatryan's family members - Sona, Sargis and Gianni - can be made to repay the loan proceeds that rightfully belong to Plaintiff.

## **PARTIES**

3.   ACMC Finance and Trade LLC is a Delaware corporation, with a principal place of business in Delaware.  OSA has assigned the promissory note and related tort claims that give rise to this action to ACMC.  OSA and ACMC are related entities.  Omar Alpark ("Apark"), Semaj Calhoun ("Calhoun") and Anthony Capano ("Capano") own and control OSA.  Capano has an ownership interest in, and controls, ACMC.

4.   Defendant, Energy Trading Company LLC is a Delaware LLC, with a principal place of business in Long Beach, California.

5.   Defendant, Petro-Diamond Incorporated  is a Delaware corporation with a principal place of business in Irvine, California.

6.   Defendant, Jack Khachatryan a/k/a/ Jack Saryan is an individual who resides in Los Angeles County, California.

7.   Defendant, Sona Apikian a/k/a Sona Saryan is an individual who resides in Los Angeles County, California. Sona is Khachatryan's wife.

8.   Defendant, Sargis Khachatryan, a/k/a Sam Saryan is an individual who resides in Los Angeles County, California. Sargis is Khachatryan's wife.

9.   Defendant, Gianni Saryan is an individual who resides in Los Angeles County, California. Gianni Saryan is Khachatryan's son.

10. Defendant, John Gessin is an individual who resides in Orange County, California.

-3-

FIRST AMENDED COMPLAINT

11. Defendant, Dennis J. Rogers II is an individual who resides in Dallas, Texas.

12. On information and belief, Khachatryan, Sona, Sargis and Gianni are the alter egos of Energy Trading. On information and belief, at all relevant times, there was a unity of interest and ownership between Energy Trading, on the one hand, and Khachatryan, Sona, Sargis and Gianni on the other hand, such that any separateness between them has ceased. On information and belief, at all relevant times, Khachatryan, Sona, Sargis and Gianni exercised dominion and control over Energy Trading. At all relevant times, Energy Trading acted as a mere shell and a mere conduit for Khachatryan, Sona, Sargis and Gianni. The Saryan family reaped the benefits of the loan OSA extended, while the Saryan family ensured that Energy Trading would not have the resources to repay the loan.

13. Maintaining the fiction of the separate existence of Energy Trading, on the one hand, and Khachatryan, Sona, Sargis and Gianni on the other would permit abuse of corporate privilege and sanction fraud and promote injustice. Specifically, Khachatryan, Sona, Sargis and Gianni are causing Energy Trading to unlawfully evade its debts. This is not a simple matter of corporate entities being unable to pay their debts when they become due. Rather, this is a matter of corporate entities and a controlling individuals with the means to pay the debt in questions, who have decided to evade those debts and to use the corporate form to carry out that evasion. As such, recognition of the corporate form in this matter would sanction fraud and promote injustice.

14. Gessin, Rogers, Khachatryan, Sona, Sargis, Gianni, Energy Trading and Petro-Diamond are all liable for each other's torts and liabilities per the doctrine of civil conspiracy. The elements of a civil conspiracy are (1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed

-4-

pursuant to the agreement; and (3) resulting damages. Gessin, Rogers, Khachatryan, Sona, Sargis, Gianni, Energy Trading and Petro-Diamond agreed to a common plan to take OSA's money through fraud and conversion.  As part of this common plan, Rogers, Gessin and Khachatryan effectuated the tort of fraud as to OSA.  As discussed herein, Rogers, Gessin, and Khachatryan defrauded OSA. This fraud is both the wrongful act and the tort that serves as the basis for civil conspiracy liability.  Moreover, Gessin, Rogers, Khachatryan, Sona, Sargis, Gianni, Energy Trading, and Petro-Diamond formed a common plan to effectuate the tort of conversion, thereby taking some or all of the loan proceeds in connection with this matter. This conversion is both the wrongful act and the underlying tort that serves as the basis for this civil conspiracy.  As a result of this common plan and design, and the wrongful acts committed pursuant thereto, OSA has been damaged.

15. On information and belief, Does 1 through 60 were responsible or legally liable in some manner for the occurrences and injuries alleged herein.  The true names and capacities of such fictitiously named defendants, whether individual, corporate, associate or otherwise, are currently unknown to Plaintiff. Plaintiff will amend this complaint to show such true names and capacities when the same have been ascertained pursuant to C.C.P. § 474.

## JURISDICTION AND VENUE

16. Pursuant to C.C.P. §410.10, this Court can exercise personal jurisdiction over Energy Trading because Energy Trading has a principal place of business in Long Beach, California. Pursuant to C.C.P. §410.10, this Court can exercise personal jurisdiction over Petro-Diamond, because Petro-Diamond has a principal place of business in Irvine, California.  Per C.C.P. §410.10, this Court can exercise personal jurisdiction over  Khachatryan, Sona, Sargis, Gianni and Gessin because they are domiciled in California.  Per C.C.P. §410.10, this Court can exercise

-5-

FIRST AMENDED COMPLAINT

jurisdiction over Rogers, because Rogers facilitated tortious conduct that originated in California, and because Rogers facilitated the transaction that gives rise to this litigation.

17. Per C.C.P. § 395.5, venue is proper in Los Angeles County because Energy Trading principal place of business is in Los Angeles County.  Moreover, paragraph 11 of the promissory note that gives rise to this litigation states that Energy Trading consents to have disputes related to the loan at issue heard in Los Angeles County.

## **FACTS**

The Consummation of the September 2017 Loan

18. In September 2017, OSA extended a loan (the "September 2017 Loan") to Energy Product and Equifunds Inc. ("Equifunds") (collectively the "Borrowers"). (A true and correct copy of the Joint Finance Agreement embodying the September 2017 Loan ("the September 2017 Note") is attached hereto as Exhibit 1).  The ostensible purpose of the September 2017 Loan was for OSA to loan the Borrowers $2,450,000  such that the Borrowers would use this money connection with Khachatryan's oil ventures.  Per the terms of the September 2017 Loan, the Borrowers were to repay the September 2017 Loan within 30 days by returning OSA's principal along with 2 percent interest.

19. On information and belief, Khachatryan and Khachatryan's family members, defendants herein, control Energy Product.  Gessin controls Equifunds.  During the consummation of the September 2017 Loan, Gessin and Rogers acted as intermediaries between the borrower, Khachatryan's company, Energy Product and OSA, the lender.  On information and belief, Khachatryan's and Khachatryan's family members, defendants herein, control several companies in the oil business with similar names.  On information and belief, Khachatryan and Khachatryan's family members have had difficulty repaying investors in their companies in the

-6-

past, and Khachatryan and Khachatryan's family members have become adept at structuring loan transactions so as to evade paying debts.

20. In the course of the consummation of the initial September 2017 Loan, Rogers was generally responsible for working with the OSA and facilitating OSA's participation in the September 2017 Loan. Gessin was generally responsible for facilitating the Energy Product's participation in the September 2017 Loan.

21. In the course of the consummation of the September 2017 Loan, Gessin and Rogers generally called OSA several times a day in preparation of extension of the loan.  Rogers and Gessin told OSA that per the terms of the September 2017 Loan, OSA was to loan Khachatryan's company, Energy Product, $2,450,000 for a loan term of 30 days with a 2 percent return.  OSA was to deposit this money into the account of a refinery associated with Khachatryan, Petro-Diamond Incorporated Rogers and Gessin indicated to OSA that there was the potential for the parties to enter into additional 30 day loan transactions if Khachatryan's company, Energy Product could sell enough oil product.  OSA agreed to pay Rogers $7,000 for each $49,000 interest payment received.

22.  Gessin was closely associated with Khachatryan's companies, Energy Product and Energy Trading.  Gessin generally played a role in raising capital for Energy Trading. Gessin had ready access to Energy Trading's and Energy Product's operations, purchase orders, contracts, customers and staff, among other things.  As the September 2017 Loan was being consummated, Rogers and Gessin conveyed to OSA that Gessin was authorized to facilitate the loan transaction between OSA and Energy Products.   OSA observed that Gessin had access to the Saryan family's companies' insurance policies, customer lists, and lists of assets, among other things.

23. As the September 2017 Loan was being consummated, Rogers was adamant in his

FIRST AMENDED COMPLAINT

Ex. Pg. 328

assertions to OSA that the September 2017 Loan was a valid and legitimate transaction and that OSA would be paid back on the loan. Rogers made these repeated assertions to Alpark and Calhoun of OSA. Rogers presented the September 2017 Loan to Alpark and Calhoun as wholly legitimate and Rogers worked to convince Calhoun and Alpark to enter into the September 2017 Loan. Rogers' assertions to Calhoun and Alpark caused Calhoun and Alpark of OSA to overcome any skepticism that Alpark and Calhoun had about the September 2017 Loan. During the course of the consummation of the September 2017 Loan, Rogers fully vouched for Khachatryn and Energy Product.

24. Moreover, during the course of the consummation of the September 2017 Loan, Rogers was particularly aggressive with Alpark in connection with getting Alpark to cause OSA to assent to the loan. Rogers encouraged Alpark to cause OSA to assent to the loan as quickly as possible. Rogers repeatedly attempted to entice Alpark with the loan, telling Alpark that OSA could make potentially 4% or even 6% per month interest, depending on how many "turns" of product Energy Product was able to accomplish. Rogers was attempting to cause OSA to enter into the loan as quickly as possible.

25. When the September 2017 Loan was being consummated, Rogers insisted to OSA that all communications to the borrower be routed through Rogers. Rogers ensured that OSA communicated with Rogers and that Rogers relayed communications to the borrower. Rogers was adamant that communications between OSA and other parties in this matter were routed through Rogers. In other words, as the September 2017 Loan was being consummated, Rogers positioned himself as a buffer between OSA and Energy Product.

26. Although they were unaware of Rogers' deception at the time, Alpark and Calhoun both

-8-

believe that Rogers was acting with fraudulent intent at the time of the consummation of the September 2017 Loan when Rogers induced OSA to enter into the loan.

27. At the time the September 2017 Loan was being facilitated, OSA insisted that the September 2017 Loan be structured so as to include three parties, OSA, Energy Product and Equifunds, as opposed to simply including OSA and Energy Product. All relevant parties assented to this proposal.

28. On or around September 15, 2017, OSA wired $2,450,000 to an account associated with Petro-Diamond so as to effectuate the September 2017 Loan. Not long thereafter, Gessin wired OSA $49,000 as early payment of the interest on the September 2017 Loan.

29. On or around the time of the extension of the September 2017 Loan, Alpark visited Energy Product, Jack Khachatryan and Jack Khachatryan's family and John Gessin at Energy Product's facilities in Southern California. Rogers was also present for this visit.  OSA personnel toured Energy Product's facilities. The visit was amicable and OSA and Energy Product discussed other business opportunities whereby the OSA and Energy Product could work together in the future.

The Maturity of the September 2017 Loan

30. As the maturity date for the September 2017 Loan approached, Rogers began suggesting to OSA that the Borrowers were going to need a some more time to repay the principal on the September 2017 Loan.  At this time, Gessin became extremely uncooperative with OSA.  After having repeatedly conveyed to OSA that Gessin was closely associated with Khachatryan's companies, Gessin came to contend that he was nothing more than a mere intermediary with no power over the situation. At this time, Rogers came to make assertions to the same effect.

31. On or around the maturity date for the September 2017 Loan, Alpark of OSA visited

FIRST AMENDED COMPLAINT

California with the purpose of seeing Energy Product personnel. Alpark met with Khachatryan, and Rogers among others. At this time, Gessin was nowhere to be found.  When Omar Alpark of OSA reminded Khachatryan that OSA needed to be paid back on the September 2017 Loan, Khachatryan contended that the signature on promissory note embodying the September 2017 Loan was a forgery.  Khachatryan's son, Gianni, who was present at the meeting, also claimed that the signature was a forgery.  Khachatryan claimed that he and his companies never would have agreed to such a short time frame for repayment.

32. At this time, Khachatryan stated that his companies had received money as a borrower on the September 2017 Loan, and that Jack Khachatryan and his companies were aware that the money had originated from OSA. Khachatryan stated that his companies were paying interest on the September 2017 Loan to Gessin, such that Gessin could pay OSA.  Khachatryan told OSA that OSA had the option of pursuing Gessin in court to recoup OSA's loan principal or finding some way to allow Khachatryan's companies to repay the loan over time.

33. Over the next several months, the Borrowers made several more interest payments on the September 2017 Loan to OSA.

The December 2017 Loan

34. In the late Fall and early Winter of 2017,  a company owned and controlled by Khachatryan and Khachatryan's family members, Energy Trading had a second promissory note prepared (the "December 2017 Promissory Note), embodying the terms by which Energy Trading was to repay OSA for the loan in question, (the "December 2017 Loan"). (Attached hereto as Exhibit 2 is the Promissory Note embodying the December 2017 Loan).  Per the terms of the December 2017 Promissory Note, OSA loaned Energy Trading $2,450,000, representing the money that OSA had already provided to Energy Product and for which Energy Product had

-10-

FIRST AMENDED COMPLAINT

not repaid OSA.  Per the terms of the December 2017 Promissory Note, Energy Trading was to pay 2% interest per month in connection with the December 2017 Loan.  As noted by Section 3 of the December 2017 Promissory Note, the December 2017 Loan is exempt from California usury laws per California Corporations Code § 25118. Per Section 4 of the December 2017 Promissory Note, Energy Trading was to make monthly interest payments of $49,000 to OSA. Per Section 4 of the December 2017 Promissory Note, the December 2017 Loan was to be paid in full by September 2018.

35. Per the terms of the December 2017 Loan, the first installment repayment on the December 2017 Loan was due on January 18, 2018.

Energy Trading Begins to Miss Making Payments and Rogers Works With Khachatryan to Continue to Deceive OSA

36. Not long after payments were due on the December 2017 Note, Energy Trading began to miss making interest payments to OSA.   At this time, Rogers and Khachatryn worked together to intentionally and fraudulently continue to deceive OSA into believing that OSA would be repaid on the relevant loans. Khachatryan claimed that Energy Trading had failed to make interest payments because there had been some fraud on Energy Trading's accounts. Rogers, on the other hand, told OSA that Energy Trading was unable to make payments because Energy Trading was busy negotiating deals with other investors.

37. On or around the time that payments were being missed in connection with the December 2017 Loan, Capano of OSA came to be more involved in this matter. Capano has an ownership interest in, and controls, ACMC, Plaintiff in the above-captioned action.

38. For a period of months, Energy Trading and Rogers repeatedly assured OSA that

-11-

FIRST AMENDED COMPLAINT

payment on the December 2017 Loan would be made.   In other words, even after January 2018, Rogers and Khachatryan continued to assure OSA that repayments would be made and that OSA would not suffer any losses in connection with this matter.

39. Rogers told OSA that OSA should communicate with Rogers in connection with seeking repayment.  At this time, Rogers again proffered himself as the designated point of contact for OSA to seek repayment from Energy Trading.  At this time, Rogers told OSA that Rogers was in constant contact with Khachatryan and that Rogers could communicate with Khachatryan so as to have the relevant loan repaid.

40. On or around February, March and April 2018, Rogers was spending a lot of time at Energy Trading's facilities in Southern California.  During this time, Rogers repeatedly sent numerous text messages to OSA telling OSA that repayment to OSA was imminent.

41. By February 2018, Rogers had to have been aware that OSA would not be repaid on the relevant loan.  At this time, Rogers was working closely with Khachatryan and visited Energy Trading's facilities in Southern California often.  Moreover, Rogers was aware of the fact that OSA had repeatedly not been paid in connection with this matter.  In light of the fact that Rogers was working closely with Khachatryan at this time, and in light of the fact OSA had repeatedly not been paid at this point, Rogers had to have known that OSA was not going to be paid on the relevant loan.  Yet, at this time, and throughout the first half of 2018, Rogers repeatedly assured OSA that OSA would indeed be repaid and that payment was imminent.  The fact that Rogers repeatedly assured OSA that OSA would be repaid on the loan after it was clear that OSA would not be repaid gives rise to the inference that Rogers acted with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan.

42. On or around March 2018, OSA discussed with Rogers having the entire December 2017

-12-

FIRST AMENDED COMPLAINT

Loan paid off in full with principal and interest in short order. Over the course of the next few months, Rogers told OSA that OSA would be repaid in full with interest and principal shortly.

43. Throughout February, March, April and May of 2018, Rogers was in constant contact with Energy Trading and Khachatryan and Rogers continued to assure OSA that OSA would be paid shortly. (Copies of text messages in which Rogers tells Capano that OSA will be paid on the loan shortly are attached hereto as Exhibit 3). Rogers' continued assurances to OSA in 2018 that OSA would be repaid give rise to the inference that Rogers was acting with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan transaction.

44. During this time, Rogers went out of his way to try and develop a connection with Capano, so that Rogers could more effectively defraud OSA. Rogers treated Capano as if Capano were a close friend. Rogers repeatedly told Capano about deeply personal problems that Rogers's wife was experiencing in order cause Capano to feel sympathy for Rogers while Rogers was defrauding OSA. Rogers and Capano often discussed sports with each other. Rogers actively worked to deceive Capano such that Capano completely trusted Rogers.

45. On or around April 2018, Khachatryan gave OSA fake wire transfer confirmations for payments that were never made. Rogers was working intimately with Khachatryan when Khachatryan provided the fake wire transfer confirmations to OSA. Indeed, Rogers forwarded these fake payment confirmations to OSA on behalf of Khachatryan.

46. On or around late April 2018, Capano and Rogers spoke on the telephone. Capano was attempting to see to it that OSA was repaid on the relevant loan transaction. When this call occurred, Rogers was in Khachatryan's office in Southern California with Khachatryan. During the call, Rogers gave his cell phone to Khachatryan intermittently so that Khachatryan could talk

-13-

FIRST AMENDED COMPLAINT

to Capano.  At this time, Khachatryan and Rogers were working closely together to continue to deceive OSA.

47. During the conversation between Capano and Rogers, Rogers stated that OSA would be repaid on that very day.  Rogers stated that Energy Trading had 3 new investors, who were assuming OSA's role as a lender on the purported transaction.  Rogers told Capano that Rogers was personally aware of the fact that Energy Trading had the money in hand to repay OSA and that the money was coming to OSA on that very day.  Rogers stated that the new investors had already signed on to replace OSA in the transaction and that Rogers was personally aware of the fact that Energy Trading was in possession of the money that was to be used to repay OSA. OSA later attempted to confirm the specifics of Rogers' assertions in this regard, and OSA learned that Rogers' statements were complete fabrications. Fraudulent intent can be established where defendant had demonstrated a pattern of making representations that were never performed. The fact that Roges engaged in a repeated pattern of making promises that were never performed, gives rise to the inference that Rogers was acting with fraudulent intent when he induced OSA to enter into the September 2017 Loan.

48. After much effort, Capano was able to arrange a meeting with Khachatryan such that repayment could be discussed. In June 2018, Khachatryan and Capano met personally and had dinner together in a restaurant in Southern California. During the dinner meeting between Capano and Khachatryan, Khachatryan called Rogers on the phone and spoke with Rogers. At this meeting, Khachatryan claimed that Gessin had committed fraud against Khachatryan and his companies and had set up companies with trade names that mirrored those of Khachatryan's companies, which destroyed Energy Trading's credit lines, leaving Energy Trading unable to repay OSA.

49. At this time, Capano attempted to follow up with Rogers to further discuss repayment. Rogers had no explanation as to how Rogers could have vouched for Khachatryan, Energy Product and Energy Trading, when OSA was never repaid on the loan.  After repeatedly assuring OSA again and again and again the September 2017 Loan was legitimate, and after repeatedly assuring OSA again and again and again that OSA would be repaid imminently, Rogers offered no explanation to OSA as to what happened in this matter.

50. Although he was unaware of Rogers' deception at the time, Capano believes that Rogers was acting with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan.

51. As such, it is abundantly clear that when Rogers induced OSA to enter into the September 2017 Loan, Rogers knew that OSA would not be repaid.  If Rogers had been acting without fraudulent in connection with this matter, Rogers would not have so adamantly convinced Calhoun and Alpark of OSA to enter into the September 2017 Loan, allaying any doubts that Calhoun and Alpark had about the Khachatryan and Energy Product.  If Rogers had not been acting with fraudulent intent in this matter, Rogers would not have deliberately positioned himself as a buffer between OSA and Energy Product/Energy Trading/Khachatryan not only while the September 2017 loan was being consummated but also in the first half of 2018 when repayments became an issue. If Rogers had not been operating with fraudulent intent in connection with this matter, Rogers would not have worked with Khachatryan when Khachatryan sent bogus wire transfer confirmations to OSA. If Rogers had not been operating with fraudulent intent in this matter, Rogers would not have assured OSA numerous times in the first half of 2018 that OSA would be repaid.  If Rogers had been acting without fraudulent intent in connection with this matter, Rogers would not have told Capano (while Rogers was in the

FIRST AMENDED COMPLAINT

room with Khachatryan) in April of 2018, that OSA would be repaid that very day and that Rogers was personally aware of the fact that Energy Trading already had OSA's money in hand. Moreover, the fact that Rogers acted with fraudulent intent when he induced OSA to enter into the September 2017 Loan can be inferred from the fact that Rogers repeatedly assured OSA that OSA would be repaid on the relevant loan, while Rogers was working closely with Khachatryan and when it had become clear that OSA would not be repaid.

52. Furthermore, fraudulent intent can be established where defendant had demonstrated a pattern of making representations that were never performed. On or around the time that the September 2017 Loan and December 2017 Loans were being consummated, Capano and Rogers entered into entirely separate transactions in the state of Texas, whereby Capano loaned money to an entity in Texas at Rogers' behest in connection with water rights. Capano and Rogers first came into contact as a result of the September 2017 Loan. When Rogers saw that Capano had access to financial resources, Rogers attempted to entice Capano into making more loans.  These Texas transactions gave rise to litigation in Texas state court, as payments were not made in connection with these transactions, despite Rogers' repeated assurances that payments would be made.  In connection with these Texas transactions, which had nothing to do with Khachatryan nor Energy Product, nor Energy Trading, Rogers gave Capano fake payment confirmations for payments that had never been made.

53. On information and belief, Khachatryan and his family members, Sargis, Sona and Gianni own and/or control entities in the oil business.  On information and belief, Khachatryan, Sargis, Sona and Gianni have had trouble repaying oil investors in the past and have become adept at rendering entities valueless and judgment proof so as to prevent investors from being repaid.  On information and belief, Khachatryan, Sargis, Sona and Gianni have received the

-16-

FIRST AMENDED COMPLAINT

proceeds of the loan that OSA extended to Energy Product and Energy Trading, and have stripped Energy Trading and Energy Product of assets such that the loan at issue cannot be repaid.  On information and belief, Rogers, Gessin and Petro-Diamond have similarly retained the loan proceeds.

54. In August of 2018, OSA assigned its claims against Energy Trading to its affiliated entity ACMC, Plaintiff herein. (A true and correct copy of the promissory note assignment agreement is attached hereto as Exhibit 4)  In October of 2019, OSA assigned to ACMC any and all of OSA's claims against any entities or person in connection with OSA's loan to Energy Product and Energy Trading. (A true and correct copy of the tort claims assignment agreement is attached hereto as Exhibit 5). OSA and ACMC are related entities.

55. In light of the foregoing, ACMC has been left with no choice but to resort to the Court system to seek redress for the fact ACMC has not been paid the $2,450,000 plus costs, fees and interests that ACMC is owed.

## COUNT I

### (Breach of Contract)

### ACMC v. Energy Trading, Khachatryan, Sona, Sargis, Gianni and  DOES 1-60

56. Plaintiff re-alleges and re-incorporates the above paragraphs as though fully set forth herein.

57. The December 2017 Promissory Note constitutes a valid contract between OSA and Energy Trading.  OSA was part of a loan transaction whereby OSA loaned $2,450,000 to entities controlled by Khachatryan and Khachatryan's family members. Originally, OSA agreed to loan Energy Product and Equifunds the $2,450,000 principal and as consideration Energy Product and Equifunds agreed to repay this loan.  Subsequently, Energy Trading assumed the obligation to

-17-

repay the $2,450,000 to OSA per the December 2017 Promissory Note. As consideration, OSA agreed to relieve Energy Product and Equifunds of their obligations repay the promissory note embodying the September 2017 Loan.

58. OSA performed its obligations to Energy Trading and Khachatryan's companies first by loaning the money as part of the September 2017 Loan, and then by agreeing to relieve Energy Product and Equifunds of their obligation to repay the loan such that Energy Trading could do so.

59. Energy Trading breached this contact by failing to pay OSA the $2,450,000 and interest due per the December 2017 Promissory Note.

60. As a result of Energy Trading's breach of contract, OSA has suffered damages in the amount of at least $2,450,000 plus costs, fees and interest.

61. OSA has assigned its claims in the December 2017 Promissory Note to its affiliated entity ACMC.

62. As noted above, Khachatryan, Sona, Sargis, and Gianni are the alter egos of Energy Trading.

63. As such, the Court should enter judgment in favor of ACMC against Energy Trading, Khachatryan, Sona, Sargis, and Gianni in the amount of $2,450,000 plus costs, fees and interest.

64. Per Cal. Civ. Code § 2224: "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is . . . an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Moreover, per Cal. Civ. Code § 2223 "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Thus, this Court should impose a constructive trust in favor of ACMC as

-18-

FIRST AMENDED COMPLAINT

to all assets that Energy Trading, Khachatryan, Sona, Sargis and Gianna have wrongfully obtained.

## COUNT II

### (Money Had and Received)

### ACMC v. All Defendants and DOES 1-60

65. Plaintiff re-alleges and re-incorporates the above paragraphs as though fully set forth herein.

66. Generally, a cause of action is stated for money had and received if the defendant is indebted to the plaintiff in a sum certain for money had and received by the defendant for use by the plaintiff.

67. All Defendants are in possession of money that rightfully belongs to ACMC. OSA loaned $2,450,000 to Energy Product and Equifunds per the September 2017 Loan. All Defendants  - Energy Trading, Petro-Diamond, Khachatryan, Sona, Sargis, Gianni, Rogers and Gessin - received and controlled the loan proceeds. Energy Trading agreed to assume Energy Product's obligations per the relevant loan. As such, All Defendants received money ultimately meant for use by OSA and are thus indebted to OSA for the money received as well as costs fees and interests.

68.  OSA has assigned its claims in connection with this matter to ACMC.

69. Thus, the Court should enter judgment in favor of ACMC  against All Defendants in the amount of $2,450,000 plus costs, fees and interest.

70. Moreover, this Court should impose a constructive trust in favor of ACMC as to all assets that All Defendants have wrongfully obtained.

## COUNT III

-19-

## (Common Count to Recover Money Paid by Mistake and Fraud)

## ACMC v. All Defendants and DOES 1-60

71. Plaintiff re-alleges and re-incorporates the above paragraphs as though fully set forth herein.

72. Where one, through mistake or fraud, receives money to which he is not entitled, he becomes the trustee of that money for the benefit of the one justly entitled to it.

73. In the instant case, OSA entered into the September 2017 and December 2017 Loans on the mistaken belief of fact that the transaction in question as legitimate and that OSA would be repaid on the loan.

74. OSA paid $2.45 million on the basis of the mistaken belief that OSA would be repaid. OSA paid this money as a result of the fraud effectuated on OSA.  OSA paid this money after having been defrauded by Rogers, Gessin and Khachatyran.

75. All Defendants - Energy Trading, Petro-Diamond, Khachatryan, Sona, Sargis, Gianni, Rogers and Gessin - have unjustly received a benefit at ACMC's expense.  Specifically, OSA loaned $2,450,000 to Khachatryan's company, Energy Product.  All Defendants received and controlled the loan principal, which was never repaid.  As discussed herein, Khachatryan's company, Energy Trading assumed Energy Product's responsibility to repay OSA.

76. All Defendants have unjustly received and retained money to which ACMC is lawfully entitled. All Defendants have not paid OSA restitution for the benefits that All Defendants have wrongfully retained in connection with the loan transactions.  All Defendants have unjustly retained this money at OSA's expense.

77. OSA has assigned its claims in connection with this matter to ACMC.

78. As such, the Court should enter judgment in favor of ACMC  against All Defendants in

FIRST AMENDED COMPLAINT

# EXHIBIT Y

PART 2

1   the amount of $2,450,000 plus costs, fees and interest.

2   79. Moreover, this Court should impose a constructive trust in favor of ACMC as to

3

4   all assets that All Defendants have wrongfully obtained.

5               **COUNT IV**

6          **(Common Count for Money Lent)**

7   **ACMC v. Energy Trading, Khachatryan, Sargis, Sona,  Gianni, and DOES 1-60**

8

9   80. Plaintiff re-alleges and re-incorporates the above paragraphs as though fully set forth

10  herein.

11  81. The elements of a common count for money lent are that money was delivered to the

12  defendant, the money was intended as a loan and the loan was not repaid.

13  82. In the instant case, OSA loaned money to Energy Product.  This money was intended as a

14  loan. This money was not repaid.

15  83. Energy Trading agreed to assume Energy Product's obligation to repay this loan.

16  84. As noted above, Khachatryan, Sona, Sargis, and Gianni, are the alter egos of Energy

17  Trading.

18  85. OSA has assigned its claims in connection with this matter to ACMC.

19  86. As such, the Court should enter judgment in favor of ACMC  against Energy Trading,

20  Khachatryan, Sona, Sargis, and Gianni in the amount of $2,450,000 plus costs, fees and interest.

21  87. Moreover, this Court should impose a constructive trust in favor of ACMC as to

22  all assets that Energy Trading, Khachatryan, Sona, Sargis, and Gianni have wrongfully obtained.

23               **COUNT V**

24       **(Promissory Fraud -Fraud in the Inducement)**

25  **ACMC v. Khachatryan Gessin, Rogers and DOES 1-60**

26

27

28

-21-

FIRST AMENDED COMPLAINT

88. Plaintiff re-alleges and re-incorporates the above paragraphs as though fully set forth herein.

89. Fraud in the inducement occurs when the plaintiff knows what he is signing but his consent is induced by fraud. A promise made without any intention of performing it constitutes fraud. The elements of fraud are (a) a misrepresentation (false representation, concealment, or nondisclosure), (b) scienter or knowledge of its falsity, (c) intent to induce reliance, (d) justifiable reliance, and (e) resulting damage.

90. In order to induce OSA to loan money in connection with the September 2017 Loan, Rogers and Gessin made representations to OSA to the effect that OSA was loaning money that would be used in Khachatryan's oil ventures, that OSA would be repaid in 30 days and that Jack Khachatryan and Energy Product agreed with Rogers, Gessin and OSA on all key terms.  On or around the time of the consummation of the September 2017 Loan, Rogers and Gessin called OSA numerous times per day, making these misrepresentations to induce OSA to enter into the September 2017 Loan.

91. When the time came for the December 2017 loan to be repaid, Rogers continued to make false representations to OSA, by telling OSA that payment was coming and that OSA would be repaid at some point.

92. Rogers and Gessin knew when they made these representations that these representations were false. When it came time for OSA to be repaid per the September 2017 Loan - a mere 30 days after the loan was consummated - Rogers and Gessin grew distant from OSA, while Khachatryan claimed that the terms to which he intended to agree were very different than those described in the September 2017 Note. Moreover, OSA has never been repaid on the December 2017 Loan.  When Rogers and Gessin made these false representations to OSA, Rogers and

-22-

Gessin intended that OSA would rely on these statements such that OSA would provide $2,450,000 in connection with the September 2017 Loan and then would expect to be repaid on both  the September 2017 Loan and the December 2017 Loan. OSA did in fact justifiably rely on these statements and provided $2,450,000 as principal for the September 2017 Loan and then agreed to the December 2017 Loan and then relied on the assurances that OSA would be repid. OSA was damaged as a result of Gessin' and Rogers' conduct, as OSA was not repaid in connection with the relevant loans.

93. The facts overwhelmingly demonstrate that Rogers acted with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan. Rogers was adamant in vouching for Khachatryan and Energy Product to OSA on or around September 2017.  Rogers was aggressive in enticing Alpark to cause OSA to enter into the September 2017 Loan as quickly as possible. Rogers worked closely with Khachatryan when Khachatryan attempted to evade OSA's attempts to be repaid. Rogers told OSA to route communications from OSA to Khachatryan through Rogers.  Rogers worked with Khachatryan to send fake payment confirmations to OSA. Rogers told OSA that Rogers personally knew that new investors had been found to replace OSA on the loan transaction and that OSA would be repaid almost immediately and this assertion was not true. Rogers repeatedly assured OSA over and over that OSA would be repaid on the relevant loan transaction.

94. Alpark, Calhoun and Capano are all intimately familiar with this matter and all have interacted with Rogers.  Although they were unaware of the fraud at the time, Alpark, Calhoun and Capano all believe that Rogers was acting with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan.

95. The fact that Rogers repeatedly assured OSA that OSA would be repaid on the

-23-

FIRST AMENDED COMPLAINT

relevant loan after several payments had been missed gives rise to the inference that Rogers was acting with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan.

96. Furthermore, fraudulent intent can be established where defendant had demonstrated a pattern of making representations that were never performed.  On or around the same time that the aforementioned conduct was occurring, Rogers enticed Capano to enter into loan transactions in Texas, which resulted in litigation. This Texas litigation arose from the fact that payments were not made in connection with these transactions, despite Rogers' assertions that payments would be made.  In connection with these Texas transactions, which had nothing to do with Khachatryan nor Energy Product nor Energy Trading, Rogers sent Capano bogus payment confirmation for payments that had never been made.

97.  In order to induce OSA to enter into the September 2017 Loan, Khachatryan had Rogers and Gessin represented to OSA that if OSA loaned $2,450,000 to Khachatryan's company, the loan principal would be invested in Khachatryan's oil ventures and that OSA would be repaid with interest within 30 days.  In order to induce OSA to enter into the December 2017 Loan, Khachatryan told OSA that Khachatryan had been deceived by Rogers and Gessin in connection with the consummation of the September 2017 Loan and that OSA would be paid back through the December 2017 Loan.

98. When the time came for the December 2017 loan to be repaid, Khachatryan continued to make false representations to OSA, by telling OSA that payment was coming and that OSA would be repaid at some point.

99. When Khachatryan made these statements, or  had these statements made to OSA, Khachatryan knew that these statements were false and Khachatryan knew that Khachatryan's companies would not repay OSA on the September 2017 Loan and the December 2017 Loan.

-24-

Khachatryan made these statements or had these statements made to OSA with the intention that OSA would rely on the statements and that OSA would lend $2,450,000 to Khachatryan's companies in connection with the September 2017 Loan and December 2017 Loan, while OSA expected to be repaid. OSA justifiably relied on Khachatryan's statements and on statements caused Khachatryan by first entering into the September 2017 Loan, and providing $2,450,000 in connection with the loan, and then entering into the December 2017 Loan, while expecting to be repaid.  OSA has been damaged as a result of Khachatryan's fraud as OSA has not been repaid on the relevant loan.

100.    Khachatryan's, Rogers' and Gessin' conduct in connection with this matter is such that Khachatryan, Rogers and Gessin have engaged in oppression, fraud and malice. Indeed, Khachatryan, Rogers and Gessin, maliciously, fraudulently and oppressively caused OSA to relinquish $2,450,000 such that OSA would lose this money and never be repaid.  As such, Plaintiff is entitled to punitive damages in connection with its fraud claim against Khachatryan, Gessin and Rogers.

101.    OSA has assigned its claims in connection with this matter to ACMC.

102.    As such, the Court should enter judgment in favor of ACMC  against Khachatryan, Gessin and Rogers in the amount of $2,450,000 plus costs, fees, interest and punitive damages.

103.    Moreover, this Court should impose a constructive trust in favor of ACMC as to all assets that Khachatryan, Rogers and Gessin have wrongfully obtained.

### COUNT VI

### (Fraud-Intentional Misrepresentation)

### ACMC v. Khachatryan, Gessin, Rogers and DOES 1-60

-25-

104.      Plaintiff re-alleges and re-incorporates the above paragraphs as though fully set forth herein.

105.      The essential elements of a count for intentional misrepresentation are (1) a misrepresentation; (2) knowledge of falsity; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage.

106.      On or around the time of the consummation of the September 2017 Loan, Rogers and Gessin made representations to OSA to the effect that OSA was loaning money that would be used in Khachatryan's oil ventures, that OSA would be paid back in 30 days and that Khachatryan and Energy Product agreed with Rogers, Gessin and OSA on all key terms. On or around the time of the consummation of the September 2017 Loan, Rogers and Gessin called OSA numerous times per day, making these misrepresentations, to induce OSA to enter into the September 2017 Loan.

107.      When the time came for the December 2017 loan to be repaid, Rogers continued to make false representations to OSA, by telling OSA that payment was coming and that OSA would be repaid at some point.

108.      Rogers and Gessin knew when they made these representations that these representations were false. When it came time for OSA to be repaid per the September 2017 Loan - a mere 30 days after the loan was consummated - Rogers and Gessin grew distant from OSA, while Khachatryan claimed that the terms to which he intended to agree were very different than those described in the September 2017 Note. Khachatryan claimed that Gessin had deceived Khachatryan's companies in connection with the consummation of the September 2017 Loan. Moreover, OSA has never been repaid on the December 2017 Loan. When Rogers and Gessin made these false representations to OSA, Rogers and Gessin intended that OSA

FIRST AMENDED COMPLAINT

would rely on these statements such that OSA would provide $2,450,000 in connection with the September 2017 Loan and that OSA would never be repaid in connection with this money. OSA did in fact justifiably rely on these statements and provided $2,450,000 as principal for the September 2017 Loan, while expecting to be repaid. OSA was damaged as a result of Gessin' and Rogers' conduct, as OSA was not repaid in connection with the September 2017 Loan, nor on the subsequent December 2017 Loan.

109.    The facts overwhelmingly demonstrate that Rogers acted with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan. Rogers was adamant in vouching for Khachatryan and Energy Product to OSA on or around September 2017.  Rogers was aggressive in enticing Alpark to cause OSA to enter into the September 2017 Loan as quickly as possible. Rogers worked closely with Khachatryan when Khachatryan attempted to evade OSA's attempts to be repaid. Rogers told OSA to route communications from OSA to Khachatryan through Rogers.  Rogers worked with Khachatryan to send fake payment confirmations to OSA.  Rogers told OSA that Rogers personally knew that new investors had been found to replace OSA on the loan transaction and that OSA would be repaid almost immediately and this assertion was not true. Rogers repeatedly assured OSA over and over that OSA would be repaid on the relevant loan transaction.

110.    Alpark, Calhoun and Capano are all intimately familiar with this matter and all have interacted with Rogers.  Although they were unaware of the fraud at the time, Alpark, Calhoun and Capano all believe that Rogers was acting with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan.

111.    The fact that Rogers repeatedly assured OSA that OSA would be repaid on the

-27-

FIRST AMENDED COMPLAINT

relevant loan after several payments had been missed gives rise to the inference that Rogers was acting with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan.

112.    Furthermore, fraudulent intent can be established where defendant had demonstrated a pattern of making representations that were never performed.  On or around the same time that the aforementioned conduct was occurring, Rogers enticed Capano to enter into loan transactions in Texas, which resulted in litigation. This Texas litigation arose from the fact that payments were not made in connection with these transactions, despite Rogers' assertions that payments would be made.  In connection with these Texas transactions, which had nothing to do with Khachatryan nor Energy Product nor Energy Trading, Rogers sent Capano bogus payment confirmation for payments that had never been made.

113.    On or around the time of the consummation of the September 2017 Loan, Khachatryan had Rogers and Gessin represented to OSA that if OSA loaned $2,450,000 to Khachatryan's company, the loan principal would be invested in Khachatryan's oil ventures and that OSA would be repaid with interest within 30 days.  On or around the time of the December 2017 Loan, Khachatryan told OSA that Khachatryan had been deceived by Rogers and Gessin in connection with the consummation of the September 2017 Loan and that OSA would be paid back through the December 2017 Loan.

114.    When the time came for the December 2017 loan to be repaid, Khachatryan continued to make false representations to OSA, by telling OSA that payment was coming and that OSA would be repaid.

115.    When Khachatryan made these statements, or  had these statements made to OSA, Khachatryan knew that these statements were false and Khachatryan knew that Khachatryan's companies would not repay OSA on the September 2017 Loan and the December 2017 Loan.

-28-

FIRST AMENDED COMPLAINT

Khachatryan made these statements or had these statements made to OSA with the intention that OSA would rely on the statements and that OSA would lend $2,450,000 to Khachatryan's companies in connection with the September 2017 Loan and December 2017 Loan, while expecting to be repaid. OSA justifiably relied on Khachatryan's statements and on statements caused by Khachatryan by first entering into the September 2017 Loan, and providing $2,450,000 in connection with the loan, and then entering into the December 2017 Loan, while expecting to be repaid.

116.    OSA has been damaged as a result of Khachatryan's fraud as OSA has not been repaid for the September 2017 Loan, nor the December 2017 Loan.

117.    Khachatryan's, Rogers' and Gessin' conduct in connection with this matter is such that Khachatryan, Rogers and Gessin have engaged in oppression, fraud and malice. Indeed, Khachatryan, Rogers and Gessin, maliciously, fraudulently and oppressively caused OSA to relinquish $2,450,000 such that OSA would lose this money and not be repaid.  As such, Plaintiff is entitled to punitive damages in connection with its fraud claim against Khachatryan, Gessin and Rogers.

118.    OSA has assigned its tort claims in connection with this matter to ACMC.

119.    Thus, the Court should enter judgment in favor of ACMC  against Khachatryan, Gessin and Rogers in the amount of $2,450,000 plus costs, fees, interest and punitive damages.

120.    Moreover, this Court should impose a constructive trust in favor of ACMC as to all assets that Khachatryan, Rogers and Gessin have wrongfully obtained.

## COUNT VII

### (Negligent Misrepresentation)

### ACMC v. Khachatryan, Gessin, Rogers and DOES 1-60

-29-

121.    Plaintiff re-alleges and re-incorporates the above paragraphs as though fully set forth herein.

122.    The elements of negligent misrepresentation are: (1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed, and (5) damages.

123.    On or around the time of the consummation of the September 2017 Loan, Rogers and Gessin made representations to OSA to the effect that OSA was loaning money that would be used in Khachatryan's oil ventures, that OSA would be paid back in 30 days and that Khachatryan and Energy Product agreed with Rogers, Gessin and OSA on all key terms. On or around the time of the consummation of the September 2017 Loan, Rogers and Gessin called OSA numerous times per day, making these misrepresentations, in order to induce OSA to enter into the September 2017 Loan.

124.    When the time came for the December 2017 loan to be repaid, Rogers continued to make false representations to OSA, by telling OSA that payment was coming and that OSA would be repaid at some point.

125.    Rogers and Gessin had no reasonable grounds to believe that these statements were true when Rogers and Gessin made these statements. When it came time for OSA to be repaid per the September 2017 Loan - a mere 30 days after the loan was consummated - Rogers and Gessin grew distant from OSA, while Khachatryan claimed that the terms to which he intended to agree were very different than those described in the September 2017 Note. Moreover, OSA has never been repaid on the December 2017 Loan.   When Rogers and Gessin made these negligent misrepresentations to OSA, Rogers and Gessin intended that OSA would

-30-

rely on these statements such that OSA would provide $2,450,000 in connection with the September 2017 Loan, while expecting to ultimately be repaid. OSA did in fact justifiably rely on these statements and provided $2,450,000 as principal for the September 2017 Loan and expected to be repaid the loan principal with interest. OSA was ignorant of the true state of affairs and did not know that Rogers and Gessin were making untruthful statements and that OSA would not be repaid on any of the loans to Khachatryan's companies. OSA was damaged as a result of Gessin' and Rogers' conduct as OSA was not repaid in connection with the September 2017 Loan, nor on the subsequent December 2017 Loan.

126.    The facts overwhelmingly demonstrate that Rogers acted with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan. Rogers was adamant in vouching for Khachatryan and Energy Product to OSA on or around September 2017.  Rogers was aggressive in enticing Alpark to cause OSA to enter into the September 2017 Loan as quickly as possible. Rogers worked closely with Khachatryan when Khachatryan attempted to evade OSA's attempts to be repaid. Rogers told OSA to route communications from OSA to Khachatryan through Rogers.  Rogers worked with Khachatryan to send fake payment confirmations to OSA.  Rogers told OSA that Rogers personally knew that new investors had been found to replace OSA on the loan transaction and that OSA would be repaid almost immediately and this assertion was not true. Rogers repeatedly assured OSA over and over that OSA would be repaid on the relevant loan transaction.

127.    Alpark, Calhoun and Capano are all intimately familiar with this matter and all have interacted with Rogers.  Although they were unaware of the fraud at the time, Alpark, Calhoun and Capano all believe that Rogers was acting with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan.

128.    The fact that Rogers repeatedly assured OSA that OSA would be repaid on the relevant loan after several payments had been missed gives rise to the inference that Rogers was acting with fraudulent intent when Rogers induced OSA to enter into the September 2017 Loan.

129.    Furthermore, fraudulent intent can be established where defendant had demonstrated a pattern of making representations that were never performed.  On or around the same time that the aforementioned conduct was occurring, Rogers enticed Capano to enter into loan transactions in Texas, which resulted in litigation. This Texas litigation arose from the fact that payments were not made in connection with these transactions, despite Rogers' assertions that payments would be made.  In connection with these Texas transactions, which had nothing to do with Khachatryan nor Energy Product nor Energy Trading, Rogers sent Capano bogus payment confirmation for payments that had never been made.

130.    On or around the time of the consummation of the September 2017 Loan, Khachatryan had Rogers and Gessin represent to OSA that if OSA loaned $2,450,000 to Khachatryan's company, the loan principal would be invested in Khachatryan's oil ventures and that OSA would be repaid with interest within 30 days.  On or around the time of the December 2017 Loan, Khachatryan told OSA that Khachatryan had been deceived by Rogers and Gessin in connection with the consummation of the September 2017 Loan and that OSA would be repaid through the December 2017 Loan.

131.    When the time came for the December 2017 loan to be repaid, Khachatryan continued to make false representations to OSA, by telling OSA that payment was coming and that OSA would be repaid at some point.

132.    When Khachatryan made these statements, or  had these statements made to OSA,

-32-

FIRST AMENDED COMPLAINT

Khachatryan did not have reasonable grounds to believe that these statements were true as Khachatryan's companies did not repay OSA on the September 2017 Loan and the December 2017 Loan.  Khachatryan made these statements or had these statements made to OSA with the intention that OSA would rely on the statements and that OSA would lend $2,450,000 to Khachatryan's companies in connection with the September 2017 Loan and the December 2017 Loan. Moreover, OSA has never been repaid on the December 2017 Loan.   OSA justifiably relied on Khachatryan's statements and on statements caused by Khachatryan by first entering into the September 2017 Loan, and providing $2,450,000 in connection with the loan, and then entering into the December 2017 Loan, while expecting to be repaid.  OSA was ignorant of the true state of affairs and did not know that Khachatryan was making untruthful statements and that OSA would not be repaid on any of the loans to Khachatryan's companies. OSA has been damaged as a result of Khachatryan's  conduct as OSA has not been repaid for the September 2017 Loan, nor the December 2017 Loan.

133.      OSA has assigned its tort claims in connection with this matter to ACMC.

134.      As such, the Court should enter judgment in favor of ACMC  against Khachatryan, Gessin and Rogers in the amount of $2,450,000 plus costs, fees, and interest.

135.      Moreover, this Court should impose a constructive trust in favor of ACMC as to all assets that Khachatryan, Rogers and Gessin have wrongfully obtained.

## COUNT VIII

### (Conversion)

### ACMC v. All Defendants and DOES 1-60

136.      Plaintiff re-alleges and re-incorporates the above paragraphs as though fully set forth herein.

137.    The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion, the defendant's conversion by a wrongful act or disposition of property rights, and damages.

138.    In the instant case, OSA is rightfully entitled to be paid the loan principal in additional to costs fees and interests. All Defendants - Energy Trading, Petro-Diamond, Khachatryan, Sona, Sargis, Gianni, Rogers and Gessin - have simply taken OSA's money and not repaid that money. As such, All Defendants have carried out a wrongful act so as to dispossess OSA of its money. As a result of All Defendants' conduct, OSA has suffered damages.

139.    All Defendants' conduct in connection with this matter is such that All Defendants have engaged in oppression, fraud and malice. Indeed, All Defendants, maliciously, fraudulently and oppressively caused OSA to relinquish $2,450,000 such that OSA would lose this money and never be repaid. Therefore, Plaintiff is entitled to an award of punitive damages in connection with its conversion claim against All Defendants.

140.    OSA has assigned its tort claims in connection with this matter to ACMC.

141.    Thus, the Court should enter judgment in favor of ACMC against All Defendants in the amount of $2,450,000 plus costs, fees, interest and punitive damages.

142.    Moreover, this Court should impose a constructive trust in favor of ACMC as to all assets that All Defendants have wrongfully obtained.

-34-

FIRST AMENDED COMPLAINT

# COUNT IX

## (Intentional Fraudulent Transfers per the Uniform Voidable Transactions Act - Cal. Civ. Code § 3439.04(a)(1))

## ACMC v. Petro-Diamond,  Khachatryan, Sargis, Sona, Gianni, Rogers and Gessin and DOES 1-60

143.     Plaintiff re-alleges and re-incorporates the above paragraphs as though fully set forth herein.

144.     Cal. Civ. Code § 3439.04(a)(1) states "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: . . . with actual intent to hinder, delay, or defraud any creditor of the debtor."

145.     In determining whether the requisite fraudulent intent exists with respect to a particular transfer, courts ask whether the "badges of fraud" are present, such that the court will conclude that the transfer was made to defraud creditors. The "badges of fraud" are indicia of fraudulent intent that demonstrates that the transfers at issue were made with the requisite intent to defraud creditors.  As stated in C.C.P. § 3493.04(b), these badges include: "(1) Whether the transfer or obligation was to an insider; (2) Whether the debtor retained possession or control of the property transferred after the transfer; (3) Whether the transfer or obligation was disclosed or concealed; (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) Whether the transfer was of substantially all the debtor's assets; (6) Whether the debtor absconded; (7) Whether the debtor removed or concealed assets; (8) Whether the value of the consideration received by the debtor was reasonably equivalent to

the value of the asset transferred or the amount of the obligation incurred; (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; (11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor."

146.    In the instant case, on information and belief, Petro-Diamond, Khachatryan, Sargis, Sona, Gianni, and Roger and Gessin received the loan proceeds from OSA and then rendered Energy Product and Energy Trading judgment proof by stripping Energy Product and Energy Trading of assets. On information and belief, Khachatryan, Sargis, Sona, and Gianni caused Energy Product and Energy Trading to transfer all of their assets to the Saryan family and/or entities controlled by the Saryan family and/or Rogers and Gessin such that Energy Product and Energy Trading could not pay their debts to OSA, all while Petro-Diamond, Khachatryan, Sargis, Sona, Gianni, Rogers and Gessin retained the loan proceeds for themselves. Moreover, Khachatryan, Sargis, Sona, and Gianni caused Energy Product and Energy Trading to refrain from obtaining the relevant loan proceeds for themselves such that OSA could ultimately be repaid.

147.    ACMC is entitled to a judgment against the recipients of the transfers, Petro Diamond, Khachatryan, Sargis, Sona, Gianni, Rogers and Gessin.

148.    OSA has assigned its claims in connection with this matter to ACMC.

149.    As such, the Court should enter judgment in favor of ACMC against Petro Diamond, Khachatryan, Sargis, Sona, Gianni, Rogers and Gessin in the amount of $2,450,000 plus costs, fees, and interest.

150.    Moreover, this Court should impose a constructive trust in favor of ACMC as to

FIRST AMENDED COMPLAINT

all assets that Petro-Diamond, Khachatryan, Sargis, Sona, Gianni, Rogers and Gessin have

wrongfully obtained.

## COUNT X

## (Constructive Fraudulent Transfers per the Uniform Voidable Transactions Act per Cal. Civ. Code § 3439.04(a)(2)(B))

## ACMC v. Khachatryan, Sargis, Sona, Gianni, Petro-Diamond, Rogers, Gessin and DOES 1-60

151.    Plaintiff re-alleges and re-incorporates the above paragraphs as though fully set forth herein.

152.    Cal. Civ. Code § 3439.04(a)(2)(B) states "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . : (B) [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

153.    In the instant case, on information and belief, Khachatryan, Sargis, Sona and Gianni caused Energy Product and Energy Trading to transfer all of their assets to the Saryan family or entities controlled by the Saryan family and/or Petro-Diamond and/or Rogers and Gessin.  Moreover, on information and belief, Khachatryan, Sargis, Sona and Gianni caused Energy Product and Energy Trading to refrain from obtaining the relevant loan proceeds for themselves such that OSA could ultimately be repaid. On information and belief, Khachatryan, Sargis, Sona, and Gianni caused Energy Trading and Energy Product to make these transfers

-37-

without receiving any reasonably equivalent value in return.  Moreover, when Energy Trading and Energy Product incurred their debts to OSA and refrained from receiving and/or retaining the loan proceeds of the loan by OSA, Energy Trading and Energy Product believed or reasonably should have believed that Energy Trading and Energy Product were incurring debts beyond their ability to repay those debts.

154.     ACMC is entitled to a judgment against the recipients of the transfers, Petro Diamond, Khachatryan, Sargis, Sona, Gianni, Rogers and Gessin.

155.     OSA has assigned its claims in connection with this matter to ACMC.

156.     As such, the Court should enter judgment in favor of ACMC against Petro Diamond, Khachatryan, Sargis, Sona, Gianni, Rogers and Gessin in the amount of $2,450,000 plus costs, fees, and interest.

157.     Moreover, this Court should impose a constructive trust in favor of ACMC as to all assets that Petro-Diamond, Khachatryan, Sargis, Sona, Gianni, Rogers and Gessin have wrongfully obtained.

**WHEREFORE,** plaintiff, ACMC prays for judgment as follows:

**ON THE FIRST CAUSE OF ACTION**

1. For damages in at least the amount of $2,450,000;

2. For costs, fees and interest;

3. For a constructive trust;

4. For other relief as this Court deems just an appropriate.

**ON THE SECOND CAUSE OF ACTION**

1. For damages in at least the amount of $2,450,000;

2. For costs, fees and interest;

-38-

FIRST AMENDED COMPLAINT

3. For a constructive trust;

4. For other relief as this Court deems just an appropriate.

**ON THE THIRD CAUSE OF ACTION**

1. For damages in at least the amount of $2,450,000;

2. For costs, fees and interest;

3. For a constructive trust;

4. For other relief as this Court deems just an appropriate.

**ON THE FOURTH CAUSE OF ACTION**

1. For damages in at least the amount of $2,450,000;

2. For costs, fees and interest;

3. For a constructive trust;

4. For other relief as this Court deems just an appropriate.

**ON THE FIFTH CAUSE OF ACTION**

1. For damages in at least the amount of $2,450,000;

2. For costs, fees and interest;

3. For punitive damages;

4. For a constructive trust;

5. For other relief as this Court deems just an appropriate.

**ON THE SIXTH CAUSE OF ACTION**

1. For damages in at least the amount of $2,450,000;

2. For costs, fees and interest;

3. For punitive damages;

4. For a constructive trust;

-39-

5.   For other relief as this Court deems just an appropriate.

**ON THE SEVENTH CAUSE OF ACTION**

1.   For damages in at least the amount of $2,450,000;

2.   For costs, fees and interest;

3.   For a constructive trust;

4.   For other relief as this Court deems just an appropriate.

**ON THE EIGHTH CAUSE OF ACTION**

1.   For damages in at least the amount of $2,450,000;

2.   For costs, fees and interest;

3.   For punitive damages;

4.   For a constructive trust;

5.   For other relief as this Court deems just an appropriate.

**ON THE NINTH CAUSE OF ACTION**

1.   For damages in at least the amount of $2,450,000;

2.   For costs, fees and interest;

3.   For a constructive trust;

4.   For other relief as this Court deems just an appropriate.

**ON THE TENTH CAUSE OF ACTION**

1.   For damages in at least the amount of $2,450,000;

2.   For costs, fees and interest;

3.   For a constructive trust;

4.   For other relief as this Court deems just an appropriate.

### DEMAND FOR A JURY TRIAL

-40-

1    Plaintiff hereby demands a jury trial on all issues triable by a jury.

2    Dated: August 14, 2020

3                                    Respectfully submitted,

4

5                                    **KLUEWER LAW P.C.**

6

7

8

9                                    By: */s/ Joshua T. Kluewer*
                                          Joshua T. Kluewer Esq.
10                                        *Attorneys for Plaintiff, ACMC Finance and*
                                          *Trade LLC*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

# EXHIBIT Z

Electronically FILED by Superior Court of California, County of Los Angeles on 11/01/2021 01:07 PM Sherri R. Carter, Executive Officer/Clerk of Court, by E. Salcido,Deputy Clerk
Case 2:23-bk-10990-SK Doc 286 Filed 03/22/24 Entered 03/22/24 11:21:27 Page 2 of 27
Ex. 3    Page 332 of 489

Joshua T. Kluewer (SBN 314105)
KLUEWER LAW P.C.
811 Wilshire Blvd. Suite 1751
Los Angeles, CA 90017
T: (213) 465-2647
Email: jkluewer@kluewerlaw.com

*Attorneys for Plaintiff, ACMC Finance and Trade LLC*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

|  |  |
|---|---|
| ACMC FINANCE AND TRADE LLC, a Delaware Limited Liability Company,<br><br>            Plaintiff.,<br><br>      v.<br><br>ENERGY TRADING COMPANY LLC, a Delaware Limited Liability Company; PETRODIAMOND INC., a Delaware Corporation; JACK KHACHATRYAN a/k/a JACK SARY AN, an individual; SONA APIKIAN a/k/a SONA SARYAN, an individual; SARGIS KHACHATRYAN a/k/a SAM SARYAN, an individual; GIANNI SARYAN, an individual; JOHN GESSIN, an individual; and DENNIS ROGERS II., an individual; and DOES 1-60.<br><br>            Defendants. | CASE NO: 19LBCV00725<br><br>**PLAINTIFF ACMC FINANCE AND TRADE LLC'S MOTION FOR SUMMARY JUDGMENT AS TO THE ACTION AGAINST DENNIS ROGERS II OR IN THE ALTERNATIVE FOR SUMMARY ADJUDICATION**<br><br>Complaint Filed: December 20, 2019<br><br>Amended Complaint Filed: August 14, 2020<br><br>Trial Date: April 4, 2022<br><br>*THE HEARING DATE IS CURRENTLY SCHEDULED FOR AFTER TRIAL AS THIS DATE WAS THE FIRST AVAILABLE ON THE COURT'S MOTION CALENDAR. PLAINTIFF IS CONCURRENTLY MOVING EX PARTE TO SCHEDULE A MORE APPROPRIATE HEARING DATE.*<br><br>   Motion Reservation ID:<br>   757546361708 |

1

---

MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

1    TO THE COURT THE PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE THAT, April 21 2022 or on a date to be scheduled by the *ex*

3  *parte* motion being filed concurrently herewith at 8:30 am in Department S-27 of the Governor

4  George Deukmejian Courthouse, 275 Magnolia Avenue Long Beach California 90802 Plaintiff,

5  ACMC Finance and Trade LLC's ("ACMC" or "Plaintiff") will and hereby does move for

6  Summary Judgment as to the Action against Dennis Rogers II ("Rogers") or the alternative for

7  Summary Adjudication.

8    This hearing date is currently scheduled for after the trial date in the above-captioned

9  action, as this hearing date was the first date available on the Court's Motion calendar. Plaintiff

10  is concurrently making an *ex parte* Motion to set a more appropriate hearing date for this Motion

11  for Summary Judgment and/or Summary Adjudication.

12    This Motion is made per C.C.P. Section 437c(a)(1) as Plaintiff is moving for Summary

13  Judgment as to the entire action as to Dennis Rogers II.  This Motion is also made per C.C.P.

14  Section 437c(f)(1) as Plaintiff is judgment as to its sixth cause of action for intentional fraud as

15  to Rogers.

16    This Motion is based on this Notice of Motion, the Memorandum of Points the

17  accompanying Declaration of Anthony Capano and exhibits thereto, the accompanying

18  Declaration of Joshua Kluewer and exhibits thereto, the accompanying Declaration of Omar

19  Alpark and exhibits thereto, the accompanying Declaration of Semaj Calhoun, the accompanying

20  Separate Statement of Undisputed Material Facts, the  record in  this case, and such other

21  evidence, arguments and matters as to which the Court may take notice.

22  Dated: November 1, 2021

23                          Respectfully submitted,

24                          **KLUEWER LAW P.C**.

25

26

27                          By: /s/ Joshua T. Kluewer
                            Joshua T. Kluewer Esq.
28                          Attorneys for Plaintiff, ACMC Finance and Trade LLC

2

---

MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................ ii

Memorandum of Points and Authorities .............................................................. 1

I.      Introduction ................................................................................................. 1

II.     Facts ............................................................................................................. 1

    A.      OSA'S LOAN TO ENERGY PRODUCT AND ENERGY TRADING ............ 1

    B.      THE PUSH START LOAN TRANSACTIONS ................................. 4

    C.      ROGERS' REPEATED ASSURANCE BETWEEN FEBRUARY 2018 UNTIL MID TO LATE 2019 THAT PAYMENTS WOULD BE MADE SHORTLY ................................................................ 4

    D.      ROGERS IS SUED IN NUMEROUS ACTIONS IN THE STATE OF TEXAS FOR DEFRAUDING VICTIMS INTO RELINQUISHING MONEY AND A COURT JUDGMENT FINDS THAT ROGERS INTENTIONALLY COMMITTED FRAUD ................................... 11

III.    Legal Argument ........................................................................................ 12

    A.      The Standard on This Motion ........................................................ 12

    B.      Plaintiff's Evidence Proves the First Element of Plaintiff's Sixth Cause of Action for Fraud ........................................................................ 14

    C.      Plaintiff's Evidence Proves the Second Element of Plaintiff's Sixth Cause of Action for Fraud ........................................................................ 15

    D.      Plaintiff's Evidence Proves the Third Element of Plaintiff's Sixth Cause of Action for Fraud ........................................................................ 16

    E.      Plaintiff's Evidence Proves the Fourth Element of Plaintiff's Sixth Cause of Action for Fraud ........................................................................ 18

    F.      Plaintiff's Evidence Proves the Fifth Element of Plaintiff's Sixth Cause of Action for Fraud ........................................................................ 19

    G.      OSA Has Assigned the Instant Cause of Action to ACMC ........... 19

IV.    Conclusion ................................................................................................. 20

i

## **TABLE OF AUTHORITIES**

Page

**CASES:**

*Advent Inc. v. National Union Fire Ins. Co.* (2016), 6 Cal. App. 5th 443, 453 ......................... 13

*Alliance Mortgage Co. v. Rothwell* (1995), 10 Cal. 4th 1226, 1239 ........................................ 18

*American T. Co. v. California Etc. Ins. Co*. (1940), 15 Cal. 2d 42, 67 ..................................... 19

*Continental Airlines Inc. v. McDonnell Douglas Corp,* (1989), 216 Cal. App. 3d 388,
     411-412 ................................................................................................................ 17

*Engalla v. Permanante Medical Group Inc.* (1997), 15 Cal. 4th 951, 975 ............................... 15

*Engalla v. Permanente Medical Group Inc.* (1997), 15 Cal. 4th 951, 976 .............................. 18

*Hart v. Browne* (1980), 103 Cal. App. 3d 947, 957 ....................................................... 15, 16

*Insurance Co. of State of Pennsylvania v American Safety Indemnity Co.* (2019), 32 Cal.
     App. 5th 898, 908 ................................................................................................ 13

*J.B.B. Investment Partners Ltd. v. Fair* (2019), 37 Cal. App. 5th 1, 8 ..................................... 13

*Jackson v. Deauville Holding Co*. (1933), 219 Cal. 498, 501-502 .......................................... 20

*Locke v. Warner Bros Inc.* (1997), 57 Cal. App. 4th 354, 368 .................................................. 17

*Miller v. National American Life Ins. Co.* (1976), 54 Cal. App. 3d 331, 338 .......................... 16

*Osuna v. Albertson* (1982), 134 Cal. App. 3d 71, 80-82 ...................................................... 20

*People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 117 ............................ 19

*S.B.C.C. Inc. v. St. Paul Fire & Marina Ins. Co.* (2010), 186 Cal. App. 4th 383, 388 ............. 13

*Tenet Health System Desert, Inc. v. Blue Cross of California* (2016), 245 Cal. App. 4th
     821, 837 ................................................................................... 14, 15, 16, 18, 19

*Tenzer v. Superscope, Inc.* (1985) 39 Cal. 3d 18, 30 (1985) ................................................... 17

*Timed Out LLC v. Youaibian Inc*. (2014), 229 Cal. App. 4th 1001 fn. 7 .................................. 19

*Twomey v. Mitchum Jones and Templeton, Inc.* (1968), 262 Cal. App. 2d 690, 711 ............... 15

*Wetherbee v. United States Ins. Co. of America* (1968), 265 Cal. App. 2d 921, 932 ............... 16

ii

**STATUTES:**

Code of Civil Procedure, section 437c(a)(1) ................................................................. 1, 12, 13

Code of Civil Procedure, section 437c(f)(1) ................................................................. 1, 12, 13

**CODES:**

Cal. Civ. Code § 953 .................................................................................................... 19

Cal Civ. Code § 954 ..................................................................................................... 19

iii

MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

## MEMORANDUM OF POINTS AND AUTHORITIES

Per C.C.P. § 437c(a)(1) and C.C.P. § 437c(f)(1), plaintiff ACMC Finance and Trade LLC ("Plaintiff" or "ACMC") hereby makes this motion for summary judgment for the entire action as to Dennis Rogers II ("Rogers") and/or for summary adjudication as to its sixth cause of action against Rogers for intentional fraud. This Motion can per made per C.C.P. § 437c(a)(1) because it will dispose of the entire action as to Rogers if granted. This Motion can per made per C.C.P. § 437c(f)(1) because it seeks to dispose of an entire single cause of action.   In support of the aforementioned Motion, ACMC states as follows:

### I.    INTRODUCTION

This action can be decided in favor of plaintiff, ACMC on this Summary Motion because the evidence is overwhelming that Rogers effectuated fraud as to ACMC's assignor, OSA Finance and Trade LLC ("OSA").  As discussed herein, and as discussed in numerous pleadings filed in this action, in September of 2017, OSA entered into a loan transaction whereby OSA loaned Energy Product Company LLC ("Energy Product") $2.45 million that was supposed to be repaid within one month with 2% interest (the "September 2017 Loan").   This loan was never repaid in full. As discussed more fully herein, the evidence overwhelming demonstrates that Rogers defrauded OSA into entering into this loan transaction.  Indeed, Rogers detailed his fraud in dozens of emails and text messages.

### II.    FACTS

#### A.    OSA'S LOAN TO ENERGY PRODUCT AND ENERGY TRADING

On or around August of 2017 and September of 2017, Rogers contacted Omar Alpark ("Alpark"), a member of OSA, about the possibility of having OSA make a loan to Energy Product as an investment. (Alpark Declaration ¶ 4).  On or around August 2017 and September 2017, Rogers contacted Alpark at least 3 times a day to encourage OSA to make a loan to Energy Product. *Id* (SSUF # 2).  Rogers presented the loan with Energy Product as an investment opportunity that could not be passed up. Rogers repeatedly asserted to OSA that Energy Product was extremely creditworthy. (Alpark Declaration ¶ 4)(SSUF # 3).  Rogers fully vouched for Energy Product to OSA. (Alpark Declaration ¶ 4)(SSUF # 3). Rogers repeatedly stated to OSA

that Energy Product would easily be able make payments on the loan transaction and return OSA's principal. (Alpark Declaration ¶ 4) (SSUF # 6). Rogers told Alpark/OSA that Rogers was personally aware that Energy Product was a growing business and would become even more profitable in the years to come. (Alpark Declaration ¶ 4) (SSUF # 4). Rogers told Alpark/OSA that Rogers was personally aware that Energy Product had substantial assets and relatively few liabilities. (Alpark Declaration ¶ 4)(SSUF #4). Rogers presented the September 2017 Loan transaction to OSA as the best investment opportunity conceivable and the investment opportunity of a lifetime and Rogers stated that he was personally aware of this fact. (Alpark Declaration ¶ 4)(SSUF #5). Rogers aggressively caused OSA to overcome any concerns that OSA had about loaning money to Energy Product. (Alpark Declaration ¶ 4)(SSUF #3). Rogers told OSA, over and over, that if OSA loaned money to Energy Product, OSA would receive a substantial return on its principal and would be repaid its principal. (Alpark Declaration ¶ 4)(SSUF # 1).   In August and September of 2017, Rogers repeatedly told OSA that OSA could earn 2%, 4% or even 6% per month on its loan principal in connection with the loan to Energy Product. (Alpark Declaration ¶ 4)(SSUF #5). While the September 2017 Loan was being consummated, Rogers told OSA to route communications between OSA and Energy Product through Rogers. (Alpark Declaration ¶ 5)(SSUF # 16). John Gessin ("Gessin") also aggressively pitched the loan transaction at issue to OSA. (Alpark Declaration ¶ 6).

As a result of Rogers' statements, OSA entered into the loan agreement and loaned $2.45 million to Energy Product in September of 2017 (the "September 2017 Loan") (Alpark Declaration ¶¶ 2-3)(Capano Declaration ¶ 2).  The September 2017 Loan was memorialized with the Joint Finance Agreement, which is attached as Exhibit 1 to the accompanying Alpark Declaration. (Alpark Declaration ¶ 2)(Capano Declaration ¶ 2).  Per the terms of the September 2017 Loan, OSA was to loan $2.45 million to Energy Product, at a two percent monthly interest rate, which was supposed be repaid in full in approximately one month. (Alpark Declaration ¶ 2). On or around the time that the September 2017 Loan was consummated, in mid-September 2017, Alpark and a member of OSA, Semaj Calhoun ("Calhoun") visited Energy Product's facilities in Southern California.  Rogers was present for the visit and, on the visit, Rogers continued to

2

assure OSA that OSA's loan to Energy Product was extremely secure. (Calhoun Declaration ¶ 2)(SSUF ## 3 15).

When the time came for OSA to be repaid in connection with the September 2017 Loan, Rogers began suggesting that the borrowers were going to need more time to repay the September 2017 Loan. (Alpark Declaration ¶ 10)(SSUF # 17). When it became clear that the principal was not going to be returned to OSA in a timely manner, Alpark and Rogers met with Jack Khachatryan ("Khachatryan") – who owned and/or controlled Energy Product – at Energy Product's facilities in Southern California. (Alpark Declaration ¶ 10). On or around mid-October 2017, Rogers and Alpark went to Energy Product's facilities in Southern California. *Id.* At the meeting, Khachatryan and his son Gianni Saryan told Alpark that the signature on the Joint Finance Agreement was a forgery and that Energy Product would never have agreed to such a short repayment term. *Id.* Khachatryan told Alpark that he knew that OSA was the source of the $2.45 million loan. *Id.* Khachatryan told Alpark that could be repaid by agreeing to a longer repayment term. *Id.* OSA ultimately agreed to enter into a second promissory note, the Unsecured Promissory Note, whereby Energy Trading Company LLC ("Energy Trading") - an entity closely associated with Energy Product - was to repay the $2.45 million to OSA with interest over a longer repayment term (the "December 2017 Loan"). *Id.* The second note whereby Energy Trading assumed Energy Product's obligation to repay the September 2017 Loan is memorialized in the Unsecured Promissory Note, which is attached to the accompanying Declaration of Omar Alpark as Exhibit 2. At the time that Alpark and Rogers visited Energy Product's facilities in Southern California, Rogers continued to assure Alpark that Energy Product and Energy Trading was a thriving business and that OSA would be repaid its $2.45 million. (Alpark Declaration ¶ 11). After the consummation of the December 2017 Loan, Energy Trading ceased making the agreed upon interest payments. Energy Trading made its last $49,000 interest payment to OSA in February of 2018. (Alpark Declaration ¶ 12). In total, in connection with the loans to Energy Product/Energy Trading, OSA was paid a total of $294,000 in interest and never received its principal. (Capano Declaration ¶ 3).

3

**B. THE PUSH START LOAN TRANSACTIONS**

On or around early November 2017, Rogers fraudulently induced a member of OSA, Anthony Capano and his mother, Joanne Capano to making more loans to entities controlled by Rogers. (Capano Declaration ¶¶ 8, 9).   On November 1, 2017, Capano and his mother, Joanne Capano made a loan to a company that Rogers owned and controlled, Push Start Industries LLC ("Push Start") for $200,000. (Capano Declaration ¶ 8).  This loan was repaid on schedule. *Id.* The ostensible purpose of the loan was connected to investing in water rights. *Id.*  Thereafter, Anthony Capano and Joanne Capano executed a promissory note in the principal amount of $500,000 with Push Start as the borrower on November 30, 2017. On March 1, 2018, Anthony Capano and Joanne Capano executed promissory note in the principal amount of $580,000 with Push Start as the borrower. On April 4, 2018, Anthony Capano and Joanne Capano executed a promissory note in the principal amount of $393,680 with Push Start as the borrower. (Capano Declaration ¶ 9).   Rogers did not pay these notes as agreed and the Push Start loan transactions gave rise to litigation in the state of Texas.  *Id.*  A true and correct copy of the amended complaint from the Push Start Loan transactions is attached to the accompanying Capano Declaration as Exhibit 3.

**C. ROGERS' REPEATED ASSURANCE BETWEEN FEBRUARY 2018 UNTIL MID TO LATE 2019 THAT PAYMENTS WOULD BE MADE SHORTLY**

On or around early March 2018, Energy Trading ceased making payments to OSA in connection with the December 2017 Loan.  Between March of 2018, Rogers sent Capano dozens of texts messages and emails telling Capano that payments on the December 2017 Loan and the Push Start loan transactions would be made almost immediately.  Rogers repeatedly sent Capano fake payment confirmations. Every indication is that Rogers doctored or created these payment confirmations. Energy Trading never repaid the December 2017 Loan. (Capano Declaration ¶ 3). Between February of 2018 and August of 2019, only one payment of $200,000 was made to Anthony Capano and Joanne Capano to satisfy the Push Start loans. (Capano Declaration ¶ 53). All of the other times that Rogers promised that payments were being made in connection with the Push Start loan transactions during this time frame, those payments were not made. All of the

4

times that Rogers promised that payments were being made in connection with OSA's loan to Energy Trading, the payments were not made.

On or around March 21, 2018, Rogers texted Capano to tell Capano that Energy Trading had made an ACH payment to OSA. This payment was never made. (Capano Declaration ¶ 14 Ex. 5) (SSUF #19). In this text message, Rogers told Capano that Rogers infant child was in dire physical condition. *Id.* Rogers told Capano fabricated stories that Roger's infant child had died and that Roger's wife's life was in danger to cause Capano to feel embarrassment when asking for repayment. (Capano Declaration ¶ 14 Ex. 5) (SSUF #20).[1]

On or around March 22, 2018, Rogers texted Capano to tell Capano that Energy Trading was going to make a payment by wire instead of ACH. This payment was never made. (Capano Declaration ¶ 15 Ex. 6) (SSUF #21).

On or around March 27, 2018, Rogers texted Capano to tell Capano that Energy Trading would repay OSA in full on the December 2017 Loan "by Friday." This payment was never made. (Capano Declaration ¶ 16 Ex. 7) (SSUF #22).

On or around March 27, 2018, Rogers texted Capano to tell Capano that Energy Trading would wire $300,000 to Capano's mother's account in partial satisfaction of Energy Trading's debt to OSA. This payment was never made. (Capano Declaration ¶ 17 Ex. 8)(SSUF #23).

On or around March 28, 2018, Rogers texted Capano to tell Capano that Rogers was sure that Energy Trading had made a $300,000 payment in partial satisfaction of the debt to OSA. This payment was never made. (Capano Declaration ¶ 18 Ex. 9)(SSUF #24).

On or around March 29, 2018, Rogers texted Capano to tell Capano that Energy Trading would pay OSA in full with principal and interest in the next few days, which would include an immediate payment of $300,000. These payments were never made. (Capano Declaration ¶ 19 Ex. 10)(SSUF #25).

On or around March 30, 2018, Rogers texted Capano to tell Capano that Energy Trading was paying $300,000 in partial satisfaction of the debt to OSA. Rogers sent Capano a fake

---

[1] According to allegations in by other victims of Rogers' fraud, Rogers fabricated stories about his wife having cancer when asked for repayment. (Kluewer Declaration ¶ 10 Ex. 9)

reference number for this payment. This text also stated that Energy Trading would repay OSA in full shortly. These payments were never made. (Capano Declaration ¶ 20 Ex. 11)(SSUF #26).

On or around April 2, 2018, Rogers texted Capano to tell Capano that Energy Trading was repaying OSA in full and that $300,000 was being paid "tomorrow." These payments were never made.  (Capano Declaration ¶ 21 Ex. 12)(SSUF #27).

On or around April 4, 2018, Rogers texted Capano to tell Capano that Energy Trading was repaying OSA in full the next day. This payment was never made. (Capano Declaration ¶ 22 Ex. 13)(SSUF #28).

On or around April 6, 2018, Rogers sent Capano a fake payment confirmation for $300,000. This payment was never made. (Capano Declaration ¶ 23 Ex. 14)(SSUF #29). On information and belief, Rogers doctored and/or created this fraudulent document himself.

On or around April 9, 2018, Rogers sent Capano a fake payment confirmation on behalf of Energy Trading for $300,000. (Capano Declaration ¶ 24 Ex. 15)(SSUF #30). This document was fraudulent and the payment was never made.

On or around April 16, 2018, Rogers sent Capano a text message in which Rogers stated that Energy Trading was receiving funding so as to repay OSA. OSA was never repaid. Rogers also stated that repayment would be made in connection with the Push Start loan transaction. This payment was not made. (Capano Declaration ¶ 25 Ex. 16)(SSUF #31).

In late April 2018, Capano and Rogers spoke on the phone while Rogers was with Khachatryan in Khachatryan's office.  Rogers told Capano that OSA would be repaid in full that very day. This payment was not made. (Capano Declaration ¶ 26)(SSUF #32).

On April 27, 2018, Rogers texted Capano and told Capano that Capano would receive $115,000 in connection with the Push Start loan transactions by Tuesday.  This payment was not made. (Capano Declaration ¶ 27 Ex. 17) (SSUF #49).

On May 4, 2018, Rogers texted Capano and stated that Energy Trading would receive funding soon such that Energy Trading could repay OSA. This payment was never made. Rogers also states that payments would be made in connection with the Push Start loan transactions soon. This payment was not made.  (Capano Declaration ¶ 28 Ex. 18)(SSUF #33).

6

On May 7, 2018, Rogers texted Capano and stated that Capano would be receiving $515,000 in connection with the Push Start loan transactions. Rogers sent Capano a fake payment confirmation number for this payment. This payment was not made. Rogers also told Capano that payment from Energy Trading was "on track." This payment was not made. (Capano Declaration ¶ 29 Ex. 19)(SSUF #50).

On May 8, 2018, Rogers texted Capano and stated that Khachatryan was receiving funding such that Energy Trading could repay OSA. Rogers also stated that payments would be made in connection with the Push Start loan transactions the next day. These payments were not made. (Capano Declaration ¶ 30 Ex. 20)(SSUF #51).

On or around May 8, 2018, Rogers texted Capano and stated that Khachatryan received funding such that Energy Trading was repaying OSA. This payment was never made. (Capano Declaration ¶ 31 Ex. 21)(SSUF #34).

On or around May 9, 2018, Rogers texted Capano and stated that "we will get done with Jack tomorrow," which appears to suggest that Energy Trading would be repaying OSA in full in connection with the December 2017 Loan on May 10, 2018. Energy Trading never repaid the December 2017 Loan. (Capano Declaration ¶ 32 Ex. 22) (SSUF #35).

On or around May 9, 2018, Rogers provided Capano with a fake wire confirmation for a payment that had never been made. (Capano Declaration ¶ 33 Ex. 23)(SSUF #52). On information and belief Rogers created this fabricated payment confirmation himself.

On or around May 14, 2018, Rogers texted Capano to tell Capano that Energy Trading would be making payment to Capano "by Wednesday morning if not by tomorrow." This payment was never made." (Capano Declaration ¶ 34 Ex. 24)(SSUF #36).

On or around May 21, 2018, Rogers texted Capano to say that everything would be repaid by "tomorrow." No such payments were made. (Capano Declaration ¶ 35 Ex. 25) (SSUF #37).

On or around May 23, 2018, Rogers texted Capano to state that he was meeting with Khachatryan "tomorrow." (Capano Declaration ¶ 36 Ex. 26).

MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

On or around May 24, 2018, Rogers emailed Capano a fake payment confirmation for $367,755 in connection with the Push Start loan transactions.  This payment was not made. (Capano Declaration ¶ 37 Ex. 27)(SSUF #53). On information and belief, Rogers doctored or created this payment confirmation himself.

On or around May 24, 2018, Rogers emailed Capano a fake payment confirmation for $300,000 in connection with the Push Start Loan transactions.  This payment was not made. (Capano Declaration ¶ 38 Ex. 28)(SSUF #53). On information and belief, Rogers doctored or created this payment confirmation himself.

On or around May 24, 2018, Rogers sent Capano an email with a fake payment confirmation in connection with the Push Start Loan transactions for $100,000. This payment was not made. (Capano Declaration ¶ 39 Ex. 29)(SSUF #53).

On or around May 24, 2018, Rogers texted Capano and stated that Rogers was making sure that payments were coming. (Capano Declaration ¶ 40 Ex. 30).

On or around May 24, 2018, Rogers texted Capano and stated that Rogers guarantees that OSA would be repaid. (Capano Declaration ¶ 42 Ex. 32)(SSUF #38). OSA was never repaid.

On or around May 25, 2018, Rogers sent Capano an email attempting to explain why Rogers had sent Capano payment confirmations for payments that had not been made. (Capano Declaration ¶ 43 Ex. 33)(SSUF #54).

On or around early June 2018, Rogers began telling Capano that Rogers' father would repay some of the money in connection with the Push Start Loan transaction. (Capano Declaration ¶ 45).

On or around June 12, 2018, Rogers texted Capano to say that Rogers' father would process a wire shortly. This payment was not made. (Capano Declaration ¶ 46 Ex. 34)(SSUF #55).

On or around June 12, 2018, Rogers texted Capano and stated that Rogers' father will make payment on the Push Start loan transaction shortly. This payment was not made. (Capano Declaration ¶ 47 Ex. 35) (SSUF #56).

8

On or around June 15, 2018, Rogers texted Capano and stated that Rogers' father will make payment on the Push Start loan transaction shortly. This payment was not made. (Capano Declaration ¶ 49 Ex. 37) (SSUF #58).

On or around June 18, 2018, Rogers texted Capano and stated that payments would be made "this morning." This payment was not made. (Capano Declaration ¶ 50 Ex. 38) (SSUF #59).

On or around June 18, 2018, Rogers texted Capano and stated that payments would be made in the morning. This payment was not made. (Capano Declaration ¶ 51 Ex. 39)(SSUF #60).

Towards the end of June 2018, Capano informed Rogers that Capano was going to visit Khachatryan and Energy Trading.  After repeatedly having told Capano to route communications to Khachatryan and Energy Trading through Rogers, Rogers arranged a meal with Capano, Khachatryan, Khachatryan's family members and Semaj Calhoun, a member of OSA. (Capano Declaration ¶ 52). Rogers had repeatedly told Capano that Energy Trading would make payment to OSA very shortly. When Capano spoke to Khachatryan, however, Khachatryan stated that Energy Trading was completely shut down.  Khachatryan stated that Rogers had never told Energy Trading that OSA wanted to be repaid. *Id.* Rogers and Capano texted during the meal. (Capano Declaration ¶ 52 Ex. 40). Khachatryan and Khachatryan's brother told Capano that OSA would be repaid in connection with the loan at issue. (Capano Declaration ¶ 52)(SSUF #39).

On or around August 26, 2018, Rogers texted Capano and stated that Rogers was meeting with some people and would cause Energy Trading to repay OSA. (Capano Declaration ¶ 54 Ex. 41)(SSUF #40). OSA was never repaid in connection with this loan.

On or around September 4, 2018, Rogers texted Capano to state that "we will get squared this week." No loan repayments were made at this time. (Capano Declaration ¶ 56 Ex. 43) (SSUF #61).

9

On or around September 5, 2018, Rogers texted Capano to state that they would be "squared" shortly. No loan repayments were made at this time. (Capano Declaration ¶ 57 Ex. 44) (SSUF #62).

Between October 8, 2018, and November 21, 2018, Rogers and Capano exchanged emails wherein Rogers stated that Energy Trading would repay its debt after Thanksgiving. (Capano Declaration ¶ 58 Ex. 45)(SSUF #41).

Between December 26, 2018, and December 28, 2018, Rogers and Capano exchanged emails wherein Rogers stated that Energy Trading was close to receiving funding such that the debt at issue could be repaid. (Capano Declaration ¶ 59 Ex. 46)(SSUF #42).

Between January 15, 2019, and February 12, 2019, Rogers and Capano exchanged emails wherein Rogers stated that Khachatryan was working to have Energy Trading's debt repaid. (Capano Declaration ¶ 60 Ex. 47)(SSUF #43).

Between February 15, 2019, and February 20, 2019, Rogers and Capano exchanged emails wherein Rogers stated that Khachatryan was having meetings whose purpose it was to Energy Trading repays its debt. (Capano Declaration ¶ 61 Ex. 48)(SSUF #44).

On or around March 5, 2019, Rogers texted Capano and stated that Rogers was paying Capano $75,000 shortly. This payment was not made. (Capano Declaration ¶ 62 Ex. 49) (SSUF #63).

On or around March 15, 2019, Rogers texted Capano and stated that Rogers was hopeful that he would make a payment to Capano by April 5, 2019. This payment was not made. (Capano Declaration ¶ 63 Ex. 50)(SSUF #64).

On or around March 20, 2019, Rogers emailed Capano to offer Capano a deal whereby the December 2017 Loan was to be repaid. This loan was never repaid. (Capano Declaration ¶ 64 Ex. 51)(SSUF #45).

On or around March 21, 2019, Rogers texted Capano and stated that he sent Capano a $75,000 payment. This payment was not made. (Capano Declaration ¶ 65 Ex. 52)(SSUF #65).

10

On or around March 26, 2019, Rogers texted Capano and stated that Rogers was sure a payment was coming to Capano. No such payment was made. (Capano Declaration ¶ 66 Ex. 53) (SSUF #66).

On or around April 3, 2019, Rogers texted Capano and stated Capano would be repaid in full in connection with the Push Start loan transactions within one week.  This payment was not made. (Capano Declaration ¶ 67 Ex. 54)(SSUF #67).

Between April 5, 2019, and April 10, 2019, Rogers and Capano exchanged emails wherein Rogers stated that Rogers was almost done seeing to it that Capano was repaid in connection with the Push Start loan transactions and that Khachatryan would be causing Energy Trading to make payments in connection with the December 2017 Loan soon. No payments were made on or around this time. (Capano Declaration ¶ 68 Ex. 55) (SSUF #68).

On or around April 12, 2019, Rogers sent Capano an email stating that Capano would be paid $75,000 by Monday and that he was waiting on a closing date that would facilitate Energy Trading's repayment of the December 2017 Loan.  These payments were not made. (Capano Declaration ¶ 69 Ex. 56)(SSUF #69).

OSA assigned its rights to bring breach of contract and tort causes of action in connection with the December 2017 Loan to OSA. (Capano Declaration ¶ 55 Ex. 42¶ 70 Ex. 57)(Alpark Declaration ¶13 Ex. 3, ¶14 Ex. 4)(SSUF #140).

Neither ACMC nor OSA have been repaid in full in connection with the December 2017 Loan to Energy Trading. (Alpark Declaration ¶15)(Capano Declaration ¶ 3) (SSUF #139).

In sum, Rogers repeatedly promised Capano that payments were being made imminently in connection with the December 2017 Loan. None of these payments were ever made.

## D. ROGERS IS SUED IN NUMEROUS ACTIONS IN THE STATE OF TEXAS FOR DEFRAUDING VICTIMS INTO RELIQUISING MONEY AND A COURT JUDGMENT FINDS THAT ROGERS INTENTIONALLY COMMITTED FRAUD

As discussed in the accompanying Kluewer Declaration, Rogers has been sued numerous times in the state of Texas, for victimizing innocent people, stealing their money and refusing to return it.  A case of particular note is *Steven Webster et al. v. Dennis J. Rogers II* et. al, DC-20-

11

---

10214. According to the evidence submitted in *Webster,* Rogers defrauded two individuals into relinquishing over $6 million and Rogers refused to return the money. (Kluewer Declaration ¶2 Ex. 1)(SSUF #70).  Rogers effectuated this fraud on or around this time that Rogers was arguing in front of this Honorable Court at a demurrer hearing that ACMC's claims had no merit and that Rogers did not defraud ACMC's assignor.  In *Webster,* an agreed judgment found that Rogers made statements to his victims knowing that those statements were false and with the intent to defraud his victims.  (Kluewer Declaration ¶3 Ex. 2) (SSUF #71).  Exhibits F-O of the *Webster* Petition, attached to Exhibit 1 of the Kluewer Declaration, demonstrate that Rogers sent his other victims messages that were strikingly similar to those Rogers sent Capano.  In sum, for whatever reason, in the recent past, Dennis Rogers II went on a veritable financial crime spree, defrauding as many victims as possible out of as much money as possible. As discussed herein, Rogers left a paper trail of text messages and emails explicitly detailing exactly what Rogers did. As such, this Honorable Court should grant the instant Motion and enter judgment against Rogers.

## III.   LEGAL ARGUMENT

### A. The Standard on This Motion

This Court should grant Plaintiff's Motion for Summary Adjudication on Plaintiff's sixth cause of action or intentional fraud against Rogers, and/or this Motion for Summary Judgment against Rogers.   Per. C.C.P. § 437c(f)(1) "[a] party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty, if the party contends that the cause of action has no merit that there is no affirmative defense to the cause of action  that there is no merit to an affirmative defense as to any cause of action." Per. C.C.P. § 437c(a)(1) "[a] party may move for summary judgment in an action or proceeding if it is contended that the action has no merit or that there is no defense to the action or proceeding."

As such, the instant Motion against Rogers may be construed as either a Motion for Summary Adjudication as Plaintiff is seeking summary disposition of Plaintiff's sixth Cause of Action for Intentional Fraud as to Rogers or may be construed as a Motion for Summary

12

Judgment as summary disposition of Plaintiff's sixth cause of action will dispose of the entire action as to Rogers.

"[W]here the plaintiff has ... moved for summary judgment ... [it] has the burden of showing there is no defense to a cause of action." *Advent Inc. v. National Union Fire Ins. Co.* (2016), 6 Cal. App. 5th 443, 453 citing C.C.P .Section 437c(a). "That burden can be met if the plaintiff 'has proved each element of the cause of action entitling [it] to judgment on that cause of action.'" *Advent Inc. v. National Union Fire Ins. Co.* (2016), 6 Cal. App. 5th 443, 453 citing C.C.P Section 437c(p)(1). "For purposes of motions for summary judgment and summary adjudication: A plaintiff or cross-complainant has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on the cause of action. Once the plaintiff or cross-complainant has met that burden, the burden shifts to the defendant or cross-defendant to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto. The defendant or cross-defendant shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto." *J.B.B. Investment Partners Ltd. v. Fair*, (2019), 37 Cal. App. 5th 1, 8. "[W]here the plaintiff has [] moved for summary judgment—or, as in this case, summary adjudication—that party has the burden of showing there is no defense to a cause of action . . . That burden can be met if the plaintiff 'has proved each element of the cause of action entitling the party to judgment on that cause of action. ... If the plaintiff meets this burden, it is up to the defendant 'to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.'" *S.B.C.C. Inc. v. St. Paul Fire & Marina Ins. Co.*, (2010), 186 Cal. App. 4th 383, 388. "Summary judgment is now seen as a 'particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." *Insurance Co. of State of Pennsylvania v American Safety Indemnity Co.*, (2019), 32 Cal. App. 5th 898, 908.

In the instant case, Plaintiff can easily demonstrate each of the elements of Plaintiff's sixth cause of action for intentional fraud as to Rogers. Rogers cannot and will not be able to

13

---

demonstrate that a triable issue of fact exists as to Plaintiff's sixth cause of action for intentional fraud as to Rogers. Rogers cannot and will not put forth specific facts to demonstrate a triable issue of fact as to Plaintiff's sixth cause of action for fraud.  Thus, judgment should be entered in favor of ACMC against Rogers.

## B. Plaintiff's Evidence Proves the First Element of Plaintiff's Sixth Cause of Action for Fraud

Plaintiff has provided sufficient evidence to prove the first element of its sixth cause of action for fraud against Rogers.  The first element of intentional fraud is a misrepresentation – a false representation, concealment or nondisclosure. *Tenet Health System Desert, Inc. v. Blue Cross of California,* (2016), 245 Cal. App. 4th 821, 837.

In the instant case, the misrepresentations that Rogers made to OSA were not complicated. Rogers told Omar Alpark of OSA that is OSA loaned $2.45 million to Energy Product per the terms of the Joint Finance Agreement, OSA would be repaid its principal and 2% interest within 1 month. (Alpark Declaration ¶ 4)(SSUF #1). Rogers called Alpark numerous times a day on or around August 2017 and September 2017 to convince OSA to enter into the loan transaction memorialized by the Joint Finance Agreement. (Alpark Declaration ¶ 4)(SSUF #2). While OSA was contemplating extending the loan to Energy Product, Rogers fully vouched for Energy Product's credit worthiness. (Alpark Declaration ¶ 4) (SSUF #3). While OSA was contemplating extending the loan to Energy Product, Rogers told OSA that Rogers was fully aware that Energy Product had substantial assets and few liabilities. (Alpark Declaration ¶ 4) (SSUF #4). While OSA was contemplating extending the loan to Energy Product, Rogers told OSA that OSA could make a 2%, 4% or even 6% return on OSA's principal. (Alpark Declaration ¶ 4)(SSUF #5). While OSA was contemplating extending the loan to Energy Product, Rogers told OSA that Energy Product would easily be able to repay OSA. (Alpark Declaration ¶ 4)(SSUF #6). As such, ACMC establishes the first element of its intentional fraud cause of action against Rogers.

## C. **Plaintiff's Evidence Proves the Second Element of Plaintiff's Sixth Cause of Action for Fraud**

Plaintiff has provided sufficient evidence to prove the second element of its sixth cause of action for fraud against Rogers.  The second element of fraud is knowledge of the falsity, scienter.  *Tenet Health System Desert, Inc. v. Blue Cross of California,* (2016), 245 Cal. App. 4th 821, 837.  Knowledge of the falsity "may be proved by inference. 'Fraud, of course, may be proved by inference and by the circumstances surrounding the transaction and the relationship and interest of the parties." *Hart v. Browne*, (1980), 103 Cal. App. 3d 947, 957. "The knowledge of the falsity of the representation and the intention not to perform as represented may be inferred from subsequent conduct of representer." *Twomey v. Mitchum Jones and Templeton, Inc.*, (1968), 262 Cal. App. 2d 690, 711. *See also Engalla v. Permanente Medical Group Inc.,* (1997), 15 Cal. 4th 951, 975 (holding that the knowledge element of fraud is established by "reasonable inference" from the evidence).

In the instant case, the evidence is overwhelming that Rogers knew of the falsity of the statements that he made to OSA when inducing OSA to enter into the September 2017 Loan.  As noted above, Rogers was emphatic in his assertions to OSA that the loan to Energy Product was an investment opportunity of the highest caliber, and one that could not be passed up. (SSUF ## 7, 8, 9, 10, 11, 12, 13, 14, 15).  Rogers told OSA to route communications between OSA and Energy Product/Energy Trading through Rogers. (SSUF # 16).  Even after Energy Product failed to repay the loan, Rogers continued to assert to OSA that Energy Product/Energy Trading was extremely credit worthy. (SSUF # 18).  Thereafter, Rogers repeatedly texted and emailed Capano and told him that payments had been made, or where being made in connection with OSA's loan to Energy Product/Energy Trading when those payments never were made. (SSUF ## 19, 21, 22, 23, 24, 25, 26, 27, 28, 31, 33, 34, 35, 36, 37, 38, 41, 42, 43, 44, 45, 46, 47).  Rogers fabricated stories about his wife and infant child being in danger to make OSA feel embarrassed about asking for repayment. (SSUF # 20). Rogers sent OSA and/or Capano fake payments confirmations for payments that had not been made in connection with OSA's loan to Energy Product/Energy Trading and in connection with other transactions. (SSUF # # 29, 30, 52, 53).

15

---

MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

Rogers promised Capano that payments were being made in connection with the Push Start transactions, and when those payments were not made either. (SSUF ## 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69). Rogers has admitted to committing similar fraud in a very similar situation in the *Webster* action. (SSUF # #70, 71). Indeed, on or around the time that Rogers was arguing on a demurrer to this Court that Rogers had not effectuated fraud in connection with this instant matter, Rogers was defrauding two innocent victims out of over $6 million, per Rogers' own admissions in the *Webster* action. (SSUF## 70 71). Finally, Rogers has been sued numerous times in the recent past for defrauding innocent victims out of substantial sums of money. (SSUF # 72). These aforementioned facts demonstrate that Rogers acted with knowledge of the falsity when he induced OSA to enter into the loan to Energy Product. Rogers cannot and will not produce specific facts to rebut this evidence as he must in order to prevail on the instant Motion.

## D. **Plaintiff's Evidence Proves the Third Element of Plaintiff's Sixth Cause of Action for Fraud**

Plaintiff has provided sufficient evidence to prove the third element of its sixth cause of action for fraud against Rogers. The third element of fraud is intent to defraud. *Tenet Health System Desert, Inc. v. Blue Cross of California*, (2016), 245 Cal. App. 4th 821, 837. A defendant's intent to commit fraud can be inferred from subsequent conduct. *Wetherbee v. United States Ins. Co. of America*, (1968), 265 Cal. App. 2d 921, 932. "The law is established in California that, since direct proof of fraudulent intent is often an impossibility, because the real intent of the parties and the facts of a fraudulent transaction are peculiarly in the knowledge of those sought to be charged with fraud, proof indicative of fraud may come by inference from circumstances surrounding the transaction, the relationship, and interest of the parties.'" *Miller v. National American Life Ins. Co.*, (1976), 54 Cal. App. 3d 331, 338. "The second and third elements, consisting of knowledge of the falsity as well as intent to induce reliance, related to respondent's state of mind. These elements may be proved by inference. 'Fraud, of course, may be proved by inference and by the circumstances surrounding the transaction and the relationship and interest of the parties.'" *Hart v. Browne*, (1980), 103 Cal. App. 3d 947, 957. "To be sure,

16

fraudulent intent must often be established by circumstantial evidence. Prosser, for example, cites cases in which fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform." *Tenzer v. Superscope, Inc.* (1985) 39 Cal. 3d 18, 30 (1985). "It is well established California law that '[s]ince direct proof of fraudulent intent is often impossible, the intent may be established by [in]ference from acts of the parties.'" *Continental Airlines Inc. v. McDonnell Douglas Corp,* (1989), 216 Cal. App. 3d 388, 411-412. "Fraudulent intent must often be established by circumstantial evidence." *Locke v. Warner Bros Inc.,* (1997), 57 Cal. App. 4th 354, 368.

In the instant case, the same evidence that establishes that Rogers acted with knowledge when inducing OSA to enter into the September 2017 Loan demonstrates that Rogers acted with fraudulent intent.  As noted above, Rogers was emphatic in his assertions to OSA that the loan to Energy Product was an investment opportunity of the highest caliber, and one that could not be passed up. (SSUF ## 73, 74, 75, 76, 77, 78, 79 80, 81).   Rogers told OSA to route communications between OSA and Energy Product/Energy Trading through Rogers. (SSUF # 82).  Even after Energy Product failed to repay the loan, Rogers continued to assert to OSA that Energy Product/Energy Trading was extremely credit worthy. (SSUF # 84).  Thereafter, Rogers repeatedly texted and emailed Capano and told him that payments had been made, or where being made in connection with OSA's loan to Energy Product/Energy Trading when those payments never were made. (SSUF ## 85, 87, 88, 89, 90, 91, 92, 93, 94, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 106, 107, 108, 109, 110, 111, 112, 113).   Rogers fabricated stories about his wife's and infant child's life being in danger to make OSA feel embarrassed about asking for repayment. (SSUF # 86). Rogers sent OSA and/or Capano fake payments confirmations for payments that had not been made in connection with OSA's loan to Energy Product/Energy Trading and in connection with other transactions. (SSUF ## 95, 96, 118, 119). Rogers promised Capano that payments were being made in connection with the Push Start transactions, and when those payments were not made either. (SSUF ## 114, 115, 116, 117, 118, 119, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133).  Rogers has admitted to

17

committing similar fraud in a very similar situation in the *Webster* action. (SSUF ## 134, 135). Indeed, on or around the time that Rogers was arguing on a demurrer to this Court that Rogers had not effectuated fraud in connection with this instant matter, Rogers was defrauding two innocent victims out of over $6 million, per Rogers' own admissions in the *Webster* action. (SSUF ## 135, 135).   Finally, Rogers has been sued numerous times in the recent past for defrauding innocent victims out of substantial sums of money. (SSUF # 136). These aforementioned facts demonstrate that Rogers acted with intent to defraud when he induced OSA to enter into the loan to Energy Product.   Rogers cannot and will not produce specific facts to rebut this evidence as he must in order to prevail on the instant Motion.

**E.   Plaintiff's Evidence Proves the Fourth Element of Plaintiff's Sixth Cause of Action for Fraud**

Plaintiff has provided sufficient evidence to prove the fourth element of its sixth cause of action for fraud against Rogers.  The fourth element of fraud is justifiable reliance.  *Tenet Health System Desert, Inc. v. Blue Cross of California,* (2016), 245 Cal. App. 4th 821, 837.  "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." *Alliance Mortgage Co. v. Rothwell* (1995), 10 Cal. 4th 1226, 1239.  "Actual reliance occurs when a misrepresentation is 'an immediate cause of [a plaintiff's] conduct, which alters his legal relations,' and when, absent such representation, 'he would not, in all reasonable probability, have entered into the contract or other transaction.'" *Engalla v. Permanante Medical Group Inc.,* (1997), 15 Cal. 4th 951, 976.

In the instant case, as discussed in the accompanying Capano Declaration and Alpark Declaration, Rogers' statements to OSA caused OSA to enter into the loan with Energy Product. (Capano Declaration ¶ 5)(Alpark Declaration ¶ 8)(SSUF #137). Rogers' statements to OSA, were the immediate cause of OSA's decision to enter into the loan with Energy Product. *Id.* Moreover, OSA justifiably relied on OSA's statements when entering into the loan to Energy

Product, because Rogers presented OSA with a real oil product business in which to invest. (Capano Declaration ¶ 5) (Alpark Declaration ¶ 7)(SSUF # 138).

Rogers is liable to OSA for the full amount of the damages from the fraud at issue even though Rogers made the fraudulent statements to OSA along with John Gessin. "Where several persons act in concert and damages result from their joint tort, each person is held for the entire damages unless segregation as to causation can be established." *People v. ConAgra Grocery Products Co.,* (2017) 17 Cal.App.5th 51, 117. As noted in the Alpark Declaration, John Gessin's statements also caused OSA to enter into the loan with Energy Product as Rogers and Gessin worked together to convince OSA to enter into the loan transaction. However, even though Gessin's statements also caused OSA to enter into the loan, Rogers is still liable to OSA for the fraud.

**F.** **Plaintiff's Evidence Proves the Fifth Element of Plaintiff's Sixth Cause of Action for Fraud**

Plaintiff has provided sufficient evidence to prove the fifth element of its sixth cause of action for fraud against Rogers. The fifth element of a fraud cause of action is damages. *Tenet Health System Desert, Inc. v. Blue Cross of California,* (2016), 245 Cal. App. 4th 821, 837. In the instant case, OSA suffered damages as a result of Rogers' fraud. As discussed in the accompanying Capano Declaration and Alpark Declaration, OSA has not been repaid its principal and has received only $294,000 in interest. As such, OSA has suffered damages as a result of Rogers' fraud. (Alpark Declaration ¶ 15)(Capano Declaration ¶ 3)(SSUF # 139).

**G.** **OSA Has Assigned the Instant Cause of Action to ACMC**

OSA has assigned its right to assert the instant cause of action against Rogers to ACMC. Under California law, "[a] thing in action, arising out of the violation of a right of property, or out of an obligation, may be transferred by the owner." Cal. Civ. Code § 954. "A thing in action is a right to recover money or other personal property by a judicial proceeding." Cal. Civ. Code § 953. *See American T. Co. v. California Etc. Ins. Co*., (1940), 15 Cal. 2d 42, 67. "[O]ur Supreme Court has held that a fraud claim is assignable where any form of property was obtained by means of fraud." *Timed Out LLC v. Youaibian Inc*., (2014), 229 Cal. App. 4th 1001 fn. 7 citing

19

---

MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION

*Jackson v. Deauville Holding Co.*, (1933), 219 Cal. 498, 501-502. *See Osuna v. Albertson*, (1982), 134 Cal. App. 3d 71, 80-82 (causes of action for fraud and negligent misrepresentation brought against trustors of deeds of trust for permitting real property, which secured various promissory notes, to be sold to state for failure to pay real property taxes were assignable).  In the instant case, OSA has validly assigned the instant cause of action to ACMC, as discussed in the accompanying Capano Declaration and Alpark Declaration. (Capano Declaration ¶¶ 55, 70). (Alpark Declaration ¶¶ 13, 14)(SSUF # 140).

**IV.** **CONCLUSION**

For the foregoing reasons, this Honorable Court should grant the instant Motion and enter judgment against Rogers in favor of ACMC.

Dated: November 1, 2021

Respectfully submitted,

**KLUEWER LAW P.C**.


By: /s/ Joshua T. Kluewer
Joshua T. Kluewer Esq.
*Attorneys for Plaintiff, ACMC Finance and Trade LLC*

20

# Journal Technologies Court Portal

# Make a Reservation

**ACMC FINANACE AND TRADE LLC vs ENERGY TRADING COMPANY LLC, et al.**

Case Number: 19LBCV00725    Case Type: Civil Unlimited    Category: Other Promissory Note/Collections Case
Date Filed: 2019-12-20   Location: Governor George Deukmejian Courthouse - Department S27

## Reservation

| | |
|---|---|
| **Case Name:**<br>ACMC FINANACE AND TRADE LLC vs ENERGY TRADING COMPANY LLC, et al. | **Case Number:**<br>19LBCV00725 |
| **Type:**<br>Motion for Summary Judgment | **Status:**<br>RESERVED |
| **Filing Party:**<br>ACMC Finanace and Trade LLC (Plaintiff) | **Location:**<br>Governor George Deukmejian Courthouse - Department S27 |
| **Date/Time:**<br>04/21/2022 8:30 AM | **Number of Motions:**<br>1 |
| **Reservation ID:**<br>757546361708 | **Confirmation Code:**<br>CR-FKW6CBV3WZMJI3VEN |

## Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| Motion for Summary Judgment | 500.00 | 1 | 500.00 |
| Credit Card Percentage Fee (2.75%) | 13.75 | 1 | 13.75 |
| TOTAL | | | **$513.75** |

## Payment

| | |
|---|---|
| **Amount:**<br>$513.75 | **Type:**<br>Visa |
| **Account Number:**<br>XXXX7009 | **Authorization:**<br>056518 |

🖶 Print Receipt     ➕ Reserve Another Hearing

Copyright © Journal Technologies, USA. All rights reserved.

Chat

# EXHIBIT AA

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
South District, Governor George Deukmejian Courthouse, Department S27

**19LBCV00725**                                                March 3, 2022
**ACMC FINANACE AND TRADE LLC vs ENERGY**                          8:30 AM
**TRADING COMPANY LLC, et al.**

Judge: Honorable Mark C. Kim              CSR: None
Judicial Assistant: B. Viola              ERM: None
Courtroom Assistant: B. Jones             Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Joshua Kluewer

For Defendant(s): Geronimo Perez for Paul Ronald Fine (Telephonic)

**NATURE OF PROCEEDINGS:** Hearing on Motion for Summary Judgment

Matter is called for hearing.

The Court reads and considers all papers and hears oral argument.

The Motion for Summary Judgment filed by ACMC Finanace and Trade LLC on 11/01/2021 is Granted in Part.

The Court finds the Plaintiff has met its burden as to Cause of Action 6.

The Court grants the Motion for Summary Adjudication as to Cause of Action 6 only.

Moving party is to give notice.

**Ex. Pg. 392**

# EXHIBIT BB

FILED
8/6/2021 2:16 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Kayla Buckley DEPUTY

DC-21-10421

CAUSE NO. _____

| | | |
|---|---|---|
| GERARD BALLANCO JR., | § | IN THE DISTRICT COURT |
| DAVID MECHE and PERRY JUDICE | § | |
| | § | |
| Plaintiffs, | § | 44th |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| BOOTSTRAP VENTURES LLC and | § | |
| DENNIS J. ROGERS II, | § | |
| | § | |
| Defendants. | § | OF DALLAS COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES GERARD BALLANCO JR., DAVID MECHE AND PERRY JUDICE, (together, "Plaintiffs") complaining of Bootstrap Ventures LLC and Dennis J. Rogers, II ("Bootstrap," "Rogers," and together "Defendants"), and files this Plaintiffs' Original Petition and for cause of action would respectfully show the Court the following:

## DISCOVERY LEVEL

1.    Plaintiffs plead that discovery will be conducted in accordance with a discovery control plan under Texas Rule of Civil Procedure 190.4 (Level 3), such designation being without prejudice to subsequent requests for modification, if any.

## PARTIES

2.    Plaintiff Gerard Ballanco Jr. is an individual residing in Louisiana.

3.    Plaintiff David Meche is an individual residing in Louisiana.

4.    Plaintiff Perry Judice is an individual residing in Louisiana.

5.    Defendant Bootstrap Ventures is a Texas limited liability company with its principal office in Texas located in Dallas County. Bootstrap Ventures may be served

*Ex. Pg. 394*

with process by serving its Registered Agent for Service, United States Corporation

Agents, Inc. at 9900 Spectrum Drive, Austin, Texas 78717.

6.      Defendant Dennis J. Rogers II is an individual whose Texas Driver's

License number is XXXXXXX436 and who resides in Dallas County, Texas, and who

may be served with process at 6520 Del Norte Ln., Dallas, Texas 75225 or as he may

be found in Dallas County.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action in that the

amount in controversy is within the jurisdictional limits of the Court. Venue is proper in

Dallas County, Texas, pursuant to Texas Civil Practice & Remedies Code Section

15.002 in that it is the county in which a substantial part of the events or omissions

giving rise to the claims occurred, it is the county of Defendant Rogers' residence at the

time the cause of action accrued, and it is the county of Bootstrap Ventures principal

office in Texas.

## RULE 47 NOTICE

8.      Plaintiffs in this case seek monetary relief over $250,000, but not more

than $1,000,000.

## STATEMENT OF FACTS

9.      Upon information and belief, at least as represented by Defendants,

Bootstrap Ventures is in the business of buying and selling land and water rights.

10.     Defendants presented Plaintiffs with an opportunity to make short term

loans to Defendants to raise money to facilitate transactions to "flip" water rights in New

Mexico.  Defendants represented that the properties and the buyers had both already

been identified and all that was needed was the capital to make the transactions

happen.  Plaintiffs were to loan the funds and Defendant Bootstrap Ventures would execute promissory notes to each of the Plaintiffs.  The loans would be short term and Defendant Rogers would personally guarantee the loans.

11.    In reliance on Defendants' representations and promises, Plaintiffs did transfer and loan funds to Defendants.  Plaintiffs are the owners and holders of the following promissory notes (together, the "<u>Notes</u>") executed by Bootstrap Ventures with personal guarantees by Defendant Rogers in the same instruments to memorialize these loans:

(a)    Bootstrap Ventures executed a promissory note dated August 25, 2020 in the original principal sum of $100,000 as the borrower and Dennis Rogers executed the same promissory note as personal guarantor of the debt thereunder with such promissory note made in favor of and payable to Perry Judice as the lender (the "<u>First Judice Note</u>");

(b)    Bootstrap Ventures executed a promissory note dated October 1, 2020 in the original principal sum of $100,000 as the borrower and Dennis Rogers executed the same promissory note as personal guarantor of the debt thereunder with such promissory note made in favor of and payable to Perry Judice as the lender (the "<u>Second Judice Note</u>");

(c)    Bootstrap Ventures executed a promissory note dated August 20, 2020 in the original principal sum of $70,000 as the borrower and Dennis Rogers executed the same promissory note as personal guarantor of the debt thereunder with such promissory note made in favor of and payable to David Meche as the lender (the "<u>First Meche Note</u>");

(d)    Bootstrap Ventures executed a promissory note dated October 7, 2020 in the original principal sum of $30,000 as the borrower and Dennis Rogers executed the same promissory note as personal guarantor of the debt thereunder with such promissory note made in favor of and payable to David Meche as the lender (the "<u>Second Meche Note</u>"); and

(e)    Bootstrap Ventures executed a promissory note dated August 24, 2020 in the original principal sum of $50,000 as the borrower and Dennis Rogers executed the same promissory note as personal guarantor of the debt thereunder with such promissory note made in favor of and payable to Gerard Ballanco as the lender (the "<u>First Ballanco Note</u>")

12.     Each of the Notes contain the personal guarantee signed and executed by Defendant Rogers (the "Guarantees").

13.     All Notes matured and neither Defendant has paid the amounts due and owing under the Notes and related and attendant Guarantees.  Plaintiffs made written demand for payment on Defendants who continue to refuse to pay amounts due thereunder.

14.     Upon information and belief, Defendants may have not been engaged in the business and transactions represented with all representations made being untrue.

## CAUSES OF ACTION

### COUNT 1 – The First Judice Note and Guarantee

15.     Plaintiffs hereby incorporate by reference each and every allegation contained all paragraphs set forth above.

16.     As set forth above, Defendant Rogers executed the First Judice Note on behalf of Bootstrap Ventures and himself as guarantor.  Plaintiff Perry Judice is the owner and holder of the First Judice Note which matured by its own terms on October 15, 2020. Despite demand, Bootstrap Ventures has refused to pay and continues to refuse to pay amounts now due and owing. Bootstrap Ventures is in default by failing to pay the principal due, plus accrued but unpaid interest. Plaintiff Judice seeks to recover damages against Bootstrap Ventures for all actual damages, plus accrued but unpaid interest as allowed by law and as the promissory note has been adjusted.

17.     Defendant Rogers executed the First Judice Note as guarantor. He unconditionally guaranteed the prompt payment and performance of every obligation of Bootstrap Ventures under the First Judice Note. As detailed above, Bootstrap Ventures failed to make payments due and owing under the First Judice Note. Despite demand

under the promissory note and guarantee, Defendant Rogers failed and refused and continues to refuse to pay amounts due and owing. Defendant Rogers has breached his guarantee and Plaintiff Perry Judice seeks recovery of all actual damages, along with accrued interests, attorneys' fees and costs and expenses.

### COUNT 2 – The Second Judice Note and Guarantee

18.     Plaintiffs hereby incorporate by reference each and every allegation contained all paragraphs set forth above.

19.     As set forth above, Defendant Rogers executed the Second Judice Note on behalf of Bootstrap Ventures and himself as guarantor.  Plaintiff Perry Judice is the owner and holder of the Second Judice Note which matured by its own terms on October 30, 2020. Despite demand, Bootstrap Ventures has refused to pay and continues to refuse to pay amounts now due and owing. Bootstrap Ventures is in default under the note, by failing to pay the principal due, plus accrued but unpaid interest. Plaintiff Judice seeks to recover damages against Bootstrap Ventures for all actual damages, plus accrued but unpaid interest as allowed by law and as the promissory note has been adjusted.

20.     Defendant Rogers executed the Second Judice Note as guarantor. He unconditionally guaranteed the prompt payment and performance of every obligation of Bootstrap Ventures under the Second Judice Note. As detailed above, Bootstrap Ventures failed to make payments due and owing under the Second Judice Note. Despite demand under the promissory note and guarantee, Defendant Rogers failed and refused and continues to refuse to pay amounts due and owing. Defendant Rogers

has breached his guarantee and Plaintiff Perry Judice seeks recovery of all actual damages, along with accrued interests, attorneys' fees and costs and expenses.

### COUNT 3 – The First Meche Note and Guarantee

21.    Plaintiffs hereby incorporate by reference each and every allegation contained all paragraphs set forth above.

22.    As set forth above, Defendant Rogers executed the First Meche Note on behalf of Bootstrap Ventures and himself as guarantor.  Plaintiff David Meche is the owner and holder of the First Meche Note which matured by its own terms on October 15, 2020. Despite demand, Bootstrap Ventures has refused to pay and continues to refuse to pay amounts now due and owing. Bootstrap Ventures is in default under the note, by failing to pay the principal due, plus accrued but unpaid interest. Plaintiff Meche seeks to recover damages against Bootstrap Ventures for all actual damages, plus accrued but unpaid interest as allowed by law and as the promissory note has been adjusted.

23.    Defendant Rogers executed the First Meche Note as guarantor. He unconditionally guaranteed the prompt payment and performance of every obligation of Bootstrap Ventures under the First Meche Note. As detailed above, Bootstrap Ventures failed to make payments due and owing under the First Meche Note. Despite demand under the promissory note and guarantee, Defendant Rogers failed and refused and continues to refuse to pay amounts due and owing. Defendant Rogers has breached his guarantee and Plaintiff David Meche seeks recovery of all actual damages, along with accrued interests, attorneys' fees and costs and expenses.

### COUNT 4 – The Second Meche Note and Guarantee

24.     Plaintiffs hereby incorporate by reference each and every allegation contained all paragraphs set forth above.

25.     As set forth above, Defendant Rogers executed the Second Meche Note on behalf of Bootstrap Ventures and himself as guarantor.  Plaintiff David Meche is the owner and holder of the Second Meche Note which matured by its own terms on October 30, 2020. Despite demand, Bootstrap Ventures has refused to pay and continues to refuse to pay amounts now due and owing. Bootstrap Ventures is in default under the note, by failing to pay the principal due, plus accrued but unpaid interest. Plaintiff Meche seeks to recover damages against Bootstrap Ventures for all actual damages, plus accrued but unpaid interest as allowed by law and as the promissory note has been adjusted.

26.     Defendant Rogers executed the Second Meche Note as guarantor. He unconditionally guaranteed the prompt payment and performance of every obligation of Bootstrap Ventures under the Second Meche Note. As detailed above, Bootstrap Ventures failed to make payments due and owing under the Second Meche Note. Despite demand under the promissory note and guarantee, Defendant Rogers failed and refused and continues to refuse to pay amounts due and owing. Defendant Rogers has breached his guarantee and Plaintiff David Meche seeks recovery of all actual damages, along with accrued interests, attorneys' fees and costs and expenses.

### COUNT 5 – The First Ballanco Note and Guarantee

27.     Plaintiffs hereby incorporate by reference each and every allegation contained all paragraphs set forth above.

28.     As set forth above, Defendant Rogers executed the First Ballanco Note on behalf of Bootstrap Ventures and himself as guarantor.  Plaintiff Gerard Ballanco Jr. is the owner and holder of the First Ballanco Note which matured by its own terms on October 15, 2020. Despite demand, Bootstrap Ventures has refused to pay and continues to refuse to pay amounts now due and owing. Bootstrap Ventures is in default under the note, by failing to pay the principal due, plus accrued but unpaid interest. Plaintiff Ballanco seeks to recover damages against Bootstrap Ventures for all actual damages, plus accrued but unpaid interest as allowed by law and as the promissory note has been adjusted.

29.     Defendant Rogers executed the First Ballanco Note as guarantor. He unconditionally guaranteed the prompt payment and performance of every obligation of Bootstrap Ventures under the first Ballanco Note. As detailed above, Bootstrap Ventures failed to make payments due and owing under the First Ballanco Note. Despite demand under the promissory note and guarantee, Defendant Rogers failed and refused and continues to refuse to pay amounts due and owing. Defendant Rogers has breached his guarantee and Plaintiff Gerard Ballanco Jr. seeks recovery of all actual damages, along with accrued interests, attorneys' fees and costs and expenses.

### COUNT 6 – Fraudulent Representation of Intent to Perform

30.     Plaintiffs hereby incorporate by reference each and every allegation contained in all the paragraphs set forth above.

31.     Defendants falsely represented to Plaintiffs that Bootstrap Ventures intended to perform all obligations under the Notes and that Rogers intended to perform

his respective obligations under the guarantees, including timely payment of the amounts owed under the loans.

32.    Defendants knew these representations were false, and Defendants made the representation with the intent that Plaintiffs would rely and act upon them. Plaintiffs did, in fact, rely on the representations, and such reliance was justifiable. Plaintiffs are entitled to actual damages against each Defendant. Plaintiffs are entitled to an award of exemplary damages as to each Defendant as a result of Defendants' fraud and because they acted with malice and gross negligence.

### COUNT 7 – Fraudulent Inducement

33.    Plaintiffs hereby incorporate by reference each and every allegation contained in all the paragraphs set forth above.

34.    Defendants represented that the loans were needed short-term in order to complete pending transactions which, when closed, would generate the proceeds for repayment, and that the closing, or closings, of the transactions were eminent and would occur well before the maturity dates of the notes. Upon information and belief, each of representations was false.

35.    Defendants knew these representations were false, and Defendants made the representations with the intent that Plaintiffs would rely and act upon them. Plaintiffs did, in fact, rely on the representations and such reliance was justifiable. Defendants are entitled to their actual damages against each Defendant.  Defendants are entitled to an award of exemplary damages as to each Defendant and as a result of Defendants' fraud and because they acted with malice and gross negligence.

### COUNT 8 – Attorneys' Fees

36.    Defendants failed and refused to pay the amounts due to Plaintiffs under the Notes and related Guarantees. Additionally, demand has been made in writing for the payment of all amounts due and owing to Plaintiffs, but Defendants failed and refused to pay the demanded amounts, or any portion thereof. In accordance with the Texas Civil Practice & Remedies Code Chapter 38 and the terms of the Notes, Plaintiffs are entitled to recover from Defendants their reasonable attorneys' fees, court costs and related litigation expenses from Defendants for the prosecution of this action.

37.    Additionally, Plaintiffs seeks recovery of Judgment for their attorneys' fees from Defendants: (i) in the amount of Ten Thousand and 00/100 Dollars ($10,000.00) and all additional costs of court, should Defendants unsuccessfully appeal this case to the Court of Appeals; and (ii) in the amount of Fifteen Thousand and 00/100 Dollars ($15,000.00) and all additional costs of court, should Defendants unsuccessfully appeal this case to the Texas Supreme Court.

### INTEREST

38.    On or June 8, 2021, through consultation with an attorney, Plaintiffs first learned that the Notes, as drafted by Defendants, could potentially be in violation Texas statutes regarding allowed interest rates.  On or about July 27, 2021, Plaintiffs served written notice on Defendants that the interest provided in each of the Notes was adjusted and reduced pursuant to Section 305.103(a) of the Texas Finance Code to ten percent (10%) annual interest.   Accordingly, Plaintiffs sue for interest on the Note balances accrued through maturity, along with pre-judgment and post-judgment interest thereafter at the rate of ten percent (10%) per annum.  Additionally, in accordance with the Texas Finance Code, Plaintiffs are entitled to recover post-judgment interest on the

accrued and unpaid pre-judgment interest, late fees, attorneys' fees and court costs at the statutory judgment rate, which is currently 5.5% per annum.

## RULE 193.7 NOTICE

39.     Pursuant to Texas Rule of Civil Procedure 193.7, Plaintiff hereby gives actual notice that any and all documents produced by any party will be used at any pretrial proceeding and/or the trial of this matter.

## CONDITIONS PRECEDENT

40.     All conditions precedent to Plaintiffs' recovery have occurred, have been performed, are excused, waived, or otherwise satisfied.

## RESERVATION OF RIGHTS

41.     Plaintiffs reserve the right to amend and supplement this Plaintiffs' Original Petition and add causes of action as facts may be discovered through discovery and the prosecution of this action.

## DISCOVERY REQUESTS

42.     Pursuant to the Texas Rules of Civil Procedure, Plaintiffs' request that Defendants (1) disclose the information and materials described in Texas Rules of Civil Procedure 194.2 within the time specified in the Texas Rules of Civil Procedure, and (2) answer and produce documents in response to Plaintiffs' First Set of Integrated Discovery (attached as **EXHIBIT A**) pursuant to Texas Rules of Civil Procedure 196, 197 and 198 and within the time specified by those Texas Rules of Civil Procedure.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Perry Judas, David Meche and Gerard Ballanco Jr. request that Defendants Bootstrap Ventures LLC and Dennis J.

Rogers, II be cited to appear and answer and that, upon final trial, Plaintiffs have

judgment against Defendants, jointly and severally, for:

(a)     all principal, interest and other amounts due and owing under the Notes and guarantees described herein in amounts within the jurisdictional limits of this Court;

(b)     all compensatory, actual and incidental damages in amounts within the jurisdictional limits of this Court

(c)     punitive and exemplary damages;

(d)     attorneys' fees, expert witness fees;

(e)     costs of court;

(f)     prejudgment and post-judgment interest as permitted by Texas law; and

(g)     such other and further relief to which Plaintiffs may be entitled

Respectfully submitted,

**McDONALD SANDERS,**
A Professional Corporation

By*:    /s/ Russell A. Devenport*
Russell A. Devenport
State Bar No. 24007109
rad@mcdonaldlaw.com

777 Main Street, Suite 2700
Fort Worth, Texas 76102
(817) 336-8651 Telephone
(817) 334-0271 Facsimile

**ATTORNEYS FOR PLAINTIFFS**

# EXHIBIT CC

## CAUSE NO. DC-21-10421

| | | |
|---|---|---|
| GERARD BALLANCO JR., | § | IN THE DISTRICT COURT |
| DAVID MECHE and PERRY JUDICE | § | |
| | § | |
| v. | § | 44th JUDICIAL DISTRICT |
| | § | |
| BOOTSTRAP VENTURES LLC and | § | |
| DENNIS J. ROGERS II, | § | OF DALLAS COUNTY, TEXAS |

## DEFAULT JUDGMENT AGAINST
## BOOTSTRAP VENTURES LLC & DENNIS J. ROGERS II

Before the Court is the Motion for Default Judgment (the "Motion") against BOOTSTRAP VENTURES LLC and DENNIS J. ROGERS II ("Defendants"). GERARD BALLANCO JR, DAVID MECHE and PERRY JUDICE ("Plaintiffs") appeared by and through their attorney of record and announced ready for trial. Defendants, although having been duly served with Plaintiff's Original Petition (the "Petition") and Citation for time and in the manner prescribed by law, failed to appear and wholly made default.

Citation for Defendants was served according to law on Defendants and the Officer's Return of Service and Affidavit of service indicating service of process has been on file with the Clerk of this Court where it has remained on file for more than ten (10) days, exclusive of the day of filing and of this day. Plaintiffs are entitled to a Default Judgment on their claims against Defendants. No jury having been demanded, all matters of fact and of law were submitted to the Court. The Court, having considered the pleadings on file in this cause and the arguments of counsel, is of the opinion and finds that the Court has jurisdiction over the subject matter and the parties to this lawsuit. The Court, having read the pleadings and the papers on file, including the Motion for Default, is of the opinion that Defendants have, by their default, admitted the allegations in the Petition and on good and sufficient evidence presented, including the

Declaration of Gerard Ballanco Jr. attached to the Motion, the Court finds that as of the date of this Default Judgment, Defendants are liable to Plaintiffs for breaches of the promissory notes and related guarantees and for the fraudulent representations and fraudulent inducements as detailed in the Petition and Motion. The Court further finds that Judgment should be rendered for Plaintiff Gerard Ballanco Jr, David Meche and Perry Judice in accordance with Plaintiff's Original Petition filed herein.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that Plaintiff Perry Judice have and recover of and from Defendants, jointly and severally, Judgment on claims for breach of the First and Second Judice Notes and related Guarantees in the principal amount of TWO HUNDRED THOUSAND and 00/100 DOLLARS ($200,000.00) along with pre-judgment interest of TWENTY ONE THOUSAND ONE HUNDRED SEVENTY TWO and 47/100 DOLLARS ($21,172.47) as of October 4, 2021 and continuing to accrue interest thereafter at the rate of 10% per annum post-judgment until paid.

IT IS, FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff David Meche have and recover of and from Defendants, jointly and severally, Judgment on claims for breach of the First and Second Meche Notes and related Guarantees in the principal amount of ONE HUNDRED THOUSAND and 00/100 DOLLARS ($100,000.00) along with pre-judgment interest of TEN THOUSAND EIGHT HUNDRED THIRTY ONE and 72/100 DOLLARS ($10,831.72) as of October 4, 2021 and continuing to accrue interest thereafter at the rate of 10% per annum post-judgment until paid.

IT IS, FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Gerard Ballanco Jr. have and recover of and from Defendants, jointly and severally, Judgment

on claims for breach of the First Ballance Note and related Guarantee in the principal amount of FIFTY THOUSAND and 00/100 DOLLARS ($50,000.00) along with pre-judgment interest of FIVE THOUSAND FIVE HUNDRED FIFTY EIGHT and 14/100 DOLLARS ($5,558.14) as of October 4, 2021 and continuing to accrue interest thereafter at the rate of 10% per annum post-judgment until paid.

IT IS, FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs Perry Judice, David Meche and Gerard Balance Jr. have and recover of and from Defendants, jointly and severally, Judgment on claims for fraudulent representations and fraudulent inducements in the principal amount of $ _____ with post-judgment interest on such amount, accruing the statutory judgment rate of 5.0% per annum, from the date of Judgment until the date paid.

IT IS, FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs Perry Judice, David Meche and Gerard Balance Jr. have and recover of and from Defendants, jointly and severally, Judgment in the amount of SIXTEEN THOUSAND EIGHT HUNDRED and 00/100 DOLLARS ($16,800), for Plaintiffs' reasonable and necessary attorneys' fees incurred in this action; plus all costs of court; plus post-judgment interest on Plaintiffs' attorneys' fees, prejudgment interest and costs of court at the statutory judgment rate of 5.0% per annum, from the date of Judgment until the date paid.

IT IS, FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs additionally have and recover of and from either Defendant; (i) Judgment in the amount of SEVEN THOUSAND FIVE HUNDRED and 00/100 DOLLARS ($7,500.00) and all additional costs of court, should that Defendant, unsuccessfully appeal this case to the Court of Appeals; and (ii) Judgment in the amount of TEN THOUSAND and 00/100

DOLLARS ($10,000.00) and all additional costs of court, should that Defendant, unsuccessfully appeal this case to the Texas Supreme Court; with post-judgment interest on all such amounts at the statutory judgment rate of 5.0% per annum from the dates such post-judgment attorneys' fees and costs of court are incurred until the date paid.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs Perry Judice, David Meche and Gerard Balance Jr. shall have all writs of execution, writs of possession and other appropriate process necessary to collect all amounts granted under this Default Judgment, and that same shall issue as many and as often as necessary. This Judgement is FINAL.

SIGNED this 27 day of Oct. , 2021.

JUDGE PRESIDING

# EXHIBIT DD

Electronically Filed
11/1/2021 4:44 PM
Steven D. Grierson
CLERK OF THE COURT

1

**ACOMP**
MICHEAL J. BROCK, ESQ.
Nevada Bar No. 9353
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699
Email: mbrock@maybrocklaw.com

2

3

4

5

*Attorneys for Plaintiff*

6

### DISTRICT COURT

7

### CLARK COUNTY, NEVADA

8

| | |
|---|---|
| TONY MAY, a Nevada resident, | ) CASE NO.: ___A-21-842897-C___ |
| Plaintiff, | ) DEPT. NO.: ___XXVII___ |
| vs. | ) |
| DENNIS ROGERS, an individual; BOOTSTRAP VENTURES, LLC, a Texas limited liability company; DOES Individuals I through X; ROE Entities XI through XX, | ) **FIRST AMENDED COMPLAINT** |
| Defendants. | ) |

9

10

11

12

13

14

15

16
### FIRST AMENDED COMPLAINT

        COMES NOW, Plaintiff TONY MAY (hereinafter "Plaintiff"), by and through his

17
counsel of record, the MICHEAL J. BROCK, ESQ, and hereby files his Complaint against

18
Defendants DENNIS ROGERS; BOOTSTRAP VENTURES, LLC; DOE Individuals I through

19
X; and ROE Entities XI through XX (hereinafter "Defendants") and hereby complains and

20
alleges as follows:

21
### THE PARTIES

22
        1.      Plaintiff is and was at all relevant times herein a resident of the State of

23
Nevada, residing in Clark County, Nevada.

24
        2.      Upon information and belief, Defendant DENNIS ROGERS (hereinafter

25
"Defendant Rogers"), is an individual who resides within the state of Texas, who has done

26
and continues to do business within the State of Nevada.

27
///

28

*M I C H E A L   J.   B R O C K ,   E S Q .*
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

MICHEAL J. BROCK, ESQ.
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

3.     Upon information and belief, Defendant BOOTSTRAP VENTURES, LLC (hereinafter "Defendant Bootstrap") is and was at all times relevant hereto, a Texas limited liability company, who has done and continues to do business within the State of Nevada.

4.     The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants DOES Individuals I through X and ROE Entities XI through XX, are unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names.  Plaintiff is informed and believes and therefore alleges that each of the Defendants designated as DOE Individuals and/or ROE Entities are responsible in some manner for the events and occurrences referred to in this Complaint and/or owes money to Plaintiff and/or may be affiliated with one of the other Defendants.  Plaintiff will ask leave of the Court to amend this Complaint and insert the true names and capacities of DOE Individuals I through X and ROE Entities XI through XX when the same have been ascertained by Plaintiff, in order to join said Defendants to this action.

## JURISDICTION & VENUE

5.     The acts and events at issue in this Complaint involve and relate to conduct and controversies that occurred in Clark County, Nevada.

6.     Further, both Defendant Rogers and Defendant Bootstrap have had dealings within the State of Nevada, including within Clark County, Nevada, wherein they have sought for and obtained the benefits of the laws of the State of Nevada on multiple occasions.

7.     Upon information and belief, both Defendants have and continue to do business within the State of Nevada and as such, venue properly lies within the District Court for Clark County, Nevada.

## GENERAL ALLEGATIONS

8.     On or about November 24, 2020, Plaintiff entered into a promissory note (hereinafter the "Promissory Note") with Defendants wherein Plaintiff provided Defendants $50,000.00 for an investment opportunity that was supposed to pay out on or before December 20, 2020 in the amount of $54,500.00.  A True and Correct copy of the signed Promissory Note is attached to this Complaint as **EXHIBIT 1**.

MICHEAL J. BROCK, ESQ.
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

9.      Prior to entering into the Promissory Note and providing the $50,000.00 to Defendants, Plaintiff informed Defendants that he needed the deal to close on or before the deadline in the Promissory Note, because he needed the money for other purposes.

10.      At that time and then after the Promissory Note was entered into by the Parties, Defendants promised that the investment would be completed and that the money would be returned to Plaintiff, with the allocated interest, on or before the deadline included within the Promissory Note.

11.      Based on the promises made by Defendants, within the Promissory Note and then thereafter, Plaintiff sent $50,000.00 to Defendants as he had promised.

12.      However, Defendants have failed to follow through with their part of the bargain and have continually provided different excuses to Plaintiff as to why the funds have not yet been returned and the interest has not yet been paid.

13.      Defendants first told Plaintiff that they had to get a few things wrapped up before they could close out the investment and pay Plaintiff.

14.      Then Defendants informed Plaintiff that the reason Plaintiff had not been paid was because Defendant Rogers had been sick and had surgical procedures.

15.      Then Defendants informed Plaintiff that the reason Plaintiff had not been paid was due to other lawsuits he had that had frozen his assets.

16.      Each time Defendants would return a call or email from Plaintiff about the status of payment, Defendants would promise payment at a date in the future, and then they would go silent for a time, including for a time period after they had promised the money and interest was to be paid.

### FIRST CAUSE OF ACTION
*(Breach of Promissory Note, Defendant Bootstrap)*

17.      Plaintiff re-alleges and incorporates herein by reference all preceding and ensuing Paragraphs of this Complaint as if fully set forth herein.

18.      Plaintiff entered into the Promissory Note with Defendant Bootstrap on or about November 24, 2020, wherein Plaintiff agreed to provide Defendant Bootstrap with

MICHEAL J. BROCK, ESQ.
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

$50,000.00 to be used for a groundwater purchase and sale deal and in return, Defendant Bootstrap was going to return Plaintiff's $50,000.00 on or before December 20, 2020, with interest as fully described within the Promissory Note, attached hereto as **EXHIBIT 1**.

19.    Pursuant to Plaintiff's duties and obligations under the Promissory Note, he caused to be wired to Defendant Bootstrap the required sum of $50,000.00, via a wire transfer, on December 3, 2020.

20.    Thereafter, Defendant Bootstrap, through Defendant Rogers, acknowledged receipt of the wired funds to their bank account on that same day.

21.    Notwithstanding Plaintiff performing all of his duties and obligations under the Promissory Note, Defendant Bootstrap has failed to return Plaintiff's $50,000.00 and has also failed to pay Plaintiff his interest as agreed within the Promissory Note, see **EXHIBIT 1**.

22.    As such, Plaintiff has been damaged by Defendant Bootstrap in an amount in excess of 15,000.00.

23.    It has been necessary for Plaintiff to retain the services of legal counsel to prosecute this action, and thus, Plaintiff is entitled to his costs and reasonable attorneys' fees incurred herein pursuant to Nevada law and the Promissory Note.

### SECOND CAUSE OF ACTION
*(Breach of Personal Guarantee, Defendant Rogers)*

24.    Plaintiff re-alleges and incorporates herein by reference all preceding and ensuing Paragraphs of this Complaint as if fully set forth herein.

25.    Plaintiff entered into the Promissory Note with Defendant Bootstrap on or about November 24, 2020, wherein Plaintiff agreed to provide Defendant Bootstrap with $50,000.00 to be used for a groundwater purchase and sale deal and in return, Defendant Bootstrap was going to return Plaintiff's $50,000.00 on or before December 20, 2020, with interest as fully described within the Promissory Note, attached hereto as **EXHIBIT 1**.

26.    A material term of the Promissory Note and a condition precedent to Plaintiff entering into the Promissory Note was the requirement that Defendant Rogers agree to

becomes a party to the Promissory Note (i.e., that Defendant Rogers become the guarantor of Defendant Bootstrap's duties and obligations under the Promissory Note).

27.    As part of the Promissory Note, Defendant Rogers did sign at the bottom of the Promissory Note, as "additional collateral and guarantee" of Defendant Bootstrap's duties and obligations under the Promissory Note.

28.    Thereafter, Plaintiff caused to be wired to Defendants the required sum of $50,000.00, via a wire transfer, on December 3, 2020 and Defendant Bootstrap acknowledged receipt of the wired funds to its bank account, via Defendant Rogers, on that same day.

29.    Notwithstanding Plaintiff performing all of this duties and obligations under the Promissory Note, Defendants have failed to return Plaintiff's $50,000.00 and have also failed to pay Plaintiff his interest as agreed within the Promissory Note, see **EXHIBIT 1**.

30.    Despite many demands to both Defendant Bootstrap and Defendant Rogers over the course of the last 10 months, Defendant Rogers has failed to adhere to his duties and obligations to guarantee Defendant Bootstrap's performance under the Promissory Note.

31.    As such, Plaintiff has not yet received the return of Plaintiff's $50,000.00 and, or any interest as required and Defendant Rogers has and continues to refuse to make the required payments after multiple demands being sent to him over the past ten (10) months.

32.    Thus, Plaintiff has been damaged by Defendant Roger's actions and/or inactions in an amount in excess of 15,000.00.

33.    It has been necessary for Plaintiff to retain the services of legal counsel to prosecute this action, and thus, Plaintiff is entitled to his costs and reasonable attorneys' fees incurred herein pursuant to Nevada law and the Promissory Note.

## THIRD CAUSE OF ACTION
*(Breach of Covenant of Good Faith and Fair Dealing, all Defendants)*

34.    Plaintiff re-alleges and incorporates herein by reference all preceding and ensuing Paragraphs of this Complaint as if fully set forth herein.

///

MICHEAL J. BROCK, ESQ.
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

MICHEAL J. BROCK, ESQ.
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

35.     Pursuant to Nevada law, each and every contract that is entered into in the State of Nevada includes, as part of the contract, an implied covenant of Good Faith and Fair Dealing, which implies that neither party to the contract will act in an arbitrary manner or act in a way which is unfair and disadvantages the other party.

36.     Further, this implied duty of good faith and fair dealing also prohibits one party to a contract to act in a manner that is unfaithful to the purpose of the contract, wherein the other party's justified expectations are denied.

37.     Plaintiff entered the Promissory Note in Good Faith and has fully and completely performed all his duties and obligations required under the Promissory Note.

38.     Notwithstanding Plaintiff's good faith performance of his duties and obligations under the Promissory Note, Defendants have failed to follow through with or perform any of their duties and obligations under the Promissory Note.

39.     As such, Defendants actions have been pursued in a manner that are unfair and disadvantage Plaintiff.

40.     Likewise, Defendants actions have been and continue to be unfaithful to the purpose of the Contract and as a result of same, Plaintiff's justified expectations have been denied.

41.     Thus, Plaintiff has been damaged by Defendants actions and/or inactions in an amount in excess of 15,000.00.

42.     It has been necessary for Plaintiff to retain the services of legal counsel to prosecute this action, and thus, Plaintiff is entitled to his costs and reasonable attorneys' fees incurred herein pursuant to Nevada law and the Promissory Note.

## FOURTH CAUSE OF ACTION
*(Declaratory Relief)*

43.     Plaintiff re-alleges and incorporates herein by reference all preceding and ensuing Paragraphs of this Complaint as if fully set forth herein.

///

*First Amended Complaint*
- 6 -

MICHEAL J. BROCK, ESQ.
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

44.    A dispute has arisen and an actual controversy now exists between Plaintiff and Defendants, and each of them, as to their respective rights and duties with regard to the Promissory Note, entered into by the parties to this matter.

45.    A declaration of the Parties duties and obligations in relation to the interest that Plaintiff is entitled to receive from Defendants, as proscribed within the Promissory Note, which is attached hereto as **EXHIBIT 1**.

46.    Plaintiff has no true and speedy remedy at law of any kind with regard to same.

47.    Thus, Plaintiff has been damaged by Defendants actions and/or inactions in an amount in excess of 15,000.00.

48.    It has been necessary for Plaintiff to retain the services of legal counsel to prosecute this action, and thus, Plaintiff is entitled to his costs and reasonable attorneys' fees incurred herein pursuant to Nevada law and the Promissory Note.

## FIFTH CAUSE OF ACTION
### (Fraud/Intentional Misrepresentation)

49.    Plaintiff re-alleges and incorporates herein by reference all preceding and ensuing Paragraphs of this Complaint as if fully set forth herein.

50.    Plaintiff contacted Defendants in November 2020 with the intention of making an investment and earning a return on that investment.

51.    Defendant Rogers advised Plaintiff that he had an investment opportunity that would provide Plaintiff with a return of his principal with interest before the end of December 2020.

52.    Plaintiff executed the Promissory Note with Defendants wherein Plaintiff provided Defendants $50,000.00 for the promised investment opportunity.

53.    Prior to entering into the Promissory Note and providing the $50,000.00 to Defendants, Plaintiff informed Defendants that he needed the deal to close on or before the deadline in the Promissory Note, because he needed the money for other purposes.

MICHEAL J. BROCK, ESQ.
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

54.    Defendants promised that the investment would be completed and that the money would be returned to Plaintiff, with the allocated interest, on or before the deadline included within the Promissory Note.

55.    However, Defendants have failed to follow through with their part of the bargain and have continually provided different excuses to Plaintiff as to why the funds have not yet been returned and the interest has not yet been paid.

56.    Defendants first told Plaintiff that they had to get a few things wrapped up before they could close out the investment and pay Plaintiff.

57.    Then Defendants informed Plaintiff that the reason Plaintiff had not been paid was because Defendant Rogers had been sick and had surgical procedures.

58.    Then Defendants informed Plaintiff that the reason Plaintiff had not been paid was due to other lawsuits he had that had frozen his assets.

59.    Plaintiff is informed and believes and thereon alleges that Defendants never had any intention of returning Plaintifff's investment as agreed and that instead, Defendants took Plaintiff's investment funds and used them for their own purposes and needs, including, but not limited to, legal actions in which Defendants were embroiled.

60.    Defendants made fraudulent misrepresentations to Plaintiff about the investment in order to induce him to send Defendants $50,000.00.

61.    Plaintiff sent $50,000.00 to Defendants based upon his reasonable belief that Defendants would follow through and make the investment and ensure that Plaintiff would be repaid the principal sum, plus the agreed upon interest.

62.    Plaintiff's belief that Defendants would follow through with the investment was reasonable because Plaintiff had successfully invested with Defendants in the past.

63.    As a result of Defendants fraudulent actions, Plaintiff has been damaged in an amount in excess of 15,000.00.

64.    Defendants have been guilty of oppression, fraud or malice, express or implied.  Plaintiff, in addition to an award of compensatory damages, should recover damages for the sake of example and by way of punishing Defendants.

65.     It has been necessary for Plaintiff to retain the services of legal counsel to prosecute this action, and thus, Plaintiff is entitled to his costs and reasonable attorneys' fees incurred herein pursuant to Nevada law and the Promissory Note.

**WHEREFORE,** Plaintiff, prays that this Honorable Court grant him the following damages:

1.     For actual and/or compensatory damages in an amount to be determined at trial, but in an amount in excess of $15,000.00;

2.     For consequential damages in an amount to be determined at trial;

3.     For punitive damages in accordance with NRS Chapter 42;

4.     For reasonable attorneys' fees incurred by Plaintiff in this action;

5.     For Plaintiff's costs incurred herein;

6.     For such other and further relief as this Court may deem just, equitable, and proper.

DATED this 1st day of November, 2021.

<div style="text-align:right">

**MICHEAL J. BROCK, ESQ.**

 _/s/ Micheal Brock_
MICHEAL J. BROCK, ESQ.
Nevada Bar No. 9353
1850 East Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Email: mbrock@maybrocklaw.com

_Attorneys for Plaintiff_

</div>

_MICHEAL J. BROCK, ESQ._
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

# EXHIBIT EE

Electronically Filed
12/9/2021 12:47 PM
Steven D. Grierson
CLERK OF THE COURT

**DFLT**
MICHEAL J. BROCK, ESQ.
Nevada Bar No. 9353
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699
Email: mbrock@maybrocklaw.com
*Attorneys for Plaintiff*

<div align="center">

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

</div>

| | |
|---|---|
| TONY MAY, a Nevada resident, | **CASE NO.:**   A-21-842891-C |
| Plaintiff, | **DEPT. NO.:**   XXVII |
| vs. | |
| DENNIS ROGERS, an individual; BOOTSTRAP VENTURES, LLC, a Texas limited liability company; DOES Individuals I through X; ROE Entities XI through XX, | **DEFAULT AGAINST DEFENDANT DENNIS ROGERS** |
| Defendants. | |

<div align="center">

**DEFAULT AGAINST DEFENDANT DENNIS ROGERS**

</div>

It appearing from the files and records in the above-entitled action that Defendant DENNIS ROGERS (hereinafter "Defendant") herein, being duly served with a copy of the Summons and First Amended Complaint on the 2nd day of November, 2021. *See* Affidvit of Service, attached hereto as **Exhibit 1**; that more than twenty-one days (21), exclusive of the day of service, having expired since service upon Defendant; that no answer or other appearance having

/ / /

/ / /

/ / /

/ / /

<div align="center">

*Default Against Defendant Dennis Rogers*
- 1 -

</div>

MICHEAL J. BROCK, ESQ.
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

1   been filed and no further time having been granted, the Default against Defendant DENNIS

2   ROGERS for failing to answer or otherwise plead to the Plaintiff's First Amended Complaint

3   is hereby entered.

STEVEN D. GRIERSON
CLERK OF THE COURT

By: _____

Deputy Clerk                    Date          12/15/2021

Regional Justice Center
200 Lewis Avenue
Las Vegas, NV 89155
A-21-842897-C
Michelle McCarthy

9   Respectfully submitted by:

10  **MICHEAL J. BROCK, ESQ.**

11   _/s/ Micheal Brock_
     MICHEAL J. BROCK, ESQ.
12   Nevada Bar No. 9353
     1850 East Sahara Ave., Suite 206
13   Las Vegas, Nevada 89104
     Telephone: (702) 388-0404
14   Email: mbrock@maybrocklaw.com

15   _Attorneys for Tony May_

MICHEAL J. BROCK, ESQ.
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

# Exhibit 1

Electronically Filed
11/3/2021 8:24 AM
Steven D. Grierson
CLERK OF THE COURT

**AOS**
MICHEAL J. BROCK, ESQ.
Nevada Bar No. 9353
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699
Email: mbrock@maybrocklaw.com
*Attorneys for Plaintiff*

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| TONY MAY, a Nevada resident, | CASE NO.: A-21-842891-C |
| Plaintiff, | DEPT. NO.: XXVII |
| vs. | |
| DENNIS ROGERS, an individual; BOOTSTRAP VENTURES, LLC, a Texas limited liability company; DOES Individuals I through X; ROE Entities XI through XX, | **AFFIDAVIT OF SERVICE** |
| Defendants. | |

Attached hereto as **EXHIBIT 1**, is a true and correct copy of the AFFIDAVIT OF SERVICE of SUMMONS-CIVIL, FIRST AMENDED COMPLAINT, and INITIAL APPEARANCE FEE DISCLOSURE upon DENNIS ROGERS, named Defendant in this matter.

DATED this 3rd day of November, 2021.

**MICHEAL J. BROCK, ESQ.**

*/s/ Micheal Brock*
MICHEAL J. BROCK, ESQ.
Nevada Bar No. 9353
1850 East Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Email: mbrock@maybrocklaw.com

*Attorneys for Plaintiff*

# EXHIBIT 1

## CAUSE NO. A-21-842897-C

| TONY MAY, a Nevada Resident | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| VS. | § | CLARK COUNTY, |
| | § | |
| DENNIS ROGERS, an individual; BOOTSTRAP | § | |
| VENTURES,LLC a Texas Limited Liability Company; | | |
| DOES Individuals I through X; Roe Entities XI through | | |
| XX | | |
| Defendant. | § | NEVADA |

## AFFIDAVIT OF SERVICE

On this day personally appeared **Jacob Nordgren** who, being by me duly sworn, deposed and said:

"The following came to hand on **Nov 1, 2021, 4:34 pm,**

### SUMMONS - CIVIL
### FIRST AMENDED COMPLAINT
### INITIAL APPEARANCE FEE DISCLOSURE

and was executed at **6520 Del Norte Lane, Dallas, TX 75225** within the county of **Dallas** at 07:31 PM on Tue, Nov 02 2021, by delivering a true copy to the within named

### DENNIS ROGERS, AN INDIVIDUAL

in person, having first endorsed the date of delivery on same.

I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Texas. I am familiar with the Texas Rules of Civil Procedure as they apply to service of Process. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I have personal knowledge of the facts stated herein and they are true and correct."

Jacob Nordgren
Certification Number: PSC-18609. Exp. 7/31/22
Certification Expiration: 7/31/22

BEFORE ME, a Notary Public, on this day personally appeared Jacob Nordgren, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements therein contained are within his or her personal knowledge and are true and correct.

SUBSCRIBED AND SWORN TO ME ON  11/2/2021

Jennifer Renee Harvey
Notary Public, State of Texas

JENNIFER RENEE HARVEY
Notary Public, State of Texas
Comm. Expires 11-21-2021
Notary ID 131359858

# EXHIBIT FF

Electronically Filed
12/20/2021 10:54 AM
Steven D. Grierson
CLERK OF THE COURT

**DFLT**
MICHEAL J. BROCK, ESQ.
Nevada Bar No. 9353
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699
Email: mbrock@maybrocklaw.com
*Attorneys for Plaintiff*

*MICHEAL J. BROCK, ESQ.*
*1850 E. Sahara Ave., Suite 206*
*Las Vegas, Nevada 89104*
*Telephone: (702) 388-0404*
*Facsimile: (702) 830-5699*

### DISTRICT COURT

### CLARK COUNTY, NEVADA

| | |
|---|---|
| TONY MAY, a Nevada resident, | ) CASE NO.: A-21-842897-C |
| Plaintiff, | ) DEPT. NO.: XXVII |
| vs. | ) |
| DENNIS ROGERS, an individual; BOOTSTRAP VENTURES, LLC, a Texas limited liability company; DOES Individuals I through X; ROE Entities XI through XX, | ) **DEFAULT AGAINST DEFENDANT BOOTSTRAP VENTURES, LLC** |
| Defendants. | ) |

### DEFAULT AGAINST DEFENDANT BOOTSTRAP VENTURES, LLC

It appearing from the files and records in the above-entitled action that Defendant BOOTSTRAP VENTURES, LLC (hereinafter "Defendant") herein, being duly served with a copy of the Summons and First Amended Complaint on the 2nd day of November, 2021. *See* Amended Affidavit of Service, attached hereto as **Exhibit 1**; that more than twenty-one days (21), exclusive of the day of service, having expired since service upon Defendant; that no answer or other appearance having

/ / /

/ / /

/ / /

/ / /

1    been filed and no further time having been granted, the Default against Defendant

2    BOOTSTRAP VENTURES, LLC for failing to answer or otherwise plead to the Plaintiff's

3    First Amended Complaint is hereby entered.

4                                    STEVEN D. GRIERSON
                                      CLERK OF THE COURT

5

6    By: _____    12/20/2021
         Deputy Clerk                Date

7                                    Michelle McCarthy
                                      Regional Justice Center

8                                    200 Lewis Avenue
                                      Las Vegas, NV 89155

9    Respectfully submitted by:       A-21-842897-C

10   **MICHEAL J. BROCK, ESQ.**

11    _/s/ Micheal Brock_
      MICHEAL J. BROCK, ESQ.

12   Nevada Bar No. 9353
      1850 East Sahara Ave., Suite 206

13   Las Vegas, Nevada 89104
      Telephone: (702) 388-0404

14   Email: mbrock@maybrocklaw.com

15   *Attorneys for Tony May*

16

17

18

19

20

21

22

23

24

25

26

27

28

**MICHEAL J. BROCK, ESQ.**
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

# Exhibit 1

Electronically Filed
12/20/2021 10:34 AM
Steven D. Grierson
CLERK OF THE COURT

1   **AAOS**
MICHEAL J. BROCK, ESQ.
2   Nevada Bar No. 9353
1850 E. Sahara Ave., Suite 206
3   Las Vegas, Nevada 89104
Telephone: (702) 388-0404
4   Facsimile: (702) 830-5699
Email: mbrock@maybrocklaw.com
5   *Attorneys for Plaintiff*

6                        **DISTRICT COURT**

7                 **CLARK COUNTY, NEVADA**

8   TONY MAY, a Nevada resident,        )   **CASE NO.:**    A-21-842897-C
                                        )
9          Plaintiff,                   )   **DEPT. NO.:**    XXVII
                                        )
10  vs.                                 )
                                        )
11  DENNIS ROGERS, an individual;       )
    BOOTSTRAP VENTURES, LLC, a Texas    )   **AMENDED AFFIDAVIT OF SERVICE**
12  limited liability company; DOES Individuals )
    I through X; ROE Entities XI through XX, )
13                                      )
                                        )
14         Defendants.                  )
    _____ )

15         Attached hereto as **EXHIBIT 1**, is a true and correct copy of the AFFIDAVIT OF

16  SERVICE of SUMMONS-CIVIL, FIRST AMENDED COMPLAINT, and INITIAL

17  APPEARANCE FEE DISCLOSURE upon BOOTSTRAP VENTURES, LLC, by serving

18  Dennis Rogers, President of named Defendant in this matter.

19         DATED this 20th day of December, 2021.

20                                 **MICHEAL J. BROCK, ESQ.**

21                                 */s/ Micheal Brock*
                                   MICHEAL J. BROCK, ESQ.
22                                 Nevada Bar No. 9353
                                   1850 East Sahara Ave., Suite 206
23                                 Las Vegas, Nevada 89104
                                   Telephone: (702) 388-0404
24                                 Email: mbrock@maybrocklaw.com

25                                 *Attorneys for Plaintiff*

26

27

28

MICHEAL J. BROCK, ESQ.
1850 E. Sahara Ave., Suite 206
Las Vegas, Nevada 89104
Telephone: (702) 388-0404
Facsimile: (702) 830-5699

*Affidavit of Service – Bootstrap Ventures, LLC*
- 1 -

# EXHIBIT 1

## CAUSE NO. A-21-842897-C

| | | |
|---|---|---|
| TONY MAY, a Nevada Resident | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| VS. | § | CLARK COUNTY |
| | § | |
| DENNIS ROGERS, an individual; BOOTSTRAP | § | |
| VENTURES,LLC a Texas Limited Liability Company; | | |
| DOES Individuals I through X; Roe Entities XI through | | |
| XX | | |
| Defendant. | § | NEVADA |

## AFFIDAVIT OF SERVICE

On this day personally appeared **Jacob Nordgren** who, being by me duly sworn, deposed and said:

"The following came to hand on **Nov 2, 2021, 4:19 pm**,

### SUMMONS - CIVIL
### FIRST AMENDED COMPLAINT
### INITIAL APPEARANCE FEE DISCLOSURE

and was executed at **6520 Del Norte Lane, Dallas, TX 75225** within the county of **Dallas** at **07:19 PM on Tue, Nov 02 2021**, by delivering a true copy to the within named

BOOTSTRAP VENTURES, LLC by serving DENNIS ROGERS, President

in person, having first endorsed the date of delivery on same.

I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Texas. I am familiar with the Texas Rules of Civil Procedure as they apply to service of Process. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I have personal knowledge of the facts stated herein and they are true and correct."

Jacob Nordgren
Certification Number: PSC-18609. Exp. 7/31/22
Certification Expiration: 7/31/22

BEFORE ME, a Notary Public, on this day personally appeared **Jacob Nordgren**, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements therein contained are within his or her personal knowledge and are true and correct.

SUBSCRIBED AND SWORN TO ME ON 12/16/2021

Notary Public, State of Texas

JENNIFER RENEE HARVEY
Notary Public, State of Texas
Comm. Expires 11-21-2025
Notary ID 13...

Ex. Pg. 434

# EXHIBIT GG

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

| | |
|---|---|
| **JOHN S. FOREMAN, III and ANDRE C. LEBLANC** | **CIVIL ACTION NO. 3:21-cv-00013** |
| **VERSUS** | |
| **DENNIS ROGERS and BOOTSTRAP VENTURES, LLC.** | **JUDGE KAREN GREN SCHOLER** |
| | **MAGISTRATE JUDGE HORAN** |

## **FIRST AMENDED COMPLAINT**

Plaintiffs, John S. Foreman, III and Andre C. Leblanc (collectively, "Plaintiffs") for their First Amended Complaint against Defendants, Dennis Rogers ("Rogers") and Bootstrap Ventures, LLC ("Bootstrap") (Rogers and Bootstrap are collectively referred to herein as "Defendants"), allege as follows:

### **PARTIES**

1.

Plaintiff, John S. Foreman, III, is a citizen of the state of Louisiana and resides at 105 Hazelnut Drive, Lafayette, Louisiana 70508.

2.

Plaintiff, Andre C. Leblanc, is a citizen of the state of Louisiana and resides at 110 Southwark Drive, Lafayette, LA 70508.

3.

Defendant, Dennis Rogers, is a citizen of the state of Texas and resides at 6520 Del Norte Lane, Dallas, TX 75225.

4.

Defendant, Bootstrap Ventures, LLC, is a limited liability company organized under the laws of the state of Texas with its principal place of business at 1920 McKinney Ave FL 7, Dallas, TX 75201.

## JURISDICTION AND VENUE

5.

Plaintiffs are both citizens of the state of Louisiana and Defendant Rogers is a citizen of the state of Texas.

6.

On information and belief, Defendant Bootstrap has no members who are citizens of the state of Louisiana.

7.

This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because it is between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

8.

This action is based on a contract and tort.  Venue is proper in this District because the contract between the parties states that the venue for enforcing the terms and conditions of the contract is Dallas, Texas.  In addition, venue is proper in this District because Defendant Rogers resides in or otherwise is a citizen of Dallas, Texas and a substantial part of the events relevant to Plaintiffs's causes of action occurred in this District.

## FACTS

9.

In October 2020, Plaintiff, Foreman, was approached with a lucrative business deal where Defendants needed a short-term loan to fund the capital necessary to fund the acquisition of a water rights deal in New Mexico (the "Water Rights Deal").

10.

At that time, Defendants represented that the loan was necessary to immediately close on the Water Rights Deal, at which time, Defendants would return all loaned capital with interest payments and an exit fee just a few weeks later.  Defendants went as far as sending news articles to Plaintiffs detailing the potentially lucrative nature of other water rights deals that had closed in the recent past.

11.

On or about October 13, 2020, Plaintiffs agreed to loan Two Hundred Thousand Dollars ($200,000.00) (the "Original Loan") to Defendants to fund the Water Rights Deal who accepted the Original Loan and executed a Promissory Note related to the repayment of same (the "Original Note").  A true and correct copy of the Original Note is attached as Exhibit A to this Complaint.

12.

A week later, Defendants represented to Plaintiffs that additional capital was needed to finalize the acquisition of the Water Rights Deal and that Plaintiffs would make "2x" their capital loan to Defendants as soon as the Water Rights Deal closed—which was represented to be closing imminently.

13.

To that end, on or about October 20, 2020, Plaintiffs loaned an additional Four-Hundred Fifty Thousand Dollars ($450,000.00) (the "Second Loan") to Defendants in connection with the Water Rights Deal who accepted the Second Loan and executed an Amended and Restated Secured Promissory Note related to the repayment of the Original Loan and Second Loan (the "Amended Note").  A true and correct copy of the Amended Note is attached as Exhibit B to this Complaint.

14.

In total, Defendants agreed to repay to Plaintiffs the sum of Six-Hundred Fifty Thousand Dollars ($650,000.00) plus interest and other costs under the terms and conditions described in the Amended Note in order for Defendants to acquire the Water Rights Deal.

15.

The Original Loan and Second Loan (hereinafter, the "Loans") were secured by a security agreement, as described in the Amended Note, whereby Defendant Rogers granted to Plaintiffs a UCC lien over and against a deposit account owned by Rogers and maintained at Goldman Sachs.  True and correct copies of the UCC-1 Financing Statements perfecting the lien and describing the collateral are attached hereto as Exhibit C, in globo.

16.

According to the terms and conditions of the Amended Note, the Loans became due and payable on November 18, 2020.

17.

However, despite amicable demand, neither Defendant has made any payment on the Amended Note.

18.

On information and belief, despite material representations to the contrary, Defendants had no intention of using the loaned funds to pursue or otherwise acquire the Water Rights Deal.

19.

On information and belief, Defendants used the loaned funds to pay for personal expenditures and settle lawsuits brought by prior individuals and entities that had loaned funds to either Rogers, Bootstrap or other entities affiliated with them.

20.

On December 18, 2020, Plaintiffs sent written notice of default and demand for payment to Defendants (the "Default Notice").  A true and correct copy of the Default Notice is attached hereto as Exhibit D.

21.

Plaintiffs have made several attempts to resolve this matter amicably without the need for litigation.  In fact, Defendant Rogers falsely told Plaintiffs that he had initiated wire transfers to Plaintiffs to repay the Loans on multiple occasions.

## CLAIM FOR RELIEF – BREACH OF CONTRACT
### (Against All Defendants)

22.

Plaintiffs incorporate Paragraphs 1 – 21 of this Complaint as if fully set forth herein.

23.

Defendants's payment obligations to Plaintiffs under the Amended Note are valid, binding, and enforceable.

24.

As of November 19, 2020, an Event of Default has occurred under the Amended Note because Defendants have not repaid the Loans plus other costs and interest pursuant to the terms and conditions described in the Amended Note.

25.

As a result of Defendants's breaches, Plaintiffs have suffered damages as detailed in the Amended Note, which include the principal, interest, and other costs described in the Amended Note.

## <u>CLAIM FOR RELIEF – COMMON LAW FRAUD</u>
## <u>(Against All Defendants)</u>

26.

Plaintiffs incorporate Paragraphs 1 – 25 of this Complaint as if fully set forth herein.

27.

Based on a review of public records, at the time Defendants represented to Plaintiffs that they needed the Loans as capital for the acquisition of the quick-turn Water Rights Deal, Defendants sought similar loans from other investors all over the country.

28.

At that same time, Defendant Rogers had been and was a party to a series of lawsuits brought against Rogers and his related entities in connection with his alleged failure to repay loans obtained from other parties.

29.

Some of those lawsuits settled or were otherwise dismissed soon after Defendants received the loaned funds from Plaintiffs and other Water Rights Deal investors in Dallas, Texas, Houston, Texas, Lafayette, Louisiana, Salt Lake City, Utah, and California.

30.

Other lawsuits were pending at the time Plaintiffs funded the Loans and remain pending today.

31.

Defendants made material false representations to Plaintiffs about the Water Rights Deal intended to deceive Plaintiffs.  At the time Defendants falsely represented to Plaintiffs that the Loans were required to fund the Water Rights Deal, on information and belief, Defendants had no intention of using the Loans to fund the Water Rights Deal; rather, Defendants intended to use and did use the Loans to fund personal expenses, including ongoing litigation expenses and settlements with other investors.

32.

Additionally, Defendant Rogers made material false statements to Plaintiffs over the telephone and in e-mail conversations about the Goldman Sachs account used to secure the Loans with full knowledge that the statements were both false and intended only to deceive Plaintiffs into funding the Loans.

33.

For instance, Defendant Rogers (on his own behalf and on behalf of his controlled entity, Defendant Bootstrap Ventures) represented to Plaintiffs that the Goldman Sachs account was

unencumbered and available as adequate security for repayment of the Loans should Defendants default on repayment. However, on information and belief, Defendant Rogers had already encumbered the Goldman Sachs account to such an extent that it is and was not available as security for the Loans.

34.

Defendants' false statements were intended to and, in fact, did deceive Plaintiffs into funding the Loans.

35.

Had Plaintiffs known the truth as to the apparent non-existence of the Water Rights Deal, Defendant Rogers's lawsuits, how the loaned funds would be utilized by Defendants, and the encumbrances of the Goldman Sachs account, Plaintiffs would not have funded the Loans.

36.

As a result of Defendants' false representations intended to deceive, Plaintiffs have been damaged.

## CLAIM FOR ATTORNEY'S FEES

37.

Pursuant to the terms and conditions of the Amended Note and applicable Texas statutory law, Defendants are entitled to recover their attorney's fees incurred in pursuing recovery from Defendants.

## REQUEST FOR RELIEF

Plaintiffs, John S. Foreman, III and Andre C. Leblanc hereby request that judgment be entered against the Defendants as follows:

1. For Plaintiffs's actual damages on the asserted claims of breach of contract and common law fraud, including without limitation, repayment of the Loans plus applicable interest and other costs as detailed in the Amended Note;

2. For all attorney's fees incurred by Plaintiffs after Defendants failed to comply with the terms and conditions of the Amended Note;

3. For pre- and post-judgment interest; and

4. For all other relief, both in law and equity, for which Defendants may show themselves justly entitled.

Respectfully,

**WILLIAMS, ANDERSON, RYAN & CARROLL LLP**

BY:   /s/ Taylor S. Carroll
         Taylor S. Carroll, Bar Roll No. 24031798
         1717 Main Street
         Suite 5350
         Dallas, Texas 75201
         Telephone: 225-412-7121
         Telecopier: 214-754-9301
         Email: tcarroll@warc-law.com

ATTORNEYS FOR JOHN S. FOREMAN, III AND ANDRE C. LEBLANC

# EXHIBIT HH

# Texas Franchise Tax Public Information Report

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

Comptroller of Public Accounts FORM 05-102 (Rev.9-11/30)

■ **Tcode** 13196 Franchise

| ■ Taxpayer number | | | | | | | | | | ■ Report year | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 2 | 0 | 4 | 9 | 4 | 3 | 8 | 2 | 8 | 9 | 2 | 0 | 1 | 8 |

*You have certain rights under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381or (512) 463-4600.*

**Taxpayer name**
PUSH START INDUSTRIES LLC

**Mailing address**
4144 N CENTRAL EXPY STE 600

| City | State | ZIP Code | Plus 4 | Secretary of State (SOS) file number or Comptroller file number |
|---|---|---|---|---|
| DALLAS | TX | 75204 | | 0801681317 |

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

**Principal office**

**Principal place of business**

*Please sign below!* Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

3204943828918

**SECTION A** Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | | Term expiration | m m d d y y |
|---|---|---|---|---|---|
| DENNIS ROGERS | PRESIDENT | ○ YES | | | |
| Mailing address 4144 N. CENTRAL EXPRESSWAY #600 | City DALLAS | State TX | ZIP Code 75204 | | |
| Name | Title | Director ○ YES | | Term expiration | m m d d y y |
| Mailing address | City | State | ZIP Code | | |
| Name | Title | Director ○ YES | | Term expiration | m m d d y y |
| Mailing address | City | State | ZIP Code | | |

**SECTION B** Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C** Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

| Registered agent and registered office currently on file. *(see instructions if you need to make changes)* | ○ Blacken circle if you need forms to change the registered agent or registered office information. |
|---|---|

**Agent:** UNITED STATES CORPORATION AGENTS, INC.

| Office: 9900 SPECTRUM DR. | City AUSTIN | State TX | ZIP Code 78717 |
|---|---|---|---|

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| **sign here**▶ Dennis J Rogers | Title Electronic | Date 04-04-2018 | Area code and phone number ( 575 ) 649 - 5004 |
|---|---|---|---|

**Texas Comptroller Official Use Only**

| VE/DE | ○ | PIR IND | ○ |
|---|---|---|---|

# EXHIBIT II

El Paso County Case 327th District Court 7 Doc 2c 326 Filed 03/22/2024 Entered 03/22/2024 51:21 Page 7 of 55 2:18:01 7 1:23:09 PM

Ex. 3    Page 415 of 489

Norma Favela Barceleau
District Clerk
El Paso County
2017DCV0481

IN THE _____

EL PASO COUNTY, TEXAS

| | | |
|---|---|---|
| THE STEEL CORPORATION OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Cause No. 2016DCV_____ |
| | § | |
| PUSH START INDUSTRIES LLC, and | § | |
| DENNIS J. ROGERS, individually, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW THE STEEL CORPORATION OF TEXAS, Plaintiff, complaining of PUSH START INDUSTRIES LLC, and DENNIS J. ROGERS, individually, Defendants, and files this, its Original Petition, and, in support thereof, would respectfully show as follows:

### I.
### Discovery Control Plan

1.    Discovery in this case shall be conducted at Level 3, T.R.C.P. 190.4.

### II.
### Parties, Jurisdiction and Venue

2.    Plaintiff THE STEEL CORPORATION OF TEXAS, is a corporation, duly organized and operating under the laws of the State of Delaware, with its principal place of business located in El Paso, Texas.

3.    Defendant PUSH START INDUSTRIES LLC, is a Texas limited liability company with its principal place of business in Dallas, Texas and which may be served with citation by serving (a) its registered agent UNITED STATES CORPORATION AGENTS, INC. at 9900 Spectrum Dr., Austin, Texas 78717 or (b) its President DENNIS J. ROGERS at one of the following addresses:

Copy from re:SearchTX

a.    6520 Del Norte Lane, Dallas, Texas 75225;
b.    4514 Cole Avenue, Ste. 608, Dallas, Texas 75205; and
c.    2427 Allen Street, Apt. 415, Dallas, Texas 75204.

4.    Defendant DENNIS J. ROGERS, is an individual residing in Dallas, Texas, who

may be served with citation by serving him at one of the following addresses:

a.    6520 Del Norte Lane, Dallas, Texas 75225;
b.    4514 Cole Avenue, Ste. 608, Dallas, Texas 75205; and
c.    2427 Allen Street, Apt. 415, Dallas, Texas 75204.

5.    This Court has jurisdiction over the parties because Defendant PUSH START

INDUSTRIES LLC, is a Texas limited liability company with its principal place of business in

the State of Texas and Defendant DENNIS J. ROGERS is a citizen of the State of Texas, who

does business in El Paso County, Texas, and the damages pled for herein are within the minimal

jurisdictional limits of the Court.  Further, this action arises out of a contract that was executed

and performable in El Paso County, Texas.

6.    Venue is proper in El Paso County because all parties do business in El Paso

County, Texas, the contract at issue is performable in El Paso County, Texas, and all of the acts

and omissions complained of herein took place in El Paso County, Texas.

### III.
### Background Facts

7.    Plaintiff would show that Defendants executed and delivered to Plaintiff the

following instruments:

a.    A Promissory Note (the "**First Note**") dated November 15, 2015 in the
original principal amount of $330,000.00, executed by Push Start
Industries LLC payable to the order of Steel Corporation of Texas;

b.    A Promissory Note (the "**Second Note**") dated December 15, 2015 in the
original principal amount of $330,000.00, executed by Push Start
Industries LLC payable to the order of Steel Corporation of Texas; and

Copy from re:SearchTX

c. A Promissory Note (the "**Third Note**") dated January 1, 2016 in the original principal amount of $325,561.64, executed by Push Start Industries LLC payable to the order of Steel Corporation of Texas.

8. Plaintiff is seeking to recover only on the Third Note.

9. On or about October 7, 2014, Patrick T. Gordon (herein referred to as "Gordon Jr."), President of THE STEEL CORPORATION OF TEXAS (herein referred to as "Plaintiff"), was contacted by DENNIS J. ROGERS (herein referred to as "Defendant Rogers"), President of PUSH START INDUSTRIES LLC (herein referred to as "Defendant Push Start"), regarding an investment opportunity dealing with selling mineral rights, (herein referred to as the "First Deal").

10. The First Deal constituted a security as that term is defined in the Texas Securities Act. Upon information and belief, neither Defendant Push Start nor Defendant Rogers are registered as dealers with the State Securities Board. Plaintiff was not provided with the materials required by the Texas Securities Act for the First Deal.

11. In connection with the First Deal Plaintiff invested $50,000.

12. On or about November 15 through 20, 2014 the investment represented by the First Deal closed. Upon the closing, Plaintiff was supposed to be paid its investment along with its profit.

13. The total stated return from the First Deal to Plaintiff was approximately $59,125. Plaintiff was not paid that amount. Rather, those funds were invested in the second deal described below.

14. On or about November 18, 2014, Gordon Jr. was contacted by Defendant Rogers regarding an investment opportunity dealing with mineral rights flip, (herein referred to as the "Second Deal").

Copy from re:SearchTX

**Ex. Pg. 450**

15.     The Second Deal constituted a security as that term is defined in the Texas Securities Act.  Upon information and belief, neither Defendant Push Start nor Defendant Rogers are registered as dealers with the State Securities Board.  Plaintiff was not provided with the materials required by the Texas Securities Act for the Second Deal.

16.     In connection with the Second Deal Plaintiff invested $100,000 including the $59,125 described above.

17.     On or about February 20, 2015, the investment represented by the Second Deal closed.  Upon the closing, Plaintiff was supposed to be paid its investment along with its profit.

18.     The total stated return from the Second Deal to Plaintiff was approximately $121,383. Plaintiff was not paid that amount.  Rather, those funds were invested in the third deal described below.

19.     On February 21, 2015, Defendant Rogers contacted Gordon Jr. regarding an investment opportunity dealing with the sale of two (2) wells located in Oklahoma, (herein referred to as the "Third Deal").

20.     The Third Deal constituted a security as that term is defined in the Texas Securities Act.  Upon information and belief, neither Defendant Push Start nor Defendant Rogers are registered as dealers with the State Securities Board.  Plaintiff was not provided with the materials required by the Texas Securities Act for the Third Deal.

21.     In that February 21, 2015 email, Defendant Rogers states that he owns 52% working interest in the Oklahoma wells and has sold 90% working interest to Energy Revenue of America (herein referred to as "ERA") for approximately $860,000 and he needs to come up with another $300,000 to buy the reaming 38% before the end of February.  To do so, Defendant Rogers suggests that he roll over the $121,383 Plaintiff was owed from the Second Deal into a

Copy from re:SearchTX

**Ex. Pg. 451**

new note then Plaintiff could add an additional $178,617 for a total of $300,000 at a 10% return rate.

22.    In connection with the Third Deal, Plaintiff invested a total of $300,000.

23.    On February 25, 2015, Plaintiff wired $178,617 to Defendant Push Start.

24.    The Third Deal was scheduled to close March 27, 2015.  The Third Deal did not close on March 27, 2015.

25.    On or about August 3, 2015, ERA sent a letter to Defendant Rogers explaining there would be a delay on closing the Oklahoma wells but ERA intended to close before August 18, 2015.

26.    On August 19, 24 and 26, 2015, Cathy Ureno, Director of Operations for The Steel Corporation of Texas (herein referred to as "Ms. Ureno"), asked Defendant Rogers for an update on payment of the $330,000 owed to Plaintiff from the Third Deal (herein referred to as "Balance Due"), to which Defendant Rogers stated he was waiting for the bank to release the funds which should occur within 48 hours.

27.    On August 27, 2015, Ms. Ureno asked Defendant Rogers for an update on payment of the Balance Due, Ms. Ureno did not receive a response.

28.    On September 2, 3 and 4, 2015, Ms. Ureno asked Defendant Rogers for an update on payment of the Balance Due, to which Defendant Rogers stated he was waiting for the bank to release the funds and expected to have the funds later that day.

29.    On September 4, 2015, Ms. Ureno asked Defendant Rogers to send confirmation of the date the funds would be released, in writing, from Wells Fargo bank.  Defendant Rogers replied stating that he would work on getting that written confirmation, he did not.

Copy from re:SearchTX

**Ex. Pg. 452**

30.    On September 14, 2015, Defendant Rogers stated that he was going to borrow the funds from his dad who would get those funds from Merrill Lynch that week.

31.    On September 21, 2015, Defendant Rogers stated that his dad had to wait until the following day to withdraw the funds from Merrill Lynch and he would wire the funds to Plaintiff that week.

32.    On September 22, 2015, Defendant Rogers claimed that he received confirmation form his dad that the Merrill Lynch funds would be available that Friday.

33.    On September 25, 2015, Ms. Ureno asked Defendant Rogers for an update on payment of the Balance Due, to which Defendant Rogers replied that he expected Merrill Lynch to release the funds that day.

34.    On September 29, 2015, Patrick Gordon, Sr. (herein referred to as Gordon Sr.) told Defendant Rogers that the funds had still not been received and wanted to know why Defendant Rogers was having to borrow money.  Subsequently, Defendant Rogers texted Gordon Jr. that he was working on getting the funds.

35.    On October 1, 2015, Defendant Rogers stated that he would wire the funds to Plaintiff on Monday.

36.    On October 4, 2015 Defendant Rogers requested Plaintiff's wire information and stated the funds would be wired on Friday. Ms. Ureno provided Plaintiff's wire information on October 5, 2015.

37.    On October 6, 2015, Gordon Sr. requested that Defendant Rogers provide the wire confirmation number, he did not.

38.    On October 7, 2015 Defendant Rogers stated that he was waiting on the funds to clear the bank, which would be by Friday.

Copy from re:SearchTX    *Ex. Pg. 453*

39.     On October 14, 2015, Ms. Ureno asked Defendant Rogers for an update on payment of the Balance Due and was told by Defendant Rogers that Wells Fargo bank would release the funds on Friday.

40.     On October 16, 2015, Gordon Sr. contacted Wells Fargo bank to confirm the wire transfer had been issued, he received no response.

41.     On October 18, 2015 Defendant Rogers stated he had secured funds from a client in Vancouver and would have those funds on Thursday.

42.     On October 23, 2015, Defendant Rogers texted Gordon Jr. that he would have a finalized delivery date of the funds plus additional penalties and interest on Monday.

43.     On November 13, 2015, Gordon Sr. forwarded Defendant Rogers the First Note which extended the payment deadline of the Balance Due to November 30, 2015.

44.     On November 18, 2015, Defendant Rogers returned a signed copy of the First Note. A true and correct copy of the First Note is attached hereto as Exhibit A.

45.     On December 4, 2015, Gordon Jr. asked Defendant Rogers for an update on payment of the Balance Due. Defendant Rogers stated that he would be late with the payment and needed to create a new promissory note extending the payment deadline. Additionally, Defendant Rogers claims that he was working with Wells Fargo and Citizens Bank to secure financing for repayment of the Balance Due.

46.     On December 18, 2015, Gordon Sr. forwarded Defendant Rogers the Second Note which extended the payment deadline of the Balance Due to December 31, 2015.

47.     On December 18, 2015, Defendant Rogers returned a signed copy of the Second Note. A true and correct copy of the Second Note is attached hereto as Exhibit B.

Copy from re:SearchTX

48.    On December 29, 2015, Defendant Rogers stated that the funds would not be released until January 18, 2016, after the December 31, 2015 deadline. Additionally, Defendant Rogers claimed that he was expecting to receive a payment on January 8, 2016 on property he had sold and would use those proceeds to pay off the Balance Due.

49.    On January 17, 2016, Defendant Rogers stated that the funds would not be available until February 3, 2016, because the closing on the property was delayed, as such the bank would not allow him to draw funds until he liquidated his Texas property holdings.

50.    On February 2, 2016, Defendant Rogers stated that the liquidation of his Texas properties was delayed until February 19, 2016, as such he would not be able to pay the Balance Due until February 26, 2016. Additionally, Defendant Rogers claimed that he closed another seller in Pain County on February 8, 2016 in the amount of $40,000 which he would use to pay down the Balance Due. The $40,000 payment was never made.

51.    On February 19, 2016, Defendant Rogers stated that he could not pay the Balance Due until after March 1, 2016 at such time he should be able to a $75,000 payment on the Balance Due. The $75,000 payment was never made.

52.    On March 9, 2016, Ms. Ureno once again asked Defendant Rogers for an update on payment of the Balance Due and is told by Defendant Rogers that he has listed his house for sale and has begun to liquidate his personal assets as well as tried to recover monies owned to him by other companies. Gordon Sr. rejected this proposal but is told by Defendant Rogers that there is no other way to pay off the Balance Due.

53.    On March 11, 2016, Gordon Sr. forwarded Defendant Rogers the Third Note which extended the payment deadline of the Balance Due to April 15, 2016.

{1107.14/HDAV/06517146.2}

Plaintiff's Original Petition

Copy from re:SearchTX

**Ex. Pg. 455**

54.     Defendant Rogers returned a signed copy of the Third Note.  A true and correct copy of the Third Note is attached hereto as Exhibit C.

55.     On April 15, 2016, Defendant Rogers claimed that the sale of his house would close on April 20, 2016 and would pay the Balance Due before April 22, 2016.

56.     On April 22, 2016, Defendant Rogers claimed the closing of his house had been delayed but he would pay the Balance Due the following day.

57.     On May 20, 2016, Gordon Jr. requests documentation of the closing and the amount Defendant Rogers will be receiving.  Defendant Rogers stated he was waiting on the closing documents, but he did receive a $120,000 payment and will receive $240,000 on Monday.  No payment was ever made to Plaintiff from these funds.

58.     Between May 25 and June 28, 2016 several emails are exchanged between Defendant Rogers, Gordon Jr. and Gordon Sr. regarding status of payment and further delays.

59.     On June 29, 2016, Gordon Sr. made formal written demand upon Defendant Rogers to honor his obligations and pay the sums due under the Third Note within five (5) days of June 30, 2016.

60.     On June 30, 2016, Defendant Rogers stated that he would pay the Balance Due within fifteen (15) days.

61.     On July 4, 2016, Defendant Rogers stated that he would pay the Balance Due by July 15, 2016.

62.     On July 21, 2016, Defendant Rogers stated that he would pay the Balance Due by that Monday.

63.     On August 21, 2016, Defendant Rogers stated that he would wire $334,927.11 to Plaintiff by September 6, 2016.

Copy from re:SearchTX

**Ex. Pg. 456**

64.    On September 16, 2016, Defendant Rogers stated that he would pay the Balance Due on Tuesday.

65.    Defendants have failed and refused, and continue to fail and refuse, to pay the sums due under the Third Note in the amount of $330,000.

**IV.**
**Cause of Action:  Breach of Contract (as to Defendant Push Start)**

66.    Plaintiff repeats the allegations contained in section III into this section IV the same as if set forth verbatim.

67.    Defendant Push Start is in material default of its obligations under the terms of the Third Note by failing and refusing to pay the Balance Due when due.

68.    As a proximate result of said breach of contract, Plaintiff has sustained damages in the amount of $334,927.11 plus interest from April 15, 2016 at the rate of 12% per annum.

**V.**
**Cause of Action:  Intentional Misrepresentation (as to Defendant Rogers and Push Start)**

69.    Plaintiff repeats the allegations contained in sections III through section IV into this section V the same as if set forth verbatim.

70.    Defendant Rogers and Defendant Push Start intentionally misrepresented the facts related to all three deals.  Plaintiff has never been provided with any documentation to reflect that the first two deals closed and, upon information and belief, asserts that Defendant Rogers and Defendant Push Start used Plaintiff's money for other purposes.

71.    Additionally, Defendant Rogers and Defendant Push Start intentionally misrepresented the facts related to the Third Deal.  Plaintiff has never been provided any documentation related to that transaction, and upon information and belief, asserts that Defendant Rogers and Defendant Push Start used Plaintiff's money for other purposes.

Copy from re:SearchTX

**Ex. Pg. 457**

72.    As a proximate result of said intentional misrepresentation, Plaintiff has sustained damages in the amount of $300,000.

## VI.
## Cause of Action:  Negligent Misrepresentation (as to Defendants Rogers and Push Start)

73.    Plaintiff repeats the allegations contained in sections III through V into this section VI the same as if set forth verbatim.

74.    In the alternative, Plaintiff will show that Defendant Rogers and Defendant Push Start made representations regarding all three deals, that said representations constitute misstatements of fact made without use of reasonable care in obtaining or communicating the information, and that Plaintiff justifiably relied on Defendant Rogers and Defendant Push Starts' representations to its detriment.

75.    As a proximate result of said negligent misrepresentations, Plaintiff has sustained damages in the amount of $300,000.

## VII.
## Cause of Action: Fraud (as to Defendant Rogers)

76.    Plaintiff repeats the allegations contained in section III through VI into this section VII the same as if set forth verbatim.

77.    Defendant Rogers made material representations to Plaintiff that Defendant Rogers would repay Plaintiff for the sums invested along with Plaintiff's profits.  Plaintiff has not seen a nickel of those funds.

78.    Defendant Rogers made such representations to Plaintiff recklessly.

79.    Defendant Rogers knew the representations he was making to Plaintiff were false when he made them, and he made such representations with the intent that Plaintiff would rely upon them.

Copy from re:SearchTX

**Ex. Pg. 458**

80.    Plaintiff relied on Defendant Rogers' representations that he would repay Plaintiff for the sums invested and those representations caused Plaintiff to invest in the three deals.

81.    As a proximate result of said fraud, Plaintiff has sustained damages in the amount of $300,000.

## VIII.
### Cause of Action:  Conversion (as to Defendant Rogers)

82.    Plaintiff repeats the allegations contained in sections III through VII into this section VIII the same as if set forth verbatim.

83.    At Defendant Rogers inducement and request, Plaintiff delivered funds in the amount of $300,000 to Defendant Rogers.  Although obligated to repay those funds, Plaintiff never received the benefit of the funds.

84.    By taking possession of Plaintiff's funds and failing to repay the funds to Plaintiff as promised, Defendant Rogers has converted the funds to his use and deprived Plaintiff of the benefit of its funds.  Upon information and belief, Plaintiff asserts that Defendant Rogers used Plaintiff's money to repay other investors and /or to pay his personal expenses.

85.    As a proximate result of said conversion, Plaintiff has sustained damages in the amount of $300,000.

## IX.
### Cause of Action:  Violation of the Texas Securities Act (as to Defendants Rogers and Push)

86.    Plaintiff repeats the allegations contained in sections III through VIII into this section IX the same as if set forth verbatim.

87.    Section 4.A of the Texas Securities Act defines securities to include any "investment contract."

Copy from re:SearchTX                    **Ex. Pg. 459**

88.    The investment opportunities offered for sale and sold by Defendant Rogers and Defendant Push Start for investor profit constitute investment contracts and, therefore, are securities as defined by the Securities Act.

89.    Further, an investment contract exists in this instant case because there was an investment of money and an expectation of profits. Defendant Rogers and Defendant Start Push enticed Plaintiff with substantial rates of return.

90.    The investment opportunities offered for sale and sold to Plaintiff were investment contracts; thus, Defendant Rogers and Defendant Start Push are selling securities.

91.    Neither Defendant Rogers nor Defendant Push Start are registered as dealers with the State Securities Board.

92.    As a proximate result of said violation of the Texas Securities Act, Plaintiff has sustained damages in the amount of $300,000.

## X.
## Damages

93.    Plaintiff repeats the allegations contained in sections III through IX into this section X the same as if set forth verbatim.

94.    As a proximate result of said breach of contract, Plaintiff has sustained damages in the amount of $334,927.11 plus interest from April 15, 2016 at the rate of 12% per annum.

95.    As a proximate result of said intentional misrepresentation, Plaintiff has sustained damages in the amount of $300,000.

96.    As a proximate result of said negligent misrepresentations, Plaintiff has sustained damages in the amount of $300,000.

97.    As a proximate result of said fraud, Plaintiff has sustained damages in the amount of $300,000.

Copy from re:SearchTX

Ex. Pg. 460

98.     As a proximate result of said conversion, Plaintiff has sustained damages in the amount of $300,000.

99.     As a proximate result of said violation of the Texas Securities Act, Plaintiff has sustained damages in the amount of $300,000.

## XI.
### Exemplary Damages

100.    Plaintiff's damages have resulted from Defendant Rogers and Defendant Push Start's intentional and willful conduct which entitles Plaintiff to exemplary damages under CPRC § 41.003(a).

## XII.
### Conditions Precedent

101.    All necessary conditions precedent have been performed or have occurred.

## XIII.
### Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays Defendant Rogers and Defendant Push Start be cited to answer and appear herein, and that upon final trial that it recover judgment for all of Plaintiff's damages, exemplary damages, prejudgment interest, post-judgment interest, attorneys' fees, costs of court, and for such other and further relief as it may show itself to be justly entitled.

Copy from re:SearchTX

**Ex. Pg. 461**

**SIGNED** this 10th day of February, 2017.

Respectfully submitted,

**GORDON DAVIS JOHNSON & SHANE P.C.**
4695 N. Mesa Street
El Paso, Texas  79912
(915) 545-1133
(915) 545-4433 (Fax)
hdavis@eplawyers.com

By:_____
Harrel L. Davis III
State Bar No. 05567560
Attorney for Plaintiff

{1107.14/HDAV/06517146.2}                                    Plaintiff's Original Petition

Copy from re:SearchTX

**Ex. Pg. 462**

# EXHIBIT JJ

FILED
3/4/2021 11:20 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
CAROLYN SELLERS DEPUTY

Cause No. DC-20-01897

| | | |
|---|---|---|
| FUNDERZ.NET LLC | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | 191ˢᵗ JUDICIAL DISTRICT |
| | § | |
| OMTC, INC., DENNIS JAMES ROGERS, II, | § | |
| AND SITE DEVELOPMENT GROUP, INC. | § | |
| | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

---

### PLAINTIFF'S THIRD AMENDED PETITION

---

Plaintiff, Funderz.net LLC ("Funderz" or "Plaintiff"), files this Third Amended Petition and would show the Court the following:

### I. SUMMARY OF THE FACTS

1.      Funderz entered into a series of three promissory notes with OMTC, Inc. to finance OMTC Inc.'s purchase of ultra-low sulfur diesel fuel from Calumet Specialty Product Partners, LP. Dennis James Rogers II, OMTC Inc.'s president, personal guarantied payment of the promissory notes. However, despite expressly promising to use the funds from contemplated by the promissory notes to purchase the fuel from Calumet Specialty Product Partners LP, OMTC, Inc. and Rogers instead used the funds to pay Site Development Group, Inc. as well as for other purposes not allowed for under the notes. OMTC, Inc. and Rogers breached the promissory notes both by non-payment and by failing to utilize the funds for the represented purposes, instead fraudulently inducing Funderz into providing the funds. Rather than litigate, OMTC, Inc. and Rogers stated they desired to settle the claims. The parties reached a settlement only for Defendants OMTC, Inc. and Dennis J. Rogers II (collectively, the "OMTC Defendants") to claim a technical breach, repudiate the settlement, and attempt to renegotiate because of the COVID-19 pandemic. However, in the

**Ex. Pg. 464**

course of litigation, it was discovered that OMTC, Inc. and Rogers made promises in the Settlement Agreement they were incapable of performing. OMTC, Inc. and Rogers sought a significant discount on the settlement already agreed upon, failed to perform under that settlement agreement, and sought to push repayment back significantly from the point agreed upon. OMTC, Inc. and Rogers drug the settlement process on for weeks, buying themselves further time to hide funds, abscond with Funderz's expected profits, and further benefit from their multi-million-dollar fraudulent scheme.

## II. PARTIES

2.      Defendant, OMTC, Inc. ("OMTC"), is a Texas corporation that may be served with process by serving its registered agent, Craig D. Rogers, at 8484 W. Monroe, Houston, Texas 77061 or wherever he may be found.

3.      Defendant, Dennis James Rogers II (SSN: Unknown, DL # XXXXXXX814) ("Rogers") is a resident of Texas and may be served with process at 6520 Del Norte Lane, Dallas, TX 75225 or wherever he may be found.

4.      Defendant, Site Development Group, Inc. ("SDG"), is a Wyoming Corporation with its principal place of business in California. SDG was previously served with process, failed to answer, and the Court entered an Interlocutory Default Judgment against SDG.

## III. DISCOVERY, JURISDICTION, AND VENUE

5.      Pursuant Tex. R. Civ. P. 190, Funderz hereby elects that all discovery shall be conducted under Level II of said rule.  Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Funderz seeks monetary relief of more than $1,000,000.00. The Court has jurisdiction because the amount in controversy is within the jurisdictional limits of the Court. Further, venue is proper in Dallas County because one or more of the Defendants is a resident of Dallas County, Texas

pursuant to Texas Civil Practice & Remedies Code § 15.002.

## IV. FACTS

**Promissory Note 1**

6.    On or about August 29, 2019, OMTC, as Maker, and Funderz, as Lender, entered into a Promissory Note ("Note 1") by which Funderz agreed to provide funds (the "Note 1 Funds") to OMTC for the purchase of the Product, therein defined as ultra-low sulfur diesel, pursuant to a Master Service Agreement and repayable on the earlier of (i) three (3) Business Days following the consummation of the Sale and (ii) the Outside Date as defined by the terms of Note 1. A true and correct copy of Note 1 is attached hereto and incorporated by reference herein as Exhibit "A."

7.    As an inducement for Funderz to lend the Note 1 Funds, OMTC executed a Security Agreement ("Security Agreement 1") by which OMTC granted Funderz a first priority security interest in the property set forth in §2 of Security Agreement 1 (the "Security Agreement 1 Collateral"). A true and correct copy of Security Agreement 1 is attached hereto and incorporated by reference herein as Exhibit "B."

8.    As further security to Funderz for entering into Note 1, OMTC executed the Collateral Assignment ("Collateral Assignment 1") by which OMTC assigned to Funderz all of its right, title, and interest in a certain Master Supply Agreement dated January 10, 2019, by and between OMTC and Calumet Specialty Product Partners, LP as well as the collateral outlined in Section 2 of the Collateral Assignment ("Collateral 1"). A true and correct copy of Collateral Assignment 1 is attached hereto and incorporated by reference herein as Exhibit "C."

9.    On August 29, 2019, to further induce Funderz to enter into Note 1, Rogers executed the Guaranty ("Guaranty 1") by which Rogers unconditionally guaranteed the full and prompt payment of all of OMTC's obligations to Funderz on a continuing basis. A true and correct copy of

Guaranty 1 is attached hereto and incorporated by reference as Exhibit "D." Additionally, as further inducement for Funderz's agreement to enter into Note 1, Rogers executed the Pledge Agreement ("Pledge Agreement 1"), by which he granted Funderz a security interest in and to all of the shares of stock in OMTC as security for Funderz's agreement to provide the Note 1 Funds. A true and correct copy of Pledge Agreement 1 is attached hereto and incorporated by reference herein as Exhibit "E."

**Promissory Note 2**

10.     On or about September 10, 2019, OMTC, as Maker, and Funderz, as Lender, entered into a second Promissory Note ("Note 2") by which Funderz agreed to lend additional funds (the "Note 2 Funds") to OMTC for the purchase of the Product, therein defined as ultra-low sulfur diesel pursuant to a Master Service Agreement and repayable on the earlier of (i) three (3) Business Days following the consummation of the Sale and (ii) the Outside Date as defined by the terms of Note 2. A true and correct copy of Note 2, is attached hereto and incorporated by reference herein as Exhibit "F."

11.     As an inducement for Funderz to lend the Note 2 Funds, OMTC executed a Security Agreement ("Security Agreement 2") by which OMTC granted Funderz a first priority security interest in the property set forth in §2 of Security Agreement 2 (the "Security Agreement 2 Collateral"). A true and correct copy of Security Agreement 2 is attached hereto and incorporated by reference herein as Exhibit "G." As further security to Funderz for entering into Note 2, OMTC executed the Collateral Assignment ("Collateral Assignment 2") by which OMTC assigned to Funderz all of its right, title, and interest in a certain Master Supply Agreement dated January 10, 2019, by and between OMTC and Calumet Specialty Product Partners, LP as well as the collateral outlined in Section 2 of the Collateral Assignment ("Collateral 2"). A true and correct copy of

Collateral Assignment 2 is attached hereto and incorporated by reference herein as Exhibit "H."

12.     On September 10, 2019, to further induce Funderz to enter into Note 2, Rogers executed the second Guaranty ("Guaranty 2") by which Rogers unconditionally guaranteed the full and prompt payment of all of OMTC's obligations to Funderz on a continuing basis. A true and correct copy of Guaranty 2 is attached hereto and incorporated by reference as Exhibit "I." Additionally, as further inducement for Funderz's agreement to enter into Note 2, Rogers executed the Pledge Agreement ("Pledge Agreement 2") by which he granted Funderz a security interest in and to all of the shares of stock in OMTC as security for Funderz's agreement to provide the Note 2 Funds. A true and correct copy of Pledge Agreement 2 is attached hereto and incorporated by reference herein as Exhibit "J."

**Promissory Note 3**

13.     On or about November 6, 2019, OMTC, as Maker, and Funderz, as Lender, entered into a third Promissory Note ("Note 3") by which Funderz agreed to lend further additional funds (the "Note 3 Funds") to OMTC for the purchase of the Product, therein defined as ultra-low sulfur diesel pursuant to a Master Service Agreement and repayable on the earlier of (i) three (3) Business Days following the consummation of the Sale and (ii) the Outside Date as defined by the terms of Note 3. A true and correct copy of Note 3 is attached hereto and incorporated by reference herein as Exhibit "K."

14.     As an inducement for Funderz to lend the Note 3 Funds, OMTC executed a Security Agreement ("Security Agreement 3") by which OMTC granted Funderz a first priority security interest in the property set forth in §2 of Security Agreement 3 (the "Security Agreement 3 Collateral"). A true and correct copy of Security Agreement 3 is attached hereto and incorporated by reference herein as Exhibit "L." As further security to Funderz for entering into Note 3, OMTC

executed the Collateral Assignment ("Collateral Assignment 3") by which OMTC assigned to Funderz all of its right, title, and interest in a certain Master Supply Agreement dated January 10, 2019, by and between OMTC and Calumet Specialty Product Partners, LP as well as the collateral outlined in Section 2 of the Collateral Assignment ("Collateral 3"). A true and correct copy of Collateral Assignment 3 is attached hereto and incorporated by reference herein as Exhibit "M."

15.    On September 10, 2019, to further induce Funderz to enter into Note 3, Rogers executed the Guaranty ("Guaranty 3") by which Rogers unconditionally guaranteed the full and prompt payment of all of OMTC's obligations to Funderz on a continuing basis. A true and correct copy of Guaranty 3 is attached hereto and incorporated by reference as Exhibit "N." Additionally, as further inducement for Funderz agreement to enter into Note 3, Rogers executed the Pledge Agreement ("Pledge Agreement 3") by which he granted Funderz a security interest in and to all of the shares of stock in OMTC as security for Funderz's agreement to provide the Note 3 Funds. A true and correct copy of Pledge Agreement 3 is attached hereto and incorporated by reference herein as Exhibit "O."

16.    Note 1, 2, and 3 are collectively referred to as the "Notes." Security Agreement 1, 2, and 3 are collectively referred to as the "Security Agreements." Collateral Assignment Agreement 1, 2, and 3 are collectively referred to as the "Collateral Assignments." Guaranty 1, 2, and 3 are collectively referred to as the "Guaranty Agreements." Pledge Agreement, 1, 2, and 3 are collectively referred to as the "Pledge Agreements." Confession 1 and 2 are collectively referred to as the "Confessions of Judgment." The Note 1, 2, and 3 Funds are collectively referred to as the "Funds." Finally, the Notes, Security Agreements, Collateral Assignments, Guaranty Agreements, and Pledge Agreements are collectively referred to as the "Agreements." Collateral 1, 2, and 3 are collectively referred to as the "Collateral."

**Additional Facts Supporting Plaintiff's Application for Injunctive Relief**

17.     OMTC defaulted under the terms of the Notes by failing to timely pay the amounts due thereunder in compliance with the terms of the Notes. Further, in direct contradiction to the terms of the Notes, the OMTC Defendants fraudulently used the Funds for purposes other than the purchase of ultra-low sulfur diesel for sale in the ordinary course of OMTC's business, including for Rogers's personal use.  Funderz discovered that OMTC and Rogers were using the Funds for non-approved purposes and made demand for immediate repayment. At present, Funderz has only recovered a portion of the Funds. Funderz discovered that the Funds were being transferred out of a Goldman Sachs accounts controlled by the OMTC Defendants and into various accounts which are outside of the reach of Funderz.

18.     When questioned by the Plaintiff concerning the whereabouts of the Funds, Defendant Rogers initially concocted a story that his wife had cancer and he was unavailable to discuss the location of the Funds as he was caring for her. When further questioned, Rogers provided a fabricated e-mail which purportedly showed that he purchased a large quantity of the Product from Titan Marine Fuel, LLC valued at approximately $5,000,000.00, which Funderz subsequently discovered was fraudulent.[1] Later, OMTC Defendants produced bank statements that the funds were transferred to an entity known as "SDG" (believed to be Site Development Group) and to purchase real property at an unknown location. Despite demand, the OMTC Defendants have wholly failed to, and in fact have been unwilling to, provide an accounting for and definitive information regarding the location of the Funds, who is currently in possession of them, and why they were not used to purchase the Product from Calumet Specialty Product Partners, LP as agreed.

---

[1] *See* Exhibit P, a true and correct copy of the Titan E-mail.

THIRD AMENDED PETITION                                                    PAGE 7

19.    Further, an analysis of the limited banking information[2] acquired by Funderz demonstrates the fraudulent movement of the Funds by the OMTC Defendants to various checking accounts as well as to pay other entities and creditors:

**OMTC Chase Bank Account #1628 –**

| Date | Transfer In | Source | Transfer Out | Destination |
|------|-------------|--------|--------------|-------------|
| 08/29/19 | $5,999,801.00 | Funderz | | |
| 08/29/19 | | | $6,000,000.00 | Checking Account 7879 |
| 08/30/19 | $3,000,000.00 | Checking #7879 | | |
| 08/30/19 | | | $2,700,000.00 | Site Development Group |
| 09/10/19 | | | $250,000.00 | Checking 7879 |
| 09/12/19 | $2,000,000.00 | Funderz | | |
| 09/12/19 | | | $500,000.00 | Site Development Group |
| 09/12/19 | | | $500,000.00 | Checking 7879 |
| 09/16/2019 | | | $777,000.00 | Checking 6837 |
| 09/16/2019 | | | $200,000.00 | Checking 7879 |
| 09/25/2019 | | | $50,000.00 | Site Development Group |
| 09/30/2019 | | | $75,000.00 | Site Development Group |
| 10/30/2019 | | | $125,000.00 | Site Development Group |
| 11/06/2019 | $1,999,801.00 | Funderz | | |
| 11/06/2019 | | | $1,370,000.00 | Site Development Group |
| 11/06/2019 | | | $500,000.00 | Checking 7879 |
| 11/26/2019 | 1,125,000.00 | Checking 7879 | | |
| 11/26/2019 | | | $1,125,000.00 | BMF Capital LLC |
| Balance as of 01/21/2020 | | | | $842.83 |

**OMTC Chase Bank Account #7879 -**

| Date | Transfer In | Source | Transfer Out | Destination |
|------|-------------|--------|--------------|-------------|
| 08/29/2019 | $6,000,000.00 | Checking 1628 | | |
| 08/30/2019 | | | $1,000,000.00 | Checking 1503 |
| 08/30/2019 | | | $3,000,000.00 | Checking 1628 |
| 09/03/2019 | $2,000,000.00 | Checking 1503 | | |
| 09/03/2019 | | | $2,000,000.00 | Checking 1503 |
| 09/03/2019 | | | $300,000.00 | Checking 1503 |

---

[2] *See* Exhibit Q and R, a true and correct copy of the relevant banking information.

| 09/03/2019 | | | $1,500,000.00 | Checking 1503 |
|---|---|---|---|---|
| 09/10/2019 | | | $450,000.00 | Checking 1503 |
| 09/10/2019 | $250,000.00 | Checking 1628 | | |
| 09/12/2019 | $500,000.00 | Checking 1628 | | |
| 09/16/2019 | $200,000.00 | Checking 1628 | | |
| 09/16/2019 | | | $150,000.00 | Checking 1503 |
| 09/16/2019 | | | $500,000.00 | Checking 1503 |
| 09/18/2019 | $1,400,000.00 | Site Development Group | | |
| 09/18/2019 | | | $1,400,000.00 | Checking 1503 |
| 09/23/2019 | $750,000.00 | Checking 6837 | | |
| 09/23/2019 | | | $750,000.00 | Checking 1503 |
| 10/30/2019 | $125,000.00 | Checking 1503 | | |
| 10/30/2019 | | | $125,000.00 | Checking 1628 |
| 11/06/2019 | $500,000.00 | Checking 1628 | | |
| 11/06/2019 | | | $500,000.00 | Checking 1503 |
| 11/26/2019 | $910,000.00 | Checking 1503 | | |
| 11/26/2019 | $200,000.00 | Checking 1503 | | |
| 11/26/2019 | | | $1,125,000.00 | Checking 1503 |
| 01/27/2020 | $700,000.00 | Checking 1503 | | |
| 01/27/2020 | $200,000.00 | Checking 8315 | | |
| 01/27/2020 | | | $700,000.00 | Funderz Partial Repayment |
| 01/2/2020 | | | $200,000.00 | Funderz Partial Repayment |
| Balance as of 01/27/2020 | | | $3,964.82 | |

### Facts Supporting Liability Against Site Development Group, Inc.

20.     The OMTC Defendants transferred approximately $4.8 million to SDG in direct contradiction to the terms of the Notes. All conditions precedent to Funderz's right to recover judgment have been performed or were waived and all notices have been given or were waived.

**Money Paid Back to Date**

21.     To date, Funderz.net, LLC has received $11.5 million towards repayment of the OMTC Defendants' fraudulent conduct.

**Dennis Rogers's Litigation History**

22.     Rogers has a demonstrated history of similar conduct. In Cause No. DC-19-01434, which was pending before the 162nd District Court in Dallas County, Texas, Rogers was sued by Luxemborg Trading, LLC after Luxemborg Trading LLC paid Rogers (through another entity, Organ Mountain Energy LLC) $1,000,000.00 to purchase ultra-low sulfur diesel fuel (the "Luxemborg Trading Lawsuit").[3] However, Rogers failed to purchase the fuel as promised, resulting in a settlement agreement between Rogers and Luxemborg Trading LLC, which Rogers proceeded to breach.[4]

23.     Further, Rogers was sued by Anthony J. Capano and Joanne Capano for breach of promissory notes and guaranties in Cause No. DC-19-12251 pending before the 192nd District Court of Dallas County, Texas (the "Capano Lawsuit").[5] The Capano Lawsuit is still pending, with the Plaintiffs recently filing a Motion to Overrule Objections, seeking to overrule the objections lodged by Rogers in response to discovery requests.[6] The Motion to Overrule Objections alleges that Rogers has failed to answer any discovery requests or produce any documents.[7] The parties have each filed amendments and it is set for hearing.

24.     Finally, both Rogers and OMTC, Inc. were sued in this Court in Cause No. DC-20-

---

[3] A true and correct copy of the Original Petition in the Luxemborg Trading Lawsuit is attached hereto and incorporated by reference herein as Exhibit "S."
[4] *Ex. S*
[5] A true and correct copy of the Capano Lawsuit is attached hereto and incorporated by reference herein as Exhibit "T."
[6] A true and corret copy of the Motion to Overrule Objections filed in the Capano Lawsuit is attached hereto and incorporated by reference herein as Exhibit "U."
[7] *Id.*

10214 styled *Steven Webster, Aaron Webster, and Dennis Woods v. Dennis J. Rogers, II and OMTC, Inc.* The *Webster* case alleges that, much like the present case, OMTC and Rogers committed fraud to acquire funds for an alleged "purchase." [8]

### OMTC Defendants' Failure to Account for the Funds

25.    Plaintiff has, on numerous occasions, including prior to this lawsuit being filed, requested information from the OMTC Defendants regarding the current location of the Funds. The OMTC Defendants have only provided limited information, continually refusing to provide a definitive accounting for the use and movement of the Funds advanced by Plaintiff. Therefore, in conjunction with the filing of this Amended Petition, Plaintiff is also filing an Emergency Motion for Expedited Discovery.

### Facts Related to the Settlement of the Parties and the OMTC Defendants' Fraud and Subsequent Repudiation of the Same

26.    Plaintiff reached a settlement with the OMTC Defendants (the "Settlement") after over a month of negotiations, including extensive mediation, thereby postponing Plaintiff's filing of the current Amended Petition.[9] The Settlement was formalized through a Settlement Agreement executed by the OMTC Defendants on or about March 4, 2020 (the "Settlement Agreement"). The Settlement called for the OMTC Defendants to make certain payments to the Plaintiff by way of a set payment schedule while also producing certain documents to allow the Plaintiff to monitor OMTC Defendants' financial situation and trace the location of Plaintiff's funds. In exchange, Plaintiff agreed to release certain UCC-1 Financing Statements it filed in New York and Texas.

27.    The Settlement was an effort by the Plaintiff to settle its claims against the OMTC Defendants, which included not only breach of contract and fraud allegations, but also Texas Theft

---

[8] A true and correct copy of the *Webster* First Amended Petition is attached as Exhibit V.
[9] A true and correct copy of the Settlement Agreement is referenced as Exhibit W, though the same is being produced only *in camera* due to confidentiality.

Liability Act, Conversion, Fraud in the Inducement, Money Had and Received, and exemplary damage claims. Plaintiff materially changed positions, agreeing to forgo seeking recovery on these causes of action in exchange for a $15 million settlement, an amount equal to the principal of the Notes plus the amount represented to the Plaintiff as Plaintiff's expected profit under the Notes.

28.    One of the primary points of negotiation during both mediation and negotiation of the Settlement Agreement was the OMTC Defendants' promise to turn over certain documents, including information related to Rogers' alleged ownership interest in an entity which was, prior to the Settlement Agreement's execution, simply referred to as the "Residential Lot Entity." Counsel for the OMTC Defendants refused to release the name of the Residential Lot Entity prior to execution of the Settlement Agreement. Ultimately, subsequent to the parties' execution of the Settlement Agreement, the name of the Residential Lot Entity was provided as "The Rogers Group, Inc." However, in the course of litigation, Plaintiff discovered during a deposition of Dennis Rogers Sr., Defendant Rogers' father, that Defendant Rogers has no interest in the Rogers Group, Inc. nor does he have the authority, or ability, to provide financial information and documents regarding the Rogers Group, Inc.'s assets.[10] Therefore, as the exchange of documents was a central component of the Settlement Agreement for which Rogers was unable to perform *ab initio*, the Settlement Agreement is void/voidable. In short, the OMTC Defendants continued their chain of fraud, attempting to cover their wrongdoing by making promises they had no intention, or ability, to perform.

29.    Rather than attempting to perform by turning over what documents were available and making the payments required under the Settlement Agreement, the OMTC Defendants decided to attempt to claim a technical breach of the Settlement by the Plaintiff.

---

[10] *See* Exhibit X, an excerpt from the Deposition of Dennis Rogers Sr.

30.     Plaintiff's principals are located in the New York/New Jersey area (while also having some operations in Florida) which was, at the time, the epicenter for the United States' COVID-19 cases. Plaintiff provided the signed Settlement Agreement, dated March 9, 2020, to its counsel on March 16, 2020, by way of e-mail. Prior to March 16, 2020, counsel for the Plaintiff was not in possession of a fully-executed copy of the Settlement. The fully-executed copy of the Settlement was forwarded to the OMTC Defendants' counsel via e-mail on March 18, 2020. Further, on March 23, 2020, within five (5) business days of counsel's knowledge of the fully executed agreement, Plaintiff's counsel e-mailed the OMTC Defendants' counsel copies of the draft UCC-3 Termination Statements contemplated in the Settlement, requesting input. After receiving no return message from the OMTC Defendants' counsel, and in an attempt to perform under the Settlement Agreement, Plaintiff's counsel filed the UCC-3 Termination Statements in both Texas and New York, thereby terminating Plaintiff's perfect liens against the OMTC Defendants. Only after the UCC-1s were terminated, and the OMTC Defendants' next date of performance was mere days away, did the OMTC Defendants' counsel claim that there was a material breach of the Settlement (without inquiring as to any of the facts surrounding the same) and inform Plaintiff's counsel that the OMTC Defendants would not honor the settlement as agreed, threatening counsel with sanctions should counsel file the Agreed Judgment.

31.     Therefore, not only did the OMTC Defendants default under the Settlement, attempting to escape such a default by claiming a "technical breach" despite no harm befalling them, but the OMTC Defendants made representations of fact that were false and, in fact, were impossible for them to perform, resulting in a void/voidable Settlement Agreement.

### V. CAUSES OF ACTION

### Count I – Enforcement of the Settlement Agreement and Entry of the Agreed Judgment – The OMTC Defendants

32.    Plaintiff requests the Court order the parties to specifically perform in compliance with the terms of the Settlement Agreement. Plaintiff performed its responsibilities under the Settlement Agreement within five (5) business days after its counsel received a fully executed Settlement Agreement. Further, and even if performance was somehow late, Plaintiff performed under the Settlement Agreement by filing the UCC-3 Termination Statements. Only after accepting Plaintiff's performance did OMTC Defendants claim existence of a material breach and inform Plaintiff it would not perform as required by the terms of the Settlement Agreement. Plaintiff requests that the Court order the OMTC Defendants to perform under the terms of the Settlement Agreement by providing the required documentation and making the payments as set forth therein. Absent performance, Plaintiff requests the Court enter the Agreed Judgment.

**Count II - Breach of Settlement Agreement – OMTC, Inc. and Dennis James Rogers II**

33.    Additionally, and if necessary, in the alternative, as set forth herein, OMTC Defendants have materially breached the terms of the Settlement Agreement. The OMTC Defendants failed to comply with the requirements of the Settlement Agreement by refusing to turn over documents described therein on or before April 6, 2020, and have failed to make the payment due on or before April 7, 2020. Additionally, despite receiving notice of default and being given an opportunity to cure, the OMTC Defendants have wholly failed and refused to do so. Therefore, Plaintiff seeks recovery of the amounts due and owing under the Settlement Agreement, $11,150,000.00, plus pre-judgment interest, post-judgment interest, attorney's fees, and costs of Court.

**Count III- Breach of Contract – OMTC, Inc. and Dennis James Rogers II**

34.    OMTC's conduct and default as set forth herein constitutes a breach of contract under the terms of the Notes.  Further, Rogers's conduct and default as set forth herein constitutes a

breach of the Guaranty Agreements as Rogers failed to pay the amounts due and owing on the

Notes upon OMTC's default. The OMTC Defendants have failed to comply with their contractual

obligations to Funderz and have failed and refused to pay the amounts due and owing under the

terms of the Notes. As a result, Funderz seeks actual and special damages, at law or in equity, within

the jurisdictional limits of this Court, including pre-judgment interest from the date of default, post-

judgment interest, reasonable and necessary attorney's fees, and costs of court.

### Count IV – Breach of Guaranty – Dennis James Rogers II

35.     Rogers's conduct and default as set forth herein constitutes a breach of the Guaranty

Agreements. Rogers failed to pay the amounts due and owing to Funderz under the terms of the

Notes upon OMTC's default thereunder, despite Funderz's performance under the terms of the

underlying Notes. As a result, Funderz seeks actual and special damages, at law or in equity, within

the jurisdictional limits of this Court, including pre-judgment interest from the date of default, post-

judgment interest, reasonable and necessary attorney's fees, and costs of court.

### Count V – Fraud/Fraud in the Inducement/Fraud by Nondisclosure – OMTC, Inc. and Dennis James Rogers II

36.     The OMTC Defendants committed fraud by promising Funderz that the Funds

would be used for OMTC's business purposes and, more specifically that the Funds would be

used to purchase the Product from Calumet Specialty Product Partners, LP and would then sell the

Product to OMTC's customers, paying Funderz under the specific terms set forth in the Notes.

However, the OMTC Defendants, with full knowledge of Funderz's expectations and the falsity of

the OMTC Defendants' promises made in the Agreements, entered into the Agreements intending

to use the Funds for personal use rather than for the express business purpose set forth in the

Agreements. Funderz advanced the Funds in reliance upon the OMTC Defendants' promises and

with the expectation that the OMTC Defendants would perform as promised. As a result of the

OMTC Defendants' malicious, intentional, and flagrant conduct, Funderz seeks actual and special damages, including exemplary damages, at law or in equity, within the jurisdictional limits of this Court, including pre-judgment interest from the date of default, post-judgment interest, reasonable and necessary attorney's fees, and costs of court. Additionally, Plaintiff expressly states that it seeks recovery of exemplary damages under Tex. Civ. Prac. & Rem. Code §41.003 to the fullest extent allowed by law due to the OMTC Defendants', malicious, fraudulent, and wrongful conduct.

### Count VI – Conversion – OMTC Defendants

37.     The Funds advanced by Plaintiff to the OMTC Defendants were private property owned by Plaintiff and intended to secure the purchase of certain fuel products from Calumet Specialty Product Partners, LP. These funds were private property marked towards specific collateral. The OMTC Defendants converted the funds for the own personal benefits. Therefore, the OMTC Defendants' wrongful conversion has caused actual and special damages to Plaintiff in an amount within the jurisdictional limits of this Court, plus pre-judgment and post-judgment interest, court costs, attorney's fees, and exemplary damages as applicable.

### Count VII – Texas Theft Liability Act/Civil Theft – The OMTC Defendants

38.     The OMTC Defendants committed theft by misrepresenting the intended use of the funds advanced under the Notes and then by secreting the funds to other accounts and creditors. Their theft by deception constitutes a wrongful act under Tex. Civ. Prac. & Rem. Code §134.001 *et seq.* Therefore, the OMTC Defendants are liable to Plaintiff for actual and special damages of at least $10,000,000.00, found by the trier of fact plus statutory awards found in Tex. Civ. Prac. & Rem Code §134.005 and exemplary damages.

### Count VIII – Chapter 41 Exemplary Damages – The OMTC Defendants

39.     The OMTC Defendants exhibited fraudulent and malicious conduct which allows

Plaintiff to seek recovery of exemplary damages pursuant to Tex. Civ. Prac. & Rem. Code §41.003.

Further, Plaintiff seeks recovery for the maximum amount of exemplary damages allowed by law as

the statutory caps found under Tex. Civ. Prac. & Rem. Code §41.008 do not apply because the

OMTC Defendants' conduct consists of actions found in various sections of the Texas Penal Code,

including §32.45 and Chapter 31 (theft) and 32 (fraud). Therefore, Plaintiff seeks recovery of

exemplary damages *of at least* two times the actual damages, plus $750,000.00.

### Count XI - Attorneys' Fees

40.     Upon OMTC Defendants' failure to pay the balance owing under the Agreements,

Funderz placed said contracts in the hands of the undersigned attorney for enforcement and has

agreed to pay said attorney reasonable attorney's fees for his services for which OMTC

Defendants have become liable by the terms of the Agreements as well as by virtue of Chapter

38 of the Texas Civil Practice and Remedies Code.

### Count X – Constructive Trust As to Site Development Group, Inc.

41.     SDG is the recipient of at least $4.8 million that was paid to it as a result of fraud by

the OMTC Defendants. Therefore, SPG, as the recipient of monies procured by fraud, should not be

permitted to retain the funds. Plaintiff requests the Court institute a constructive trust against SPG

regarding the funds in SPG's possession which it received from the OMTC Defendants.

### Count XI – Fraudulent Inducement - OMTC, Inc. and Dennis James Rogers II

42.     The OMTC Defendants committed fraud in the inducement by representing to

Plaintiff that they had a large ultra-low sulfur diesel purchase from Calumet Specialty for which

they intended to use the Funds advanced under the Note. This representation, which forms the entire

basis of the Notes entered into between Plaintiff and the OMTC Defendants (along with the

associated ancillary agreements) was not only a misrepresentation, but outright false. OMTC

Defendants' conduct constituted a knowing, malicious misrepresentation of fact that the OMTC Defendants were fully aware was relied upon by the Plaintiff in entering into the Notes.

43.    Rather than coming clean, the OMTC Defendants compounded their misrepresentation by misrepresenting their ability to repay the $15 million settlement amount and by misrepresenting their authority to turn over documents for the Rogers Group, Inc., an important and highly negotiated portion of the Settlement. These false representations were relied upon by Plaintiff in settling their claims, which included a potential recovery of exemplary damages well in excess of $20 million, forgoing the litigation and settling at $15 million. This further delayed Plaintiff's recovery efforts, exacerbating the fraud by withholding Plaintiff's funds for a longer period of time. Therefore, Plaintiff seeks recovery of actual and special damages, pre-judgment interest, post-judgment interest, attorney's fees and costs of court. Additionally, Plaintiff expressly states that it seeks recovery of exemplary damages under Tex. Civ. Prac. & Rem. Code §41.003 to the fullest extent allowed by law due to OMTC Defendants, OMTC, Inc. and Dennis James Rogers II's, malicious, fraudulent, and wrongful conduct.

### Count XII- Money Had and Received – All Defendants

44.    OMTC Defendants hold money, which in equity and good conscience, belongs to the Plaintiff. However, OMTC Defendants have failed and refused to turn over the funds to Plaintiff.

### Count XIII – Turnover of Pledged Assets – OMTC, Inc. and Dennis James Rogers II

45.    Pursuant to the terms of the Security Agreements, Collateral Assignments, and Pledge Agreements, OMTC, Inc. and Dennis James Rogers II pledged certain assets to Funderz in the event they defaulted under the Notes and Guaranty Agreements.  As OMTC, Inc. and Dennis James Rogers II have unquestionably defaulted under the terms of the Notes and Guaranty

Agreements, Plaintiff seeks turnover of the collateral set forth in the Security Agreements, Collateral Assignments, and Pledge Agreements in compliance with their terms.

### VI. CONCLUSION AND REQUEST FOR RELIEF

For the reasons stated above, Funderz seek the following relief and requests that:

a.  Defendants be cited to appear and answer herein;

b.  Recovery from Defendants, jointly and severally, of actual and special damages within the jurisdictional limits of this Court, including recovery of pre-judgment interest at the contract rate from the date of default, October 15, 2019;

c.  Recovery from the OMTC Defendants, jointly and severally, of exemplary damages resulting from OMTC Defendants malice and fraud pursuant to Chapter 41 of the Texas Civil Practice & Remedies Code;

d.  Reasonable attorneys' fees, costs, and expenses incurred in bringing this action;

e.  Post-judgment interest as allowed by law; and

f.  Specific performance of the terms of the Settlement Agreement;

g.  Any and all such further and additional relief, whether at law or in equity, to which Funderz demonstrates itself entitled.

Respectfully submitted,

PADFIELD & STOUT, L.L.P.
420 Throckmorton Street, Suite 1210
Fort Worth, Texas 76102
817-338-1616 Phone
817-338-1610 Fax
mstout@padfieldstout.com
mdg@padfieldstout.com
bgibbons@padfieldstout.com

/s/ Mark W. Stout
Mark W. Stout
State Bar I.D. # 24008096
Matthew D. Giadrosich
State Bar I.D. # 24074274
Brandon J. Gibbons
State Bar I.D. #24082516

*Attorneys for Plaintiff*

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon all parties who have made an appearance herein by and through counsel via e-service.

/s/ Brandon J. Gibbons
Brandon J. Gibbons

# EXHIBIT KK

FILED
DALLAS COUNTY
8/19/2019 4:11 PM
FELICIA PITRE
DISTRICT CLERK
Marcus Turner

DC-19-12251

CAUSE NO. _____



| ANTHONY J. CAPANO and | § | IN THE DISTRICT COURT |
| JOANNE CAPANO, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | 192ND |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| PUSH START INDUSTRIES LLC and | § | |
| DENNIS ROGERS, INDIVIDUALLY, | § | |
| | § | |
| **Defendants.** | § | DALLAS COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs Anthony J. Capano (A. Capano) and Joanne Capano (J. Capano) (together "Plaintiffs" or "Capanos") complain of Defendants Push Start Industries LLC ("Push Start") and Dennis Rogers, individually ("Rogers") (together "Defendants") and would respectfully show the Court the following:

## I.
## DISCOVERY CONTROL PLAN & MONETARY RELIEF

1.      Discovery is intended to be conducted under Level 2, pursuant to Rule 190.3 of the Texas Rules of Civil Procedure. Plaintiffs reserve the right to request reassignment to a different discovery control plan level.

2.      Plaintiffs seek monetary relief over $200,000.00 but no more than $1,000,000.00.

## II.
## PARTIES

3.      Plaintiff Anthony J. Capano is an individual residing in Florida.

4.      Plaintiff Joanne Capano is an individual residing in Delaware.

5.      Push Start Industries LLC is a Texas limited liability company with its principal place of business in Dallas County, Texas. Push Start Industries LLC may be served with process

by serving its registered agent, United States Corporate Agents, Inc. at 9900 Spectrum Dr.,

Austin, Texas 78717, or wherever he may be found.

6.      Defendant Dennis Rogers is an individual who resides in Texas and may be

served with process at his residence, 7775 Firefall Way, Apt. 1614, Dallas, Texas 75230, or

wherever he may be found.

### III.
### JURISDICTION AND VENUE

7.      The Court has jurisdiction over the controversy because the damages are within

the jurisdictional limits of the Court.

8.      Pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code, venue

is proper in Dallas County, Texas because Push Start's principal place of business is in Dallas

County, Texas, and because Dennis Rogers resides in Dallas County, Texas. Further, venue is

proper in Dallas County, Texas pursuant to Section 15.005 of the Texas Civil Practice and

Remedies Code.

### IV.
### CONDITIONS PRECEDENT

9.      All conditions precedent to Plaintiffs' recovery against Defendants have been

fully performed, have occurred, or have been waived.

### V.
### FACTS

10.     A. Capano and/or J. Capano made four loans, in the form of promissory notes, to

Push Start to fund water rights deals. This lawsuit concerns the third and fourth promissory

notes. Push Start failed and refuses to pay the remaining balance on the third and fourth notes.

Through two guaranties, Rogers agreed to pay Push Start's debt on those notes, but has breached

those guaranties by failing and refusing to pay the past due balance as well.

**PLAINTIFFS' ORIGINAL PETITION**                                                          **PAGE 2**

## A.    The Second Note and Accompanying Guaranty.

11.    On or about November 30, 2017, Push Start, as borrower, executed the second promissory note made payable to the Capanos as lenders, in the principal amount of $500,000.00 ("Note 2"). A true and correct copy of Note 2 is attached as Exhibit A  and  is  incorporated  by reference for all purposes.

12.    On or about November 30, 2017, Rogers signed a personal guaranty pursuant to which Rogers unconditionally guaranteed the prompt payment and performance of every obligation of Push Start under Note 2 (the "Note 2 Guaranty"). A true and correct copy of the Note 2 Guaranty signed by Rogers is included in Exhibit A and incorporated herein by reference.

13.    The Capanos are the owners and holders of Note 2.

14.    Note 2 matured on January 22, 2018.

15.    Pursuant to Note 2 and accounting for credits, Push Start was to pay A. Capano $507,397.26 on or before January 22, 2018.

## B.    The Third Note.

16.    On or about March 1, 2018, Push Start, as borrower, executed the third promissory note made payable to A. Capano as lender, in the principal amount of $580,000.00 ("Note 3"). A true and correct copy of Note 3 is attached as Exhibit B and is incorporated by reference for all purposes.

17.    Note 3 was funded from rolling over the $507,397.26 balance of Note 2 to Note 3.

18.    Capano is the owner and holder of Note 3.

19.    Note 3 matured on May 31, 2018.

20.    Pursuant to Note 3 and accounting for credits, Push Start was to pay A. Capano $507,397.26, plus interest on or before May 31, 2018.

21.    Push Start defaulted on Note 3 by failing to pay all amounts due and owing on May 31, 2018.

**C.    The Fourth Note and Accompanying Guaranty.**

22.    On or about April 4, 2018, Push Start, as borrower, executed a fourth promissory note made payable to the Capanos, as lenders, in the principal amount of $393,680.00 ("Note 4"). A true and correct copy of Note 4 is attached as <u>Exhibit C</u> and is incorporated by reference for all purposes.

23.    Note 4 was funded, in part from $100,000.00 advanced by A. Capano and $293,680.00 rolled over from the principal balance of Note 3. Effectively, the principal due under Note 3 was reduced to $213,717.26 upon entry of Note 4.

24.    On or about April 4, 2018, Rogers signed a personal guaranty pursuant to which Rogers unconditionally guaranteed the prompt payment and performance of every obligation of Push Start under Note 4 (the "Note 4 Guaranty"). A true and correct copy of the Note 4 Guaranty signed by Rogers is included in <u>Exhibit C</u> and incorporated herein by reference.

25.    The Capanos are the owners and holders of Note 4 and the Guaranty.

26.    Note 4 matured on  May 31, 2018.

27.    Pursuant to Note 4, Push Start was to pay the Capanos $393,680.00, plus interest on or before May 31, 2018.

28.    Push Start defaulted on Note 4 by failing to pay all amounts due and owing on May 31, 2018.

**D.    Plaintiffs' Damages.**

29.    At maturity, there was a principal balance due on Note 3 in the amount of $213,717.26 and a principal balance due on Note 4 of $393,680.00 for a total principal balance

of $607,397.26. After Note 3 and Note 4 (together the "Notes") matured, A. Capano had numerous communications with Rogers about the outstanding debt.

30.    Rogers conceded the debt was due under both Note 3 and Note 4 and advised that he would wire money to pay back the debt.

31.    In August 2018, Defendants made a $200,000.00 payment toward the outstanding aggregate balance due and owing on the Notes.

32.    However, since then, no further payments have been made despite numerous assurances from Rogers.

33.    After application of all payments, offsets, and credits, the principal due under the Notes is $423,128.66.

**34.**    The Capanos demanded payment of all amounts due and owing on the Notes, including the principal balance of $423,128.66, plus all accrued but unpaid interest. Despite demand for payment, Defendants refused and continue to refuse to pay the amounts due and owing pursuant to the Notes.

## VI.
## CAUSE OF ACTION

### COUNT ONE: UNPAID NOTE – NOTE 3

35.    Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs set forth above.

36.    As set forth above, Push Start signed Note 3. A. Capano is the owner and holder of Note 3. Note 3 matured by its own terms on May 31, 2018. Despite demand, Push Start is in default under the Note 3, by failing to pay the principal due under Note 3, plus accrued but unpaid interest. Plaintiffs seek to recover damages against Push Start in the principal amount of

at least $29,448.66, plus accrued but unpaid interest as allowed under Note 3, as cured, and Texas law.

37.      Based on the failure of Push Start to pay the sums due under Note 3, despite demand, Plaintiffs seek damages against Push Start in excess of the minimum jurisdictional limit of this Court as alleged above.

## COUNT TWO: UNPAID NOTE – NOTE 4

38.      Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs set forth above.

39.      As set forth above, Push Start signed Note 4. The Capanos are the owners and holders of Note 4. Note 4 matured by its own terms on May 31, 2018. Despite demand, Push Start is in default under Note 4, by failing to pay the principal due under Note 4, plus accrued but unpaid interest. A. Capano seeks to recover damages against Push Start in the principal amount of at least $393,680.00, plus accrued but unpaid interest as allowed under Note 4, as cured, and Texas law.

40.      Based on the failure of Push Start to pay the sums due under Note 4, despite demand, Plaintiffs seeks damages against Push Start in excess of the minimum jurisdictional limit of this Court as alleged above.

## COUNT THREE: BREACH OF GUARANTIES – DENNIS ROGERS

41.      Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs set forth above.

42.      Rogers, individually, signed the Note 2 Guaranty and Note 4 Guaranty (collectively, the "Guaranties") in which he unconditionally guaranteed the prompt payment and performance of every obligation of Push Start to the Capanos under Note 2 and Note 4. Note 3

**PLAINTIFFS' ORIGINAL PETITION**                                                            **PAGE 6**

was funded by rolling the outstanding balance owed under Note 2 to Note 3. As detailed above, despite the Capano's demands, Push Start has failed to make payments due and owing under Note 3 and Note 4. Despite Capano's demand under the Guaranties for payment of the Notes, Rogers has breached the Guaranties by wrongfully failing and refusing to pay all amounts due on Note 3 and Note 4. As a result of Rogers' breach, A. Capano, as owner of the Guaranty, is owed the amount of at least $423,128.66, plus interest, attorneys' fees, costs, and expenses.

## COUNT FOUR: ATTORNEYS' FEES

43.    Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs set forth above.

44.    Plaintiffs previously presented Defendants with written demand for their claims. Despite demand, Defendants failed and refused to pay the balances due. As a result, Plaintiffs have been required to retain the law firm of Bell, Nunnally & Martin LLP to enforce Plaintiffs' rights and have agreed to pay the firm a reasonable fee for its services. Plaintiffs have incurred, and will continue to incur, reasonable attorneys' fees, which they seek to recover as damages from Defendants pursuant to the terms of the Notes, Section 38.001 of the Texas Civil Practice and Remedies Code, and Texas law.

## VII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Anthony J. Capano and Joanne Capano request that Defendants Push Start Industries LLC and Dennis Rogers, individually, be cited to appear and answer this Petition and that upon final hearing that Plaintiffs have judgment against Defendants Push Start Industries LLC and Dennis Rogers, individually, jointly and severally (as applicable), as follows:

a.  Damages related to Note 3 in the principal amount of $29,448.66, plus accrued but unpaid interest;

b.  Damages related to Note 4 in the principal amount of $393,680.00, plus accrued but unpaid interest;

c.  Pre- and post-judgment interest at the maximum rate allowed by the Notes, as cured, and Texas law;

d.  Reasonable attorneys' fees and expenses for pre-trial, trial, and any subsequent appeal and petitions for review;

e.  All costs of suit; and

f.  All such other and further relief, at law and in equity, to which Plaintiffs may be entitled in law or equity.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By: */s/ Sydnie A. Shimkus*
    Gwen I. Walraven
    State Bar No. 24047065
    gwalraven@bellnunnally.com
    Scott R. Larson
    State Bar No. 24097971
    slarson@bellnunnally.com
    Sydnie A. Shimkus
    State Bar No. 24093783
    sshimkus@bellnunnally.com

2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
Telephone: (214) 740-1409
Telecopy: (214) 740-1499

**ATTORNEYS FOR PLAINTIFFS
ANTHONY J. CAPANO AND
JOANNE CAPANO**

4652966_1.docx/11860.1

# EXHIBIT LL

CAUSE NO. DC-19-12251

| | | |
|---|---|---|
| ANTHONY J. CAPANO and | § | IN THE DISTRICT COURT |
| JOANNE CAPANO, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 192ND JUDICIAL DISTRICT |
| | § | |
| PUSH START INDUSTRIES LLC and | § | |
| DENNIS ROGERS, INDIVIDUALLY, | § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## ORDER GRANTING PLAINTIFFS' MOTION TO DISMISS WITH PREJUDICE

Came on for consideration Plaintiffs'. Motion to Dismiss With Prejudice (the "Motion").
The Court, having considered the Motion, is of the opinion that the Motion should be granted.  It
is, therefore,

**ORDERED** that the Motion is hereby granted.  It is further

**ORDERED** that this action is hereby dismissed with prejudice to the rights of Plaintiffs
Anthony J. Capano and Joanne Capano to re-file the action or any part of it at a later time.

SIGNED this __27__ day of _____, 2020.

_____
PRESIDING JUDGE

5246623_1.doc/11860.1

ORDER GRANTING PLAINTIFFS' MOTION TO DISMISS WITH PREJUDICE          SOLO PAGE

# EXHIBIT MM



# Texas Franchise Tax Public Information Report

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*

**This report MUST be signed and filed to satisfy franchise tax requirements**

Comptroller 05-102
of Public (Rev.9-11/30)
Accounts
FORM

■ **Tcode** 13196 Franchise

| ■ Taxpayer number | ■ Report year |
|---|---|
| 3 2 0 6 3 7 9 9 4 0 0 | 2 0 2 1 |

*You have certain rights under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381 or (512) 463-4600.*

| Taxpayer name | |
|---|---|
| ORGAN MOUNTAIN ENERGY LLC | |

| Mailing address | | | | Secretary of State (SOS) file number or Comptroller file number |
|---|---|---|---|---|
| 1920 MCKINNEY AVE FL 7 | | | | |
| City DALLAS | State TX | ZIP Code 75201 | Plus 4 | 0802724910 |

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office |
|---|
| Principal place of business |

Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

*Please sign below!*

3206379940021

**SECTION A**  Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | | m m d d y y |
|---|---|---|---|---|
| **DENNIS JAMES ROGERS II** | **MANAGING M** | ○ YES | Term expiration | |
| Mailing address 4144 N. CENTRAL EXPY., STE. 600 | City DALLAS | State TX | | ZIP Code 75204 |
| Name | Title | Director ○ YES | Term expiration | m m d d y y |
| Mailing address | City | State | | ZIP Code |
| Name | Title | Director ○ YES | Term expiration | m m d d y y |
| Mailing address | City | State | | ZIP Code |

**SECTION B**  Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C**  Enter the information required for each corporation or LLC, if any, that owns an interest of 10  percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

| Registered agent and registered office currently on file. *(see instructions if you need to make changes)* | ○ Blacken circle if you need forms to change the registered agent or registered office information. |
|---|---|
| Agent: **UNITED STATES CORPORATION AGENTS, INC.** | |

| Office: 9900 SPECTRUM DRIVE | City AUSTIN | State TX | ZIP Code 78717 |
|---|---|---|---|

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ | Dennis J Rogers | Title Electronic | Date 10-07-2021 | Area code and phone number ( 575 ) 649 - 5004 |
|---|---|---|---|---|

## Texas Comptroller Official Use Only

| VE/DE | ○ | PIR IND | ○ |
|---|---|---|---|

# EXHIBIT NN

FILED
DALLAS COUNTY
1/29/2019 11:27 AM
FELICIA PITRE
DISTRICT CLERK
JAVIER HERNANDEZ

DC-19-01434

CAUSE NO. _____

| | | |
|---|---|---|
| LUXEMBORG TRADING, LLC | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| vs. | § | I-162ND |
| | § | _____ JUDICIAL DISTRICT |
| | § | |
| ORGAN MOUNTAIN ENERGY LLC and | § | |
| DENNIS J. ROGERS, II, | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF LUXEMBORG TRADING, LLC'S
## ORIGINAL PETITION AND REQUESTS FOR DISCLOSURE

NOW COMES Plaintiff Luxemborg Trading, LLC ("Luxemborg"), and files its Original Petition against Defendants Organ Mountain Energy LLC ("Defendant Organ Mountain") and Dennis J. Rogers, II ("Defendant Rogers") (collectively, "Defendants"). In support thereof, Luxemborg shows the Court as follows. By this Original Petition, Luxemborg additionally serves Requests for Disclosure to Defendants pursuant to Texas Rule of Civil Procedure 194.

### Discovery Plan

1.      Pursuant to Texas Rule of Civil Procedure 190.4, Luxemborg intends to conduct discovery under a Level 3 Discovery Control Plan and hereby makes request for entry of an appropriate scheduling order. Pursuant to Texas Rule of Civil Procedure 47(c), Luxemborg states that the monetary amount in controversy exceeds $1,000,000.00. Pursuant to Texas Rule of Civil Procedure 169, this case is exempted from any expedited case management procedure.

### Parties

2.      Plaintiff Luxemborg Trading, LLC is a Texas limited liability company that appears in this action by and through its attorneys of record, Corey F. Wehmeyer and John W. Ellis, Santoyo Moore Wehmeyer P.C., 12400 San Pedro Avenue, Suite 300, San Antonio, Texas 78216.

3.      Defendant Organ Mountain Energy LLC is Texas limited liability company with its principal office located at 1920 McKinney Ave., Floor 7, Dallas, Texas 75201. It may be served with

process of this lawsuit by and through its registered agent, United States Corporation Agents, Inc., 9900 Spectrum Drive, Austin, Texas 78717.

4.     Defendant Dennis J. Rogers, II is an individual believed to reside in the State of Texas. He may be served with process of this lawsuit at his home address or wherever he may be found.

### Venue and Jurisdiction

5.     This Court has proper jurisdiction over the parties to and subject matter of this action. The amount in controversy is within the jurisdictional limits of the Court.

6.     Venue of this action is proper in Dallas County, Texas, pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code because Dallas County is the county in which all or a substantial part of the actions or omissions giving rise to the claim occurred.

### Factual Background

7.     This lawsuit has arisen as a result of (1) Defendants' refusal to return to Luxemborg the sum of $1,000,000.00, which Luxemborg paid as an up-front deposit for an order of ultra low sulfur diesel in August 2018 that was subsequently canceled, and (2) Defendants' subsequent breach of a settlement agreement that independently required them to return the $1,000,000.00 to Luxemborg.

**I.   Luxemborg's Payment of $1,000,000.00 for Diesel that it Never Received.**

8.     In July 2018, Luxemborg placed an order with Defendant Organ Mountain and Defendant Rogers for 1,050,000 gallons of ultra low sulfur diesel (ULSD).  The total cost for Luxemborg's ULSD purchase was $2,194,500.00, and Defendant Organ Mountain issued an invoice for this amount on July 27, 2018, being Invoice No. 002518.  A true and correct copy of Invoice No. 002518 is appended hereto as Exhibit A.[1]

---

[1] See page 9 hereof.

**PLAINTIFF LUXEMBORG TRADING, LLC'S**
**ORIGINAL PETITION AND REQUESTS FOR DISCLOSURE – PAGE 2**

9.      Thereafter, on August 7, 8, 9 and 10, 2018, Luxemborg made four separate wire transfers to Defendant Organ Mountain in the amounts of $310,000.00, $190,000.00, $350,000.00, and $150,000.00, respectively, for a total of $1,000,000.00 as a deposit to begin shipment of the ULSD. True and correct copies of the four wire transfer confirmations are appended hereto as Exhibit B.[2]

10.     On August 13, 2018 after receiving the wire transfers from Luxemborg totaling $1,000,000.00, Defendant Rogers, President of Defendant Organ Mountain, sent Luxemborg an acknowledgment of payment and notification that the ULSD would soon begin shipping.  The full text of Defendant Rogers's correspondence is as follows:

**Invoice Payment and Product Shipment:**

We have received the down payment for toward [sic] the invoice number listed above [002518] in the amount of $1 million dollars and we have begun our process of ordering the requested fuel.  This process can typically take between 5 to 7 business days to complete and to have it ready for pickup in the TransMontaigne terminal.  One day prior to loading the product, we will provide you with all the proper documentation (COA, ETA, ETC) and begin to clear your carriers.

We appreciate your business!

Sincerely,

Dennis Rogers,
President Organ Mountain Energy, LLC

A true and correct copy of the above correspondence from Defendant Rogers is appended hereto as Exhibit C.[3]

11.     Approximately one month passed, but Defendants never shipped or otherwise made available any of the ULSD for which Luxemborg had paid $1,000,000.00.  Luxemborg engaged counsel in mid-September and sent notice to Defendants that the diesel order was being canceled, and

---

[2] See page 11 hereof.
[3] See page 16 hereof.

**PLAINTIFF LUXEMBORG TRADING, LLC'S**
**ORIGINAL PETITION AND REQUESTS FOR DISCLOSURE – PAGE 3**

to please return the $1,000,000.00 to Luxemborg.  A copy of that notice of cancelation is attached hereto as Exhibit D.[4]

      12.     Defendant Rogers agreed to return the $1,000,000.00 to Luxemborg on the condition that Luxemborg executed a release of claims to Defendant Rogers and Defendant Organ Mountain.

## II.  Execution of a Settlement Agreement Requiring Return of the $1,000,000.00 to Luxemborg.

      13.     Effective as of October 24, 2018, Luxemborg and Defendants entered into a formal Settlement Agreement and Mutual Release (the "Settlement Agreement").  A true and correct copy of the Settlement Agreement is appended hereto as Exhibit E.[5]

      14.     In the Settlement Agreement, all parties agreed that the diesel order (Invoice No. 002518) had been canceled, and that Defendants would return Luxemborg's $1,000,000.00 within fourteen (14) days of the Settlement Agreement's effective date of October 24, 2018.  The Settlement Agreement also contained mutual releases from Luxemborg and Defendants to one another, but the releases each expressly provided that "**[a]ny claims arising from** fraud, conversion, and/or **a breach of this Settlement Agreement are specifically excluded from this release**." (Emphasis added).

      15.     Luxemborg complied with all of its obligations under the Settlement Agreement, and in accordance with the terms of the same, Defendants were required to pay $1,000,000.00 to Luxemborg by 14 days from October 24, 2018, being November 7, 2018.  The Settlement Agreement further explicitly acknowledged that the $1,000,000.00 was "owed by [Defendant] Organ Mountain **and** [Defendant] Rogers." (Emphasis added).

## III.  Defendants' Breach of the Settlement Agreement.

      16.     November 7, 2018 passed without Defendants making their required $1,000,000.00 payment to Luxemborg.  To date, Defendants have failed and refused to pay the $1,000,000.00 they

---

[4] See page 18 hereof.
[5] See page 21 hereof.

**PLAINTIFF LUXEMBORG TRADING, LLC'S
ORIGINAL PETITION AND REQUESTS FOR DISCLOSURE – PAGE 4**

owe to Luxemborg under the terms of the Settlement Agreement, with no justification for their breach.

17.    Luxemborg now brings this lawsuit to recover its $1,000,000.00, along with all available interest and attorneys' fees.

18.    All conditions precedent to Luxemborg's maintenance of this action have occurred, been performed, or been waived, and proper presentment has been made.

### Causes of Action

*Breach of Contract (Breach of the Settlement Agreement)*

19.    The paragraphs set forth above are incorporated here by reference.

20.    The Settlement Agreement constitutes a valid and binding contract between Defendants on the one hand, and Luxemborg on the other hand.  In the Settlement Agreement, Defendants agreed that they owed, and would pay, Luxemborg the sum of $1,000,000.00 by November 7, 2018. Luxemborg fully performed all of its obligations under the Settlement Agreement. However, Defendants breached the Settlement Agreement by refusing to make the $1,000,000.00 payment to Luxemborg as required.  As a direct result of Defendants' breach, Luxemborg has suffered actual damages, including, without limitation, the $1,000,000.00 payment Luxemborg never received from Defendants.  Defendants are jointly and severally liable for these damages.

21.    Pursuant to Section 38.001(8) of the Texas Civil Practice and Remedies Code, Luxemborg additionally seeks recovery of its reasonable attorneys' fees incurred as a result of Defendants' breaches of the Settlement Agreement.

*Breach of Contract (Breach of the Agreement to Provide Diesel)*

22.    The paragraphs set forth above are incorporated here by reference.

23.    Pleading additionally and/or in the alternative, Luxemborg paid $1,000,000.00 to Defendants for an equivalent volume of ULSD.  Defendants acknowledged receipt of Luxemborg's

payment and agreed to provide the ULSD. This constituted a valid contract between Luxemborg and Defendants, and Luxemborg performed all of its obligations under that contract. Defendants, however, breached the contract by failing to furnish the ULSD, but keeping Luxemborg's $1,000,000.00 without justification. As a direct result of Defendants' breach, Luxemborg has suffered actual damages, including, without limitation, the $1,000,000.00 sum that Defendants have never returned to Luxemborg. Defendants are jointly and severally liable for these damages.

24.     Pursuant to Section 38.001(8) of the Texas Civil Practice and Remedies Code, Luxemborg additionally seeks recovery of its reasonable attorneys' fees incurred as a result of Defendants' breaches.

*Unjust Enrichment/Money Had and Received*

25.     The paragraphs set forth above are incorporated here by reference.

26.     Pleading additionally and/or in the alternative, Defendants received and still hold $1,000,000.00 to which they are not entitled. Defendants received the $1,000,000.00 in exchange for their agreement to provide ULSD to Luxemborg, an agreement they never fulfilled. The $1,000,000.00 being wrongfully held by Defendants belongs to Luxemborg in equity and good conscience, and it should be returned by Defendants. Luxemborg seeks equitable relief requiring Defendants to return the $1,000,000.00 to Luxemborg.

## Demand for Jury Trial

27.     Luxemborg hereby makes written demand for a trial by jury and contemporaneously herewith pays the requisite fee. Request is made that the cause be set on the Court's jury docket and that the Clerk make notation of payment of fee on the Court's docket sheet.

## Requests for Disclosure

28.     Pursuant to Texas Rule of Civil Procedure 194.2, Luxemborg serves Requests for Disclosure to Defendants. Defendants shall separately disclose to counsel for Luxemborg, not later

**PLAINTIFF LUXEMBORG TRADING, LLC'S**
**ORIGINAL PETITION AND REQUESTS FOR DISCLOSURE – PAGE 6**

than thirty (30) days after service of this Original Petition and Requests for Disclosure, the information and material described in Texas Rule of Civil Procedure 194.2. TEX. R. CIV. P. 194.3(a). Such disclosure shall include Defendants' production of all relevant documents and tangible things as mandated by Texas Rule of Civil Procedure 194.4.

## **Prayer**

WHEREFORE, PREMISES CONSIDERED, Luxemborg prays that Defendants be cited to appear herein and that Luxemborg be awarded the following relief against Defendants:

A.   All actual, special, and consequential damages as pled for herein;

B.   All reasonable and necessary attorneys' fees, including contingent fees through the Court of Appeals and the Supreme Court of Texas;

C.   All costs of court;

D.   Pre-judgment and post-judgment interest on the foregoing amounts at the highest rate permitted by law; and

E.   All such other and further relief, general and special, at law and in equity, to which Luxemborg may be justly entitled.

Respectfully submitted,

SANTOYO MOORE WEHMEYER P.C.
IBC Highway 281 North Centre Building
12400 San Pedro Avenue, Suite 300
San Antonio, Texas 78216
Telephone: 210-920-9459
Facsimile: 210-920-9490


By:  _/s/ John W. Ellis_____
    Corey F. Wehmeyer
    State Bar No. 24051903
    _cwehmeyer@smwenergylaw.com_
    Benjamin Robertson
    State Bar No. 24083748
    _brobertson@smwenergylaw.com_
    John W. Ellis
    State Bar No. 24087467
    _jellis@smwenergylaw.com_

**ATTORNEYS FOR PLAINTIFF
LUXEMBORG TRADING, LLC**

# EXHIBIT OO

CAUSE NO. DC-19-01434

| | | |
|---|---|---|
| LUXEMBORG TRADING, LLC, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| vs. | § | 162nd JUDICIAL DISTRICT |
| | § | |
| ORGAN MOUNTAIN ENERGY LLC and | § | |
| DENNIS J. ROGERS, II, | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## AGREED ORDER OF DISMISSAL WITH PREJUDICE

Plaintiff Luxemborg Trading, LLC and Defendants Organ Mountain Energy LLC and Dennis J. Rogers, II previously filed their All Parties' Agreed Joint Motion to Dismiss with Prejudice (the "Motion to Dismiss"). The Court, having reviewed the Motion to Dismiss and confirmed all Parties' agreement to same as evidenced by the signatures of their counsel, finds that the Parties' Motion to Dismiss has merit and should be, and is in all things, **GRANTED**.

It is therefore, **ORDERED, ADJUDGED, AND DECREED** that all claims between Plaintiff Luxemborg Trading, LLC and Defendants Organ Mountain Energy LLC and Dennis J. Rogers, II in the above-entitled and numbered cause are dismissed with prejudice, with costs of court being assessed against the party incurring same. This Agreed Order of Dismissal with Prejudice resolves and dismisses all claims between all Parties and is final and appealable. This case is hereby ordered removed from the Court's docket.

Signed this **22** day of **October** 2019.

_____
DISTRICT JUDGE PRESIDING

AGREED ORDER OF DISMISSAL WITH PREJUDICE – PAGE 1

AGREED AS TO FORM AND SUBSTANCE:

SANTOYO WEHMEYER P.C.
IBC Highway 281 North Centre Building
12400 San Pedro Avenue, Suite 300
San Antonio, Texas 78216
Telephone: 210-998-4200
Facsimile: 210-998-4201

By: _____
    Corey F. Wehmeyer
    State Bar No. 24051903
    *cwehmeyer@swenergylaw.com*

**ATTORNEY FOR PLAINTIFF
LUXEMBORG TRADING, LLC**


MCCATHERN, PLLC
Regency Plaza
3710 Rawlins, Suite 1600
Dallas, Texas 75219

By: _____
    Brett M. Chisum
    *bchisum@mccathernlaw.com*
    State Bar No. 24082816

**ATTORNEY FOR DEFENDANTS
DENNIS J. ROGERS, II AND
ORGAN MOUNTAIN ENERGY LLC**

AGREED ORDER OF DISMISSAL WITH PREJUDICE – PAGE 2

# EXHIBIT PP

FILED
10/16/2020 1:00 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
JAVIER HERNANDEZ DEPUTY

DC-20-17073

NO. _____

| | | |
|---|---|---|
| CLARK HODGES, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| BOOTSTRAP VENTURES, LLC | § | |
| and DENNIS ROGERS, | § | |
| | § | 160TH |
| | § | |
| Defendants. | § | ____JUDICIAL DISTRICT |

**PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE**

Plaintiff Clark Hodges files this Original Petition, complaining of Defendants Bootstrap Ventures, LLC and Dennis Rogers and would show the following:

**DISCOVERY CONTROL PLAN AND RULE 47 DISCLOSURE**

1.     Discovery is intended to be conducted under Level 2 of Texas Rule of Civil Procedure 190. Pursuant to Texas Rule of Civil Procedure 47, this case involves causes of action based on notes and guarantees and causes of action for fraud in connection with the transactions giving rise to the referenced instruments.

2.     The damages sought are within the jurisdictional limits of the court. Plaintiff seeks monetary relief over $200,000.00 but not more than $1,000,000.00, and Plaintiff demands all other relief to which he may be entitled.

**PARTIES**

3.     Clark Hodges is an individual who resides in Collin County, Texas ("Plaintiff" or "Hodges"), and his current business address is 2905 Maple Avenue, Dallas, Texas 75201. The last three numbers of Hodges' Texas driver's license number are 637; and the last three numbers of his social security number are 779.

**PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE - Page 1 of 9**

Copy from re:SearchTX

4.      Bootstrap Ventures LLC ("Bootstrap Ventures") is a Texas limited liability company with its principal office in Texas located in Dallas County. Bootstrap Ventures may be served with process by serving its registered agent for service, United States Corporation Agents, Inc. at 9900 Spectrum Drive, Austin, Texas 78717.

5.      Dennis Rogers ("Rogers") is an individual who resides in Dallas County, Texas, and who may be served with process at 6520 Del Norte Lane, Dallas, Texas 75225 or as he may be found in Dallas County.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action in that the amount in controversy is in within the jurisdictional limits of the Court. Venue is proper in Dallas County, Texas pursuant to Section 15.002 of the Texas Civil Practice and Remedies Code in that it is the county in which a substantial part of the events or omissions giving rise to the claims occurred, it is the county of Rogers' residence at the time the cause of action accrued, and it is the county of Bootstrap Ventures' principal office in Texas.

## BACKGROUND FACTS

7.      Upon information and belief, at least as represented by Defendants, Bootstrap Ventures is in the business of buying and selling water rights.

8.      Rogers, on behalf of Bootstrap Ventures, approached Hodges about Hodges making a short-term loan to Bootstrap Ventures in order to facilitate a water rights transaction involving Bootstrap Ventures. Rogers represented that the proceeds of the loan were simply needed for a matter of days until the transaction was closed and that, upon closing the transaction, the loan immediately would be repaid. Additionally, Rogers represented that he would guarantee repayment of the loan.

**PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE - Page 2 of 9**

9.    In reliance on Bootstrap Ventures and Rogers' representations, on or about September 25, 2020, Hodges loaned Bootstrap Ventures the principal sum of $100,000.00, which was to be repaid on or before October 2, 2020 (the "First Loan"). In connection with the First Loan, Bootstrap Ventures executed a Promissory Note, dated September 25, 2020, payable to Hodges in the principal sum of $100,000.00 with a maturity date of October 2, 2020 (the First Note").

10.    Rogers guaranteed repayment of principal and interest under the First Note (the "First Guarantee").

11.    On or about September 29, 2020, Rogers approached Hodges about the prospect of a second loan in the amount of $50,000.00 on similar terms as the First Loan, and Rogers made the same representations concerning the circumstances of the second loan that he made in connection with the First Loan.

12.    In reliance on Bootstrap Ventures and Rogers' representations, on or about September 29, 2020, Hodges loaned Bootstrap Ventures the principal sum of $50,000.00, which was to be repaid on or before October 9, 2020 (the "Second Loan," together with the First Loan, the "Loans"). In connection with the Second Loan, Bootstrap Ventures executed a Promissory Note, dated September 29, 2020, payable to Hodges in the principal sum of $50,000.00 with a maturity date of October 9, 2020 (the "Second Note," together with the First Note, the "Notes").

13.    Rogers guaranteed repayment of principal and interest under the Second Note (the "Second Guarantee," together with the First Guarantee, the "Guarantees").

14.    Both Notes have matured, but neither Bootstrap Ventures nor Rogers has paid the amounts owed under either the First Note or the Second Note.

**PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE - Page 3 of 9**

Copy from re:SearchTX

15.     Despite demand, Defendants have failed to pay the amounts owed under the Notes.

16.     Upon information and belief, Bootstrap Ventures was not engaged in a transaction or transactions that necessitated a need for either of the Loans as represented, and the representations Rogers made in connection with the Loans were untrue.

## CONDITIONS PRECEDENT

17.     All conditions precedent to Plaintiff's recovery have occurred, have been performed, are excused, waived, or otherwise satisfied.

## COUNT ONE – ACTION TO ENFORCE NOTE (First Note)

18.     Hodges incorporates by reference his allegations in paragraphs 1 through 17 as though fully set forth herein.

19.     Hodges seeks to enforce the terms of the First Note through a judgment that compels Bootstrap Ventures to pay the amounts owed for principal and accrued but unpaid interest, plus other fees or expenses permitted under the First Note.

## COUNT TWO – BREACH OF CONTRACT UNDER NOTE (First Note)

20.     Hodges incorporates by reference his allegations in paragraphs 1 through 19 as though fully set forth herein.

21.     Bootstrap Ventures has breached the First Note by failing to pay the amounts owed under the First Note. As a result of Bootstrap Ventures' breaches, Hodges has suffered damages. Hodges seeks to recover his damages against Bootstrap Ventures.

## COUNT THREE – ACTION TO ENFORCE GUARANTEE (First Guarantee)

22.     Hodges incorporates by reference his allegations in paragraphs 1 through 21 as though fully set forth herein.

**PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE - Page 4 of 9**

Copy from re:SearchTX

23.    Hodges seeks to enforce the terms of the First Guarantee through a judgment that compels Rogers to pay the amounts required by the First Guarantee in accordance with its terms.

## COUNT FOUR – BREACH OF CONTRACT (First Guarantee)

24.    Hodges incorporates by reference his allegations in paragraphs 1 through 23 as though fully set forth herein.

25.    Rogers has breached the First Guarantee by failing to pay the amounts owed under it. As a result of Rogers' breach, Hodges has suffered damages. Hodges seeks to recover its damages against Rogers.

## COUNT FIVE – ACTION TO ENFORCE NOTE (Second Note)

26.    Hodges incorporates by reference his allegations in paragraphs 1 through 25 as though fully set forth herein.

27.    Hodges seeks to enforce the terms of the Second Note through a judgment that compels Bootstrap Ventures to pay the amounts owed for principal and accrued but unpaid interest, plus other fees or expenses permitted under the Second Note.

## COUNT SIX – BREACH OF CONTRACT UNDER NOTE (Second Note)

28.    Hodges incorporates by reference his allegations in paragraphs 1 through 27 as though fully set forth herein.

29.    Bootstrap Ventures has breached the Second Note by failing to pay the amounts owed under the Second Note. As a result of Bootstrap Ventures' breach, Hodges has suffered damages. Hodges seeks to recover his damages against Bootstrap Ventures.

## COUNT SEVEN – ACTION TO ENFORCE GUARANTEE (Second Guarantee)

30.    Hodges incorporates by reference his allegations in paragraphs 1 through 29 as though fully set forth herein.

**PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE - Page 5 of 9**

Copy from re:SearchTX

*Ex. Pg. 514*

31.     Hodges seeks to enforce the terms of the Second Guarantee through a judgment that compels Rogers to pay the amounts required by the Second Guarantee in accordance with its terms.

## COUNT EIGHT – BREACH OF CONTRACT (Second Guarantee)

32.     Plaintiff incorporates by reference his allegations in paragraphs 1 through 31 as though fully set forth herein.

33.      Rogers has breached the Second Guarantee by failing to pay the amounts owed under it. As a result of Rogers' breach, Plaintiff has suffered damages. Plaintiff seeks to recover its damages against Rogers.

## COUNT NINE – FRAUDULENT REPRESENTATION OF INTENT TO PERFORM

34.     Plaintiff incorporates by reference his allegations in paragraphs 1 through 33 as though fully set forth herein.

35.     Rogers on behalf Bootstrap Ventures and Rogers, individually, falsely represented to Hodges that Bootstrap Ventures intended to perform its obligations under the Notes and that Rogers intended to perform his respective obligations under the Guarantees, including timely repayment of the amounts owed under the loans.

36.     Bootstrap Ventures and Rogers knew these representations were false, and Defendants made the representations with the intent that Hodges would rely and act upon them. Hodges did, in fact, rely on the representations, and such reliance was justifiable

37.     Hodges is entitled to his actual damages against each Defendant.

38.     Hodges is entitled to an award of exemplary damages as to each Defendant as a result of Defendants' fraud and because they acted with malice and gross negligence.

Copy from re:SearchTX

*Ex. Pg. 515*

## COUNT TEN – FRAUDULENT INDUCEMENT

39.    Plaintiff incorporates by reference his allegations in paragraphs 1 through 38 as though fully set forth herein

40.    Rogers and Bootstrap Ventures, through Rogers, represented that the loans were needed short-term in order to complete pending transactions which, when closed, would generate the proceeds for repayment, and that the closing, or closings, of the transactions were imminent and would occur well before the maturity dates of the Notes. Upon information belief, each of these representations was false.

41.    Rogers and Bootstrap Ventures knew these representations were false, and Defendants made the representations with the intent that Hodges would rely and act upon them. Hodges did in fact rely on the representations, and such reliance was justifiable

42.    Hodges is entitled to his actual damages against each Defendant.

43.    Hodges is entitled to an award of exemplary damages as to each Defendant as a result of Defendants' fraud and because they acted with malice and gross negligence.

## COUNT ELEVEN – ATTORNEYS' FEES, EXPERT FEES, AND EXPENSES

44.    Plaintiff incorporates by reference his allegations in paragraphs 1 through 43 as though fully set forth herein.

45.    Plaintiff has retained the law firm of Reese Marketos LLP to enforce the Notes and the Guarantees.  Pursuant to the referenced instruments and Chapter 38 of the Texas Civil Practices and Remedies Code, Plaintiff seeks to recover his attorneys' fees in connection with the defaults under the Notes and the Guarantees and in connection with enforcing these instruments. Plaintiff is entitled to recover the reasonable attorneys' fees, court costs, and other expenses as permitted under the referenced instruments and in connection with pursuing the

**PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE - Page 7 of 9**

Copy from re:SearchTX

claims against Defendants. Further under the instruments, Plaintiff is entitled to expert witness fees and costs.

## REQUEST FOR DISCLOSURE

46.     Pursuant to the Texas Rules of Civil Procedure, Plaintiff requests that Defendants disclose the information and materials described in Texas Rule of Civil Procedure 194.2 within the time period specified in the rules.

## PRAYER

47.     Plaintiff Clark Hodges requests that Defendants Bootstrap Ventures, LLC and Dennis Rogers be cited to appear and answer and that, upon final trial, Plaintiff have judgment against Defendants for:

i.    All principal, interest, and other amounts owed under the Notes and Guarantees described herein in an amount within the jurisdictional limits of this Court;

ii.   All compensatory, actual, and incidental damages in an amount within the jurisdictional limits of this Court;

iii.  Punitive and exemplary damages;

iv.   Attorneys' fees, expert witness fees, and all costs;

v.    Costs of court;

vi.   Pre-judgment and post-judgment interest as permitted by Texas law; and

vii.  Such other and further relief to which Plaintiff may be entitled.

**PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE - Page 8 of 9**

Copy from re:SearchTX

Dated:  November 16, 2020.

Respectfully submitted,

**REESE MARKETOS LLP**

By: _____

Bradley M. Gordon
State Bar No. 00784150
brad.gordon@rm-firm.com
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3201
214.382.9810 telephone
214.501.0731 facsimile

**ATTORNEYS FOR PLAINTIFF
CLARK HODGES**

Copy from re:SearchTX

*Ex. Pg. 518*

# EXHIBIT QQ

NO. DC-20-17073

| | | |
|---|---|---|
| CLARK HODGES, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | DALLAS COUNTY, TEXAS |
| BOOTSTRAP VENTURES, LLC and | § | |
| DENNIS ROGERS, | § | |
| | § | |
| Defendants. | § | 160th JUDICIAL DISTRICT |

## AGREED FINAL ORDER OF DISMISSAL WITH PREJUDICE

Before the Court is the Agreed Final Order of Dismissal with Prejudice. Plaintiff has requested the dismissal of his claims as set forth herein, and Defendants have agreed to the relief. Accordingly, the Court is of the opinion that the relief in this order should be granted. It is therefore

ORDERED, ADJUDGED, AND DECREED that Plaintiff's claims in this case are dismissed with prejudice. It is further

ORDERED, ADJUDGED, AND DECREED that any court costs shall be paid by the party incurring it.

This order finally disposes of all parties and all claims and is appealable.

SIGNED this _____ day of February, 2021.

_____
JUDGE PRESIDING

AGREED:

REESE MARKETOS LLP

By: _(signature)_

Bradley M. Gordon
State Bar No. 00784150
brad.gordon@rm-firm.com

750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3201
214.382.9810 telephone
214.501.0731 facsimile

**ATTORNEYS FOR PLAINTIFF
CLARK HODGES**

McCATHERN, PLLC

By: _Brett Chisum_

Brett M. Chisum
State Bar No. 24082816
bchisum@mccathernlaw.com
Salvador J. Robles
State Bar No. 24121800
srobles@mccathernlaw.com

3710 Rawlins St., Suite 1600
Dallas, Texas 75219
214.741.2662 telephone
214.741.4717 facsimile

**ATTORNEYS FOR DEFENDANTS
BOOTSTRAP VENTURES, LLC and
DENNIS ROGERS**

AGREED FINAL ORDER OF DISMISSAL WITH PREJUDICE – Page 2 of 2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Ann Hall on behalf of Bradley Gordon
Bar No. 784150
ann.hall@rm-firm.com
Envelope ID: 50470401
Status as of 2/9/2021 3:08 PM CST

Associated Case Party: CLARK HODGES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Bradley M.Gordon | | brad.gordon@rm-firm.com | 2/8/2021 6:02:24 PM | SENT |

Associated Case Party: BOOTSTRAP VENTURES, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| McCathern Receptionist | | receptionist@mccathernlaw.com | 2/8/2021 6:02:24 PM | SENT |
| Emily Snow | | esnow@mccathernlaw.com | 2/8/2021 6:02:24 PM | SENT |
| Brett Chisum | | bchisum@mccathernlaw.com | 2/8/2021 6:02:24 PM | SENT. |
| Kayla Damron | | kayladamron@mccathernlaw.com | 2/8/2021 6:02:24 PM | SENT |
| Salvador Robles | | srobles@mccathernlaw.com | 2/8/2021 6:02:24 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Bradley M. Gordon | 784150 | brad.gordon@rm-firm.com | 2/8/2021 6:02:24 PM | SENT |